# EXHIBIT D

No. 20-542

# In the Supreme Court of the United States

REPUBLICAN PARTY OF PENNSYLVANIA,
*Petitioner*

*v.*

KATHY BOOCKVAR, IN HER OFFICIAL CAPACITY AS
SECRETARY OF PENNSYLVANIA, *ET AL.*,
*Respondents*

ON PETITION FOR WRIT OF CERTIORARI TO
THE SUPREME COURT OF PENNSYLVANIA

## BRIEF IN OPPOSITION TO
## PETITION FOR CERTIORARI

JOSH SHAPIRO
*Attorney General
of Pennsylvania*

J. BART DELONE
*Chief Deputy Attorney General
Appellate Litigation Section
Counsel of Record*

Office of Attorney General        HOWARD G. HOPKIRK
15th Floor                        CLAUDIA M. TESORO
Strawberry Square                 SEAN A. KIRKPATRICK
Harrisburg, PA 17120              *Sr. Deputy Attorneys General*
(717) 712-3818
jdelone@attorneygeneral.gov       MICHAEL J. SCARINCI
                                  DANIEL B. MULLEN
                                  *Deputy Attorneys General*

i

## QUESTIONS PRESENTED

Before the 2020 Presidential election—in light of the exigencies induced by the COVID-19 pandemic and slowdowns in the operation of the United States Postal Service—the Pennsylvania Supreme Court held that the Pennsylvania Constitution required a one-time, three-day extension of the "received-by" date for mail-in ballots. Fewer than 10,000 ballots were received during those three days. Pennsylvania has since certified its election results. There is no federal election in Pennsylvania whose outcome would be altered if those ballots were counted. Petitioner, a state political party, asserts that the Pennsylvania Supreme Court's decision violates the Elections Clause, U.S. Const. art. I, § 4, cl. 1, the Electors Clause, U.S. Const. art. II, § 1, cl. 2, and federal statutes establishing Election Day.

I.    Whether Petitioner's claims are moot.

II.   Whether Petitioner, a state political party, has Article III standing to pursue its claims under the Elections and Electors Clauses.

III.  Whether the Elections and Electors Clauses forbid the Pennsylvania Supreme Court's state law remedy for a state statute's as-applied violation of the state constitution.

IV.   Whether the Pennsylvania Supreme Court's remedy, which did not alter the statutory deadline for casting a ballot, violated federal statutes establishing a uniform federal Election Day.

ii

## PARTIES TO THE PROCEEDING

Petitioner is the Pennsylvania Republican Party (Petitioner). Respondent is the Secretary of the Commonwealth, Kathy Boockvar. Also respondents, but separately represented, are all 67 Pennsylvania County Boards of Elections and the Pennsylvania Democratic Party.

iii

# TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED ..........................................i

PARTIES TO THE PROCEEDING...........................ii

INTRODUCTION .......................................................1

OPINIONS BELOW......................................................2

STATEMENT OF THE CASE.....................................3

   A. Mail-in Voting under the Pennsylvania Election Code.....................................................3

   B. Letter from the United States Postal Service...3

   C. *Pennsylvania Democratic Party v. Kathy Boockvar*, 238 A.3d 345 (Pa. 2020) ...................4

   D. 2020 General Election ......................................7

REASONS FOR DENYING THE WRIT .....................7

I.  Petitioner's Claims are Moot. ..................................8

II. The Court Should Not Grant Review of Petitioner's Constitutional Claims.......................11

   A. Petitioner Lacks Article III Standing to Advance Their Constitutional Claims.............11

   B. This Case is a Poor Vehicle to Address the Federal Constitutional Claims ........................13

   C. The Pennsylvania Supreme Court's Ruling was Entirely Consistent with the Elections and Electors Clauses' History, Structure, and Text, As Well As This Court's Decisions Concerning Those Clauses ...............................16

III. The Court Should Not Grant Review of Petitioner's Federal Statutory Claims ..............25

CONCLUSION...........................................................28


Attachment 1 – Letter from USPS's General Counsel
Attachment 2 – Certification of Presidential Election
                        Results
Attachment 3 -  Certificate of Ascertainment

Case 2:20-cv-01831-NR   Document 45-5   Filed 12/21/20   Page 7 of 50

v

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Already, LLC v. Nike, Inc.*,
 __ U.S.__, 133 S. Ct. 721 (2013) ...............................8

*Alvarez v. Smith*,
 558 U.S. 87 (2009)....................................................8

*Anderson v. Celebrezze*,
 460 U.S. 780 (1983)...................................................9

*Arizona State Legislature v. Arizona Independent
 Redistricting Commission*,
 576 U.S. 787 (2015) (*AIRC*) ....................1, 20, 21, 22

*Bank Markazi v. Peterson*,
 __ U.S. __ , 136 S. Ct. 1310 (2016)..........................18

*Bognet v. Sec'y Commonwealth of Pennsylvania*,
 __ F.3d__, 2020 WL 6686120 (3d Cir. Nov. 13,
 2020) ........................................................................12

*Bush v. Gore*,
 531 US 98 (2000)................................................23, 24

*Bush v. Palm Beach Cty. Canvassing Bd.*,
 531 U.S. 70 (2000)...................................................23

*Carson v. Simon*,
 978 F.3d 1051 (8th Cir. 2020)..................................12

*Chase v. Lujan*,
 149 P.2d 1003 (N.M. 1944) .....................................22

*Commonwealth of Pennsylvania v. DeJoy,*
  CV 20-4096, 2020 WL 5763553 (E.D. Pa. Sept.
  28, 2020) ....................................................................4

*Crossey v. Boockvar,*
  108 MM 2020 (Pa.)..................................................13

*DeFunis v. Odegaard,*
  416 U.S. 312 (1974)..................................................9

*Democratic National Comm. v. Bostelmann,*
  __ F.3d __, 2020 WL 5796311 (7th Cir. Sept. 29,
  2020) ........................................................................12

*Democratic National Comm. v. Wisconsin State
  Legislature,*
  No. 20A66 (Oct. 26, 2020) ......................................24

*Ex parte Siebold,*
  100 U.S. 371 (1879)................................................26

*Fed. Election Commn. v. Wisconsin Right To Life,*
  Inc., 551 U.S. 449 (2007)...........................................9

*Florida v. Powell,*
  559 U.S. 50 (2010)..................................................25

*Foster v. Love,*
  522 U.S. 67 (1997)..................................................26

*In re Bruno,*
  101 A.3d 635 (Pa. 2014) ...........................................5

*In re General Election-1985,*
  531 A.2d 836 (Pa. Cmwlth. 1987)......................1, 15

*In re Luzerne Cty. Return Bd.,*
  290 A.2d 108 (Pa. 1972) .........................................15

*In re Opinion of the Justices*,
 107 A. 705 (Me. 1919) ..............................................22

*In re: Extension of Time for Absentee and Mail-In*
 *Ballots to be Received by Mail and Counted in*
 *the 2020 Primary Election*,
 No. 2020-003416 (C.P. Delaware) ...........................5

*Kingdomware Techs., Inc. v. United States*,
 __ U.S.__, 136 S. Ct. 1969 (2016) ............................9

*Lance v. Coffman*,
 549 U.S. 437 (2007) (per curiam) ...........................11

*League of Women Voters v. Commonwealth*,
 178 A.3d 737 (Pa. 2018) ..................................passim

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992).............................................11, 12

*McPherson v. Blacker*,
 146 U.S. 1 (1892)................................................20, 21

*Murphy v. Hunt*,
 455 U.S. 478 (1982).................................................10

*N.L.R.B. v. Noel Canning*,
 573 U.S. 513 (2014).................................................27

*Ohio ex rel. Davis v. Hildebrant*,
 241 U.S. 565 (1916)............................................20, 21

*Palm Beach Cty. Canvassing Bd. v. Harris*,
 772 So. 2d 1273 (Fla. 2000) ...................................23

*Pennsylvania Democratic Party v. Boockvar*,
 238 A.3d 345 (Pa. 2020)...........................................2

viii

*Rotkiske v. Klemm,*
  __U.S.__, 140 S. Ct. 355 (2019) .............................27

*Rucho v. Common Cause,*
  __U.S.__, 139 S.Ct. 2484 (2019) ........................24, 25

*Seila Law LLC v. Consumer Financial Protection
  Bureau,* __ U.S.__, 140 S.Ct. 2183 (2020) .........16, 17

*Smiley v. Holm,*
  285 U.S. 355 (1932)........................................passim

