## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICOLE ZICCARELLI, | : | |
| Plaintiff, | : | No. 2:20-cv-01831-NR |
| | : | |
| v. | : | |
| | : | |
| THE ALLEGHENY COUNTY BOARD OF | : | |
| ELECTIONS, RICH FITZGERALD, in his | : | |
| official capacity as a Member of the | : | |
| Allegheny County Board of Elections, | : | |
| SAMUEL DEMARCO, in his official | : | |
| capacity as a member of the Allegheny | : | |
| County Board of Elections, BETHANY | : | |
| HALLAM, in her official capacity as a | : | |
| member of the Allegheny County Board of | : | |
| Elections, and KATHY BOOCKVAR, in | : | |
| her official capacity as the Secretary of | : | |
| the Commonwealth of Pennsylvania, | : | |
| Defendants. | : | |

## PLAINTIFF'S BRIEF
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Joshua J. Voss (No. 306853)
Matthew H. Haverstick (No. 85072)*
Shohin H. Vance (No. 323551)*
James G. Gorman (No. 328376)*
Samantha G. Zimmer (No. 325650)*
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000 | Fax: (215) 568-0140
Eml: jvoss@kleinbard.com
mhaverstick@kleinbard.com
svance@kleinbard.com
jgorman@kleinbard.com
szimmer@kleinbard.com
* *Admitted Pro Hac Vice*
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................. 1

II.  BACKGROUND ................................................................................................... 3

   A. The Pennsylvania Election Code and Act 77. ................................................... 3

   B. Case Background. ............................................................................................... 6

   C. History of the Litigation in State Court ........................................................... 12

III. ARGUMENT ...................................................................................................... 15

   A. Plaintiff Ziccarelli is entitled to summary judgment as a matter of law on her
      equal protection claim in Count I ...................................................................... 15

   B. Plaintiff Ziccarelli is entitled to summary judgment as a matter of law on her
      due process claim in Count II. ........................................................................... 19

   C. The appropriate, and only, remedy for the constitutional violations is to "level
      down." ................................................................................................................. 27

      1. The Court must look to legislative intent to determine whether to level up
         or level down: in this matter, legislative intent shows leveling down is
         compelled. ....................................................................................................... 28

      2. Leveling down will not cause disenfranchisement. ....................................... 29

      3. Leveling down is the only appropriate remedy. ........................................... 32

IV.  CONCLUSION ................................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597 (E.D. Pa. 2018)............. 19, 20

*Afran v. McGreevey*, 115 Fed.Appx. 539 (3d Cir. 2004).............................................. 20

*Baber v. Dunlap*, 349 F. Supp. 3d 68 (D. Me. 2018).................................................... 33

*Burdick v. Takushi*, 504 U.S. 428 (1992) ..................................................................... 29

*Bush v. Gore*, 531 U.S. 98 (2000)............................................................... 15, 17, 18, 19

*Bush v. Palm Beach Cty. Canvassing Bd*., 531 U.S. 70 (2000) .................................. 33

*Case of Loucks*, 1893 WL 3125 (Pa. Quar. Sess. 1893)................................................ 31

*Cimaszewski v. Bd. of Prob. & Parole*, 868 A.2d 416 (Pa. 2005)................................ 13

*Com. v. Glover*, 441 A.2d 1216 (Pa. 1982).................................................................... 13

*Curry v. Baker*, 802 F.2d 1302 (11th Cir.1986) .......................................................... 25

*Democratic Natl. Comm. v. Wisconsin State Legis.*, No. 20A66, 2020 WL 6275871
(U.S. Oct. 26, 2020) ..................................................................................................... 30

*Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-CV-966, ---F. Supp. 3d----,
2020 WL 5997680 (W.D. Pa. Oct. 10, 2020) .......................................... 15, 16, 17, 30

*Donald J. Trump for Pres., Inc. v. Sec. of Pennsylvania*, No. 20-3371, 2020 WL
7012522 (3d Cir. Nov. 27, 2020) ............................................................................ 3, 5

*Donald J. Trump for Pres., Inc. v. Boockvar*, No 20-CV-2078, ---F. Supp. 3d----, 2020
WL 6821992 (M.D. Pa. Nov. 21, 2020) ........................................................... 3, 4, 32

*Gibson v. Firestone*, 741 F.2d 1268 (11th Cir. 1984) .................................................. 34

*Griffin v. Burns*, 570 F.2d 1065 (1st Cir.1978) ........................................................... 22

*In re Allegheny County Provisional Ballots in the 2020 Gen. Election*, No. 1161 C.D.
2020, 2020 WL 6867946 (Pa. Cmwlth. Nov. 20, 2020) ........................................... 31

*In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*,
No. 29 WAP 2020, ---A.3d----, 2020 WL 6866415 (Pa. Nov. 23, 2020)............ passim

*In re Canvass of Absentee Ballots of Apr. 28, 1964, Primary Election*, 34 Pa. D. &
C.2d 419 (C.P. Philadelphia Cty. 1964)..................................................................... 31

*In re Canvass of Absentee Ballots of Gen. Election*, 39 Pa. D. & C.2d 429 (C.P. Montgomery Cty. 1965)............................................................................................31

*In re Primary Election Apr. 28, 1964*, 203 A.2d 212 (Pa. 1964) .................................31

*In re T.S.*, 192 A.3d 1080 (Pa. 2018) .............................................................................15

*In re Whitpain Twp. Election Case*, 44 Pa. D. & C. 374 (C.P. Montgomery Cty. 1942) ......................................................................................................................................31

*In re 2,349 Ballots in the 2020 Gen. Election App. of: Nicole Ziccarelli*, No. 1162 C.D. 2020, 2020 WL 6820816 (Pa. Cmwlth. Nov. 19, 2020) ............................. 1, 5, 13, 29

*Kasper v. Bd. of Election Comm'rs of the City of Chicago*, 814 F.2d 332 (7th Cir. 1987) ............................................................................................................................26

*Kendrick v. Bland*, 740 F.2d 432 (6th Cir. 1984).........................................................33

*Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010)................................................28

*Long v. Kochenderfer*, 1894 WL 3768, at *2 (Pa. Quar. Sess. 1894).........................31

*Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994) ................................................. 20, 26, 27

*Nolles v. State Comm. for Reorganization of Sch. Districts*, 524 F.3d 892 (8th Cir. 2008) ............................................................................................................................26

*Northeast Ohio Coalition for the Homeless v. Husted*, No. 12-4354, slip op. (6th Cir. Nov. 16, 2012)...........................................................................................................33

*Perkins v. City of Chicago Heights*, 47 F.3d 212 (7th Cir. 1995)................................34

*Pierce v. Allegheny Cty. Bd. of Elections*, 324 F. Supp. 2d 684 (W.D. Pa. 2003) .................................................................................................................. 16, 17, 19, 20

*Rary v. Guess*, 198 S.E.2d 879 (Ga. 1973)...................................................................31

*Reynolds v. Sims*, 377 U.S. 533 (1964)................................................................. 19, 20

*Roe v. Mobile County Appointing Bd.*, 904 F. Supp. 1315 (S.D. Ala. 1995)...............23

*Roe v. Mobile Cty. Appointment Bd.*, 676 So. 2d 1206 (Ala. 1995)............................22

*Roe v. State of Ala. By & Through Evans*, 43 F.3d 574 (11th Cir. 1995)............. 21, 22

*Roe v. State of Ala. By & Through Evans*, 52 F.3d 300 (11th Cir. 1995)...................22

*Roe v. State of Alabama*, 68 F.3d 404 (11th Cir. 1995) ..............................................23

*Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1 (1st Cir. 2004) .............................. 25

*Scheer v. City of Miami*, 15 F. Supp. 2d 1338 (S.D. Fla. 1998) ................................... 25

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017) .................................................. 28

*Shannon v. Jacobowitz*, 394 F.3d 90 (2d Cir. 2005) ............................................. 25, 26

*Smith v. Cherry*, 489 F.2d 1098 (7th Cir.1973) ........................................................... 26

*St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264 (8th Cir. 2011) .................................. 34

*Texas Democratic Party v. Abbot*, 961 F.3d 389 (5th Cir. 2020) ................................ 28

*Vargus v. Pitman Mfg. Co.*, 675 F.2d 73 (3d Cir. 1982) ............................................. 13

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ..................................................................... 19

## Statutes

25 P.S. § 2601 ................................................................................................................... 3

25 P.S. § 2621 ............................................................................................................. 3, 17

25 P.S. § 2642 ................................................................................................................... 3

25 P.S. § 3146.6 ........................................................................................................... 4, 6

25 P.S. § 3146.8 ........................................................................................................... 4, 6

25 P.S. § 3150.16 ......................................................................................................... 1, 4

25 P.S. § 3159 ............................................................................................................. 3, 17

Ala.Code § 17–10–7 ........................................................................................................ 21

## Constitutional Provisions

Pa. Const. art. VI, § 3 .................................................................................................... 17

## I.      INTRODUCTION

Under the Pennsylvania Election Code, a mail-in ballot that does not have a

dated declaration is invalid. This statement of law is agreed with by:

- The Pennsylvania Supreme Court[1];

- The Pennsylvania Commonwealth Court[2];

- The Pennsylvania General Assembly[3];

- The Pennsylvania Attorney General[4];

- Secretary of the Commonwealth Kathy Boockvar[5]; and

- The Westmoreland County Board of Elections[6].

Despite all of the foregoing *agreement* with Plaintiff Nicole Ziccarelli's core legal

position, the parties are before the Court because the Allegheny County Board of

Elections decided to count 311 of these invalid ballots, and, more importantly,

Secretary Boockvar accepted the Allegheny Board's certification of those invalid

---

[1] *See In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, No. 29 WAP 2020, ---A.3d----, 2020 WL 6866415, at *23, *25 (Pa. Nov. 23, 2020) (concurring and dissenting opinions).

