# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICOLE ZICCARELLI, | : | |
|                 Plaintiff, | : | No. 2:20-cv-01831-NR |
| | : | |
| v. | : | |
| | : | |
| THE ALLEGHENY COUNTY BOARD OF ELECTIONS, RICH FITZGERALD, in his official capacity as a Member of the Allegheny County Board of Elections, SAMUEL DEMARCO, in his official capacity as a member of the Allegheny County Board of Elections, BETHANY HALLAM, in her official capacity as a member of the Allegheny County Board of Elections, and KATHY BOOCKVAR, in her official capacity as the Secretary of the Commonwealth of Pennsylvania, | : : : : : : : : : : : : | |
|                 Defendants. | : | |

## PLAINTIFF'S BRIEF
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Joshua J. Voss (No. 306853)
Matthew H. Haverstick (No. 85072)*
Shohin H. Vance (No. 323551)*
James G. Gorman (No. 328376)*
Samantha G. Zimmer (No. 325650)*
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000 | Fax: (215) 568-0140
Eml: jvoss@kleinbard.com
mhaverstick@kleinbard.com
svance@kleinbard.com
jgorman@kleinbard.com
szimmer@kleinbard.com
*Admitted Pro Hac Vice*
*Attorneys for Plaintiff*

## I. INTRODUCTION

Under the Pennsylvania Election Code, a mail-in ballot that does not have a dated declaration is invalid. This statement of law is agreed with by:

- The Pennsylvania Supreme Court[1];
- The Pennsylvania Commonwealth Court[2];
- The Pennsylvania General Assembly[3];
- The Pennsylvania Attorney General[4];
- Secretary of the Commonwealth Kathy Boockvar[5]; and
- The Westmoreland County Board of Elections[6].

Despite all of the foregoing *agreement* with Plaintiff Nicole Ziccarelli's core legal position, the parties are before the Court because the Allegheny County Board of Elections decided to count 311 of these invalid ballots, and, more importantly, Secretary Boockvar accepted the Allegheny Board's certification of those invalid

---

[1] *See In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, No. 29 WAP 2020, ---A.3d----, 2020 WL 6866415, at *23, *25 (Pa. Nov. 23, 2020) (concurring and dissenting opinions).

[2] *See In re 2,349 Ballots in the 2020 Gen. Election App. of: Nicole Ziccarelli*, No. 1162 C.D. 2020, 2020 WL 6820816, at *5 (Pa. Cmwlth. Nov. 19, 2020), *rev'd sub nom. In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, 2020 WL 6866415.

[3] *See* 25 P.S. § 3150.16(a).

[4] *See* Stipulated Undisputed Facts (hereafter, Stip. Facts) ¶¶ 18-19, Stip. Facts Ex. C at 16 (Appendix Ex. 1) (Brief of Kathy Boockvar). All exhibits in the Appendix submitted herewith have been abridged to remove unnecessary pages, where appropriate, and highlighted where necessary to call out content relied upon in this brief.

[5] *See* Stip. Facts ¶¶ 18-19, Stip. Facts Ex. C at 16 Appendix Ex. 1) (Brief of Kathy Boockvar).

[6] *See* Stip. Facts ¶¶ 59-63; Westmoreland County Board of Elections November 30, 2020 Certification (Appendix Ex. 2).

1

ballots alongside ballot totals she knew did not include a similar count. The Secretary and the Allegheny Board did so even though Secretary Boockvar herself advised the Allegheny Board on September 28, 2020 not to count such ballots.[7] This also occurred even though Allegheny County directed individual voters before the 2020 General Election (1) to "[s]ign and print your name and the date" on the mail-in ballot declaration;[8] (2) to "sign, date, and provide their address on the back of the envelope,"[9] and (3) to "make sure that your vote is counted, be certain to follow the instructions that come with your ballot[.]"[10]

The Secretary's and Allegheny Board's decisions to go against even their own guidance has resulted in this basic state of affairs: the difference between who wins and who loses the 2020 General Election for Pennsylvania Senate District 45 hinges entirely upon whether these invalid ballots are counted. As equally important, the Secretary's and Allegheny Board's decisions have yielded an equal protection violation, since identically situated voters in Westmoreland County did not have their invalid ballots counted. The decision also created a due process violation, since the decisions to forge ahead with changing the rules of the election after the election had already concluded unlawfully altered the results.