*Spokeo, Inc. v. Robins,*
  __U.S.__, 136 S. Ct. 1540 (2016) ............................11

*Storer v. Brown,*
  415 U.S. 724 (1974)...................................................9

*U.S. Term Limits, Inc. v. Thornton,*
  514 U.S. 779 (1995)..................................................19

*U.S. v. Johnston,*
  268 U.S. 220 (1925)..................................................14

*United States v. Booker,*
  543 U.S. 220 (2000)..................................................15

## Constitutional Provisions

U.S. Const. art. I, § 4....................................................... i
U.S. Const. art. II, § 1...................................................... i
U.S. CONST. art. III, § 2 ............................................11
PA. CONST. art. I, § 5 ..................................................4
PA. CONST. art. II, § 1................................................21
PA. CONST. art. V, § 2 ............................................5, 15
PA. CONST. of 1776 § 19 ............................................18
PA. CONST. of 1776 § 2 ..............................................18
PA. CONST. of 1776 § 3 ..............................................18

PA. CONST. of 1790, art. I, § 1 .....................................18
PA. CONST. of 1790, art. II, § 1 ....................................18
PA. CONST. of 1790, art. II, § 2 ....................................18

**Statutes**

10 Ill. Comp. Stat. 5/18A-15 .......................................27
10 Ill. Comp. Stat. 5/19-8 ...........................................27
2 U.S.C. § 1 .............................................................26
2 U.S.C. § 7 .............................................................26
25 P.S. § 3046 ....................................................14, 15
25 P.S. § 3150.11 ......................................................3
25 P.S. § 3150.12a ....................................................3
25 P.S. § 3150.12b ....................................................3
25 P.S. § 3150.16 ......................................................3
25 Pa.C.S. § 3511 ....................................................15
3 U.S.C. §1 ............................................................26
35 Pa.C.S. § 7301.....................................................5
42 Pa.C.S § 726 .......................................................5
42 Pa.C.S. § 501.......................................................5
52 U.S.C. § 20303 ...................................................27
Act 77 of 2019, P.L. 552 (Act 77) .................................3
Alaska Stat. § 15.20.081 ...........................................27
Cal. Elec. Code § 3020..............................................27
D.C. Code § 1-1001.05..............................................27
Iowa Code Ann. § 53.17.............................................27
Kan. Stat. Ann. 25-1132 ...........................................27
Md. Code Ann., Elec. Law, § 9-505............................27
Miss. Code Ann. § 23-15-637 ....................................27
N.C. Gen. Stat. § 163A-1310......................................27
N.D. Cent. Code Ann. § 16.1-07-09............................27
N.J. Stat. Ann. § 19:63-22..........................................27
N.Y. Elec. Law § 8-412..............................................27
Nev. Rev. Stat. § 293.317...........................................27
Ohio Rev. Code Ann. § 3509.05 .................................27
Tex. Elec. Code Ann. § 86.007 ...................................27

x

Utah Code Ann. § 20A-3a-204 ....................................27
Va. Code Ann. § 24.2-709.............................................27
W. Va. Code § 3-3-5......................................................27
Wash. Rev. Code Ann. § 29A.40.091 ........................27

**Rules**

Pa.R.A.P. 3309................................................................5

**Other Authorities**

*Bush v. Gore and Article II: Pressured Judgment
    Makes Dubious Law*, THE FEDERAL LAWYER,
    Mar./Apr. 2001, Vol. 48, No. 3 .................................22

Robert A. Schapiro, *Conceptions and
    Misconceptions of State Constitutional Law in
    Bush v. Gore*, 29 Fla. St. U. L. Rev. 661, 671-72
    (2001)........................................................................19

## INTRODUCTION

Petitioner seeks a radical change in the law—one that would force federal courts to review state court interpretations of state law, and that would require the reversal of a decision issued by this Court just five years ago. *See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 817-818 (2015) (*AIRC*). Petitioner advances that request, moreover, in an idiosyncratic case that arose from the singular, unprecedented disruptions caused by COVID-19, a spike in voting by mail, and an unanticipated slowdown in the operation of the United States Postal Service. The Pennsylvania Supreme Court, when presented with that unique circumstance, fulfilled its role under the Pennsylvania Constitution and Election Code in ordering a remedy designed to avoid the disenfranchisement of Pennsylvania voters. *See e.g. In re General Election-1985*, 531 A.2d 836, 838–39 (Pa. Cmwlth. Ct. 1987).

The petition should be denied for three fundamental reasons. *First*, this case is moot: Pennsylvania has certified its election results for President of the United States, which would not be altered even if Petitioner were to succeed on the merits of its claims. There is also no basis to believe that the issue here is likely to recur or would escape review if it did. *Second*, Petitioner lacks Article III standing to raise its Elections and Electors Clause claims, this case is a poor vehicle to review them, and the decision below did not violate the U.S. Constitution. *Finally*, Petitioner's federal statutory arguments do not implicate any circuit split, seek

at most fact-bound error correction, and in all events are themselves mistaken.

The 2020 Election is now over. President-Elect Joseph Biden defeated President Donald Trump by over 80,000 votes in Pennsylvania. Of the approximate 6.9 million votes cast, counties have reported only 9,428 mailed-in ballots that were received during the three-day extension at issue. The number of challenged ballots is insufficient to change the outcome of the Presidential election (or any other federal election in Pennsylvania). Nonetheless, this petition remains. And it remains against the backdrop of President Trump and his campaign (which seeks to intervene here) alleging baseless claims of fraud and illegality in elections nationwide. Those claims wrongly impugn the integrity of the democratic process and aim to cast doubt on the legitimacy of its outcome. This resistance to a transfer of power has no parallel in the modern history of the Nation. Particularly against that background, the Court should not plunge itself into the political thicket by granting a case that will not affect the outcome of any election, that presents substantial Article III defects, that seeks reversal of recent precedent, and that targets a state court decision arising from singular circumstances.

## OPINIONS BELOW

The Pennsylvania Supreme Court's opinion is reported at *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020), and is reprinted at App. 1a-81a.

## STATEMENT OF THE CASE

### A. Mail-in Voting under the Pennsylvania Election Code

On October 31, 2019, Governor Wolf signed Act 77 of 2019, P.L. 552 (Act 77) into law, allowing, for the first time, no-excuse mail-in voting for all qualified voters. 25 P.S. § 3150.11. Voters had until October 27, 2020, to request a ballot for this year's November 3rd General Election. 25 P.S. § 3150.12a(a). Act 77 set 8:00 p.m. on Election Day as the due date for returning those ballots to the county boards of elections. 25 P.S. § 3150.16. The Election Code provides for a variety of safeguards to ensure the integrity of this process. *See* 25 P.S. § 3146.8(g)(3); 25 P.S. § 3146.2c; 25 P.S. § 3146.8(g)(4); 25 P.S. § 3150.12b(a)(2).

### B. Letter from the United States Postal Service

On July 29, 2020, Thomas J. Marshall, General Counsel for the USPS, mailed a letter to Secretary Boockvar stating that, based on the USPS's expected delivery times during the General Election, "there is a significant risk that * * * ballots may be requested in a manner that is consistent with [Pennsylvania's] election rules and returned promptly, and yet not be [delivered] in time to be counted." USPS Letter at 2.[1] Critically, the letter explained that Pennsylvania's election law "deadlines for requesting and casting mail-in ballots are incongruous with the USPS's delivery standards." *Id.* at 1. "This mismatch creates a risk that

---

[1]   *See* Attachment 1.

ballots requested near the deadline under state law would not be returned by mail in time to be counted under your laws as we understand them." *Ibid.*[2]

### C. *Pennsylvania Democratic Party v. Kathy Boockvar*, 238 A.3d 345 (Pa. 2020)

The Pennsylvania Democratic Party and several Democratic candidates (collectively the Democratic Party) originally filed suit in the Commonwealth Court of Pennsylvania against Secretary Boockvar and the 67 County Boards raising challenges to the mail-in ballot process. Relevant here, the Democratic Party argued that, in light of the current COVID-19 pandemic and the delays in mail delivery, the due date for receipt of mail-in ballots violated the Pennsylvania Constitution's Free and Equal Elections Clause. PA. CONST., art. I, § 5.[3] Pennsylvania's primaries demonstrated that the unexpected number of requests for mail-in ballots and the COVID-19 pandemic strained some election boards'

---

[2]   *See also, Commonwealth of Pennsylvania v. DeJoy*, CV 20-4096, 2020 WL 5763553, at *43 (E.D. Pa. Sept. 28, 2020) (finding that the Commonwealth's "administration of the upcoming election has been and will continue to be frustrated as a result of mail delays").