[2] *See In re 2,349 Ballots in the 2020 Gen. Election App. of: Nicole Ziccarelli*, No. 1162 C.D. 2020, 2020 WL 6820816, at *5 (Pa. Cmwlth. Nov. 19, 2020), *rev'd sub nom. In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, 2020 WL 6866415.

[3] *See* 25 P.S. § 3150.16(a).

[4] *See* Stipulated Undisputed Facts (hereafter, Stip. Facts) ¶¶ 18-19, Stip. Facts Ex. C at 16 (Appendix Ex. 1) (Brief of Kathy Boockvar). All exhibits in the Appendix submitted herewith have been abridged to remove unnecessary pages, where appropriate, and highlighted where necessary to call out content relied upon in this brief.

[5] *See* Stip. Facts ¶¶ 18-19, Stip. Facts Ex. C at 16 Appendix Ex. 1) (Brief of Kathy Boockvar).

[6] *See* Stip. Facts ¶¶ 59-63; Westmoreland County Board of Elections November 30, 2020 Certification (Appendix Ex. 2).

ballots alongside ballot totals she knew did not include a similar count. The Secretary and the Allegheny Board did so even though Secretary Boockvar herself advised the Allegheny Board on September 28, 2020 not to count such ballots.[7] This also occurred even though Allegheny County directed individual voters before the 2020 General Election (1) to "[s]ign and print your name and the date" on the mail-in ballot declaration;[8] (2) to "sign, date, and provide their address on the back of the envelope,"[9] and (3) to "make sure that your vote is counted, be certain to follow the instructions that come with your ballot[.]"[10]

The Secretary's and Allegheny Board's decisions to go against even their own guidance has resulted in this basic state of affairs: the difference between who wins and who loses the 2020 General Election for Pennsylvania Senate District 45 hinges entirely upon whether these invalid ballots are counted. As equally important, the Secretary's and Allegheny Board's decisions have yielded an equal protection violation, since identically situated voters in Westmoreland County did not have their invalid ballots counted. The decision also created a due process violation, since the decisions to forge ahead with changing the rules of the election after the election had already concluded unlawfully altered the results.

In the end, and at a most basic level, Plaintiff Nicole Ziccarelli has been told by courts, boards, bodies, and state officials that she is right and that some 311

---

[7] Stip. Facts ¶¶ 15-16; Stip. Facts Ex. B at 5, 9 (Appendix Ex. 3).

[8] Stip. Facts ¶ 25.

[9] Stip. Facts ¶¶ 22, 24, Stip. Facts Ex. F; Transcript of Mail In Ballot Instructions at 3 (Appendix Ex. 4).

[10] Stip. Facts ¶¶ 22-23, Stip. Facts Ex. E (Appendix Ex. 5).

votes cast in her race are invalid, and yet—incredibly—she stands before this Court on the verge of losing because those ballots are being tallied against her. This makes no sense. It doesn't because it is unfair and unjust, and contrary to the basic guarantees of the U.S. Constitution.

## II.    BACKGROUND

### A.    The Pennsylvania Election Code and Act 77.

Pennsylvania's basic rules for conducting an election are set forth in the Pennsylvania Election Code. 25 P.S. § 2601 *et seq*. The statute's purpose is to "promote 'freedom of choice, a fair election and an honest election return.'" *Donald J. Trump for Pres., Inc. v. Boockvar*, No 20-CV-2078, ---F. Supp. 3d----, 2020 WL 6821992, at \*1 (M.D. Pa. Nov. 21, 2020) (hereafter, *Donald J. Trump MDPA*), *aff'd sub nom. Donald J. Trump for Pres., Inc. v. Sec. of Pennsylvania*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020) (hereafter, *Donald J. Trump THIRD*). As it concerns county boards of elections, the Election Code tasks them with ensuring that elections "be honestly, efficiently, *and uniformly conducted."* 25 P.S. § 2642(g) (emphasis added). The Election Code also imposes various duties on the Secretary of the Commonwealth, which include the duty to "receive from county boards of elections the returns of primaries and elections, *to canvass* and compute the votes cast for candidates …; to proclaim the results of such primaries and elections, and to issue certificates of election to the successful candidates at such elections[.]" 25 P.S. § 2621(f) (emphasis added); *see also* 25 P.S. § 3159.

The Election Code saw changes in 2019 when the General Assembly passed, and Governor Wolf signed into law, Act 77 of 2019, P.L. 552. As described by

Secretary Boockvar, through Attorney General Josh Shapiro, Act 77 allowed "for the first time, no-excuse mail-in voting for all qualified voters." Stip. Facts ¶¶ 20-21, Stip. Facts Ex. D at 3 (Appendix Ex. 6) (Brief of Kathy Boockvar in Opposition to Petition for Certiorari). Despite this change in the manner in which Pennsylvanians cast ballots, the Election Code still retained "a variety of safeguards to ensure the integrity of" the elections process. Stip. Facts Ex. D at 3 (Appendix Ex. 6). Among them was the duty of county boards of elections to inspect the declaration on both absentee and mail-in ballots so that the board "is satisfied that the declaration is sufficient[.]" 25 P.S. § 3146.8(g)(3), *cited in* Stip. Facts Ex. D at 3 (Appendix Ex. 6); *see also* Stip. Facts Ex. A at 3 (Appendix Ex. 7) ("If the Voter's Declaration on the return envelope is signed and the county board is satisfied that the declaration is sufficient, the mail-in or absentee ballot should be approved for canvassing…").

The basic requirements for voting absentee or by mail-in are set forth at 25 P.S. § 3146.6 (absentee) and 25 P.S. § 3150.16 (mail-in). Both provisions contain an identical command to the voter regarding completing the voter declaration on the outer envelope: "The elector shall then fill out, ***date*** and sign the declaration printed on such envelope." 25 P.S. § 3146.6(a) (emphasis added); 25 P.S. § 3150.16(a). The Middle District of Pennsylvania recently described Section 3150.16 as setting "forth procedural requirements that voters *must follow* in order for their ballot to be counted." *Donald J. Trump MDPA*, 2020 WL 6821992, at *2 (emphasis added). The Third Circuit, on appeal of that case, gave a similar description of the provision: "[the voter] must also 'fill out, date and sign the

declaration printed' on the outside of the larger envelope." *Donald J. Trump THIRD*, 2020 WL 7012522, at \*2.

The purpose of the date provision on the voter declaration is an election integrity/anti-fraud provision. Indeed, Secretary Boockvar, through Attorney General Shapiro, described it to the U.S. Supreme Court exactly that way, stating:

> [T]he mail-in ballot envelope contains a Voter's Declaration that must be signed and dated by the qualified elector. Even absent a legible postmark, if a declaration indicates it was signed after Election Day, that would be compelling evidence that the ballot was not timely mailed. Lying on this declaration constitutes voter fraud. 25 P.S. § 3527. Voter fraud in Pennsylvania is a third-degree felony, carrying a maximum 7-year prison term. *Ibid*. To assume that hordes of voters will commit voter fraud and flood the post offices with late ballots, so that some may slip through without postmarking, is fantasy. Applicants point to nothing in support of such baseless fearmongering.

*See* Stip. Facts ¶¶ 18-19, Stip. Facts Ex. C at 16 (Appendix Ex. 1). This election-integrity purpose described by Secretary Boockvar and Attorney General Shapiro was later echoed by the Pennsylvania Commonwealth Court, which described the foundation of the date requirement as follows:

> [T]here is an obvious and salutary purpose behind the requirement that a voter date the declaration. The date provides a measure of security, establishing the date on which the elector actually executed the ballot in full, ensuring their desire to cast it in lieu of appearing in person at a polling place. The presence of the date also establishes a point in time against which to measure the elector's eligibility to cast the ballot, as reflected in the body of the declaration itself.

*In re 2,349 Ballots in 2020 Gen. Election*, 2020 WL 6820816, at \*6. The election integrity/anti-fraud assessment of purpose of the date provision was likewise joined by four justices of the Pennsylvania Supreme Court:

- "The only practical and principled alternative is to read 'shall' as mandatory. Only by doing so may we restore to the legislature the onus

5

for making policy judgments about what requirements are necessary to ensure the security of our elections against fraud and avoid inconsistent application of the law, especially given the certainty of disparate views of what constitute 'minor irregularities' and countervailing 'weighty interests.'" *In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, 2020 WL 6866415, at \*23 (Wecht, J., concurring and dissenting opinion).

- "The date also ensures the elector completed the ballot within the proper time frame and prevents the tabulation of potentially fraudulent back-dated votes." *In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, 2020 WL 6866415, at \*25 (Dougherty, J., joined by Saylor, C.J., and Mundy, J., concurring and dissenting opinion).

In sum, the Pennsylvania Supreme Court, the Commonwealth Court, the Attorney General, and the Secretary of the Commonwealth all agree that the date requirement on mail-in and absentee ballots is a crucial election integrity provision.

As a final piece of background on the Election Code, it is important to note that the above-described anti-fraud provisions are identical to those that had governed absentee voting well before the mail-in voting scheme was implemented with Act 77. *See* 25 P.S. §§ 3146.6, 3146.8. In essence, Act 77 amended the absentee voting statute in place for decades to simply permit no-excuse mail-in voting.

## B.    Case Background.

Nicole Ziccarelli is the Republican candidate for Pennsylvania Senate District 45 in the 2020 General Election. Stip. Facts ¶ 1. Ms. Ziccarelli is a qualified elector residing in Westmoreland County who voted in person on Election Day, for herself. Stip. Facts ¶ 2. James Brewster is the Democratic candidate for Senate District 45. Stip. Facts ¶ 3. Pennsylvania Senate District 45 covers part of Allegheny County and part of Westmoreland County. Stip. Facts ¶ 4.

6

Defendant the Allegheny County Board of Elections is generally responsible for overseeing the conduct of all elections in Allegheny County. Stip. Facts ¶ 5. The Allegheny County Board of Elections has three members: Rich Fitzgerald, Samuel DeMarco, and Bethany Hallam (collectively, "the Allegheny Board"). Stip. Facts ¶¶ 5-9. The Allegheny Board's counterpart in Westmoreland County is the Westmoreland County Board of Elections, which is generally responsible for overseeing the conduct of all elections in its county. Stip. Facts ¶ 10.