In the end, and at a most basic level, Plaintiff Nicole Ziccarelli has been told by courts, boards, bodies, and state officials that she is right and that some 311

---

[7] Stip. Facts ¶¶ 15-16; Stip. Facts Ex. B at 5, 9 (Appendix Ex. 3).
[8] Stip. Facts ¶ 25.
[9] Stip. Facts ¶¶ 22, 24, Stip. Facts Ex. F; Transcript of Mail In Ballot Instructions at 3 (Appendix Ex. 4).
[10] Stip. Facts ¶¶ 22-23, Stip. Facts Ex. E (Appendix Ex. 5).

Code, but also the Secretary's own guidance—creates precisely the type of fundamental unfairness that warrants recourse to this Court.

In this regard, the series of decisions in *Roe v. Alabama* are particularly instructive. By way of relevant background, those decisions involved an Alabama statute requiring absentee ballots to be enclosed in an envelope that was either notarized, or signed by two witnesses attesting that the voter cast the ballot without any improper influence or duress. *See* Ala.Code § 17–10–7; *see also Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 577 (11th Cir. 1995) (*per curiam*) (*Roe I*). Notwithstanding this clear statutory directive, following the 1994 General Election, a county trial court in Alabama entered an order directing all counties to canvass absentee ballots that lacked the requisite notarization or attestation from two witnesses, but were otherwise compliant. *See id.* at 578. Shortly thereafter, several candidates and voters commenced an action under Section 1983 alleging the state court's directive effected a post-election change in the rules governing the election process and, thus, violated the Due Process Clause. The United States District Court for the Southern District of Alabama agreed and entered an order not only prohibiting the local boards from counting those ballots, but also enjoining the Secretary of State from including any such votes in his certification. *See id.* at 579.

On appeal, the Eleventh Circuit Court of Appeals affirmed the entry of a preliminary injunction, agreeing with the District Court's conclusion that "failing to exclude the contested absentee ballots will constitute a post-election departure from previous practice in Alabama[,]" in violation of the Due Process Clause. *Id.* at 581

21

(citing *Griffin v. Burns,* 570 F.2d 1065, 1075 (1st Cir.1978)). However, expressing "reluctan[ce] to reach a final decision in this case while the proper application of the Alabama Election Code remains muddled[,]" the Court certified a question to the Alabama Supreme Court concerning validity of the ballots that violated the notarization/witness requirement under Alabama law. *Id.* at 582-83.

In response to the certified question, the Alabama Supreme Court found the relevant provision merely directory and, thus, held that ballots that were not properly notarized or witnessed, but otherwise complied with state law, must be canvassed. *See Roe v. Mobile Cty. Appointment Bd.*, 676 So. 2d 1206, 1226 (Ala. 1995). Nevertheless, upon receiving the answer to the certified question, the Eleventh Circuit directed the District Court to independently ascertain the established practice in Alabama, as it existed when the election as held. *See Roe v. State of Ala. By & Through Evans*, 52 F.3d 300 (11th Cir. 1995) (*per curiam*).

On remand, the District Court found that prior to the election, the notarization/witness requirement was widely regarded as mandatory by the relevant election officials and that a voter's failure to comply with it was understood a settled basis for setting ballots aside. Among other things the District Court emphasized that this precept was plainly articulated by the Alabama Secretary of State's pre-election directives to county officials:

> The consistent and plain position of the Secretary of State, the chief election official of the State of Alabama, is that an absentee ballot must include the signature of the voter and that signature must be notarized or witnessed by two adult witnesses. The Secretary of State has instructed every voting official in Alabama to that effect and has

22

provided voters with the same information. The rule is a "bright-line" rule.

*Roe v. Mobile County Appointing Bd.*, 904 F. Supp. 1315, 1335 (S.D. Ala. 1995) (*Roe II*). Accordingly, the District Court held the post-election change in Alabama election law resulting from the state court ruling was "a fundamental deficiency in the fairness of the process" that violated the Due Process Clause of the Fourteenth Amendment. *Id.* (internal quotation marks omitted). This defect was poignantly summarized in three sentences by the District Court: "The change in election practice and interpretation of the law of the State of Alabama is broad-gauged unfairness that permeates an election. The post-election change of practice is abominable under the Constitution of the United States. It amounts to ballot-box stuffing." *Id.* On appeal, the Eleventh Circuit affirmed once again and directed the parties to comply with the District Court's injunction. *See Roe v. State of Alabama*, 68 F.3d 404, 407-09 (11th Cir. 1995) (*Roe III*) (*per curiam*).