[3]   The Free and Equal Elections Clause provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right to suffrage." PA. CONST. art. I, § 5. This provision "guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government." *League of Women Voters v. Commonwealth,* 178 A.3d 737, 804 (Pa. 2018).

timely receipt and processing of mail-in and absentee ballots. Appx. 29a-30a; 48a-49a.[4]

The Democratic Party sought an injunction to allow any ballot postmarked by election night to be counted if received by the boards by November 10—seven days after the election. Petitioner intervened and opposed any extension.

The Secretary asked the Pennsylvania Supreme Court to exercise extraordinary jurisdiction over the matter.[5] Although the Secretary initially opposed any extension, the Secretary subsequently recognized that a three-day extension of the mail-in ballot receipt date was necessary given the USPS's acknowledgment that its capabilities conflicted with Pennsylvania's election deadlines.

Given the unprecedented circumstances and "the near-certain delays" that would have occurred in the

---

[4]   During the 2020 primaries, the election boards of Delaware and Bucks counties had such a difficult time that they sought, and received, a seven-day extension of the date for the return of mail-in ballots from the county courts. Appx. 29a-30a. Governor Wolf, pursuant to the Emergency Management Services Code, 35 Pa.C.S. § 7301(c), extended the received-by date for six additional counties during the primary through executive order. *Ibid.*

[5]   The Pennsylvania Supreme Court may assume, at its discretion, plenary jurisdiction over any matter of immediate public importance that is pending before another court of the Commonwealth. *See* 42 Pa.C.S § 726. *See e.g., League of Women Voters*, 178 A.3d at 766–67. This power arises, not only from statute, but from the Pennsylvania Supreme Court's constitutionally granted "supreme judicial power." PA. CONST. art. V, § 2(a); 42 Pa.C.S. § 501. This power is used "sparingly" and only for matters requiring immediate resolution. *See In re Bruno*, 101 A.3d 635, 676 (Pa. 2014).

processing of mail-in applications, Appx. 46-47a, the Pennsylvania Supreme Court, pursuant to, *inter alia*, the Free and Equal Elections Clause of the Pennsylvania Constitution, exercised its "broad authority to craft meaningful remedies when required." Appx. 47a (quoting *League of Women Voters*, 178 A.3d at 822). Despite requests for a greater extension, the Pennsylvania Supreme Court exercised that authority to extend the ballot receipt due date by three days, until November 6, 2020 at 5:00 p.m. Appx. 49a (Opinion). That remedy "protect[ed] voters' rights while being least at variance with Pennsylvania's permanent election calendar." Appx. 49a (Opinion). Thus, "rather than allowing the chaos to brew, creating voter confusion regarding whether extensions will be granted, for how long, and in what counties[,]" the Pennsylvania Supreme Court acted well in advance of Election Day in order to bring clarity to the mail-in ballot process. Appx. 47a-48a.

The Pennsylvania Supreme Court also instructed that ballots received without a legible postmark would be presumed to have been mailed by Election Day unless a preponderance of the evidence demonstrated otherwise. Appx. 48a n.26. This holding "require[d] that all votes be cast by Election Day but [did] not disenfranchise a voter based upon the absence or illegibility of a USPS postmark that is beyond the control of the voter once she places her ballot in the USPS delivery system." Appx. 36 n.20.

Thereafter, Petitioner and two Pennsylvania state senators asked the Pennsylvania Supreme Court to stay its order pending appeal to this Court. The Pennsylvania Supreme Court denied those requests, prompting the current petition. This Court also denied

a stay, and subsequently, denied a motion for expedited consideration.

### D. 2020 General Election

On November 3, 2020, the Commonwealth conducted the 2020 General Election. Over 6.9 million Pennsylvanians voted in that election, with 2,628,599 of those voters using mail-in or absentee ballots. Counties reported that only 9,428 ballots were received within the three-day extension at issue, and only 669 of those lacked a legible postmark. This tiny number of ballots is insufficient to affect any federal race.[6] The presidential election results were certified, and Governor Wolf signed the Certificate of Ascertainment, on November 24, 2020.[7]

### REASONS FOR DENYING THE WRIT

Petitioner asks this Court to hold that the Elections and Electors Clauses immunize state legislatures from the state constitutional systems that create them and define their lawful powers. This would be a breathtaking request under any circumstance. But it is especially unjustified here, for a bevy of independently sufficient reasons. First, this entire case is moot. Moreover, Petitioner lacks Article III standing to advance its constitutional claims—which, in any event, are not

---

[6]   There was no United States Senate race in Pennsylvania's General Election. And no United States Congressional race was decided by less than 12,000 votes in any district. *See* Pa. Department of State, https://www.electionreturns.pa.gov/General/OfficeResults?OfficeID=11&ElectionID=undefined&ElectionType=undefined&IsActive=undefined (last visited 11/25/2020).

[7]   *See* Attachments 2 and 3.

implicated here and lack merit. Finally, Petitioner's statutory arguments rest upon clear legal error and seek nothing more than fact-bound error correction of a decision that is immaterial to the outcome of the election.

## I.   Petitioner's Claims are Moot.

"No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, [a] case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013). That rule governs here. The General Election is over. Its results have been certified. Even if Petitioner were to succeed on its claims—and even if this Court were to adopt the remedy of disregarding all 9,428 challenged ballots—there would be no effect whatsoever on the outcome of any election.[8] Because the Court does not issue advisory opinions, or adjudicate disputes where there are no longer actual stakes, this case is now moot. *See Alvarez v. Smith*, 558 U.S. 87, 93 (2009) ("[A] dispute solely about the meaning of a law, abstracted from any concrete actual or threatened harm, falls outside the scope of the constitutional words 'Cases' and 'Controversies.'").

Petitioner may resist that conclusion and insist that this dispute is not moot because it is capable of repetition while evading review. *See Kingdomware Techs.,*

---

[8]   *See* Pennsylvania Dept. of State, electionreturns.pa.gov (last visited 11/25/2020) (noting that President-elect Joseph Biden defeated President Trump by 80,555 votes according to the certified election results).

*Inc. v. United States*, 136 S. Ct. 1969, 1975 (2016). But any such argument would fail. "That exception applies 'only in exceptional situations,' where (1) 'the challenged action is in its duration too short to be fully litigated prior to cessation or expiration,' and (2) 'there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *Ibid.* (citations omitted). Neither requirement is met here.

First, the action challenged here was not too transient to be fully litigated prior to its cessation. In fact, the Court could have decided this very case before Election Day (as the parties requested); while the Court declined to do so, it does not follow that the issues evade review in a manner justifying an exception to the constitutional limitations set forth in Article III. Moreover, unlike in some cases involving voting practices or ballot access, *see, e.g.*, *Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974); *Anderson v. Celebrezze*, 460 U.S. 780, 784 (1983), questions about the role of the state legislature (and other state actors) in regulating elections will often be resolvable well in advance of Election Day, *see DeFunis v. Odegaard*, 416 U.S. 312, 319 (1974).

Second, there is no "reasonable expectation" or "demonstrated probability" that Petitioner "will again be subjected to the alleged illegality." *Fed. Election Commn. v. Wisconsin Right To Life*, Inc., 551 U.S. 449, 463 (2007) (citations omitted). That is obviously true as to this specific plaintiff and this specific case of alleged illegality: the decision below arose from an extraordinary and unprecedented confluence of circumstances raising novel, as-applied state constitutional questions about the operation of a recently enacted state statutory scheme to govern voting by mail in Pennsylvania.

Further, the Pennsylvania Supreme Court limited its reasoning and remedy to the 2020 election, so there is no basis to believe that this will have any effect in future elections. While this Court does not require likely repetition of every "last detail" of a challenge to avoid mootness, *id.*, here there is no reason to believe that any part of this fact pattern is likely to recur in future elections in Pennsylvania (or anywhere else).

To escape that conclusion, Petitioner may seek to frame the issue at so high a level of generality that it escapes all moorings from this litigation. But the possibility that some sort of dispute over these statutory or constitutional provisions may arise sometime, somewhere in the future does not mean that *this case* presents a question capable of repetition yet evading review. If that were the standard—potential repetition of claims involving the same provisions of federal law—then "virtually any matter of short duration would be reviewable." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). That would also invite the issuance of advisory opinions lacking any grounding in the specifics of a genuine case or controversy, which would be particularly improper here given the immense fact-dependency of both the decision below and the exceedingly vague standard proposed by Petitioner for assessing when a state court has departed so substantially from state law that it violates the Elections and Elector Clauses.