Defendant Kathy Boockvar is the Secretary of the Commonwealth of Pennsylvania. Stip. Facts ¶ 11. The Secretary of the Commonwealth has duties under the Election Code to, among other things, receive certified election returns from county boards of election and to issue certificates of election. Stip. Facts ¶ 12. Part of her duties as Secretary of the Commonwealth involves issuing "guidance" documents to, among other persons, county boards of elections. Stip. Facts ¶¶ 13-16.

For instance, on September 28, 2020, Secretary Boockvar issued guidance entitled "Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures." Stip. Facts ¶¶ 15-16, Stip. Facts Ex. B (Appendix Ex. 3). In it she gave county boards of elections express instructions on the treatment of undated ballots, directing that they should ***not be counted***:

- "A ballot-return envelope with a declaration that is not filled out, dated, and signed is not sufficient and must be set aside, declared void and may not be counted." Stip. Facts Ex. B at 5 (Appendix Ex. 3).

- "Set aside any ballots without a filled out, dated and signed declaration envelope." Stip. Facts Ex. B at 9 (Appendix Ex. 3).

Critically, the Allegheny Board received and reviewed the September 28, 2020 Guidance before the November 3, 2020 General Election. Stip. Facts ¶ 17.

Before Election Day, the Allegheny County Elections Division published on its website a video, with accompanying website text, entitled "Mail in Ballot Instructions." Stip. Facts ¶ 22. The text on the website advised potential voters that "[t]o make sure that your vote is counted, be certain to follow the instructions that come with your ballot or consider this brief video to assist[.]" Stip. Facts ¶ 23, Stip. Facts Ex. E at 1 (Appendix Ex. 5). The referenced instructions that came with the ballot advised potential voters to "Sign and print your name *and the date* beneath the 'VOTER'S DECLARATION' on the return envelope." Stip. Facts ¶ 25 (emphasis added). The video likewise advised voters to follow all instructions, stating: "It's important to do everything right so your vote is counted." Stip. Facts ¶ 24, Stip. Facts Ex. F at 1; Transcript at 1:2-3 (Appendix Ex. 4). The video further supplied guidance on completing the voter declaration, specifically stating as follows regarding the date: "The voter is *required* to sign, *date*, and provide their address on the back of the envelope. …. The next line is for the date on which you were signing the declaration, not your date of birth." Stip. Facts Ex. F; Transcript at 3:3-5, 12-13 (emphasis added) (Appendix Ex. 4).

The 2020 General Election was held on November 3, 2020. Stip. Facts ¶ 26. The Allegheny Board received approximately 350,000 mail-in/absentee ballots for the 2020 General Election. Stip. Facts ¶ 27. While review of those ballots was underway after Election Day, the Allegheny County Elections Division regularly

8

supplied "Election Day Updates" and posted the same on the internet at

https://www.alleghenycounty.us/elections/election-day-updates-(november-3,-
2020).aspx. Election Day Updates (Appendix Ex. 8). On November 10, 2020, in the 8

PM Dispatch, Allegheny County advised that "approximately 2,000 ballots were

naked—meaning they were returned without a secrecy envelope" and advised that

those ballots "will not be counted." Election Day Updates at 9 (Appendix Ex. 8). The

same update stated "an additional 370 had incomplete voter declarations and will

not be counted." Election Day Updates at 9 (Appendix Ex. 8). The 370 "incomplete"

voter declarations did not include the 2,349 ballots returned with no date, which

were separately discussed in the same update. Election Day Updates at 9 (Appendix

Ex. 8). A few days later on November 14, 2020, in addition to the over 2000 ballots

that were not counted based on the secrecy defect or the incomplete declaration

defect, the Allegheny Board voted to not count 13 provisional ballots because the

voter declaration was unsigned. Stip. Facts ¶ 28.

From the entirety of Allegheny County, the Allegheny Board received 2,349

mail-in/absentee ballots from the 2020 General Election that did not have a dated

voter declaration. Stip. Facts ¶ 29. Concerning just Senate District 45, the

Allegheny Board received 311 mail-in/absentee ballots that did not have a dated

voter declaration (hereafter, "the Undated Ballots"). Stip. Facts ¶ 31. The Undated

Ballots contained 202 votes for Mr. Brewster and 109 votes for Ms. Ziccarelli, a

difference of 93 votes in favor of Mr. Brewster. Stip. Facts ¶ 32.

On November 10, 2020, the Allegheny Board decided, by a vote of 2-1, to count the undated mail-in/absentee ballots, including the Undated Ballots. Stip. Facts ¶ 33. In the midst of state court litigation, discussed below, on November 23, 2020, the Allegheny Board certified the results of the 2020 General Election, which results included a separate tally of the undated ballots, but which were not included in the overall total votes counted. Stip. Facts ¶ 51. On November 25, 2020, the Allegheny Board approved an amended certification that included the Undated Ballots and submitted that amended certification to Secretary Boockvar. Stip. Facts ¶ 52. The total votes for Senate District 45 from Allegheny County for the 2020 General Election were as follows: 57,782 votes for Mr. Brewster and 51,561 votes for Ms. Ziccarelli. This certification included the 311 Undated Ballots. Stip. Facts ¶ 52. Without the Undated Ballots, the Allegheny Board would have certified 57,580 votes for Mr. Brewster and 51,452 votes for Ms. Ziccarelli, as indicated in the initial November 23, 2020 certification. Stip. Facts ¶ 53.

Secretary Boockvar received the Allegheny Board's amended final certification, inclusive of the Undated Ballots. Stip. Facts ¶ 54. Later, the final tally from Allegheny County was adjusted again, and the final tabulated vote totals in Senate District 45 from Allegheny County, which included certain ballots that were received by the Board between 8:00 PM on election day and 5:00 PM on Friday, November 6, were 57,815 votes for Mr. Brewster and 51,588 votes for Ms. Ziccarelli. Stip. Facts ¶ 55. This total includes the 311 Undated Ballots. Stip. Facts ¶ 55.

10

Meanwhile, in the other county composing Senate District 45, Westmoreland County, approximately 60,000 mail-in/absentee ballots were received by the Westmoreland County Board of Elections for the 2020 General Election. Stip. Facts ¶ 56. The Westmoreland County Board of Elections received 343 mail-in/absentee ballots where the voter declaration was signed but undated ("the Westmoreland Undated Mail-in Ballots"). Stip. Facts ¶ 57. The Westmoreland County Board of Elections did not determine how many of the Westmoreland Undated Mail-in Ballots were in Pennsylvania Senate District 45. Stip. Facts ¶ 57.

On November 13, 2020, a member of the three-member Westmoreland County Board of Elections, proposed a motion to count the Westmoreland Undated Mail-In Ballots, but the motion did not receive a second. Stip. Facts ¶ 58. Between November 13, 2020 and November 30, 2020, the Westmoreland Undated Mail-in Ballots were not counted. Stip. Facts ¶ 59. On November 30, 2020, a Westmoreland County commissioner again proposed a motion to count the Westmoreland Undated Mail-In Ballots, but the motion again did not receive a second. Stip. Facts ¶ 64. Thereafter, and on that same day, the Westmoreland County Board of Elections certified to Secretary Boockvar its final election results, which certification did not include any count of the Westmoreland Undated Mail-In Ballots. Stip. Facts ¶ 65.

In the final election results certified to Secretary Boockvar by the Westmoreland County Board of Elections, that Board expressly notified the Secretary that it had not counted the Westmoreland Undated Mail-In Ballots by stating "[t]he below listed categories of votes subject to pending timely filed

11

litigation are not included as part of this updated certification: 1. Undated mail-in and absentee ballots in the 45th District and throughout the County." Westmoreland County Certification (Appendix Ex. 2); Stip. Facts ¶¶ 65, 68.

In total, the Westmoreland County Board of Elections certified 8,412 votes for Mr. Brewster and 14,560 votes for Ms. Ziccarelli. Stip. Facts ¶ 67. However, the final tabulated vote totals in Senate District 45 from Westmoreland County, after including the after 8 PM ballots described above, were 8,446 votes for Mr. Brewster and 14,604 votes for Ms. Ziccarelli. Stip. Facts ¶ 69. Again, this total does not include any of the Westmoreland Undated Mail-In Ballots. Stip. Facts ¶ 69.

Combining the Allegheny County and Westmoreland County final totals from the 2020 General Election, Mr. Brewster received 66,261 votes and Ms. Ziccarelli received 66,192 votes, a difference of 69 votes in favor of Mr. Brewster. Stip. Facts ¶ 70. If the Undated Ballots were removed from the final votes, Mr. Brewster would receive 66,059 votes and Ms. Ziccarelli would receive 66,083 votes, a difference of 24 votes in favor of Ms. Ziccarelli. Stip. Facts ¶ 71.

Weeks after the initiation of this litigation, on December 16, 2020, Secretary Boockvar certified the general election results for State Senator, including Senate District 45. Stip. Facts ¶¶ 72-73. But, as of December 21, 2020, the Secretary had not issued a certificate of election for any State Senate race. Stip. Facts ¶ 74.

### C.    History of the Litigation in State Court.

Ms. Ziccarelli filed a timely appeal from the Allegheny Board's November 10, 2020 decision to count the Undated Ballots to the Allegheny County Court of Common Pleas, which affirmed the decision to canvass the Undated Ballots. Stip.

Facts ¶¶ 34-37. Next, upon expedited review, a three-judge panel of the Commonwealth Court reversed the Allegheny Board's decision on November 19, 2020. Stip. Facts ¶¶ 38-40; *see In re 2,349 Ballots in 2020 Gen. Election*, 2020 WL 6820816, at *7. Thereafter, the Allegheny Board filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court, which the Supreme Court granted on November 20, 2020, and then consolidated the appeal with *In re: Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*. Stip. Facts ¶ 41.