Against the foregoing backdrop, the Secretary's and Allegheny Board's conduct is fundamentally unfair and inconsistent with rudimentary principles of due process, as set forth in the *Roe* decisions. Specifically, in canvassing the Undated Ballots, the Allegheny Board and the Secretary changed the rules of the election after the election had already been conducted: the very essence of *Roe*'s proscription. The Allegheny Board's and Secretary's actions are inconsistent with the Election Code, which is the chief "rule-book" for conducting elections in Pennsylvania, since undated declarations render the accompanying ballot invalid

23

in the election. *Id.* at 875. The Third Circuit agreed that, under the circumstances, the plaintiffs demonstrated a "likelihood of success on the claims that the defendants conduct violated … 'the substantive due process right of Plaintiffs to a free and fair election.'" *Id.* at 878.

Like as was the case in *Marks*, the matter before this Court, although it does not involve unlawfully obtained absentee ballots, presents an analogous example of a violation of voters' substantive rights under the Due Process Clause. Specifically, like in *Marks*, the violation here implicates a systemic deficiency associated with a specific aspect of the electoral process. Thus, a result similar to the one reached in *Marks* is fully warranted.

In sum, the Secretary's and the Allegheny Board's post-election decisions to change the rules, as matter of law, violate Ms. Ziccarelli's substantive due process rights—particularly where the resulting dilution of votes can be traced to a specific class of illegal ballots and stands to radically alter the outcome of the election. Accordingly, Plaintiff Ziccarelli is entitled to summary judgment on the merits of her due process claim.

### C. The appropriate, and only, remedy for the constitutional violations is to "level down."

The central question in this matter has been whether the remedy for the constitutional violations is to "level up" or "level down." The answer is "level down" for three reasons: one, it is what the Election Code commands; two, leveling down does not cause disenfranchisement; and three, it is the *only* appropriate remedy.

1. **The Court must look to legislative intent to determine whether to level up or level down: in this matter, legislative intent shows leveling down is compelled.**

When unconstitutional unequal treatment is found by a federal court, the Constitution is silent on whether the court must then level up or level down to cure the inequity. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017). While the U.S. Supreme Court has explained that the "preferred rule in the typical case is to extend favorable treatment," it has further explained that this general rule *does not* apply in a case where application of the rule (i.e., leveling up) would thwart legislative intent with a particular statutory scheme. *See id.* at 1701 (where court leveled down based on perceived congressional intent). Indeed, where unconstitutional disparate treatment springs from application of a statutory scheme—like here with the Pennsylvania Election Code—the question a court must answer is this: what would the legislative body have done with the equal treatment violation had it been presented with it? *See id.* at 1700; *see also Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 427 (2010); *Texas Democratic Party v. Abbot*, 961 F.3d 389, 416-17 (5th Cir. 2020) (Ho, J., concurring) (discussing *Sessions* in context of Texas mail-in voting scheme).

Here, the General Assembly's intent with the requirement to date the voter declaration is clear based on the plain language of the Election Code, meaning the General Assembly would (and, indeed did) command each county to set aside and not canvass such ballots to yield equal treatment of the ballots. That is, the General Assembly intended and would want "leveling down" in the context of equal treatment of undated ballots across counties. *See In re 2,349 Ballots in 2020 Gen.*

28

*Election*, 2020 WL 6820816, at *6 ("While we realize that our decision in this case means that some votes will not be counted, the decision is grounded in law. It ensures that the votes will not be counted because the votes are invalid as a matter of law. Such adherence to the law ensures equal elections throughout the Commonwealth, on terms set by the General Assembly."). And certainly Secretary Boockvar interpreted the Code exactly this way when she issued formal guidance on September 28, 2020 advising county boards of election to "[s]et aside any ballots without a filled out, dated and signed declaration envelope." *See* Stip. Facts ¶¶ 15-16, Stip. Facts Ex. B at 5, 9 (Appendix Ex. 3). Moreover, that leveling down is what the General Assembly would want under these circumstances is manifest when identifying the purpose of the date provision, which is to prevent *actual* fraud and the *appearance of* fraud in the election returns. *See* Pl. Brief, *supra* § II.A.

In sum, based on the statutory scheme implicated by this constitutional violation, the appropriate remedy is to level down because it reflects what the General Assembly would want if presented with this scenario.

    **2.    Leveling down will not cause disenfranchisement.**

The U.S. Supreme Court has long held that states may impose reasonable conditions on the exercise of the franchise, in effect holding potential voters cannot simply vote however and whenever they want under the Constitution or otherwise. *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order,