Accordingly, this case is moot and the petition for certiorari should be denied on that basis.

## II.    The Court Should Not Grant Review of Petitioner's Constitutional Claims

For three independent reasons, the Court should deny review of Petitioner's claims under the Elections and Electors Clauses: first, Petitioner lacks Article III standing to advance these claims; second, this case is a poor vehicle to address them; and third, the decision below was fully consistent with the U.S. Constitution.

### A. Petitioner Lacks Article III Standing to Advance Their Constitutional Claims

The jurisdiction of the federal judiciary is confined to "Cases" and "Controversies." U.S. CONST. art. III, § 2. To comply with Article III, a party cannot rely upon a mere "generalized grievance" shared "generally with the public at large in the proper application of the Constitution and laws." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 (1992). They must instead prove that they have suffered a concrete and particularized injury. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).

Petitioner cannot make that showing as to its Elections and Electors Clauses claims. As Petitioner itself insists, the Elections and Electors Clauses confer specific institutional prerogatives upon *state legislatures*, Pet. at 17, 19-20, not state political parties or candidates for office. For this reason, it is settled law that private parties lack standing to sue for alleged violations of those clauses. *Lance v. Coffman*, 549 U.S. 437, 438-42 (2007) (per curiam). Petitioner's challenge is thus a generalized grievance, indistinguishable from the interests of the public at large. *Ibid*. That does not

satisfy the Article III requirement of a concrete, particularized injury to a legally protected interest. *Ibid*

The Third Circuit recently recognized this point in a well-reasoned decision, holding that "private plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause." *Bognet v. Sec'y Commonwealth of Pennsylvania*, __ F.3d__, 2020 WL 6686120, at *6 (3d Cir. Nov. 13, 2020) (Smith, C.J.); *see also id.* at *7 (reaching the same conclusion regarding the Electors Clause). That conclusion flowed directly from this Court's decision in *Lance*, *supra*, and was consistent with the view of other appellate courts. *See, e.g., Democratic National Comm. v. Bostelmann*, __ F.3d __, 2020 WL 5796311, *1 (7th Cir. Sept. 29, 2020) (extension of received-by date for mailed ballots did not cause any injury-in-fact to political party or its members).[9]

Simply put, Petitioner has no concrete and particular interest in vindicating the "alleged usurpation of the General Assembly's rights under the Elections and Electors Clauses." *Bognet*, 2020 WL 6686120, at *7. It advances only a generalized interest—shared in common with the public—in governmental adherence to

---

[9] Although the Eighth Circuit recently held that a candidate for the position of presidential elector in Minnesota had Article III standing to bring a claim under the Elections Clause, that decision was linked to the specific interests vested in presidential electors by Minnesota law and by the unique role that presidential electors play. *See Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020). *Carson* did not purport to articulate a more general rule conferring Article III standing on private parties (or political parties) to advance Elections Clause claims. Thus, even the appellate decision that has taken the broadest view of Article III standing in this field, Petitioner would still lack Article III standing,

these constitutional provisions. That is not enough to support Article III standing, particularly where, as here, the Elections and Electors claims at issue would not affect the outcome of any federal election even if they were to succeed on the merits. *See id.* at *8 ("[F]or [a candidate] to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to [his] detriment." (citations omitted)).

Because Petitioner lacks Article III standing to present the constitutional questions raised in the petition for certiorari, the petition should be denied.

## B. This Case is a Poor Vehicle to Address the Federal Constitutional Claims

This case is a poor vehicle to address far-reaching questions about the Elections and Electors Clauses.

In addition to Petitioner's lack of standing and the mootness of this case, Petitioner also explicitly seeks to mire this Court in factual disputes. Petitioner repeatedly seeks to litigate questions of fact concerning the United States Postal Service's delivery capabilities and other predicates of the Pennsylvania Supreme Court's decision. *See, e.g.*, Pet. at 27-30. To support its position, Petitioner effectively urges this Court to credit the proposed findings and conclusions of a special master appointed by the Pennsylvania Supreme Court in a different case. *See id.*; *see also Crossey v. Boockvar*, 108 MM 2020 (Pa.). But the Pennsylvania Supreme Court ultimately dismissed that case as moot. And the proposed findings by a special master in a different case involving different parties cannot be used to

collaterally attack the factual predicates of the decision below. This Court has long recognized that it "do[es] not grant a certiorari to review evidence and discuss specific facts." *U.S. v. Johnston*, 268 U.S. 220, 227 (1925). This is precisely what Petitioner seeks here.

And that is not the only vehicle defect. Still another basis for denying review is that the Pennsylvania Supreme Court's remedy order was, in fact, consistent with the statutory plan and legislative intent behind Act 77. As a result, even if Petitioner's proposed statements of the law were correct (which it is not, as we explain in the next section), this is not a case in which that rule of law would be outcome determinative.

As noted above, the test proposed by Petitioner requires a "significant departure" from the framework enacted by the state legislature. Here, the Pennsylvania Supreme Court faithfully hewed to the framework the General Assembly devised when enacting the uniform Election Code that governs state and federal elections. *See* Appx. 45a.[10] Relying on 25 P.S. § 3046,[11] as

---

[10]   Petitioner relies upon this Court's *per curiam* decision in *Palm Beach Cty. Canvassing Bd.*, 531 U.S. at 78, which found the Florida Supreme Court's decision "unclear" as to whether it considered the Electors Clause at all. But unlike the Florida Supreme Court in that case, the Pennsylvania Supreme Court made clear that its construction of the Free and Equal Elections Clause had to be consistent with the Elections and Electors Clauses. Appx. 45a.

[11]   That legislative enactment delegates to the Pennsylvania judiciary "the power, on the day of an election, to decide 'matters pertaining to the election as may be necessary to carry out the intent' of the Election Code," which "provid[es] 'an equal opportunity for all eligible electors to participate in the election process.'" Appx. 45a-46a, quoting 25 P.S. § 3046 and *In re General Election-1985*, 531 A.2d 836, 839 (Pa. Cmwlth. 1987).

well as its statutory and constitutional authority, *see* 2 Pa.C.S. § 726, *and* PA. CONST. Art. V, § 2(a), the Pennsylvania Supreme Court concluded that it had the lawful power to modify the received-by date for absentee and mail-in ballots to avoid an impending violation of the Free and Equal Elections Clause. Appx. 45a-46a (citing *In re General Election-1985*, 531 A.2d at 839).

That was perfectly consistent with the General Assembly's specific instruction that the judiciary must presume against any legislative intent to violate the Pennsylvania Constitution. 1 Pa.C.S. § 1922(3). It was also fully consistent with the legislative intent behind Act 77, which favored the exercise of the fundamental right to vote.[12] Appx. 25a-26a, (citing *In re Luzerne Cty. Return Bd.*, 290 A.2d 108, 109 (Pa. 1972)); Appx.47a (citing *League of Women Voters*, 178 A.3d at 322); *see also* 25 Pa.C.S. § 3511 (military and overseas ballots counted if received within seven days of Election Day); *see also United States v. Booker*, 543 U.S. 220, 247 (2000) (holding that a legislatively unforeseen constitutional problem may require modification of a statutory provision when consistent with legislative intent).

---

[12] Petitioner errs in claiming that the General Assembly's intent is reflected by its implicit consideration and rejection of the need to move the received-by date for ballots when the legislature enacted Act 12 in March. Pet. at 24; Act of Mar. 27, 2020, P.L. 41, No. 12. Petitioner ignores that it was not until July, after Act 12 was enacted, that slowdowns in the mail were discovered. Appx. 32a. The General Assembly could not consider a postal slowdown that had not occurred when enacting Act 12.

### C. The Pennsylvania Supreme Court's Ruling was Entirely Consistent with the Elections and Electors Clauses' History, Structure, and Text, As Well As This Court's Decisions Concerning Those Clauses

Petitioner suggests that under the Elections and Electors Clauses, state legislatures have absolute authority over the states' conduct of federal elections, unencumbered by state constitutions. The fundamental principles of our Constitution, the Framers' intent, and this Court's own long-standing and recently re-affirmed precedent confirm that Petitioner is wrong.

### 1. Petitioner's Arguments Would Upend Principles of Federalism, Separation of Powers, and Checks and Balances

Federalism, separation of powers, and checks-and-balances among the co-equal branches of government are the bedrock features of our system of government. *See Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S.Ct. 2183, 2202-03 (2020) ("[S]tructural protections against abuse of power were critical to preserving liberty."). James Madison wrote, "[n]o political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty than" the separation of powers. The Federalist No. 47 (Madison). "The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." *Ibid.* The Framers' solution to this problem was to "split the atom of sovereignty" both horizontally among three co-equal branches and vertically

among state and federal governments. *Seila Law*, 140 S.Ct. at 2202-03.