On November 23, 2020, the Supreme Court issued a fractured decision in *In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*, No. 29 WAP 2020. Stip. Facts ¶ 42-43. Specifically, the Opinion Announcing Judgment of the Court (OAJC), authored by Justice Donohue and joined by Justices Todd and Baer, concluded the Undated Ballots should be canvassed because an undated signature on the voter declaration was a minor irregularity. *See generally In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*, 2020 WL 6866415, at *16.[11] However, **a four-justice majority of the Court held**

---

[11] As explained by the Pennsylvania Supreme Court, "an Opinion Announcing the Judgment of Court is not binding precedent[,]" as it has not garnered the vote of a majority of the justices. *Cimaszewski v. Bd. of Prob. & Parole*, 868 A.2d 416, 424 (Pa. 2005); *see also Vargus v. Pitman Mfg. Co.*, 675 F.2d 73, 75 (3d Cir. 1982) (noting that the opinion announcing the judgment of the court was not precedential and, thus, the expressions contained in it were not binding). Moreover, because "a concurrence in the result only cannot confer precedential value to an opinion[,]" *Vargus*, 675 F.2d at 75, Justice Wecht's decision to join Justices Donohue, Todd, and Baer in the ultimate judgment issued by the Court does not elevate the OAJC to a binding expression of Pennsylvania law. *See Com. v. Glover*, 441 A.2d 1216, 1217 (Pa. 1982).

**an undated signature on the voter declaration renders the enclosed mail-in ballot defective**.

Specifically, in a concurring and dissenting opinion in which Chief Justice Saylor and Justice Mundy joined, Justice Dougherty differed from the OAJC's analysis relative to the Undated Ballots, concluding "the statutory language expressly requires that the elector provide" a date and signature on mail-in ballots. 2020 WL 6866415, at *25 (Dougherty, J., concurring and dissenting).

Justice Wecht also filed a concurring and dissenting opinion, "part[ing] ways with the conclusion … that a voter's failure to comply with the statutory requirement that voters date the voter declaration should be overlooked as a 'minor irregularity.'" 2020 WL 6866415, at *16 (Wecht, J., concurring and dissenting). Justice Wecht reasoned that these requirements for signing and dating a mail-in ballot are "stated in unambiguously mandatory terms, and nothing in the Election Code suggests that the legislature intended that courts should construe its mandatory language as directory." 2020 WL 6866415, at *16 (footnote omitted). Such a reading, Justice Wecht explained, was necessary to effectuate the General Assembly's "policy judgments about what requirements are necessary to ensure the security of our elections against fraud and avoid inconsistent application of the law[.]" *Id.* at *23. Despite agreeing the Undated Ballots do not comply with a mandatory statutory directive, Justice Wecht expressed his preference for a prospective application of the requirement and, on that basis, joined in the ultimate judgment of the Court to reinstate the decision of the Court of Common Pleas. *Id.*

14

Yet, in short, the legal principle that emerged from the Court's decision was that mail-in ballots with undated declarations are invalid under the Election Code.[12]

## III.   ARGUMENT

Plaintiff Ziccarelli is entitled to summary judgment on Count I (equal protection) and Count II (due process).

### A.   Plaintiff Ziccarelli is entitled to summary judgment as a matter of law on her equal protection claim in Count I.

"The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Relying on these principles, this Court observed the following statement is "uncontroversial": "a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other[.]" *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-CV-966, ---F. Supp. 3d----, 2020 WL 5997680, at *42 (W.D. Pa. Oct. 10, 2020) (citing *Bush*) (Ranjan, J.) (hereafter, *Donald J. Trump WDPA*). This Court continued by saying "[i]t also seems reasonable (or at least defensible) that this proposition should be extended to situations where a state takes two equivalent votes and, for

---

[12] *See generally In re T.S.*, 192 A.3d 1080, 1088 (Pa. 2018) (analyzing a fractured decision and holding that the relevant legal principle on the issue before the Court was not expressed by the OAJC, but rather had to be discerned from a concurring and dissenting opinion filed by Chief Justice Saylor, which was joined by Justice Todd and a dissenting opinion filed by Justice Mundy, which Justice Baer had joined).

no good reason, adopts procedures that greatly increase the risk that one of them will not be counted—or perhaps give more weight to one over the other." *Id.*; *see also Pierce v. Allegheny Cty. Bd. of Elections*, 324 F. Supp. 2d 684, 697 (W.D. Pa. 2003) ("A state must impose uniform statewide standards in each county in order to protect the legality of a citizen's vote. Anything less implicates constitutional problems under the equal protection clause of the Fourteenth Amendment.").

The foregoing underscores the basic Equal Protection violations present in this case, of which there are at least three.

*First*, Secretary Boockvar, despite issuing guidance on September 28 advising counties to set aside undated ballots, Stip. Facts ¶¶ 15-16, Stip. Facts Ex. B at 5, 9 (Appendix Ex. 3), despite telling the U.S. Supreme Court the date provision was an important anti-fraud provision, Stip. Facts ¶¶ 18-19, Stip. Facts Ex. C at 16 (Appendix Ex. 1), and despite telling that same Court provisions like the date provision are important election "safeguards," Stip. Facts ¶¶ 20-21, Stip. Facts Ex. D at 3 (Appendix Ex. 6), took the ballot totals from Allegheny County and Westmoreland County and accepted them as is on December 16. Stip. Facts ¶ 72. This is to say, she received the results and certified them knowing fully that the two counties treated identical ballots in antipodal ways; indeed, notably, she certified the results *after* Plaintiff filed this suit and sought injunctive relief on November 25, 2020 and *after* Westmoreland County certified its final results on November 30, 2020 with an express note that undated ballots had not been counted. *See* Complaint (doc. 1); Westmoreland County Certification (Appendix Ex. 2); *see also*

16

Amended Complaint (doc. 29) (filed December 1, 2020). In doing so, she unlawfully took "the votes of two voters, similarly situated in all respects, and, for no good reason, count[ed] the vote of one but not the other[.]" *Donald J. Trump WDPA*, 2020 WL 5997680, at \*42; *see also Pierce*, 324 F. Supp. 2d at 697.

And Secretary Boockvar has no legitimate reason to have done so. For starters, regardless of what this Court deems the legal effect of the Pennsylvania Supreme Court order was on the Allegheny Board, no doubt exists that the order said nothing about what Secretary Boockvar should do with disparate, irreconcilable vote tallies from two counties; i.e., she was under no court compulsion to act one way or another. Further, as repeatedly noted, the counting of these votes went against her own guidance as well as her representations to the U.S. Supreme Court. Finally, as a matter of state law, she was, and remains, duty-bound to critically examine the votes she receives from counties in exercising her obligation to "canvass" their tallies, *see* 25 P.S. §§ 2621, 3159, and in fulfilling her oath to obey the U.S. Constitution, Pa. Const. art. VI, § 3, meaning she cannot simply certify election totals knowing full well they are infected with the fatal disease of arbitrary, disparate treatment of identically situated voters.

*Second*, Secretary Boockvar has also violated equal protection by accepting "incomplete" results. Alongside the much-discussed equal protection violation identified in *Bush v. Gore* (arbitrary treatment of votes) was "yet a further equal protection problem." 531 U.S. at 108. That problem, as described by the Court, was as follows: "votes certified by the [Florida Supreme Court] included a partial total

17

from one county, Miami-Dade. The Florida Supreme Court's decision thus gives no assurance that the recounts included in the final certification must be complete." *Id*. The same incomplete tally has occurred here in one of two ways. *One*, with Secretary Boockvar accepting Allegheny's totals inclusive of one set of ballots with statutory problems—the undated ballots—but not other sets of ballots with indistinguishable statutory problems—ballots without secrecy envelopes or declaration defects, *see* Election Day Updates at 9 (Appendix Ex. 8)—she allowed the Allegheny Board, and consequently the Commonwealth with her certification of the vote totals, to arbitrarily tally partial totals. *Two*, with Secretary Boockvar accepting Allegheny's totals inclusive of undated ballots, while simultaneously accepting Westmoreland's totals without undated ballots, she allowed the election to be knowingly certified with an entire block of votes—343 in total, *see* Stip. Facts ¶¶ 57, 68-69—left by the wayside. Either those votes should be counted with Allegheny's similarly situated votes or both sets of votes should be set aside (the right result), but they can't just be ignored. Doing so means the Commonwealth, through Secretary Boockvar, certified an incomplete total, contrary to the guarantees of Equal Protection. *Cf. Bush*, 531 U.S. at 108.

*Third*, the Allegheny Board violated equal protection by treating undated ballots from Allegheny County differently from identically situated ballots from Westmoreland County. It did so despite being in receipt of Secretary Boockvar's September 28 Guidance to the contrary *before* Election Day. *See* Stip. Facts ¶ 17 ("The Allegheny Board received and reviewed the … September 28, 2020 Guidance

18

before November 3, 2020."). This led to the entirely arbitrary outcome that identically situated voters—in all respects—had their ballots treated differently based on the sole happenstance of where within Senate District 45 the voter lived. And critically, what the Westmoreland County Board did in deciding to not count these ballots was simply follow that which is expressly commanded by the Election Code—not count them—and which is agreed with by a majority of the Pennsylvania Supreme Court *and* Secretary Boockvar.

**B.    Plaintiff Ziccarelli is entitled to summary judgment as a matter of law on her due process claim in Count II.**

Separate and apart from the equal protection violation, Defendants' conduct also violates substantive due process rights as guaranteed by the First and Fourteenth Amendments of the United States Constitution. At the outset, it cannot be emphasized enough that the right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 643 (E.D. Pa. 2018) (citing *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (reiterating that the protections afforded under the United States Constitution extend to state and federal elections alike)); *accord Pierce*, 324 F. Supp. 2d at 697 (relaying that the United States Supreme Court has found a constitutional violation "where a canvassing procedure "was not conducted 'in compliance with the requirements of equal protection and due process'" (quoting *Bush*, 531 U.S. at 110)).