Given the centrality of these principles to our constitutional order, the Framers, in granting state legislatures the power to prescribe election rules, did not intend to hermetically seal those legislatures from all scrutiny by the co-equal branches of state government. *See* The Federalist No. 59 (Hamilton) ("Nothing can be more evident, than that an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy."). But that is precisely what Petitioner argues here. In Petitioner's view, the reference to "legislature" in the Elections and Electors Clauses constitutes a sweeping and exclusive grant of authority that insulates the Pennsylvania General Assembly from any check on the exercise of its authority. Pet. at 19-20. That reading would be directly contrary to the foundational principles that gave rise to the structure of the Constitution and that animates every single state constitutional system in the Nation.

## 2. Petitioner's Arguments Clash With the Framers' Original Understanding

As the Framers debated the framework of the new Federal government in 1787, they already had in mind the different forms of government attempted under state constitutions. *See League of Women Voters v. Commonwealth,* 178 A.3d at 741 (Pennsylvania Constitution "is the ancestor, not the offspring, of the federal Constitution"). Pennsylvania's Constitution of 1776 set up a structure of government that the Framers criticized as tyrannical for placing too much power

in the legislature. The legislative power was placed in a unicameral body, while the executive power was placed in a president and a council. *See* PA. CONST. of 1776, §§ 2, 3, 19 (granting the power to the legislature and the executive council to choose the president). This plural executive branch was thus weak, lacking any significant ability to check the legislative branch that, at the time, "epitomized the ethos of legislative supremacy." *Bank Markazi v. Peterson*, __ U.S. __ , 136 S. Ct. 1310, 1331 (2016) (Roberts, C.J., dissenting). The Pennsylvania judiciary, too, did not have "any significant check (such as veto power)" on the legislature. Williams, *supra* at 556; *see Bank Markazi*, 136 S. Ct. at 1331 (Roberts, C.J., dissenting) (describing this unicameral legislature as "unconstrained").

This 1776 Pennsylvania Constitution was recognized by the Framers as an example of the dangers of uncontrolled legislative power. Indeed, as James Madison described in the Federalist Papers, Pennsylvania's 1776 constitution "had been flagrantly violated by the Legislature in a variety of important instances." The Federalist No. 48 (Madison).[13] Thus, the Framers understood the problem of legislative overreach that could occur if left unchecked, and that understanding "ultimately shaped the Federal Constitution." *See Bank Markazi*, 136 S. Ct. at 1331-32 (Roberts, C.J., dissenting); *see also* Robert A. Schapiro, *Conceptions and*

---

[13]   Pennsylvania ultimately recognized its own error. By 1790, after years of clamoring for change, Pennsylvanians adopted a new constitution that established a more balanced structure of government, similar to its federal counterpart. PA. CONST. of 1790, art. I, § 1 (establishing bicameral legislature), art. II, § 1 (vesting executive power in governor), art. II, § 2 (governor chosen by citizens of the Commonwealth); *see also* Williams, *supra* at 558.

*Misconceptions of State Constitutional Law in Bush v. Gore*, 29 Fla. St. U. L. Rev. 661, 671-72 (2001).

The Framers also expressed a general mistrust of state legislatures that would put their interests not only ahead of the national government, but also the people those state legislatures represent. *See* The Federalist No. 59 (Hamilton) ("[I]t is as fair to presume [abuses of power] on the part of the state" legislatures), *cited in U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 808-09 (1995) (noting that the Constitutional Convention debates make "clear that the Framers' overriding concern was the potential for states' abuse of the power to set the 'Times, Places and Manner' of elections"). The Framers therefore placed in the Constitution a check on state legislative power to regulate Federal elections by giving Congress "the power to override state regulations." *Thornton*, 514 U.S. at 832-33.

Consistent with these experiences, the Framers expected that the "exercise of the [legislative] authority," even over federal elections, had to be "in accordance with the method" prescribed in a state's constitution. *Smiley v. Holm*, 285 U.S. 355, 367 (1932). In *Smiley*, the Court held that a purported state law governing redistricting, passed without the governor's approval or two-thirds of the legislature, was a nullity. Reviewing state practice contemporaneous with the ratification of the United States Constitution, the Court noted that "restrictions," such as the gubernatorial veto, features of both the New York and Massachusetts Constitutions, were "well known" at the time. *Id.* at 368. The Court also noted that the Framers expected that a "state legislature might be subject to" the gubernatorial veto either at the time of ratification "or thereafter

imposed as the several states might think wise." *Ibid.* Moreover, "dictionaries, even those in circulation during the founding era, capaciously define the word 'legislature'" to include "[t]he power that makes laws." *See AIRC*, 576 U.S. at 814.

The Framers understood that the power of state legislatures would necessarily be bounded by their state constitutions. This makes perfect sense. Indeed, it would have been passing strange for the Framers, who created a system of checks and balances both vertically and horizontally, to allow, in this one area, for state legislatures to regulate federal elections unchecked by any other branch of state government.

### 3. Petitioner's Position is Foreclosed by This Court's Precedents

This Court's decisions are grounded in that same understanding of text and history. Simply put, under this Court's precedents, a state legislature must enact regulations governing Federal elections in accord with state constitutional law. *See AIRC,* 576 U.S. at 817; *Smiley*, 285 U.S. at 373-74; *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916). Nothing in the Elections Clause "attempts to endow the Legislature of the state with power to enact laws in any manner other than that in which the Constitution of the state has provided that laws shall be enacted." *Smiley*, 285 U.S. at 368; *see McPherson v. Blacker*, 146 U.S. 1, 25 (1892) ("The legislative power is the supreme authority, *except as limited by the constitution of the state*.") (emphasis added).

Thus, if the governor of a state, through the veto power contained in a state constitutional provision, has

a part in the making of state laws, that "check in the legislative process, cannot be regarded as repugnant to the grant of legislative authority" under the Elections and Electors Clauses. *Smiley*, 285 U.S. at 368; *Hildebrant*, 241 U.S. at 566 (holding the same for a referendum process that was part of the process for making state laws under the Ohio Constitution).

The same is true for substantive provisions of a state constitution. This Court has specifically (and recently) held that a state legislature is bound by substantive provisions of a state constitution when enacting regulations governing federal elections, and that such substantive limitations do not violate the Elections Clause. *See AIRC*, 576 U.S. at 817.

Indeed, *AIRC* rejected the argument that state legislatures can enact regulations governing federal elections in defiance of their state constitutions. *AIRC*, 576 U.S. at 817-18. It did so for two reasons. *First*, it is elemental that a state statute cannot trump the state constitution. *See AIRC*, 576 U.S. at 818; *Marbury v. Madison*, 5 U.S. 137, 138 (1803); *see also* The Federalist No. 78 (Alexander Hamilton). *Second*, although the Electors and Elections Clauses supply state legislatures with the power to regulate federal elections, those clauses by themselves do not create state legislatures; rather, they are creations of their own state constitutions. *See McPherson*, 146 U.S. at 25 ("What is forbidden or required to be done by a state is forbidden or required of the legislative power under state constitutions as they exist."); *see also* PA CONST. art. II, § 1 (vesting legislative power in the General Assembly).

In other words, "Article II * * * takes state legislative bodies as it finds them, subject to * * * the state constitutional limits that [the people of each state] create." Vikram Amar & Alan Brownstein, *Bush v. Gore and Article II: Pressured Judgment Makes Dubious Law*, THE FEDERAL LAWYER, Mar./Apr. 2001, Vol. 48, No. 3 at 31. Consequently, "any time the legislature contravenes the state constitution, it is not acting as the legitimate legislative body (within the meaning of the state constitutional charter that creates and empowers the legislature to begin with) and thus [is] not entitled to Article II protection." *Ibid.*[14] Just as a state legislature attempting to enact a law governing federal elections without first presenting the bill to the governor is not acting as a legitimate legislative body, *Smiley*, 285 U.S. at 372-73, so, too, is a state legislature not acting legitimately when it proposes that same bill but violates a substantive provision of the state constitution. *AIRC*, 576 U.S. at 817-18.