Importantly, the Due Process Clause proscribes not only an outright denial of the right to vote, but also actions and practices that dilute the weight of votes.

19

Indeed, this Court has cautioned that the "fundamental right to vote 'can be denied by a debasement or dilution of the weight of a citizen's vote *just as effectively* as by wholly prohibiting the free exercise of the franchise.'" *Pierce*, 324 F. Supp. 2d at 695 (quoting *Reynolds*, 377 U.S. at 555) (emphasis added). Of course, not every state election dispute implicates substantive due process rights protected by the U.S. Constitution, *see Acosta*, 288 F. Supp. 3d at 643 (collecting cases involving "garden variety election irregularities [that] are not actionable" (internal quotation marks omitted)), but where "the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order." *Marks v. Stinson*, 19 F.3d 873, 888 (3d Cir. 1994) (quoting *Griffin v. Burns*, 570 F.2d 1065 (1st Cir.1978)); *see also Afran v. McGreevey*, 115 Fed.Appx. 539, 544 (3d Cir. 2004) (*per curiam*); *Acosta*, 288 F. Supp. 3d at 610 n.5 ("In the election context, substantive due process rights are implicated where alleged election misconduct affects the fundamental fairness of an election and the right of citizens to vote in the election.").

Although such systemic defects can take many forms, several courts have agreed that where state officials establish guidelines for processing and canvassing ballots prior to the election, a change in those rules *after* votes have been cast violates the Due Process Clause of the Fourteenth Amendment. Canvassing the Undated Ballots and including them in the final certification of the results of the election for Senate District 45—in direct contravention of not only the Election

20

Code, but also the Secretary's own guidance—creates precisely the type of fundamental unfairness that warrants recourse to this Court.

In this regard, the series of decisions in *Roe v. Alabama* are particularly instructive. By way of relevant background, those decisions involved an Alabama statute requiring absentee ballots to be enclosed in an envelope that was either notarized, or signed by two witnesses attesting that the voter cast the ballot without any improper influence or duress. *See* Ala.Code § 17–10–7; *see also Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 577 (11th Cir. 1995) (*per curiam*) (*Roe I*). Notwithstanding this clear statutory directive, following the 1994 General Election, a county trial court in Alabama entered an order directing all counties to canvass absentee ballots that lacked the requisite notarization or attestation from two witnesses, but were otherwise compliant. *See id.* at 578. Shortly thereafter, several candidates and voters commenced an action under Section 1983 alleging the state court's directive effected a post-election change in the rules governing the election process and, thus, violated the Due Process Clause. The United States District Court for the Southern District of Alabama agreed and entered an order not only prohibiting the local boards from counting those ballots, but also enjoining the Secretary of State from including any such votes in his certification. *See id.* at 579.

On appeal, the Eleventh Circuit Court of Appeals affirmed the entry of a preliminary injunction, agreeing with the District Court's conclusion that "failing to exclude the contested absentee ballots will constitute a post-election departure from previous practice in Alabama[,]" in violation of the Due Process Clause. *Id.* at 581

21

(citing *Griffin v. Burns,* 570 F.2d 1065, 1075 (1st Cir.1978)). However, expressing "reluctan[ce] to reach a final decision in this case while the proper application of the Alabama Election Code remains muddled[,]" the Court certified a question to the Alabama Supreme Court concerning validity of the ballots that violated the notarization/witness requirement under Alabama law. *Id.* at 582-83.

In response to the certified question, the Alabama Supreme Court found the relevant provision merely directory and, thus, held that ballots that were not properly notarized or witnessed, but otherwise complied with state law, must be canvassed. *See Roe v. Mobile Cty. Appointment Bd.*, 676 So. 2d 1206, 1226 (Ala. 1995). Nevertheless, upon receiving the answer to the certified question, the Eleventh Circuit directed the District Court to independently ascertain the established practice in Alabama, as it existed when the election as held. *See Roe v. State of Ala. By & Through Evans*, 52 F.3d 300 (11th Cir. 1995) (*per curiam*).

On remand, the District Court found that prior to the election, the notarization/witness requirement was widely regarded as mandatory by the relevant election officials and that a voter's failure to comply with it was understood a settled basis for setting ballots aside. Among other things the District Court emphasized that this precept was plainly articulated by the Alabama Secretary of State's pre-election directives to county officials:

> The consistent and plain position of the Secretary of State, the chief election official of the State of Alabama, is that an absentee ballot must include the signature of the voter and that signature must be notarized or witnessed by two adult witnesses. The Secretary of State has instructed every voting official in Alabama to that effect and has

22

provided voters with the same information. The rule is a "bright-line" rule.

*Roe v. Mobile County Appointing Bd.*, 904 F. Supp. 1315, 1335 (S.D. Ala. 1995) (*Roe II*). Accordingly, the District Court held the post-election change in Alabama election law resulting from the state court ruling was "a fundamental deficiency in the fairness of the process" that violated the Due Process Clause of the Fourteenth Amendment. *Id.* (internal quotation marks omitted). This defect was poignantly summarized in three sentences by the District Court: "The change in election practice and interpretation of the law of the State of Alabama is broad-gauged unfairness that permeates an election. The post-election change of practice is abominable under the Constitution of the United States. It amounts to ballot-box stuffing." *Id.* On appeal, the Eleventh Circuit affirmed once again and directed the parties to comply with the District Court's injunction. *See Roe v. State of Alabama*, 68 F.3d 404, 407-09 (11th Cir. 1995) (*Roe III*) (*per curiam*).

Against the foregoing backdrop, the Secretary's and Allegheny Board's conduct is fundamentally unfair and inconsistent with rudimentary principles of due process, as set forth in the *Roe* decisions. Specifically, in canvassing the Undated Ballots, the Allegheny Board and the Secretary changed the rules of the election after the election had already been conducted: the very essence of *Roe*'s proscription. The Allegheny Board's and Secretary's actions are inconsistent with the Election Code, which is the chief "rule-book" for conducting elections in Pennsylvania, since undated declarations render the accompanying ballot invalid

23

under the plain language of the statute, as confirmed by the Pennsylvania Supreme Court's interpretation.

Further, perhaps the best evidence of the pre-election rule is Secretary Boockvar's own unambiguous directive that "[a] ballot-return envelope with a declaration that is not filled out, ***dated***, and signed is not sufficient and must be set aside, declared void and may not be counted." Stip. Facts ¶¶ 15-16, Stip. Facts Ex. B at 5 (emphasis added) (Appendix Ex. 3). Indeed, her brief to the United States Supreme Court on October 5, 2020, the Secretary, through the Attorney General Shapiro, characterized any suggestion of potential fraud associated with Pennsylvania's mail-in voting scheme as "fantasy" and "baseless fearmongering" because "the mail-in ballot envelope contains a Voter's Declaration that must be signed and dated by the qualified elector." Stip. Facts ¶¶ 15-16, Stip. Facts Ex. C at 15 (Appendix Ex. 1).

The Allegheny Board, for its part, acknowledges it "received and reviewed" the Secretary's guidance prior to the election. Stip. Facts ¶ 17. In fact, consistent with the Secretary's guidance, the Allegheny Board not only sent instructions to all mail-in/absentee voters directing them to date their voter declarations, Stip. Facts ¶ 25, but also the Allegheny County Elections Bureau published a video entitled "Mail In Ballot Instructions" on its website reminding voters that they must date their voter declaration and cautioning that failure to do so would result in their vote not being counted. Stip. Facts ¶¶ 22-23, Stip. Facts Ex. E.

Nevertheless, after all the votes have been cast, the Secretary now seeks to certify an election result that would contravene a rule that she articulated and distributed to the county boards of elections weeks before the election and, on which basis, she urged the United States Supreme Court to refrain from acting. Such a "change[ in] the rules half way through the game[,]" whereby "[t]he state t[ells] voters one thing before the election and change[s] its policy thereafter[,]" *Scheer v. City of Miami*, 15 F. Supp. 2d 1338, 1344 (S.D. Fla. 1998), is precisely the type of fundamental unfairness that the Due Process Clause prohibits. *Accord Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1, 20 (1st Cir. 2004) (Howard, J., concurring) (noting that "a viable federal vote-dilution claim might lie in some circumstances where a post-election rule change has the effect of causing previously invalid ballots to be adjudicated," but concluding that no such violation had occurred).

Furthermore, even apart from *Roe*'s cogent formulation of the Due Process violation, the Secretary's and Allegheny Board's deliberate decision to ignore a mandatory statutory directive is far from the type of "episodic event" or "isolated incident" that courts encounter in "garden variety" election disputes. *Scheer*, 15 F. Supp. 2d 1342-43 (quoting *Curry v. Baker*, 802 F.2d 1302 (11th Cir.1986)). Plaintiff Ziccarelli's claim does not involve isolated occurrences, such as machine malfunction, human or mechanical error in tabulation, vague allegations of inadequate safeguards, or ordinary mistakes by election officials. *See Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005) (collecting examples of irregularities courts have found are not actionable). To the contrary, Ms. Ziccarelli's challenge

25

relates to the type of "willful conduct that undermines the organic processes by which candidates are elected[.]" *Id.* (citing *Smith v. Cherry*, 489 F.2d 1098 (7th Cir.1973)).[13] Indeed, the impact of this systemic defect—at least under the present circumstances—is both particularized and profound, since the Undated Ballots do not merely cause a generalized dilution to the votes of the more than 65,000 voters (including Ms. Ziccarelli herself) who lawfully voted for Ms. Ziccarelli; rather, this single class of illegal ballots, if permitted to remain in the certification, will change the result of the election. Stip. Facts ¶¶ 70-71.