Recognizing that *AIRC* forecloses their argument, Petitioner asks this Court to overturn (or eviscerate) that precedent. Pet. at 26. And, once overturned,

---

[14]   As a number of state supreme courts have held, the Electors Clause did not give state legislatures "any superiority over or independence from the organic law of the state in force at the time when a given law is passed." *In re Opinion of the Justices*, 107 A. 705, 706 (Me. 1919); ."); *see, e.g.*, *State ex rel. Carroll v. Becker*, 45 S.W.2d 533, 536 (Mo. 1932), *aff'd sub nom. Carroll v. Becker*, 285 U.S. 380 (1932) (holding that, in the context of the Elections Clause, the "word 'legislature' means a political body of persons organized for the purpose of making laws. Appropriately it could not mean merely the members of that body. It cannot act as a Legislature expect in its official capacity. Its normal function is the enactment of laws. When assigned a certain duty, that duty must be performed by the enactment of a law . . . ."); *see also Chase v. Lujan*, 149 P.2d 1003, 1004 (N.M. 1944).

Petitioner urges the Court to follow the concurrence by Chief Justice Rehnquist in *Bush v. Gore*, 531 US 98, 111 (2000) (Rehnquist, C.J., concurring).

But even if AIRC were overturned, and even if this Court were inclined to adopt a concurrence from *Bush v. Gore* as its rule of decision, Chief Justice Rehnquist's concurrence does not speak to the question presented in this case. After all, *Bush v. Gore* did not address whether a state legislature's exercise of authority under the Electors or Elections Clauses must conform to the state constitution. Although the question had been raised during a prior phase of that litigation, *see Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 78 (2000), the Court did not ultimately address it once the Florida Supreme Court clarified on remand that it was not relying on the Florida Constitution, *see Palm Beach Cty. Canvassing Bd. v. Harris*, 772 So. 2d 1273 (Fla. 2000); *see also Bush*, 531 U.S at 98.

Rather, Chief Justice Rehnquist recognized the authority of state judiciaries to review state election laws governing federal elections and the deference owed to that review. *See Bush*, 531 U.S. at 113, 122 (Rehnquist, C.J., concurring). He merely expressed the view that a state court's *interpretation* of a state election code may intrude upon the constitutional authority of the legislature if the interpretation significantly departs from the framework the state legislature has enacted.[15] *Bush*, 531 U.S. at 113, 122 (Rehnquist, C.J., concurring); *see also id.* at 131 (Souter, J., dissenting)

---

[15]   In undertaking this review, the *Bush* concurrence applied "an independent, [but] still deferential, analysis of state law." *Bush*, 531 U.S. at 114 (Rehnquist, C.J., concurring).

(interpretation must be "so unreasonable as to transcend the accepted bounds of statutory interpretation, to the point of being a nonjudicial act and producing new law untethered to the legislative Act in question").

And here, as discussed above, the Pennsylvania Supreme Court made clear that it was *not* asked to "interpret the statutory deadline for mail-in ballots." Appx. 43a. Instead, the Pennsylvania Supreme Court determined that the application of the statutory language to a unique set of circumstances, not contemplated by the General Assembly, created an as-applied violation of the Pennsylvania Constitution. Appx. 44a. So, the issue at hand is unlike that which Chief Justice Rehnquist attempted to address in *Bush v. Gore*. See *Democratic National Comm. v. Wisconsin State Legislature*, No. 20A66, slip op. at 1 (Oct. 26, 2020) (Roberts, C.J., concurring in denial of application to vacate stay).

Moreover, attempting to extend Chief Justice Rehnquist's concurrence would expose another fundamental problem—there are no manageable standards by which this or any other federal court can evaluate Petitioner's claims. In order to recognize a claim under the Elections Clause, there must be "a limited and precise standard that is judicially discernible and manageable." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2502 (2019). The concurring justices in *Bush v. Gore* suggested that a state supreme court might run afoul of a state legislature's prerogative under the Electors Clause if it were to render a decision that is a "significant departure from the legislative scheme." *See* 531 U.S. at 113 (Rehnquist, C.J., concurring). Petitioner offers no guidance on how, precisely, this Court would make such a determination, particularly in light of the

bedrock feature of our system of federalism that state supreme courts are the ultimate expositors of state law, and are to "be left free and unfettered by [this Court] when interpreting their state constitutions." *Florida v. Powell*, 559 U.S. 50, 56 (2010); *see also Wardius v. Oregon*, 412 U.S. 470, 477 (1973).

To reverse the Pennsylvania Supreme Court's decision here, this Court must, necessarily, conclude that it has better methods of interpreting Pennsylvania law than those established by the Pennsylvania General Assembly and the Pennsylvania Supreme Court over the course of centuries. Any such decision would require this Court to substitute its interpretation of state law for that of the state court—and to make fraught, *ad hoc* judgments about when a state court interpretation works too "substantial" a "departure" from what this Court thinks state law should be. That is not a workable standard that can yield consistent results. *Rucho*, 139 S.Ct. at 2505. It is a recipe for disaster.

## III.   The Court Should Not Grant Review of Petitioner's Federal Statutory Claims

The second question that Petitioner presents—concerning federal statutes establishing a uniform federal Election Day—does not warrant review. There is no circuit split on the issue. Rather, there is a consensus (embraced by the Pennsylvania Supreme Court below) that federal law prohibits the counting of ballots cast after Election Day. To the extent Petitioner argues that the decision below varied from that prohibition through the evidentiary rules it established for reviewing ballots received after November 3, 2020, Petitioner seeks nothing more than fact-bound error correction of an issue

that did not affect the outcome of any federal election and that is highly unlikely to recur.

Moreover, Petitioner is decidedly mistaken in its assertions that the remedy adopted by the Pennsylvania Supreme Court was inconsistent with federal law.

The Elections Clause gives States presumptive authority over the "time, place, and manner" of federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). That default authority extends to "procedure[s]" relating to "counting of votes." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). The Constitution also reserves ultimate authority to Congress, which can preempt state election rules. *Foster*, 522 U.S. at 69. But state election law is preempted only insofar as it conflicts with relevant congressional enactments. *See Ex parte Siebold*, 100 U.S. 371, 384 (1879). And here there is no such conflict.

In its effort to show otherwise, Petitioner invokes three federal statutes establishing a nationwide Election Day. Pet. 31 (citing 3 U.S.C. §1; 2 U.S.C. §§ 1, 7). But all that these statutes require is that the "election"—i.e., the "act of *choosing* [officeholders]"—is complete by Election Day. *See Foster*, 522 U.S. at 71 (emphasis added). Consistent with those statutes, the decision below explicitly requires that all mail-in ballots be *cast* before 8 p.m. on Election Day. App. 48 n.26. Because the election—the "act of choosing"—is complete when ballots are cast (rather than tabulated) there is no preemption here: the Pennsylvania Supreme Court did nothing more than create an evidentiary presumption about how to determine *when* ballots were cast. And that presumption is fully consistent with federal

law, which is silent on the evidence that may properly be considered in determining when ballots were cast.[16]

Nationwide practice confirms that Pennsylvania's timeliness evidentiary presumption coheres with common sense, settled understanding, and federal law. *Cf. N.L.R.B. v. Noel Canning*, 573 U.S. 513, 525 (2014). Eighteen States, plus the District of Columbia, permit mail-in ballots to arrive after Election Day. *See, e.g.*, Alaska Stat. § 15.20.081; Cal. Elec. Code § 3020; D.C. Code § 1-1001.05; 10 Ill. Comp. Stat. 5/19-8, 10 Ill. Comp. Stat. 5/18A-15; Iowa Code Ann. § 53.17; Kan. Stat. Ann. 25-1132; Md. Code Ann., Elec. Law, § 9-505; Miss. Code Ann. § 23-15-637; Nev. Rev. Stat. § 293.317; N.J. Stat. Ann. § 19:63-22; N.Y. Elec. Law § 8-412; N.C. Gen. Stat. § 163A-1310; N.D. Cent. Code Ann. § 16.1-07-09; Ohio Rev. Code Ann. § 3509.05; Tex. Elec. Code Ann. § 86.007; Utah Code Ann. § 20A-3a-204; Va. Code Ann. § 24.2-709; Wash. Rev. Code Ann. § 29A.40.091; W. Va. Code § 3-3-5. There is no thus merit to Petitioner's federal statutory contentions—and no need to grant review of this case to address that issue.

---

[16]  If Congress wanted to regulate mail-balloting this way, it knew how to do so. *See* 52 U.S.C. § 20303(f)(1) (prohibiting refusal of mail-in ballot solely based on notarization requirements). Accordingly, the Court should not create a preemptive conflict via "[a]textual judicial supplementation." *See Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019).