Finally, the Third Circuit Court of Appeals has reached a similar conclusion in the context of a dispute involving improperly cast absentee ballots. In *Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994), the Circuit Court reviewed the District Court's grant of a preliminary injunction that, among other things, prohibited the winning candidate in a Pennsylvania state senate race from exercising any authority of the office based on findings that unlawfully distributed absentee ballots were counted

---

[13] Notably, in nearly every decision where a due process challenge has been rejected, the voter dilution was caused by error or negligence. The few cases where election officials have intentionally disregarded an established rule, on the other hand, courts have almost universally found a due process violation. In this regard, the Seventh Circuit Court of Appeals has noted that "intent is an essential ingredient" of a due process challenge to the conduct of an election. *See Kasper v. Bd. of Election Comm'rs of the City of Chicago*, 814 F.2d 332, 343 (7th Cir. 1987); *see also Nolles v. State Comm. for Reorganization of Sch. Districts*, 524 F.3d 892, 898 (8th Cir. 2008) ("A canvass of substantive due process cases related to voting rights reveals that voters can challenge a state election procedure in federal court only in limited circumstances, such as when . . . *the willful and illegal conduct of election officials results* in fraudulently obtained or *fundamentally unfair voting results.*" (emphasis added)). Here, the intentional nature of the Secretary's and Allegheny Board's violations further militates in favor of finding a due process violation.

in the election. *Id.* at 875. The Third Circuit agreed that, under the circumstances, the plaintiffs demonstrated a "likelihood of success on the claims that the defendants conduct violated … 'the substantive due process right of Plaintiffs to a free and fair election.'" *Id.* at 878.

Like as was the case in *Marks*, the matter before this Court, although it does not involve unlawfully obtained absentee ballots, presents an analogous example of a violation of voters' substantive rights under the Due Process Clause. Specifically, like in *Marks*, the violation here implicates a systemic deficiency associated with a specific aspect of the electoral process. Thus, a result similar to the one reached in *Marks* is fully warranted.

In sum, the Secretary's and the Allegheny Board's post-election decisions to change the rules, as matter of law, violate Ms. Ziccarelli's substantive due process rights—particularly where the resulting dilution of votes can be traced to a specific class of illegal ballots and stands to radically alter the outcome of the election. Accordingly, Plaintiff Ziccarelli is entitled to summary judgment on the merits of her due process claim.

### C.    The appropriate, and only, remedy for the constitutional violations is to "level down."

The central question in this matter has been whether the remedy for the constitutional violations is to "level up" or "level down." The answer is "level down" for three reasons: one, it is what the Election Code commands; two, leveling down does not cause disenfranchisement; and three, it is the *only* appropriate remedy.

27

> 1.  **The Court must look to legislative intent to determine whether to level up or level down: in this matter, legislative intent shows leveling down is compelled.**

When unconstitutional unequal treatment is found by a federal court, the Constitution is silent on whether the court must then level up or level down to cure the inequity. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017). While the U.S. Supreme Court has explained that the "preferred rule in the typical case is to extend favorable treatment," it has further explained that this general rule *does not* apply in a case where application of the rule (i.e., leveling up) would thwart legislative intent with a particular statutory scheme. *See id.* at 1701 (where court leveled down based on perceived congressional intent). Indeed, where unconstitutional disparate treatment springs from application of a statutory scheme—like here with the Pennsylvania Election Code—the question a court must answer is this: what would the legislative body have done with the equal treatment violation had it been presented with it? *See id.* at 1700; *see also Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 427 (2010); *Texas Democratic Party v. Abbot*, 961 F.3d 389, 416-17 (5th Cir. 2020) (Ho, J., concurring) (discussing *Sessions* in context of Texas mail-in voting scheme).

Here, the General Assembly's intent with the requirement to date the voter declaration is clear based on the plain language of the Election Code, meaning the General Assembly would (and, indeed did) command each county to set aside and not canvass such ballots to yield equal treatment of the ballots. That is, the General Assembly intended and would want "leveling down" in the context of equal treatment of undated ballots across counties. *See In re 2,349 Ballots in 2020 Gen.*

28

*Election*, 2020 WL 6820816, at *6 ("While we realize that our decision in this case means that some votes will not be counted, the decision is grounded in law. It ensures that the votes will not be counted because the votes are invalid as a matter of law. Such adherence to the law ensures equal elections throughout the Commonwealth, on terms set by the General Assembly."). And certainly Secretary Boockvar interpreted the Code exactly this way when she issued formal guidance on September 28, 2020 advising county boards of election to "[s]et aside any ballots without a filled out, dated and signed declaration envelope." *See* Stip. Facts ¶¶ 15-16, Stip. Facts Ex. B at 5, 9 (Appendix Ex. 3). Moreover, that leveling down is what the General Assembly would want under these circumstances is manifest when identifying the purpose of the date provision, which is to prevent *actual* fraud and the *appearance of* fraud in the election returns. *See* Pl. Brief, *supra* § II.A.

In sum, based on the statutory scheme implicated by this constitutional violation, the appropriate remedy is to level down because it reflects what the General Assembly would want if presented with this scenario.

### 2.      Leveling down will not cause disenfranchisement.

The U.S. Supreme Court has long held that states may impose reasonable conditions on the exercise of the franchise, in effect holding potential voters cannot simply vote however and whenever they want under the Constitution or otherwise. *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order,

29

rather than chaos, is to accompany the democratic processes.'"); *Donald J. Trump WDPA*, 2020 WL 5997680, at *38 ("At the same time, however, the Constitution 'confers on the states broad authority to regulate the conduct of elections, including federal ones.' This authority includes 'broad powers to determine the conditions under which the right of suffrage may be exercised.'" (internal citation omitted)); *see also Democratic Natl. Comm. v. Wisconsin State Legis.*, No. 20A66, 2020 WL 6275871, at *5 (U.S. Oct. 26, 2020) (Kavanaugh, J, concurring in denial of application to vacate stay) ("Voters who, for example, show up to vote at midnight after the polls close on election night do not have a right to demand that the State nonetheless count their votes. Voters who submit their absentee ballots after the State's deadline similarly do not have a right to demand that the State count their votes.").

The effect of these reasonable restrictions on the exercise of the franchise is simply that sometimes persons who intended to vote will simply not have their ballots counted, which is not an offense to the Constitution, *nor is it* disenfranchisement. *See Democratic Natl. Comm.*, 2020 WL 6275871, at *7 ("In other words, reasonable election deadlines do not 'disenfranchise' anyone under any legitimate understanding of that term."); *In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, 2020 WL 6866415, at *19 (Wecht, J.) ("And even where the legislature's goal, however objectionable, is to impose a requirement that appears to have a disenfranchising effect, it may do so to any extent that steers clear of constitutional protections."); *In re Allegheny County*

30

*Provisional Ballots in the 2020 Gen. Election*, No. 1161 C.D. 2020, 2020 WL 6867946, at *5 (Pa. Cmwlth. Nov. 20, 2020) ("Finally, although our decision may be perceived as disenfranchising voters, the Election Code mandates that these deficient ballots shall not be counted. This Court emphasizes that it is following and faithfully applying the mandates of our General Assembly and our Supreme Court precedent.").[14]

Indeed, it is not disenfranchisement to disallow the counting of undated ballots that are not now, ***and never were***, lawful ballots under Pennsylvania law. Disallowing this class of attempted votes is no different from the Allegheny Board itself disallowing, on its own, attempted votes where the declaration was wholly defective, where the secrecy envelope was not included, or where a voter failed to comply with various procedural rules related to provisional balloting. These three categories of ballots resulted in ***excess of 2000 ballots*** being disallowed in the 2020

---

[14] Indeed, Pennsylvania courts have long held that, where electors fail to follow statutory mandates in submitting ballots, their votes are properly set aside because they have "disenfranchised themselves." *In re Primary Election Apr. 28, 1964*, 203 A.2d 212, 218-19 (Pa. 1964) (refusing to canvass defective ballots and holding that the "desire to … avoid 'disfranchising' many voters" was "more superficial than real[,]" since "if there was any disfranchisement the voters carelessly or unthinkingly disfranchised themselves"); *In re Canvass of Absentee Ballots of Gen. Election*, 39 Pa. D. & C.2d 429, 432 (C.P. Montgomery Cty. 1965) ("The voter, by failing to observe the statutory requirements, has disfranchised himself[.]" (quoting *In re Canvass of Absentee Ballots of Apr. 28, 1964, Primary Election*, 34 Pa. D. & C.2d 419, 422-23 (C.P. Philadelphia Cty. 1964)); *In re Whitpain Twp. Election Case*, 44 Pa. D. & C. 374, 384 (C.P. Montgomery Cty. 1942); *Case of Loucks*, 1893 WL 3125, at *4 (Pa. Quar. Sess. 1893); *Long v. Kochenderfer*, 1894 WL 3768 (Pa. Quar. Sess. 1894); *see also Rary v. Guess*, 198 S.E.2d 879, 880 (Ga. 1973) (holding that "a voter has disenfranchised himself" when he fails to follow a statutory mandate for voting).

General Election. *See* Election Day Updates at 9 (Appendix Ex. 8). In each of these instances, the elector attempted to vote, but not in a way permitted by the Election Code, and accordingly the ballot was set aside. This was not disenfranchisement, it was merely the outcome of following important anti-fraud provisions—or as Secretary Boockvar calls them: "safeguards to ensure the integrity" of the elections process, Stip. Facts Ex. D at 3 (Appendix Ex. 6)—that protect the franchise for all voters from misfeasance, intentional or otherwise.

In the end, the matter before this Court is not one where "good" votes are mixed in with "bad" votes, and the Court cannot distinguish the good from the bad. *Cf. Donald J. Trump MDPA*, 2020 WL 6821992, at *13. It is, instead, a case where a discrete and identifiable set of invalid ballots (the 311 undated Allegheny County ballots) can be readily separated from the remaining lawfully cast ballots, and appropriately disqualified. Doing so would ensure equal treatment of voters both across counties *and* within a single county (the Allegheny Board set aside in excess of 2000 bad ballots on its own). More importantly, doing so would ensure the Constitution is appropriately followed.

### 3.   Leveling down is the only appropriate remedy.

Finally, because an order directing Westmoreland County to join in the Allegheny Board's violation of the Election Code would violate the Due Process Clause of the Fourteenth Amendment and would be at odds with settled precepts of federalism and comity, leveling down is the only appropriate remedy.