28

## CONCLUSION

For the reasons set forth above, the Court should deny the petition for certiorari.

Respectfully submitted,

JOSH SHAPIRO
Attorney General

J. BART DeLONE
Chief Deputy Attorney General
Appellate Litigation Section
*Counsel of Record*

HOWARD G. HOPKIRK
CLAUDIA M. TESORO
SEAN A. KIRKPATRICK
Sr. Deputy Attorneys General

MICHAEL J. SCARINCI
DANIEL B. MULLEN
Deputy Attorneys General

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 783-3226
Cell:  (717) 712-3818
jdelone@attorneygeneral.gov

DATE: November 30, 2020

**ATTACHMENT 1**

THOMAS J. MARSHALL
GENERAL COUNSEL
AND EXECUTIVE VICE PRESIDENT


**UNITED STATES**
**POSTAL SERVICE**

July 29, 2020

Honorable Kathy Boockvar
Secretary of the Commonwealth of Pennsylvania
302 North Capitol Building
Harrisburg, PA 17120-0001

Dear Secretary Boockvar:

Re:  Deadlines for Mailing Ballots

With the 2020 General Election rapidly approaching, this letter follows up on my letter dated May 29, 2020, which I sent to election officials throughout the country.  That letter highlighted some key aspects of the Postal Service's delivery processes.  The purpose of this letter is to focus specifically on the deadlines for requesting and casting ballots by mail.  In particular, we wanted to note that, under our reading of Pennsylvania's election laws, certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards.  This mismatch creates a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted under your laws as we understand them.

As I stated in my May 29 letter, the two main classes of mail that are used for ballots are First-Class Mail and USPS Marketing Mail, the latter of which includes the Nonprofit postage rate.  Voters must use First-Class Mail (or an expedited level of service) to mail their ballots and ballot requests, while state or local election officials may generally use either First-Class Mail or Marketing Mail to mail blank ballots to voters.  While the specific transit times for either class of mail cannot be guaranteed, and depend on factors such as a given mailpiece's place of origin and destination, most domestic First-Class Mail is delivered 2-5 days after it is received by the Postal Service, and most domestic Marketing Mail is delivered 3-10 days after it is received.

To account for these delivery standards and to allow for contingencies (e.g., weather issues or unforeseen events), the Postal Service strongly recommends adhering to the following timeframe when using the mail to transmit ballots to domestic voters:

- **Ballot requests:**  Where voters will both receive and send a ballot by mail, voters should submit their ballot request early enough so that it is received by their election officials at least 15 days before Election Day at a minimum, and preferably long before that time.

- **Mailing blank ballots to voters:**  In responding to a ballot request, election officials should consider that the ballot needs to be in the hands of the voter so that he or she has adequate time to complete it and put it back in the mail stream so that it can be processed and delivered by the applicable deadline.  Accordingly, the Postal Service recommends that election officials use First-Class Mail to transmit blank ballots and allow 1 week for delivery to voters.  Using Marketing Mail will result in slower delivery times and will increase the risk that voters will not receive their ballots in time to return them by mail.

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-1100
PHONE: 202-268-5555
FAX: 202-268-6981
THOMAS.J.MARSHALL@USPS.GOV
www.usps.com

- **Mailing completed ballots to election officials:** To allow enough time for ballots to be returned to election officials, domestic voters should generally mail their completed ballots at least one week before the state's due date. So, if state law requires ballots to be returned by Election Day, voters should mail their ballots no later than Tuesday, October 27.

Under our reading of your state's election laws, as in effect on July 27, 2020, certain state-law requirements and deadlines appear to be incompatible with the Postal Service's delivery standards and the recommended timeframe noted above. As a result, to the extent that the mail is used to transmit ballots to and from voters, there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted.

Specifically, it appears that a completed ballot must be received by Election Day to be counted. If that understanding is correct, we accordingly recommend, as noted above, that voters who choose to mail their ballots do so no later than Tuesday, October 27. However, it further appears that state law generally permits voters to request a ballot as late as 7 days before the November general election. If a voter submits a request at or near that deadline, and the ballot is transmitted to the voter by mail, there is a significant risk that the voter will not have sufficient time to complete and mail the completed ballot back to election officials in time for it to arrive by the state's return deadline. That risk is exacerbated by the fact that the law does not appear to require election officials to transmit a ballot until 48 hours after receiving a ballot application.

To be clear, the Postal Service is not purporting to definitively interpret the requirements of your state's election laws, and also is not recommending that such laws be changed to accommodate the Postal Service's delivery standards. By the same token, however, the Postal Service cannot adjust its delivery standards to accommodate the requirements of state election law. For this reason, the Postal Service asks that election officials keep the Postal Service's delivery standards and recommendations in mind when making decisions as to the appropriate means used to send a piece of Election Mail to voters, and when informing voters how to successfully participate in an election where they choose to use the mail. It is particularly important that voters be made aware of the transit times for mail (including mail-in ballots) so that they can make informed decisions about whether and when to (1) request a mail-in ballot, and (2) mail a completed ballot back to election officials.

We remain committed to sustaining the mail as a secure, efficient, and effective means to allow citizens to participate in the electoral process when election officials determine to utilize the mail as a part of their election system. Ensuring that you have an understanding of our operational capabilities and recommended timelines, and can educate voters accordingly, is important to achieving a successful election season. Please reach out to your assigned election mail coordinator to discuss the logistics of your mailings and the services that are available as well as any questions you may have. A list of election mail coordinators may be found on our website at: https://about.usps.com/election-mail/politicalelection-mail-coordinators.pdf.

We hope the information contained in this letter is helpful, and please let me know if you have any questions or concerns.

Sincerely,

Thomas J. Marshall

**ATTACHMENT 2**



**COMMONWEALTH OF PENNSYLVANIA**
DEPARTMENT OF STATE

November 24, 2020

TO THE GOVERNOR:

In accordance with Section 1409 of the Pennsylvania Election Code, I do hereby certify that the attached is a true and correct copy of the returns received from the sixty-seven County Boards of Elections for the office of President of the United States for the General Election held November 3, 2020.



Witness my hand and the seal of my office this twenty-fourth day of November, 2020.

Kathy Boockvar
Secretary of the Commonwealth

COMMONWEALTH OF PENNSYLVANIA          DEPARTMENT OF STATE          OFFICIAL RETURNS
2020 General Election
November 3, 2020

## President of the United States

| COUNTY | JOSEPH R BIDEN DEMOCRATIC | DONALD J TRUMP REPUBLICAN | JO JORGENSEN LIBERTARIAN |
|---|---|---|---|
| ADAMS | 18,207 | 37,523 | 810 |
| ALLEGHENY | 429,065 | 282,324 | 8,344 |
| ARMSTRONG | 8,457 | 27,489 | 424 |
| BEAVER | 38,122 | 54,759 | 1,241 |
| BEDFORD | 4,367 | 23,025 | 182 |
| BERKS | 92,895 | 109,736 | 2,909 |
| BLAIR | 17,636 | 45,306 | 653 |
| BRADFORD | 8,046 | 21,600 | 513 |
| BUCKS | 204,712 | 187,367 | 4,155 |
| BUTLER | 37,508 | 74,359 | 1,438 |
| CAMBRIA | 21,730 | 48,085 | 759 |
| CAMERON | 634 | 1,771 | 29 |
| CARBON | 11,212 | 21,984 | 433 |
| CENTRE | 40,055 | 36,372 | 1,066 |
| CHESTER | 182,372 | 128,565 | 3,565 |
| CLARION | 4,678 | 14,578 | 237 |
| CLEARFIELD | 9,673 | 29,203 | 546 |
| CLINTON | 5,502 | 11,902 | 221 |
| COLUMBIA | 10,532 | 20,098 | 541 |
| CRAWFORD | 12,924 | 28,559 | 521 |
| CUMBERLAND | 62,245 | 77,212 | 2,138 |
| DAUPHIN | 78,983 | 66,408 | 1,977 |
| DELAWARE | 206,423 | 118,532 | 2,976 |
| ELK | 4,522 | 12,140 | 244 |
| ERIE | 68,286 | 66,869 | 1,928 |
| FAYETTE | 20,444 | 41,227 | 468 |
| FOREST | 728 | 1,882 | 36 |
| FRANKLIN | 22,422 | 57,245 | 1,116 |
| FULTON | 1,085 | 6,824 | 68 |
| GREENE | 4,911 | 12,579 | 179 |
| HUNTINGDON | 5,445 | 17,061 | 286 |
| INDIANA | 12,634 | 28,089 | 475 |
| JEFFERSON | 4,527 | 17,960 | 337 |
| JUNIATA | 2,253 | 9,649 | 141 |
| LACKAWANNA | 61,991 | 52,334 | 1,085 |
| LANCASTER | 115,847 | 160,209 | 4,183 |
| LAWRENCE | 15,978 | 29,597 | 501 |
| LEBANON | 23,932 | 46,731 | 989 |
| LEHIGH | 98,288 | 84,259 | 2,166 |
| LUZERNE | 64,873 | 86,929 | 1,519 |
| LYCOMING | 16,971 | 41,462 | 821 |
| MCKEAN | 5,098 | 14,083 | 285 |
| MERCER | 21,067 | 36,143 | 744 |
| MIFFLIN | 4,603 | 16,670 | 229 |
| MONROE | 44,060 | 38,726 | 1,043 |
| MONTGOMERY | 319,511 | 185,460 | 5,186 |
| MONTOUR | 3,771 | 5,844 | 156 |
| NORTHAMPTON | 85,087 | 83,854 | 2,001 |
| NORTHUMBERLAND | 12,677 | 28,952 | 654 |
| PERRY | 5,950 | 18,293 | 409 |
| PHILADELPHIA | 603,790 | 132,740 | 4,847 |
| PIKE | 13,019 | 19,213 | 322 |