*First*, as detailed above, where a method of canvassing votes has been established prior to the election, "for this Court to change the rules of the election,

after the votes have been cast, could well offend due process." *Baber v. Dunlap*, 349 F. Supp. 3d 68, 76 (D. Me. 2018) (citing *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 73 (2000) (*per curiam*)); *accord Northeast Ohio Coalition for the Homeless v. Husted*, No. 12-4354, slip op., at 11 (6th Cir. Nov. 16, 2012) (*per curiam* opinion in support of order granting emergency motion for stay pending appeal; staying the District Court's order directing the Secretary of State to tabulate ballots that did not conform with a directive he had issued prior to the election because "[c]hanging the rules by which votes are counted after they have already been cast compromises the interest of Ohio, the Secretary, and the general public in fair and orderly election procedures") (attached hereto).[15]

*Second*, settled notions of federalism and comity militate against a level-up approach. Specifically, because Pennsylvania law, as set forth in the Election Code and confirmed by the Pennsylvania Supreme Court, prohibits mail-in ballots with undated declarations from being canvassed, any level-up order from this Court would necessarily require the Westmoreland County Board of Elections to disregard state law. While federal courts may override state law, their "broad, equitable authority … is tempered by precepts of comity and federalism." *Kendrick v. Bland*, 740 F.2d 432, 437 (6th Cir. 1984). As such, when considering the proper remedy in the context of a constitutional violation by state officers, courts generally, wherever possible, refrain from crafting relief inconsistent with state law, unless "such a

---

[15] Because the appeal was dismissed prior to its final disposition, the opinion accompanying the stay order contains the only substantive analysis offered by the Sixth Circuit.

remedy is *necessary* to rectify a violation of *federal law*[.]" *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995) (emphasis in original); *see also St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 271 (8th Cir. 2011). Indeed, in the analogous context of a due process challenge to a state's electoral process, the Eleventh Circuit explained the relief sought by the parties was inappropriate because compliance with such an order would require the election official to violate state law. *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984).

Consistent with these precepts, a level-up remedy would put this Court in the untenable position of directing the Westmoreland County Board of Elections to violate a mandatory provision of the Election Code. Such a remedy, however, is not "*necessary* to rectify a violation of federal law," *Perkins*, 47 F.3d at 216 (emphasis modified), given the availability of a remedy that is in full accord with state law: i.e., the exclusion of the Undated Ballots from the Senate District 45 vote count.

## IV.   CONCLUSION

What has occurred here is unfair. Identically situated voters in two counties were treated fundamentally differently. That is not in dispute. What is also not in dispute is that this disparate, arbitrary treatment has directly impacted the outcome of the election for Senate District 45. That is what brings this dispute to this Court. The U.S. Constitution's guarantees of equal and fair treatment by state actors has been violated. And now it falls to this Court to find as such and then apply the appropriate remedy. That remedy, as set forth above, is singular, and clear: the unlawful ballots certified in the final returns by Secretary Boockvar must be set aside. This is not an act of disenfranchisement; it is, instead, an act that

34

guarantees uniform treatment of all voters, and, frankly, preserves the integrity of this election. Accordingly, Plaintiff Nicole Ziccarelli respectfully requests that the Court enter summary judgment in her favor and grant relief as set forth in the proposed order submitted herewith.

Respectfully submitted,

Dated: December 23, 2020

/s/ Joshua J. Voss
Joshua J. Voss (No. 306853)
Matthew H. Haverstick (No. 85072)*
Shohin H. Vance (No. 323551)*
James G. Gorman (No. 328376)*
Samantha G. Zimmer (No. 325650)*
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: jvoss@kleinbard.com
mhaverstick@kleinbard.com
svance@kleinbard.com
jgorman@kleinbard.com
szimmer@kleinbard.com
* *Admitted Pro Hac Vice*
*Attorneys for Plaintiff*

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

No. 12-4354

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

```
FILED
Nov 16, 2012
DEBORAH S. HUNT, Clerk
```

NORTHEAST OHIO COALITION FOR )
THE HOMELESS, et al., )
)
     Plaintiffs-Appellees, )
)
v. )
)
JON HUSTED, )
) ON APPEAL FROM THE UNITED
     Defendant-Appellant, ) STATES DISTRICT COURT FOR THE
) SOUTHERN DISTRICT OF OHIO
STATE OF OHIO, )
)
     Intervenor Defendant-Appellant, )

Before:  GIBBONS and COOK, Circuit Judges; ROSENTHAL, District Judge[*]

PER CURIAM. Before us is an emergency motion for stay pending appeal filed by appellants Jon Husted, the Secretary of State of Ohio ("Secretary"), and the State of Ohio.  Appellants seek to stay the district court's order requiring the Secretary to count all SSN-4 provisional ballots cast on November 6, 2012, with an improperly completed "Step 2" on their provisional ballot affirmation and to issue a directive by noon on Friday, November 16, 2012, that instructs local boards of elections to count non-SSN-4 provisional ballots cast on November 6 with an improperly completed "Step 2."  We grant the stay pending appeal.

---

[*] The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

-1-

NEOCH, et al. v. Husted, et
Case No. 12-4354

I.

These new requirements are part of an order granting the NEOCH plaintiffs' motion for

clarification and modification of the consent decree, entered November 13, 2012. The factual and

procedural context from which the order arose is critical to an understanding of the request for stay.

In January 2012 the Secretary issued Directive 2012-01, which provided instructions to election

officials about the counting of provisional ballots, including a six-step process for determining their

validity. Concurrent with the directive, the Secretary issued Form 12-B, entitled "Provisional Ballot

Affirmation." On the evening of November 2, 2012, after prior litigation in this case had concluded,

the Secretary issued Directive 2012-54, which superseded Directive 2012-01 but covered the same

subject matter. Form 12-B remained unchanged.

A day before the issuance of Directive 2012-54, on November 1, 2012, the NEOCH

plaintiffs filed an emergency motion to clarify the district court's order of October 26, 2012, which

denied plaintiffs' motion to modify the April 19, 2010, consent decree in this case and granted the

Secretary's motion for modification. This motion addressed a provision of the consent decree not

directly at issue in the October 26 order, paragraph 5(b)(vii), and raised an issue concerning Form

12-B. Essentially, the NEOCH plaintiffs contended that Form 12-B, by requiring the voter to fill in

his own identification information, violated state law. According to the plaintiffs, under the consent

decree, Form 12-B affirmations lacking identification information were not "properly completed"

by poll workers and thus must be counted in accord with paragraphs 5(b) and 5(b)(vii) of the consent

decree. On November 5, 2012, the NEOCH plaintiffs also moved to modify the consent decree to

extend to all provisional voters the protections plaintiffs believed paragraph 5(b)(vii) afforded to

-2-

*NEOCH, et al. v. Husted, et*
Case No. 12-4354

SSN-4 voters.[1]  A primary aspect of their argument was that Directive 2012-54 marked a dramatic departure from the Secretary's earlier position on voters' responsibility to write their identification information on the provisional ballot affirmation and that judicial estoppel thus precluded his opposition to their request.

After a hearing, the district court granted the relief sought by the NEOCH plaintiffs.  It found that Directive 2012-54 violated state law and the consent decree.  It enjoined the application of Directive 2012-54 to SSN-4 provisional voters, found this injunction to violate the equal protection rights of non-SSN-4 provisional voters, extended the protections of the consent decree to non-SSN-4 provisional voters, and concluded that judicial estoppel barred the Secretary from arguing that the consent decree did not signficantly change the procedure for poll workers to follow in counting ballots.   The Secretary and the State of Ohio appealed and filed the instant motion.

## II.

Appellants fail to cite the standard for granting a stay in their briefing.  Nevertheless, because they discuss the substance of the required factors, we consider their motion and their arguments. This court examines four factors when considering a stay pending appeal under Federal Rule of Appellate Procedure 8(a):

> (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.

---

[1] On that same day, in the related matter of *SEIU v. Husted*, No. 12-cv-00562 (S.D. Ohio), the SEIU plaintiffs moved for a preliminary injunction.  That request was later withdrawn.

NEOCH, et al. v. Husted, et
Case No. 12-4354

*Michigan Coal. of Radioactive Material Users, Inc. v. Gripentrog*, 945 F.2d 150, 153 (6th Cir. 1991). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Id.* As the moving party, Ohio and the Secretary have the burden of showing they are entitled to a stay. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

We begin by examining the likelihood that Ohio and the Secretary will prevail on the merits of their appeal of the district court's order finding that Directive 2012-54 violates the Decree. While we must give some degree of deference to the district court's interpretation of a consent decree that it approved, our review of an order interpreting a consent decree is *de novo*. *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 371–72 (6th Cir. 1998).

Appellants have strong arguments that they will prevail on appeal on several critical issues. The claim that Directive 2012-54 violates state law is based on the Directive's utilization of Form 12-B. The portion to be filled out by the voter contains three steps. The form instructs the voter that each step is "mandatory information required for your ballot to count." Ohio Sec'y of State, Directive 2012-54, at 9, *available at* http://www.sos.state.oh.us/SOS/Upload/elections/directives/2012/Dir2012-54.pdf The second of these three steps asks the voter to "provide . . . [a] form of identification." The voter must either (1) write the last four digits of his social security number, (2) write their driver's license number, or (3) check a box indicating that another satisfactory form of identification has been shown to the poll worker, or that a Form 10-T, entitled "Affirmation of Voter Who Cannot Provide Information," has been completed. *Id.* As is the case on the sample provisional ballot affirmation found at Ohio Rev.

*NEOCH, et al. v. Husted, et*
Case No. 12-4354

Code § 3505.182,[2] the voter "provides" identification by writing it on the provisional ballot affirmation. While there is a very short section at the end of the form where the poll worker is supposed to provide information, there is no space on the form for the poll worker to "record" the type of identification used by the voter.