COMMONWEALTH OF PENNSYLVANIA        DEPARTMENT OF STATE        OFFICIAL RETURNS
2020 General Election
November 3, 2020

## President of the United States

| COUNTY | JOSEPH R BIDEN DEMOCRATIC | DONALD J TRUMP REPUBLICAN | JO JORGENSEN LIBERTARIAN |
|---|---|---|---|
| POTTER | 1,726 | 7,239 | 99 |
| SCHUYLKILL | 20,727 | 48,871 | 1,005 |
| SNYDER | 4,910 | 13,983 | 247 |
| SOMERSET | 8,654 | 31,466 | 423 |
| SULLIVAN | 921 | 2,619 | 55 |
| SUSQUEHANNA | 6,236 | 15,207 | 309 |
| TIOGA | 4,955 | 15,742 | 378 |
| UNION | 7,475 | 12,356 | 284 |
| VENANGO | 7,585 | 18,569 | 374 |
| WARREN | 6,066 | 14,237 | 347 |
| WASHINGTON | 45,088 | 72,080 | 1,310 |
| WAYNE | 9,191 | 18,637 | 261 |
| WESTMORELAND | 72,129 | 130,218 | 2,350 |
| WYOMING | 4,704 | 9,936 | 218 |
| YORK | 88,114 | 146,733 | 3,624 |
| PENNSYLVANIA | 3,458,229 | 3,377,674 | 79,380 |

**ATTACHMENT 3**



# Commonwealth of Pennsylvania

## Governor's Office

**CERTIFICATE OF ASCERTAINMENT OF PRESIDENTIAL ELECTORS**

IN THE NAME AND BY THE AUTHORITY OF THE

COMMONWEALTH OF PENNSYLVANIA

Pursuant to the Laws of the United States, I, Tom Wolf, Governor of the Commonwealth of Pennsylvania, do hereby certify that in accordance with the provisions of the Pennsylvania Election Code, Act of June 3, 1937 (P.L. 1333, No. 320), the Secretary of the Commonwealth, on receiving and computing the returns of the election of Presidential Electors, shall lay them before the Governor, who shall enumerate and ascertain the number of votes given for each person so voted for, and shall cause a certificate of election to be delivered to each person so chosen. It appears from the returns so laid before me by the Secretary of the Commonwealth, that at an election for that purpose held on the Tuesday next following the first Monday in November, being the third day of November, A.D. 2020, the votes given for each person so voted for were:

| | | | |
|---|---|---|---|
| Nina Ahmad | 3,458,229 | Jordan Harris | 3,458,229 |
| Val Arkoosh | 3,458,229 | Malcolm Kenyatta | 3,458,229 |
| Cindy Bass | 3,458,229 | Gerald Lawrence | 3,458,229 |
| Rick Bloomingdale | 3,458,229 | Clifford Levine | 3,458,229 |
| Ryan Boyer | 3,458,229 | Virginia McGregor | 3,458,229 |
| Paige Gebhardt Cognetti | 3,458,229 | Nancy Mills | 3,458,229 |
| Daisy Cruz | 3,458,229 | Marian Moskowitz | 3,458,229 |
| Kathy Dahlkemper | 3,458,229 | Josh Shapiro | 3,458,229 |
| Janet Diaz | 3,458,229 | Sharif Street | 3,458,229 |
| Charles Hadley | 3,458,229 | Connie Williams | 3,458,229 |

as Presidential Electors for Joseph R. Biden for President and Kamala D. Harris for Vice President of the United States;

| | | | |
|---|---|---|---|
| Bob Asher | 3,377,674 | Ash Khare | 3,377,674 |
| Bill Bachenberg | 3,377,674 | Thomas Marino | 3,377,674 |
| Lou Barletta | 3,377,674 | Lisa Patton | 3,377,674 |
| Ted Christian | 3,377,674 | Pat Poprik | 3,377,674 |
| Ted Coccodrilli | 3,377,674 | Andy Reilly | 3,377,674 |
| Bernadette Comfort | 3,377,674 | Lance Stange | 3,377,674 |
| Sam DeMarco | 3,377,674 | Lawrence Tabas | 3,377,674 |
| Marcela Diaz-Myers | 3,377,674 | Christine Toretti | 3,377,674 |
| Josephine Ferro | 3,377,674 | Calvin Tucker | 3,377,674 |
| Robert Gleason | 3,377,674 | Carolyn "Bunny" Welsh | 3,377,674 |

as Presidential Electors for Donald J. Trump for President and Michael R. Pence for Vice President of the United States;

| | | | |
|---|---|---|---|
| Kyle Burton | 79,380 | Paul V. Nicotera | 79,380 |
| Henry William Conoly | 79,380 | Paul Rizzo | 79,380 |
| Daniel A. Cooper | 79,380 | Richard Schwartzman | 79,380 |
| Thomas H. Eckman | 79,380 | William Martin Sloane | 79,380 |
| Greg Faust | 79,380 | Kathleen S. Smith | 79,380 |
| Kevin Gaughen | 79,380 | Jake Towne | 79,380 |
| Willie J. Harmon | 79,380 | Glenn J. Tuttle | 79,380 |
| Ken V. Krawchuk | 79,380 | Stephen Wahrhaftig | 79,380 |
| Brandon M. Magoon | 79,380 | John M. Waldenberger | 79,380 |
| Roy A. Minet | 79,380 | Daniel S. Wassmer | 79,380 |

as Presidential Electors for Jo Jorgenson for President and Jeremy Spike Cohen for Vice President of the United States;

WHEREUPON it appears by the final ascertainment, under and in pursuance of the laws of the United States of America and of this Commonwealth, of the number of votes given or cast for each and all qualified persons voted for, for whose election or appointment any votes have been given or cast, that

| | |
|---|---|
| Nina Ahmad | Jordan Harris |
| Val Arkoosh | Malcolm Kenyatta |
| Cindy Bass | Gerald Lawrence |
| Rick Bloomingdale | Clifford Levine |
| Ryan Boyer | Virginia McGregor |
| Paige Gebhardt Cognetti | Nancy Mills |
| Daisy Cruz | Marian Moskowitz |
| Kathy Dahlkemper | Josh Shapiro |
| Janet Diaz | Sharif Street |
| Charles Hadley | Connie Williams |

have received the greatest number of votes for Electors of President and Vice President of the United States for the Commonwealth of Pennsylvania, and therefore are the persons duly elected and appointed Electors of President and Vice President of the United States, to meet at the seat of Government of this Commonwealth (being in the city of Harrisburg) on the first Monday after the second Wednesday in December next following their appointment, being the fourteenth day of December, A.D. 2020, agreeably to the laws of this Commonwealth and of the United States, then and there to vote for President and Vice President of the United States for the respective terms prescribed by the Constitution of the United States, to begin on the twentieth day of January, A.D. 2021, and to perform such other duties as devolve upon them under the Constitution and Laws of the United States.

GIVEN under my hand and the Great Seal of the State, at the City of Harrisburg, this twenty-fourth day of November in the year of our Lord two thousand and twenty, and of the Commonwealth the two hundred and forty-fifth.

_____
Governor

Attest:

_____
Secretary of the Commonwealth