Form 12-B is not without its flaws. It appears to contemplate voting procedures that relieve the poll worker of the duty to record the type of identification provided by the voter, as Ohio Rev. Code § 3505.181(B)(6) requires.[3] But we note that § 3505.181(B)(6) does not ask the poll worker to "record" the information on the provisional ballot affirmation sheet. The form provided in § 3505.182 provides a separate "verification statement" page that allows the poll worker to "record" the type of identification the voter showed prior to casting a ballot. And it is not obvious that Form 12-B violates section 3505.181(B)(6) because it asks the voter to "provide" identification by writing down an identification number or checking a box. In any event, any violation would, in and of itself, merely be a violation of state law, not redressable by the district court or this court. *See*

---

[2] The statute replicates the text and format of a sample provisional ballot affirmation and provides that "the written affirmation shall be printed upon the face of the provisional ballot envelope and shall be substantially" in the form of the sample. Ohio Rev. Code § 3505.182.

[3]
> If, at the time that an individual casts a provisional ballot, the individual *provides* identification . . . or *provides* the last four digits of the individual's social security number, or *executes an affirmation* that the elector does not have any of those forms of identification or the last four digits of the individual's social security number because the individual does not have a social security number, or declines to execute such an affirmation, *the appropriate local election officials shall record the type of identification provided, the social security number information,* the fact that the affirmation was executed, or the fact that the individual declined to execute such an affirmation and include that information with the transmission of the ballot or voter or address information under division (B)(3) of this section.

Ohio Rev. Code § 3505.181(B)(6) (emphasis added).

NEOCH, et al. v. Husted, et
Case No. 12-4354

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against state officials on the basis of state law . . . does not vindicate the supreme authority of federal law.").

　　　　　Whether use of Form 12-B and Directive 2012-54 violates the consent decree is more problematic. The consent decree's purpose is to protect voting rights for those who are indigent and may not have a home address or the funds to purchase identification. The method chosen for this protection is permitting the use of the last four digits of the voter's social security number as identification. The alleged violation of the consent decree is rejecting a provisional SSN-4 ballot when the voter has not provided identification; the violation occurs, in plaintiffs' view, because the voter is asked to write his own information on the form instead of relaying it to a poll worker to record. Such a violation is far afield from the potential harm the consent decree sought to redress. Moreover, the consent decree can be violated by this policy only if the meaning of "properly completed" in Paragraph 5(b)(vii) includes all kinds of mistakes and errors not germane to the purpose of the decree. This reading seems strained. The decree is not intended to enforce poll worker compliance with Ohio election law; it is designed to help voters without usual means of identification. Even if such poll worker omission to record identification information was deemed to violate the consent decree, the proper remedy for such a violation would not include an injunction that creates an equal protection violation and builds on that violation by imposing the more sweeping relief of expanding the consent decree and the scope of those it benefits. The district court's order improperly expands the class of voters it was intended to cover and the types of provisional ballot issues it was meant to address.

NEOCH, et al. v. Husted, et
Case No. 12-4354

Moreover, appellants' argument that the NEOCH plaintiffs lack standing to obtain relief on

behalf of individuals who are non-SSN-4 provisional voters likely has merit. In expanding the

consent decree on the NEOCH plaintiffs motion, the district court granted relief to a group of people

who are not before the court, who have not requested relief, and whose interests are not implicated

in the NEOCH litigation. The NEOCH plaintiffs lack the sort of "legally protected interest" in the

voting rights of non-SSN-4 voters necessary to seek relief on their behalf. *See Lujan v. Defenders*

*of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he plaintiff must have suffered . . . an invasion of a legally

protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not

conjectural or hypothetical' . . . .") (internal quotation marks omitted) (quoting *Whitmore v.*

*Arkansas*, 495 U.S. 149, 155 (1990)).

The district court also likely misapplied the doctrine of judicial estoppel. "[J]udicial estoppel

'generally prevents a party from prevailing in one phase of a case on an argument and then relying

on a contradictory argument to prevail in another phase.'" *White v. Wyndham Vacation Ownership,*

*Inc.*, 617 F.3d 472, 476 (6th Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749

(2001). The district court's analysis of this question focused on the following comment by counsel

for the Secretary, made at a hearing to modify the consent decree in light of this court's *NEOCH*

decision, which acknowledged the poll worker's responsibility to record identification information

under section 3505.181(B)(6):

> [T]he question is what is left of the concept of poll worker error in the context of
> defective ballot affirmations.
>
> [Plaintiffs' counsel] suggested to you, for example, that there might still be
> poll worker error because there is an obligation to record on the form the mode of

> identification used, and, if that's missing, that's a defect in the ballot. But that
> scenario is not covered by [paragraph 5(b)(vii) of the consent decree] we're talking
> about because, as they say, the obligation to write down the identifying information
> is imposed upon the poll worker, not upon the voter. [The consent decree] says that
> we won't invalidate ballots based upon the poll worker's failure to write something
> down.

The district court found that this comment constituted an assurance that the Secretary would not

order provisional ballots to be discarded because the poll worker did not "record" the voter's

identification information.

In Directive 2012-01, the Secretary asks election officials to "[d]etermine whether the

provisional voter was required to provide additional information to the board of elections within ten

days after the election." *See* Ohio Sec'y of State, Directive 2012-01, at 2, *available at*

http://www.sos.state.oh.us/SOS/Upload/elections/directives/2012/Dir2012-01.pdf. Directive 2012-

01 identified the only four situations under which Ohio law requires a voter to return to the board

of elections to provide identification after an election:

> 1. The voter possesses a SSN or proper identification, but [is] unable to provide it to
> the precinct election official;
>
> 2. The voter possesses a SSN or proper identification, but decline[s] to provide it the
> precinct official;
>
> 3. The voter does not possess a SSN or proper identification, and refused to sign a
> SOS Form 10-T [an affirmation by the voter that he or she cannot provide
> identification];
>
> 4. The voter was challenged at the polling place and his or her eligibility to vote
> could not be determined by the precinct election officials.

*Id.* If the voter is "not required to provide additional information," or provides the information to

the local election board within ten days of the election, then the election official can move to the next

-8-

NEOCH, et al. v. Husted, et
Case No. 12-4354

step in the provisional ballot evaluation process.  *Id.* at 3.  Otherwise, the ballot must be rejected.
*Id.*  Form 12-B, which was issued alongside Directive 2012-01 in January 2012, requires the voter,
and not the poll worker, to "provide" this information by writing it on the provisional ballot
affirmation.  The only fair reading of Directive 2012-01 is that if the voter does not properly write
this information down, the provisional ballot will be rejected.

The modified version of this procedure found in Directive 2012-54, issued in early November
2012 with no changes to Form 12-B, attempts to streamline its elements.  It asks the election official
to determine (1) "[i]f the voter provided one of the acceptable forms of identification," (2) if the
voter "completed a Form 10-T" affirmation at the polling place, or (3) the voter returned to the
county election board within ten days to either provide the identification or complete a Form 10-T
affirmation.  Directive 2012-54, at 3.  If the voter did not "provide identification on the provisional
ballot affirmation," complete a Form 10-T, or return to the election board, "the [election official]
must reject the provisional ballot."  *Id.*

Read in this context, the district court's interpretation of counsel's statement appears
problematic.  The comment made during the motion hearing is not the sort of "unequivocal" prior
position necessary for the imposition of judicial estoppel.  *See McMeans v. Brigano*, 228 F.3d 674,
686 (6th Cir. 2000).   This is particularly so in light of the history of Form 12-B and the directives.
The precise problem appellees raise here has not previously been a subject in this litigation and was
not at issue during the motion hearing in which the comment was made. While Directive 2012-54
is more explicit than Directive 2012-01 in specifying that ballots will be rejected when the voter has
not provided identification, either at the polling place or subsequently within ten days of the election,

*NEOCH, et al. v. Husted, et*
Case No. 12-4354

and has not filled out a form stating he lacks a social security number, the change is more stylistic than substantive. Form 12-B, when read in conjunction with the two directives at issue, confirms the Secretary's consistency on this point.

We also find that the three equitable *Gripentrog* factors weigh in favor of the issuance of a stay. In the most recent opinion arising from this litigation, we addressed a request made by the plaintiffs for a preliminary injunction just weeks before election day. *SEIU v. Husted*, --- F.3d ----, 2012 WL 5352484 (6th Cir. Oct. 31, 2012). We concluded that a stay was equitable because (1) "last-minute injunctions changing election procedures are strongly disfavored," particularly in cases "when a party does not seek to clarify or expand the scope of relief after having an opportunity to do so," and (2) "the harm to Ohio, the Secretary, and the general public caused by issuance of this injunction easily outweighs any potential harm to the plaintiffs." *Id.* at *3–4.

Both observations apply *a fortiori* here. First, any claim of irreparable harm to the NEOCH plaintiffs is belied by their waiting until five days before the election to raise issues concerning a form prescribed months earlier. Plaintiffs and the district court are simply inaccurate in portraying Directive 2012-54 as a dramatic departure from prior policy. At most, it represents a modest clarification of a policy that was in place for months. Second, there is an even greater disparity between the harms to either side if the stay were to be denied than there was in the *SEIU* case. The requirement that a voter write down identification information on a provisional ballot is a "rather simple instruction[]." *NEOCH v. Husted*, 696 F.3d 580, 599–600 (6th Cir. 2012). By contrast, the interests of the defendants and the public in obtaining a stay are significant. Voting in the November 2012 election is now complete. Poll workers performed their duties during that election based on

-10-

*NEOCH, et al. v. Husted, et*
Case No. 12-4354

longstanding instructions provided by the Secretary which put the voter in charge of writing down

identification information.  Changing the rules by which votes are counted after they have already

been cast compromises the interest of Ohio, the Secretary, and the general public in fair and orderly

election procedures. *See SEIU*, 2012 WL 5352484, at *4.

III.

For the reasons stated above, we grant the motion of Ohio and the Secretary to stay the

district court's order pending appeal.