# Unreported Opinions

# Unreported Opinion 1

*In Re: Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*, Case No. 29 WAP 2020, --- A.3d ----, 2020 WL 6866415 (Pa. Nov. 23, 2020)



KeyCite Blue Flag – Appeal Notification

Petition for Certiorari Docketed by DONALD J. TRUMP FOR PRESIDENT, INC. v. KATHY BOOCKVAR, SECRETARY OF PENNSYLVANIA, ET AL., U.S., December 23, 2020

2020 WL 6866415
Only the Westlaw citation is currently available.
Supreme Court of Pennsylvania.

IN RE: CANVASS OF ABSENTEE AND
MAIL-IN BALLOTS OF NOVEMBER
3, 2020 GENERAL ELECTION

Appeal of: Donald J. Trump for President, Inc.
In re: Canvass of Absentee and Mail-in
Ballots of November 3, 2020 General Election
Appeal of: Donald J. Trump for President, Inc.
In re: Canvass of Absentee and Mail-in
Ballots of November 3, 2020 General Election
Appeal of: Donald J. Trump for President, Inc.
In re: Canvass of Absentee and Mail-in
Ballots of November 3, 2020 General Election
Appeal of: Donald J. Trump for President, Inc.
In re: Canvass of Absentee and Mail-in
Ballots of November 3, 2020 General Election
Appeal of: Donald J. Trump for President, Inc.
In re: 2,349 Ballots in the 2020 General Election
Appeal of: Allegheny County Board of Elections

No. 31 EAP 2020
|
No. 32 EAP 2020
|
No. 33 EAP 2020
|
No. 34 EAP 2020
|
No. 35 EAP 2020
|
No. 29 WAP 2020
|
Submitted: November 18, 2020
|
Submitted: November 20, 2020
|
Decided: November 23, 2020

**Synopsis**

**Background:** Presidential campaign challenged decision of the county board of elections to count 8,329 absentee and mail-in ballots on grounds that the voters who submitted them failed to handwrite their name, street address or the date (or some combination of the three) on the ballot-return outer envelope. The Court of Common Pleas, Philadelphia County, J-118A-E-2020, James Crumlish, J., upheld the board's decision. Campaign appealed, and the Supreme Court granted the board's application to exercise extraordinary jurisdiction. In separate proceeding, candidate for state senator initiated a statutory appeal from a decision by the county board of elections to canvass and count 2,349 absentee or mail-in ballots for the general election, notwithstanding the lack of a date of signature by the elector on the statutorily required elector declaration on the outside envelope of the ballots. The Court of Common Pleas, Allegheny County, No. GD 20-011654, Joseph M. James, Senior Judge, affirmed.

Candidate appealed, and the Commonwealth Court, No. 1162 CD 2020, 2020 WL 6820816, reversed. Board filed emergency petition for appeal, which was granted, and appeals were consolidated.

**Holdings:** The Supreme Court, Nos. 31-35 EAP 2020 and 29 WAP 2020, Donohue, J., held that:

[1] absentee or mail-in voter's failure to handwrite name and/ or address under the full paragraph of the declaration on the back of the outer envelope was not a material violation of statutory directive to "fill out" the declaration, and

[2] Per concurring opinion of Wecht, J., statutory requirement that absentee or mail-in ballot voter date and sign the voter declaration was not a minor irregularity which could be overlooked and thus, in future elections, the omission of either item would be sufficient, without more, to invalidate the ballot in question.

Affirmed; Commonwealth Court reversed.

Wecht, J., concurred in the result and filed concurring and dissenting opinion.

Dougherty, J., concurred in part and dissented in part with opinion in which Saylor, Chief Justice, and Mundy, J., joined.

2020 WL 6866415

**Procedural Posture(s):** On Appeal; Petition for Discretionary Review; Judgment.

West Headnotes (20)

**[1]**    **Statutes** 🔑 **Absence of Ambiguity; Application of Clear or Unambiguous Statute or Language**

Where the language of a statute is unambiguous, the language shall be controlling. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.) 📄 1 Pa. Cons. Stat. Ann. § 1921(b).

**[2]**    **Statutes** 🔑 **Purpose and intent; determination thereof**

In the case of ambiguity in a statute, court looks to ascertain the legislative intent. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[3]**    **Election Law** 🔑 **Liberal or strict construction**

In election cases, court adheres to the overarching principle that the Election Code should be liberally construed so as to not deprive, inter alia, electors of their right to elect a candidate of their choice. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[4]**    **Election Law** 🔑 **Liberal or strict construction**

Election laws will be strictly enforced to prevent fraud, but ordinarily will be construed liberally in favor of the right to vote. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[5]**    **Election Law** 🔑 **Liberal or strict construction**

All statutes tending to limit the citizen in his exercise of the right of suffrage should be liberally construed in his favor. (Per Donohue,

J., with two Justices concurring and four Justices concurring in part.)

**[6]**    **Election Law** 🔑 **Construction and Operation**

Where the elective franchise is regulated by statute, the regulation should, when and where possible, be so construed as to insure rather than defeat the exercise of the right of suffrage. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[7]**    **Election Law** 🔑 **Liberal or strict construction**

Technicalities should not be used to make the right of the voter insecure. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[8]**    **Election Law** 🔑 **Construction and Operation**

No construction of a statute should be indulged that would disfranchise any voter if the law is reasonably susceptible of any other meaning. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[9]**    **Appeal and Error** 🔑 **Elections, voting, and political rights**

Supreme Court would review Court of Common Pleas' decision regarding absentee and mail-in ballots to determine whether the findings are supported by competent evidence and to correct any conclusions of law erroneously made. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.) 📄 25 Pa. Stat. Ann. §§ 3146.6(a), 📄 3150.16(a).

**[10]**    **Appeal and Error** 🔑 **Elections, voting, and political rights**

Proper interpretation of the Election Code presents a question of law, and thus the Supreme Court's standard of review is de novo and its scope of review is plenary. (Per Donohue, J.,

4

**[11]** **Election Law** 🔑 **In General; Right of Suffrage**

It is the longstanding and overriding policy in the Commonwealth to protect the elective franchise. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[12]** **Election Law** 🔑 **Liberal or strict construction**

The Election Code must be liberally construed so as not to deprive the voters of their right to elect a candidate of their choice. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[13]** **Election Law** 🔑 **Ballots**

Under Pennsylvania election law, every rationalization within the realm of common sense should aim at saving the ballot rather than voiding it. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[14]** **Election Law** 🔑 **Construction and Operation**

Imbedded in the Election Code is the General Assembly's intent to protect voter privacy in her candidate choice and to prevent fraud and to otherwise ensure the integrity of the voting process. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

Pa. Const. art. 7, § 4.

**[15]** **Statutes** 🔑 **Mandatory or directory statutes**

The use of "shall" in a statute is not always indicative of a mandatory directive; in some instances, it is to be interpreted as merely directory. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[16]** **Election Law** 🔑 **Absentee or mail-in ballots**

Absentee or mail-in voter's failure to handwrite name and/or address under the full paragraph of the declaration on the back of the outer envelope was not a material violation of statutory directive to "fill out" the declaration, and therefore county board of elections was not required to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name or address, where no fraud or irregularity was alleged. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.) 25 Pa. Stat. Ann. §§ 3146.4, 3150.14(b).

**[17]** **Election Law** 🔑 **Liberal or strict construction**

Where an election statute is ambiguous, courts apply the interpretative principle that election laws ordinarily will be construed liberally in favor of the right to vote. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[18]** **Statutes** 🔑 **Mandatory or directory statutes**

While both mandatory and directory provisions of the Legislature are meant to be followed, the difference between a mandatory and directory provision is the consequence for non-compliance: a failure to strictly adhere to the requirements of a directory statute will not nullify the validity of the action involved. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[19]** **Election Law** 🔑 **Ballots**

Ballots containing mere minor irregularities should only be stricken for compelling reasons. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[20]** **Election Law** 🔑 **Absentee or mail-in ballots**

Statutory requirement that absentee or mail-in ballot voter date and sign the voter declaration

was not a minor irregularity which could be overlooked and thus, in future elections, the omission of either item would be sufficient, without more, to invalidate the ballot in question

(Per concurring opinion of Wecht, J.). 25 Pa. Stat. Ann. §§ 3146.6(a), 3150.16(a).

Appeal from the Order of the Commonwealth Court entered November 19, 2020 at No. 1162 CD 2020, reversing the Order of the Court of Common Pleas of Allegheny County entered November 18, 2020 at No. GD 20-011654 and remanding.

**Attorneys and Law Firms**

Ronald Lee Hicks Jr., Esq., Porter Wright Morris & Arthur, LLP, Linda Ann Kerns, Esq., Law Offices of Linda A. Kerns, LLC, for Appellant Donald J. Trump for President, Inc. and for Appellee Elken, Elizabeth J.

Adam Craig Bonin, Esq., The Law Office of Adam C. Bonin, for Appellee DNC Services Corp. / Democratic National Committee.

Mark Alan Aronchick, Esq., John Gracie Mackay Coit, Esq., Michele D. Hangley, Esq., Robert Andrew Wiygul, Esq., Hangley Aronchick Segal Pudlin & Schiller, Marcel S. Pratt, Esq., Philadelphia Law Department, for Appellee Philadelphia County Board of Elections.

Benjamin Hirsch Field, Esq., Lydia Maureen Furst, Esq., Craig R. Gottlieb, Esq., Marcel S. Pratt, Esq., Philadelphia Law Department, for Appellees Philadelphia County Board of Elections, Sabir, Omar, Schmidt, Al, Deely, Lisa.

Kathleen Marie Kotula, Esq., Pennsylvania Department of State, for Appellee Bureau of Commissions, Elections and Legislation.

Michael R. McDonald, Esq., Matthew Ian Vahey, Esq., Kahlil Charles Williams, Esq., Ballard Spahr LLP, for Appellee DNC Services Corp. / Democratic National Committee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

JUSTICE DONOHUE

**\*1** These appeals present the question of whether the Election Code requires a county board of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, their address, and/or a date, where no fraud or irregularity has been alleged. Pursuant to our longstanding jurisprudence, central to the disposition of these appeals is whether the information is made mandatory by the Election Code or whether the inclusion of the information is directory, i.e., a directive from the Legislature that should be followed but the failure to provide the information does not result in invalidation of the ballot.

**[1] [2] [3] [4] [5] [6] [7] [8]** We are guided by well-established interpretive principles including that where the language of a statute is unambiguous, the language shall be controlling. 1 Pa.C.S. § 1921(b). In the case of ambiguity, we look to ascertain the legislative intent, and in election cases, we adhere to the overarching principle that the Election Code should be liberally construed so as to not deprive, inter alia, electors of their right to elect a candidate of their choice. Pa. Democratic Party v. Boockvar, ⸺ Pa. ⸺, 238 A.3d 345, 356 (2020). Stated more fully:

> Election laws will be strictly enforced to prevent fraud, but ordinarily will be construed liberally in favor of the right to vote. All statutes tending to limit the citizen in his exercise of the right of suffrage should be liberally construed in his favor. Where the elective franchise is regulated by statute, the regulation should, when and where possible, be so construed as to insure rather than defeat the exercise of the right of suffrage. Technicalities should not be used to make the right of the voter insecure. No construction of a statute should be indulged that would disfranchise any voter if the law

is reasonably susceptible of any other meaning.

*Appeal of James*, 377 Pa. 405, 105 A.2d 64, 65-66 (1954).

Guided by these principles and for the reasons discussed at length in this opinion, we conclude that the Election Code does not require boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, their address, and/or date, where no fraud or irregularity has been alleged.

* * *

In connection with five of these consolidated appeals, Petitioner Donald J. Trump for President, Inc. (the "Campaign") challenges the decision of the Philadelphia County Board of Elections (the "Philadelphia Board") to count 8,329 absentee and mail-in ballots. The Campaign does not contest that these ballots were all timely received by the Philadelphia Board prior to 8:00 p.m. on November 3, 2020 (election day); that they were cast and signed by qualified electors; and that there is no evidence of fraud associated with their casting. The Campaign instead contends that these votes should not be counted because the voters who submitted them failed to handwrite their name, street address or the date (or some combination of the three) on the ballot-return outer envelope. The Philadelphia County Court of Common Pleas, per the Honorable James Crumlish, upheld the Philadelphia Board's decision to count the ballots, ruling that the Election Code does not mandate the disqualification of ballots for a failure to include the challenged information, stressing that the inclusion or exclusion of this information does not prevent or promote fraud. The Campaign pursued an appeal to the Commonwealth Court. This Court granted the Philadelphia Board's application to exercise our extraordinary jurisdiction, 42 Pa. C.S. § 726, over these cases then pending in the Commonwealth Court.

 **\*2** At or around the same time that the matters were being litigated in Philadelphia, across the state in Allegheny County, Nicole Ziccarelli, a candidate for the Pennsylvania Senate in the 45th Senatorial District (Allegheny-Westmoreland counties) challenged the November 10, 2020 decision of the Allegheny County Board of Elections (the "Allegheny County Board") to canvass 2,349 mail-in ballots that contained a signed – but undated – declaration. Again, all

of the outer envelopes were signed, they are conceded to be timely and there are no allegations of fraud or illegality. On November 18, 2020, the Court of Common Pleas of Allegheny County, per the Honorable Joseph James, upheld the decision of the Allegheny County Board to count the ballots. *Ziccarelli v. Allegheny County Board of Elections*, No. GD-20-011654 (Allegheny Cty. Ct. Com. Pl.). Ziccarelli filed an appeal to the Commonwealth Court and an application in this Court requesting that we exercise extraordinary jurisdiction over her appeal. During the pendency of the request to this Court, on November 19, 2020, a three-judge panel of the Commonwealth Court, with one judge dissenting, reversed the common pleas court decision.

On November 20, 2020, the Allegheny County Board filed an emergency petition for allowance of appeal, which we granted, limited to whether the ballots contained in undated outer envelopes should be invalidated. We stayed the order of the Commonwealth Court pending the outcome of this appeal and consolidated it with the Philadelphia Board cases.

In these appeals, we are called upon to interpret several provisions of the Election Code. We set them forth at the outset since they guide the resolution of these appeals.

Section 3146.6(a) provides as follows with respect to absentee ballots:

> (a) Except as provided in paragraphs (2) and (3), at any time after receiving an official absentee ballot, but on or before eight o'clock P.M. the day of the primary or election, the elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. **The elector shall then fill out, date and**

sign the declaration printed on such envelope. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

25 P.S. § 3146.6(a) (emphasis added).

Section 3150.16(a) sets forth the procedure for the submission of a mail-in ballot:

(a) General rule.--At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. **The elector shall then fill out, date and sign the declaration printed on such envelope.** Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

25 P.S. § 3150.16(a) (emphasis added).

Sections 3146.4 and 3150.14(b) delegate to the Secretary of the Commonwealth the responsibility to prescribe the form of the elector's declaration on the outer envelope used to mail the absentee and mail-in ballots:

**\*3 § 3146.4. Envelopes for official absentee ballots**

The county boards of election shall provide two additional envelopes for each official absentee ballot of such size and shape as shall be prescribed by the Secretary of the Commonwealth, in order to permit the placing of one within the other and both within the mailing envelope. On the smaller of the two envelopes to be enclosed in the mailing envelope shall be printed, stamped or endorsed the words "Official Election Ballot," and nothing else. **On the larger of the two envelopes, to be enclosed within the mailing envelope, shall be printed the form of the declaration of the elector, and the name and address of the county board of election of the proper county.** The larger envelope shall also contain information indicating the local election district of the absentee voter. **Said form of declaration and envelope shall be as prescribed by the Secretary of the Commonwealth and shall contain among other things a statement of the electors qualifications, together with a statement that such elector has not already voted in such primary or election.** The mailing envelope addressed to the elector shall contain the two envelopes, the official absentee ballot, lists of candidates, when authorized by section 1303 subsection (b) of this act, the uniform instructions in form and substance as prescribed by the Secretary of the Commonwealth and nothing else.

25 P.S. § 3146.4 (emphasis added).

**§ 3150.14. Envelopes for official mail-in ballots**

* * *

(b) Form of declaration and envelope.--**The form of declaration and envelope shall be as prescribed by the Secretary of the Commonwealth and shall contain, among other things, a statement of the elector's qualifications, together with a statement that the elector has not already voted in the primary or election.**

25 P.S. § 3150.14(b) (emphasis added).

The pre-canvassing or canvassing of absentee and mail-in ballots proceed in accordance with the dictates of 25 P.S. § 3146.8(g)(3), as follows:

**§ 3146.8. Canvassing of official absentee ballots and mail-in ballots**

When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots under paragraphs (1), (1.1) and (2), **the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) [a voter who dies before the election] and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote**, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

**\*4** 25 P.S. § 3146.8(g)(3) (emphasis added).

Pursuant to the authority granted in § 3150.14(b), the Secretary of the Commonwealth developed the following declaration used in connection with the 2020 General Election:

I hereby declare that I am qualified to vote from the below stated address at this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

[BAR CODE]

Voter, sign or mark here/Votante firme o marque aqui

X_____

_____
Date of signing (MM/DD/YYYY)/Fechade firme (MM/DD/YYYY)

_____
Voter, print name/Votante, nombre en letra de impreta

_____
Voter, address (street)/Votante, dirreccion (calle)

Voter, sign or mark here/Votante firme o marque aqui

X_____

_____

Date of signing (MM/DD/YYYY)/
Fechade firme (MM/DD/YYYY)

_____

Voter, print name/Votante, nombre en letra de impreta

_____

Voter, address (street)/Votante, dirreccion (calle)

[LABEL – Voters' name and address]

In addition, the Secretary issued guidance to the county boards of elections with respect to the examination of ballot return envelopes. First, on September 11, 2020, she issued the following guidance:

3. EXAMINATION OF DECLARATION ON BALLOT RETURN ENVELOPES:

The county board of elections is responsible for approving ballots to be counted during pre-canvassing.

To promote consistency across the 67 counties, the county boards of elections should follow the following steps when processing returned absentee and mail-in ballots.

After setting aside ballots of elector's who died prior to the opening of the polls, the county board of elections shall examine the Voter's Declaration on the outer envelope of each returned ballot and compare the information on the outer envelope, i.e., the voter's name and address, with the information contained in the "Registered Absentee and Mail-in Voters File, the absentee voter's list and/or the Military Veterans' and Emergency Civilians Absentee Voters File."

If the Voter's Declaration on the return envelope is blank, that ballot return envelope must be set aside and not counted. If the board determines that a ballot should not be counted, the final ballot disposition should be noted in SURE. The ballot return status (Resp Type) should be noted using the appropriate drop-down selection.

If the Voter's Declaration on the return envelope is signed and the county board is satisfied that the declaration is sufficient, the mail-in or absentee ballot should be approved for canvassing unless challenged in accordance with the Pennsylvania Election Code.

Guidance Concerning Examination of Absentee and Mail-in Ballot Return Envelopes, 9/11/2020, at 3. On September 28, 2020, the Secretary offered additional guidance on the treatment of ballot return envelopes:

With regard to the outer ballot-return envelope:

A ballot-return envelope with a declaration that is filled out, dated, and signed by an elector who was approved to receive an absentee or mail-in ballot is sufficient and counties should continue to pre-canvass and canvass these ballots.

**\*5** A ballot-return envelope with a declaration that is not filled out, dated, and signed is not sufficient and must be set aside, declared void and may not be counted. Ballot-return envelopes should be opened in such a manner as not to destroy the declarations executed thereon.

All ballot-return envelopes containing executed declarations must be retained for a period of two years in accordance with the Election Code.

\* \* \*

**Pre-canvass and Canvass Procedures**

At the pre-canvass or canvass, as the case may be, the county board of elections should:

- Segregate the unopened ballots of voters whose applications were challenged by the challenge deadline (5:00 PM on the Friday before the election).

  o These ballots must be placed in a secure, sealed container until the board of elections holds a formal hearing on the challenged ballots.

  o Ballot applications can only be challenged on the basis that the applicant is not qualified to vote.

- Set aside the ballot of any voter who was deceased before election day.

- Set aside any ballots without a filled out, dated and signed declaration envelope.

- Set aside any ballots without the secrecy envelope and any ballots in a secrecy envelope that include text, mark, or symbol which reveals the identity of the voter, the voter's political affiliation (party), or the voter's candidate preference.

The Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis.

No challenges may be made to mail-in or absentee ballot applications after 5:00 pm on the Friday before the election.

No challenges may be made to mail-in and absentee ballots at any time based on signature analysis.

NOTE: For more information about the examination of return envelopes, please refer to the Department's September 11, 2020 *Guidance Concerning Examination of Absentee and Mail-in Ballot Return Envelopes*.

Guidance Concerning Civilian Absentee and Mail-in Ballot Procedures, 9/28/2020, at 5, 8-9.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Pursuant to the General Assembly's passage of Act 77 of 2019, voters in Pennsylvania may cast their ballots in elections by absentee or no-excuse mail-in ballots. To do so, they must submit applications to county boards of elections, and in connection therewith must provide the address at which they are registered to vote. They must also sign a declaration affirming, among other things, that they are "eligible to vote by mail-in [or absentee] ballot at the forthcoming primary or election," and that "all of the information" supplied in the mail-in or absentee ballot application is "true and correct." 25 P.S. §§ 3150.12, 3146.2. Upon receipt of the application, the county board of elections must confirm the elector's qualifications and verify that the elector's address on the application matches the elector's registration. Upon the county board of elections' approval of the application, the elector is provided with a ballot, an inner "secrecy envelope"

into which the ballot is to be placed, and an outer envelope into which the secrecy envelope is to be placed and returned to the board. The outer envelope has pre-printed on it (1) a voter's declaration, (2) a label containing the voter's name and address, and (3) a unique nine-digit bar code that links the outer envelope to the voter's registration file contained in the Statewide Uniform Registry of Electors ("SURE") system. After receiving the outer envelope, the board of elections stamps the date of receipt on it and then scans the unique nine-digit bar code, which links the voter's ballot to his or her registration file.

**\*6** The pre-canvassing or canvassing of absentee and mail-in ballots then proceeds in accordance with the dictates of 25 P.S. § 3146.8(g)(3):

> When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots under paragraphs (1), (1.1) and (2), the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) [a voter who dies before the election] and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

25 P.S. § 3146.8(g)(3).

Pursuant to this section, on November 9, 2020, the Philadelphia Board met to determine whether ballots separated into nine categories were "sufficient" to be pre-canvassed or canvassed. It concluded that four categories were not sufficient to be pre-canvassed or canvassed: (1) 472 ballots where the outer envelope lacked a signature and any other handwritten information; (2) 225 ballots where the outer envelope was not signed by the voter; (3) 112 ballots where the individual who completed the declaration appeared to be different from the individual who had been assigned the ballot; and (4) 4,027 ballots that were not submitted in a secrecy envelope.

In contrast, the Philadelphia Board approved as sufficient to be pre-canvassed or canvassed the ballots in five categories: (1) 1,211 ballots that lacked a handwritten date, address, and printed name on the back of the outer envelope (but were signed); (2) 1,259 ballots that lacked only a handwritten date on the back of the outer envelope (but were signed and contained a handwritten name and address); (3) 533 ballots that lack only a handwritten name on the back of the outer envelope (but were signed and dated and contained a handwritten address); (4) 860 ballots that lack only a handwritten address on the back of the outer envelope (but were signed and dated and contained a handwritten name); (5) 4,466 ballots that lack only a handwritten name and address on the back of the outer envelope (but were signed and dated).

On November 10, 2020, the Campaign filed five pleadings entitled "Notice of Appeal via Petition for Review of Decision by the Philadelphia County Board of Elections," one for each of the five categories referenced above that the Philadelphia Board approved as sufficient to be pre-canvassed or canvassed. In each petition for review, the Campaign alleged that this Court, in *Pa. Democratic Party v. Boockvar*, ––– Pa. –––238 A.3d 345 (2020), declared that absentee and mail-in ballots cast in violation of the Election Code's mandatory requirements are void and cannot be counted. Petition for Review, 11/10/2020, ¶ 14. The Campaign further alleged that failures to include hand-written names, addresses and dates constituted violations of mandatory obligations under Sections 3146.6(a) and/or 3150.16(a) of the Election Code. *Id.* at 15-16. Accordingly, the Campaign alleged that the Board's decisions with respect to the absentee and mail-in ballots in the above-referenced five categories were based on a clear error of law and must be reversed. *Id.* at 32.

**\*7** On November 13, 2020, Judge Crumlish held oral argument on the issues raised in the Petition for Review. In response to questions from Judge Crumlish, counsel for the Campaign agreed that the Petition for Review was "not proceeding based on allegations of fraud or misconduct." Transcript, 11/13/2020, at 13-14. She further agreed that the Campaign was not challenging the eligibility of the 8,329 voters in question and did not contest either that all of the ballots at issue were signed by the voters or that they had been timely received by the Board. *Id.* at 30-31, 37. Instead, she indicated that the Campaign was "alleging that the ballots were not filled out correctly." *Id.* at 14. Counsel for the DNC [1] argued that the failures to handwrite names, addresses

and dates "are, at most, minor technical irregularities that the Supreme Court of Pennsylvania has repeatedly said do not warrant disenfranchisement." *Id.* at 14. Counsel for the Philadelphia Board added that the Election Code includes no provision requiring "absolute technical perfection" when filling out the declaration on the outer envelope containing an absentee or mail-in ballot. *Id.* at 38.

Later that same day, Judge Crumlish entered five orders affirming the Philadelphia Board's decision to count the contested ballots. In his orders, Judge Crumlish noted that while the declaration contained a specific directive to the voter to sign the declaration, it made no mention of filling out the date or other information. Trial Court Orders, 11/13/2020, ¶ 2. He further found that while the Election Code provides that while the voter shall "fill out" and date the declaration, the term " 'fill out' is not a defined term and is ambiguous." *Id.* at ¶ 4. He indicated that the outer envelope already contains a pre-printed statement of the voter's name and address, and that "[n]either a date nor the elector's filling out of the printed name or of the address are requirements necessary to prevent fraud." *Id.* at ¶ 5-6. Concluding that "[t]he Election Code directs the Court of Common Pleas in considering appeals from the County Board of Elections to make such decree as right and justice may require[,]" *id.* at ¶ 8 (quoting 25 P.S. § 3157), Judge Crumlish upheld the decision of the Philadelphia Board.

The Campaign filed appeals from Judge Crumlish's orders in the Commonwealth Court on November 14, 2020, and the next day the Commonwealth Court issued an order consolidating the five appeals and setting an expedited briefing schedule. On November 17, 2020, the Philadelphia Board filed an application with this Court to exercise its extraordinary jurisdiction, 42 Pa.C.S. § 726, over the consolidated appeals, which we granted by order dated November 18, 2020.

In our order granting the Philadelphia Board's application for the exercise of extraordinary jurisdiction, we stated the issue to be decided as follows:

> Does the Election Code require county boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed their ballot's outer envelopes but did not handwrite their name, their address,

and/or a date, where no fraud or irregularity has been alleged?

On November 10, 2020, the Allegheny County Board decided to canvass 2,349 mail-in ballots that contained a signed but undated declaration. Ziccarelli challenged the decision in an appeal to the court of common pleas ultimately heard and decided by the Honorable Joseph James. It was not disputed that all 2,349 voters signed and printed their name and address on the outer envelopes and returned the ballots to the Allegheny County Board on time. Each of the ballots was processed in the Statewide Uniform Registry of Electors ("SURE") system and was time-stamped when it was delivered to the Allegheny County Board on or before November 3, 2020. At a hearing, via Microsoft Teams, on November 17, 2020, the Democratic Party and James Brewster (Ziccarelli's opponent in the 45th Senatorial District race) moved to intervene, which motion was granted. At the hearing, Ziccarelli stated that she was not claiming voter fraud regarding the challenged ballots.

**\*8** In an opinion and order dated November 18, 2020, Judge James affirmed the Allegheny County Board's decision to count the ballots. He concluded that the date provision in Section 3150.16(a) is directory, not mandatory, and that "ballots containing mere minor irregularities should only be stricken for compelling reasons," citing *Shambach v. Bickhart*, 577 Pa. 384, 845 A.2d 793, 798 (2004). Noting that the ballots were processed in the SURE system and time-stamped when delivered to the Allegheny County Board, he found that the technical omission of the handwritten date on a ballot was a minor technical defect and did not render the ballot deficient.

Ziccarelli immediately appealed Judge James' decision to the Commonwealth Court and contemporaneously filed an application to this Court requesting our exercise of extraordinary jurisdiction, noting that the issue presented was accepted by this Court as part of the Philadelphia Board appeals. While the application was pending, the Commonwealth Court ordered expedited briefing and on November 19, 2020, issued an opinion and order reversing the Court of Common Pleas of Allegheny County and remanded.

*In Re: 2,349 Ballots in the 2020 General Election; Appeal of: Nicole Ziccarelli*, ––– A.3d ––––, 1162 C.D. 2020, 2020 WL 6820816 (Commw. Ct. 2020). Ziccarelli then withdrew her application for extraordinary jurisdiction.

On November 20, 2020, this Court granted the Allegheny County Board's Petition for Allowance of Appeal limited to the question of whether the ballots contained in undated but signed outer envelopes should be invalidated. The opinion of the Commonwealth Court will be discussed, as necessary, in the analysis that follows. The order was stayed pending our disposition of these consolidated cases.

[9] [10] The pertinent scope and standard of review follow: the Court of Common Pleas' decision is reviewed on appeal "to determine whether the findings are supported by competent evidence and to correct any conclusions of law erroneously made." *In re Reading Sch. Bd. of Election*, 535 Pa. 32, 634 A.2d 170, 171–72 (1993). The Court of Common Pleas, in turn, could reverse the Philadelphia Board's decision only for an abuse of discretion or error of law. *See Appeal of McCracken*, 370 Pa. 562, 88 A.2d 787, 788 (1952). As the issue involves the proper interpretation of the Election Code, it presents a question of law and our standard of review is de novo and our scope of review is plenary. *See, e.g., Banfield v. Cortés*, 631 Pa. 229, 110 A.3d 155, 166 (2015).

## II. ARGUMENTS OF THE PARTIES

Although more fully developed in our analysis set forth later in this opinion, we here briefly summarize the arguments of the parties and intervenors.

The Campaign argues that the General Assembly set forth in the Election Code the requirements for how a qualified elector can cast a valid absentee or mail-in ballot. Campaign's Brief at 22. One of those requirements is for each elector to "fill out, date, and sign" the declaration on the Outside Envelope. *Id.* (citing 25 P.S. §§ 3146.6(a) and 3150.16(a)). According to the Campaign, this Court has repeatedly ruled that the requirements of the sections of Election Code relevant here impose mandatory obligations, and that ballots cast in contravention of the these requirements are void and cannot be counted. *Id.* at 23. As a result, the Campaign insists that the trial court erred in affirming the Board's decision to count the 8,329 non-conforming absentee and mail-in ballots. *Id.*

The Philadelphia Board, conversely, contends that the Election Code does not require the Philadelphia Board to set aside timely-filed ballots by qualified electors that are merely missing handwritten names, street addresses, and/or dates on the signed voter declaration. Philadelphia Board's Brief at 12. Contrary to the Campaign's contention that

the provisions of the Election Code at issue here impose exclusively mandatory requirements, the Philadelphia Board argues that Pennsylvania courts have long held that minor errors or omissions should not result in disenfranchisement, particularly in cases where the errors or omissions do not implicate the board's ability to ascertain the voter's right to vote or the secrecy or sanctity of the ballot. *Id.* Here, the Philadelphia Board notes that the Campaign does not allege that the voters at issue here were not qualified to vote and have not asserted that any fraud or other impropriety has occurred. *Id.* As such, it concludes that it acted properly and within its discretion in determining that these omissions were not a basis for setting aside those ballots. *Id.*

*9 The DNC largely concurs with the Philadelphia Board's arguments, indicating that there is no statutory requirement that voters print their full name or address on the outer envelopes and that adding a date to the envelope serves no compelling purpose. DNC's Brief at 9-10.

Ziccarelli argues further that, in regard to outer envelopes not containing a voter-supplied date, this Court's opinion in *In Re: Nov. 3, 2020 General Election*, —— Pa. ——, 240 A.3d 591 (2020) definitively speaks to the mandatory nature of the date requirement and, without much extrapolation, requires that such ballots not be counted. The Allegheny County Board agrees with its Philadelphia counterpart. It counters Ziccarelli's reliance on *In Re Nov. 3, 2020 General Election* by noting that Ziccarelli's challenge to the ballots for lack of a date is based on the premise that the date is essential to the validity of the signature. Allegheny County Board points out this is the precise type of challenge that was disavowed in the case upon which Ziccarelli relies.

## III. ANALYSIS

[11] [12] [13] [14] We begin by recognizing from the outset that it is the "longstanding and overriding policy in this Commonwealth to protect the elective franchise." *Shambach v. Bickhart*, 577 Pa. 384, 845 A.2d 793, 798 (2004). "The Election Code must be liberally construed so as not to deprive ... the voters of their right to elect a candidate of their choice." *Ross Nomination Petition*, 411 Pa. 45, 190 A.2d 719, 719 (1963). It is therefore a well-settled principle of Pennsylvania election law that "[e]very rationalization within the realm of common sense should aim at saving the ballot rather than voiding it." *Appeal of Norwood*, 382 Pa. 547, 116 A.2d 552, 554–55 (1955). It is likewise settled that

imbedded in the Election Code is the General Assembly's intent to protect voter privacy in her candidate choice based on Article VII, Section 4 of the Pennsylvania Constitution and to prevent fraud and to otherwise ensure the integrity of the voting process.

[15] We agree with the Campaign's observation that in Sections 3146.6(a) and 3150.16(a), the General Assembly set forth the requirements for how a qualified elector may cast a valid absentee or mail-in ballot. Campaign's Brief at 22. We further agree that these sections of the Election Code specifically provide that each voter "shall fill out, date, and sign" the declaration on the outside envelope. *Id.* We do not agree with the Campaign's contention, however, that because the General Assembly used the word "shall" in this context, it is of necessity that the directive is a mandatory one, such that a failure to comply with any part of it requires a board of elections to declare the ballot void and that it cannot be counted. It has long been part of the jurisprudence of this Commonwealth that the use of "shall" in a statute is not always indicative of a mandatory directive; in some instances, it is to be interpreted as merely directory. *See, e.g., Commonwealth v. Baker*, 547 Pa. 214, 690 A.2d 164, 167 (1997) (citing *Fishkin v. Hi–Acres, Inc.*, 462 Pa. 309, 341 A.2d 95 (1975)); *see also Commonwealth ex rel. Bell v. Powell*, 249 Pa. 144, 94 A. 746, 748 (1915) (quoting *Bladen v. Philadelphia*, 60 Pa. 464, 466 (1869) ("It would not perhaps be easy to lay down any general rule as to when the provisions of a statute are merely directory, and when mandatory and imperative.")). The Campaign's reliance on this Court's recent decision in *Pa. Democratic Party v. Boockvar,* ——— Pa. ———, 238 A.3d 345 (2020) for the proposition it asserts is misplaced.

*10 In *Pa. Democratic Party*, we held that the requirement in Section 3150.16(a) that a mail-in voter place his or her ballot in the inner secrecy envelope was a mandatory requirement and thus a voter's failure to comply rendered the ballot void. *Pa. Democratic Party,* 238 A.3d at 380. In concluding that the use of the secrecy envelope was a mandatory, rather than a discretionary directive, we reviewed our prior decisions on the distinction between mandatory and discretionary provisions in the Election Code, including *Shambach v. Bickhart,* 577 Pa. 384, 845 A.2d 793 (2004), *In re Luzerne County Return Board, Appeal*

*of Elmer B. Weiskerger*, 447 Pa. 418, 290 A.2d 108 (1972), and *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election, Appeal of John Pierce*, 577 Pa. 231, 843 A.2d 1223 (2004).

In *Shambach*, the Court declined to invalidate a write-in vote cast for a candidate who was named on the ballot, in direct violation of the Election Code's instruction that a voter could only write in a person's name if the name of said individual was "not already printed on the ballot for that office." *Shambach*, 845 A.2d at 795. In reaching that conclusion, the Court observed that "[m]arking a ballot is an imprecise process, the focus of which is upon the unmistakable registration of the voter's will in substantial conformity to the statutory requirements." *Id.* at 799 (quoting *Appeal of Gallagher*, 351 Pa. 451, 41 A.2d 630, 632 (1945)).

In *Weiskerger*, this Court refused to invalidate a ballot based upon the "minor irregularity" that it was completed in the wrong color of ink. The provision of the Election Code in question provided that " '[a]ny ballot that is marked in blue, black or blue-black ink ... shall be valid and counted.' " *Weiskerger*, 290 A.2d at 109 (citing 25 P.S. § 3063). In providing that ballots completed in the right color must be counted, we noted that the General Assembly "neither stated nor implied that ballots completed in a different color must not be counted." *Id.* We thus treated the instruction to use blue, black or blue-black ink as merely directory.

In *Pa. Democratic Party*, we compared these cases to our decision in *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election, Appeal of John Pierce*, 577 Pa. 231, 843 A.2d 1223 (2004), where we held that the Election Code's "in-person" ballot delivery requirement, *see* 25 P.S. § 3146.6, was mandatory, and that votes delivered by third persons must not be counted. *Appeal of Pierce*, 843 A.2d at 1231. There, we recognized that the in-person requirement served important purposes in the Election Code, including "limit[ing] the number of third persons who unnecessarily come in contact with the ballot[,] ... provid[ing] some safeguard that the ballot was filled out by the actual voter, ... and that once the ballot has been marked by the actual voter in secret, no other person has the opportunity to tamper with it."

*Id.* at 1232. We thus explained in *Pa. Democratic Party* that "the clear thrust of *Appeal of Pierce*, ... is that, even absent an express sanction, where legislative intent is clear and supported by a weighty interest like fraud prevention, it would be unreasonable to render such a concrete provision ineffective for want of deterrent or enforcement mechanism." *Pa. Democratic Party*, 238 A.3d at 380 (citing *Appeal of Pierce*, 843 A.2d at 1232).

Based upon this comparison between *Shambach, Weiskerger* and *Appeal of Pierce*, in *Pa. Democratic Party* we determined that the decision in *Appeal of Pierce* provided the appropriate guidance for the analysis of the secrecy envelope requirement. We held that "[i]t is clear that the Legislature believed that an orderly canvass of mail-in ballots required the completion of two discrete steps before critical identifying information on the ballot could be revealed. The omission of a secrecy envelope defeats this intention." *Pa. Democratic Party*, 238 A.3d at 380. Unlike in *Shambach* and *Weiskerger* which involved "minor irregularities," the use of a secrecy envelope implicated a "weighty interest," namely secrecy in voting protected expressly by Article VII, Section 4 of our state charter. *Id.* As such, we recognized the use of a secrecy envelope as a mandatory requirement and that failures to comply with the requirement required that the ballot must be disqualified."

*Id.*; *see also id.* at 378 (quoting *JPay, Inc. v. Dep't of Corr. & Governor's Office of Admin.*, 89 A.3d 756, 763 (Pa. Commw. 2014) ("While both mandatory and directory provisions of the Legislature are meant to be followed, the difference between a mandatory and directory provision is the consequence for non-compliance: a failure to strictly adhere to the requirements of a directory statute will not nullify the validity of the action involved.")).

**\*11** To determine whether the Election Code's directive that the voter handwrite their names, address and the date of signing the voter declaration on the back of the outer envelope is a mandatory or directory instruction requires us to determine whether the intent of the General Assembly was clear and whether the failure to handwrite the information constitutes "minor irregularities" or instead represent "weighty interests," like fraud prevention or ballot secrecy that the General Assembly considered to be critical to the integrity of the election.

**(1) Failures to include handwritten names and addresses**

**[16]** Beginning with the Campaign's contention that ballots may not be counted if a voter fails to handwrite their name and/or address under the full paragraph of the declaration on the back of the outer envelope, we conclude that given the factual record in this case and the mechanics of the pre-canvassing and canvassing procedures including the incorporation of reliance on the SURE system, this "requirement" is, at best, a "minor irregularity" and, at worst, entirely immaterial. More to the point, the direction to the voter to provide a handwritten name and/or address is not only not mandatory, it is not a directive expressed in the Election Code. Thus, these directions do not meet the first prong of the test used in *Pa. Democratic Party*: the clear intent of the General Assembly.

The Election Code does not require that the outer envelope declaration include a handwritten name or address at all. Instead, Sections 3146.4 (absentee) and 3150.14(b) (mail-in) provide only that the declaration must include "a statement of the elector's qualifications, together with a statement that the elector has not already voted in the primary or election." 25 P.S. §§ 3146.4, 3150.14(b). Aside from this information (none of which is relevant to the present issue), the General Assembly delegated to the Secretary of the Commonwealth the obligation to prescribe the form of declaration and envelope for absentee and mail-in ballots, presumably to allow the inclusion of information that would be helpful for administrative or processing purposes. *Id.*[2] As such, the decision to include spaces in the declaration for handwritten names and addresses was made solely by the Secretary of the Commonwealth, not the General Assembly. It would be a stretch to divine that the General Assembly was advancing any weighty interest for the inclusion of handwritten names and addresses in the declaration such that a voter's failure to include them should result in the ballot not being counted. Moreover, the Campaign does not argue that the Secretary's request for handwritten names and addresses implicated any "weighty interests" that would compel a finding that the request to provide them constituted a mandatory requirement.[3]

**\*12** The Campaign argues that we should read the "handprinted name and address" requirement into the

directives in Section 3146.6(a) and 3150.16(a) that the voter "fill out" the declaration. Campaign's Brief at 30. Citing to dictionary definitions, the Campaign contends that "fill out" means "to write or type information in spaces that are provided for it." *Id.* at 32. Because 8,349 voters did not "fill out" one or more spaces provided on the outer envelope provided in the declaration (including the voter's name and/ or address), the Campaign argues that those ballots were non-conforming and could not be counted. *Id.* at 29. The directive to "fill out" does not give any legislative definition to the specific information to be placed in the blank spaces. It is the weight of the information that must be tested in the analysis. As stated, since the General Assembly did not choose the information to be provided, its omission is merely a technical defect and does not invalidate the ballot.

 **[17]**  Further, as Judge Crumlish observed, the term "fill out" is ambiguous. [4]  Trial Court Opinion, 11/13/2020, ¶ 4. As Judge Crumlish recognized, the term "fill out" is not a defined term under the Election Code. *Id.* Moreover, and contrary to the Campaign's contention that no alternative understanding of the term "fill out" has been proffered, the Campaign has failed to recognize, **the voter's name and address are already on the back of the outer envelope on a pre-printed label affixed no more than one inch from the declaration itself.** A voter could reasonably have concluded that the blanks requesting his or her name and address needed to be "filled out" only if the name and/or address on the label was incorrect or incomplete, as it was unnecessary to provide information that was already on the back of the outer envelope. [5]  To add further confusion, the declaration itself can be read to refer to the label: "I hereby declare that I am qualified to vote from the below stated address" can be read to mean the address as already stated on the label.

 ***13**  The text of the Election Code provides additional evidence of the directory nature of the provisions at issue. With regard to individuals who are not able to sign their name due to illness or physical disability, the General Assembly imposed a requirement that the declarant provide his or her "complete address." 25 P.S. § 3146.6(a)(3); 25 P.S. § 3150.16(a.1). These provisions demonstrate that the General Assembly clearly knew how to impose such a requirement when it wishes to do so. *In re Nov. 3, 2020 Gen. Election*, ––– Pa. ––––, 240 A.3d 591, ––––, 2020 WL 6252803, at *14 (2020)* (stating that the General Assembly's prior inclusion of a signature comparison

requirement demonstrated that "it understands how to craft language requiring signature comparisons at canvassing when it chooses to do so"). Moreover, Sections 3146.6(a)(3) and 3150.16(a.1) contain a precise form of declaration, crafted by the General Assembly, pertaining to voters with disabilities evidencing the General Assembly's understanding of how to mandate a precise declaration without resort to delegating non-essential information to the Secretary.

Finally, the text of the Election Code further demonstrates the lack of any need for handwritten names and addresses. Section 3146.8(g)(3), which relates to the canvassing of official absentee ballots and mail-in ballots, provides, in relevant part:

> When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots under paragraphs (1), (1.1) and (2), the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) [a voter who dies before the election] and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable.

25 P.S. § 3146.8(g)(3). The county board of elections' duty to keep a "Military Veterans and Emergency Civilians Absentee Voters File," which is not relevant to the current dispute, is governed by 25 P.S. § 3146.2c(b). Section 3146.2c(a) previously housed the board's duty to keep a "Registered Absentee and Mail-in Voters File." However, the General Assembly recently eliminated this directive. *See* 2020, March 27, P.L. 41, No. 12, § 8, imd. effective (deleting subsection (a), which required county board of elections to maintain at its office "a file containing the duplicate absentee voter's temporary registration cards of every registered elector to whom an absentee ballot has been sent"). By virtue of this amendment, the General Assembly eliminated one of the reference points that still appear in Section 3146.8(g)(3). The current Section 3146.2c(c) directs the county board to maintain the "the absentee voters' list" referenced in Section 3146.8(g)(3). The General Assembly also amended Section 3146.2c(c), which previously only directed the chief clerk to "prepare a list for each election district showing the names and post office addresses of all voting residents thereof to whom

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

official absentee ballots shall have been issued," to include such voting residents who were issued mail-in ballots. *See* 2019, Oct. 31, P.L. 552, No. 77, § 5.1, imd. effective (inserting "or mail-in" twice in subsection (c)).

As such, as relevant for our purposes, 🔖 Section 3146.8(g)(3) directs that "the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) [a voter who dies before the election] and shall compare the information thereon with that contained in the ... the absentee voters' list," which, pursuant to 🔖 Section 3146.2c(c), now also contains voters who received mail-in ballots. A close reading of the language chosen by the General Assembly here is telling. 🔖 Section 3146.8(g)(3) directs the board to "examine the declaration **on the envelope**" and "compare the information **thereon**" to the absentee (and mail-in) voters' list. 🔖 25 P.S. § 3146.8(g)(3) (emphasis added). Reading these phrases together, it is clear that the General Assembly intended that the information to be compared to the absentee (and mail-in) voters' list is the information on the outer envelope which includes the pre-printed name and address. If the General Assembly intended for the information written by the voter to be compared to the absentee voters' list, it would have used the term "therein," thus directing the board to compare the information contained "within" the declaration (the handwritten name and address).

**\*14** The following sentence in this section further suggests that the General Assembly intended such bifurcation. 🔖 Section 3146.8(g)(3) next states:

> If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the ... the absentee voters' list ... verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

🔖 25 P.S. § 3146.8(g)(3). Here, the board is directed to consider whether the declaration is sufficient (i.e., the

examination contained in the previous sentence) and also ensure that the absentee voters' list confirms the voter's right to vote (i.e., the comparison of the printed information to the relevant list from the prior sentence).

**(2) Failures to include dates**
Both the Campaign and Ziccarelli argue that the requirement to state the date on which declaration was signed is a mandatory obligation requiring disenfranchisement for lack of compliance. We disagree, as we conclude that dating the declaration is a directory, rather than a mandatory, instruction, and thus the inadvertent failure to comply does not require that ballots lacking a date be excluded from counting. As reviewed hereinabove, in our recent decision in 🔖 *Pa. Democratic Party*, we reiterated that the distinction between directory and mandatory instructions applies with respect to a voter's obligations under the Election Code, and that only failures to comply with mandatory obligations, which implicate both legislative intent and "weighty interests" in the election process, like ballot confidentiality or fraud prevention, will require disqualification. 🔖 *Pa. Democratic Party*, 238 A.3d at 379-80.

The Commonwealth Court and Ziccarelli relied upon the Election Code's use of the of "**shall** ... date" language in construing the date obligation as mandatory. 🚩 *In Re: 2,349 Ballots in the 2020 General Election, Appeal of: Nicole Ziccarelli*, ─── A.3d ───, 1162 C.D. 2020, 10, 2020 WL 6820816 (Pa. Comm. 2020). Although unlike the handwritten name and address, which are not mentioned in the statute, the inclusion of the word "date" in the statute does not change the analysis because the word "shall" is not determinative as to whether the obligation is mandatory or directive in nature. That distinction turns on whether the obligation carries "weighty interests." The date that the declaration is signed is irrelevant to a board of elections' comparison of the voter declaration to the applicable voter list, and a board can reasonably determine that a voter's declaration is sufficient even without the date of signature. Every one of the 8,329 ballots challenged in Philadelphia County, as well as all of the 2,349 ballots at issue in Allegheny County, were received by the boards of elections by 8:00 p.m. on Election Day, so there is no danger that any of these ballots was untimely or fraudulently back-dated. Moreover, in all cases, the receipt date of the ballots is verifiable, as upon receipt of the ballot, the county board stamps the date of receipt on the ballot-return and records the date the ballot is received in the SURE

system. The date stamp and the SURE system provide a clear and objective indicator of timeliness, making any handwritten date unnecessary and, indeed, superfluous.

**\*15**  Ziccarelli offers two alternative "weighty interests" for our consideration. She first contends that the date on which the declaration was signed may reflect whether the person is a "qualified elector" entitled to vote in a particular election. Pursuant to Section 3150.12b (entitled "Approval of application for mail-in ballot"), a board of elections may have determined that the person was a qualified elector and thus entitled to receive a mail-in ballot. Pursuant to Section 2811, however, to be a qualified elector, "[h]e or she shall have resided in the election district where he or she shall offer to vote at least thirty days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, he or she may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within thirty days preceding the election." 25 P.S. § 2811. As a result, Ziccarelli contends that the person may have been qualified to vote in a particular voting district at the time of applying for a mail-in ballot, but no longer a qualified elector in that voting district on Election Day. Ziccarelli's Brief at 16.

This unlikely hypothetical scenario is not evidence of a "weighty interest" in the date on the document for assuring the integrity of Pennsylvania's system for administering mail-in voting. Among other things, the canvassing statute, 25 P.S. § 3146.8(g)(3), directs the board to examine the declaration on the envelope of each ballot and compare the information thereon with that contained in the now defunct "Registered Absentee and Mail-in Voters File." *See* discussion supra pp. —— – ——. The date of signing the declaration will not be of any benefit in performing this task, as the name of the voter at issue will be on this list (as a result of his or her approval to receive a mail-in ballot), and the date of signing will provide no information with respect to whether or not he or she has left the voting district in the interim. Most critically, our current statutory framework includes no requirement that a county board of elections investigate whether an individual who had been confirmed as a qualified elector at the time of approval to receive a mail-in ballot remains as a qualified elector on Election Day. If the General Assembly had so intended, it would certainly have expressly stated it, as opposed to nebulously tucking such an unprecedented requirement into the instructions to the Secretary for designing the declaration.

Second, Ziccarelli argues that the date of signature of the declaration will serve to prevent double voting, as "whether an elector has already voted in the election for which the ballot is issued, by its very nature, depends on the date on which the declaration was signed." Ziccarelli's Brief at 16. Boards of elections do not use signatures or any handwritten information to prevent double voting. Duplicate voting is detected by the use of bar codes through the SURE system, and the board identifies the earlier cast vote by referencing the date it received the ballot, not the date on which the declaration was signed.

Ziccarelli and the Commonwealth Court insist that this Court "has already held that mail-in ballots with undated declarations are not 'sufficient' and, thus, must be set aside." Ziccarelli's Brief at 9; *In Re: 2,349 Ballots in the 2020 General Election*, 1162 C.D. 2020, at 10. In support of this contention, they reference an observation in our recent decision in *In re November 3, 2020 General Election*, —— Pa. ——, 240 A.3d 591 (2020), that when assessing the sufficiency of a voter's declaration, "the county board is required to ascertain whether the return envelope has been filled out, dated, and signed – and if it fails to do so then the ballot cannot be designated as "sufficient" and must be set aside.[6] *Id.* at —— – ——, 2020 WL 6252803 at *12-13. This statement is being taken out of context. Our statement in 2020 *General Election* was in reference to the limitations on what an election board is directed by the statute to do when assessing the sufficiency of a voter's declaration for the express purpose of indicating what they were not to do, i.e., signature comparisons. The question in *In Re: Nov. 3, 2020 General Election* was a narrow one. We did not address (as it was not at issue) whether a county board of elections could find a declaration as sufficient even though it was undated. That question requires an entirely different analysis that depends in significant part on whether dating was a mandatory, as opposed to a directive, requirement. We have conducted that analysis here and we hold that a signed but undated declaration is sufficient and does not implicate any weighty interest. Hence, the lack of a handwritten date cannot result in vote disqualification.

## IV. CONCLUSION

**\*16**  **[18]**  **[19]**  As we recognized in *Pa. Democratic Party*, "while both mandatory and directory provisions of the Legislature are meant to be followed, the difference between

Case 2:20-cv-01831-NR Document 55-1 Filed 12/30/20 Page 19 of 249
In re Canvass of Absentee and Mail-in Ballots of November 3,..., --- A.3d ---- (2020)
2020 WL 6866415

a mandatory and directory provision is the consequence for non-compliance: a failure to strictly adhere to the requirements of a directory statute will not nullify the validity of the action involved." *Pa. Democratic Party*, 238 A.3d at 378. Here we conclude that while failures to include a handwritten name, address or date in the voter declaration on the back of the outer envelope, while constituting technical violations of the Election Code, do not warrant the wholesale disenfranchisement of thousands of Pennsylvania voters. As we acknowledged in *Shambach*, "ballots containing mere minor irregularities should only be stricken for compelling reasons." *Shambach*, 845 A.2d at 799; *see also Appeal of Gallagher*, 351 Pa. 451, 41 A.2d 630, 632 (1945) ("[T]he power to throw out a ballot for minor irregularities ... must be exercised very sparingly and with the idea in mind that either an individual voter or a group of voters are not to be disfranchised at an election except for compelling reasons."). Having found no compelling reasons to do so, we decline to intercede in the counting of the votes at issue in these appeals.

The decision of the Philadelphia Court of Common Pleas is hereby affirmed. The decision of the Commonwealth Court is hereby reversed and the decision of the Allegheny County Court of Common Pleas is reinstated.

Justice Donohue announces the judgment of the Court, joined by Justices Baer, Todd and Wecht, and files an opinion joined by Justices Baer and Todd.

Justices Baer and Todd join the opinion.

Justice Wecht concurs in the result and files a concurring and dissenting opinion.

Justice Dougherty files a concurring and dissenting opinion in which Chief Justice Saylor and Justice Mundy join.

## CONCURRING AND DISSENTING OPINION

JUSTICE WECHT

[20] I agree with the conclusion that no mail-in or absentee ballot should be set aside solely because the voter failed to hand print his or her name and/or address on the declaration form on the ballot mailing envelope. These items are prescribed not by statute but by the Secretary of the Commonwealth under legislatively delegated authority.

Absent evidence of legislative intent that what in context amounts to redundant information must be furnished to validate a mail ballot, their omission alone should not deny an elector his or her vote. But I part ways with the conclusion reflected in the Opinion Announcing the Judgment of the Court ("OAJC") that a voter's failure to comply with the statutory requirement that voters date the voter declaration should be overlooked as a "minor irregularity." This requirement is stated in unambiguously mandatory terms, and nothing in the Election Code [1] suggests that the legislature intended that courts should construe its mandatory language as directory. Thus, in future elections, I would treat the date and sign requirement as mandatory in both particulars, with the omission of either item sufficient without more to invalidate the ballot in question. [2] However, under the circumstances in which the issue has arisen, I would apply my interpretation only prospectively. So despite my reservations about the OAJC's analysis, I concur in its disposition of these consolidated cases.

Concurring in this Court's recent decision in *Pennsylvania Democratic Party v. Boockvar*, I expressed my increasing discomfort with this Court's willingness to peer behind the curtain of mandatory statutory language in search of some unspoken directory intent.

[If this Court is] to maintain a principled approach to statutory interpretation that comports with the mandate of our Statutory Construction Act, [3] if we are to maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect, we must read mandatory language as it appears, and we must recognize that a mandate without consequence is no mandate at all. [4]

*17 There, I wrote separately in support of this Court's ruling requiring the invalidation of mail-in ballots that were returned to boards of elections not sealed in their secrecy envelopes as required by statutory language. The secrecy envelope requirement at issue in that case was no less ambiguous than the "fill out, date and sign" mandate at issue in this case. [5] Nonetheless, departing from that holding for reasons that do not bear close scrutiny, the OAJC concludes that invalidation should *not* follow for failure to comply with the Election Code provisions requiring that "the elector shall ... fill out, date and sign the declaration printed on" the ballot mailing envelope, even though this requirement appears in precisely the same statutory provisions as were at issue in *PDP*.

Section 3150.16 of the Election Code, governing "[v]oting by mail-in electors"—and its counterpart for absentee ballots, which employs the same operative language [6]—provides:

> At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. *The elector* ***shall*** *then fill out, date and sign the declaration printed on such envelope.* Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election. [7]

While this Court has not reviewed every constituent step this provision prescribes, we have addressed several of the requirements, taking it upon ourselves to weigh in each instance whether to interpret the mandatory statutory language as being mandatory in fact. The law those cases now comprise is so muddled as to defy consistent application, an inevitable consequence of well-meaning judicial efforts to embody a given view of what is faithful to the spirit of the law, with the unfortunate consequence that it is no longer clear what "shall" even means.

Nearly fifty years ago, this Court considered whether a ballot completed in red or green ink should be counted given that the statute provided by its terms only for the canvassing of ballots completed in blue/black ink. [8] Then-applicable Section 3063 of the Election Code provided that "[a]ny ballot that is marked in blue, black or blue-black ink, in fountain pen or ball point pen, or black lead pencil or indelible pencil, shall be valid and counted." [9] The Court determined that the Code did not require the invalidation of ballots completed in other colors, holding that the mandatory language was merely directory in effect:

> **\*18** [T]he power to throw out a ballot for minor irregularities should be sparingly used. It should be done only for very compelling reasons. Marking a ballot in voting is a matter not of precision engineering but of an unmistakable registration of the voter's will in substantial conformity to statutory requirements. In construing election laws[,] while we must strictly enforce all provisions to prevent fraud over overriding concern at all times must be to be flexible in order to favor the right to vote. Our goal must be to enfranchise and not to disenfranchise. This section of the code merely assures the validity of ballots marked in blue, black or blue-black ink. It does not ... specify that any other type of marking will necessarily be void. We have noted in other cases that the dominant theme of this section is to prevent ballots from being identifiable. A ballot should not be invalidated under
>
> [ 25 P.S. § 3063] unless the voter purposely makes a mark thereon or commits some other act in connection with this ballot to distinguish and identify it. The proper interpretation of this portion of the statute considering the occasion for its enactment, the mischief to be remedied, and the policy to liberally construe voting laws in the absence of fraud, is that the ballot is valid unless there is a clear showing

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

that the ink used was for the purpose of making the ballot identifiable. [10]

As this Court later stressed in *Appeal of Pierce, Weiskerger* "was decided before the enactment of the Statutory Construction Act [ ("SCA") ], which dictates that legislative intent is to be considered only when a statute is ambiguous." [11] Thus, while *Pierce* focused on distinguishing *Weiskerger*, it nonetheless implicitly called into question the *Weiskerger* Court's casual dismissal of the language of the statute there at issue because the various factors the *Weiskerger* Court cited as relevant to its decision not to give "shall" mandatory effect are relevant under the SCA only when a statute is susceptible of two or more reasonable interpretations. [12]

In insisting that a court's goal should be to "enfranchise and not to disenfranchise" and to be "flexible" in furtherance of that goal, the *Weiskerger* Court found itself awash in language so slippery as to defy consistent application. The Court posited the existence of "minor irregularities," a term we repeat often but have yet to define with suitable rigor, [13] and posited that ballots should be invalidated only for "very compelling reasons." [14] It also blessed "substantial conformity," and directed courts to "be flexible in order to favor the right to vote"—evidently even when doing so runs counter to statutory directives stated in mandatory terms. [15]

**\*19** Perhaps most troublingly, the Court posited that its "*goal* must be to enfranchise and not to disenfranchise." [16] A court's only "goal" should be to remain faithful to the terms of the statute that the General Assembly enacted, employing only one juridical presumption when faced with unambiguous language: that the legislature *meant what it said*. And even where the legislature's goal, however objectionable, is to impose a requirement that appears to have a disenfranchising effect, it may do so to any extent that steers clear of constitutional protections. In any event, even if the *Weiskerger* Court faithfully applied the common-law principles it cited, it did so inconsistently with the SCA's contrary guidance, which issued later the same year and binds us today. [17]

But the advent of the SCA did not prevent this Court from repeating the same mistake even decades later. In *Shambach v. Bickhart,* [18] a voter wrote in a candidate for office despite the fact that the candidate appeared on the official ballot for that office. This facially violated the Election Code, which provided that the voter shall, in the designated area, "write the identification of the office in question and the name of *any person not already printed on the ballot for that office*, and such mark and written insertion shall count as a vote for that person for such office." [19] Echoing *Weiskerger*, the *Shambach* Court observed that, "although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote." [20] Thus, the Court "[has] held that ballots containing mere irregularities should only be stricken for compelling reasons." [21] In support of this particular proposition, though, the Court cited only decisions that predated the SCA. [22] Much as in *Weiskerger*, the Court held that the absence of statutory language requiring the invalidation of a ballot completed in violation of the mandatory language of Section 3031.12(b)(3), combined with the amorphous principles it drew from the Court's prior cases, precluded the invalidation of a nonconforming ballot, effectively writing unambiguous language out of the Election Code entirely.

**\*20** We restored a greater degree of rigor in *Pierce*. In that case, we considered whether absentee ballots delivered by third persons on behalf of non-disabled voters were invalid under the Election Code, which provided that "*the elector shall* send [the absentee ballot] by mail, postage prepaid, except where franked, *or deliver it in person* to said county board of election." [23] There, in a step the *Shambach* Court tacitly bypassed, the Court underscored the SCA's direction that a court's sole objective in construing a statute is to "ascertain and effectuate the intention of the General Assembly," and that, "[g]enerally speaking, the best indication of legislative intent is the plain language of a statute." [24] "[I]t is only when the words of a statute 'are not explicit' that a court may resort to other considerations, such as the statute's perceived 'purpose,' in order to ascertain legislative intent." [25] In this light, the Court turned to the legislature's use of the word "shall." "Although some contexts may leave the precise meaning of the word 'shall' in doubt," the Court opined, "this Court has repeatedly recognized the

unambiguous meaning of the word in most contexts." [26] As noted *supra*, this Court in 🔖 *Pierce* declined to treat 🔖 *Weiskerger* as controlling in part because it was decided before the enactment of the SCA. While we did not assert 🔖 *Weiskerger*'s abrogation, we certainly cast doubt upon its probity, as well, by extension, as all similarly permissive Election Code case law relying upon the presumption to count votes that violated the Code's unambiguous directives.

In *In re Scroggin*,[27] too, we applied the relevant statutory language strictly in conformity with its terms, despite colorable arguments that doing so would deny ballot access to a candidate who had "substantially complied" with the statutory requirements. And at issue in that case was not merely the votes of a small percentage of otherwise qualified voters, but whether a political body's Presidential candidate would appear on the ballot at all in the wake of a placeholder nominee's failure to satisfy the Code's mandatory affidavit requirement. "[T]he provisions of the election laws relating to the form of nominating petitions and the accompanying affidavits are not mere technicalities," we explained, "but are necessary measures to prevent fraud and to preserve the integrity of the election process. ... Thus, the policy of the liberal reading of the Election Code cannot be distorted to emasculate those requirements necessary to assure the probity of the process." [28]

Finally, in 🔖 *PDP*, we held that the failure strictly to comply with the Election Code's mandatory requirement that mail-in ballots be sealed in the provided "Official Election Ballot" envelope required invalidation. Again, we specifically rejected the appellants' reliance upon 🔖 *Weiskerger* and 🔖 *Shambach*, relying instead upon 🔖 *Pierce*. As in 🔖 *Pierce*, we found that to interpret "shall" as directory rather than mandatory would render the Code's requirements "meaningless and, ultimately, absurd," notwithstanding the absence of an express, statutorily-prescribed sanction for non-compliance. [29] While we did not go out of our way to express as jaundiced a view of our cases holding that "minor irregularities" might be overlooked, the gravamen of our decision in that case, as in 🔖 *Pierce*, was clear: shall means *shall*. [30]

Although I joined the Majority in that case, I wrote separately to underscore the difficulties endemic to judicial efforts

to discern ulterior meanings ostensibly obscured by the legislature's use of mandatory language. I observed that relying upon such unbounded investigations invited courts "to bend unclear texts toward whatever ends that they believe to be consonant with legislative intent, but with little or no contemporaneous insight into whether they have done so successfully." [31] Acknowledging that legislation is sometimes less than a model of clarity, and that this Court consequently will continue to face invitations to treat mandatory language as something less, I wrote: "[I]f we are to maintain a principled approach to statutory interpretation that comports with the mandate of [the SCA], if we are to maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect, we must read mandatory language as it appears, and we must recognize that a mandate without consequence is no mandate at all." [32]

**\*21** It is against this case law, and particularly the views I expressed in 🔖 *PDP*, that I review the question now before us, briefly addressing the Secretary-imposed name and address requirement first, before proceeding to consider the statutory requirement that the voter date and sign the voter declaration.

As to the former question, I agree with the OAJC's conclusion, although I subscribe to the narrower approach briefly set forth by Justice Dougherty in his Concurring and Dissenting Opinion and developed variously in the OAJC's analysis. But while the OAJC acknowledges the reasons that Justice Dougherty cites as militating against invalidation, it supplements them with the minor-irregularity analysis familiar from 🔖 *Weiskerger* and 🔖 *Shambach*, which is neither necessary nor advisable. Justice Dougherty's approach requires no reliance upon cases that 🔖 *Pierce* and 🔖 *PDP* rightly have called into question. Rather, the fact that the name and address requirement does not stem from mandatory statutory language,[33] as well as questions about the Secretary's authority to compel county boards of elections to conform with whatever guidance the Secretary offers,[34] combined with our presumption in favor of treating qualified voters' ballots as valid absent clear legal mandates to the contrary where statutory language is less than clear,[35] collectively recommend against invalidating ballots for this omission alone. [36] That is enough for me.

The same cannot be said about the date and sign requirement, which derives from an unmistakable statutory directive. Drawing upon our less rigorous case law, and relying heavily upon the interpretive latitude this Court has arrogated to itself sporadically for generations, the OAJC assumes that our mission is to determine whether the apparent mandate is in fact directory, hanging the entire inquiry upon the question of mandatory versus directory effect. That reading, in turn, must rely upon the "minor irregularity" / "weighty interest" dichotomy underlying the cases that 📖 *Pierce* and 📖 *PDP* have called into question.

> To determine whether the Election Code's directive that the voter handwrite their names, address, and the date of signing the voter declaration on the back of the outer envelope is a mandatory or directory instruction requires us to determine whether the intent of the General Assembly was clear and whether the failure to handwrite the information constitutes "minor irregularities" or instead represent[s] "weighty interests" ... that the General Assembly considered to be critical to the integrity of the election. [37]

**\*22**  To be clear, the OAJC offers a commendably thorough analysis, but its length and involution is necessary only *because* of the open-ended inquiry it embarks upon. And it is no surprise that, like the cases upon which it relies, the OAJC involves protean characterizations of voting requirements as "technicalities," [38] "minor irregularities," [39] and even "superfluous." [40] As illustrated in my review of earlier case law, the OAJC does not conjure this terminology from the ether—all but the last of these terms have been central to this Court's decisional law going back decades. But properly understood, all of these terms signal (and implicitly bless) the substitution of judicial appraisals for legislative judgments.

The OAJC's approach ultimately requires that in *any* case requiring interpretation of the Election Code to determine the validity of votes nonconforming with facially mandatory requirements, the Court must assess the effect of that language

*de novo* before deciding whether the legislature intended for it to be interpreted as mandatory or merely directory. [41] Thus, while a court embracing that test might take it as obvious, *e.g.*, that the signature requirement should be construed as mandatory, it could not merely have taken its mandatory effect as a given by virtue of the statutory language alone. If the mandatory/directory inquiry is ever appropriately applied to mandatory language, then the Court can only conclude that mandatory language must be applied as such after applying its balancing test, with cases that *seem* obvious merely reflecting that the Court deemed the "interest" to be protected so "weighty" that its omission clearly cannot be viewed as a "minor irregularity."

**\*23**  The only practical and principled alternative is to read "shall" as mandatory. Only by doing so may we restore to the legislature the onus for making policy judgments about what requirements are necessary to ensure the security of our elections against fraud and avoid inconsistent application of the law, especially given the certainty of disparate views of what constitute "minor irregularities" and countervailing "weighty interests."

I do not dispute that colorable arguments may be mounted to challenge the necessity of the date requirement, and the OAJC recites just such arguments. [42] But colorable arguments also suggest its importance, as detailed in Judge Brobson's opinion as well as Justice Dougherty's Concurring and Dissenting Opinion. [43] And even to *indulge* these arguments requires the court to referee a tug of war in which unambiguous statutory language serves as the rope. That reasonable arguments may be mounted for and against a mandatory reading only illustrates precisely why we have no business doing so.

Ultimately, I agree with Judge Brobson's description of the greatest risk that arises from questioning the intended effect of mandatory language on a case-by-case basis:

> While we realize that our decision in this case means that some votes will not be counted, the decision is grounded in law. It ensures that the votes will not be counted because the votes are invalid as a matter of law. Such adherence to the law ensures equal elections throughout the Commonwealth, on terms set by the

General Assembly. The danger to our democracy is not that electors who failed to follow the law in casting their ballots will have their ballots set aside due to their own error; rather, the real danger is leaving it to each county board of election to decide what laws must be followed (mandatory) and what laws are optional (directory), providing a patchwork of unwritten and arbitrary rules that will have some defective ballots counted and others discarded, depending on the county in which a voter resides. Such a patchwork system does not guarantee voters an "equal" election, particularly where the election involves inter-county and statewide offices. We do not enfranchise voters by absolving them of their responsibility to execute their ballots in accordance with law. [44]

We must prefer the sometimes-unsatisfying clarity of interpreting mandatory language as such over the burden of seeking The Good in its subtext. Substantive perfection is the ever-elusive concern of the legislature. Ours must be consistency of interpretive method without fear or favor, a goal that recedes each time a court takes liberties with statutory language in furtherance of salutary abstractions. Because the OAJC favors a more intrusive and ambitious inquiry, I respectfully dissent.

But just because I disagree with the OAJC's interpretation of the date and sign requirement does not inexorably lead me to the conclusion that the votes at issue in this case must be disqualified. While it is axiomatic that *ignorantia legis neminem excusat* (ignorance of the law excuses no one), this Court may elect to apply only prospectively a ruling that overturns pre-existing law or issues a ruling of first impression not foreshadowed by existing law. Indeed, we have done so in at least one case under the Election Code. In 🔖 *Appeal of Zentner*, [45] we confronted a statute governing candidates' obligation to submit statements of financial interests by a time certain that had been revised specifically to correct our previously fluid interpretations of the predecessor statute. We were forced to consider whether our newly strict construal of the revised statute should result in the invalidation of entire ballots already cast because they included one or more candidates who had failed to satisfy the statutory disclosures. We held, as the legislature clearly intended, that a candidate's "failure to file the requisite financial interests statement within the prescribed time shall be fatal to a candidacy." [46] But we also concluded that to "void the results of an election where all candidates were submitted to the voters, with late but nonetheless filed financial statements which left adequate time for study by the electorate, would be an unnecessary disenfranchisement." [47] Thus we determined that our holding should apply prospectively but not to the election at issue. [48]

**\*24** It goes without saying that 2020 has been an historically tumultuous year. In October of 2019, the legislature enacted Act 77, [49] introducing no-excuse mail-in voting with no inkling that a looming pandemic would motivate millions of people to avail themselves of the opportunity to cast their ballots from home in the very first year that the law applied. Soon thereafter, Act 12, [50] introduced and enacted with unprecedented alacrity in response to the pandemic, further amended the Election Code to address emergent concerns prompted by the looming public health crisis. While aspects of the new provisions that are relevant to this case were not wholly novel to the Code, as such—for example, the provisions that authorized no-excuse mail-in voting by and large just expanded the pool of voters to whom the rules that long had governed absentee balloting applied —the massive expansion of mail-in voting nonetheless presented tremendous challenges to everyone involved in the administration of elections, from local poll workers to the Secretary of the Commonwealth. Importantly, it transformed the incentives of probing the mail-in balloting provisions for vulnerabilities in furtherance of invalidating votes. For the first time, a successful challenge arising from a given technical violation of statutory requirements might result in the invalidation of many thousands of no-excuse mail-in ballots rather than scores or hundreds of absentee ballots.

In advance of the 2020 election, neither this Court nor the Commonwealth Court had occasion to issue a precedential ruling directly implicating the fill out, date and sign requirement. Moreover, as the OAJC highlights in multiple connections, the Secretary issued confusing, even contradictory guidance on the subject. [51] Thus, local election officials and voters alike lacked clear information regarding the consequence of, *e.g.*, failing to handwrite one's address on an envelope that already contained preprinted text with that

exact address or record the date beside the voter's declaration signature.

I have returned throughout this opinion to our decision in 🟡 *PDP*, and I do so once more. I maintained in that case that the Election Code should be interpreted with unstinting fidelity to its terms, and that election officials should disqualify ballots that do not comply with unambiguous statutory requirements, when determining noncompliance requires no exercise of subjective judgment by election officials. [52] The date requirement here presents such a case. But I *also* emphasized that disqualification is appropriate "[s]o long as the Secretary and county boards of elections *provide electors with adequate instructions for completing the declaration of the elector—including conspicuous warnings regarding the consequences for failing strictly to adhere*" to those requirements. [53] I cannot say with any confidence that even diligent electors were adequately informed as to what was required to avoid the consequence of disqualification in this case. As in 🟡 *Zentner*, it would be unfair to punish voters for the incidents of systemic growing pains.

In case after case involving the Election Code, especially this year, we have been reminded how important it is that the General Assembly provide unambiguous guidance for the administration of the election process. But it is imperative that we recognize when the legislature has done precisely that, and resolve not to question the legislature's chosen language when it has done so. And perhaps it is a silver lining that many of the problems that we have encountered this year, in which a substantially overhauled electoral system has been forced to make its maiden run in stormy seas, are now clear enough that the legislature and Department of State have notice of what statutory refinements are most needful. It is my sincere hope that the General Assembly sees fit to refine and clarify the Election Code scrupulously in the light of lived experience. In particular, because this is the second time this Court has been called upon to address the declaration requirement, it seems clear that the General Assembly might clarify and streamline the form and function of the declaration, perhaps prescribing its form to advance clarity and uniformity across the Commonwealth. [54]

**CONCURRING AND DISSENTING OPINION**

JUSTICE DOUGHERTY

 **\*25**  I concur in the decision to affirm the lower courts' orders pertaining to ballots where the qualified electors failed to print their name and/or address on the outer envelope containing their absentee or mail-in ballots. However, I cannot agree that the obligation of electors to set forth the date they signed the declaration on that envelope does not carry "weighty interests." Opinion Announcing the Judgment of the Court (OAJC) at ——. I therefore respectfully dissent from the holding at Section III(2) of the OAJC which provides that the undated ballots may be counted.

The applicable statutes require that electors "shall [ ] fill out, date and sign" the declaration printed on the ballot envelope. 🟡 25 P.S. §§ 3146.6(a), 🟡 3150.16(a). In my view, the term "fill out" is subject to interpretation. Maybe it means printing one's name and address on the envelope, and maybe it does not. Given that our goal in interpreting the Election Code is to construe ambiguous provisions liberally, in order to avoid disenfranchisement where possible, I do not consider the failure of qualified electors to "fill out" their name and address, particularly where the name and address already appear on the other side of the envelope, to require disqualification of the ballot. I am further persuaded of this position by the fact that the blank spaces on the envelope indicating where the name and address should be "filled out" were designated by the Secretary, not the General Assembly. 🟡 25 P.S. § 3146.4 ("Said form of declaration and envelope shall be as prescribed by the Secretary of the Commonwealth[.]"); *see also* Concurring and Dissenting Opinion at —— – —— (Wecht, J.). But, the meaning of the terms "date" and "sign" — which **were** included by the legislature — are self-evident, they are not subject to interpretation, and the statutory language expressly requires that the elector provide them. *See* 🟡 *In re Canvass of Absentee Ballots of Nov. 4, 2003 General Election*, 577 Pa. 231, 843 A.2d 1223, 1231 (2004) ("[A]ll things being equal, the law will be construed liberally in favor of the right to vote but, at the same time, we cannot ignore the clear mandates of the Election Code.") (citation omitted). Accordingly, I do not view the absence of a date as a mere technical insufficiency we may overlook.

In my opinion, there is an unquestionable purpose behind requiring electors to date and sign the declaration. As Judge Brobson observed below, the date on the ballot envelope provides proof of when the "elector actually executed the

ballot in full, ensuring their desire to cast it in lieu of appearing in person at a polling place. The presence of the date also establishes a point in time against which to measure the elector's eligibility to cast the ballot[.]" 🚩 *In Re: 2,349 Ballots in the 2020 General Election*, 1162 C.D. 2020, slip op. at 12, 2020 WL 6820816 (Pa. Cmwlth. Nov. 19, 2020) (memorandum). The date also ensures the elector completed the ballot within the proper time frame and prevents the tabulation of potentially fraudulent back-dated votes. *Cf.*

📄 *In re Canvass of Absentee Ballots of November 4, 2003 General Election*, 843 A.2d at 1232-33 (statutory requirement that ballot be submitted by elector and not third-party is mandatory safeguard against fraud). I recognize there is presently no dispute that all undated ballots at issue here arrived in a timely manner. But I am also cognizant that our interpretation of this relatively new statute will act as precedential guidance for future cases.

Chief Justice Saylor and Justice Mundy join this concurring and dissenting opinion.

**All Citations**

--- A.3d ----, 2020 WL 6866415

---

## Footnotes

1       DNA Services Corp./Democratic National Committee (hereinafter "DNC") intervened in the proceedings before the trial court.

2       None of the parties have challenged whether these provisions constituted improper delegations of legislative authority. 📄 *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 639 Pa. 645, 161 A.3d 827 (2017).

3       Conversely, the Philadelphia Board and the DNC have both selectively relied upon guidance provided by the Secretary to the county boards of election that indicated that a voter's failure to handwrite his/her name and address was not a ground to set the ballot aside. Philadelphia Board's Brief at 19; DNC's Brief at 15. They have directed the Court to the Guidance published on September 11, 2020, in which the Secretary advised that "[i]f the Voter's Declaration on the return envelope is signed and the county board is satisfied that the declaration is sufficient, the mail-in or absentee ballot should be approved for canvassing." Guidance, 9/11/2020, at 3. As discussed infra at n.6, however, on September 28, 2020 the Secretary issued arguably contrary guidance stating that "[a] ballot-return envelope with a declaration that is not filled out, dated, and signed is not sufficient and must be set aside, declared void and may not be counted." Guidance, 9/28/20, at 9. Confusingly, she also incorporated by reference the September 11, 2020 Guidance. Both sets of Guidance are set forth on pages —— – —— supra.

4       Where an election statute is ambiguous, courts apply the interpretative principle that that "election laws ... ordinarily will be construed liberally in favor of the right to vote." 📄 *Pa. Democratic Party*, 238 A.3d at 360–61.

5       The DNC argues, with some persuasive force, that the Campaign's requested interpretation of Pennsylvania's Election Code could lead to a violation of federal law by asking the state to deny the right to vote for immaterial reasons. Nobody acting under color of state law may deny anyone the right to vote "in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 📄 52 U.S.C. § 10101(a)(2)(B).
        Under this section, the so-called "materiality provision" of the Voting Rights Act, federal courts have barred the enforcement of similar administrative requirements to disqualify electors. *See, e.g.,* 📄 *Schwier v. Cox,* 340 F.3d 1284 (11th Cir. 2003) (disclosure of voter's social security number is not "material" in determining whether a person is qualified to vote under Georgia law for purposes of the Voting Rights Act); 📄 *Washington Ass'n of Churches v. Reed*, 492 F.Supp.2d 1264 (W.D. Wash. 2006) (enjoining enforcement of "matching"

statute, requiring state to match potential voter's name to Social Security Administration or Department of Licensing database, because failure to match applicant's information was not material to determining qualification to vote); *Martin v. Crittenden*, 347 F.Supp.3d 1302 (N.D. Ga. 2018), *reconsideration denied*, 1:18-CV-4776-LMM, 2018 WL 9943564 (N.D. Ga. Nov. 15, 2018) (voter's ability to correctly recite his or her year of birth on absentee ballot envelope was not material to determining said voter's qualifications).

6    In her brief, Ziccarelli cites to the Guidance distributed by the Secretary of the Commonwealth on September 28, 2020 to the county boards of elections, advising that "[a] ballot-return envelope with a declaration that is not filled out, dated, and signed is not sufficient and must be set aside, declared void and may not be counted." As noted in footnote 3 supra, however, the Secretary also issued Guidance on September 11, 2020, which was cited with approval by the Philadelphia Board and the DNC. No party referenced both sets of Guidance, however, even though the September 28 Guidance incorporated the September 11 Guidance. *See* Guidance, 9/28/2020, at 9 ("For more information about the examination of return envelopes, please refer to the Department's September 11, 2020 Guidance Concerning Examination of Absentee and Mail-in Ballot Return Envelopes.").

In any event, we will not consider this Guidance in making our decision. Neither of the parties explain how the potentially contradictory directives are to be understood. More importantly, the Secretary has no authority to definitively interpret the provisions of the Election Code, as that is the function, ultimately, of this Court. The Secretary also clearly has no authority to declare ballots null and void. "[I]t is the Election Code's express terms that control, not the written guidance provided by the Department and as this Court repeatedly has cautioned, even erroneous guidance from the Department or county boards of elections cannot nullify the express provisions of the Election Code." *In re Scroggin*, ––– Pa. ––––, 237 A.3d 1006, 1021 (2020). Moreover, the Secretary has no authority to order the sixty-seven county boards of election to take any particular actions with respect to the receipt of ballots. 25 P.S. § 2621(f.2).

Finally, with respect to the September 28 Guidance indicating that undated ballots must be set aside, we note that in addition to the Philadelphia and Allegheny County Boards, at least two other boards of elections also did not follow it. *Donald J. Trump for President Inc. v. Bucks Cnty. Bd. of Elections,* No. 2020-05786 (Bucks Cty. Ct. Com. Pl.); *Donald J. Trump for President, Inc., et al. v. Montgomery Cnty. Bd. of Elections*, No. 2020-18680 (Nov. 13, 2020). Both the Bucks County and Montgomery County Courts of Common Pleas affirmed the counting of the ballots even though the declarations had not been filled out in full. Each of the courts of common pleas appropriately applied this Court's precedent in doing so.

1    Act of June 3, 1937, P.L. 1333, art. I, § 101, *codified as amended at* 25 P.S. §§ 2601, *et seq.*

2    None of the parties or courts involved in these consolidated cases dispute that a voter's failure to sign a mail-in or absentee ballot's declaration requires invalidation.

3    Act of Dec. 6, 1972, No. 290, § 3, *codified as amended at* 1 Pa.C.S. §§ 1501, *et seq.*

4    ––– Pa. ––––, 238 A.3d 345, 391 (2020) (Wecht, J., concurring) (hereinafter " *PDP*").

5    Specifically, 25 P.S. § 3150.16(a) provides that the mail-in ballot elector "shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, *enclose and securely seal the same in the envelope on which is printed, stamped or endorsed 'Official Election Ballot.'* "

6    *Compare* 25 P.S. § 3150.16(a) ("Voting by mail-in electors") *with* 25 P.S. § 3146.6(a) ("Voting by absentee electors"). Each provision governing the form of mail-in ballots and the voter's obligations in preparing and transmitting them has its verbatim equivalent for absentee ballots, and the issue presented applies equally to both. Hereinafter, for simplicity's sake, I refer exclusively to mail-in ballots and cite and quote only the provisions that apply to mail-in ballots, but my analysis applies identically to both. The OAJC reproduces the relevant sections at length. *See* OAJC at –––– – ––––.

7    25 P.S. § 3150.16(a) (emphasis added).

8    *Appeal of Weiskerger*, 447 Pa. 418, 290 A.2d 108 (1972).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

9      25 P.S. § 3063 (applicable through October 30, 2019).

10     *Weisberger*, 290 A.2d at 109 (cleaned up).

11     *Appeal of Pierce*, 577 Pa. 231, 843 A.2d 1223, 1231 (2004); *see* 1 Pa.C.S. 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."); *see also Oberneder v. Link Computer Corp.*, 548 Pa. 201, 696 A.2d 148, 150 n.2 (1997) (rejecting a party's reliance upon a 1965 case because it was at odds with the ambiguity-first, reliance-upon-rules-of-construction-later approach to statutory construction required by the SCA).

12     Without suggesting that the ink color language at issue in that case was ambiguous on its face, the *Weisberger* Court suggested that interpreting the language required it to consider, *inter alia*, "the occasion for its enactment" and "the mischief to be remedied." *Weisberger*, 290 A.2d at 109. Section 1921 of the SCA similarly provides that courts may consider "[t]he occasion and necessity for the statute" and "[t]he mischief to be remedied"—but *only* "[w]hen the words of the statute are not explicit." 1 Pa.C.S. § 1921(c). *See, e.g., Appeal of Norwood*, 382 Pa. 547, 116 A.2d 552, 555 (1955); *Appeal of Gallagher*, 351 Pa. 451, 41 A.2d 630, 632 (1945).

13

14     *Weisberger*, 290 A.2d at 109 (quoting *In re Petitions to Open Ballot Boxes*, 410 Pa. 62, 188 A.2d 254, 256 (1963)).

15     In contrast to *Weisberger*'s capacious understanding of this principle, the Court adopted a more measured tone in *Appeal of Urbano*, 411 Pa. 45, 190 A.2d 719 (1963). There, citing the presumption in favor of counting votes, it allowed for relief from the apparent consequences of failing to satisfy mandatory statutory language, but did so specifically because the common-law presumption was in keeping with additional statutory language expressly granting the court discretion to permit amendments to cure even "material errors or defects." *Id.*

16     *Weisberger*, 290 A.2d at 109 (emphasis added).

17     To be clear, *Weisberger* was by no means our original sin in this area. In one earlier example cited by the OAJC, this Court discerned reason to disregard the mandatory connotation of "shall" in *Appeal of James*, 377 Pa. 405, 105 A.2d 64 (1954). Indeed, one can detect aspects of the same open-ended analysis in, *e.g.*, our 1922 decision in *In re Fish's Election*, 273 Pa. 410, 117 A. 85, 87 (1922) (quoting *Knight v. Borough of Coudersport*, 246 Pa. 284, 92 A. 299, 300 (1914)) ("If the law declares a specified irregularity to be fatal, the court will follow that command, irrespective of their views of the importance of the requirement. In the absence of such declaration the judiciary endeavor, as best they may, to discern whether the deviation from the prescribed forms of law had or had not so vital an influence on the proceedings as probably prevented a full and free expression of the popular will. ... [If not], it is considered immaterial."). Our willingness to substitute our judgment for that of the legislature perhaps reached its nadir in *Norwood*, where we held that "[e]very rationalization within the realm of common sense should aim at saving [a] ballot rather than void it," 116 A.2d at 554-55, an expression that the OAJC embraces as a "well-settled principle of Pennsylvania election law." OAJC at ——. Perhaps no passage better illustrates the liberties this Court has taken when probing for reasons to treat mandatory language as anything but mandatory.

18     577 Pa. 384, 845 A.2d 793 (2004).

19     25 P.S. § 3031.12(b)(3) (emphasis added). The language in question has been amended in the intervening years.

20     *Shambach*, 845 A.2d at 798 (quoting *James*, 105 A.2d at 65).

21     *Id.* at 798.

2020 WL 6866415

22   *See Appeal of Mellody*, 449 Pa. 386, 296 A.2d 782, 784 (1972); *Reading Defense Committee*, 188 A.2d at 256; *Gallagher*, 41 A.2d at 632. The OAJC similarly relies substantially for these principles on pre-SCA case law. *See*, *e.g.*, OAJC at —— (quoting *James*, 105 A.2d at 65-66 (Pa. 1954)); *id.* at —— (quoting *Urbano*, 190 A.2d at 719, and *Norwood*, 116 A.2d at 554).

23   25 P.S. § 3146.6(a) (emphasis added); *see Pierce*, 843 A.2d at 1231.

24   *Pierce*, 843 A.2d at 1230 (citations omitted).

25   *Id.*

26   *Id.* at 1231-32 (citing, *inter alia*, BRYAN GARNER, DICTIONARY OF MODERN LEGAL USAGE 939 (2d ed. 1995)).

27   —— Pa. ——, 237 A.3d 1006 (2020).

28   *Id.* at 1019 (quoting *Appeal of Cubbage*, 467 Pa. 491, 359 A.2d 383, 384 (1976)).

29   *PDP*, 238 A.3d at 379 (quoting *Pierce*, 843 A.2d at 1232).

30   *Id.* at 380 ("[*Pierce*] leads to the inescapable conclusion that a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified. ... Accordingly, we hold that the secrecy [envelope] language in Section 3150.16(a) is mandatory and the mail-in elector's failure to comply ... renders the ballot invalid.").

31   *Id.* at 391 (Wecht, J., concurring).

32   *Id.*

33   *See* Conc. & Diss. Op. at ——Conc. & Diss. Op. at —— (Dougherty, J.).

34   *See* OAJC at —— – —— n.6.

35   *See PDP*, 238 A.3d at 356 ("[T]he Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice."). Notably, the OAJC cites *PDP* for the same proposition, correctly qualifying the principle by noting that liberal construction comes into play only "[*w*]*here an election statute is ambiguous.*" OAJC at —— n.4 (emphasis added).

36   I also find cause for concern in the absence of clear instruction on the ballot materials indicating that a ballot lacking a name or address will be disqualified, a concern that informs my preference for prospective application of the statutory date requirement. *Cf. Reading*, 188 A.2d at 256 (declining to invalidate ballots upon which voters did not signal their intended votes strictly with the X or check mark mandated by statute for various reasons—including a "minor irregularity" approach I reject—especially where the printed instruction on the ballot did not specify that only those two methods of signaling one's vote would be recognized).

37   OAJC at ——.

38   *See id.* at —— (quoting *James*, 105 A.2d at 66 ("Technicalities should not be used to make the right of the voter insecure.")). *James*'s tendentious resort to the word "technicalities," which seldom is used constructively when invoked in connection with the law, is contradicted at least in tenor by subsequent pronouncements. *See Pierce*, 843 A.2d at 1234 ("[S]o-called technicalities of the Election Code are necessary for the preservation of secrecy and the sanctity of the ballot and must therefore be observed ...."); *Appeal of Weber*, 399 Pa. 37, 159 A.2d 901, 905 (1960) ("The technicalities of the Election Law (and they are many) are necessary for the preservation of the secrecy and purity of the ballot and must, therefore, be meticulously observed.").

39   *See* OAJC at —— – —— (counterposing "minor irregularities" and "weighty interests" as the framework for decision). Notably, the question as to which we granted review quite confused the meaning of "irregularity." We proposed to answer the question whether "the Election Code require[s] county boards of elections to

2020 WL 6866415

disqualify mail-in or absentee ballots submitted by qualified electors who signed their ballot's outer envelopes but did not handwrite their name, their address, and/or a date, *where no fraud or irregularity has been alleged*?" *Id.* at ——. But this formulation is irreconcilable with the question whether failing to date a ballot declaration is, itself, a "minor irregularity" and, as such, not subject to the sanction of ballot invalidation —the very crux of the case, as the OAJC defines it. I raise this discrepancy because it illustrates how these constructs lend themselves to confusion, complicating what should be simple questions by engrafting unenumerated considerations upon plainly worded statutes.

40    *See id.* at —— ("The date stamp and the SURE system provide a clear and objective indicator of timeliness, making any handwritten date unnecessary and, indeed, superfluous."); *cf. id.* at —— (characterizing the handwritten name and address requirement as, "at best, a 'minor irregularity' and, at worst, entirely immaterial").

41    *See id.* at —— ("Although unlike the handwritten name and address, which are not mentioned in the statute, the inclusion of the word 'date' in the statute does not change the analysis *because the word 'shall' is not determinative as to whether the obligation is mandatory or direct[ory] in nature.*" (emphasis added)).

42    *See id.* at —— – ——.

43    *See* In re 2,349 Ballots in the 2020 General Election, 1162 C.D. 2020, slip op. at 12, 2020 WL 6820816 (Pa. Cmwlth. Nov. 19, 2020) (memorandum); Conc. & Diss. Op. at —— (Dougherty, J.).

44    In re 2,349 Ballots, slip op. at 12-13.

45    533 Pa. 564, 626 A.2d 146 (1993)

46    *Id.* at 149.

47    *Id.*

48    *Cf.* Andino v. Middleton, No. 20A55, —— U.S. ——, ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 5887393, *1 (Oct. 5, 2020) (staying the district court's injunction of an absentee ballot witness requirement, "except to the extent that any ballots cast before this stay issues and received within two days of this order may not be rejected for failing to comply with the witness requirement" in light of the fact that voters cast nonconforming absentee ballots in reliance upon the guidance of state elections officials during the pendency of the injunction); In re Beyer, 631 Pa. 612, 115 A.3d 835, 843-44 (2015) (Baer, J., dissenting) (finding it "reasonable for this Court to rule prospectively that a candidate may only designate his occupation or profession as 'lawyer' on nomination papers after he or she has graduated from law school, passed the bar exam, and is in good standing as an active member of the Pennsylvania Bar," but dissenting because, "at the time Candidate Beyer filed his nomination papers, neither a majority of this Court nor the Commonwealth Court had ever made such an express declaration").

49    *See* Act of Oct. 31, 2019, P.L. 552, No. 77.

50    *See* Act of March 27, 2020, P.L. 41, No. 12.

51    *See* OAJC at —— n.3, —— – —— n.6; *see also id.* at —— – —— (reproducing all relevant aspects of the guidance documents pertaining to the issues presented).

52    *See* PDP, 238 A.3d at 389 (Wecht, J., concurring).

53    *See* id. (emphasis added).

54    In this regard, the OAJC observes that the Democratic National Committee "argues, with some persuasive force, that the Campaign's requested interpretation of Pennsylvania's Election Code could lead to a violation of [the federal Voting Rights Act] by asking the state to deny the right to vote for immaterial reasons." OAJC at —— n.5; *see* 52 U.S.C. § 10101(a)(2) ("No person acting under color of law shall ... (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election ...."). The OAJC does not pursue this argument, except to acknowledge a handful of cases that might be read to suggest that

Case 2:20-cv-01831-NR   Document 55-1   Filed 12/30/20   Page 31 of 249
In re Canvass of Absentee and Mail-in Ballots of November 3,..., --- A.3d ---- (2020)
2020 WL 6866415

the name and address, and perhaps even the date requirement could qualify as "not material in determining whether such individual is qualified under State law to vote." Given the complexity of the question, I would not reach it without the benefit of thorough advocacy. But I certainly would expect the General Assembly to bear that binding provision in mind when it reviews our Election Code. It is inconsistent with protecting the right to vote to insert more impediments to its exercise than considerations of fraud, election security, and voter qualifications require.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Unreported Opinion 2

*Donald J. Trump for President, Inc. v. Boockvar*, Case No. 4:20-cv-2078, ---
F.Supp.3d ----, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020) (Brann, J. op.)

KeyCite Blue Flag – Appeal Notification

Appeal Filed by   DONALD J. TRUMP FOR PRESIDENT, ET AL. v.
SECRETARY COMMONWEALTH OF PA ET AL.,   3rd Cir.,   November
23, 2020

2020 WL 6821992
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiffs,
v.
Kathy BOOCKVAR, et al., Defendants.

No. 4:20-CV-02078
|
Filed November 21, 2020

**Synopsis**
**Background:** Voters and President's reelection campaign
brought action against Secretary of the Commonwealth
of Pennsylvania and county boards of elections, seeking
to invalidate millions of votes cast by Pennsylvanians in
presidential election during COVID-19 pandemic based on
allegations that Secretary's authorization of notice-and-cure
procedure for procedurally defective mail-in ballots violated
the Equal Protection Clause and that poll watchers were
impermissibly excluded from canvass. Secretary and county
boards of elections moved to dismiss.

**Holdings:** The District Court, Matthew W. Brann, J., held
that:

[1] voters lacked standing to pursue action;

[2] campaign lacked associational standing to pursue action;

[3] campaign lacked competitive standing to pursue action;

[4] rational basis existed for Secretary's decision to provide
counties with discretion to use notice-and-cure procedure for
procedurally defective mail-in ballots, and thus, Secretary's
decision did not violate voters' rights under the Equal
Protection Clause; and

[5] campaign failed to allege that its poll watchers
were treated differently than opposing party presidential
candidate's poll watchers, as required to state equal protection
claim for allegedly excluding watchers from canvass.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim; Motion to Dismiss for Lack of Standing.

West Headnotes (45)

**[1]**   **Election Law**   Power to Confer and
Regulate

The power to regulate and administer federal
elections arises from the Constitution. U.S.
Const. art. 1, § 4, cl. 1.

**[2]**   **United States**   Relation to state law;
preemption

States' power to regulate the incidents of federal
elections, including balloting, is limited to
the exclusive delegation of power under the
Elections Clause. U.S. Const. art. 1, § 4, cl. 1.

**[3]**   **Federal Courts**   Case or Controversy
Requirement

Article III limits the power of the federal
judiciary to "cases" and "controversies." U.S.
Const. art. 3, § 2, cl. 1.

**[4]**   **Federal Civil Procedure**   In general;
injury or interest
**Federal Courts**   Case or Controversy
Requirement

To satisfy the case-or-controversy requirement
of Article III, a plaintiff must establish that they
have standing. U.S. Const. art. 3, § 2, cl. 1.

**[5]**   **Federal Civil Procedure**   In general;
injury or interest

Standing is a "threshold" issue; it is an
irreducible constitutional minimum, without

which a federal court lacks jurisdiction to rule on the merits of an action. U.S. Const. art. 3, § 2, cl. 1.

**[6]    Federal Civil Procedure**  In general; injury or interest

Federal courts are obligated to raise the issue of standing sua sponte. U.S. Const. art. 3, § 2, cl. 1.

**[7]    Federal Civil Procedure**  In general; injury or interest

The plaintiff bears the burden of establishing standing. U.S. Const. art. 3, § 2, cl. 1.

**[8]    Federal Civil Procedure**  In general; injury or interest

**Federal Civil Procedure**  Causation; redressability

To demonstrate standing, a plaintiff must show: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. U.S. Const. art. 3, § 2, cl. 1.

**[9]    Federal Civil Procedure**  In general; injury or interest

In assessing whether a plaintiff has carried the burden of demonstrating standing, courts must separate the standing inquiry from any assessment of the merits of the plaintiff's claim. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[10]    Federal Civil Procedure**  In general; injury or interest

To maintain the fundamental separation between standing and merits at the dismissal stage, courts assume for the purposes of the standing inquiry that a plaintiff has stated valid legal claims. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[11]    Federal Civil Procedure**  In general; injury or interest

While a court's standing inquiry may necessarily reference the nature and source of the claims asserted, the court's focus remains on whether the plaintiff is the proper party to bring those claims. U.S. Const. art. 3, § 2, cl. 1.

**[12]    Election Law**  Nature and source of right

**Election Law**  Persons entitled to bring contest

A person's right to vote is individual and personal in nature; accordingly, the denial of a person's right to vote is typically always sufficiently concrete and particularized to establish a cognizable injury for standing purposes, and this is true regardless of whether such a harm is widely shared. U.S. Const. art. 3, § 2, cl. 1.

**[13]    Federal Civil Procedure**  In general; injury or interest

So long as an injury is concrete, courts will find that an injury in fact exists, as required for standing, despite the fact that such harm is felt by many. U.S. Const. art. 3, § 2, cl. 1.

**[14]    Constitutional Law**  Elections

Pennsylvania voters, who were not given opportunity to cure their mail-in ballots for presidential election after ballots were invalidated, suffered an injury-in-fact, as required to have standing to pursue action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, challenging on equal protection grounds millions of votes cast by Pennsylvanians in presidential election during COVID-19 pandemic, although many other voters across the state might also have had their votes invalidated due to their county's failure to implement notice-and-cure procedure for procedurally defective mail-in ballots. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 25 Pa. Stat. Ann. § 3150.16.

**[15]**    **Civil Rights**    Injury and Causation

County boards of elections did not cause injury to Pennsylvania voters, who were not given opportunity to cure their mail-in ballots after ballots were invalidated, and thus, voters lacked standing to pursue action against the boards, challenging on equal protection grounds the boards' use of notice-and-cure procedure for procedurally defective mail-in ballots cast by Pennsylvanians in presidential election during COVID-19 pandemic; voters' ballots were rejected by counties that were not party to the action, and boards of elections did not receive, review, or discard voters' ballots. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 25 Pa. Stat. Ann. § 3150.16.

**[16]**    **Civil Rights**    Injury and Causation

Secretary of the Commonwealth of Pennsylvania did not cause injury to Pennsylvania voters, who were not given opportunity to cure their mail-in ballots after ballots were invalidated, and thus, voters lacked standing to pursue action against Secretary, challenging on equal protection grounds Secretary's decision to provide counties with direction to use notice-and-cure procedure for procedurally defective mail-in ballots cast by Pennsylvanians in presidential election during COVID-19 pandemic; by sending e-mail to counties encouraging them to adopt notice-and-cure policy, Secretary did not intend for voters' ballots to be cancelled but encouraged counties to allow voters' types of votes to be counted. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 25 Pa. Stat. Ann. § 3150.16.

**[17]**    **Civil Rights**    Injury and Causation

Pennsylvania voters' injury of not being given opportunity to cure their mail-in ballots after ballots were invalidated could not be redressed by favorable decision, and thus, voters lacked standing to pursue action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, challenging on equal protection grounds Secretary's authorization of and boards' use of notice-and-cure procedure for procedurally defective mail-in ballots cast by Pennsylvanians in presidential election during COVID-19 pandemic; voters sought injunction prohibiting boards of elections from certifying election results, but prohibiting certification of the election results would not reinstate voters' right to vote. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 25 Pa. Stat. Ann. § 3150.16.

**[18]**    **Federal Civil Procedure**    In general; injury or interest

**Federal Civil Procedure**    Causation; redressability

Standing is measured based on the theory of harm and the specific relief requested, and it is not dispensed in gross, as a plaintiff's remedy must be tailored to redress the plaintiff's particular injury. U.S. Const. art. 3, § 2, cl. 1.

**[19]**    **Associations**    Suits on Behalf of Members; Associational or Representational Standing

Associational standing allows an entity to bring suit on behalf of members upon a showing that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. U.S. Const. art. 3, § 2, cl. 1.

**[20]**    **Constitutional Law**    Elections

President's reelection campaign lacked associational standing to pursue action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, challenging on equal protection grounds Secretary's authorization of and boards' use of notice-and-cure procedures for procedurally defective mail-in ballots cast by Pennsylvanians in presidential

election during COVID-19 pandemic; even if member voters attempted to vote for President but had their ballots invalidated, voters' constitutional interests were different from interests of campaign. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 25 Pa. Stat. Ann. § 3150.16.

**[21]**  **Constitutional Law** ⬥ Elections

President's reelection campaign lacked competitive standing to pursue action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, challenging on equal protection grounds Secretary's authorization of and boards' use of notice-and-cure procedures for procedurally defective mail-in ballots cast by Pennsylvanians in presidential election during COVID-19 pandemic, absent allegation that presidential candidate was ineligible to appear on ballot. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 25 Pa. Stat. Ann. § 3150.16.

**[22]**  **Election Law** ⬥ Persons entitled to bring contest

Competitive standing applies to challenges regarding the eligibility of a candidate. U.S. Const. art. 3, § 2, cl. 1.

**[23]**  **Federal Civil Procedure** ⬥ Pleading, Defects In, in General

A motion to dismiss for failure to state a claim tests the legal sufficiency of a claim and streamlines litigation by dispensing with needless discovery and factfinding. Fed. R. Civ. P. 12(b)(6).

**[24]**  **Federal Civil Procedure** ⬥ Insufficiency in general

Rule governing motions to dismiss for failure to state a claim authorizes a court to dismiss a claim on the basis of a dispositive issue of law; this is true of any claim, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one. Fed. R. Civ. P. 12(b)(6).

**[25]**  **Federal Civil Procedure** ⬥ Insufficiency in general

Although the plausibility standard used for motions to dismiss for failure to state a claim does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully. Fed. R. Civ. P. 12(b)(6).

**[26]**  **Federal Civil Procedure** ⬥ Insufficiency in general

On a motion to dismiss for failure to state a claim, asking for plausible grounds calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of wrongdoing. Fed. R. Civ. P. 12(b)(6).

**[27]**  **Federal Civil Procedure** ⬥ Insufficiency in general

The plausibility determination on a motion to dismiss for failure to state a claim is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense; no matter the context, however, where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Fed. R. Civ. P. 12(b)(6).

**[28]**  **Federal Civil Procedure** ⬥ Matters deemed admitted; acceptance as true of allegations in complaint

The tenet that a court must accept as true all of the allegations contained in the complaint on a motion to dismiss for failure to state a claim is inapplicable to legal conclusions. Fed. R. Civ. P. 12(b)(6).

**[29]** **Constitutional Law** 🔑 Discrimination and Classification

**Constitutional Law** 🔑 Similarly situated persons; like circumstances

The Equal Protection Clause does not forbid classifications; it simply keeps governmental decisionmakers from treating similarly situated persons differently. U.S. Const. Amend. 14.

**[30]** **Constitutional Law** 🔑 Perfect, exact, or complete equality or uniformity

A classification resulting in some inequality will be upheld under the Equal Protection Clause unless it is based on an inherently suspect characteristic or jeopardizes the exercise of a fundamental right. U.S. Const. Amend. 14.

**[31]** **Constitutional Law** 🔑 Voting rights and suffrage in general

All citizens of the United States have a constitutionally protected right to vote; and all citizens have a constitutionally protected right to have their votes counted.

**[32]** **Election Law** 🔑 State legislatures

States have broad authority to regulate the conduct of elections, including federal ones; this authority includes broad powers to determine the conditions under which the right of suffrage may be exercised. U.S. Const. art. 1, § 4, cl. 1.

**[33]** **Election Law** 🔑 Constitutionality and validity

Because states must have freedom to regulate elections if some sort of order, rather than chaos, is to accompany the democratic processes, such regulation is generally insulated from the stringent requirements of strict scrutiny. U.S. Const. art. 1, § 4, cl. 1.

**[34]** **Election Law** 🔑 Constitutionality and validity

State regulation that burdens voting rights is normally subject to the 🔑 *Anderson*-🔑 *Burdick* balancing test, which requires that a court weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule; under this test, any law respecting the right to vote, whether it governs voter qualifications, candidate selection, or the voting process, is subjected to a deferential important regulatory interests standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote.

**[35]** **Election Law** 🔑 Constitutionality and validity

The 🔑 *Anderson*-🔑 *Burdick* balancing test, which requires a court to weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule, operates on a sliding scale; thus, more restrictive laws are subject to greater scrutiny, and conversely, minimally burdensome and nondiscriminatory regulations are subject to a level of scrutiny closer to rational basis.

**[36]** **Constitutional Law** 🔑 Voting and political rights

Where a state imposes no burden on the right to vote at all, true rational basis review applies on an equal protection challenge to a voting law. U.S. Const. Amend. 14.

**[37]** **Constitutional Law** 🔑 Absentee ballots

Notice-and-cure procedure for procedurally defective mail-in ballots used by county boards of elections and authorized by the Secretary of the Commonwealth of Pennsylvania imposed no burden on voters' right to vote, such that voters'

equal protection challenge to millions of votes cast by Pennsylvanians in presidential election during COVID-19 pandemic was subject to rational basis review; counties by implementing procedure had lifted burden on the right to vote, and expanding the right to vote for some residents did not burden the rights of others.

U.S. Const. Amend. 14; 🔖 25 Pa. Stat. Ann. § 3150.16.

[38]  **Constitutional Law** ⚷ Absentee ballots

**Election Law** ⚷ Rejection of vote by election officers

Rational basis existed for decision of the Secretary of the Commonwealth of Pennsylvania to provide counties with discretion to use notice-and-cure procedure for procedurally defective mail-in ballots for presidential election during COVID-19 pandemic, and thus, Secretary's decision did not violate rights of voters, who were not given opportunity to cure their mail-in ballots after ballots were invalidated, under Equal Protection Clause; although states may not discriminatorily sanction procedures likely to burden some persons' right to vote more than others, they need not expand the right to vote in perfect uniformity, and no county was forced to adopt notice-and-cure procedure but made choice to do so, or not. U.S. Const. Amend. 14; 🔖 25 Pa. Stat. Ann. § 3150.16.

[39]  **Federal Civil Procedure** ⚷ Causation; redressability

Though every injury must have its proper redress, a court may not prescribe a remedy unhinged from the underlying right being asserted.

[40]  **Injunction** ⚷ Conduct of elections

Even if decision of the Secretary of the Commonwealth of Pennsylvania to provide counties with discretion to use notice-and-cure procedure for procedurally defective mail-in ballots for presidential election during

COVID-19 pandemic violated rights of voters, who were not given opportunity to cure their mail-in ballots after ballots were invalidated, under Equal Protection Clause, District Court could not grant voters' requested injunctive relief preventing certification of Pennsylvania election results; granting voters' requested injunctive relief would necessarily require invalidating the ballots of every person who voted in Pennsylvania, and court lacked the authority to take away the constitutionally-protected right to vote of even one person. U.S. Const. Amend. 14; 🔖 25 Pa. Stat. Ann. § 3150.16.

[41]  **Civil Rights** ⚷ Judgment and relief in general

When remedying an equal-protection violation, a court may either level up or level down; this means that a court may either extend a benefit to one that has been wrongfully denied it, thus leveling up and bringing that person on par with others who already enjoy the right, or a court may level down by withdrawing the benefit from those who currently possess it. U.S. Const. Amend. 14.

[42]  **Civil Rights** ⚷ Judgment and relief in general

Generally, the preferred rule when remedying an equal-protection violation in a typical case is to extend favorable treatment and to level up; in fact, leveling down is impermissible where the withdrawal of a benefit would necessarily violate the Constitution, and such would be the case if a court were to remedy discrimination by striking down a benefit that is constitutionally guaranteed. U.S. Const. Amend. 14.

[43]  **Constitutional Law** ⚷ Conduct of Elections

**Election Law** ⚷ Presence of representatives of candidates or parties

President's reelection campaign failed to allege that its poll watchers were treated differently from opposing party presidential candidate's poll watchers, as required to state equal protection claim against Secretary of the Commonwealth

2020 WL 6821992

of Pennsylvania and county boards of elections for allegedly excluding watchers from canvass; campaign simply alleged that poll watchers did not have access or were denied access to some areas. U.S. Const. Amend. 14.

[44] **Federal Civil Procedure** ⚷ Complaint

Among the grounds that could justify a denial of leave to amend a complaint are undue delay, bad faith, dilatory motive, prejudice, and futility.

[45] **Federal Civil Procedure** ⚷ Time for amendment

Allowing voters and President's reelection campaign to amend their complaint would unduly delay resolution of the issues, and thus, District Court would deny leave to amend in action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, challenging on equal protection grounds Secretary's authorization of and boards' use of notice-and-cure procedure for procedurally defective mail-in ballots cast by Pennsylvanians in presidential election during COVID-19 pandemic; voters and campaign had already amended once as of right, voters and campaign sought to amend simply in order to effectively reinstate their initial complaint and claims, and deadline for counties in Pennsylvania to certify their election results was two days away. U.S. Const. Amend. 14; 🔖 25 Pa. Stat. Ann. § 3150.16.

**Attorneys and Law Firms**

Brian C. Caffrey, Marc A. Scaringi, Rudolph William Giuliani, Scaringi & Scaringi PC, Rudolph Giuliani, PLLC, Harrisburg, PA, New York, NY, for Plaintiff.

Thomas W. King, III, Dillon McCandless King Coulter & Graham LLP, Buter, PA, for Intervenor Plaintiff.

Daniel T. Brier, Donna A. Walsh, John B. Dempsey, Karen Mascio Romano, Keli M. Neary, Nicole J. Boland, Stephen Moniak, John Coit, John B. Hill, Andrew F. Szefi, Christina C. Matthias, Mark A. Aronchick, Michele D. Hangley, Robert A. Wiygul, Virginia Scott, Elizabeth A. Dupuis, Molly E. Meacham, Edward D. Rogers, Elizabeth Wingfield, Terence M. Grugan, Timothy D. Katsiff, Brian J. Taylor, Timothy P. Brennan, Myers Brier & Kelly, LLP, Pennsylvania Office of Attorney General, Office of Attorney General, Office of Attorney General Civil Litigation Section, Hangley Aronchick Segal Pudlin & Schiller, Scott Law Office, Babst, Calland, Clements and Zomnir, P.C., Ballard Spahr LLP, King Spry Herman Freund & Faul LLC, Scranton, PA, Harrisburg, PA, Philadelphia, PA, Pittsburgh, PA, State College, PA, Bethlehem, PA, Easton, PA, for Defendant.

Jon Greenbaum, Witold J. Walczak, Adriel I. Cepeda Derieux, Benjamin D. Geffen, Claudia De Palma, Dale E. Ho, David Meir Zionts, Ezra D. Rosenberg, Ihaab Syed, Marian K. Schneider, Mary M. McKenzie, Rani Gupta, Sarah E. Brannon, Shankar Duraiswamy, Sophia Lin Lakin, Lawyers' Committee for Civil Rights Under Law District Of Columbia, American Civil Liberties Union of PA, American Civil Liberties Union Foundation, Inc., Covington & Burling LLP, Washington, DC, Pittsburgh, PA, New York, NY, Philadelphia, PA, Palo Alto, CA, for Intervenor/Interpleader Defendant.

Remy Green, Jonathan Wallace, Sean M. Shultz, Zachary Michael Wallen, Nancy A. Temple, Richard Bernstein, James P. DeAngelo, Joshua John Voss, Shohin Vance, Matthew H. Haverstick, Cohen & Green P.L.L.C., Hanft & Knight, P.C., Chalmers & Adams LLC, Katten & Temple LLP, McNees Wallace & Nurick, Kleinbard LLC, Ridgewood, NY, Amagansett, NY, Carlisle, PA, Pittsburgh, PA, Chicago, IL, Harrisburg, PA, Philadelphia, PA, for Amicus.

Alex M. Lacey, Ari Holtzblatt, John Michael Geise, Kyle J. Semroc, Lalitha D. Madduri, Marc E. Elias, Seth Waxman, Uzoma Nkwonta, Witold J. Walczak, Clifford B. Levine, Robert M. Linn, Dentons Cohen & Grigsby P.C., Wilmer Cutler Pickering Hale & Dorr LLP, Perkins Coie LLP, American Civil Liberties Union of PA, Cohen & Grigsby, PC, Pittsburgh, PA, Washington, DC, for Intervenor.

Jeffrey Cutler, York, PA, pro se.

**MEMORANDUM OPINION**

Matthew W. Brann, United States District Judge

**\*1** Pending before this Court are various motions to dismiss Plaintiffs' First Amended Complaint. Plaintiffs in this matter are Donald J. Trump for President, Inc. (the "Trump Campaign"), and two voters, John Henry and Lawrence Roberts (the "Individual Plaintiffs").[1] Defendants, who filed these motions to dismiss, include seven Pennsylvania counties (the "Defendant Counties"), as well as Secretary of the Commonwealth Kathy Boockvar.[2]

## I. INTRODUCTION

In this action, the Trump Campaign and the Individual Plaintiffs (collectively, the "Plaintiffs") seek to discard millions of votes legally cast by Pennsylvanians from all corners – from Greene County to Pike County, and everywhere in between. In other words, Plaintiffs ask this Court to disenfranchise almost seven million voters. This Court has been unable to find any case in which a plaintiff has sought such a drastic remedy in the contest of an election, in terms of the sheer volume of votes asked to be invalidated. One might expect that when seeking such a startling outcome, a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption, such that this Court would have no option but to regrettably grant the proposed injunctive relief despite the impact it would have on such a large group of citizens.

That has not happened. Instead, this Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence. In the United States of America, this cannot justify the disenfranchisement of a single voter, let alone all the voters of its sixth most populated state. Our people, laws, and institutions demand more. At bottom, Plaintiffs have failed to meet their burden to state a claim upon which relief may be granted. Therefore, I grant Defendants' motions and dismiss Plaintiffs' action with prejudice.

## II. BACKGROUND

### A. Legal and Factual Background

**[1]** **[2]** The power to regulate and administer federal elections arises from the Constitution.[3] "Because any state authority to regulate election to those offices could not precede their very creation by the Constitution, such power 'had to be delegated to, rather than reserved to by, the States.' "[4] Consequently, the Elections Clause "delegated to the

States the power to regulate the 'Times, Places, and Manner of holding Elections for Senators and Representatives,' subject to a grant of authority to Congress to 'make or alter such Regulations.' "[5] Accordingly, States' power to "regulate the incidents of such elections, including balloting" is limited to "the exclusive delegation of power under the Elections Clause."[6]

Pennsylvania regulates the "times, places, and manner" of its elections through the Pennsylvania Election Code.[7] The Commonwealth's Constitution mandates that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."[8] Recognizing this as a foundational principle, the Pennsylvania Supreme Court has declared that the purpose of the Election Code is to promote "freedom of choice, a fair election and an honest election return."[9]

**\*2** In October 2019, the General Assembly of Pennsylvania enacted Act 77, which, "for the first time in Pennsylvania," extended the opportunity for all registered voters to vote by mail.[10] Following the beginning of the COVID-19 outbreak in March 2020, the General Assembly enacted laws regulating the mail-in voting system.[11] Section 3150.16 of the Election Code sets forth procedural requirements that voters must follow in order for their ballot to be counted.[12] These procedures require, for example, that voters mark their ballots in pen or pencil, place them in secrecy envelopes, and that ballots be received by the county elections board on or before 8:00 P.M. on Election Day.[13]

Nowhere in the Election Code is any reference to "curing" ballots, or the related practice of "notice-and-cure." This practice involves notifying mail-in voters who submitted procedurally defective mail-in ballots of these deficiencies and allowing those voters to cure their ballots.[14] Notified voters can cure their ballots and have their vote counted by requesting and submitting a provisional ballot.[15]

Recently, the Supreme Court of Pennsylvania in *Democratic Party of Pennsylvania v. Boockvar* addressed whether counties are *required* to adopt a notice-and-cure policy under the Election Code.[16] Holding that they are not, the court declined to explicitly answer whether such a policy is necessarily *forbidden*.[17]

Following this decision, Secretary Boockvar sent an email on November 2, 2020 encouraging counties to "provide information to party and candidate representatives during the pre-canvass that identifies the voters whose ballots have been rejected" so those ballots could be cured.[18] From the face of the complaint, it is unclear which counties were sent this email, which counties received this email, or which counties ultimately followed Secretary Boockvar's guidance.

Some counties chose to implement a notice-and-cure procedure while others did not.[19] Importantly, however, Plaintiffs allege only that Philadelphia County implemented such a policy.[20] In contrast, Plaintiffs also claim that Lancaster and York Counties (as well as others) did not adopt any cure procedures and thus rejected all ballots cast with procedural deficiencies instead of issuing these voters provisional ballots.[21]

Both Individual Plaintiffs had their ballots cancelled in the 2020 Presidential Election.[22] John Henry submitted his mail-in ballot to Lancaster County; however, it was cancelled on November 6, 2020 because he failed to place his ballot in the required secrecy envelope.[23] Similarly, after submitting his ballot to Fayette County, Lawrence Roberts discovered on November 9, 2020 that his ballot had been cancelled for an unknown reason.[24] Neither was given an opportunity to cure his ballot.[25]

### B. The 2020 Election Results

In large part due to the coronavirus pandemic still plaguing our nation, the rate of mail-in voting in 2020 was expected to increase dramatically. As anticipated, millions more voted by mail this year than in past elections. For weeks before Election Day, ballots were cast and collected. Then, on November 3, 2020, millions more across Pennsylvania and the country descended upon their local voting precincts and cast ballots for their preferred candidates. When the votes were counted, the Democratic Party's candidate for President, Joseph R. Biden Jr., and his running-mate, Kamala D. Harris, were determined to have received more votes than the incumbent ticket, President Donald J. Trump and Vice President Michael R. Pence. As of the day of this Memorandum Opinion, the Biden/Harris ticket had received 3,454,444 votes, and the Trump/Pence ticket had received 3,373,488 votes, giving the Biden ticket a lead of more than 80,000 votes, per the Pennsylvania state elections return website.[26] These results

will become official when counties certify their results to Secretary Boockvar on November 23, 2020 – the result Plaintiffs seek to enjoin with this lawsuit.

### C. Procedural History

**\*3** Although this case was initiated less than two weeks ago, it has already developed its own tortured procedural history. Plaintiffs have made multiple attempts at amending the pleadings, and have had attorneys both appear and withdraw in a matter of seventy-two hours. There have been at least two perceived discovery disputes, one oral argument, and a rude and ill-conceived voicemail which distracted the Court's attention from the significant issues at hand.[27] The Court finds it helpful to place events in context before proceeding further.

In the evening of November 9, 2020, Plaintiffs filed suit in this Court against Secretary Boockvar, as well as the County Boards of Elections for the following counties: Allegheny, Centre, Chester, Delaware, Montgomery, Northampton, and Philadelphia.[28] The original complaint raised seven counts; two equal-protection claims, two due-process claims, and three claims under the Electors and Elections Clauses.[29]

The following day, I convened a telephonic status conference with the parties to schedule future proceedings. During that conference, I learned that several organizations, including the Democratic National Committee, sought to file intervention motions with the Court. Later that day, I set a briefing schedule.[30] Additionally, November 17, 2020 was set aside for oral argument on any motions to dismiss, and the Court further told the parties to reserve November 19, 2020 in their calendars in the event that the Court determined that an evidentiary hearing was necessary. Subsequent to the Court's scheduling order, the proposed-intervenors filed their motions, and the parties filed their briefings. Plaintiffs then filed a motion for a preliminary injunction on November 12, 2020.[31]

On November 12, 2020, Plaintiffs also underwent their first change in counsel. Attorneys Ronald L. Hicks, Jr., and Carolyn B. McGee with Porter Wright Morris & Arthur LLP filed a motion seeking to withdraw from the case. The Court granted this motion, and Plaintiffs retained two attorneys from Texas, John Scott and Douglas Brian Hughes, to serve as co-counsel to their original attorney, Linda A. Kerns.

The next day, November 13, 2020, was a relatively quiet day on the docket for this case, but an important one for the parties. That day, the United States Court of Appeals for the Third Circuit issued a decision in 🏳 *Bognet v. Secretary Commonwealth of Pennsylvania.* [32] This decision, though not factually connected to this matter, addressed issues of standing and equal protection relevant to the Plaintiffs' claims. [33]

Thereafter, on Sunday, November 15, 2020 – the day Plaintiffs' response to Defendants' motions to dismiss was due – Plaintiffs filed a First Amended Complaint (the "FAC") with the Court. This new complaint excised five of the seven counts from the original complaint, leaving just two claims: one equal-protection claim, and one Electors and Elections Clauses claim. [34] In addition, a review of the redline attached to the FAC shows that Plaintiffs deleted numerous allegations that were pled in the original complaint.

Plaintiffs acknowledge that under the Third Circuit's decision in 🏳 *Bognet*, this Court cannot find that Plaintiffs have standing for their Elections and Electors Clauses claim in the FAC. Plaintiffs represent that they have included this claim in the FAC to preserve the argument for appellate review. Because Plaintiffs have made this concession, and because the Third Circuit's decision in 🏳 *Bognet* is clear, this Court dismisses Count II for lack of standing without further discussion.

**\*4** Defendants filed new motions to dismiss and briefs in support thereof on November 16, 2020. That evening, less than 24 hours before oral argument was begin, Plaintiffs instituted a second series of substitutions in counsel. Ms. Kerns, along with Mr. Scott and Mr. Hughes, requested this Court's permission to withdraw from the litigation. I granted the motions of the Texan attorneys because they had been involved with the case for approximately seventy-two hours. Because oral argument was scheduled for the following day, however, and because Ms. Kerns had been one of the original attorneys in this litigation, I denied her request. I believed it best to have some semblance of consistency in counsel ahead of the oral argument. That evening, attorney Marc A. Scaringi entered an appearance on behalf of Plaintiffs. Furthermore, Mr. Scaringi asked the Court to postpone the previously-scheduled oral argument and evidentiary hearing. The Court denied Mr. Scaringi's motion for a continuance; given the emergency nature of

this proceeding, and the looming deadline for Pennsylvania counties to certify their election results, postponing those proceedings seemed imprudent.

On November 17, 2020, the Court prepared to address the parties in oral argument. That morning, attorney Rudolph W. Giuliani entered his appearance on behalf of Plaintiffs. With this last-minute appearance, Plaintiffs had made their final addition to their representation. [35] At the conclusion of the argument, I determined that an evidentiary hearing (previously scheduled to take place on November 19, 2020) was no longer needed and cancelled that proceeding. Instead, I imposed a new briefing schedule in light of the FAC's filing, which arguably mooted the initial motions to dismiss. The parties submitted briefing on the issues. [36]

### D. Plaintiffs' Claims

Plaintiffs' only remaining claim alleges a violation of equal protection. This claim, like Frankenstein's Monster, has been haphazardly stitched together from two distinct theories in an attempt to avoid controlling precedent. The general thrust of this claim is that it is unconstitutional for Pennsylvania to give counties discretion to adopt a notice-and-cure policy. Invoking 🏳 *Bush v. Gore*, Plaintiffs assert that such local control is unconstitutional because it creates an arbitrary system where some persons are allowed to cure procedurally defective mail-in ballots while others are not.

Apparently recognizing that such a broad claim is foreclosed under the Third Circuit's decision in 🏳 *Bognet*, Plaintiffs try to merge it with a much simpler theory of harm based on the cancellation of Individual Plaintiffs' ballots in order to satisfy standing. [37] Because Individual Plaintiffs' votes were invalidated as procedurally defective, Individual Plaintiffs argue, for purposes of standing, that their claim is based on the denial of their votes. But on the merits, Plaintiffs appear to have abandoned this theory of harm and instead raise their broader argument that the lack of a uniform prohibition against notice-and-cure is unconstitutional. [38] They assert this theory on behalf of both Individual Plaintiffs and the Trump Campaign.

**\*5** That Plaintiffs are trying to mix-and-match claims to bypass contrary precedent is not lost on the Court. The Court will thus analyze Plaintiffs' claims as if they had been raised properly and asserted as one whole for purposes of standing *and* the merits. Accordingly, the Court considers Plaintiffs

2020 WL 6821992

as alleging two equal-protection claims. The first being on behalf of Individual Plaintiffs whose ballots were cancelled. And the second being on behalf of the Trump Campaign and raising the broad 🔖 *Bush v. Gore* arguments that Plaintiffs allege is the main focus of this lawsuit.[39] The Court analyzes both claims separately for purposes of standing and the merits analysis.

## III. STANDING

[3] [4] [5] [6] Plaintiffs lack standing to raise either of their claims. "Article III of the United States Constitution limits the power of the federal judiciary to 'cases' and 'controversies.' "[40] To satisfy the case-or-controversy requirement, a plaintiff must establish that they have standing.[41] Standing is a "threshold" issue.[42] It is an "irreducible constitutional minimum," without which a federal court lacks jurisdiction to rule on the merits of an action.[43] Consequently, federal courts are obligated to raise the issue of standing sua sponte.[44]

[7] [8] [9] [10] [11] The plaintiff bears the burden of establishing standing.[45] To demonstrate standing, he must show: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.[46] "In assessing whether a plaintiff has carried this burden, [courts must] separate [the] standing inquiry from any assessment of the merits of the plaintiff's claim."[47] "To maintain this fundamental separation between standing and merits at the dismissal stage, [courts] assume for the purposes of [the] standing inquiry that a plaintiff has stated valid legal claims."[48] "While [the Court's] standing inquiry may necessarily reference the 'nature and source of the claims asserted,' [the Court's] focus remains on whether the plaintiff is the proper party to bring those claims."[49]

As discussed above, Plaintiffs allege two possible theories of standing. First, Individual Plaintiffs argue that their votes have been unconstitutionally denied. Under this theory, Individual Plaintiffs must show that Defendant Counties' use of the notice-and-cure procedure, as well as Secretary Boockvar's authorization of this procedure, denied Individual Plaintiffs the right to vote.[50] Second, the Trump Campaign maintains that it has competitive standing.[51]

*6 Both theories are unavailing. Assuming, as this Court must, that Plaintiffs state a valid equal-protection claim, the Court finds that Individual Plaintiffs have adequately established an injury-in-fact. However, they fail to establish that it was Defendants who caused these injuries and that their purported injury of vote-denial is adequately redressed by invalidating the votes of others. The Trump Campaign's theory also fails because neither competitive nor associational standing applies, and it does not assert another cognizable theory of standing.

### A. Voters

#### 1. Injury in Fact

[12] [13] Individual Plaintiffs have adequately demonstrated that they suffered an injury-in-fact. "[A] person's right to vote is 'individual and personal in nature.' "[52] Accordingly, the denial of a person's right to vote is typically always sufficiently concrete and particularized to establish a cognizable injury.[53] This is true regardless of whether such a harm is widely shared.[54] So long as an injury is concrete, courts will find that an injury in fact exists despite the fact that such harm is felt by many.[55]

[14] This is precisely the situation presented here. Individual Plaintiffs have adequately pled that their votes were denied. As discussed above, the denial of a vote is a highly personal and concrete injury. That Individual Plaintiffs had their ballots cancelled and thus invalidated is sufficiently personal to establish an injury in fact. It is of no matter that many persons across the state might also have had their votes invalidated due to their county's failure to implement a curing procedure. Accordingly, the Court finds that Individual Plaintiffs have established injury in fact.

#### 2. Causation

[15] However, Individual Plaintiffs fail to establish that Defendant Counties or Secretary Boockvar actually caused their injuries. First, Defendant Counties, by Plaintiffs' own pleadings, had nothing to do with the denial of Individual Plaintiffs' ability to vote. Individual Plaintiffs' ballots were rejected by Lancaster and Fayette Counties, neither of which is a party to this case. None of Defendant Counties received, reviewed, or discarded Individual Plaintiffs' ballots. Even

assuming that Defendant Counties unconstitutionally allowed *other* voters to cure their ballots, that alone cannot confer standing on Plaintiffs who seek to challenge the denial of *their* votes.

 **[16]**  Second, Individual Plaintiffs have not shown that their purported injuries are fairly traceable to Secretary Boockvar. Individual Plaintiffs have entirely failed to establish any causal relationship between Secretary Boockvar and the cancellation of their votes. The only connection the Individual Plaintiffs even attempt to draw is that Secretary Boockvar sent an email on November 2, 2020 to some number of counties, encouraging them to adopt a notice-and-cure policy. However, they fail to allege which counties received this email or what information was specifically included therein. Further, that this email encouraged counties to adopt a notice-and-cure policy does not suggest in any way that Secretary Boockvar intended or desired Individual Plaintiffs' votes to be cancelled. To the contrary, this email suggests that Secretary Boockvar encouraged counties to allow exactly these types of votes to be counted. Without more, this Court cannot conclude that Individual Plaintiffs have sufficiently established that their injuries are fairly traceable to Secretary Boockvar. [56]

### 3. Redressability

 **\*7**  **[17]**  In large part because the Individual Plaintiffs cannot establish that their injury is "fairly traceable" to the Defendants' conduct, they also cannot show that their injury could be redressed by a favorable decision from this Court. [57] Beyond that substantial hurdle, however, a review of the injury alleged and the relief sought plainly shows that the Individual Plaintiffs' injury would not be redressable. The Individual Plaintiffs base their equal-protection claim on the theory that their right to vote was denied. Their prayer for relief seeks, in pertinent part: (1) an order, declaration, or injunction from this Court prohibiting the Defendants from certifying the results of the 2020 General Election in Pennsylvania on a Commonwealth-wide basis; and (2) another order prohibiting Defendants from certifying the results which include ballots the Defendants permitted to be cured.

 **[18]**  Neither of these orders would redress the injury the Individual Plaintiffs allege they have suffered. Prohibiting certification of the election results would not reinstate the Individual Plaintiffs' right to vote. It would simply deny more than 6.8 million people *their* right to vote. "Standing

is measured based on the theory of harm and the specific relief requested." [58] It is not "dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." [59] Here, the answer to invalidated ballots is not to invalidate millions more. Accordingly, Plaintiffs have not shown that their injury would be redressed by the relief sought.

### B. Trump Campaign

The standing inquiry as to the Trump Campaign is particularly nebulous because neither in the FAC nor in its briefing does the Trump Campaign clearly assert what its alleged injury is. Instead, the Court was required to embark on an extensive project of examining almost every case cited to by Plaintiffs to piece together the theory of standing as to this Plaintiff – the Trump Campaign.

The Trump Campaign first posits that "as a political committee for a federal candidate," it has "Article III standing to bring this action." [60] On its face, this claim is incorrect. Simply being a political committee does not obviate the need for an injury-in-fact, nor does it automatically satisfy the other two elements of standing.

For this proposition, the Trump Campaign relies on two federal cases where courts found associational standing by a political party's state committee. Therefore, the Court considers whether the Trump Campaign can raise associational standing, but finds that those cases are inapposite. [61] First, a candidate's political committee and a political party's state committee are not the same thing. Second, while the doctrine of associational standing is well established, the Trump Campaign overlooks a particularly relevant, very recent decision from another federal court – one where the Trump Campaign itself argued that it had associational standing. In *Donald J. Trump for President, Inc. v. Cegavske,* [62] the Trump Campaign asserted associational standing, and that court rejected this theory.

 **[19]**  Associational standing allows an entity to bring suit on behalf of members upon a showing that: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." [63]

Case 2:20-cv-01831-NR   Document 55-1   Filed 12/30/20   Page 45 of 249
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d --- (2020)
2020 WL 6821992

**\*8**  **[20]**  In *Cegavske* (another case in which the Trump Campaign alleged violations of equal protection), the court found that the Trump Campaign failed to satisfy the second prong of associational standing because it "represents only Donald J. Trump and his 'electoral and political goals' of reelection." [64]  That court noted that while the Trump Campaign might achieve its purposes through its member voters, the "constitutional interests of those voters are wholly distinct" from that of the Trump Campaign. [65]  No different here. Even if the Individual Plaintiffs attempted to vote for President Trump, their constitutional interests are different, precluding a finding of associational standing. In any event, because the Individual Plaintiffs lack standing in this case, the Trump Campaign cannot satisfy the first prong of associational standing either.

**[21]**  The Trump Campaign's second theory is that it has " 'competitive standing' based upon disparate state action leading to the 'potential loss of an election.' " [66]  Pointing to a case from the United States Court of Appeals for the Ninth Circuit, *Drake v. Obama*, [67] the Trump Campaign claims this theory proves injury-in-fact. First, the Court finds it important to emphasize that the term "competitive standing" has specific meaning in this context. Second, the Trump Campaign's reliance on the theory of competitive standing under *Drake v. Obama* is, at best, misguided. Subsequent case law from the Ninth Circuit has explained that competitive standing "is the notion that 'a candidate or his political party has standing to challenge the *inclusion of an allegedly ineligible rival on the ballot*, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election.' " [68]  In the present matter, there is no allegation that the Democratic Party's candidate for President, or any other candidate, was ineligible to appear on the ballot.

**[22]**  Examination of the other case law cited to by Plaintiffs contradicts their theory that competitive standing is applicable here for the same reason. For example, in *Texas Democratic Party v. Benkiser*, the United States Court of Appeals for the Fifth Circuit found competitive standing in a case in which the Democratic Party petitioned against the decision to deem a candidate ineligible and replace him with another. [69]  Likewise, in *Schulz v. Williams*, the United States Court of Appeals for the Second Circuit found competitive standing where the Conservative party alleged an injury in fact by arguing that a candidate from the Libertarian Party of New York was improperly placed on the ballot for the Governor's race in 1994. [70]  By way of yet another example, Plaintiffs' citation to *Fulani v. Hogsett* makes the same point; competitive standing applies to challenges regarding the eligibility of a candidate. There, the Indiana Secretary of State was required to certify the names of candidates for President by a certain date. [71]  When the Secretary failed to certify the Democratic and Republican candidates by that date, the New Alliance party challenged the inclusion of those candidates on the ballot, arguing that allowing these ineligible candidates constituted an injury-in-fact. [72]  Three other cases relied on by Plaintiffs illustrate separate grounds for stating an injury in fact, all still relating to ballot provisions. [73]

**\*9**  It is telling that the only case from the Third Circuit cited to by Plaintiffs, *Marks v. Stinson*, does not contain a discussion of competitive standing or any other theory of standing applicable in federal court. [74]  Simply pointing to another case where a competitor in an election was found to have standing does not establish *competitive standing* in this matter. Without more, this Court declines to take such an expansive view of the theory of competitive standing, particularly given the abundance of guidance from other Circuits, based on Plaintiffs' own citations, limiting the use of this doctrine.

The Trump Campaign has not offered another theory of standing, and therefore, cannot meet its burden of establishing Article III jurisdiction. To be clear, this Court is not holding that a political campaign can never establish standing to challenge the outcome of an election; rather, it merely finds that in this case, the Trump Campaign has not pled a cognizable theory. [75]

### IV. MOTION TO DISMISS 12(b)(6)

#### A. Legal Standard

**[23]**  **[24]**  Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted." A motion to dismiss "tests the legal sufficiency of a claim" [76] and "streamlines litigation by dispensing with needless discovery and factfinding." [77]  "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." [78]  This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." [79]

Following the Roberts Court's "civil procedure revival,"[80] the landmark decisions of 🔖 *Bell Atlantic Corporation v. Twombly*[81] and 🔖 *Ashcroft v. Iqbal*[82] tightened the standard that district courts must apply to 12(b)(6) motions. [83] These cases "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard. [84]

[25] [26] Accordingly, after 🔖 *Twombly* and 🔖 *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[85] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[86] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[87] Moreover, "[a]sking for plausible grounds ... calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[88]

*10 [27] The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[89] No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' "[90]

[28] When disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the light most favorable to [the plaintiff]."[91] However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[92] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[93]

As a matter of procedure, the Third Circuit has instructed that:

Under the pleading regime established by 🔖 *Twombly* and 🔖 *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. [94]

## B. Equal Protection

Even if Plaintiffs had standing, they fail to state an equal-protection claim. The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[95] The principle of equal protection is fundamental to our legal system because, at its core, it protects the People from arbitrary discrimination at the hands of the State.

[29] [30] But, contrary to Plaintiffs' assertions, not all "unequal treatment" requires Court intervention.[96] The Equal Protection Clause "does not forbid classifications."[97] It simply keeps governmental decisionmakers from treating similarly situated persons differently.[98] The government could not function if complete equality were required in all situations. Consequently, a classification resulting in "some inequality" will be upheld unless it is based on an inherently suspect characteristic or "jeopardizes the exercise of a fundamental right."[99]

[31] One such fundamental right, at issue in this case, is the right to vote. Voting is one of the foundational building blocks of our democratic society, and that the Constitution firmly protects this right is "indelibly clear."[100] All citizens of the United States have a constitutionally protected right

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

to vote. [101] And all citizens have a constitutionally protected right to have their votes counted. [102]

*11 With these background principles firmly rooted, the Court turns to the merits of Plaintiffs' equal-protection claims. The general gist of their claims is that Secretary Boockvar, by failing to prohibit counties from implementing a notice-and-cure policy, and Defendant Counties, by adopting such a policy, have created a "standardless" system and thus unconstitutionally discriminated against Individual Plaintiffs. Though Plaintiffs do not articulate why, they also assert that this has unconstitutionally discriminated against the Trump Campaign.

As discussed above, the Court will address Individual Plaintiffs' and the Trump Campaign's claims separately. Because Individual Plaintiffs premised standing on the purported wrongful cancellation of their votes, the Court will only analyze whether Defendants have impermissibly burdened Individual Plaintiffs' ability to vote. Further, the Court will consider two issues raised by the Trump Campaign; the first being whether it has stated a valid claim alleging discrimination relating to its use of poll-watchers, and the second being whether the General Assembly's failure to uniformly prohibit (or permit) the notice-and-cure procedure is unconstitutional.

### 1. Individual Plaintiffs

[32] [33] States have "broad authority to regulate the conduct of elections, including federal ones." [103] "This authority includes 'broad powers to determine the conditions under which the right of suffrage may be exercised.' " [104] Because states must have freedom to regulate elections if "some sort of order, rather than chaos, is to accompany the democratic processes," [105] such regulation is generally insulated from the stringent requirements of strict scrutiny. [106]

[34] Instead, state regulation that burdens voting rights is normally subject to the *Anderson-* 🔖 *Burdick* balancing test, which requires that a court "weigh the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.' " [107] Under this test, "any 'law respecting the right to vote – whether it governs voter qualifications,

candidate selection, or the voting process,' is subjected to 'a deferential "important regulatory interests" standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote.' " [108]

[35] [36] The *Anderson-* 🔖 *Burdick* balancing test operates on a sliding scale. [109] Thus, more restrictive laws are subject to greater scrutiny. Conversely, "minimally burdensome and nondiscriminatory" regulations are subject to "a level of scrutiny 'closer to rational basis.' " [110] "And where the state imposes no burden on the 'right to vote' at all, true rational basis review applies." [111]

*12 [37] Here, because Defendants' conduct "imposes no burden" on Individual Plaintiffs' right to vote, their equal-protection claim is subject to rational basis review. [112] Defendant Counties, by implementing a notice-and-cure procedure, have in fact *lifted* a burden on the right to vote, even if only for those who live in those counties. Expanding the right to vote for some residents of a state does not burden the rights of others. [113] And Plaintiffs' claim cannot stand to the extent that it complains that "the state is *not* imposing a restriction on *someone else's* right to vote." [114] Accordingly, Defendant Counties' use of the notice-and-cure procedure (as well as Secretary Boockvar's authorization of this procedure) will be upheld unless it has no rational basis. [115]

[38] Individual Plaintiffs' claims fail because it is perfectly rational for a state to provide counties discretion to notify voters that they may cure procedurally defective mail-in ballots. Though states may not discriminatorily sanction procedures that are likely to burden some persons' right to vote more than others, they need not expand the right to vote in perfect uniformity. All Plaintiffs have alleged is that Secretary Boockvar allowed counties to choose whether or not they wished to use the notice-and-cure procedure. No county was forced to adopt notice-and-cure; each county made a choice to do so, or not. Because it is not irrational or arbitrary for a state to allow counties to expand the right to vote if they so choose, Individual Plaintiffs fail to state an equal-protection claim.

[39] [40] Moreover, even if they could state a valid claim, the Court could not grant Plaintiffs the relief they seek. Crucially, Plaintiffs fail to understand the relationship between right and remedy. Though every injury must have its proper redress, [116] a court may not prescribe a remedy

unhinged from the underlying right being asserted. [117] By seeking injunctive relief preventing certification of the Pennsylvania election results, Plaintiffs ask this Court to do exactly that. Even assuming that they can establish that their right to vote has been denied, which they cannot, Plaintiffs seek to remedy the denial of their votes by invalidating the votes of millions of others. Rather than requesting that their votes be counted, they seek to discredit scores of other votes, but only for one race. [118] This is simply not how the Constitution works.

[41] [42] When remedying an equal-protection violation, a court may either "level up" or "level down." [119] This means that a court may either extend a benefit to one that has been wrongfully denied it, thus leveling up and bringing that person on par with others who already enjoy the right, [120] or a court may level down by withdrawing the benefit from those who currently possess it. [121] Generally, "the preferred rule in a typical case is to extend favorable treatment" and to level up. [122] In fact, leveling down is impermissible where the withdrawal of a benefit would necessarily violate the Constitution. [123] Such would be the case if a court were to remedy discrimination by striking down a benefit that is constitutionally guaranteed.

*13 Here, leveling up to address the alleged cancellation of Plaintiffs' votes would be easy; the simple answer is that their votes would be counted. But Plaintiffs do not ask to level up. Rather, they seek to level down, and in doing so, they ask the Court to violate the rights of over 6.8 million Americans. It is not in the power of this Court to violate the Constitution. [124] "The disenfranchisement of even one person validly exercising his right to vote is an extremely serious matter." [125] "To the extent that a citizen's right to vote is debased, he is that much less a citizen." [126]

Granting Plaintiffs' requested relief would necessarily require invalidating the ballots of every person who voted in Pennsylvania. Because this Court has no authority to take away the right to vote of even a single person, let alone millions of citizens, it cannot grant Plaintiffs' requested relief.

### 2. Trump Campaign

Plaintiffs' brief in opposition to the motions to dismiss spends only *one* paragraph discussing the merits of its equal-protection claim. Plaintiffs raise two arguments as to how equal protection was violated. The first is that "Defendants excluded Republican/Trump observers from the canvass so that they would not observe election law violations." [127] The second claims that the "use of notice/cure procedures violated equal protection because it was deliberately done in counties where defendants knew that mail ballots would favor Biden/Democrats." [128] The former finds no support in the operative pleading, and neither states an equal-protection violation.

[43] Count I of the FAC makes no mention of disparity in treatment of observers based on which campaign they represented. Instead, Count I discusses the use of "standardless" procedures. These are two separate theories of an equal protection violation. That deficiency aside, to the extent this new theory is even pled, Plaintiffs fail to plausibly plead that there was "uneven treatment" of Trump and Biden watchers and representatives. Paragraphs 132-143 of the FAC are devoted to this alleged disparity. None of these paragraphs support Plaintiffs' argument. A selection below:

- "Defendants have not allowed *watchers and representatives* to be present ..." [129]

- "In Centre County, the central pre-canvassing location was a large ballroom. The set-up was such that the *poll watchers did not have meaningful access* to observe the canvassing and tabulation process of mail-in and absentee ballots, and in fact, the *poll watchers and observers* who were present could not actually observe the ballots such that they could confirm or object to the validity of the ballots." [130]

- "In Philadelphia County, *poll watchers and canvass representatives* were denied access altogether in some instances." [131]

- "In Delaware County, *observers* were denied access to a back room counting area ..." [132]

None of these allegations (or the others in this section) claim that the Trump Campaign's watchers were treated *differently* than the Biden campaign's watchers. Simply alleging that poll watchers did not have access or were denied access to some areas does not plausibly plead unequal treatment. Without actually alleging that one group was treated differently than another, Plaintiffs' first argument falls flat.

2020 WL 6821992

**\*14** Likewise, Plaintiffs cannot salvage their notice-and-cure theory by invoking *Bush v. Gore*. [133] Plaintiffs claim that the Equal Protection clause "imposes a 'minimum requirement for nonarbitrary treatment of voters' and forbids voting systems and practices that distribute resources in 'standardless' fashion, without 'specific rules designed to ensure uniform treatment.' " [134] Plaintiffs attempt to craft a legal theory from *Bush*, but they fail because: (1) they misapprehend the issues at play in that case; and (2) the facts of this case are distinguishable.

Plaintiffs' interpretation of *Bush v. Gore* would broaden the application of that case far beyond what the Supreme Court of the United States endorsed. In *Bush*, the Supreme Court stopped a recount of votes in Florida in the aftermath of the 2000 Presidential Election. Despite Plaintiffs' assertions, *Bush* does not stand for the proposition that every rule or system must ensure uniform treatment. In fact, the Supreme Court explicitly said so, explaining: "[t]he question before the Court is *not* whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." [135] Instead, the Court explained that its holding concerned a "situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards." [136] Where a state court has ordered such a remedy, the Supreme Court held that "there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." [137] In other words, the lack of guidance from a court constituted an equal-protection violation.

In the instant matter, Plaintiffs are not challenging any court action as a violation of equal protection, and they do not allege that Secretary Boockvar's guidance differed from county to county, or that Secretary Boockvar told some counties to cure ballots and others not to. That some counties may have chosen to implement the guidance (or not), or to implement it differently, does not constitute an equal-protection violation. "[M]any courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state." [138] "Arguable differences in how elections boards apply uniform statewide standards to the innumerable permutations of ballot irregularities, although perhaps unfortunate, are to be expected, just as judges in sentencing-guidelines cases apply uniform standards with arguably different results." [139] Requiring that every single county administer elections in exactly the same way would impose untenable burdens on counties, whether because of population, resources, or a myriad of other reasonable considerations.

## V. CONCLUSION

**[44]** **[45]** Defendants' motions to dismiss the First Amended Complaint are granted with prejudice. Leave to amend is denied. "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." [140] Given that: (1) Plaintiffs have already amended once as of right; (2) Plaintiffs seek to amend simply in order to effectively reinstate their initial complaint and claims; and (3) the deadline for counties in Pennsylvania to certify their election results to Secretary Boockvar is November 23, 2020, amendment would unduly delay resolution of the issues. This is especially true because the Court would need to implement a new briefing schedule, conduct a second oral argument, and then decide the issues.

**\*15** An appropriate Order follows.

## ORDER

**AND NOW**, this 21st day of November 2020, in accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1. Defendants' motions to dismiss the First Amended Complaint (Docs. 127, 135, 140, 145, 161, and 165) are **GRANTED WITH PREJUDICE. NO LEAVE TO AMEND IS GRANTED**.

2. Defendants' motions to dismiss the original complaint (Docs. 81, 85, 90, 92, 96, and 98) are **DENIED AS MOOT**.

3. Plaintiffs' motion for leave to file a second amended complaint (Doc. 172) is **DENIED AS MOOT**.

4. Plaintiffs' motions for preliminary injunction (Docs. 89 and 182) are **DENIED AS MOOT.**

5. Plaintiffs' motions regarding discovery (Docs. 118 and 171) are **DENIED AS MOOT.**

6. Further motions regarding amicus briefing and intervention (Docs. 166, 180, and 200) are **DENIED AS MOOT**.

7. The case is dismissed and the Clerk of Court is directed to close the case file.

**All Citations**

--- F.Supp.3d ----, 2020 WL 6821992

## Footnotes

1  Doc. 125.

2  *Id.* Since the filing of the initial complaint, there have also been several intervenors and amicus petitioners.

3  *Cook v. Gralike*, 531 U.S. 510, 522, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001).

4  *Id.* (quoting *U.S. Term Limits v. Thornton*, 514 U.S. 779, 804, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995)).

5  *Id.* (quoting U.S. Const. Art. I, § 4, cl. 1).

6  *Id.* at 523, 121 S.Ct. 1029.

7  25 P.S. §§ 2601, *et seq.*

8  *Pa. Democratic Party v. Boockvar*, ––– Pa. ––––, 238 A.3d 345, 356 (2020) (quoting Pa. Const., Art. I, § 5).

9  *Id.* (quoting *Perles v. Hoffman*, 419 Pa. 400, 213 A.2d 781, 783 (1965)).

10 *Id.* at 352 (citing 25 P.S. §§ 3150.11-3150.17). Prior to the enactment of Act 77, voters were only permitted to vote by mail if they could "demonstrate their absence from the voting district on Election Day." *Id.* (internal citations omitted).

11 *E.g.*, 25 P.S. § 3150.16.

12 *Id.*

13 *Id.*

14 *Pa. Democratic Party*, 238 A.3d at 372.

15 Doc. 93 at 9.

16 *Pa. Democratic Party*, 238 A.3d at 374.

17 *Id.* (holding only that the Election Code "does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner").

18 Doc. 125 at ¶ 129.

19 *Id.* at ¶¶ 124-27.

20 *Id.* at ¶ 127.

21 *Id.* at ¶ 130.

22 *Id.* at ¶¶ 15-16.

23 *Id.* at ¶ 15.

24 *Id.* at ¶ 16.

25 *Id.* at ¶¶ 15-16.

26 Pa. Dep't of State, *Unofficial Returns, Statewide*, https://www.electionreturns.pa.gov/ (last visited on November 21, 2020).

27 Doc. 131 (denied).

28 *See* Doc. 1.

29 *Id.*

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6821992

30   *See* Doc. 35.

31   Doc. 89.

32   No. 20-3214, ---- F.3d ----, 2020 WL 6686120 (3d Cir. Nov. 13, 2020) (pending publication).

33   For example, *Bognet* held that only the General Assembly had standing to raise claims under the Elections and Electors Clauses. *Id.* at ----, 2020 WL 6686120, at *7. This ruling effectively shut the door on Plaintiffs' allegations under those clauses of the Constitution.

34   Doc. 125.

35   Ms. Kerns has since withdrawn from the case.

36   Separately, Plaintiffs filed a motion seeking leave to file a second amended complaint. Doc. 172. Having filed the FAC as of right, Plaintiffs may file a second amended complaint only with the opposing party's written consent or the court's leave. During the oral argument on November 17, 2020, Defendants indicated that they would not consent to the filing of a third pleading and did not concur in the motion for leave to file this second amended complaint.

37   Plaintiffs initially appeared to base their standing under the Equal Protection Clause on the theory that the notice-and-cure policy unlawfully allowed certain ballots to be counted, and that this inclusion of illegal ballots diluted Plaintiffs' legal votes. Doc. 1. After *Bognet* expressly rejected this theory of standing, however, Plaintiffs have since reversed course and now argue that their standing is based on the cancellation of Individual Plaintiffs' votes and the Trump Campaign's "competitive standing." ---- F.3d at ---- – ----, 2020 WL 6686120, at *9-10; Doc. 124 at 2. To the extent that Plaintiffs may still argue that votes have been unconstitutionally diluted (*see*, FAC ¶ 97), those claims are barred by the Third Circuit's decision in *Bognet.*

38   Plaintiffs essentially conceded that they were only setting forth the vote-denial theory for purposes of standing when they stated on the record at oral argument that they believed Individual Plaintiffs' votes were *lawfully* cancelled. Hr'g. Tr. 110:22-111:02.

39   In briefing, Plaintiffs attempt to revive their previously-dismissed poll-watcher claims. Count I does not seek relief for those allegations, but the Court considers them, *infra.*

40   *Pa. Voters All. v. Centre Cnty.*, No. 4:20-CV-01761, ---- F.Supp.3d ----, ----, 2020 WL 6158309, at *3 (M.D. Pa. Oct. 21, 2020) (*quoting* *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 161-62 (3d Cir. 2017)).

41   *Cottrell*, 874 F.3d at 161-62.

42   *Wayne Land & Mineral Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 573-74 (3d Cir. 2020) (internal citations omitted).

43   *Id.* at 574 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

44   *Id.* (quoting *Seneca Reservation Corp. v. Twp. of Highland*, 863 F.3d 245, 252 (3d Cir. 2017).

45   *Cottrell*, 874 F.3d at 162 (quoting *Spokeo, Inc. v. Robins*, ---- U.S. ----, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016)).

46   *Id.* (quoting *Spokeo*, 136 S. Ct. at 1547).

47   *Id.*

48   *Id.* (citing *Info. Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003)).

49   *Id.* (brackets and internal citations omitted).

50   As discussed above, to the extent that Plaintiffs would have premised standing on the theory that Pennsylvania's purportedly unconstitutional failure to uniformly prohibit the notice-and-cure procedure constitutes vote-dilution, such an assertion would be foreclosed under *Bognet,* ---- F.3d at ---- – ----,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-01831-NR   Document 55-1   Filed 12/30/20   Page 52 of 249
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d --- (2020)
2020 WL 6821992

2020 WL 6686120, at *9-10. Accordingly, the Court will only consider whether Individual Plaintiffs have standing under their vote-denial theory.

51    In the interest of comprehensiveness, the Court also addresses whether the Trump Campaign has associational standing.

52    *Gill v. Whitford*, ––– U.S. ––––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)).

53    *See Gomillion v. Lightfoot*, 364 U.S. 339, 349, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (Whittaker, J.) (noting the distinction between injuries caused by outright denial of the right to vote versus those caused by reducing the weight or power of an individual's vote). The Court notes that much of standing doctrine as it relates to voting rights arises from gerrymandering or vote-dilution cases, which often involve relatively abstract harms.

*See, e.g., Gill*, 138 S. Ct. at 1929; *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)).

54    *See Federal Election Comm'n v. Akins*, 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (citing *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449-50, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989)).

55    *See id.* ("[W]here a harm is concrete, though widely shared, the [United States Supreme] Court has found 'injury in fact.' ") (quoting *Public Citizen*, 491 U.S. at 449-50, 109 S.Ct. 2558).

56    The Third Circuit has held that a party may have standing "to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014) (quoting *Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 116 (D.D.C. 2013)). But in that case, standing was permitted to avoid a catch-22 situation where, absent standing against a third-party government actor, a plaintiff would not be able to bring suit against any responsible party. *Id.* at 367. Here, Plaintiffs allege that Secretary Boockvar is responsible for authorizing the unconstitutional actions of Defendant Counties. However, unlike the plaintiffs in *Aichele*, Plaintiffs are able to sue Defendant Counties for their allegedly unconstitutional actions. Moreover, because this Court has already concluded that Plaintiffs lack standing to sue Defendant Counties for their use of the notice-and-cure policy, it would be counterintuitive for Plaintiffs to have standing to challenge Secretary Boockvar's authorization of this policy, which is even further removed from any purported harm that Individual Plaintiffs have suffered.

57    *See, e.g., Newdow v. Roberts*, 603 F.3d 1002, 1011 (D.C. Cir. 2010) (noting that when an injury is caused by a third party not before the Court, courts cannot "redress injury ... that results from [such] independent action.") (ellipses and alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

58    *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, ––– F.Supp.3d ––––, ––––, 2020 WL 5997680, at *37 (W.D. Pa. Oct. 10, 2020) (citing *Gill*, 138 S. Ct. at 1934).

59    *Gill*, 138 S. Ct. at 1934 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)).

60    Doc. 170 at 11.

61    *Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006); *Orloski v. Davis*, 564 F. Supp. 526 (M.D. Pa. 1983).

62    No. 2:20-CV-1445, ––– F.Supp.3d ––––, 2020 WL 5626974 (D. Nev. Sept. 18, 2020).

63    *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

64    *Cegavske*, ––– F.Supp.3d at ––––, 2020 WL 5626974 at *4 (internal citations omitted).

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.   

65  *Id.*

66  Doc. 170 at 11 (citing *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)).

67  664 F.3d at 783.

68  *Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013) (emphasis added) (quoting *Drake*, 664 F.3d at 782);

*see also Mecinas v. Hobbs*, No. CV-19-05547, ––– F.Supp.3d ––––, –––– – ––––, 2020 WL 3472552,
at *11-12 (D. Ariz. June 25, 2020) (explaining the current state of the doctrine of competitive standing and
collecting cases).

69  459 F.3d at 586.

70  44 F.3d 48, 53 (2d Cir. 1994).

71  917 F.2d 1028, 1029-30 (7th Cir. 1990).

72  *Id.*

73  *See Green Party of Tennessee v. Hargett*, 767 F.3d 533, 542-43 (6th Cir. 2014) (finding that Plaintiffs had

standing to challenge Tennessee's *ballot-access* laws); *see also Pavek v. Donald J. Trump for President,
Inc.*, 967 F.3d 905, 907 (8th Cir. 2020) (finding that Plaintiffs had standing to challenge the *ballot-ordering*

provision in Minnesota); *Nelson v. Warner*, No. 3:19-0898, ––– F.Supp.3d ––––, ––––, 2020 WL 4582414,
at *3 (S.D. W. Va. Aug. 10, 2020) (same).

74  19 F.3d 873 (3d Cir. 1994).

75  Even assuming, however, that the Trump Campaign could establish that element of standing, it would still fail
to satisfy the causation and redressability requirements for the same reasons that the Voter Plaintiffs do. To
the extent the Trump Campaign alleges any injury at all, its injury is attenuated from the actions challenged.

76  *Richardson v. Bledsoe*, 829 F.3d 273, 289 n. 13 (3d Cir. 2016) (Smith, C.J.) (citing *Szabo v. Bridgeport
Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (Easterbrook, J.)).

77  *Neitzke v. Williams*, 490 U.S. 319, 326-27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

78  *Id.* at 326, 109 S.Ct. 1827 (internal citations omitted).

79  *Id.* at 327, 109 S.Ct. 1827.

80  Howard M. Wasserman, The Roberts Court and the Civil Procedure Revival, 31 Rev. Litig. 313, 316, 319-20
(2012).

81  550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

82  556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

83  *Id.* at 670, 129 S.Ct. 1937.

84  *Id.*

85  *Id.* at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

86  *Id.*

87  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (Jordan, J.) (internal quotations and
citations omitted).

88  *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955.

89  *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

90  *Id.* at 678, 129 S.Ct. 1937 (*quoting Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

91  *Phillips v. County. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

92  *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937;

93  *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955); *see also* *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

94  *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).

95  U.S. Const. Amend. XIV, cl. 1.

96  Doc. 170 at 29.

97  *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)).

98  *Id.* (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)).

99  *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

100  *Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

101  *Id.* (citing *Ex parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884)).

102  *Id.* (citing *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915)).

103  *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citing U.S. Const. Art. I, § 4, cl. 1).

104  *Donald J. Trump for President, Inc.*, ––– F.Supp.3d at ––––, 2020 WL 5997680, at *38 (quoting *Shelby County, Ala. v. Holder*, 570 U.S. 529, 543, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013)).

105  *Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)).

106  *Burdick*, 504 U.S. at 432-33, 112 S.Ct. 2059.

107  *Crawford v. Marion County Election Board*, 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (quoting *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059).

108  *Donald J. Trump for President*, ––– F.Supp.3d at ––––, 2020 WL 5997680, at *39 (quoting *Crawford*, 553 U.S. at 204, 128 S.Ct. 1610 (Scalia, J. concurring)).

109  *See id.* at ––––, 2020 WL 5997680, at *40; *see also* *Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019); *Fish v. Schwab*, 957 F.3d 1105, 1124 (10th Cir. 2020).

110  *Donald J. Trump for President*, ––– F.Supp.3d at ––––, 2020 WL 5997680, at *39 (quoting *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016)).

111  *Id.* (citing *Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004)).

112  Even after questioning from this Court during oral argument regarding the appropriate standard of review for their equal-protection claim, Plaintiffs failed to discuss this key aspect of the claim in briefing. *See* Doc. 170.

113  *See, e.g., Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).

114  *Donald J. Trump for President*, ––– F.Supp.3d at ––––, 2020 WL 5997680, at *44 (emphasis in original).

115  *Biener*, 361 F.3d at 215.

116  *Marbury v. Madison*, 5 U.S. 137, 147, 1 Cranch 137, 2 L.Ed. 60 (1803).

117  *Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.") (citing *Cuno*, 547 U.S. at 353, 126 S.Ct. 1854).

118  Curiously, Plaintiffs now claim that they seek only to enjoin certification of the presidential election results. Doc. 183 at 1. They suggest that their requested relief would thus not interfere with other election results in the state. But even if it were logically possible to hold Pennsylvania's electoral system both constitutional and unconstitutional at the same time, the Court would not do so.

119  *Heckler v. Mathews*, 465 U.S. 728, 740, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) (internal citations omitted).

120  *Id.* at 741, 104 S.Ct. 1387; *Califano v. Westcott*, 443 U.S. 76, 90-91, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979).

121  *E.g.,* *Sessions v. Morales-Santana*, ——— U.S. ———, 137 S. Ct. 1678, 1701, 198 L.Ed.2d 150 (2017).

122  *Id.* (internal citations omitted).

123  *See* *Palmer v. Thompson*, 403 U.S. 217, 226-27, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) (addressing whether a city's decision to close pools to remedy racial discrimination violated the Thirteenth Amendment); *see also* *Reynolds*, 377 U.S. at 554, 84 S.Ct. 1362 (citing *Mosley*, 238 U.S. at 383, 35 S.Ct. 904).

124  *Marbury*, 5 U.S. at 147.

125  *Perles v. County Return Bd. of Northumberland County*, 415 Pa. 154, 202 A.2d 538, 540 (1964) (cleaned up).

126  *Id.* at 567.

127  Doc. 170 at 29. Count I makes no mention of the poll-watching allegations, nor does it seek relief for any violation of law on the basis of those allegations. Out of an abundance of caution, however, the Court considers whether these allegations state a claim.

128  *Id.*

129  Doc. 125 at ¶ 134 (emphasis added).

130  *Id.* at ¶ 135 (emphasis added).

131  *Id.* at ¶ 136 (emphasis added).

132  *Id.* at ¶ 137 (emphasis added).

133  531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

134  Doc. 170 at 13.

135  *Bush*, 531 U.S. at 109, 121 S.Ct. 525 (emphasis added).

136  *Id.*

137  *Id.*

138  *Donald J. Trump for President*, ——— F.Supp.3d at ———, 2020 WL 5997680, at *44.

139  *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 636 (6th Cir. 2016).

140  *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413–14 (3d Cir.1993).

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Unreported Opinion 3

*In Re: Canvass of Absentee and/or Mail-in Ballots of November 3, 2020 General Election*, Case No. 1191 C.D. 2020, (Pa. Commw. Ct. Nov. 25, 2020) (Slip. Op.)

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re:  Canvass of Absentee | : | |
| and/or Mail-in Ballots of | : | |
| November 3, 2020 General Election | : | |
| | : | |
| v. | : | No. 1191 C.D. 2020 |
| | : | Submitted: November 23, 2020 |
| Appeal of:  Donald J. Trump for | : | |
| President, Inc. | : | |

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED: November 25, 2020**

Donald J. Trump for President, Inc. (Appellant) appeals from the Order of the Court of Common Pleas of Bucks County (common pleas) that overruled the Appellant's objections to certain absentee and/or mail-in ballots, denied Appellant's requested relief, and dismissed Appellant's appeal from the Bucks County Board of Elections' (Board) determination that the challenged ballots were valid and could be counted in the General Election of November 3, 2020 (Election).[1]  Appellant argues the Board violated the Election Code[2] (Code) when it did not reject and, over objection, accepted 2,177 ballots on the basis that they did not comply, in some way, with Sections 3146.6 or 3150.16 of the Code, 25 P.S. §§ 3146.6 (absentee electors),

---

[1] Others challenged the Board's decision to common pleas, but only Appellant has filed a notice of appeal from the common pleas' Order.

[2] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2601-3591.

3150.16 (mail-in electors).  Appellant has since withdrawn some of the challenges, and of the remaining challenges, all but 69 ballots are resolved by a recent decision of the Supreme Court; common pleas' Order with regard to those ballots is, therefore, affirmed for that reason.  The remaining 69 ballots were received with secrecy envelopes that were "unsealed."  The statute unambiguously requires that secrecy envelopes shall be "securely seal[ed]," 25 P.S. §§ 3146.6(a), 3150.16(a), and that the board of elections shall "break the seals" on these envelopes before counting the ballots.   Section 3146.8(g)(4)(iii) of the Code, 25 P.S. § 3146.8(g)(iii).[3] Therefore, in future elections, the sealing requirement should be treated as mandatory and if unsealed secrecy envelopes are received, this will invalidate the ballots contained therein.  However, because of the facts and circumstances in this case, this interpretation will be applied prospectively.  Common pleas' Order is, therefore, affirmed with regard to those 69 ballots.

The parties filed a joint stipulation of facts with common pleas setting forth the following facts relevant to the Court's resolution of this appeal.  On November 3, 2020, the Board met to pre-canvass absentee and mail-in ballots as set forth in Section 3146.8(g) of the Code.  (Stip. ¶ 17.)  During the course of the Board's canvass meeting on November 7, 2020, and with Authorized Representatives present and given an opportunity to provide argument, the Board considered whether certain voter declarations on the outer envelope were "sufficient" to meet the requirements of Section 3146.8(g).  (*Id.* ¶ 18.)  The Board separated the ballots into 10 different categories, and accepted some of the categories for canvassing and rejected others. (*Id.* ¶ 19.)  Of the categories accepted for canvassing, Appellant challenged six to common pleas.  Those six categories were:

---

[3] This section was added by Section 11 of the Act of March 6, 1951, P.L. 3.

- Category 1:  1,196 ballots whose outer envelopes did not contain a handwritten date or contained only a partial handwritten date.

- Category 2:  644 ballots whose outer envelopes did not include a handwritten name or address.

- Category 3:  86 ballots whose outer envelopes contained a partial written address.

- Category 4:  246 ballots whose outer envelopes contained mismatched addresses.

- Category 5:  69 ballots with "unsealed" secrecy envelopes.

- Category 6:  7 ballots whose secrecy envelopes had markings that did not identify the elector's identity, political affiliation, or candidate preference.

(*Id.* ¶ 24.)   During the hearing before common pleas, Appellant withdrew its challenges to Categories 4 and 6, (Hr'g Tr. at 114-15; common pleas' op. at 6; common pleas' November 23, 2020 Order Clarifying the Record.)  Therefore, these challenges will not be discussed further.

The parties stipulated that "[w]hen received by [the Board,] each of the challenged ballots was inside a [secrecy] envelope, and the [secrecy] envelope was inside a sealed outer envelope with a voter's declaration that had been signed by the elector."  (Stip. ¶ 45.)  On the outer envelope "is a checklist for the voter, asking: "Did you . . . [p]ut your ballot inside the secrecy envelope and place it in here?"  (*Id.* ¶ 10).  With regard to Category 5 ballots, the parties stipulated that the Board "could not determine whether the [secrecy] envelopes were initially sealed by the elector but later became unsealed."  (*Id.* ¶ 46.)   The electors whose ballots are being challenged have not been notified.  (*Id.* ¶ 47.)  The stipulation clearly establishes that Appellant does not allege, and there is no evidence of, fraud, misconduct, impropriety, or undue influence.  (*Id.* ¶¶ 27-30.)  Further, Appellant does not allege,

and there is no evidence, that the Board counted ballots that did not contain signatures on the outer envelope or "'naked ballots,' (ballots that did not arrive in a secrecy envelope)." (*Id.* ¶¶ 31-32.) Last, Appellant does not allege, and there is no evidence, that the electors who cast these votes were ineligible to vote, that votes were cast by or on the behalf of a deceased elector, or that votes were cast by someone other than the elector. (*Id.* ¶¶ 33-35.)

In addition to these stipulated facts, common pleas held a hearing, at which Thomas Freitag, the Board's Director (Director), testified. (Hr'g Tr. at 63-64.) Director testified about the Board's process in reviewing the ballots in general, the challenged ballots, and the Board's determinations to accept or reject challenged ballots that were missing information on the outer envelopes. (*Id.* at 68-96.) Relevant specifically to Category 5 challenges, Director indicated that "the privacy of the ballots [were not] jeopardized in any manner[,]" there was no "view of the ballots" "to his knowledge," and that there was no "way to determine by the Board whether or not [the secrecy envelope] had been sealed at one point and became unsealed." (*Id.* at 97-98.) He testified that the Board provided the envelopes, including the secrecy envelopes, which were the type that had "to be either moistened by licking or water or glue," and agreed that people would have to rely on the type of envelopes provided by the Board as to the quality of the seal. (*Id.* at 98-99.) Director agreed that the Board discussed the possibility that voters may have concerns about licking the envelopes, given the pandemic, which appeared to be a factor in its decisions. (*Id.* at 99.) He further agreed that the "ballots that were enclosed within unsealed [secrecy] envelopes" were "enclosed within [the] outer envelope." (*Id.*) Director was subjected to limited cross-examination., but not on this issue. The parties then provided argument on the various challenges. Following

the hearing, common pleas issued an opinion and order rejecting the challenges and dismissing the appeal of the Board's decision.  Appellant now appeals to this Court.[4]

As to Categories 1 through 3, which challenged the ballots on the basis of a deficiency on the outer envelopes, common pleas held that the information missing was not mandatory under the Election Code, but directory and, therefore, its absence would not invalidate those ballots.  (Common pleas' op. at 14-19.)  Appellant challenges these determinations before this Court.  However, after the filing of the appeal, the Supreme Court of Pennsylvania rejected these same legal challenges in *In re:  Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election* (Pa., Nos. 31-35 EAP 2020 and 29 WAP 2020, filed November 23, 2020) (*Philadelphia/Allegheny*), slip op. 19-32.[5]  In doing so, the Supreme Court "conclude[d] that the . . . Code does not require boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, their address, and/or date, where no fraud or irregularity has been alleged." *Id.*, slip op. at 3.  Appellant acknowledges this holding in its brief, but points out that, per a majority of the Supreme Court, dating the outer envelope is a mandatory requirement, but would be applied prospectively.  (Appellant's Brief (Br.) at 27.)

---

[4] Common pleas' decision is reviewed on appeal "to determine whether the findings are supported by competent evidence and to correct any conclusions of law erroneously made." *In re Reading Sch. Bd. Election*, 634 A.2d 170, 171-72 (Pa. 1993).  Issues involving the proper interpretation of the Code is a question of law, and the Court's standard of review is de novo and scope of review is plenary. *Banfield v. Cortes*, 110 A.3d 155, 166 (Pa. 2015).

[5] DNC Services Corporation/Democratic National Committee, an appellee here, filed an application for extraordinary relief with the Supreme Court requesting the Supreme Court exercise its extraordinary jurisdiction powers over this appeal, but this application was denied by the Supreme Court by order dated November 24, 2020.

This Court is bound by the Supreme Court's decision,[6] and, applying that decision, there was no error in common pleas rejecting Appellant's challenges to Categories 1 through 3.[7]

The sole remaining issue before this Court is whether the ballots identified in Category 5, which are those ballots that were enclosed, but did not appear to be "sealed," in the secrecy envelope, must be invalidated under the Code. In rejecting Appellant's challenge to this category, common pleas explained that the ballots at issue were not "naked ballots," which would have been invalid pursuant to the Supreme Court's decision in *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 378-80 (Pa. 2020). Common pleas held that "[t]here is no factual evidence that supports a conclusion that the envelopes had not been sealed by the elector prior to" the time of canvassing. (Common pleas op. at 20.) Instead, common pleas pointed to the parties' stipulation that "[w]ith respect to Category 5 . . . [the Board] could not determine whether the [secrecy] envelopes were initially sealed by the elector but later became unsealed." (*Id.* (quoting Stip. ¶ 46).) Accordingly, common pleas found "there [was] no evidence that the electors failed to 'securely seal [the ballot] in the [secrecy] envelope,' as required by the . . . Code." (*Id.* (first and third alteration added).) It explained that "[t]he elector was provided the envelope by the government" and "[i]f the glue on the envelope failed[,] that would be the responsibility of the government." (*Id.*) Therefore, common pleas held "[t]here

---

[6] Notably, the Supreme Court referenced common pleas' decision in this matter and held that common pleas "appropriately applied th[e Supreme] Court's precedent" in affirming the counting of these ballots. *Philadelphia/Allegheny*, slip op. at 32-33 n.6.

[7] To the extent Appellant seeks to "incorporate" Equal Protection arguments into this case that were raised in other cases, Appellant did not raise such claims before common pleas and, therefore, the Court will not consider them. Pennsylvania Rule of Appellate Procedure 302(a), Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

[was] insufficient evidence to determine whether the specific language of the mandated law was violated" and "it would be an injustice to disenfranchise these voters when it cannot be shown that the ballots in question were not 'securely sealed' in the [secrecy] envelope prior to the canvassing of those ballots," particularly where "there ha[d] been no suggestion or evidence that the absence of a sealed inner envelope in anyway jeopardized the privacy of the ballot." (*Id.*)

Appellant, citing *Boockvar*, argues that the requirements of Sections 3146.6(a) and 3150.16(a) are mandatory, not directory. According to Appellant, the Supreme Court has recognized that these requirements of the Code "are necessary for the preservation of secrecy and the sanctity of the ballot and must therefore be observed -- particularly where . . . they are designed to reduce fraud." *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d 1223, 1234 (Pa. 2004) (*Appeal of Pierce*). Therefore, Appellant argues, "absentee or mail-in ballots cast in contravention of the requirements of [Section 3146.6(a) and 3150.16(a) of the Code] are 'void' and cannot be counted." (Appellant's Br. at 23 (quoting *Appeal of Pierce*, 843 A.2d at 1234).)

The Board, as an appellee, argues that the deficiencies set forth in Category 5 are minor technical deficiencies related to the sealing of the secrecy envelopes and should be treated like other minor mistakes that do not require that the ballots be stricken. The Board maintains that there is no evidence that these 69 electors did not comply with the statutory language or that the secrecy of the ballots was in any way compromised. *Boockvar*, the Board asserts, requires that the ballots must be **enclosed** in the secrecy envelopes or the ballots should be disqualified. 238 A.3d at 380. Here, there is no dispute that the ballots were fully enclosed in the secrecy envelopes, consistent with the holding in *Boockvar*, and, as a factual matter, there

could be no determination as to whether the secrecy envelopes were sealed by the electors and later became unsealed. Given that the Court cannot tell whether the electors made errors in casting their ballots, and the lack of any allegation of fraud, the Board argues there is no compelling reason to disenfranchise these electors. *Appeal of James*, 105 A.2d 64, 66 (Pa. 1954).

Appellee DNC Services Corporation/Democratic National Committee (DNC) asserts there is no statutory requirement that the voter must seal the secrecy envelope in order for the ballot to be counted. Further, it asserts that the word "seal" is not a term of art and is not defined by the Code, is ambiguous and, per a dictionary definition, commonly means "to close" or "to make secure," and there is no allegation that the secrecy envelopes were not closed or the ballots were not secure in the envelopes. (DNC's Br. at 16-17.) DNC argues that noncompliance with this requirement does not justify disenfranchisement because, unlike with "naked ballots," the identity of the electors was protected, which is consistent with the statutory purpose.[8]

Relevant here are Sections 3146.6(a), 3150.16(a), and 3146.8(g)(4)(ii) and (iii) of the Code. Section 3146.6(a) states, in pertinent part:

> at any time after receiving an official absentee ballot, but on or before eight o'clock P.M. the day of the primary or election, **the elector shall**, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, **enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot**. This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election

---

[8] DNC argues this Court does not have jurisdiction to consider this matter; however, our Supreme Court's order denying DNC's request for that Court to exercise its powers of extraordinary jurisdiction confirms this Court's jurisdiction.

district of the elector.  The elector shall then fill out, date and sign the declaration printed on such envelope.  Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

25 P.S. § 3146.6(a) (emphasis added).   Section 3150.16(a) contains the nearly identical statement that "**the mail-in elector shall**, in secret, proceed to mark the ballot . . . and then fold the ballot, **enclose and securely seal the same in the envelope** on which is printed, stamped or endorsed 'Official Election Ballot'" and "[t]his envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector " 25 P.S. § 3150.16(a) (emphasis added).

Section 3146.8(g)(4)(ii) and (iii), governing "Canvassing of official absentee ballots and mail-in ballots," specifies that

> (4) All absentee ballots which have not been challenged under section 1302.2(c) and all mail-in ballots which have not been challenged under section 1302.2-D(a)(2) and that have been verified under paragraph (3) shall be counted and included with the returns of the applicable election district as follows:
>
> . . . .
>
> (ii) If any of the envelopes on which are printed, stamped or endorsed the words "Official Election Ballot" contain any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void.
>
> (iii) **The county board shall then break the seals of such envelopes, remove the ballots and count, compute and tally the votes**.

25 P.S. § 3146.8(g)(4)(ii), (iii) (emphasis added).

The parties present three legal interpretive approaches to whether these 69 ballots were properly accepted by the Board when they were enclosed, but not sealed, in the secrecy envelope at the time of canvassing.  Appellant argues this requirement is mandatory and allows for **no** exception.  The Board and DNC argue that this requirement is directory and noncompliance with that requirement is a minor defect that should be excused.  The Board alternatively argues, in accordance with common pleas' reasoning, that as a factual matter, a violation of this requirement by the electors has not been established, and, in the absence of compelling reasons, such as allegations of fraud or infringement on the electors' secrecy, the electors should not be disenfranchised.

"[T]he polestar of statutory construction is to determine the intent of the General Assembly." *Appeal of Pierce*, 843 A.2d at 1230.  Generally, "the best indication of the legislative intent is the plain language of a statute." *Id.* (citation omitted).  In construing that language, "[w]ords and phrases shall be construed according to the rules of grammar and according to their common and approved usage . . . ." *Id.* (citation omitted).  The Court is mindful that, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* (citation omitted).  It is only when the words of the statute "are not explicit" that the Court may then "resort to other considerations, such as the statute's perceived 'purpose,' in order to ascertain legislative intent." *Id.* (citation omitted).  The Court is likewise mindful that, as our Supreme Court has explained, "all things being equal, the [Code] will be construed liberally in favor of the right to vote but, at the same time, we cannot ignore the clear mandates of the . . . Code." *Id.* at 1231.

The operative provisions at issue here involve the statutory direction that "the elector shall . . . fold the ballot, **enclose and securely seal** the same in the envelope on which is printed, stamped or endorsed 'Official Election Ballot.'"  25 P.S. §§ 3146.6(a), 3150.16(a) (emphasis added).  At canvassing, "[t]he county board shall then **break the seals** of such envelopes, remove the ballots and count . . . ."  25 P.S. § 3146.8(g)(4)(iii) (emphasis added).

The provisions that are at issue here are contained within sections that our Supreme Court has found to contain both mandatory and directory provisions.  However, particularly applicable here, the Supreme Court in *Boockvar* held that "the secrecy provision language in Section 3150.16(a) is **mandatory** and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid."  *Boockvar*, 238 A.3d at 380 (emphasis added).  In *Boockvar*, our Supreme Court considered whether county boards of election should be required to "clothe and count naked ballots," that is, place ballots that were returned to the county board without the secrecy envelopes into an envelope and count them.  238 A.3d at 374.  As here, the Supreme Court was presented with conflicting assertions that this requirement was directory or mandatory.  After examining the statutory text, the Court concluded that the legislative intent was for the "**secrecy envelope provision**" to be mandatory, citing article VII, section 4 of the Pennsylvania Constitution, providing that "secrecy in voting shall be preserved," PA. CONST. art. VII, § 4, and Section 3146.8(g)(4)(ii).  The Supreme Court explained that the two statutory provisions, dealing with the same subject, "must be read *in pari materia*."  *Boockvar*, 238 A.3d at 378.  Based on that statutory language, the Supreme Court held that it was clear that the legislature intended "that, during the collection and canvassing processes, when the outer envelope in which the ballot

arrived is unsealed and **the sealed ballot** removed, it should not be readily apparent who the elector is, with what party [the elector] affiliates, or for whom the elector has voted." *Id.* (emphasis added). Per the Court, "[t]he secrecy envelope properly unmarked **and sealed** ensures that result, unless it is marked with identifying information, in which case that goal is compromised" and that "[t]he omission of a secrecy envelope defeats this intention." *Id.* at 378, 380 (emphasis added). The Supreme Court in *Boockvar* found the matter analogous to the issue in *Appeal of Pierce*, where there was a challenge to absentee ballots that were delivered to the county board of election by third persons in violation of the Code's "in-person" delivery requirement. *Id.* at 379. In *Appeal of Pierce*, the Supreme Court held that the "so-called technicalities of the . . . Code," such as the requirement that an elector personally deliver the elector's absentee ballot, "are necessary for the preservation of secrecy and the sanctity of the ballot and must therefore be observed – particularly where, as here, they are designed to reduce fraud." 843 A.2d at 1234. Therefore, the Court in that case, found that the in-person delivery requirement was mandatory and the absentee ballots delivered in contravention of this mandatory provision were void. *Id.*

The Court recognizes that the unsealed envelopes here could be viewed as a less substantial noncompliance than an elector's failure to use the secrecy envelope, as the ballots here were actually enclosed in the secrecy envelope and then in the sealed outer envelope. However, the language relating to securely sealing the secrecy envelope is encompassed within the provision directing the use of the secrecy envelope, which the Supreme Court found mandatory in *Boockvar*. That the legislature intended the secrecy envelopes to remain sealed until the ballots are counted is further evidenced by the directive in Section 3146.8(g)(4)(iii) that "[t]he

county board **shall then break the seals of such envelopes**, remove the ballots and **count** . . . ." 25 P.S. § 3146.8(g)(4)(iii) (emphasis added). Such language, when read *in pari materia* with Sections 3146.6(a) and 3150.16(a), reflects that the legislature intended the secure sealing of the secrecy envelope to be mandatory. *Boockvar*, 238 A.3d at 378. Accordingly, Appellant's argument that this directive is mandatory such that an elector's noncompliance results in a ballot that is not valid is supported by the statutory language and *Boockvar*.

The parties stipulated that these challenged ballots were "unsealed" in the secrecy envelopes when canvassing of the ballots was to begin. The text of the Code unambiguously states that the elector "shall . . . enclose and securely seal the [ballot] in the envelope . . . ," 25 P.S. §§ 3146.6(a), 3150.16(a), and that, at canvassing, "[t]he county board shall then break the seals of such envelopes, remove the ballots and count," 25 P.S. § 3146.8(g)(4)(iii). The legislature did not merely require the envelope to be sealed, but specified that it be **"securely"** sealed. 25 P.S. §§ 3146.6(a), 3150.16(a) (emphasis added). The Code unambiguously requires the envelopes remain sealed until the county board of elections can "break the seals" of the secrecy envelopes. 25 P.S. § 3146.8(g)(4)(iii). When the text of the statute is clear and unambiguous, those words best reflect the legislative intent, and "the letter of [the unambiguous language] is not to be disregarded under the pretext of pursuing its spirit." *Appeal of Pierce*, 843 A.2d at 1230 (citation omitted).

Justice Wecht recently in *Philadelphia/Allegheny* highlighted that there are times a Court should give prospective application to a ruling under the Code. Slip op. at 17-18 (Wecht, J., concurring). Citing *In Appeal of Zentner*, 626 A.2d 146 (Pa.1993), as precedent, Justice Wecht concurred in the decision of the Court to count the ballots that were undated, and would prospectively apply a more strict

interpretation of the statute favored by three other justices.  As did Justice Wecht, this Court recognizes the tremendous challenges presented by the massive expansion of mail-in voting, and the lack of precedential rulings on the requirement of a "securely sealed" secrecy envelope.  Moreover, the parties stipulated in this case reveals that the instructions on the outer envelope for the elector stated only that the ballot should be placed in the secrecy envelope and did not specify that the envelope needed to be securely sealed or the consequences of failing to strictly adhere to that requirement.  *See Philadelphia/Allegheny*, slip op. at 20 (Wecht, J., concurring). Moreover, in this case, it cannot be established that the electors did not seal the secrecy envelope.  Importantly, the Court must point out that there are absolutely **no allegations** of any fraud, impropriety, misconduct, or undue influence, that anyone voted who was not eligible to vote, or that the secrecy of the ballots cast was jeopardized.  For these reasons, the decision of the Court will be applied prospectively, and the 69 ballots will not be invalidated.

Accordingly, common pleas' Order is affirmed.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Canvass of Absentee       :
and/or Mail-in Ballots of         :
November 3, 2020 General Election :
                                  :
                    v.            :     No. 1191 C.D. 2020
                                  :
Appeal of:  Donald J. Trump for   :
President, Inc.                    :

# O R D E R

 **NOW**, November 25, 2020, the Order of the Court of Common Pleas of Bucks County, entered in the above-captioned matter, is **AFFIRMED** in accordance with the foregoing opinion.

_____

**RENÉE COHN JUBELIRER,** Judge

<span style="color:red">Order Exit
11/25/2020</span>

# Unreported Opinion 4

*In Re: 2020 General Election Provisional Ballot Challenges*, Case No. 4152 of 2020 (Pa. Ct. Comm. Pl. Westmoreland Cty. Nov. 23, 2020)

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY,
PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: 2020 GENERAL ELECTION | ) | |
| PROVISIONAL BALLOT | ) | No. 4152 of 2020 |
| CHALLENGES | ) | |
| | ) | |

## <u>OPINION AND ORDER OF COURT</u>

*By Harry F. Smail, Jr., Judge:*

This matter is before the Court on a *Petition for Review in the Nature of a Statutory Appeal* filed by Nicole Ziccarelli, candidate for the Senate of Pennsylvania from the 45th Senatorial District. Ziccarelli presents two challenges to the Westmoreland County Board of Elections' (the "Board") decisions regarding challenged provisional ballots submitted pursuant to the November 3, 2020 general election. Ziccarelli challenges first the Board's decision to count 250 provisional ballots which were cast where the voter had also signed the precinct's poll book (the "poll book issue"). Ziccarelli additionally challenges the Board's decision to count nine (9) provisional ballots which were submitted without secrecy envelopes, while denying to count an additional three (3) which were submitted without secrecy envelopes (the "secrecy envelope issue"). Petitioner's appeal will be granted for the reasons that follow.

## *PROCEDURAL HISTORY*

The instant matter commenced with the timely filing of the Petition for Review by Ziccarelli on November 18, 2020. This matter was scheduled for argument before this Court on November 20, 2020. Intervention in this matter was requested by the Pennsylvania Democratic Party and Jim Brewster, incumbent candidate for the Senate of Pennsylvania from the 45th Senatorial District. Intervention was granted, and Intervenors filed a Brief in Opposition to Petition for Review in the Nature of a Statutory Appeal. Counsel for Ziccarelli, Brewster, the

1

Board, and the Democratic Party presented argument before this court at the scheduled time and place, and this Court took all arguments and pleadings under consideration in rendering the within opinion and order.

## *LEGAL STANDARDS*

The standard of review in a statutory appeal in which the court has taken no additional evidence is limited to review for an abuse of discretion or error of law. *Newtown Twp. Bd. of Sup'rs v. Greater Media Radio Co.,* 587 A.2d 841 (Pa. Cmwlth. 1991). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Paden v. Baker Concrete Constr., Inc.*, 658 A.2d 341, 343 (Pa. 1995) (citing *Mielcuszny v. Rosol,* 176 A. 236 (Pa. 1934)).

County Boards of Elections are granted "plenary powers in the administration of the election code." *Appeal of McCracken*, 88 A.2d 787, 788 (Pa. 1952). Under Pennsylvania law, "the Election Code should be liberally construed so as not to deprive, inter alia, electors of their right to elect a candidate of their choice." *Pennsylvania Democratic Party v. Boockvar,* 238 A.3d 345, 356 (Pa. 2020). Pennsylvania appellate Courts have repeatedly reiterated that "all things being equal, the law will be construed liberally in favor of the right to vote but, at the same time, we cannot ignore the clear mandates of the Election Code." *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d 1223, 1231 (Pa. 2004).

Pennsylvania's constitution makes explicit in its first Article that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise

2

of the right of suffrage." Pa. Const. art. I, § 5.[1] The Pennsylvania Supreme Court notes that "Article I, Section 5 guarantees our citizens an equal right, on par with every other citizen, to elect their representatives. Stated another way, the actual and plain language of Section 5 mandates that all voters have an equal opportunity to translate their votes into representation. This interpretation is consistent with both the historical reasons for the inclusion of this provision in our Commonwealth's Constitution and the meaning we have ascribed to it through our case law." *League of Women Voters v. Commonwealth*, 178 A.3d 737, 804 (Pa. 2018).

In its recent decision involving the propriety accepting of mail-in ballots which were not correctly dated, the Pennsylvania Commonwealth Court noted the following:

> Our Election Code does not contemplate a process that bogs down county boards of election or the many election day volunteers to track down voters who committed errors of law in casting their ballots in order to verify the information that the elector, through his or her own negligence, failed to provide on the elector's mail-in or absentee ballot. Decisions as to whether these defective ballots must be set aside are to be made at the canvass or pre-canvass based on objective criteria established by the General Assembly and what is before the elections board – that being the ballot itself.

*In re: 2,349 Ballots in the 2020 General Election*, No. 1162 C.D. 2020 (Nov. 19, 2020 (Slip Op. at 12 n. 13) (citations omitted).

### *APPELLATE ISSUES*

POLL BOOK ISSUE

The Court will first address Ziccarelli's challenge to the Board's decision to uphold the challenge to the 250 provisional ballots which were subject to the poll book issue, and thus permitted their counting. At time of hearing before the Board, testimony was submitted which

---

[1] The Pennsylvania Supreme Court has repeatedly reiterated that "that the Free and Equal Elections Clause of the Pennsylvania Constitution requires that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government. *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 369 (Pa. 2020) (citation omitted).

indicated that numerous Westmoreland County precincts were affected by an issue in which poll workers incorrectly directed voters who were required to submit provisional ballots to additionally sign the precincts' poll books, indicating that they had voted at the poll on a voting machine. *See, e.g.,* 11/13/2020 Tr. at 18, 11/16/2020 Tr. at 18-19, 29-30. This resulted in two separate and distinct sworn affirmations by each voter that he or she had voted; one found on the provisional ballot envelope and one found in the poll book.

Evidence was presented to the Board at the November 16, 2020 hearing in the form of unsworn testimony from twenty three (23) of the at-issue voters themselves that they had only voted once, by provisional ballot and not via the voting machines as indicated by the poll books, with an additional four (4) providing sworn testimony. *See, e.g.,* 11/16/2020 Tr. at 3. Additionally, nineteen (19) sworn affidavits from voters were submitted stating that the individuals had only voted once, again only by provisional ballot. 11/16/2020 Tr. 40-47, 54-58. This results in a total of forty six (46) provisional ballots, challenged for two signatures, which were supported by additional evidence that the voter had voted only once.

In making its decision, the Board accepted all 250 votes on their assumption that the discrepancy of double signatures in each case was most likely caused by error on the part of the judges of elections, owing to probable deficiencies in their poll worker training. 11/16/2020 Tr. at 68-70. The Board decided to accept all 250 votes on this basis, in lieu of individually contacting each voter who had not already provided additional evidence in order to discern whether he or she had voted only once in order to avoid "going down the rabbit hole" of contacting all affected voters. *Id.*

In determining challenges to provisional ballots, "the county board of elections... shall count the ballot if the county board of elections confirms that the individual did not cast any

4

other ballot, including an absentee ballot, in the election." 25 P.S. § 3050(a.4)(5)(i).  The two signatures by each of the aforementioned 250 voters triggered the Board's duty to inquire into whether each of these voters had only properly voted once, and thus whether the provisional ballots should be counted.  Although witness testimony generally should be sworn in court proceedings, the Pennsylvania Rules of Evidence do not apply to the Board's review of provisional ballot challenges. 42 Pa.C.S. §5901, 25 P.S. § 3050)(a.4)(4)(iii).

Here, it is clear that the Board abused its discretion in accepting two hundred and four (204) ballots where provisional ballots were submitted and the poll book was signed without any further substantiating evidence indicating that only one vote was cast by each voter.  Although counsel for the Board and Brewster argue that the affirmation and signature on the provisional ballot which states that the provisional ballot is the sole vote cast is sufficient evidence of the same, this is clearly evidence deficient; indeed, the fact of the two existent affirmations -- one of which being the provisional ballot affirmation -- is the sole cause of the challenge to these 250 provisional ballots.

While the Court is sympathetic to the legitimate concerns regarding disenfranchisement of the 204 voters whose ballots were not supported by evidence before the board, the Court must apply statutes as written.  "When the words of a statute are clear and free from all ambiguity, it should be interpreted solely from the plain meaning of its words and the letter of the statute is not to be disregarded under the pretext of pursuing its spirit." *In re Septa MVFRL Interest Litig.*, 996 A.2d 1099, 1105 (Pa. Cmwlth. 2010).  25 P.S. § 3050(a.4)(5)(i) requires that the Board of Elections "shall count the ballot if the county board of elections *confirms that the individual* did not cast any other ballot, including an absentee ballot, in the election." (emphasis added).

In the case of the 204 ballots where additional evidence regarding each additional voter was not received, the Board was derelict in their mandate under the Elections Code to confirm that each *individual* did not cast any other ballot.  The statute makes plain that these are decisions to be made on an individual, ballot by ballot, voter by voter basis.  The Board plainly abused its discretion by failing to fulfill its obligation, even if that entailed "going down the rabbit hole" of contacting each voter individually to ascertain that they had voted only once.  Contrary to the Board's embellished assertion that they must needs contact "a million people" to fulfill their duty under the statute, it is apparent that effort needed to be made only to contact the additional 204 individuals who had not already provided additional evidence. 11/16/2020 Tr. at 68.

Respondents argue that evidence of the pattern of error on the part of the poll workers and judges of elections constitutes sufficient evidence to determine that all 204 provisional ballots were the only ballots cast by those particular electors.  Respondents rely on Pennsylvania Rule of Evidence 406 in claiming a pattern or practice of error at the polls.  While it may indeed be true that a failure of adequate training for poll workers is the cause of all issues presently in front of this Court, this is simply not enough to satisfy the mandate of 25 P.S. § 3050(a.4)(5)(i), which requires individual validation of each ballot to ensure that no voters submitted more than one ballot in any fashion.

The Board of Elections is a body intended to uphold one of our most cherished and trusted institutions - our guaranteed right to free and fair elections in the Commonwealth.  In its dereliction of this duty to the electorate, as well as its duty to the poll workers and judges of elections who braved an unprecedented pandemic to conduct the 2020 general election, the Board clearly abused its discretion in not conducting its due diligence in the confirmation of each individual's vote under 25 P.S. § 3050(a.4)(5)(i).  Though the Board termed this conduct

6

"temporary" "for this election, for 2020" only, the Court cannot abide the Board's failure to comply with the statute in any instance. 11/16/2020 Tr. at 68-70.

Indeed, the nonchalant manner in which the Board dismissed its responsibilities to the electorate shocks the conscience of this Court. While the Court is loathe to impose the consequences of a failure of the Board onto an innocent electorate, as well as the two candidates here who earnestly ran their campaigns pursuant to the law, the Court must apply the provisions of the Elections Code consistently and as written by our legislature. Judicial activism in the form of indifference to the clear intent of the legislature is a violation of the separation of powers, and it cannot be indulged in regardless of the Court's sympathy to the guiltless electors in this instance. The Board's contention that the sworn and unsworn testimony provided by some voters can be broadly and generally applied to all similar situations runs counter to the plain mandate of 25 P.S. § 3050(a.4)(5)(i), which requires that the Board of Elections "shall count the ballot if the county board of elections confirms that the individual" voted only once.

Considering all evidence before the board and construing strictly 25 P.S. § 3050(a.4)(5)(i), it is clear that the Board erred in counting the 204 ballots which were not supported by individual additional evidence, and so the Boards decision regarding those 204 ballots must be reversed, while the Board's decision to accept the 46 ballots which were supported by individual addition evidence must be affirmed.

SECRECY ENVELOPE ISSUE

The Court will now address Ziccarelli's challenge to the Board regarding the secrecy envelope issue. At time of hearing on November 13, 2020, the Board was made aware of three (3) challenged provisional ballots which were submitted without secrecy envelopes in the Lower Burrell 4th Ward 2nd Precinct. 11/13/2020 Tr. at 68. Evidence was received pertaining to a note that was allegedly left by the judge of elections at the Lower Burrell precinct indicating that he

had mistakenly erred in his instructions regarding the secrecy envelopes. 11/13/2020 Tr. at 60-61. The Board denied challenges to these three (3) challenged ballots and thus did not permit them to be counted. At the continuation of hearing on November 16, 2020 the Board was made aware of nine (9) challenged provisional ballots which were submitted without secrecy envelopes in the Derry Township-Cokeville Precinct. 11/16/2020 Tr. at 12-17, 19, 26-27. One voter testified that he was not directed to utilize a secrecy envelope when casting his provisional ballot at this precinct. 11/16/2020 Tr. at 10-11. The board upheld the challenges to these nine (9) challenged ballots, and thus permitted them to be counted.

Ziccarrelli argues that regardless of whether the challenges regarding the secrecy envelopes are upheld or denied, that they must be treated identically on the basis of equal protection as well as the Free and Fair Elections Clause of the Pennsylvania Constitution. At time of argument, all parties agreed that the provisional ballots which were lacking secrecy envelopes should be treated in the same manner, and that the arbitrary manner in which the decisions were made was inappropriate. It is clear that the Board abused its discretion in treating the identical challenges in a disparate manner violative of the Free and Fair Elections Clause of the Pennsylvania Constitution. It is clear from the administration of free and fair elections comes requires the Board and the Court to treat voters in a consistent and equal manner, and to base their decisions solely on the application of the controlling statutes as they are written along with precedent law.

This Court must then address these essentially identical challenges based on the lack of secrecy envelopes in the two at-issue precincts, considering that all challenges should be either upheld or denied. Pennsylvania law plainly states that "[a] provisional ballot shall not be counted if… a provisional ballot envelope does not contain a secrecy envelope." 25 P.S. §

8

3050(a.4)(5)(ii).  "The word 'shall' carries an imperative or mandatory meaning." *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d 1223, 1231 (Pa. 2004).  In the context of mail-in ballots, the Pennsylvania Supreme Court has recently held that "that the secrecy provision language… is mandatory and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid." *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 380 (Pa. 2020).

A plain reading of the provisional ballot statute makes clear that lack of a secrecy envelope is a fatal defect to the counting of a provisional ballot.  As stated previously, appellate Courts in Pennsylvania have repeatedly reiterated that "[w]hen the words of a statute are clear and free from all ambiguity, it should be interpreted solely from the plain meaning of its words and the letter of the statute is not to be disregarded under the pretext of pursuing its spirit." *In re Septa MVFRL Interest Litig.*, 996 A.2d 1099, 1105 (Pa. Cmwlth. 2010).  The words of the statute in this instance are unambiguous and mandatory; a provisional ballot lacking secrecy envelope shall not be counted.

It is clear that voters at both precincts suffered from confusion and misdirection through no fault of their own.  That is of no moment, however, where the law is explicit that provisional ballots submitted without secrecy envelopes are facially and fatally defective.  This Court is therefore constrained to hold that none of the twelve (12) challenged provisional ballot challenges can be upheld, and so the twelve (12) provisional ballots lacking secrecy envelopes in the Lower Burrell 4th Ward 2nd and Derry Township-Cokeville Precincts cannot be counted.  The decision of the Board with regard to the Lower Burrell ballots must consequently be affirmed, and the decision of the Board with regard to the Derry Township-Cokeville ballots must be reversed.

Accordingly, this Court enters the following Order:

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY,
PENNSYLVANIA

IN RE: 2020 GENERAL ELECTION )
PROVISIONAL BALLOT ) No. 4152 of 2020
CHALLENGES )
)

## ORDER OF COURT

AND NOW, to wit, this 23rd day of November, 2020, consistent with the foregoing

analysis, and after careful consideration, it is hereby ORDERED, ADJUDGED and DECREED

that the *Petition for Review in the Nature of a Statutory Appeal* filed by Nicole Ziccarelli is

GRANTED in accord with the rationale contained in the foregoing opinion, and the decisions of

the Westmoreland County Board of Elections regarding the challenged provisional ballots are

AFFIRMED in part and REVERSED in part as follows:

1.  The Westmoreland County Board of Elections' decision to permit the counting of the two

    hundred and four (204) challenged provisional ballots in which the poll book was also

    signed by the voter and as to which no additional evidence was presented is REVERSED.

2.  The Westmoreland County Board of Elections' decision to permit the counting of the

    forty six (46) challenged provisional ballots in which the poll book was also signed by

    the voter and as to which additional sworn and/or unsworn evidence showing that the

    voter had not voted twice was presented is AFFIRMED.

3.  The Westmoreland County Board of Elections' decision to permit the counting of the

    nine (9) challenged provisional ballots cast in the Derry Township-Cokeville Precinct is

    REVERSED.

11

4.   The Westmoreland County Board of Elections' decision to exclude the three (3) challenged provisional ballots cast in the Lower Burrell 4th Ward 2nd Precinct is AFFIRMED.

5.   The Westmoreland County Elections Bureau is hereby directed not to count or certify the 216 ballots as defined herein.

6.   In accord with Pa.R.C.P. 236(a)(2)(b), the Prothonotary is DIRECTED to note in the docket that the individuals listed below have been given notice of this Order.


BY THE COURT:


Harry F. Small, Jr., Judge

ATTEST:

_____
Prothonotary

cc:   Matthew H. Haverstick, Esq.
      Meilssa Guiddy, Esq.
      Christopher Nichols, Esq.
      James Antoniono, Esq.
      Marco S. Attisano, Esq.

12

# Unreported Opinion 5

*Donald J. Trump for President, Inc. v. Boockvar,* Case No. 2:20-cv-966, ---
F.Supp.3d ----, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020)

2020 WL 5997680
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiffs

v.

Kathy BOOCKVAR, in her capacity
as Secretary of the Commonwealth
of Pennsylvania, et al., Defendants.

No. 2:20-cv-966
|
Signed 10/10/2020

**Synopsis**

**Background:** President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors filed suit against state and county election officials alleging federal and state constitutional violations stemming from Pennsylvania's implementation of mail-in voting plan for upcoming general election and its poll watcher residency requirement. State Democratic Party, advocacy organizations, and their members intervened. Parties filed cross-motions for summary judgment.

**Holdings:** The District Court, J. Nicholas Ranjan, J., held that:

[1] plaintiffs' claims were ripe for adjudication;

[2] any injury that plaintiffs would suffer was too speculative to establish Article III standing;

[3] use of unmanned drop boxes for mail-in ballots by some counties, but not others, did not violate Equal Protection Clause;

[4] use of unmanned drop boxes for mail-in ballots did not violate substantive due process principles;

[5] state law did not impose signature comparison requirement for mail-in and absentee ballots;

[6] state law did not impose signature comparison requirement for applications for mail-in and absentee ballots;

[7] fact that some county boards of elections intended to verify signatures on mail-in and absentee ballots and applications, while others did not, did not violate Equal Protection Clause;

[8] fact that state did not require signature comparison for mail-in and absentee ballots, but did for in-person ballots, did not violate Equal Protection Clause; and

[9] county residency requirement on being poll watcher did not violate plaintiffs' constitutional rights.

Defendants' motion granted.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (55)

**[1]** **Federal Civil Procedure** 🔑 Summary Judgment

**Federal Civil Procedure** 🔑 Burden of proof

Summary judgment stage is essentially "put up or shut up" time for non-moving party, which must rebut motion with facts in record and cannot rest solely on assertions made in pleadings, legal memoranda, or oral argument. Fed. R. Civ. P. 56(a).

**[2]** **Federal Civil Procedure** 🔑 Lack of cause of action or defense

If non-moving party fails to make showing sufficient to establish existence of element essential to that party's case, and on which that party will bear burden at trial, summary judgment is warranted. Fed. R. Civ. P. 56(a).

**[3]** **Federal Civil Procedure** 🔑 By both parties

**Federal Civil Procedure** 🔑 Presumptions

Parties' filing of cross-motions for summary judgment does not constitute agreement that if one is rejected the other is necessarily justified, but court may resolve cross-motions for summary judgment concurrently, viewing evidence in light most favorable to non-moving

party with respect to each motion. Fed. R. Civ. P. 56(a).

---

**[4]**   **Federal Courts** 👉 Nature of dispute; concreteness

Ripeness doctrine seeks to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.

---

**[5]**   **Federal Courts** 👉 Ripeness; Prematurity

**Federal Courts** 👉 Nature of dispute; concreteness

Ripeness inquiry involves various considerations, including whether there is sufficiently adversarial posture, facts are sufficiently developed, and party is genuinely aggrieved.

---

**[6]**   **Federal Courts** 👉 Nature of dispute; concreteness

Ripeness requires case to have taken on fixed and final shape so that court can see what legal issues it is deciding, what effect its decision will have on adversaries, and some useful purpose to be achieved in deciding them.

---

**[7]**   **Federal Courts** 👉 Nature of dispute; concreteness

Dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.

---

**[8]**   **Federal Courts** 👉 Fitness and hardship

Ripeness involves weighing two factors: (1) hardship to parties of withholding court consideration; and (2) fitness of issues for judicial review.

---

**[9]**   **Federal Courts** 👉 Elections, voting, and political rights

Claims by President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors that Pennsylvania's use of drop boxes for mail-in ballots, its guidance not to reject mail-in ballots where voter's signature did not match the one on file, and its poll watcher residency requirement violated their federal constitutional rights were ripe for adjudication; general election was one month away, claims could significantly affect implementation of Pennsylvania's electoral procedures, delay would prevent court from providing meaningful relief, and parties had engaged in extensive discovery, creating sufficient factual record to permit court to adequately address legal issues.

---

**[10]**   **Federal Courts** 👉 Rights and interests at stake

**Federal Courts** 👉 Available and effective relief

Mootness stems from same principle as ripeness, but is stated in inverse: courts lack jurisdiction when issues presented are no longer live or parties lack legally cognizable interest in outcome.

---

**[11]**   **Federal Courts** 👉 Timeliness issues

Mootness is determined at time of court's decision, rather than at time that complaint is filed.

---

**[12]**   **Federal Courts** 👉 Mootness

For purposes of mootness analysis, court may assume that standing exists.

---

**[13]**   **Federal Courts** 👉 Elections, voting, and political rights

Claims by President's reelection campaign, Republican National Committee, and

Republican congressional candidates and electors that Pennsylvania's use of drop boxes for mail-in ballots, its guidance not to reject mail-in ballots where voter's signature did not match signature on file, and its poll watcher residency requirement violated their federal constitutional rights were not rendered moot by primary election, Secretary of the Commonwealth's issuance of new guidance, or Pennsylvania Supreme Court's clarification of Election Code; alleged harms were not solely dependent on already-passed primary election, and state officials indicated their intention to abide by guidelines and to use drop boxes during general election.

**[14]**    **Federal Civil Procedure** 🔑 Governmental bodies and officers thereof

County boards of elections were necessary parties in action by President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors alleging that Pennsylvania's use of drop boxes for mail-in ballots, its guidance not to reject mail-in ballots where voter's signature did not match signature on file, and its poll watcher residency requirement violated their federal constitutional rights; county boards had discretion in certain areas when administering elections, and court could not enjoin county boards if they were not parties. Fed. R. Civ. P. 19(a), 65(d)(2).

**[15]**    **Federal Civil Procedure** 🔑 In general; injury or interest

**Federal Civil Procedure** 🔑 Causation; redressability

**Federal Courts** 🔑 Case or Controversy Requirement

One component of Article III's case-or-controversy requirement is standing, which requires plaintiff to demonstrate (1) injury in fact, (2) causation, and (3) redressability. U.S. Const. art. 3, § 2, cl. 1.

**[16]**    **Constitutional Law** 🔑 Nature and scope in general

Article III standing serves to prevent judicial process from being used to usurp political branches' powers. U.S. Const. art. 3, § 2, cl. 1.

**[17]**    **Constitutional Law** 🔑 Elections

Any injury that President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors would suffer as result of Pennsylvania's allegedly unconstitutional use of drop boxes without manned security personnel for mail-in ballots, its guidance not to perform signature comparison for mail-in ballots, and its poll watcher residency requirement was too speculative to establish Article III standing to raise claims of vote dilution, despite their contention that these alleged deficiencies opened door to potential for massive fraud; no fraud had yet occurred, and possibility of future injury was based on series of speculative events by theoretical bad actors that might never come to pass. U.S. Const. art. 3, § 2, cl. 1.

**[18]**    **Election Law** 🔑 Parties; standing

Plaintiff can have standing to bring vote-dilution claim—typically in malapportionment case—by putting forth statistical evidence and computer simulations of dilution and establishing that he or she is in packed or cracked district.

**[19]**    **Federal Civil Procedure** 🔑 In general; injury or interest

Standing is measured based on theory of harm and specific relief requested.

**[20]**    **Constitutional Law** 🔑 Similarly situated persons; like circumstances

Equal Protection Clause keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike. U.S. Const. Amend. 14, § 1.

**[21]** **Constitutional Law** 🔑 **Rational Basis Standard; Reasonableness**

Unless classification warrants some form of heightened review because it jeopardizes exercise of fundamental right or categorizes on basis of inherently suspect characteristic, Equal Protection Clause requires only that classification rationally further legitimate state interest. U.S. Const. Amend. 14, § 1.

**[22]** **Election Law** 🔑 **Nature and source of right**

Right of every citizen to vote is fundamental right that helps to preserve all other rights.

**[23]** **Election Law** 🔑 **Count of Votes**

**Election Law** 🔑 **Dilution of voting power in general**

Scope of right to vote is broad enough to encompass not only right of each voter to cast ballot, but also right to have those votes counted without dilution as compared to votes of others.

**[24]** **Constitutional Law** 🔑 **Voting rights and suffrage in general**

**Constitutional Law** 🔑 **Elections, Voting, and Political Rights**

**Constitutional Law** 🔑 **Equality of Voting Power (One Person, One Vote)**

State election procedure that burdens right to vote, including by diluting value of votes compared to others, must comport with equal protection and all other constitutional requirements. U.S. Const. Amend. 14, § 1.

**[25]** **Election Law** 🔑 **State legislatures**

**United States** 🔑 **Relation to state law; preemption**

Constitution confers on states broad authority to regulate conduct of elections, including federal ones, including broad powers to determine conditions under which right of suffrage may be exercised. U.S. Const. art. 1, § 4, cl. 1.

**[26]** **Election Law** 🔑 **Constitutionality and validity**

**Election Law** 🔑 **Power to Restrict or Extend Suffrage**

Fact that law or state action imposes some burden on right to vote does not make it subject to strict scrutiny; instead, any law respecting right to vote—whether it governs voter qualifications, candidate selection, or voting process—is subjected to deferential important regulatory interests standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict right to vote.

**[27]** **Election Law** 🔑 **Constitutionality and validity**

**Election Law** 🔑 **Power to Restrict or Extend Suffrage**

In determining whether state law or action imposes undue burden on right to vote, courts must weigh character and magnitude of burden that state's rule imposes on right to vote against interests that state contends justify that burden, and consider extent to which state's concerns make that burden necessary.

**[28]** **Election Law** 🔑 **Constitutionality and validity**

**Election Law** 🔑 **Power to Restrict or Extend Suffrage**

If state imposes severe burden on right to vote, strict scrutiny applies, and rule may survive only if it is narrowly tailored and only if state advances compelling interest.

**[29]** **Election Law** 🔑 **Power to Restrict or Extend Suffrage**

If state imposes only reasonable, nondiscriminatory restrictions on right to vote,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   4

its important regulatory interests will usually be enough to justify it.

**[30]    Constitutional Law** 🔑 Equality of Voting Power (One Person, One Vote)

**Election Law** 🔑 Voting procedures

Pennsylvania's use of unmanned drop boxes for mail-in ballots by some counties, but not others, did not result in differential treatment as between counties, and thus did not violate Equal Protection Clause, even though state permitted counties to use drop boxes to varying extents and with varying degrees of security; any dilutive impact resulting from illegal voting in counties using drop boxes would be felt equally by voters in all counties. U.S. Const. Amend. 14, § 1.

**[31]    Constitutional Law** 🔑 Perfect, exact, or complete equality or uniformity

Equal protection does not demand imposition of mechanical compartments of law all exactly alike; rather, Constitution is sufficiently flexible to permit its requirements to be considered in relation to contexts in which they are invoked. U.S. Const. Amend. 14, § 1.

**[32]    Constitutional Law** 🔑 Absentee ballots

**Election Law** 🔑 Voting procedures

For equal protection purposes, possible risk of vote dilution resulting from Pennsylvania's use of unmanned drop boxes for mail-in ballots in some counties, but not in others, was justified by important state interests in increasing voter turnout, protecting voters' health in midst of ongoing pandemic, increasing voter satisfaction, and reducing costs for counties, despite possibility of voter fraud; potential for fraud was speculative, state provided lawful, comprehensive, and reasonable standards regarding location, design, signage, security, and collection, providing security guards would impose financial burden on cash-strapped counties, there were no equivalent security measures present at United States postal mailboxes, and state chose to tolerate risks

inherent in "no excuse" mail-in voting scheme. U.S. Const. Amend. 14, § 1.

**[33]    Election Law** 🔑 Power to Confer and Regulate

**Election Law** 🔑 Scope of Inquiry and Powers of Court or Board

Constitution does not authorize federal courts to be state election monitors. U.S. Const. art. 1, § 4, cl. 1.

**[34]    Election Law** 🔑 Effect of Irregularities or Defects

Garden variety election irregularities, let alone risk of such irregularities, are not matter of federal constitutional concern even if they control outcome of vote or election.

**[35]    Election Law** 🔑 Power to Regulate Conduct

It is job of democratically-elected representatives to weigh pros and cons of various balloting systems, and so long as their choice is reasonable and neutral, it is free from judicial second-guessing.

**[36]    Constitutional Law** 🔑 Voters, candidates, and elections

**Election Law** 🔑 Voting procedures

Pennsylvania's use of unmanned drop boxes for mail-in ballots did not work patent and fundamental unfairness, in violation of substantive due process principles, despite possible risk of vote dilution; any burden on right to vote was slight, and state took host of other fraud-prevention measures. U.S. Const. Amend. 14, § 1.

**[37]    Election Law** 🔑 Identification of voter

**Election Law** 🔑 Review of absentee ballots

Under Pennsylvania law, Election Code provision requiring county election boards to verify proof of identification did not impose

signature comparison requirement for mail-in and absentee ballots; word "signature" was absent from provision, Code defined "proof of identification" as mail-in/absentee voter's driver's license number, last four digits of their Social Security number, or specifically approved form of identification, and Code expressly referred to signature comparisons for in-person voting, but not for mail-in and absentee ballots. 25 Pa. Stat. Ann. §§ 2602(z.5)(3)(i)-(iv), 3146.8(g)(3).

1 Cases that cite this headnote

**[38]**    **Election Law**   Liberal or strict construction

Under Pennsylvania law, although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of right to vote.

**[39]**    **Election Law**   Application and delivery

Under Pennsylvania law, Election Code provision requiring applications for mail-in and absentee ballots to be signed did not impose signature-comparison requirement for such applications; Code expressly required applicant to include several pieces of identifying information, including their name, mailing address, and date of birth, and required election official to verify proof of identification and to compare it with information contained on applicant's permanent registration card, but did not mention signature verification. 25 Pa. Stat. Ann. §§ 3146.2(d), 3150.12(c).

**[40]**    **Constitutional Law**   Voters, candidates, and elections

**Election Law**   Application and delivery

**Election Law**   Identification of voter

Pennsylvania's failure to require signature comparison for mail-in and absentee ballots or ballot applications did not violate substantive due process principles, despite possibility that mail-in and absentee ballots would be prone to

fraud, thereby diluting other lawful ballots; there was no evidence of actual fraud resulting from failure to verify signatures. U.S. Const. Amend. 14, § 1.

1 Cases that cite this headnote

**[41]**    **Constitutional Law**   Absentee ballots

**Election Law**   Review of absentee ballots

Fact that some county boards of elections in Pennsylvania intended to verify signatures on mail-in and absentee ballots and applications, while others did not, did not violate Equal Protection Clause; Secretary of the Commonwealth's guidance instructing county boards not to verify signatures was uniform and nondiscriminatory, and boards that verified signatures did so without support from Secretary or Election Code. U.S. Const. Amend. 14, § 1.

**[42]**    **Constitutional Law**   Absentee ballots

**Election Law**   Identification of voter

Fact that Pennsylvania Election Code did not require signature comparison for mail-in and absentee ballots, but did for in-person ballots, did not violate Equal Protection Clause; signature comparison was only required verification for in-person voters, whereas there were several verification steps implemented before mail-in or absentee ballot could be counted, and in-person voter would be notified of his or her signature deficiency and afforded opportunity to cure, but absentee and mail-in ballots could not be verified until Election Day, thus precluding opportunity to cure. U.S. Const. Amend. 14, § 1; 25 Pa. Stat. Ann. §§ 3050(a.3)(2), 3146.8(g)(3).

2 Cases that cite this headnote

**[43]**    **Election Law**   Mode of voting

States may employ in-person voting, absentee voting, and mail-in voting, and each method need not be implemented in exactly same way.

**[44]    Election Law**  ⬥  Identification of voter

Pennsylvania Election Code's signature comparison requirement for mail-in and absentee ballots, but not for in-person ballots, did not impose undue burden on in-person voters' right to vote, even if failure to engage in signature comparison might increase risk of voter fraud; evidence of voter fraud was largely speculative, Code imposed detailed verification procedure as to information on mail-in ballots, and state imposed criminal penalties for voter fraud.

**[45]    Federal Courts**  ⬥  Pullman abstention

Under  *England, 84 S.Ct. 461*, doctrine, after federal court has abstained under *Pullman*, if party freely and without reservation submits his federal claims for decision by state courts, litigates them there, and has them decided there, then he has elected to forgo his right to return to district court.

**[46]    Federal Courts**  ⬥  Pullman abstention

To reserve its right to litigate federal claims in federal court, plaintiff forced into state court by way of *Pullman* abstention must inform state court that it is exposing federal claims there only to provide proper context for considering the state law questions, and that it intends, should state court hold against it on question of state law, to return to district court for disposition of its federal contentions.

**[47]    Federal Courts**  ⬥  Elections, Voting, and Political Rights

Failure of President's reelection campaign, Republican National Committee, and Republican congressional candidates, as intervenors or amici in state court action, to reserve right to relitigate in federal court claim that Pennsylvania's county residency requirement for poll watchers violated their constitutional rights as applied did not bar their

claim in federal court pursuant to  *England, 84 S.Ct. 461*, doctrine; none of their poll-watching claims directly asked court to construe ambiguous state statute, they were not parties in state court case, and they were not given opportunity to develop record or present evidence relevant to claim.

**[48]    Constitutional Law**  ⬥  Elections, Voting, and Political Rights

Where right to vote is not burdened by state's regulation on election process, state need only provide rational basis for statute to survive equal protection challenge. U.S. Const. Amend. 14, § 1.

**[49]    Constitutional Law**  ⬥  Elections in general
**Constitutional Law**  ⬥  Polling places
**Constitutional Law**  ⬥  Conduct of Elections

Pennsylvania statute imposing county residency requirement on being poll watcher did not impose burden on any fundamental right or discriminate on based suspect classification, and thus rational basis test applied in determining whether requirement violated equal protection, free speech, or association rights as applied. U.S. Const. Amends. 1, 14; 25 Pa. Stat. Ann. § 2687.

**[50]    Constitutional Law**  ⬥  Elections in general

There is no individual right to serve as poll watcher protected by First Amendment. U.S. Const. Amend. 1.

1 Cases that cite this headnote

**[51]    Constitutional Law**  ⬥  Voting and political rights

Political parties are not suspect class for purposes of equal protection analysis. U.S. Const. Amend. 14, § 1.

**[52]** **Constitutional Law** ⬌ Elections in general

**Constitutional Law** ⬌ Polling places

**Constitutional Law** ⬌ Elections, Voting, and Political Rights

**Election Law** ⬌ Presence of representatives of candidates or parties

Pennsylvania statute imposing county residency requirement on being poll watcher did not violate major political party's and Presidential campaign's equal protection, free speech, or association rights as applied, despite their contention that requirement might make it more difficult to recruit poll watchers, and result in election irregularities; they did not identify any counties where they actually tried and failed to recruit poll watcher because of residency requirement or pandemic, there were significant numbers of party members in all counties, and residency requirement ensured that poll watchers would have some degree of familiarity with voters they were observing in given election district, resulting in increased trust in government, faith in elections, and voter turnout.

U.S. Const. Amends. 1, 14; 📗 25 Pa. Stat. Ann. § 2687.

1 Cases that cite this headnote

**[53]** **Federal Civil Procedure** ⬌ Rights of third parties or public

Ordinarily, litigant must assert his or her own legal rights and interests and cannot rest claim of relief on legal rights or interests of third parties.

**[54]** **Federal Civil Procedure** ⬌ Rights of third parties or public

Only time that litigant can bring action on third party's behalf is when: (1) litigant suffered injury in fact, thus giving him or her sufficiently concrete interest in outcome of issue in dispute; (2) litigant has close relation to third party; and (3) there is some hindrance to third party's ability to protect his or her own interest.

**[55]** **Federal Courts** ⬌ Effect of dismissal or other elimination of federal claims

District court must decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction unless considerations of judicial economy, convenience, and fairness to parties provide affirmative justification for exercising supplemental jurisdiction. 📗 28 U.S.C.A. § 1367(c)(3).

**Attorneys and Law Firms**

Ronald L. Hicks, Jr., Carolyn Batz McGee, Jeremy A. Mercer, Russell D. Giancola, Devin A. Winklosky, Porter Wright Morris & Arthur LLP, Pittsburgh, PA, Justin R. Clark, Pro Hac Vice, Matthew Earl Morgan, Pro Hac Vice, Elections LLC, Washington, DC, for Plaintiffs.

Daniel T. Donovan, Pro Hac Vice, Caroline Darmody, Pro Hac Vice, Kristen Leigh Bokhan, Michael Glick, Pro Hac Vice, Susan Marie Davies, Pro Hac Vice, Kirkland & Ellis LLP, Washington, DC, Howard G. Hopkirk, Karen Mascio Romano, Keli Marie Neary, Pro Hac Vice, Nicole Boland, Pro Hac Vice, Stephen Moniak, Pennsylvania Office of Attorney General, Kathleen M. Kotula, Kenneth L. Joel, M. Abbegael Giunta, Governor's Office of General Counsel, Timothy Gates, Pennsylvania Department of State Office of Chief Counsel, Harrisburg, PA, Daniel T. Brier, Donna A. Walsh, John B. Dempsey, Nicholas F. Kravitz, Pro Hac Vice, Myers, Brier & Kelly, LLP, Scranton, PA, Jaywin Singh Malhi, Pro Hac Vice, Madelyn Morris, Sara S. Tatum, Kirkland & Ellis LLP, New York, NY, for Defendant Kathy Boockvar.

Molly R. Mudd, Pro Hac Vice, County of Adams, Gettysburg, PA, for Defendant Adams County Board of Elections.

Andrew F. Szefi, Allan J. Opsitnick, George M. Janocsko, Allegheny County Law Department, Pittsburgh, PA, for Defendant Allegheny County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendants Armstrong County Board of Elections, Bedford County Board of Elections, Centre

County Board of Elections, Columbia County Board of Elections, Fayette County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lebanon County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections.

Nathan A. Morgan, Beaver, PA, for Defendant Beaver County Board of Elections.

Christine D. Steere, Deasey, Mahoney & Valentini, Ltd., Media, PA, for Defendant Berks County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Nathan W. Karn, Evey Black Attorneys LLC, Hollidaysburg, PA, for Defendant Blair County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Peter V. Keays, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Joseph J. Khan, County of Bucks, Doylestown, PA, for Defendant Bucks County Board of Elections.

William Gleason Barbin, Cambria County Solicitor's Office, Ebensburg, PA, for Defendant Cambria County Board of Elections.

Gerard Joseph Geiger, Pro Hac Vice, Newman Williams, Stroudsburg, PA, for Defendant Carbon County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, for Defendant Chester County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, for Defendant Clarion County Board of Elections.

Frank A. Blum, III, Jefferson Hills, PA, for Defendant Clearfield County Board of Elections.

Keith A. Button, Shafer Law Firm, Meadville, PA, for Defendant Crawford County Board of Elections.

Keith O. Brenneman, Law Office of Keith O. Brenneman, P.C., Mechanicsburg, PA, for Defendant Cumberland County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Joseph A. Curcillo, III, Dauphin County, Harrisburg, PA, for Defendant Dauphin County Board of Elections.

Edward D. Rogers, Pro Hac Vice, Elizabeth Wingfield, Pro Hac Vice, Kahlil Williams, Pro Hac Vice, David S. Fryman, Ballard, Spahr, Andrews & Ingersoll, Terence Grugan, Pro Hac Vice, Ballard Spahr, Philadelphia, PA, for Defendant Delaware County Board of Elections.

Thomas S. Talarico, Talarico & Niebauer, Erie, PA, for Defendant Erie County Board of Elections.

Andrew W. Norfleet, Frank J. Lavery, Jr., Stephen B. Edwards, Lavery Law, Harrisburg, PA, for Defendants Franklin County Board of Elections, Perry County Board of Elections.

Robert Eugene Grimm, Robert Eugene Grimm Attorney, Smithfield, PA, for Defendant Greene County Board of Elections.

Peter M. McManamon, Pro Hac Vice, Gill, McManamon & Ghaner, Huntingdon, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Huntingdon County Board of Elections.

C.J. Zwick, Zwick & Zwick LLP, DuBois, PA, Gregory D. Sobol, Brookville, PA, for Defendant Jefferson County Board of Elections.

Donald Zagurskie, Pro Hac Vice, Johnston & Zagurskie, PC, Mifflin, PA, for Defendant Juniata County Board of Elections.

Christina L. Hausner, Pro Hac Vice, County of Lancaster, Lancaster, PA, for Defendant Lancaster County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Thomas W. Leslie, New Castle, PA, Elizabeth

2020 WL 5997680

A. Dupuis, Babst Calland, State College, PA, for Defendant Lawrence County Board of Elections.

Thomas M. Caffrey, Pro Hac Vice, PO BOX A, Coplay, PA, Sarah Mae Murray, Pro Hac Vice, County of Lehigh, Allentown, PA, for Defendant Lehigh County Board of Elections.

Lawrence J. Moran, Jr., Matthew J. Carmody, Joyce, Carmody & Moran, P.C., Regina M. Blewitt, Joyce Carmody Moran, Pittston, PA, for Defendant Luzerne County Board of Elections.

Joseph D. Smith, McCormick Law Firm, Williamsport, PA, for Defendant Lycoming County Board of Elections.

Anthony V. Clarke, The Clarke Firm, Bradford, PA, for Defendant Mckean County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, William J. Madden, Solicitor, Mercer County, Sharon, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Mercer County Board of Elections.

Gerard Joseph Geiger, Newman Williams, Stroudsburg, PA, for Defendants Monroe County Board of Elections, Pike County Board of Elections, Schuylkill County Board of Elections, Snyder County Board of Elections, Wayne County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Maureen Calder, Pro Hac Vice, Montgomery County Solicitor's Office, Norristown, PA, for Defendant Montgomery County Board of Elections.

Brian Taylor, Pro Hac Vice, Richard E. Santee, Pro Hac Vice, County of Northampton, Easton, PA, Timothy P. Brennan, Pro Hac Vice, County of Northampton, PA, PA, for Defendant Northampton County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Zachary Strassburger, City of Philadelphia Law Department, Philadelphia, PA, for Defendant Philadelphia County Board of Elections.

Thomas R. Shaffer, Glassmire & Shaffer Law Offices, Coudersport, PA, for Defendant Potter County Board of Elections.

Michael P. Barbera, Barbera, Melvin, Svonavec & Sperlazza LLP, Somerset, PA, for Defendant Somerset County Board of Elections.

Kenneth R. Levitzky, Kenneth R. Levitzky, Esquire, Dushore, PA, for Defendants Sullivan County Board of Elections, Wyoming County Board of Elections.

Robert Gawlas, Robert Schaub, Rosenn Jenkins & Greenwald LLP, Wilkes-Barre, PA, for Defendant Susquehanna County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, Raymond E. Ginn, Jr., Pro Hac Vice, Ginn & Vickery, P.C., Wellsboro, PA, for Defendant Tioga County Board of Elections.

Steven B. Silverman, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Allen P. Page, McNerney, Page, Vanderlin & Hall, Williamsport, PA, for Defendant Union County Board of Elections.

Nathaniel Justus Schmidt, Schmidt Law Firm, Warren, PA, for Defendant Warren County Board of Elections.

Robert J. Grimm, Swartz Campbell, Ryan Michael Joyce, Swartz Campbell, LLC, Pittsburgh, PA, for Defendant Washington County Board of Elections.

David A. Regoli, New Kensington, PA, for Defendant Westmoreland County Board of Elections.

Michelle Pokrifka, Pro Hac Vice, York County Solicitor's Office, York, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant York County Board of Elections.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Pro Hac Vice, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 10

Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant NAACP Pennsylvania State Conference.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant Common Cause Pennsylvania.

Adriel I. Cepeda Derieux, Dale E. Ho, Sophia Lin Lakin, American Civil Liberties Union Foundation, Christopher R. Noyes, Eleanor Davis, Jared Vasconcellos Grubow, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Boston, MA, Samantha Picans, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendants League of Women Voters of Pennsylvania, Patricia Demarco, Danielle Graham Robinson, Kathleen Wise.

## OPINION

J. Nicholas Ranjan, United States District Judge

*1 Plaintiffs in this case are President Trump's reelection campaign, the Republican National Committee, and several other Republican congressional candidates and electors. They originally filed this suit, alleging federal and state constitutional violations stemming from Pennsylvania's

implementation of a mail-in voting plan for the upcoming general election.

Since then, the Pennsylvania Supreme Court issued a decision involving similar claims, which substantially narrowed the focus of this case. And Secretary of the Commonwealth, Kathy Boockvar, issued additional election "guidance," which further narrowed certain of the claims.

Therefore, as this case presently stands, only three claims remain. First, whether the use of so-called "drop boxes" [1] for mail-in ballots is unconstitutional, given the lack of guidance or mandates that those drop boxes have security guards to man them. Second, whether the Secretary's guidance as to mail-in ballots—specifically, her guidance that county election boards should not reject mail-in ballots where the voter's signature does not match the one on file—is unconstitutional. Third, whether Pennsylvania's restriction that poll watchers be residents in the county for which they are assigned, as applied to the facts of this case, is unconstitutional.

In order to present these claims to the Court on a complete record, the parties engaged in extensive fact and expert discovery, and have filed cross-motions for summary judgment. No party has raised a genuine dispute of material fact that would require a trial, and the Court has found none. As such, the parties' cross-motions for summary judgment are ready for disposition.

After a careful review of the parties' submissions and the extensive evidentiary record, the Court will enter judgment in favor of Defendants on all of Plaintiffs' federal-constitutional claims, decline to exercise supplemental jurisdiction over the state-constitutional claims, and dismiss this case. This is so for two main reasons.

First, the Court concludes that Plaintiffs lack Article III standing to pursue their claims. Standing, of course, is a necessary requirement to cross the threshold into federal court. Federal courts adjudicate cases and controversies, where a plaintiff's injury is concrete and particularized. Here, however, Plaintiffs have not presented a concrete injury to warrant federal-court review. All of Plaintiffs' remaining claims have the same theory of injury—one of "vote dilution." Plaintiffs fear that absent implementation of the security measures that they seek (guards by drop boxes, signature comparison of mail-in ballots, and poll watchers), there is a risk of voter fraud by other voters. If another person engages

in voter fraud, Plaintiffs assert that their own lawfully cast vote will, by comparison, count for less, or be diluted.

**\*2** The problem with this theory of harm is that it is speculative, and thus Plaintiffs' injury is not "concrete"—a critical element to have standing in federal court. While Plaintiffs may not need to prove actual voter fraud, they must at least prove that such fraud is "certainly impending." They haven't met that burden. At most, they have pieced together a sequence of uncertain assumptions: (1) they assume potential fraudsters may attempt to commit election fraud through the use of drop boxes or forged ballots, or due to a potential shortage of poll watchers; (2) they assume the numerous election-security measures used by county election officials may not work; and (3) they assume their own security measures may have prevented that fraud.

All of these assumptions could end up being true, and these events could theoretically happen. But so could many things. The relevant question here is: are they "certainly impending"? At least based on the evidence presented, the answer to that is "no." And that is the legal standard that Plaintiffs must meet. As the Supreme Court has held, this Court cannot "endorse standing theories that rest on speculation about the decisions of independent actors." *See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013).*

Second, even if Plaintiffs had standing, their claims fail on the merits. Plaintiffs essentially ask this Court to second-guess the judgment of the Pennsylvania General Assembly and election officials, who are experts in creating and implementing an election plan. Perhaps Plaintiffs are right that guards should be placed near drop boxes, signature-analysis experts should examine every mail-in ballot, poll watchers should be able to man any poll regardless of location, and other security improvements should be made. But the job of an unelected federal judge isn't to suggest election improvements, especially when those improvements contradict the reasoned judgment of democratically elected officials. *See Andino v. Middleton, --- U.S. ----, ---- S.Ct. ----, ----, ---- L.Ed.2d ----, 2020 WL 5887393, at \*1 (Oct. 5, 2020)* (Kavanaugh, J. concurring) (state legislatures should not be subject to "second-guessing by an unelected federal judiciary," which is "not accountable to the people") (cleaned up).

Put differently, "[f]ederal judges can have a lot of power—especially when issuing injunctions. And sometimes we may even have a good idea or two. But the Constitution sets out our sphere of decision-making, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Georgia Project v. Raffensperger, --- F.3d ----, ----, 2020 WL 5877588, at \*4 (11th Cir. Oct. 2, 2020).*

As discussed below, the Court finds that the election regulations put in place by the General Assembly and implemented by Defendants do not significantly burden any right to vote. They are rational. They further important state interests. They align with the Commonwealth's elaborate election-security measures. They do not run afoul of the United States Constitution. They will not otherwise be second-guessed by this Court.

## BACKGROUND

### I. Procedural Background

#### A. Plaintiffs' original claims.

On June 29, 2020, Plaintiffs filed their original complaint in this case against Defendants, who are the Secretary of the Commonwealth and the 67 county boards of elections. [ECF 4]. With their lawsuit, Plaintiffs challenged a number of Pennsylvania's procedures with respect to mail-in voting—in particular, the use of drop boxes and the counting of mail-in ballots that contained certain procedural defects. *See [id.].* Shortly after filing their original complaint, Plaintiffs moved for expedited discovery and an expedited declaratory-judgment hearing. [ECF 6]. Defendants opposed the motion. The Court partially granted the motion, scheduled a speedy hearing, and ordered expedited discovery before that hearing. [ECF 123; ECF 124].

**\*3** After Plaintiffs filed the original complaint, many non-parties sought to intervene in the action, including several organizations.[2] The Court granted all intervention motions. [ECF 309].

Defendants and Intervenors moved to dismiss the original complaint. In response, Plaintiffs filed an amended complaint. [ECF 234]. The amended complaint maintained the gist of the original, but added two new counts and made a variety of other drafting changes. *See* [ECF 242]. Defendants and Intervenors moved to dismiss the first amended complaint, too, primarily asking the Court to abstain and stay the case.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiffs' first amended complaint asserted nine separate counts, but they could be sorted into three overarching categories.

### 1. Claims alleging vote dilution due to unlawful ballot collection and counting procedures.

The first category covered claims related to allegedly unlawful procedures implemented by some Defendants for the collection and counting of mail-in and absentee ballots. Those included claims related to (1) Defendants' uneven use of drop boxes and other satellite ballot-collection sites, (2) procedures for verifying the qualifications of voters applying in person for mail-in or absentee ballots, and (3) rules for counting non-compliant ballots (such as ballots submitted without a secrecy envelope, without an elector declaration, or that contained stray marks on the envelope).

In Count I, Plaintiffs alleged violations of the Elections Clause and the related Presidential Electors Clause of the U.S. Constitution. [ECF 234, ¶¶ 193-205]. Plaintiffs asserted that, under these provisions, only the state legislature may set the time, place, and manner of congressional elections and determine how the state chooses electors for the presidency. [*Id.* at ¶ 196].

In support of this claim, Plaintiffs alleged that Secretary Boockvar's guidance concerning the use of mail-in ballot drop boxes, whether county boards of elections must independently verify mail-in ballot applications, and the counting of non-compliant mail-in ballots, was an executive overreach—in that the Secretary's guidance allegedly violated certain provisions of the Election Code enacted by the Pennsylvania General Assembly. [*Id.* at ¶ 201]. Plaintiffs also claimed that the Secretary's "unlawful guidance" increased the risk of fraudulent or unlawful voting and infringed on the right to vote, which, they said, amounted to additional violations of the 1st and 14th Amendments to the U.S. Constitution. [*Id.* at ¶ 202-03].

In Count II, Plaintiffs alleged a violation of the Equal-Protection Clause under the 14th Amendment. [*Id.* at ¶¶ 206-15]. Plaintiffs asserted that the implementation of the foregoing (*i.e.*, mail-in ballot drop boxes, the verification of mail-in ballot applications, and the counting of non-compliant ballots) was different in different counties, thereby treating voters across the state in an unequal fashion. [*Id.* at ¶¶ 211-13].

**\*4** In Count III, Plaintiffs asserted a violation of the Pennsylvania State Constitution. [*Id.* at ¶¶ 216-22]. Plaintiffs alleged that the same actions and conduct that comprised Counts I and II also violated similar provisions of the Pennsylvania Constitution. [*Id.* at ¶ 220].

Finally, in Counts VI and VII, Plaintiffs alleged that Defendants violated provisions of the federal and state constitutions by disregarding the Election Code's notice and selection requirements applicable to "polling places." [*Id.* at ¶¶ 237-52]. Plaintiffs alleged that drop boxes are "polling places," and thus subject to certain criteria for site selection and the requirement that county election boards provide 20 days' public notice. [*Id.* at ¶¶ 239-42]. Plaintiffs asserted that Defendants' failure to provide this notice or select appropriate "polling places" in the primary election, if repeated in the general election, would create the risk of voter fraud and vote dilution. [*Id.* at ¶¶ 243-246].

### 2. Poll-watcher claims.

The second category of claims in the first amended complaint consisted of challenges to the constitutionality of Election-Code provisions related to poll watchers.

In Count IV, Plaintiffs alleged violations of the 1st and 14th Amendments. These claims had both a facial and an as-applied component. [ECF 234, ¶ 230 ("On its face and as applied to the 2020 General Election ...") ].

First, Plaintiffs alleged that 25 P.S. § 2687 was facially unconstitutional because it "arbitrarily and unreasonably" limits poll watchers to serving only in their county of residence and to monitoring only in-person voting at the polling place on election day. [*Id.* at ¶ 226]. Second, Plaintiffs alleged that the same provision was unconstitutional as applied in the context of Pennsylvania's new vote-by-mail system, because these poll-watcher restrictions, combined with insecure voting procedures, create unacceptable risks of fraud and vote dilution. [*Id.* at ¶ 228]. Plaintiffs contended that these limitations make it "functionally impracticable" for candidates to ensure that they have poll watchers present where ballots are deposited and collected, given the widespread use of remote drop boxes and other satellite collection sites. [*Id.*].

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Count V was the same as Count IV, but alleged that the same poll-watching restrictions violated the Pennsylvania Constitution, too. [*Id.* at ¶ 234].

### 3. In-person voting claims.

The third category of claims consisted of challenges to the procedures for allowing electors to vote in person after requesting a mail-in ballot.

That is, in Counts VIII and IX, Plaintiffs asserted that the Election Code permits an elector that has requested a mail-in ballot to still vote in person so long as he remits his spoiled ballot. [ECF 234, ¶¶ 253-267]. Plaintiffs asserted than during the primary, some counties allowed such electors to vote in person, while others did not, and they fear the same will happen in the general election. [*Id.* at ¶¶ 255, 259]. Plaintiffs also asserted that some counties allowed electors who had voted by mail to vote in person, in violation of the Election Code. [*Id.* at ¶¶ 257-58]. Plaintiffs alleged that this conduct also violates the federal and state constitutional provisions concerning the right to vote and equal protection. [*Id.* at ¶¶ 261, 265].

### B. The Court's decision to abstain.

**\*5** Upon consideration of Defendants' and Intervenors' motions to dismiss the first amended complaint, on August 23, 2020, the Court issued an opinion abstaining under *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and temporarily staying the case. [ECF 409, 410].

In doing so, the Court determined that the three requisite prongs for *Pullman* abstention were met, and that the discretionary considerations weighed in favor of abstention. [ECF 409, p. 3 ("[Under *Pullman*, federal courts abstain] if (1) doing so requires interpretation of 'unsettled questions of state law'; (2) permitting resolution of the unsettled state-law questions by state courts would 'obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims'; and (3) an 'erroneous construction of state law would be disruptive of important state policies[.]' " (citing *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 631 (3d Cir. 1991))); *id.* at p. 30 (explaining that after the three prongs of *Pullman* abstention are

met, the court must "make a discretionary determination of whether abstention is appropriate given the particular facts of this case," which requires weighing "such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." (cleaned up)) ].

The Court found that abstaining under *Pullman* was appropriate because of several unresolved ambiguities in Pennsylvania's Election Code. Specifically, the Court found that there were significant ambiguities as to whether the Election Code (1) permitted delivery of ballots to locations other than the county election board's headquarters, such as drop boxes, (2) permitted counties to count ballots that were not placed within the "secrecy envelope" (*i.e.*, "naked ballots"), (3) considered drop boxes and other ballot-collection sites as "polling places," as defined in the Election Code, and (4) required counties to automatically verify ballot applications for mail-in ballots (where the person applied for the ballot in person), even if there was no "bona fide objection" to the application. [ECF 409, pp. 17-23].

The Court explained that each of these ambiguities, if settled, would significantly narrow—or even resolve—some of Plaintiffs' claims. As the Court explained, for example, if a state court interpreted the Election Code to disallow drop boxes, Plaintiffs would obtain their requested relief (*i.e.*, no drop boxes); alternatively, if drop boxes were authorized by the Election Code, then Plaintiffs' allegations that drop boxes were illegal would be eliminated, which would, in turn, significantly affect the constitutional analysis of Plaintiffs' claims. [*Id.* at pp. 25-28]. The same held true for "naked ballots," the breadth of coverage of "polling places," and the requisite verification for personal ballot applications.

The Court then explained that it was appropriate for it to abstain until a state court could interpret the ambiguous state law. [*Id.* at pp. 28-30]. The Court concluded that if it interpreted the ambiguous state law, there was a sufficient chance that a state court could disagree with the interpretation, which would render this Court's interpretation not only advisory, but disruptive to state policies. The Court noted that especially in the election context, states have considerable discretion to implement their own policies without federal intervention. Accordingly, because these were questions of uninterpreted state law that were sufficiently ambiguous, federalism and comity demanded that a state court, not this Court, be the first interpreter.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-01831-NR  Document 55-1  Filed 12/30/20  Page 100 of 249
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

**\*6** Finally, the Court explained that, despite the imminence of the election, abstention was still proper. [*Id.* at pp. 30-33]. The Court noted that state-court litigation was already pending that would resolve some of the statutory ambiguities at issue. [*Id.* at p. 31]. Further, the Court highlighted three courses Plaintiffs could immediately take to resolve the statutory ambiguities: intervene in the pending state-court litigation; file their own state-court case; or appeal this Court's abstention decision to the Third Circuit, and then seek certification of the unsettled state-law issues in the Pennsylvania Supreme Court. [*Id.* at pp. 31-33].

Additionally, the Court explained that it would stay the entire case, despite several of Plaintiffs' claims not being subject to *Pullman* abstention as they were not based on ambiguous state law. [*Id.* at pp. 34-37]. That's because, in its discretion, the Court determined it would be more efficient for this case to progress as a single proceeding, rather than in piecemeal fashion. [*Id.*]. However, the Court allowed any party to move to lift the stay as to the few claims not subject to *Pullman* abstention, if no state-court decision had been issued by October 5, 2020. [*Id.*].

On August 28, 2020, five days after the Court abstained, Plaintiffs moved to modify the Court's stay, and moved for a preliminary injunction. [ECF 414]. Plaintiffs requested, among other things, that the Court order Defendants to segregate, and not pre-canvass or canvass, all ballots that were returned in drop boxes, lacked a secrecy envelope, or were delivered by a third party. [*Id.*]. Plaintiffs also requested that the Court lift the stay by September 14, 2020, instead of October 5, 2020. [*Id.*].

The Court denied Plaintiffs' motion for preliminary injunctive relief, finding that Plaintiffs failed to show they would be irreparably harmed. [ECF 444; ECF 445]. The Court also declined to move up the date when the stay would be lifted. [*Id.*]. The Court noted that, at the request of Secretary Boockvar, the Pennsylvania Supreme Court had already exercised its extraordinary jurisdiction to consider five discrete issues and clarify Pennsylvania law in time for the general election. [*Id.* at p. 1]. Since that case appeared to be on track, the Court denied Plaintiffs' motion without prejudice, and the Court's abstention opinion and order remained in effect.

### C. The Pennsylvania Supreme Court's decision.

On September 17, 2020, the Pennsylvania Supreme Court issued its decision in *Pennsylvania Democratic Party v. Boockvar*, ––– Pa. ––––, ––– A.3d ––––, 2020 WL 5554644 (Sept. 17, 2020). The court clarified three issues of state election law that are directly relevant to this case.

### 1. Counties are permitted under the Election Code to establish alternate ballot-collection sites beyond just their main county office locations.

The Pennsylvania Supreme Court first considered whether the Election Code allowed a Pennsylvania voter to deliver his or her mail-in ballot in person to a location other than the established office address of the county's board of election. *Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at \*8. The court further considered the means by which county boards of election could accept hand-delivered mail-in ballots. *Id.*

Consistent with this Court's abstention opinion, the court found that "the parties' competing interpretations of the Election Code on [these questions] are reasonable, rendering the Code ambiguous" on these questions. *Id.* After applying traditional principles of statutory interpretation, the court held that "the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." *Id.* at––––, 2020 WL 5554644, at \*9. The court reached this conclusion due to "the clear legislative intent underlying Act 77 ... to provide electors with options to vote outside of traditional polling places." *Id.*

**\*7** The respondents in that case further argued that this interpretation would cause county boards of election to "employ myriad systems to accept hand-delivered mail-in ballots," which would "be unconstitutionally disparate from one another in so much as some systems will offer more legal protections to voters than others will provide" and violate the Equal-Protection Clause *Id.* The court rejected this argument. It found that "the exact manner in which each county board of election will accept these votes is entirely unknown at this point; thus, we have no metric by which to measure whether any one system offers more legal protection than another, making an equal protection analysis impossible at this time." *Id.*

### 2. Ballots lacking inner secrecy envelopes should not be counted.

The court next considered whether the boards of elections "must 'clothe and count naked ballots,' *i.e.*, place ballots that were returned without the secrecy envelope into a proper envelope and count them, rather than invalidate them." *Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at *21. The court concluded that they should not.

The court held that "the Legislature intended for the secrecy envelope provision [in the Election Code] to be mandatory." *Id.* at ⸺, 2020 WL 5554644, at *24. In other words, the relevant provisions "make clear the General Assembly's intention that, during the collection and canvassing processes, when the outer envelope in which the ballot arrived is unsealed and the sealed ballot removed, it should not be readily apparent who the elector is, with what party he or she affiliates, or for whom the elector has voted." *Id.* The secrecy envelope "properly unmarked and sealed ensures that result," and "[w]hatever the wisdom of the requirement, the command that the mail-in elector utilize the secrecy envelope and leave it unblemished by identifying information is neither ambiguous nor unreasonable." *Id.*

As a result, the court ultimately concluded, "a mail-ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified." *Id.* at ⸺, 2020 WL 5554644, at *26

### 3. Pennsylvania's county-residency requirement for poll watchers is constitutional.

The final relevant issue the court considered was whether the poll-watcher residency requirement found in 25 P.S. § 2687(b) violates state or federal constitutional rights. *Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at *26. Relying on *Republican Party of Pennsylvania v. Cortés*, 218 F. Supp. 3d 396 (E.D. Pa. 2016), the court concluded that the poll-watcher residency provision "impose[d] no burden on one's constitutional right to vote and, accordingly, requires only a showing that a rational basis exists to be upheld." *Id.*

at ⸺, 2020 WL 5554644, at *30. The court found rational-basis review was appropriate for three reasons.

First, "there is no individual constitutional right to serve as a poll watcher; rather, the right to do so is conferred by statute." *Id.* (citation omitted). Second, "poll watching is not incidental to the right of free association and thus, has no distinct First Amendment protection." *Id.* (cleaned up). Third, "poll watching does not implicate core political speech." *Id.* (citation omitted).

The court went on to find that there was a "clear rational basis for the county poll watcher residency requirement[.]" *Id.* That is, given "Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth," it is "reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Id.*

In upholding the constitutionality of the "county poll watcher residency requirement," the court rejected the claim that "poll watchers are vital to protect against voter fraud and that because of the distribution of voters throughout Pennsylvania, the residency requirement makes it difficult to identify poll watchers in all precincts." *Id.* The court concluded that the claims of "heightened election fraud involving mail-in voting" were "unsubstantiated" and "specifically belied by the Act 35 report issued by [Secretary Boockvar] on August 1, 2020." *Id.* Moreover, the court held that the "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, even if true, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Id.*

**\*8** Based on the foregoing, the court declared "that the poll-watcher residency requirement does not violate the state or federal constitutions." *Id.* at ⸺, 2020 WL 5554644, at *31.

### D. Plaintiffs' notice of remaining claims.

Following the Pennsylvania Supreme Court's decision, this Court lifted the stay it had imposed pursuant to the

*Pullman* abstention doctrine and ordered the parties to identify the remaining viable claims and defenses in the case. [ECF 447].

In their notice, Plaintiffs took the position that nearly all their claims remained viable, with a few discrete exceptions. Plaintiffs conceded that their "federal and state constitutional claims of voter dilution solely on the basis that drop boxes and other collection sites are not statutorily authorized by the Pennsylvania Election Code [were] no longer viable." [ECF 448, p. 4]. They also stated that their "facial challenge to the county residency requirement under *25 P.S. § 2687* is no longer a viable claim." [*Id.* at p. 10]. Plaintiffs also moved for leave to amend their complaint a second time to add new allegations and a new claim relating to Secretary Boockvar's recent signature-comparison guidance. [ECF 451].

Defendants and Intervenors, for their part, suggested that Plaintiffs' claims had been substantially narrowed, if not outright mooted, by the Pennsylvania Supreme Court's decision, and reminded the Court that their arguments for dismissal remained outstanding.

### E. The Court's September 23, 2020, memorandum orders.

In response to the notices filed by the parties and Plaintiffs' motion for leave to amend their first amended complaint, the Court issued an order granting Plaintiffs' motion, narrowing the scope of the lawsuit, and establishing the procedure for resolving the remaining claims. [ECF 459].

As to Plaintiffs' proposed amendment to their complaint, the Court found that the new claim and allegations were relatively narrow, and thus amendment wouldn't prejudice Defendants and Intervenors. [*Id.* at pp. 3-4]. As a result, the Court granted the motion. [*Id.* at p. 4].

The Court, however, did inform the parties that it would "continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the "polling place" requirements under the Election Code apply to drop-box locations." [*Id.* at p. 5]. This was so because those claims involve still-unsettled issues of state law. The Court explained that the "fact that the Pennsylvania Supreme Court did not address this issue in its recent decision is immaterial" because the "propriety of *Pullman* abstention does not depend on the

existence of parallel state-court proceedings." [*Id.* (citing *Stoe v. Flaherty*, 436 F.3d 209, 213 (3d Cir. 2006)) ]. Moreover, Plaintiffs had several other avenues to pursue prompt interpretation of state law after this Court abstained. [*Id.* at p. 6].

The Court also informed the parties, for similar reasons, that it would continue to abstain with respect to Plaintiffs' claims regarding Secretary Boockvar's guidance that personal applications for mail-in ballots shall be accepted absent a "bona fide objection." [ECF 460].

The Court found that "no Article III 'case or controversy' remain[ed] with respect to the claims on which the Pennsylvania Supreme Court effectively ruled in Plaintiffs' favor on state-law grounds (*e.g.*, illegality of third-party ballot delivery; excluding 'naked ballots' submitted without inner-secrecy envelopes)." [ECF 459, p. 6]. Because there was "no reason to believe Defendants plan to violate what they themselves now agree the law requires," the Court held that Plaintiffs' claims were premature and speculative. [*Id.* at p. 7]. The Court therefore dismissed those claims as falling outside of its Article III power to adjudicate. [*Id.* (citations omitted) ].

**\*9**  To resolve the remaining claims, the Court directed the parties to file cross-motions for summary judgment presenting all arguments for dismissal or judgment under *Federal Rule of Civil Procedure 56*. [*Id.* at pp. 8-10]. Before briefing on those motions, the Court authorized additional expedited discovery. [*Id.* at pp. 4-5]. The parties completed discovery and timely filed their motions; they identified no material disputes of fact; and therefore, the motions are now fully briefed and ready for disposition.

### F. The claims now at issue.

Based on the Pennsylvania Supreme Court's prior ruling, this Court's prior decisions, Plaintiffs' nine-count Second Amended Complaint, and recent guidance issued by Secretary Boockvar, the claims remaining in this case are narrow and substantially different than those asserted at the outset of the case.

**Drop Boxes (Counts I-III).** Plaintiffs still advance a claim that drop boxes are unconstitutional, but in a different way. Now that the Pennsylvania Supreme Court has expressly held that drop boxes are authorized under the Election Code, Plaintiffs now assert that the use of "unmanned" drop boxes

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

is unconstitutional under the federal and state constitutions, for reasons discussed in more detail below.

**Signature Comparison (Counts I-III).** Plaintiffs' newly added claim relates to signature comparison. Secretary Boockvar's September 2020 guidance informs the county boards that they are not to engage in a signature analysis of mail-in ballots and applications, and they must count those ballots, even if the signature on the ballot does not match the voter's signature on file. Plaintiffs assert that this guidance is unconstitutional under the federal and state constitutions.

**Poll Watching (Counts IV, V).** The Pennsylvania Supreme Court already declared that Pennsylvania's county-residency requirement for poll watchers is *facially* constitutional. Plaintiffs now only assert that the requirement, *as applied*, is unconstitutional under the federal and state constitutions.

The counts that remain in the Second Amended Complaint, but which are *not* at issue, are the counts related to where poll watchers can be located. That is implicated mostly by Counts VI and VII, and by certain allegations in Counts IV and V. The Court continues to abstain from reaching that issue. Plaintiffs have filed a separate state lawsuit that would appear to address many of those issues, in any event. [ECF 549-22; ECF 573-1]. Counts VIII and IX concern challenges related to voters that have requested mail-in ballots, but that instead seek to vote in person. The Secretary issued recent guidance, effectively mooting those claims, and, based on Plaintiffs' positions taken in the course of this litigation, the Court deems Plaintiffs to have withdrawn Counts VIII and IX. [ECF 509, p. 15 n.4 ("[I]n the September 28 guidance memo, the Secretary corrected [her] earlier guidance to conform to the Election Code and states that any mail-in voter who spoils his/her ballot and the accompanying envelopes and signs a declaration that they did not vote by mail-in ballot will be allowed to vote a regular ballot. Therefore, Plaintiffs agree to withdraw this claim from those that still are being pursued.") ].

## II. Factual Background

### A. Pennsylvania's Election Code, and the adoption of Act 77.

#### 1. The county-based election system.

Pennsylvania's Election Code, first enacted in 1937, established a county-based system for administering

elections. *See* 25 P.S. § 2641(a) ("There shall be a county board of elections in and for each county of this Commonwealth, which shall have jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions of [the Election Code]."). The Election Code vests county boards of elections with discretion to conduct elections and implement procedures intended to ensure the honesty, efficiency, and uniformity of Pennsylvania's elections. *Id.* §§ 2641(a), 2642(g).

#### 2. The adoption of Act 77.

**\*10** On October 31, 2019, the Pennsylvania General Assembly passed "Act 77," a bipartisan reform of Pennsylvania's Election Code. *See* [ECF 461, ¶¶ 91]; 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421).

Among other things, by passing Act 77, Pennsylvania joined 34 other states in authorizing "no excuse" mail-in voting by all qualified electors. *See* [ECF 461, ¶¶ 92]; 25 P.S. §§ 3150.11-3150.17; [ECF 549-11, p. 5 ("The largest number of states (34), practice no-excuse mail-in voting, allowing any persons to vote by mail regardless of whether they have a reason or whether they will be out of their jurisdiction on Election Day.") ]. Previously, a voter could only cast an "absentee" ballot if certain criteria were met, such as that the voter would be away from the election district on election day. *See* 1998 Pa. Legis. Serv. 1998-18 (H.B. 1760), § 14.

Like the previous absentee voting system, Pennsylvania's mail-in voting system requires voters to "opt-in" by requesting a ballot from either the Secretary or the voter's county board of elections. *See* 25 P.S. §§ 3146.2(a), 3150.12(a). When requesting a ballot, the voter must provide, among other things, his or her name, date of birth, voting district, length of time residing in the voting district, and party choice for primary elections. *See* 25 P.S. §§ 3146.2(b), 3150.12(b). A voter must also provide proof of identification; namely, either a driver's license number or, in the case of a voter who does not have a driver's license, the last four digits of the voter's Social Security number, or, in the case of a voter who has neither a driver's license nor a Social Security number, another form of approved identification. 25 P.S. § 2602(z.5)(3). In this respect, Pennsylvania differs from states that automatically mail each registered voter a

Case 2:20-cv-01831-NR Document 55-1 Filed 12/30/20 Page 104 of 249
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

ballot—a practice known as "universal mail-in voting." [ECF 549-11, p. 6] ("[N]ine states conduct universal vote-by-mail elections in which the state (or a local entity, such [as] a county or municipality) mails all registered voters a ballot before each election without voters' [sic] having to request them.").

### 3. The COVID-19 pandemic.

Since early 2020, the United States, and Pennsylvania, have been engulfed in a viral pandemic of unprecedented scope and scale. [ECF 549-8, ¶ 31]. In that time, COVID-19 has spread to every corner of the globe, including Pennsylvania, and jeopardized the safety and health of many people. [*Id.* at ¶¶ 31, 38-39, 54-55, 66]. As of this date, more than 200,000 Americans have died, including more than 8,000 Pennsylvanians. *See* Covid in the U.S.: Latest Map and Case Count, The New York Times, available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Oct. 10, 2020); COVID-19 Data for Pennsylvania, Pennsylvania Department of Health, available at https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited Oct. 10, 2020).

There have been many safety precautions that Pennsylvanians have been either required or urged to take, such as limiting participation in large gatherings, maintaining social distance, and wearing face coverings. [ECF 549-8, ¶¶ 58, 63-65]. The threat of COVID-19 is likely to persist through the November general election. [*Id.* at ¶¶ 53-56, 66-68].

### B. Facts relevant to drop boxes.

**\*11** Pennsylvania's county-based election system vests county boards of elections with "jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions" of the Election Code. 25 P.S. § 2641(a). The Election Code further empowers the county boards to "make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." *Id.* at § 2642(f). The counties are also charged with the responsibility to "purchase, preserve, store and maintain primary and election equipment of all kinds, including voting booths, ballot boxes and voting machines." *Id.* at § 2642(c).

As noted above, in *Pennsylvania Democratic Party v. Boockvar*, the Pennsylvania Supreme Court interpreted the Election Code, which allows for mail-in and absentee ballots to be returned to the "county board of election," to "permit[ ] county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." —— A.3d at ——, 2020 WL 5554644, at \*10.

Thus, it is now settled that the Election Code permits (but does not require) counties to authorize drop boxes and other satellite-collection locations for mailed ballots. 25 P.S. § 3150.16(a). Pennsylvania is not alone in this regard—as many as 34 other states and the District of Columbia authorize the use of drop boxes or satellite ballot collection sites to one degree or another. [ECF 549-11, p. 8, fig. 4]. Indeed, Secretary Boockvar stated that as many as 16% of voters nationwide had cast their ballots using drop boxes in the 2016 general election, including the majority of voters in Colorado (75%) and Washington (56.9%). [ECF 547, p. 18 (citing ECF 549-16) ].

### 1. Secretary Boockvar's guidance with respect to drop boxes.

Since the passage of Act 77, Secretary Boockvar has issued several guidance documents to the counties regarding the counties' implementation of mail-in voting, including guidance with respect to the use of drop boxes. [ECF 504-21; 504-22; 504-23; 504-24; 504-25; 571-1, Ex. E]. In general terms, the Secretary's guidance as to drop boxes informed the counties that the use of drop boxes was authorized by the Election Code and recommended "best practices" for their use. Her latest guidance offered standards for (1) where drop boxes should be located, [ECF 504-23, § 1.2], (2) how drop boxes should be designed and what signage should accompany them, [*id.* at §§ 2.2-2.3], (3) what security measures should be employed, [*id.* at § 2.5], and (4) what procedures should be implemented for collecting and returning ballots to the county election office, [*id.* at §§ 3.1-3.3, 4].

As to the location of drop boxes, the Secretary recommended that counties consider the following criteria, [*id.* at § 1.2]:

- Locations that serve heavily populated urban/suburban areas, as well as rural areas;

- Locations near heavy traffic areas such as commercial corridors, large residential areas, major employers and public transportation routes;

- Locations that are easily recognizable and accessible within the community;

- Locations in areas in which there have historically been delays at existing polling locations, and areas with historically low turnout;

- Proximity to communities with historically low vote by mail usage;

- Proximity to language minority communities;

- Proximity to voters with disabilities;

- Proximity to communities with low rates of household vehicle ownership;

- Proximity to low-income communities;

- Access to accessible and free parking; and

- The distance and time a voter must travel by car or public transportation.

With respect to drop-box design criteria, the Secretary recommended to counties, [*id.* at § 2.2]:

**\*12** • Hardware should be operable without any tight grasping, pinching, or twisting of the wrist;

- Hardware should require no more than 5 lbs. of pressure for the voter to operate;

- Receptacle should be operable within reach-range of 15 to 48 inches from the floor or ground for a person utilizing a wheelchair;

- The drop-box should provide specific points identifying the slot where ballots are inserted;

- The drop-box may have more than one ballot slot (e.g. one for drive-by ballot return and one for walk-up returns);

- To ensure that only ballot material can be deposited and not be removed by anyone but designated county board of election officials, the opening slot of a drop-box should be too small to allow tampering or removal of ballots; and

- The opening slot should also minimize the ability for liquid to be poured into the drop-box or rainwater to seep in.

The Secretary's guidance as to signage recommended, [*id.* at § 2.3]:

- Signage should be in all languages required under the federal Voting Rights Act of 1965 ( 52 U.S.C. Sec. 10503);

- Signage should display language stating that counterfeiting, forging, tampering with, or destroying ballots is a second-degree misdemeanor pursuant to sections 1816 and 1817 of the Pennsylvania Election Code ( 25 P.S. §§ 3516 and 3517);

- Signage should also provide a statement that third-party return of ballots is prohibited unless the person returning the ballot is rendering assistance to a disabled voter or an emergency absentee voter. Such assistance requires a declaration signed by the voter and the person rendering assistance; and

- Signage should provide a statement requesting that the designated county elections official should be notified immediately in the event the receptacle is full, not functioning, or is damaged in any fashion, and should provide a phone number and email address for such purpose.

With respect to ballot security, the Secretary stated that county boards should implement the following security measures, [*id.* at § 2.5]:

- Only personnel authorized by the county board of elections should have access to the ballots inside of a drop-box;

- Drop-boxes should be secured in a manner to prevent their unauthorized removal;

- All drop-boxes should be secured by a lock and sealed with a tamper-evident seal. Only authorized election officials designated by the county board of elections may access the keys and/or combination of the lock;

- Drop-boxes should be securely fastened in a manner as to prevent moving or tampering, such as fastening the drop-box to concrete or an immovable object;

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

• During the hours when the staffed return site is closed or staff is unavailable, the drop-box should be placed in a secure area that is inaccessible to the public and/or otherwise safeguarded;

• The county boards of election should ensure adequate lighting is provided at all ballot return sites when the site is in use;

• When feasible, ballot return sites should be monitored by a video security surveillance system, or an internal camera that can capture digital images and/or video. A video security surveillance system can include existing systems on county, city, municipal, or private buildings. Video surveillance should be retained by the county election office through 60 days following the deadline to certify the election; and

**\*13** • To prevent physical damage and unauthorized entry, the drop-box at a ballot return site located outdoors should be constructed of durable material able to withstand vandalism, removal, and inclement weather.

With respect to ballot collection and "chain of custody" procedures, the Secretary stated that counties should adhere to the following standards, [*id.* at §§ 3.1-3.2]:

• Ballots should be collected from ballot return sites only by personnel authorized by the county board of elections and at times determined by the board of elections, at least every 24 hours, excluding Saturdays and Sundays;

• The county board of elections should designate at least two election officials to collect voted ballots from a ballot return site. Each designated election official should carry identification or an official designation that identifies them as an election official authorized to collect voted ballots;

• Election officials designated to collect voted ballots by the board of elections should sign a declaration declaring that he or she will timely and securely collect and return voted ballots, will not permit any person to tamper with a ballot return site or its contents, and that he or she will faithfully and securely perform his or her duties;

• The designated election officials should retrieve the voted ballots from the ballot return site and place the voted ballots in a secure ballot transfer container;

• The designated election officials should note on *Ballot Return Site Collection Forms* the site and unique identification number of the ballot return site and the date and time of retrieval;

• Ballots collected from any ballot return site should be immediately transported to the county board of elections;

• Upon arrival at the office of the county board of elections, the county board of elections, or their designee(s), should note the time of arrival on the same form, as described above;

• The seal number should be verified by a county election official or a designated representative;

• The county board of elections, or their designee(s), should inspect the drop-box or secure ballot transfer container for evidence of tampering and should receive the retrieved ballots by signing the retrieval form and including the date and time of receipt. In the event tampering is evident, that fact must be noted on the retrieval form;

• The completed collection form should be maintained in a manner proscribed by the board of elections to ensure that the form is traceable to its respective secure ballot container; and

• The county elections official at the county election office or central count location should note the number of ballots delivered on the retrieval form.

And finally, as to election day and post-election day procedures with respect to drop boxes, the Secretary provided as follows, [*id.* at §§ 3.3, 4]:

• The county board of elections should arrange for authorized personnel to retrieve ballots on election night and transport them to the county board of elections for canvassing of the ballots;

• Authorized personnel should be present at ballot return sites immediately prior to 8:00 p.m. or at the time the polls should otherwise be closed;

• At 8:00 p.m. on election night, or later if the polling place hours have been extended, all ballot return sites and drop-boxes must be closed and locked;

*14 • Staff must ensure that no ballots are returned to the ballot return site after the close of polls;

• After the final retrieval after the closing of the polls, the drop-box must be removed or locked and/or covered to prevent any further ballots from being deposited, and a sign shall be posted indicating that polling is closed for the election; and

• Any ballots collected from a return site should be processed in the same manner as mail-in ballots personally delivered to the central office of the county board of elections official by the voter and ballots received via the United States Postal Service or any other delivery service.

The Secretary and her staff developed this guidance in consultation with subject-matter experts within her Department and after review of the policies, practices, and laws in other states where drop boxes have been used. [ECF 549-6, pp. 23:14-22]. The evidence reflects at least one instance in which the Secretary's deputies reiterated that these "best practices" should be followed in response to inquiries from county officials considering whether to use drop boxes. [ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

Approximately 24 counties plan to use drop boxes during the November general election, to varying degrees. [ECF 549-28; ECF 504-1]. Of these, about nine counties intend to staff the drop boxes with county officials, while about 17 counties intend to use video surveillance in lieu of having staff present. [ECF 549-28].

### 2. Defendants' and Intervenors' evidence of the benefits and low risks associated with drop boxes.

Secretary Boockvar advocates for the use of drop boxes as a "direct and convenient way" for voters to deliver cast ballots to their county boards of elections, "thereby increasing turnout." [ECF 547, p. 22 ¶ 54 (citing 549-11 at pp. 10-11) ]. The Secretary also touts the special benefits of expanding drop-box use in the ongoing COVID-19 pandemic. Specifically, she asserts that drop boxes reduce health risks and inspire voter confidence because "many voters understandably do not wish to cast their votes in person at their polling place on Election Day" due to COVID-19.

[Id. at ¶¶ 55, 57 (citing ECF 549-2 ¶ 39; ECF 549-11 at p. 10; 549-8, ¶ 95) ]. Drop boxes, she says, allow voters to vote in person without coming into "close proximity to other members of the public, compared to in-person voting or personally delivering a mail-in ballot to a public office building." [Id. at ¶ 57].

Secretary Boockvar also states that drop boxes are highly convenient, and cost-saving, for both counties and voters. For counties, she notes that "24-hour secure ballot drop boxes" are "cost-effective measures ... as they do not have to be staffed by election judges." [Id. at p. 24 ¶ 62 (citing ECF 549-11 at p. 11); ECF 549-9 at ¶ 34]. As for voters, the Secretary explains that, in a state where "ten counties ... cover more than 1,000 square miles" and "two-thirds" of counties "cover more than 500 square miles," many Pennsylvania voters "could be required to drive dozens of miles (and perhaps in excess of 100 miles) if he or she wished to deposit his or her mail-in ballot in person at the main county board of elections office." [Id. at ¶ 58 (citing ECF 549-29) ].

*15 In addition to any tangible benefit drop boxes may have for voter access and turnout, Secretary Boockvar also states that drop boxes have a positive impact on voter confidence. In particular, she cites a recent news article, and a letter sent by the General Counsel of the U.S. Postal Service regarding Pennsylvania's absentee and mail-in ballot deadline, which have raised concerns over the timeliness and reliability of the U.S. Postal Service. [Id. at ¶¶ 60-61 (citing ECF 549-13; ECF 549-14); ECF 549-17; ECF 549-2 ¶¶ 42-43]. Voters' fears that votes returned by mail will not be timely counted could, the Secretary worries, "justifiably dissuade voters from wanting to rely upon the Postal Service for return of their mail-in or absentee ballot." [ECF 547, ¶ 61]. Drop boxes, she says, can address this concern by allowing voters to safely return mail-in ballots to an in-person location.

In exchange for these benefits, the Secretary insists that any potential security risk associated with drop boxes is low. She notes that the federal Department of Homeland Security has released guidance affirming that a "ballot drop box provides a secure and convenient means for voters to return their mail ballot," and recommending that states deploy one drop box for every 15,000 to 20,000 registered voters. [Id. at ¶¶ 63-65 (citing ECF 549-24, p. 1) ]. She also points to a purported lack of evidence of systemic ballot harvesting or any attempts to tamper with, destroy, or otherwise commit voter fraud using drop boxes, either in Pennsylvania's recent primary election, or in other states that have used drop boxes for many years.

[*Id.* at ¶¶ 68-74 (citations omitted) ]. And she asserts that "[i]n the last 20 years in the entire state of Pennsylvania, there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots" among the many millions of votes cast during that time period. [*Id.* at ¶ 70 (citing ECF 549-10, pp. 3-4) ].

Finally, the Secretary, and other Defendants and Intervenors, argue that Pennsylvania already has robust measures in place to prevent fraud, including its criminal laws, voter registration system, mail-in ballot application requirement, and canvassing procedures. [*Id.* at ¶¶ 66-67 (citing 25 P.S. §§ 3516 - 3518) ]; [ECF 549-9, p. 15, ¶¶ 46-47 ("These allegations are not consistent with my experience with drop box security, particularly given the strong voter verification procedures that are followed by elections officials throughout the country and in Pennsylvania. Specifically, the eligibility and identity of the voter to cast a ballot is examined by an election judge who reviews and confirms all the personal identity information provided on the outside envelope. Once voter eligibility is confirmed, the ballot is extracted and separated from the outside envelope to ensure the ballot remains secret. During this step, election judges confirm that there is only one ballot in the envelope and checks for potential defects, such as tears in the ballot.... Regardless of the receptacle used for acceptance of the ballot (drop box versus USPS mailbox), ballot validation occurs when the ballot is received by the county board of elections. The validation is the same regardless of how the ballots are collected or who delivers the ballot, even where that delivery contravenes state law.") ].

Defendants and Intervenors also point to several expert reports expressing the view that drop boxes are both low risk and beneficial. These experts include:

**Professor Matthew A. Barreto**, a Professor of Political Science and Chicana/o Studies at UCLA. [ECF 549-7]. Professor Barreto offers the opinion that ballot drop boxes are an important tool in facilitating voting in Black and Latino communities. Specifically, he discusses research showing that Black and Latino voters are "particularly concerned about the USPS delivering their ballots." [*Id.* at ¶ 22]. And he opines that ballot drop boxes help to reassure these voters that their vote will count, because "there is no intermediary step between the voters and the county officials who collect the ballot." [*Id.* at ¶ 24].

**\*16** **Professor Donald S. Burke**, a medical doctor and Distinguished University Professor of Health Science and Policy, Jonas Salk Chair in Population Health, and Professor of Epidemiology at the University of Pittsburgh. [ECF 549-8]. Professor Burke details the "significant risk of exposure" to COVID-19 in "enclosed areas like polling places." [*Id.* at ¶ 69]. He opines that "depositing a ballot in a mailbox and depositing a ballot in a drop-box are potential methods of voting that impart the least health risk to individual voters, and the least public health risk to the community." [*Id.* at ¶ 95].

**Amber McReynolds**, the CEO of the National Vote at Home Institute, with 13 years of experience administering elections as an Elections Director, Deputy Director, and Operations Manager for the City and County of Denver, Colorado. [ECF 549-9]. Ms. McReynolds opines that "[b]allot drop-boxes can be an important component of implementing expanded mail-in voting" that are "generally more secure than putting a ballot in post office boxes." [*Id.* at ¶ 16 (a) ]. She notes that "[d]rop boxes are managed by election officials ... delivered to election officials more quickly than delivery through the U.S. postal system, and are secure." [*Id.*].

Ms. McReynolds also opines that Secretary Boockvar's guidance with respect to drop boxes is "consistent with best practices and advice that NVAHI has provided across jurisdictions." [*Id.* at ¶ 35]. But she also notes that "[b]est practices will vary by county based on the county's available resources, population, needs, and assessment of risk." [*Id.* at ¶ 52].

More generally, Ms. McReynolds argues that "[d]rop-boxes do not create an increased opportunity for fraud" as compared to postal boxes. [*Id.* at ¶ 44]. She also suggests that Pennsylvania guards against such fraud through other "strong voter verification procedures," including "ballot validation [that] occurs when the ballot is received by the county board of elections" and "[r]econciliation procedures adopted by election officials ... [to] protect against the potential risk of double voting." [*Id.* at ¶¶ 46-48]. She notes that "Pennsylvania's balloting system requires that those who request a mail-in vote and do not return the ballot (or spoil the mail-in ballot at their polling place), can only vote a provisional ballot" and "[i]f a mail-in or absentee ballot was submitted by an individual, their provisional ballot is not counted." [*Id.* at ¶ 48].

**Professor Lorraine C. Minnite**, an Associate Professor and Chair of the Department of Public Policy and Administration

at Rutgers University-Camden. [ECF 549-10]. Professor Minnite opines that "the incidence of voter fraud in contemporary U.S. elections is exceedingly rare, including the incidence of voter impersonation fraud committed through the use of mail-in absentee ballots." [*Id.* at p. 3]. In Pennsylvania specifically, she notes that "[i]n the last 20 years ... there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots, and most of them were perpetrated by insiders rather than ordinary voters." [*Id.* at pp. 3-4]. As a "point of reference," she notes that 1,459,555 mail-in and absentee ballots were cast in Pennsylvania's 2020 primary election alone. [*Id.* at 4].

**Professor Robert M. Stein**, a Professor of Political Science at Rice University and a fellow in urban politics at the Baker Institute. [ECF 549-11]. Professor Stein opines that "the Commonwealth's use of drop boxes provides a number of benefits without increasing the risk of mail-in or absentee voter fraud that existed before drop boxes were implemented because (manned or unmanned) they are at least as secure as U.S. Postal Service ('USPS') mailboxes, which have been successfully used to return mail-in ballots for decades in the Commonwealth and elsewhere around the U.S." [*Id.* at p. 3]. According to Professor Stein, the use of drop boxes "has been shown to increase turnout," which he suggests is particularly important "during a global pandemic and where research has shown that natural and manmade disasters have historically had a depressive effect on voter turnout." [*Id.* at p. 4]. Professor Stein notes that "[d]rop boxes are widely used across a majority of states as a means to return mail-in ballots" and he is "not aware of any studies or research that suggest that drop boxes (manned or unmanned) are a source for voter fraud." [*Id.*]. Nor is he aware "of any evidence that drop boxes have been tampered with or led to the destruction of ballots." [*Id.*].

**\*17 Professor Paul Gronke**, a Professor of Political Science at Reed College and Director of the Early Voting Information Center. [ECF 545-7]. Professor Gronke recommends that "drop boxes should be provided in every jurisdiction that has significant (20% or more) percentage[] of voters casting a ballot by mail, which includes Pennsylvania" for the general election. [*Id.* at ¶ 6]. He avers that "[s]cientific research shows that drop boxes raise voter turnout and enhance voter confidence in the elections process." [*Id.* at ¶ 7]. Voters, he explains, "utilize drop boxes heavily—forty to seventy percent of voters in vote by mail states and twenty-five percent or more in no-excuse absentee states." [*Id.*]. Professor Gronke further states that he is "not

aware of any reports that drop boxes are a source for voter fraud" despite having "been in use for years all over the country." [*Id.* at ¶ 8]. And he suggests that the use of drop boxes is "especially important" in an election "that will be conducted under the cloud of the COVID-19 pandemic, and for a state like Pennsylvania that is going to experience an enormous increase in the number of by-mail ballots cast by the citizenry of the state." [*Id.* at ¶ 9].

Based on this evidence, and the purported lack of any contrary evidence showing great risks of fraud associated with the use of drop boxes, Defendants and Intervenors argue that Pennsylvania's authorization of drop boxes, and the counties' specific implementation of them, furthers important state interests at little cost to the integrity of the election system.

### 3. Plaintiffs' evidence of the risks of fraud and vote dilution associated with drop boxes.

Plaintiffs, on the other hand, argue that the drop boxes allow for an unacceptable risk of voter fraud and "illegal delivery or ballot harvesting" that, when it occurs, will "dilute" the votes of all lawful voters who comply with the Election Code. *See, e.g.,* [ECF 461, ¶¶ 127-128]. As evidence of the dilutive impact of drop boxes, Plaintiffs offer a combination of anecdotal and expert evidence.

Foremost among this evidence is the expert report of Greg Riddlemoser, the former Director of Elections and General Registrar for Stafford County, Virginia from 2011 until 2019. [ECF 504-19]. According to Mr. Riddlemoser, "voter fraud exists." [*Id.* at p. 2]. He defines the term "voter fraud" to mean any "casting and/or counting of ballots in violation of a state's election code." [*Id.*]. Examples he gives include: "Voting twice yourself—even if in multiple jurisdictions," "voting someone else's ballot," and "[e]lection officials giving ballots to or counting ballots from people who were not entitled to vote for various reasons." [*Id.* at pp. 2-3]. All of these things, he asserts, are "against the law and therefore fraudulent." [*Id.*]. [3]

Mr. Riddlemoser argues that "ballot harvesting" (which is the term Plaintiffs use to refer to situations in which an individual returns the ballots of other people) "persists in Pennsylvania." [*Id.* at p. 3]. He points to the following evidence to support this opinion:

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 24

- Admissions by Pennsylvania's Deputy Secretary for Elections and Commissions, Jonathan Marks, that "several Pennsylvania counties permitted ballot harvesting by counting ballots that were delivered in violation of Pennsylvania law" during the recent primary election, [*Id.*];

- "[S]everal instances captured by the media where voters in the June 2020 Primary deposited multiple ballots into unstaffed ballot drop boxes," [*Id.* at p. 4];

- "Other photographs and video footage of at least one county's drop box (Elk County) on Primary Election day" which "revealed additional instances of third-party delivery," [*Id.*]; and

- "Documents produced by Montgomery County" which "reveal that despite signs warning that ballot harvesting is not permitted, people during the 2020 Primary attempted to deposit into the five drop boxes used by that county ballots that were not theirs," [*Id.*].

**\*18** With respect to the use of "unstaffed" or "unmanned" ballot drop boxes, Mr. Riddlemoser expresses the opinion that "the use of unmanned drop boxes presents the easiest opportunity for voter fraud" and "certain steps must be taken to make drop boxes 'secure' and 'monitored.' " [*Id.* at p. 16].

He states that, to be "secure," drop boxes must be "attended" by "sworn election officials" at all times (*i.e.*, "never left unattended at any time they are open for ballot drop-off."). [*Id.*]. He further suggests that officials stationed at drop boxes must be empowered, and required, to "verify the person seeking to drop off a ballot is the one who voted it and is not dropping off someone else's ballot." [*Id.*]. Doing so, he says, would, in addition to providing better security, also "allow the election official to ask the voter if they followed the instructions they were provided ... and assist them in doing so to remediate any errors, where possible, before ballot submission." [*Id.*].

In addition to being "manned," Mr. Riddlemoser suggests that certain procedures with respect to ballot collection are necessary to ensure the integrity of votes cast in drop boxes. For example, he suggests that, at the end of each day, drop boxes, which should themselves be "tamperproof," should "be verifiably completely emptied into fireproof/tamperproof receptacles, which are then sealed and labeled by affidavit as to whom, where, when, etc." [*Id.*] Once sealed, the containers

"must then be transported by sworn officials in a county owned vehicle (preferably marked law enforcement) back to the county board where they are properly receipted and safeguarded." [*Id.*]. Emptied drop boxes should also be sealed at the end of each day "such that they are not able to accept any additional ballots until they are 'open' again[.]" [*Id.*]. And boxes should be "examined to ensure no ballots are in the box, that nothing else is inside the box, and that the structural integrity and any security associated with the box remains intact." [*Id.*]. All of this, he suggests, should also be "available for monitoring by poll watchers." [*Id.*].

According to Mr. Riddlemoser, anything short of these robust procedures won't do. In particular, "video cameras would not prevent anyone from engaging in activity that could or is designed to spoil the ballots inside the box; such as dumping liquids into the box, lighting the ballots on fire by using gasoline and matches, or even removing the box itself." [*Id.* at p. 17]. Even if the "identity of the person responsible may be determined ... the ballots themselves would be destroyed —effectively disenfranchising numerous voters." [*Id.*]. And given "recent footage of toppled statues and damage to government buildings" in the news, Mr. Riddlemoser finds the "forcible removal of ballot drop boxes" to be "a distinct possibility." [*Id.*]. In addition to increasing the risk of ballot destruction, Mr. Riddlemoser notes that reliance on video cameras would also "not prohibit someone from engaging in ballot harvesting by depositing more than one ballot in the drop box[.]" [*Id.*].

Beyond Mr. Riddlemoser's expert testimony, Plaintiffs proffer several other pieces of evidence to support their claims that drop boxes pose a dilutive threat to the ballots of lawful voters. Most notably, they present photographs and video stills of, by the Court's count, approximately seven individuals returning more than one ballot to drop boxes in Philadelphia and Elk County (the same photographs referenced by Mr. Riddlemoser). [ECF 504-19, PDF pp. 49-71].

**\*19** Those photographs depict the following:

- **An unidentified woman holding what appear to be two ballots at a Philadelphia drop box.**



- A photograph posted to social media showing a hand placing two ballots in a drop box; captioned, in part, "Cory and I voted!"



- Instagram user "thefoodiebarrister" posing for a selfie with two ballots in Philadelphia; captioned, in part, "dropping of [sic] my votes in a designated ballot drop box."



- A photograph of an unidentified man wearing a "Philadelphia Water" sweater and hat, placing two ballots in a Philadelphia drop box.



- **Several video stills that, according to Plaintiffs, show voters depositing more than one ballot in an Elk County drop box.**





In addition to these photographs and video stills, Plaintiffs also provide a May 24, 2020, email sent by an official in Montgomery County (which placed security guards to monitor its drop boxes) observing that security "have turned

people away yesterday and today without incident who had ballots other than their own." [ECF 504-28].

Separate and apart from this evidence specific to the use of drop boxes, Plaintiffs and their expert also provide evidence of instances of election fraud, voter fraud, and illegal voting generally. These include, for example:

- A case in which a New Jersey court ordered a new municipal election after a city councilman and councilman-elect were charged with fraud involving mail-in ballots. [ECF 504-19, p. 3].

- A New York Post article written by an anonymous fraudster who claimed to be a "master at fixing mail-in ballots" and detailed his methods. [*Id.*].

- Philadelphia officials' admission that approximately 40 people were permitted to vote twice during the 2020 primary elections. [*Id.*].

- A YouTube video purporting to show Philadelphia election officials approving the counting of mail-in ballots that lacked a completed certification on the outside of the envelope. [*Id.* (citation omitted) ].

- The recent guilty plea of the former Judge of Elections in South Philadelphia, Domenick J. DeMuro, to adding fraudulent votes to voting machines on election day. [ECF 461, ¶ 61]; *see United States v. DeMuro*, No. 20-cr-112 (E.D. Pa. May 21, 2020).

- The 2014 guilty plea of Harmar Township police chief Richard Allen Toney to illegally soliciting absentee ballots to benefit his wife and her running mate in the 2009 Democratic primary for town council, [ECF 461, ¶ 69];

- The 2015 guilty plea of Eugene Gallagher for unlawfully persuading residents and non-residents of Taylor, in Lackawanna County, Pennsylvania, to register for absentee ballots and cast them for him during his councilman candidacy in the November 2013 election, [*Id.*];

**\*20** • The 1999 indictment of Representative Austin J. Murphy in Fayette County for forging absentee ballots for residents of a nursing home and adding his wife as a write-in candidate for township election judge, [*Id.*];

• The 1994 Eastern District of Pennsylvania and Third Circuit case *Marks v. Stinson*, which involved an alleged incident of extensive absentee ballot fraud by a candidate for the Pennsylvania State Senate, *see Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994); *Marks v. Stinson*, No. 93-6157, 1994 WL 146113 (E.D. Pa. Apr. 26, 1994), [ECF 461, ¶ 78]; and

• A report from the bipartisan Commission on Federal Election Reform, chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which observed that absentee voting is "the largest source of potential voter fraud" and proposed that states "reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." [ECF 461, ¶¶ 66-67, 80].

### C. Facts relevant to signature comparison.

Many of the facts relevant to Plaintiffs' signature-comparison claim relate to the verification procedures for mail-in and absentee ballots, on one hand, and those procedures for in-person voting, on the other. These are described below.

#### 1. Mail-in and absentee ballot verification.

As noted above, Pennsylvania does not distribute unsolicited mail-in and absentee ballots. Rather, a voter must apply for the ballot (and any voter can). [ECF 549-2, ¶ 64]. As part of the application for a mail-in ballot, [4] an applicant must provide certain identifying information, including name, date of birth, length of time as a resident of the voting district, voting district if known, party choice in the primary, and address where the ballot should be sent. 25 P.S. § 3150.12(b). In applying for a mail-in ballot, the applicant must also provide "proof of identification," which is defined by statute as that person's driver's license number, last four digits of Social Security number, or another specifically approved form of identification. [ECF 549-2, ¶ 64; ECF 549-27]. 25 P.S. § 2602(z.5)(3). A signature is not mentioned in the definition of "proof of identification." 25 P.S. § 2602(z.5)(3). However, if physically capable, the applicant must sign the application. *Id.* at § 3150.12(c)- (d).

Upon receiving the mail-in ballot application, the county board of elections determines if the applicant is qualified by "verifying the proof of identification and comparing the information provided on the application with the information contained on the applicant's permanent registration card." 25 P.S. § 3150.12b(a). The county board of elections then either approves the application [5] or "immediately" notifies the applicant if the application is not approved. *Id.* at § 3150.12b(a), (c). Upon approval, the county mails the voter the mail-in ballot.

**\*21** After receiving the ballot, the mail-in voter must "mark the ballot" with his or her vote, insert the ballot into the "secrecy" envelope, and place the "secrecy" envelope into a larger envelope. *Id.* at § 3150.16(a). Then, the voter must "fill out, date and sign the declaration printed on [the larger] envelope. [The larger] envelope shall then be securely sealed and the elector shall send [it] by mail ... or deliver it in person to said county board of election." *Id.* The declaration on the larger envelope must be signed, unless the voter is physically unable to do so. *Id.* at § 3150.16(a)- (a.1).

Once the voter mails or delivers the completed mail-in ballot to the appropriate county board of elections, the ballot is kept "in sealed or locked containers until they are to be canvassed by the county board of elections." *Id.* at § 3146.8(a). The county boards of elections can begin pre-canvassing and canvassing the mail-in ballots no earlier than election day. *Id.* at § 3146.8(g)(1.1).

When pre-canvassing and canvassing the mail-in ballots, the county boards of elections must "examine the declaration on the [larger] envelope of each ballot ... and shall compare the information thereon with that contained in the ...Voters File." *Id.* at § 3146.8(g)(3). The board shall then verify the "proof of identification" and shall determine if "the declaration [on the larger envelope] is sufficient." *Id.* If the information in the "Voters File ... verifies [the elector's] right to vote," the ballot shall be counted. *Id.*

#### 2. In-person voting verification.

When a voter decides to vote in-person on election day, rather than vote by mail, the procedures are different. There is no application to vote in person. Rather, on election day, the in-person voter arrives at the polling place and "present[s] to

an election officer proof of identification," which the election officer "shall examine." *Id.* at § 3050(a). The in-person voter shall then sign a voter's certificate" and give it to "the election officer in charge of the district register." *Id.* at § 3050(a.3) (1). Next, the election officer shall "announce the elector's name" and "shall compare the elector's signature on his voter's certificate with his signature in the district register." *Id.* at § 3050(a.3)(2). If the election officer believes the signature to be "genuine," the in-person voter may vote. *Id.* But if the election officer does not deem the signature "authentic," the in-person voter may still cast a provisional ballot and is given the opportunity to remedy the deficiency. *Id.*

### 3. The September 11, 2020, and September 28, 2020, sets of guidance.

In September 2020, Secretary Boockvar issued two new sets of guidance related to signature comparisons of mail-in and absentee ballots and applications. The first, issued on September 11, 2020, was titled "Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes." [ECF 504-24]. The guidance stated, in relevant part, the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [*Id.* at p. 3]. The second set of guidance, issued on September 28, 2020, was titled, "Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures." [ECF 504-25]. This September 28, 2020, guidance stated, in relevant part, "The Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [*Id.* at p. 9]. Thus, as evidenced by these two sets of guidance, Secretary Boockvar advised the county boards of elections not to engage in a signature-comparison analysis of voters' signatures on ballots and applications for ballots.

**\*22** Most of the counties intend to follow the Secretary's guidance and will not compare signatures on mail-in ballots and applications for the upcoming general election. *E.g.*, [ECF 504-1]. A few counties, however, stated their intent to not comply with the guidance, and instead would compare and verify the authenticity of signatures. *E.g.*, [*id.* (noting the counties of Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming, as not intending to follow Secretary Boockvar's guidance to not compare signatures) ].

According to Defendants, there are valid reasons to not require signature comparisons for mail-in and absentee ballots. For example, Secretary Boockvar notes that signature verification is a technical practice, and election officers are not "handwriting experts." [ECF 549-2, p. 19, ¶ 68]. Secretary Boockvar also notes that voters' signatures can change over time, and various medical conditions (*e.g.*, arthritis) can impact a person's signature. [*Id.*] Defendants' expert, Amber McReynolds, also finds that "signature verification" involves "inherent subjectivity." [ECF 549-9, p. 20, ¶ 64]. Ms. McReynolds further notes the "inherent variability of individuals' signatures over time." [*Id.*] And according to Secretary Boockvar, these are just some reasons Pennsylvania implements verification procedures other than signature comparisons for mail-in voters, who, unlike in-person voters, are not present when their signature would be verified. [ECF 549-2, p. 20, ¶ 69].

Plaintiffs' expert, Greg Riddlemoser, on the other hand, states that signature comparison is "a crucial security aspect of vote-by-mail" and failing to verify signatures on mail-in ballots would "undermine voter confidence and would increase the possibility of voter fraud." [ECF 504-19, pp. 10-11]. Mr. Riddlemoser asserts that Secretary Boockvar's September 11, 2020, and September 28, 2020, guidance "encourage, rather than prevent, voter fraud." [*Id.* at p. 12]. As such, Mr. Riddlemoser explains that mail-in voters should be subject to the same signature-comparison requirement as in-person voters. [*Id.* at pp. 13-14].

### 4. Secretary Boockvar's King's Bench petition.

In light of this case and the parties' disagreement over whether the Election Code mandates signature comparison for mail-in ballots, Secretary Boockvar filed a "King's Bench" petition with the Pennsylvania Supreme Court on October 4, 2020. In that petition, she asked the Pennsylvania Supreme Court to exercise its extraordinary jurisdiction, in light of the impending election, to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557].

On October 7, 2020, several groups, including Donald J. Trump for President, Inc. and the Republican National Committee—who are Plaintiffs in this case—moved to intervene as Respondents in the Pennsylvania Supreme Court case. [ECF 571-1]. The Pennsylvania Supreme Court has not

Case 2:20-cv-01831-NR Document 55-1 Filed 12/30/20 Page 115 of 249
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

yet decided the motion to intervene or whether to accept the case. The petition remains pending.

### D. Facts relevant to poll-watcher claims.

The position of "poll watcher" is a creation of state statute. *See* 25 P.S. § 2687. As such, the Election Code defines how a poll watcher may be appointed, what a poll watcher may do, and where a poll watcher may serve.

### 1. The county-residency requirement for poll watchers.

**\*23** The Election Code permits candidates to appoint two poll watchers for each election district. 25 P.S. § 2687(a). The Election Code permits political parties and bodies to appoint three poll watchers for each election district. *Id.*

For many years, the Pennsylvania Election Code required that poll watchers serve only within their "election district," which the Code defines as "a district, division or precinct, ... within which all qualified electors vote at one polling place." 25 P.S. § 2687(b) (eff. to May 15, 2002) (watchers "shall serve in only one district and must be qualified registered electors of the municipality or township in which the district where they are authorized to act is located"); 25 P.S. § 2602(g). Thus, originally, poll watching was confined to a more limited geographic reach than one's county, as counties are themselves made up of many election districts.

Then, in 2004, the General Assembly amended the relevant poll-watcher statute to provide that a poll watcher "shall be authorized to serve in the election district for which the watcher was appointed and, when the watcher is not serving in the election district for which the watcher was appointed, in any other election district in the county in which the watcher is a qualified registered elector." 25 P.S. § 2687(b) (eff. Oct. 8, 2004).

This county-residency requirement is in line with (or is, in some cases, more permissive than) the laws of at least eight other states, which similarly require prospective poll watchers to reside in the county in which they wish to serve as a watcher or (similar to the pre-2004 Pennsylvania statute) limit poll watchers to a sub-division of the county. *See, e.g.,* Fla. Stat. Ann. § 101.131(1) (Florida); Ind. Code Ann. § 3-6-8-2.5 (Indiana); Ky. Rev. Stat. Ann. §

117.315(1) (Kentucky); N.Y. Elec. Law § 8-500(5) (New York); N.C. Gen. Stat. Ann. § 163-45(a) (North Carolina); Tex. Elec. Code Ann. § 33.031(a) (Texas); S.C. Code Ann. § 7-13-860 (South Carolina); Wyo. Stat. Ann. § 22-15-109(b) (Wyoming). However, at least one state (West Virginia) does not provide for poll watchers at all. *See* W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41

The General Assembly has not amended the poll-watcher statute since 2004, even though some lawmakers have advocated for the repeal of the residency requirement. *See* *Cortés,* 218 F. Supp. 3d at 402 (observing that legislative efforts to repeal the poll-watcher residency requirement have been unsuccessful).

As part of its September 17, 2020, decision, the Pennsylvania Supreme Court found that the county-residency requirement does not violate the U.S. or Pennsylvania constitutions. *Boockvar,* ––– A.3d at ––––, 2020 WL 5554644, at \*31.

### 2. Where and when poll watchers can be present during the election.

The Pennsylvania Election Code sets forth the rules for where and when poll watchers are permitted to be present.

The Election Code provides that poll watchers may be present "at any public session or sessions of the county board of elections, and at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines under" the Code. 25 P.S. § 2650. Additionally, one poll watcher for each candidate, political party, or political body may "be present in the polling place ... from the time that the election officers meet prior to the opening of the polls ... until the time that the counting of votes is complete and the district register and voting check list is locked and sealed." 25 P.S. § 2687(b).

**\*24** During this time, poll watchers may raise objections to "challenge any person making application to vote." *Id.* Poll watchers also may raise challenges regarding the voters' identity, continued residence in the election district, or registration status. 25 P.S. § 3050(d).

Although Pennsylvania has historically allowed absentee ballots to be returned by U.S. Postal Service or by in-person delivery to a county board of elections office, the Election Code does not provide (and has never provided for) any right to have poll watchers in locations where absentee voters fill out their ballots (which may include their home, office, or myriad other locations), nor where those votes are mailed (which may include their own mailbox, an official U.S. Postal Service collection box, a work mailroom, or other places U.S. Postal Service mail is collected), nor at county board of elections offices. [ECF 549-2, ¶¶ 86-90].

Before Act 77, absentee ballots were held in election districts rather than centralized at the county board of elections. *See* 📄 25 P.S. § 3146.8 (eff. Mar. 14, 2012 to Oct. 30, 2019) ("In all election districts in which electronic voting systems are used, absentee ballots shall be opened at the election district, checked for write-in votes in accordance with section 1113-A and then either hand-counted or counted by means of the automatic tabulation equipment, whatever the case may be.").

At such time (again, before Act 77), poll workers opened those absentee ballots at each polling place after the close of the polls. *Id.* ("Except as provided in section 1302.1(a.2), the county board of elections shall then distribute the absentee ballots, unopened, to the absentee voter's respective election district concurrently with the distribution of the other election supplies. Absentee ballots shall be canvassed immediately and continuously without interruption until completed after the close of the polls on the day of the election in each election district. The results of the canvass of the absentee ballots shall then be included in and returned to the county board with the returns of that district." (footnote omitted)).

With the enactment of Act 77, processing and counting of mail-in and absentee ballots is now centralized in each county board of elections, with all mail-in and absentee ballots in such county held and counted at the county board of elections (or such other site as the county board may choose) without regard to which election district those ballots originated from. 📄 25 P.S. § 3146.8(a) (eff. Mar. 27, 2020); [ECF 549-2, ¶ 81].

Under Act 12, counties are permitted to "pre-canvass" mail-in or absentee ballots received before Election Day beginning at 7:00 a.m. on Election Day. 📄 25 P.S. § 3146.8(g)(1.1). Counties are further permitted to "canvass" ballots received after that time beginning "no earlier than the close of the polls

on the day of the election and no later than the third day following the election." 📄 *Id.* § 3146.8(g)(2).

The Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed." 📄 25 P.S. § 3146.8(g) (1.1). Similarly, during canvassing, the Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are canvassed." 📄 25 P.S. § 3146.8(g)(2).

**\*25** The Election Code provisions pertaining to the "pre-canvass" and "canvass" do not make any separate reference to poll watchers, instead referring only to the "authorized representatives" of parties and candidates. *See* 📄 25 P.S. § 3146.8.

On October 6, 2020, Secretary Boockvar issued guidance concerning poll watchers and authorized representatives. [ECF 571-1]. The guidance states that poll watchers "have no legal right to observe or be present at ... ballot return sites," such as drop-box locations. [ECF 571-1, Ex. E, p. 5]. The guidance also states that while a candidate's authorized representative may be present when mail-in ballots are opened (including during pre-canvass and canvass), the representative cannot challenge those ballots. [*Id.* at Ex. E, p. 4].

On October 9, 2020, in a separate lawsuit brought by the Trump Campaign in the Philadelphia County Court of Common Pleas, the state court there confirmed Secretary Boockvar's guidance. Specifically, the state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, p. 12 ("It is clear from a reading of the above sections [of the Election Code] that the satellite offices where these activities, and only these activities, occur are true 'offices of the Board of Elections' and are not polling places, nor public sessions of the Board of Elections, at which watchers have a right to be present under the Election Code.") ]. Immediately after issuance of this decision, the Trump Campaign filed a notice of appeal, indicating its intention to appeal the decision to the Commonwealth Court of Pennsylvania. Having just been noticed, that appeal remains in its infancy as of the date of this Opinion.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

### 3. Plaintiffs' efforts to recruit poll watchers for the upcoming general election.

In order to become a certified poll watcher, a candidate must meet certain criteria. [ECF 504-20, ¶ 9]. That is, a poll watcher needs to be "willing to accept token remuneration, which is capped at $120 under Pennsylvania state law" and must be able to take off work or otherwise make arrangements to be at the polling place during its open hours on Election Day, which can mean working more than 14 hours in a single day. [*Id.*].

The Pennsylvania Director for Election Day Operations for the Trump Campaign, James J. Fitzpatrick, stated that the Trump Campaign wants to recruit poll watchers for every county in Pennsylvania. [ECF 504-2, ¶ 30]. To that end, the RNC and the Trump Campaign have initiated poll-watcher recruitment efforts for the general election by using a website called DefendYourBallot.com. [ECF 528-14, 265:2-15, 326:14-329-7]. That website permits qualified electors to volunteer to be a poll watcher. [*Id.*]. In addition, Plaintiffs have called qualified individuals to volunteer to be poll watchers, and worked with county chairs and conservative activists to identify potential poll watchers. [*Id.*].

Despite these efforts, the Trump Campaign claims it "is concerned that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25]. Mr. Fitzpatrick, however, could not identify a specific county where the Trump Campaign has been unable to obtain full coverage of poll watchers or any county where they have tried and failed to recruit poll watchers for the General Election. [ECF 528-14, 261:21-262:3, 263:8-19, 265:2-266:3].

**\*26** In his declaration, Representative Reschenthaler shared Mr. Fitzpatrick's concern, stating that he does not believe that he will "be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12]. But Representative Reschenthaler did not provide any information regarding his efforts to recruit poll watchers to date, or what he plans to do in the future to attempt to address his concern. *See generally* [*id.*].

Representative Kelly stated in his declaration that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. Representative Kelly never detailed his efforts (*e.g.*, the outreach he tried, prospective

candidates he unsuccessfully recruited, and the like), and he never explained why those efforts aren't likely to succeed in the future. *See generally* [*id.*].

In his declaration, Representative Thompson only stated that based on his experience, "parties and campaigns cannot always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20].

According to statistics collected and disseminated by the Pennsylvania Department of State, there is a gap between the number of voters registered as Democrats and Republicans in some Pennsylvania counties. [ECF 504-34]. Plaintiffs' expert, Professor Lockerbie, believes that this puts the party with less than a majority of voters in that county at a disadvantage in recruiting poll watchers. [ECF 504-20, ¶ 15]. However, despite this disadvantage, Professor Lockerbie states that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified poll watchers who meet the residency requirement[ ]." [*Id.* at ¶ 16].

Additionally, Professor Lockerbie finds the gap in registered voters in various counties to be especially problematic for minor political parties. [*Id.* at ¶ 16]. As just one example, according to Professor Lockerbie, even if one were to assume that all third-party voters were members of the same minor party, then in Philadelphia County it would require "every 7th registrant" to be a poll watcher in order for the third party to have a poll watcher observing each precinct." [*Id.*].

Professor Lockerbie believes that disruptions to public life caused by the COVID-19 pandemic "magnified" the difficulties in securing sufficient poll watchers. [*Id.* at ¶ 10].

Nothing in the Election Code limits parties from recruiting only registered voters from their own party. [ECF 528-14, 267:23-268:1]. For example, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

### 4. Rationale for the county-residency requirement.

Defendants have advanced several reasons to explain the rationale behind county-residency requirement for poll watchers.

Secretary Boockvar has submitted a declaration, in which she has set forth the reasons for and interests supporting the county-residency requirement. Secretary Boockvar states that the residency requirement "aligns with Pennsylvania's county-based election scheme[.]" [ECF 549-2, at p. 22, ¶ 77]. "By restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [*Id.* at p. 22, ¶ 78].

**\*27**  In a similar vein, Intervenors' expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know" and are "familiar with ... from their community." [ECF 524-1, at p. 14, ¶ 40]. That's because when poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making that determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

**[1]  [2]**  The summary-judgment stage "is essentially 'put up or shut up' time for the non-moving party," which "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**[3]**  "The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The parties' filing of cross-motions "does not constitute an agreement that if one is rejected the other is necessarily justified[.]" *Id.* But the Court may "resolve cross-motions for summary judgment concurrently." *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018). When doing so, the Court views the evidence "in the light most favorable to the non-moving party with respect to each motion." *Id.*

## DISCUSSION & ANALYSIS

Plaintiffs, Defendants, and Intervenors all cross-move for summary judgment on all three of Plaintiffs' remaining claims, which the Court refers to, in the short-hand, as (1) the drop-box claim, (2) the signature-comparison claim, and (3) the poll-watching claim. The common constitutional theory behind each of these claims is vote dilution. Absent the security measures that Plaintiffs seek, they fear that others will commit voter fraud, which will, in turn, dilute their lawfully cast votes. They assert that this violates the federal and Pennsylvania constitutions.

The Court will address only the federal-constitutional claims. For the reasons that follow, the Court finds that Plaintiffs lack standing to bring their federal-constitutional claims because Plaintiffs' injury of vote dilution is not "concrete" for Article III purposes.

But even assuming Plaintiffs had standing, the Court also concludes that Defendants' regulations, conduct, and election guidance here do not infringe on any right to vote, and if they do, the burden is slight and outweighed by the Commonwealth's interests—interests inherent in the Commonwealth's other various procedures to police fraud, as well as its overall election scheme.

**\*28**  Finally, because the Court will be dismissing all federal-constitutional claims, it will decline to exercise supplemental jurisdiction over any of the state-constitutional claims and will thus dismiss those claims without prejudice.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## I. Defendants' procedural and jurisdictional challenges.

At the outset, Defendants and Intervenors raise a number of jurisdictional, justiciability, and procedural arguments, which they assert preclude review of the merits of Plaintiffs' claims. Specifically, they assert (1) the claims are not ripe and are moot, (2) there is a lack of evidence against certain county boards, and those boards are not otherwise necessary parties, and (3) Plaintiffs lack standing. The Court addresses each argument, in turn.

### A. Plaintiffs' claims are ripe and not moot.

Several Defendants have argued that Plaintiffs' claims in the Second Amended Complaint are not ripe and are moot. The Court disagrees.

### 1. Plaintiffs' claims are ripe.

**[4]** **[5]** **[6]** **[7]** The ripeness doctrine seeks to "prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Artway v. Attorney Gen. of N.J.*, 81 F.3d 1235, 1246-47 (3d Cir. 1996) (cleaned up). The ripeness inquiry involves various considerations including whether there is a "sufficiently adversarial posture," the facts are "sufficiently developed," and a party is "genuinely aggrieved." *Peachlum v. City of York*, 333 F.3d 429, 433-34 (3d Cir. 2003). Ripeness requires the case to "have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*, 385 F.3d 801, 806 (3d Cir. 2004) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). "A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*

**[8]** Ultimately, "[r]ipeness involves weighing two factors: (1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247. Unlike standing, ripeness is assessed at the time of the court's decision (rather than the time the complaint was filed). *See Blanchette v.*

*Connecticut General Ins. Corp.*, 419 U.S. 102, 139-40, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

**[9]** The Court finds that Plaintiffs' claims are ripe. Applying the two-factor test here, the Court first concludes that the parties would face significant hardship if the Court were to hold that the case was unripe (assuming it was otherwise justiciable). The general election is less than one month away, and Plaintiffs assert claims that could significantly affect the implementation of Pennsylvania's electoral procedures. Further, if the Court were to find that Plaintiffs' claims were not ripe, Plaintiffs would be burdened. This is because Plaintiffs would then have to either wait until after the election occurred—and thus after the alleged harms occurred—or Plaintiffs would have to bring suit on the very eve of the election, and thus there would be insufficient time for the Court to address the issues. This hardship makes judicial review at this time appropriate. The first factor is met.

**\*29** Some Defendants argue that because some of the Secretary's guidance was issued after the 2020 primary election, Plaintiffs' claims that rely on such guidance are not ripe because the guidance has not been implemented in an election yet. The Court disagrees. Both the allegations in the Second Amended Complaint, and the evidence presented on summary judgment, reveal that the guidance issued after the primary election will apply to the upcoming general election. This is sufficient to make this a properly ripe controversy. [6]

The second factor the Court must consider in determining ripeness is "the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247. "The principal consideration [for this factor] is whether the record is factually adequate to enable the court to make the necessary legal determinations. The more that the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa." *Id. at 1249.*

Under this framework, the Court concludes that the issues are fit for review. The parties have engaged in extensive discovery, creating a developed factual record for the Court to review. Further, as shown below, the Court finds it can assess Plaintiffs' claims based on the current factual record and can adequately address the remaining legal questions that predominate this lawsuit. As such, the Court finds Plaintiffs' claims fit for judicial review.

Thus, Plaintiffs' claims are presently ripe.

### 2. Plaintiffs' claims are not moot.

Some Defendants also assert that Plaintiffs' claims are moot because Plaintiffs reference allegations of harm that occurred during the primary election, and since then, Secretary Boockvar has issued new guidance and the Pennsylvania Supreme Court has interpreted the Election Code to clarify several ambiguities. The Court, however, concludes that Plaintiffs' remaining claims are not moot.

[10] [11] [12] Mootness stems from the same principle as ripeness, but is stated in the inverse: courts "lack jurisdiction when 'the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.' " *Merle v. U.S.*, 351 F.3d 92, 94 (3d Cir. 2003) (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Like ripeness and unlike standing, mootness is determined at the time of the court's decision (rather than at the time the complaint is filed). *See U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). When assessing mootness, the Court may assume (for purposes of the mootness analysis) that standing exists. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citation omitted).

**\*30** [13] Here, the Court finds that Plaintiffs' claims are not moot, as the claims Plaintiffs are proceeding with are "live." First, Plaintiffs' claims are based on guidance that issued after the primary election and are to be applied in the upcoming general election. As such, the *harms* alleged are not solely dependent on the already-passed primary election. Second, Defendants, by and large, have made clear that they intend to abide by guidance that Plaintiffs assert is unlawful or unconstitutional. Third, Plaintiffs sufficiently show that certain Defendants intend to engage in the conduct (*e.g.*, use unmanned drop-boxes) that Plaintiffs say infringes their constitutional rights. Thus, these issues are presently "live" and are not affected by the completion of the primary election. [7] Plaintiffs' claims are not moot.

### 3. All named Defendants are necessary parties to this lawsuit.

[14] Many of the county boards of elections that are Defendants in this case argue that the claims against them should be dismissed because Plaintiffs did not specifically allege or prove sufficient violative facts against them. Plaintiffs argue in response that all county boards have been joined because they are necessary parties, and the Court cannot afford relief without their presence in this case. The Court agrees with Plaintiffs, and declines to dismiss the county boards from the case. They are necessary parties.

Federal Rule of Civil Procedure 19(a) states that a party is a necessary party that must be joined in the lawsuit if, "in that [party's] absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).

Here, if the county boards were not named defendants in this case, the Court would not be able to provide Plaintiffs complete relief should Plaintiffs prove their case. That's because the Court could not enjoin the county boards if they were not parties. *See* Fed. R. Civ. P. 65(d)(2). [8] This is important because each individual county board of elections manages the electoral process within its county lines. As one court previously summarized, "Election procedures and processes are managed by each of the Commonwealth's sixty-seven counties. Each county has a board of elections, which oversees the conduct of all elections within the county." *Cortés*, 218 F. Supp. 3d at 403 (citing 25 P.S. § 2641(a)). "The county board of elections selects, fixes and at times alters the polling locations of new election districts. Individual counties are also tasked with the preservation of all ballots cast in that county, and have the authority to investigate fraud and report irregularities or any other issues to the district attorney[.]" *Id.* (citing 25 P.S. §§ 2726, 2649, and 2642). The county boards of elections may also make rules and regulations "as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." 25 P.S. § 2642(f).

**\*31** Indeed, Defendants' own arguments suggest that they must be joined in this case. As just one example, a handful of counties assert in their summary-judgment brief that the "[Election] Code permits Boards to exercise discretion in certain areas when administering elections, to administer the

election in a manner that is both legally-compliant and meets the unique needs of each County's citizens." [ECF 518, p. 6]. Thus, because of each county's discretionary authority, if county boards engage in unconstitutional conduct, the Court would not be able to remedy the violation by enjoining only Secretary Boockvar. [9]

To grant Plaintiffs relief, if warranted, the Court would need to enter an order affecting all county boards of elections—which the Court could not do if some county boards were not joined in this case. Otherwise, the Court could only enjoin violative conduct in some counties but not others. As a result, inconsistent rules and procedures would be in effect throughout the Commonwealth. While some counties can pledge to follow orders issued by this Court, the judicial system cannot rely on pledges and promises, regardless of the county boards' good intent. The only way to ensure that any illegal or unconstitutional conduct is uniformly remedied, permanently, is to include all county boards in this case.

Thus, because the county boards are necessary parties, the Court cannot dismiss them.

### 4. Plaintiffs lack Article III standing to raise their claims of vote dilution because they cannot establish a "concrete" injury-in-fact.

While Plaintiffs can clear the foregoing procedural hurdles, they cannot clear the final one—Article III standing.

[15] Federal courts must determine that they have jurisdiction before proceeding to the merits of any claim. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." One component of the case-or-controversy requirement is standing, which requires a plaintiff to demonstrate the now-familiar elements of (1) injury in fact, (2) causation, and (3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

[16] Standing is particularly important in the context of election-law cases, including a case like this one, that challenge the laws, regulations, and guidance issued by elected and appointed state officials through the democratic processes. As the Supreme Court has explained, the standing "doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (cleaned up). The doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* In this way, "Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* Nowhere is that concern more acute than in a case that challenges a state's exercise of its core constitutional authority to regulate the most deeply political arena of all—elections.

**\*32** [17] Here, Defendants and Intervenors claim that Plaintiffs lack standing, largely arguing that Plaintiffs' injury is too speculative. [ECF 547, pp. 43-50]. The Court agrees and finds that Plaintiffs lack Article III standing for this reason.

Initially, to frame the standing inquiry, understanding the specific claims at issue is important. As discussed above, there are essentially three claims remaining in this case: (1) a challenge to Secretary Boockvar's guidance that does not require all drop boxes to have manned security personnel; (2) a challenge to Secretary Boockvar's guidance that counties should not perform a signature comparison for mail-in ballots; and (3) a challenge to Pennsylvania's county-residency restriction for poll-watchers. *See* [ECF 509, pp. 4-5]. The theory behind all of these claims and the asserted injury is one of vote dilution due to the heightened risk of fraud; that is, without the above measures in place, there is an imminent risk of voter fraud (primarily by mail-in voters); and if that fraud occurs, it will dilute the votes of many of Plaintiffs, who intend to vote in person in the upcoming election. [ECF 551, p. 12 ("As qualified electors who will be voting in the November election, Plaintiffs will suffer an injury through their non-equal treatment and/or the dilution or debasement of their legitimately case votes by absentee and mail-in votes that have not been properly verified by matching the voters' signatures on their applications and ballots to the permanent voter registration record and/or that have been improperly delivered by others to drop boxes or other mobile collection sites in manners that are different[ ] from those offered or being used in their counties of residence.") ].

Turning to the familiar elements of Article III standing, the first and, in the Supreme Court's estimation, "foremost" element—injury-in-fact—is dispositive. *See Gill v. Whitford*, ––– U.S. ––––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d

313 (2018). Specifically, the Court finds that Plaintiffs' theory of vote dilution, based on the evidence presented, is insufficient to establish standing because Plaintiffs' injury-in-fact is not sufficiently "concrete."

With respect to injury-in-fact, the Supreme Court has made clear that an injury must be "concrete" and "particularized." *See* Spokeo, 136 S. Ct. at 1548. Defendants argue that the claimed injury of vote dilution caused by possible voter fraud here is too speculative to be concrete. The Court agrees.

To establish a "concrete" injury, Plaintiffs rely on a chain of theoretical events. They first argue that Defendants' lack of election safeguards (poll watchers, drop-box guards, and signature-comparison procedures) creates a risk of voter fraud or illegal voting. *See* [ECF 461, ¶¶ 230-31, 240, 256]. That risk, they say, will lead to potential fraudsters committing voter fraud or ballot destruction. [*Id.*]. And if that happens, each vote cast in contravention of the Election Code will, in Plaintiffs' view, dilute Plaintiffs' lawfully cast votes, resulting in a constitutional violation.

The problem with this theory of harm is that this fraud hasn't yet occurred, and there is insufficient evidence that the harm is "certainly impending."

To be clear, Plaintiffs need not establish actual fraud at this stage; but they must establish that fraud is "certainly impending," and not just a "possible future injury." *See* Clapper, 568 U.S. at 409, 133 S.Ct. 1138 ("Thus, we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.") (cleaned up).

**\*33** This case is well past the pleading stage. Extensive fact and expert discovery are complete. [ECF 462]. Nearly 300 exhibits have been submitted on cross-motions for summary judgment (including 68 by Plaintiffs alone). Plaintiffs bear the burden of proof on this issue, and unlike on a motion to dismiss, on summary judgment, they must come forward with proof of injury, taken as true, that will prove standing, including a concrete injury-in-fact. *See* Lujan, 504 U.S. at 561, 112 S.Ct. 2130 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice ... In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence

specific facts ... which for purposes of the summary judgment motion will be taken to be true.") (cleaned up).

Based on the evidence presented by Plaintiffs, accepted as true, Plaintiffs have only proven the "possibility of future injury" based on a series of speculative events—which falls short of the requirement to establish a concrete injury. For example, Plaintiffs' expert, Mr. Riddlemoser, opines that the use of "unstaffed or unmanned" drop boxes merely "increases the *possibility* for voter fraud (and vote destruction)[.]" [ECF 504-19, p. 20 (emphasis added) ]. That's because, according to him (and Plaintiffs' other witnesses), theoretical bad actors *might* intentionally "target" a drop box as the "easiest opportunity for voter fraud" or with the malicious "intent to destroy as many votes ... as possible." [*Id.* at pp. 16-18; *see also* ECF 504-2, ¶ 12 (declaring that drop boxes "*may* serve as a target for bad actors that may wish to tamper with lawfully case ballots before such ballots are counted") (emphasis added) ]. But there's no way of knowing whether these independent actors will ever surface, and if they do, whether they will act as Mr. Riddlemoser and Plaintiffs predict.

Similarly, Mr. Riddlemoser concludes that, at most, not conducting signature analysis for mail-in and absentee ballots "open[s] the door to the potential for massive fraud through a mechanism already susceptible to voter fraud." [ECF 504-19, p. 20].

This increased susceptibility to fraud and ballot destruction is the impetus for Plaintiffs, in their various capacities, to express their concerns that vote dilution might occur and disrupt their right to a "free and fair election." *See, e.g.,* [504-3, ¶ 6; 504-4, ¶ 7; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9]. But these concerns, as outlined above, are based solely on a chain of unknown events that may never come to pass.

In addition to Plaintiffs' expert report, Plaintiffs' evidence consists of instances of voter fraud in the past, including an article in the N.Y. Post purporting to detail the strategies of an anonymous fraudster, as well as pointing to certain prior cases of voter fraud and election irregularities (*e.g.,* Philadelphia inadvertently allowing 40 people to vote twice in the 2020 primary election; some counties counting ballots that did not have a completed declaration in the 2020 primary election). [ECF 461, ¶¶ 63-82; ECF 504-19, p. 3 & Ex. D]. Initially, with one exception noted directly below, none of this evidence is tied to individuals using drop boxes, submitting forged mail-in ballots, or being unable to poll watch in another county

—and thus it is unclear how this can serve as evidence of a concrete harm in the upcoming election as to the specific claims in this case.

**\*34** Perhaps the best evidence Plaintiffs present are the several photographs and video stills, which are depicted above, and which are of individuals who appear to be delivering more than one ballot to a drop box during the primary election. It is undisputed that during the primary election, some county boards believed it be appropriate to allow voters to deliver ballots on behalf of third parties. [ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; ECF 504-49].

But this evidence of past injury is also speculative. Initially, the evidence is scant. But even assuming the evidence were more substantial, it would still be speculative to find that third-party ballot delivery will also occur in the general election. It may; it may not. Indeed, it may be less likely to occur now that the Secretary issued her September 28, 2020, guidance, which made clear to all county boards that for the general election, third-party ballot delivery is prohibited. [ECF 504-25 ("Third-person delivery of absentee or mail-in ballots is not permitted, and any ballots delivered by someone other than the voter are required to be set aside. The only exceptions are voters with a disability, who have designated in writing an agent to deliver their ballot for them.") ]. It may also be less likely to occur in light of the Secretary's other guidance, which recommends that county boards place signs near drop boxes, warning voters that third-party delivery is prohibited.

It is difficult—and ultimately speculative—to predict future injury from evidence of past injury. This is why the Supreme Court has recognized that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564, 112 S.Ct. 2130 (cleaned up).

In fact, based on Plaintiffs' theory of harm in this case, it is almost impossible for them to present anything other than speculative evidence of injury. That is, they would have to establish evidence of a certainly impending illegal practice that is likely to be prevented by the precautions they seek. All of this sounds in "possible future injury," not "certainly impending" injury. In that way, this case is very much like the Supreme Court's decision in *Clapper*.

In *Clapper*, plaintiffs-respondents were attorneys, other advocates, and media groups who communicated with clients overseas whom they feared would be subject to government surveillance under a FISA statute. 568 U.S. at 406, 133 S.Ct. 1138. The plaintiffs there alleged that the FISA statute at issue created a risk of possible government surveillance, which prevented them from communicating in confidence with their clients and compelled them to travel overseas instead and incur additional costs. *Id.* at 406-07, 133 S.Ct. 1138. Based on these asserted injures, the plaintiffs filed suit, seeking to invalidate provisions of FISA. *Id.* at 407, 133 S.Ct. 1138.

The Supreme Court held that plaintiffs there lacked standing because their risk of harm was not concrete—rather, it was attenuated and based on a series of speculative events that may or may not ever occur. *Id.* at 410, 133 S.Ct. 1138 (finding that "respondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts).

**\*35** In the end, the Court found that it would not "endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 414, 133 S.Ct. 1138.

Like *Clapper*, here, Plaintiffs' theory of harm rests on speculation about the decisions of independent actors. For drop boxes, that speculation includes that unknown individuals will utilize drop boxes to commit fraud or other illegal activity; for signature comparison, that fraudsters will submit forged ballots by mail; for poll watchers, that illegal votes will not be sufficiently challenged; and for all these claims, that other security measures in place to monitor drop boxes, to verify ballot information, and to challenge ballots will not work.

All of this may occur and may result in some of Plaintiffs' votes being diluted; but the question is whether these events are "certainly impending." The evidence outlined above and presented by Plaintiffs simply fails to meet that standard.

 **[18]** This is not to say that claims of vote dilution or voter fraud never give rise to a concrete injury. A plaintiff can have standing to bring a vote-dilution claim—typically, in a malapportionment case—by putting forth statistical evidence and computer simulations of dilution and establishing that he or she is in a packed or cracked district. *See* Gill, 138 S. Ct. at 1936 (Kagan, J., concurring). And a plaintiff can have standing to bring a voter-fraud claim, but the proof of injury there is evidence of actual fraud in the election and thus the suit will be brought after the election has occurred. *See, e.g.,* Marks v. Stinson, 19 F.3d 873 (3d Cir. 1994). But, at least based on the evidence presented here, a claim of vote dilution brought in advance of an election on the theory of the risk of potential fraud fails to establish the requisite concrete injury for purposes of Article III standing.

Plaintiffs advance three other theories of harm here, in order to establish standing—none of which establish a concrete injury-in-fact.

First, Plaintiffs assert that since some of them are Republican candidates and that Republicans are more likely to vote in person and Democrats more likely to vote by mail, that their injury here is a competitive disadvantage in the electoral process. [ECF 551, pp. 16-18 ("The challenged guidance will further harm the RNC through the institutional prioritization of voting by mail and the potential disenfranchisement of Republican voters, who prefer to vote in person in the upcoming General Election.") ]. This too is a speculative, non-concrete injury. There is nothing in the record to establish that potential voter fraud and dilution will impact Republicans more than Democrats.

 **\*36** To be sure, the information that Plaintiffs present shows that more Democrats are likely to use mail-in ballots. [ECF 551, p. 31 ("[I]n Pennsylvania, of the 1.9 million absentee or mail-in ballots that have been requested for the November 3, 2020 General Election, 'nearly 1.5 million Democrats have requested a mail-in ballot—nearly three times the requests from Republicans.' ") (quoting L. Broadwater, "Both Parties Fret as More Democrats Request Mail Ballots in Key States," New York Times (Sept. 30,

2020), *available at* https://www.nytimes.com/2020/09/30/us/mail-voting-democrats-republicans-turnout.html) ]. But it doesn't necessarily follow that more Democrats will commit voter fraud, such as through the destruction of drop boxes or third-party ballot harvesting, and thus more Republicans' votes will be diluted.

In fact, as Plaintiffs' expert, Mr. Riddlemoser, explains, fraudsters from either party could target drop boxes in specific areas in order to destroy ballots, depending on who may be the predominant party in the area. [ECF 504-19, at pp. 17-18 ("In short, nothing would prevent someone from intentionally targeting a drop box in a predominantly Republican or predominantly Democratic area with an intent to destroy as many votes for that political party or that party's candidate(s) as possible.") ]. Indeed, the more important fact for this theory of harm is not the party of the voter, but the party of the fraudster—and, on this, Plaintiffs present no evidence that one party over the other is likely to commit voter fraud.

Second, Plaintiffs also argue that the RNC, the Congressional Plaintiffs, and the Trump Campaign have organizational standing because they "have and will continue to devote their time and resources to ensure that their Pennsylvania supporters, who might otherwise be discouraged by the Secretary's guidance memos favoring mail-in and absentee voting and Defendants' implementation thereof, get out to the polls and vote on Election Day." [ECF 551, p. 19]. This is a similar argument raised by the plaintiffs in Clapper, and rejected there by the Supreme Court. Because Plaintiffs' harm is not "certainly impending," as discussed above, spending money in response to that speculative harm cannot establish a concrete injury. Clapper, 568 U.S. at 416, 133 S.Ct. 1138 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."); *see also* Donald J. Trump for President, Inc. v. Cegavske, — F. Supp. 3d ——, ——, 2020 WL 5626974, at *5 (D. Nev. Sept. 18, 2020) ("Outside of stating 'confusion' and 'discouragement' in a conclusory manner, plaintiffs make no indication of how AB 4 will discourage their member voters from voting. If plaintiffs did not expend any resources on educating their voters on AB4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections.").

Third, with respect to the poll-watching claim, Plaintiffs argue that at least one of the Plaintiffs, Ms. Patterson, is a prospective poll watcher who is being denied the right to poll watch based on the county-residency restriction, and thus she meets the Article III requirements. [ECF 551, p. 34 (citing ECF 551-3, ¶¶ 9-10) ]. However, Ms. Patterson cannot establish standing because, by Plaintiffs' own concession, the theory of harm in this case is not the denial of the right to poll watch, but instead dilution of votes from fraud caused from the failure to have sufficient poll watchers. [ECF 509, p. 67 ("But, the core of the as-applied challenge here is not that the Plaintiffs cannot staff a particular polling place, it is that a candidate and his or her party is prevented with the Hobson's choice of selecting limited polling places to observe due to the residency requirement and accept that unobserved polling places must exist due to the inability to recruit a sufficient force of poll watchers due to the necessity that candidates be county residents.") ].

*37 [19] And the remedy sought here is much broader than simply allowing Ms. Patterson to poll watch in a certain county, but is tied to the broader harm of vote dilution that Plaintiffs assert. [ECF 503-1, p. 3, ¶ 3 ("Plaintiffs shall be permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections.") ]. Standing is measured based on the theory of harm and the specific relief requested.

See 🔖 Gill, 138 S. Ct. at 1934 ("We caution, however, that 'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). As with all of the claims, the poll-watching claim rests on evidence of vote dilution that does not rise to the level of a concrete harm.

In sum, Plaintiffs here, based on the evidence presented, lack Article III standing to assert their claims. Because they lack standing, the Court will enter judgment in Defendants' favor and dismiss all claims. [10] However, because of the novelty of Plaintiffs' claims and theories, a potential appeal in this case, and the short time before the general election, out of an abundance of caution, the Court will, in the alternative, proceed to examine the claims on the merits.

## II. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' claim that drop boxes violate the U.S. Constitution.

Plaintiffs' drop-box claim has materially changed since the Pennsylvania Supreme Court's decision authorizing the use of drop boxes. Plaintiffs now allege that drop boxes effectively allow third parties to return the ballots of voters other than themselves because, they say, no one is there to stop them. Absent an in-person guard or poll worker to monitor the drop boxes and prevent the return of ballots cast in a manner contrary to what the Election Code permits, Plaintiffs assert that they face an unacceptable risk of vote dilution, which burdens their right to vote. Plaintiffs also argue that the "uneven" use of drop boxes in Pennsylvania, by some counties but not others, violates equal protection by subjecting voters in different counties to different amounts of dilutive risk, and perhaps by diluting lawful votes cast by individuals who failed to comply with the Election Code.

The evidence relevant to these claims is undisputed. See [ECF 509, p. 45 ("After the completion of extensive discovery, including numerous depositions and responses to discovery requests, no genuine dispute of material fact exists regarding Plaintiffs' constitutional claims.") ]. Viewed in the light most favorable to Plaintiffs, the Court could conclude from this evidence, and will assume for purposes of this decision, that (1) drop boxes allow for greater risk of third-party ballot delivery in violation of the Election Code than in-person polling locations or manned drop boxes, and (2) that the use of drop boxes is "uneven" across Pennsylvania due to its county-based election system—i.e., some counties are using "unmanned" drop boxes with varying security measures, some are using "manned" drop boxes, some are using dozens of drop boxes in a variety of locations, some are using one drop box in a county office building, and some are not using drop boxes at all. The question before the Court is whether this state of affairs violates equal protection or due process.

*38 The Court finds that it does not. The uneven use of drop boxes across counties does not produce dilution as between voters in different counties, or between "lawful" and "unlawful" voters, and therefore does not present an equal-protection violation. But even if it did, the guidelines provided by Secretary Boockvar are rational, and weighing the relative burdens and benefits, the Commonwealth's interests here outweigh any burden on Plaintiffs' right to vote.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

### A. Pennsylvania's "uneven" use of drop boxes does not violate federal equal-protection rights.

Plaintiffs' primary claim concerns the uneven use of drop boxes across the Commonwealth, which they contend violates the Equal-Protection Clause of the 14th Amendment.

The 14th Amendment's Equal-Protection Clause commands that "no State shall ... deny to any person within its jurisdiction the equal protection of laws." U.S. Const. amend. XIV, § 1. This broad and simple promise is "an essential part of the concept of a government of laws and not men." *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

[20] [21] But while the Constitution demands equal protection, that does not mean all forms of differential treatment are forbidden. *See Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) ("Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications."). Instead, equal protection "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* (citation omitted). What's more, "unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Id.* (citations omitted).

[22] [23] Of course, the right of every citizen to vote is a fundamental right. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ("[F]or reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure.") (citations omitted). Indeed, it is a foundational right "that helps to preserve all other rights." *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir. 1996); *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). And its scope is broad enough to encompass not only the right of each voter to cast a ballot, but also the right to have those votes "counted without dilution as compared to the votes of others." *Minn.*

*Voters Alliance v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (cleaned up).

[24] As a result, Plaintiffs are quite correct when they suggest that a state election procedure that burdens the right to vote, including by diluting the value of votes compared to others, must "comport with equal protection and all other constitutional requirements." *Cortés*, 218 F. Supp. 3d at 407. That much, at least, is not in dispute.

[25] At the same time, however, the Constitution "confers on the states broad authority to regulate the conduct of elections, including federal ones." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citing U.S. Const. Art. I, § 4, cl. 1). This authority includes "broad powers to determine the conditions under which the right of suffrage may be exercised." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013) (cleaned up). Indeed, "[c]ommon sense, as well as constitutional law, compels the conclusion" that states must be free to engage in "substantial regulation of elections" if "some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (cleaned up). And all "[e]lection laws will invariably impose some burden upon individual voters." *Id.*

**\*39** If the courts were "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest," it "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* The "machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Tex. v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482 (1931). Thus, when faced with a constitutional challenge to a state election law, or to the actions of state officials responsible for regulating elections, a federal court must weigh these competing constitutional considerations and "make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008).

The Supreme Court has supplied lower courts guidance as to how to make these hard judgments, by "forg[ing]" the "flexible standard" for assessing the constitutionality

of election regulations into "something resembling an administrable rule." *Id.* at 205, 128 S.Ct. 1610 (Scalia, J. concurring) (citing *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059).

**[26]** Under this standard, first articulated in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) and then refined in *Burdick,* the fact "[t]hat a law or state action imposes some burden on the right to vote does not make it subject to strict scrutiny." *Donatelli v. Mitchell,* 2 F.3d 508, 513 (3d Cir. 1993); *see also Libertarian Party of Ohio v. Blackwell,* 462 F.3d 579, 585 (6th Cir. 2006) ("[V]oting regulations are not automatically subjected to heightened scrutiny."). Instead, any "law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process," is subjected to "a deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote." *Crawford,* 553 U.S. at 204, 128 S.Ct. 1610 (Scalia, J. concurring).

**[27]** **[28]** **[29]** In practice, this means that courts must weigh the "character and magnitude of the burden the State's rule imposes" on the right to vote "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make that burden necessary." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (cleaned up). If the state imposes a "severe" burden on the right to vote, strict scrutiny applies—the rule may survive only if it is "narrowly tailored" and only if the state advances a "compelling interest." *Id.* But if the state imposes only "reasonable, nondiscriminatory restrictions," its "important regulatory interests will usually be enough" to justify it. *Id.* Indeed, where state regulations are "minimally burdensome and nondiscriminatory" a level of scrutiny "closer to rational basis applies[.]" *Ohio Council 8 Am. Fed'n of State v. Husted,* 814 F.3d 329, 335 (6th Cir. 2016). And where the state imposes no burden on the "right to vote" at all, true rational basis review applies. *See Biener v. Calio,* 361 F.3d 206, 215 (3d Cir. 2004) ("Biener also cannot establish an infringement on the fundamental right to vote ... As the [election] filing fee does not infringe upon a fundamental right, nor is Biener in a suspect class, we consider the claims under a rational basis test.") (citation omitted); *Common Cause/New York v.*

*Brehm,* 432 F. Supp. 3d 285, 310 (S.D.N.Y. 2020) ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

**\*40** This operates as a "sliding scale"—the "more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny." *Arizona Libertarian Party v. Hobbs,* 925 F.3d 1085, 1090 (9th Cir. 2019); *see also Fish v. Schwab,* 957 F.3d 1105, 1124 (10th Cir. 2020) ("We, and our sister circuits and commentators, have referred to this as a 'sliding scale' test."); *Libertarian Party of New Hampshire v. Gardner,* 638 F.3d 6, 14 (1st Cir. 2011) ("We review all of the First and Fourteenth Amendment claims under the sliding scale approach announced by the Supreme Court in *Anderson* ... and *Burdick*[.]"); *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059 ("[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.").

Against that backdrop, the Court now turns to Plaintiffs' claim that the use of unmanned drop boxes by some Pennsylvania counties, but not others, violates equal protection. As will be discussed, Plaintiffs' equal-protection claim fails at the threshold, without even reaching *Anderson*-*Burdick,* because Plaintiffs have not alleged or shown that Pennsylvania's system will result in the dilution of votes in certain counties and not others. Furthermore, even if the Court applies *Anderson*-*Burdick,* the attenuated "burden" Plaintiffs have identified—an increased risk of vote dilution created by the use of unmanned drop boxes—is more than justified by Defendants' important and precise interests in regulating elections.

### 1. Plaintiffs have not shown that Pennsylvania treats equivalent votes in different counties differently.

Plaintiffs' equal-protection claim asserts differential treatment on a theory of vote dilution. As far as the Court can discern, this claim has two dimensions.

First, the main thrust concerns differential treatment as between counties. Plaintiffs assert that some counties will use drop boxes in certain ways (specifically, without in-person guards or in varying number and locations), while others will not—resulting in differential treatment. *See, e.g.,* [ECF 551, p. 44 ("Plaintiffs assert (and have proven)

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

that Defendants have adopted, and intend to implement in the General Election, an election regime that applies Pennsylvania's Election Code in a way that treats the citizens of Pennsylvania unequally depending on ... the location where they happen to live: in some counties, voters will have around-the-clock access to 'satellite election offices' at which they can deposit their vote, but in other counties, voters will have no access at all to such drop boxes; in some counties those drop boxes will be staffed and secure, but in other counties drop boxes will be unmonitored and open to tampering[.]") ]; [*Id.* at p. 46 ("Defendants' ongoing actions and stated intentions ensure that votes will not be counted the same as those voting in other counties, and in some instances, in the same Congressional district. For instance, the harm flowing from those actions will fall disproportionately on the Republican candidates that bring suit here because many Democrat-heavy counties have stated intentions to implement the Secretary's unconstitutional ... ballot collection guidance, and many Republican-heavy counties have stated intentions to follow the Election Code as it is written.") ].

**\*41** Second, although less clear, Plaintiffs' equal-protection claim may also concern broader differential treatment between law-abiders and scofflaws. In other words, Plaintiffs appear to suggest that Pennsylvania discriminates against all law-abiding voters by adopting policies which tolerate an unacceptable risk of a lawfully cast votes being diluted by each unlawfully cast vote anywhere in Pennsylvania. *See, e.g.,* [ECF 509, p. 55 ("The use of unstaffed drop boxes ... not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (emphasis in original) ]; [ECF 509 p. 68 ("There will be no protection of one-person, one-vote in Pennsylvania, because her policies ... allowing inconsistently located/used drop boxes will result in illegal ballots being cast and counted with legitimate votes[.]") ].

 **[30]** As discussed below, both of these species of equal protection fail because there is, in fact, no differential treatment here—a necessary predicate for an equal-protection claim.

Initially, Plaintiffs "have to identify a burden before we can weigh it." *Crawford*, 553 U.S. at 205, 128 S.Ct. 1610 (Scalia, J. concurring). In the equal-protection context, this means the plaintiff "must present evidence that s/he has been treated differently from persons who are similarly situated." *Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010)

(cleaned up). And not just any differential treatment will do. As discussed above, differences in treatment raise equal-protection concerns, and necessitate heightened scrutiny of governmental interests, only if they burden a fundamental right (such as the right to vote) or involve a suspect classification based on a protected class. *See Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used.").

Plaintiffs argue that equal protection is implicated because Pennsylvania has permitted counties to use drop boxes to varying extents, and with varying degrees of security. Some, like Delaware County, intend to use dozens of drop boxes. *See generally* [ECF 549-28]. Many others will not use drop boxes at all. *See generally* [ECF 504-1]. And among the counties that *do* use drop boxes, some will staff them with county officials, while others will monitor them only with video surveillance or not at all. *See generally* [ECF 549-28].

In this respect, Plaintiffs argue that they suffer an equal-protection harm similar to that found by the Supreme Court in *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). There, the Supreme Court held that the Florida Supreme Court violated equal protection when it "ratified" election recount procedures that allowed different counties to use "varying standards to determine what was a legal vote." *Id.* at 107, 121 S.Ct. 525. This meant that entirely equivalent votes might be counted in one county but discounted in another. *See, e.g., id.* ("Broward County used a more forgiving standard than Palm Beach County, and uncovered almost three times as many new votes, a result markedly disproportionate to the difference in population between the counties."). Given the absence of uniform, statewide rules or standards to determine which votes counted, the Court concluded that the patchwork recount scheme failed to "satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right [to vote]." *Id.*

**\*42** While the Supreme Court expressly limited its holding in *Bush* "to the present circumstances" of a standardless "statewide recount under the authority of a single state judicial officer," *id.* at 109, 121 S.Ct. 525, a few courts have found

its reasoning to be persuasive as a broader principle of equal protection. *See* Stewart v. Blackwell, 444 F.3d 843, 859 (6th Cir. 2006) ("Somewhat more recently decided is *Bush v. Gore*, ... which reiterated long established Equal Protection principles."); Ne. Ohio Coal. for Homeless v. Husted, 696 F.3d 580, 598 (6th Cir. 2012) ("We agree with all of the parties and the district court that the consent decree likely violates the equal protection principle recognized in *Bush v. Gore*."); Pierce v. Allegheny Cty. Bd. of Elections, 324 F. Supp. 2d 684, 705 (W.D. Pa. 2003) (Conti, J.) ("As noted above, the court finds that the facts presented raise a serious equal protection claim under a theory similar to that espoused by the United States Supreme Court in *Bush v. Gore, supra.*"); Black v. McGuffage, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002) ("The Court is certainly mindful of the limited holding of Bush. However, we believe that situation presented by this case is sufficiently related to the situation presented in *Bush* that the holding should be the same.").

Indeed, *Bush's* core proposition—that a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other—seems uncontroversial. It also seems reasonable (or at least defensible) that this proposition should be extended to situations where a state takes two equivalent votes and, for no good reason, adopts procedures that greatly increase the risk that one of them will not be counted—or perhaps gives more weight to one over the other. *See, e.g.*, Black, 209 F. Supp. 2d at 899 ("Plaintiffs in this case allege that the resulting vote dilution, which was found to be unacceptable in *Bush* without any evidence of a disproportionate impact on any group delineated by traditional suspect criteria, is impacting African American and Hispanic groups disproportionately.... Any voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional."); *see also* Reynolds, 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

That is the sort of equal-protection claim Plaintiffs purport to be asserting—a claim that voters in counties that use drop boxes are subjected to a much higher risk of vote dilution than those in other counties that do not. But that characterization falls apart under scrutiny. Indeed, despite their assertions, Plaintiffs have not actually alleged, let alone proven, that votes cast in some counties are diluted by a greater amount relative to votes cast in others. Rather, they have, at best, shown only that events causing dilution are more likely to occur in counties that use drop boxes. But, importantly, the effect of those events will, by Plaintiffs' own admission, be felt by every voter across all of Pennsylvania. [ECF 509, p. 55. ("The use of unstaffed drop boxes places the security of unknown hundreds (if not thousands) of ballots in jeopardy of theft, destruction, and manipulation. This not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (citations omitted) (emphasis in original) ]. Such dilution impacts the entire electorate equally; not just voters in the county where it occurs.

To illustrate this distinction, consider, for example, a presidential election. The Court agrees with Plaintiffs that the relevant electoral unit in such an election is "the entire Commonwealth of Pennsylvania." [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. Indeed, on election night, votes cast in each of Pennsylvania's 67 counties will be canvassed, counted, and ultimately added to a statewide vote total that decides who wins Pennsylvania's 20 electoral votes. So, ask: what is the dilutive impact of a hypothetical illegal vote cast in Philadelphia during that election? Does it cause, in any sense, an "unequal evaluation of ballots" cast in different counties, Bush, 531 U.S. at 106, 121 S.Ct. 525, such that lawful ballots cast in Philadelphia will be less likely to count, worth less if they do, or otherwise disfavored when compared to votes cast in other counties? The answer is evident—it does not. Rather, the hypothetical illegal vote cast in Philadelphia dilutes *all lawful votes* cast in the election *anywhere* in the Commonwealth by the exact same amount.

**\*43** The same reasoning holds in elections that occur within part of a state, rather than statewide. For example, consider a hypothetical legislative district covering two counties—one that uses drop boxes and one that does not. There may well be a greater risk that illegal voting will occur in the county that uses drop boxes. But any dilutive impact of those votes will be felt equally by voters in *both* counties.

This is categorically different from the harm at issue in Bush and cases like it. In Bush, Florida's arbitrary use of different recount standards in different counties meant that the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   44

state was counting equivalent ballots differently in different counties, meaning that voters in some counties were more likely to have their votes counted than those in others.

In *Black v. McGuffage*, an Illinois district-court case on which Plaintiffs heavily rely, the plaintiffs alleged that the type of voting machines used in some Illinois counties were statistically much more likely to result in equivalent votes being discounted at a much higher frequency in some counties than others, and that the worst machines were those being used in counties with high populations of minority groups. *209 F. Supp. 2d at 899*. As a result, voters (and, specifically, minority voters) were much more likely to have their votes discounted, based just on the county in which they lived. *See id.* ("As a result, voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office. Similarly situated persons are treated differently in an arbitrary manner.... In addition, the Plaintiffs in this case allege that the resulting vote dilution ... is impacting African American and Hispanic groups disproportionately.").

Finally, *Stewart v. Blackwell*, another case cited by Plaintiffs, was the same as *Black*—voters in counties that used punch-card voting were "approximately four times as likely not to have their votes counted" as a voter in a different county "using reliable electronic voting equipment." *444 F.3d at 848*.

What ties these cases together is that each of them involves a state arbitrarily "valu[ing] one person's vote over that of another," *Bush, 531 U.S. at 104-05, 121 S.Ct. 525*, by permitting counties to either apply different standards to decide what votes count (*Bush*) or use different voting technologies that create a great risk of votes being discounted in one county that does not exist in others (*Black* and *Stewart*). It is this sort of "differential treatment ... burden[ing] a fundamental right" that forms the bedrock of equal protection. *Sullivan v. Benningfield, 920 F.3d 401, 409 (6th Cir. 2019)*.

Plaintiffs, in contrast, have shown no constitutionally significant differential treatment at all.

Instead, as discussed, if Plaintiffs are correct that the use of drop boxes increases the risk of vote dilution, all votes in the relevant electoral unit—whether that is statewide, a subset of the state, or a single county—face the same degree of increased risk and dilution, regardless of which county is most at fault for elevating that risk.

What Plaintiffs have really identified, then, are not uneven *risks of vote dilution*—affecting voters in some counties more than equivalent voters in others—but merely different voting procedures in different counties that may contribute different amounts of vote dilution *distributed equally across the electorate as a whole*. The Court finds that this is not an equal-protection issue.

**\*44** To be clear, the reason that there is no differential treatment is solely based on Plaintiffs' theory of harm in this case. In the more "routine" vote-dilution cases, the state imposes some restriction or direct impact on the plaintiff's right to vote—that results in his or her vote being weighed less (*i.e.*, diluted) compared to those in other counties or election districts. *See Gill, 138 S. Ct. at 1930*, (explaining that "the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were individual and personal in nature, because the claims were brought by voters who alleged facts showing disadvantage to themselves as individuals") (cleaned up). In this case, though, Plaintiffs complain that the state is *not* imposing a restriction on *someone else's* right to vote, which, they say, raises the risk of fraud, which, if it occurs, could dilute the value of Plaintiffs' vote. The consequence of this inverted theory of vote dilution is that all other votes are diluted in the same way; all feel the same effect.

Finally, the Court's ruling in this regard is consistent with the many courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state.

*See, e.g.,* *Wexler v. Anderson, 452 F.3d 1226, 1231-33 (11th Cir. 2006)* ("Plaintiffs do not contend that equal protection requires a state to employ a single kind of voting system throughout the state. Indeed, local variety in voting systems can be justified by concerns about cost, the potential value of innovation, and so on.") (cleaned up); *Hendon v. N.C. State Bd. of Elections, 710 F.2d 177, 181 (4th Cir. 1983)* ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state."); *Short v. Brown, 893 F.3d 671, 679*

(9th Cir. 2018) ("[T]he appellants' reading of the Supreme Court's voting cases would essentially bar a state from implementing any pilot program to increase voter turnout. Under their theory, unless California foists a new system on all fifty-eight counties at once, it creates 'unconstitutional vote-dilution' in counties that do not participate in the pilot plan. Nothing in the Constitution, the Supreme Court's controlling precedent, or our case law suggests that we can micromanage a state's election process to this degree."); *Fla. State Conference of N.A.A.C.P. v. Browning*, 569 F. Supp. 2d 1237, 1258 (N.D. Fla. 2008) ("[A]s with countless public services delivered through Florida's political subdivisions— such as law enforcement and education—resource disparities are to some degree inevitable. They are not, however, unconstitutional."); *Green Party of State of New York v. Weiner*, 216 F. Supp. 2d 176, 192 (S.D.N.Y. 2002) ("Even in that situation, [ *Bush v. Gore*] did not challenge, and the Court did not question, the use of entirely different technologies of voting in different parts of the state, even in the same election."); *Paher v. Cegavske*, No. 20-243, 2020 WL 2748301, at *9 (D. Nev. May 27, 2020) ("[I]t cannot be contested that Clark County, which contains most of Nevada's population—and likewise voters (69% of all registered voters [ ] )—is differently situated than other counties. Acknowledging this as a matter of generally known (or judicially noticeable) fact and commonsense makes it more than rational for Clark County to provide additional accommodations to assist eligible voters."); *Ron Barber for Cong. v. Bennett*, No. 14-2489, 2014 WL 6694451, at *5 (D. Ariz. Nov. 27, 2014) ("[T]he [ *Bush v. Gore*] Court did not invalidate different county systems regarding implementation of election procedures."); *Tex. Democratic Party v. Williams*, No. 07-115, 2007 WL 9710211, at n.4 (W.D. Tex. Aug. 16, 2007) ("In *Bush v. Gore*, the Supreme Court specifically noted: 'The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.' ").

*45 [31] Equal protection does not demand the imposition of "mechanical compartments of law all exactly alike." *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31, 43 S.Ct. 9, 67 L.Ed. 107 (1922). Rather, "the Constitution is sufficiently flexible to permit its requirements to be considered in relation to the ... contexts in which they are invoked." *Merchants Nat'l Bank of Mobile v. Dredge Gen. G. L. Gillespie*, 663 F.2d 1338, 1343 (5th Cir. 1981). And in this context, "few (if any) electoral systems could survive constitutional scrutiny if the use of different voting mechanisms by counties offended

the Equal Protection Clause." *Trump v. Bullock,* ---- F.3d ----, ----, 2020 WL 5810556, at *14 (D. Mont. Sept. 30, 2020).

The distinction—between differences in county election procedures and differences in the treatment of votes or voters between counties—is reflected in *Bush* itself. There, the Supreme Court took pains to clarify that the question before it was "not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Bush*, 531 U.S. at 109, 121 S.Ct. 525; *see also id.* at 134, 121 S.Ct. 525 (Souter, J. dissenting) ("It is true that the Equal Protection Clause does not forbid the use of a variety of voting mechanisms within a jurisdiction, even though different mechanisms will have different levels of effectiveness in recording voters' intentions; local variety can be justified by concerns about cost, the potential value of innovation, and so on."); *Bullock,* ---- F.3d at ----, 2020 WL 5810556, at *14 ("[T]he Supreme Court was clear in *Bush v. Gore* that the question was not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.") (cleaned up).

Thus, coming back to the theory of Plaintiffs' case, Plaintiffs contend that Secretary Boockvar's drop-box guidance will result in differences between counties and differing risks of fraud. But the result of that uneven implementation will not be votes in certain counties being valued less than others. And the result won't be that voters who vote in person will have their votes valued less, either. Instead, if Plaintiffs are right, any unlawful votes will dilute all other lawful votes in the same way. While certainly voter fraud and illegal voting are bad, as a matter of equal protection, there is no unequal treatment here, and thus no burden on Plaintiffs' rights under the Equal Protection Clause.

In addition to their equal-protection claim based on county differences, Plaintiffs also appear to allude to a more general type of equal-protection violation. They assert that Pennsylvania comprises a single election unit. [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. They assert that they intend to cast their ballots lawfully. *See, e.g.,* [ECF 504-3, ¶ 4 ("As a Pennsylvania qualified registered elector, I have always voted in-person at primary and general elections, and I intend to vote in-person at the upcoming November 3, 2020 General Election.") ]. And they assert that unmanned drop

boxes across the Commonwealth (regardless of the county) will, on a statewide basis, dilute their votes. *See, e.g.,* [*id.* at ¶ 6 ("As a Pennsylvania qualified registered elector who votes in-person, I do not want my in-person vote diluted or cancelled by votes that are cast in a manner contrary to the requirements enacted by the Pennsylvania General Assembly.") ]. For example, if one "qualified elector" casts a lawful ballot, but a fraudulent voter casts ten ballots, then that elector's vote will, under Plaintiffs' theory, be diluted by a magnitude of ten—resulting in differential treatment.

**\*46** The problem with this theory is that there does not appear to be any law to support it. Indeed, if this were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop illegal activity. This is not the law. To the contrary, it is well-established that even violations of state election laws by state officials, let alone violations by unidentified third parties, do not give rise to federal constitutional claims except in unusual circumstances. *See Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A violation of state law does not state a claim under § 1983, and, more specifically, a deliberate violation of state election laws by state election officials does not transgress against the Constitution.") (cleaned up); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations—no matter how egregious those violations may appear within the local legal framework.").

Thus, this type of equal-protection claim fails as a matter of law, as well.

### 2. If Pennsylvania's "uneven" use of drop boxes indirectly burdens the right to vote at all, that burden is slight, and justified by important state interests.

**[32]** Even assuming that Plaintiffs could establish unequal treatment to state an equal-protection claim, their claim nonetheless fails because the governmental interests here outweigh any burden on the right to vote.

Initially, the Court finds that the appropriate level of scrutiny is rational basis. Defendants' failure to implement a mandatory requirement to "man" drop boxes doesn't directly infringe or burden Plaintiffs' rights to vote at all. Indeed, as discussed above in the context of standing, what Plaintiffs characterize as the burden or harm here is really just an ancillary 'increased risk' of a theoretical harm, the degree of which has not been established with any empirical precision.

*See Obama*, 697 F.3d at 429 ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used."); *Brehm*, 432 F. Supp. 3d at 310 ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

On rational-basis review, the Secretary's guidance here passes constitutional muster. Her guidance certainly provides some flexibility in how counties may use drop boxes, but the guidance overall is rationally related to a legitimate governmental interest—namely, the implementation of drop boxes in a secure manner, taking into account specific county differences. That Plaintiffs feel the decisions and actions of the Pennsylvania General Assembly, Secretary Boockvar, and the county Defendants are insufficient to prevent fraud or illegal voting is of no significance. "[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe by Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

As detailed above, Secretary Boockvar's guidance provides lawful, comprehensive, and reasonable standards with respect to (1) selecting the location of drop boxes, (2) drop-box design criteria, (3) signage, (4) drop-box security measures, and (5) drop-box ballot collection and chain of custody procedures. Of particular note, with respect to ballot security, the Secretary's guidance calls for the use of reasonably robust measures like video surveillance, durable and tamperproof design features, regular ballot collection every 24 hours, chain-of-custody procedures to maintain ballot traceability, and signage advising voters that third-party delivery is prohibited, among other things.

To be sure, the Secretary's guidance doesn't insist on the use of security personnel—though some counties have decided to post security guards outside of drop boxes on their own. But the Court can't say that either the Secretary's failure to provide that requirement, or the decision of some counties to proceed with drop boxes "unmanned," is irrational. For example, the evidence presented demonstrates that placing a security guard

outside of a drop box at all times is costly, particularly for cash-strapped counties—at least $13 per hour or about $104 (8 hours) to $312 (24 hours) per day, according to Defendants' expert, Professor Robert McNair. [ECF 549-11, p. 11] In the context of a broader election system that detects and deters fraud at many other stages of the voting process, and given that that there are also no equivalent security measures present at U.S. postal mailboxes (which constitute an arguably more tempting vehicle for the would-be ballot harvester), the Court finds that the lack of any statewide requirement that all drop boxes be manned or otherwise surveilled is reasonable, and certainly rational.

**\*47** But even assuming Plaintiffs are right that their right to vote here has been burdened (and thus a heightened level of scrutiny must apply), that burden is slight and cannot overcome Defendants' important state interests under the *Anderson*-*Burdick* framework. Indeed, courts routinely find attenuated or ancillary burdens on the right to vote to be "slight" or insignificant, even burdens considerably *less* attenuated or ancillary than any burden arguably shown here.

*See, e.g., Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("Under *Burdick*, the use of touchscreen voting systems is not subject to strict scrutiny simply because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect."). [11]

To begin with, application of the *Anderson*-*Burdick* framework here presents something of a "square peg, round hole" dilemma. After all, that test assumes there is some constitutional injury to "weigh" against the state's "important" regulatory interests in the first place. And without differential treatment of votes or voters, there isn't any equal-protection injury for the Court to balance.

The *Anderson*-*Burdick* test is also ill-fitted to Plaintiffs' claims for another reason. Typically, *Anderson*-*Burdick* is invoked where the government takes some direct action to burden or restrict a plaintiff's right to vote. Here, in contrast, Plaintiffs complain that Pennsylvania has indirectly burdened the right to vote through *inaction*—*i.e.*, by not imposing *enough* regulation to secure the voting process it has adopted, which, Plaintiffs say, will allow third parties to vote in an unlawful way, which, if it happens, will dilute (and thus burden) the right to vote.

**\*48** This unusual causal daisy-chain makes it difficult to apply *Anderson*-*Burdick*'s balancing approach. After all, it is one thing to assess the government's interest in taking a specific action that imposed burdens on the right to vote. It is much less natural for a court to evaluate whether the government had a good reason for not doing something differently, or for failing to do more to prevent (or reduce the risk of) misconduct by third parties that could burden the right to vote.

To the extent *Anderson*-*Burdick* applies in such circumstances, the appropriate course would, in this Court's view, be to weigh any burden stemming from the government's alleged failures against the government's interest in enacting the broader election scheme it has erected, of which the challenged piece is usually only one part. Focusing solely on the allegedly inadequate procedure being challenged, such as the state's authorization of "drop boxes" here, would ignore the fact that Election Code provisions and regulations operate as part of a single, complex organism balancing many competing interests, all of which are "important" for purposes of the *Anderson*-*Burdick* analysis. *See, e.g., Crawford*, 553 U.S. at 184, 128 S.Ct. 1610 ("deterring and detecting voter fraud"); *Tedards v. Ducey*, 951 F.3d 1041, 1067 (9th Cir. 2020) ("voter turnout"); *Lunde v. Schultz*, 221 F. Supp. 3d 1095, 1106 (S.D. Iowa 2014) ("expanding ballot access to nonparty candidates"); *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 671 (D.S.C. 2011) ("promoting voter participation in the electoral process"); *Mays v. LaRose,* 951 F.3d 775, 787 (6th Cir. 2020) ("orderly administration of elections"); *Dudum*, 640 F.3d at 1115 ("orderly administration of ... elections"); *Paher v. Cegavske* , 457 F.Supp.3d 919, ——, 2020 WL 2089813, at \*7 (2020) ("protect[ing] the health and safety of ... voters" and "safeguard[ing] the voting franchise"); *Nemes*, —— F. Supp. 3d at ——, 2020 WL 3402345, at \*13 ("implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19").

Thus, on the "burden" side of the equation is Plaintiffs' harm of vote dilution predicated on a risk of fraud. As discussed above in the context of lack of standing, that burden is slight, factually, because it is based on largely speculative evidence of voter fraud generally, anecdotal evidence of the mis-use of certain drop boxes during the primary election, and worries that the counties will not implement a "best practice" of

having poll workers or guards man the drop boxes. *See* [ECF 461, ¶¶ 63-82; ECF 504-2, ¶ 12; 504-3, ¶ 6; 504-4, ¶7;; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9; ECF 504-9; 92:4-10; ECF 504-10, 60:3-61:10; 504-19, pp. 3, 16-18, 20 & Ex. D; ECF 504-25; ECF 504-49; ECF 509, p. 67; ECF 551, p. 34].

 **[33]**  This somewhat scant evidence demonstrates, at most, an increased risk of some election irregularities—which, as many courts have held, does not impose a meaningful burden under *Anderson*-*Burdick*. "Elections are, regrettably, not always free from error," *Hutchinson v. Miller*, 797 F.2d 1279, 1286–87 (4th Cir. 1986), let alone the "risk" of error. In just about every election, votes are counted, or discounted, when the state election code says they should be. But the Constitution "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980). It is "not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations." *Fournier v. Reardon*, 160 F.3d 754, 757 (1st Cir. 1998). Nor is it "an election fraud statute." *Minnesota Voters*, 720 F.3d at 1031.

 ***49** **[34]**  "Garden variety" election irregularities, let alone the "risk" of such irregularities, are simply not a matter of federal constitutional concern "even if they control the outcome of the vote or election." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). And as discussed above, most often, even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Shipley*, 947 F.3d at 1062. *see, e.g.*, *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018) ("[E]ven assuming the Fredericksburg officials' failure to provide provisional ballots amounted to a violation of state law, it would not rise to the level of an equal protection violation.").

Compared, then, to Plaintiffs' slight burden, the Commonwealth has put forward reasonable, precise, and sufficiently weighty interests that are undisputed and that can be distilled into three general categories: (1) the benefits of drop boxes, (2) the Commonwealth's interests in furthering its overall election-security plan concerning drop boxes, and (3) the interests inherent in the Commonwealth's general mail-in ballot scheme.

The first category concerns the benefits of drop boxes generally. Secretary Boockvar has pointed out the Commonwealth's interests generally in using drop boxes— including, (1) the increase of voter turnout, (2) the protection of voters' health in the midst of the ongoing pandemic, (3) the increase of voter satisfaction, in light of ongoing U.S. Postal Service issues, and (4) the reduction of costs for counties. [ECF No. 547, at pp. 22-25; ECF No. 549-2, ¶¶ 36-39, 42-44]. Plaintiffs do not dispute any of these interests.

The second category of interests concerns the Commonwealth's interests in implementing drop boxes with appropriate and effective safety measures and protocols in place. That is, Secretary Boockvar has, in her capacity as the chief state official charged with overseeing elections, issued uniform guidance to all counties regarding the use of drop boxes, which is noted above. That guidance includes (1) advising counties that the Election Code permits the use of drop boxes, and (2) setting forth best practices that the counties should "consider" with respect to their use. Among other things, the Secretary advised that counties should maintain a traceable chain of custody for mail-in and absentee ballots retrieved from drop boxes; utilize drop boxes with various security features (*e.g.*, anti-tampering features, locks, video surveillance, and removal when the site is closed or cannot be monitored); and designate sworn county personnel to remove ballots from drop boxes. And evidence suggests that the Secretary's deputies have emphasized these best practices when queried by county officials. [ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

This guidance is lawful, reasonable, and non-discriminatory, and so does not create any constitutional issue in its own right. With this guidance, the Secretary has diminished the risks tolerated by the legislature in adopting mail-in voting and authorizing drop-boxes, by encouraging the counties to adopt rather comprehensive security and chain-of-custody procedures if they do elect to use drop boxes. Conversely, the legislature's decision to leave the counties with ultimate discretion when it comes to how, and to what extent, to use drop boxes (as opposed to adopting a scheme in which the Secretary could enforce compliance with her guidance) is also reasonable, and justified by sufficiently weighty governmental interests, given the many variations in population, geography, local political culture, crime rates, and resources. [ECF 549-9 ("There is no logical reason why ballot receptacles such as drop boxes must be uniform across different counties; particularly because the verification of the voter is determined by election officials upon receipt of the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

ballot. Counties vary in size and need. Across the country, best practices dictate that counties determine what type of box and size works for them. The needs of a large county are very different from the needs of a smaller county."); ECF 549-11, p. 9 ("Such variation between counties even within a state makes sense, since the needs of different counties vary and their use of drop boxes reflects those considerations (e.g., the geographic size of a county, the population of the county, and the ease with which voters in the county can access other locations to return mail-in ballots).").

**\*50** The third category of interests is, more generally, the interests of the Commonwealth in administering its overall mail-in ballot regime, including the various security and accountability measures inherent in that legislative plan.

Pennsylvania did not authorize drop boxes in a vacuum. Last year, the Pennsylvania legislature "weigh[ed] the pros and cons," *Weber*, 347 F.3d at 1107, and adopted a broader system of "no excuse" mail-in voting as part of the Commonwealth's Election Code. As the Pennsylvania Supreme Court has now confirmed, that system left room for counties to authorize drop boxes and other satellite locations for returning ballots to the county boards of elections. *See Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at \*9 ("[W]e need not belabor our ultimate conclusion that the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes.").

Inherent in any mail-in or absentee voting system is some degree of increased risk of votes being cast in violation of other provisions of the Election Code, regardless of whether those ballots are returned to drop boxes, mailboxes, or some other location. For example, there is simply no practical way to police third party delivery of ballots to any mailbox anywhere in the Commonwealth, where Plaintiffs do not dispute that such ballots can be lawfully returned. It is also likely that more (and perhaps many more) voters than usual will be disenfranchised by technicalities this year, for failing to comply with the procedural requirements associated with mail-in ballots, such as the requirement that such ballots be placed in "inner secrecy envelopes."

But in enacting the "no excuse" mail-in voting system that it did, the Pennsylvania legislature chose to tolerate the risks inherent in that approach. And the key point is that the legislature made that judgment in the context of erecting a broader election scheme that authorizes other forms of voting and has many other safeguards in place to catch or deter fraud and other illegal voting practices. These safeguards include voter registration; a mail-in ballot application and identity verification process, 25 P.S. §§ 3146.2, 3150.12; a system for tracking receipt of mail-in ballots, 25 P.S. §§ 3146.3(a), 3150.13(a); and, perhaps most important of all, a pre-canvassing and canvassing process during which mail-in ballots are validated before being counted. In addition, Pennsylvania law also seeks to deter and punish fraud by imposing criminal penalties for unlawful voting, 25 P.S § 3533; voting twice in one election, 25 P.S § 3535; forging or destroying ballots, 25 P.S § 3517; unlawful possession or counterfeiting of ballots 25 P.S § 3516; and much more of the conduct Plaintiffs fear, *see* 25 P.S. § 3501, *et seq.*

In this larger context, the Court cannot say that the balance Pennsylvania struck across the Election Code was unreasonable, illegitimate, or otherwise not "sufficiently weighty to justify," *Crawford*, 553 U.S. at 191, 128 S.Ct. 1610, whatever ancillary risks may be associated with the use of drop boxes, or with allowing counties to exercise discretion in that regard. Pennsylvania may balance the many important and often contradictory interests at play in the democratic process however it wishes, and it must be free to do so "without worrying that a rogue district judge might later accuse it of drawing lines unwisely." *Abbott*, 961 F.3d at 407.

**\*51** **[35]** Thus, balancing the slight burden of Plaintiffs' claim of dilution against the categories of interests above, the Court finds that the Commonwealth and Defendants' interests in administering a comprehensive county-based mail-in ballot plan, while both promoting voting and minimizing fraud, are sufficiently "weighty," reasonable, and justified. Notably, in weighing the burdens and interests at issue, the Court is mindful of its limited role, and careful to not intrude on what is "quintessentially a legislative judgment." *Griffin*, 385 F.3d at 1131. "[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." *Weber*, 347 F.3d at 1106. "So long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Id.*; *see also Abbott*, 961 F.3d at 407, ("That the line might have been drawn differently ... is a matter for

legislative, rather than judicial, consideration.") (cleaned up);

*Trinsey v. Com. of Pa.*, 941 F.2d 224, 235 (3d Cir. 1991) ("We take no position on the balancing of the respective interests in this situation. That is a function for which the legislature is uniquely fitted.").

Thus, even under the *Anderson*-*Burdick* framework, the Court finds that Plaintiffs' constitutional challenge fails as a matter of law.

### B. Pennsylvania's use of drop boxes does not violate federal due process.

[36]   In addition to their equal-protection challenge to the use of drop boxes, Plaintiffs also appear to argue that the use of unmanned drop boxes violates substantive due process protected by the 14th Amendment. This argument is just a variation on their equal-protection argument—*i.e.*, the uneven use of drop boxes will work a "patent and fundamental unfairness" in violation of substantive due process principles.

*See* *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) (substantive due process rights are violated "[i]f the election process itself reaches the point of patent and fundamental unfairness[.]"). The analysis for this claim is the same as that for equal protection, and thus it fails for the same reasons.

But beyond that, this claim demands even stricter proof. Such a claim exists in only the most extraordinary circumstances.

*See* *Nolles v. State Comm. for Reorganization of Sch. Districts*, 524 F.3d 892, 898 (8th Cir. 2008) ("A canvass of substantive due process cases related to voting rights reveals that voters can challenge a state election procedure in federal court only in limited circumstances, such as when the complained of conduct discriminates against a discrete group of voters, when election officials refuse to hold an election though required by state law, resulting in a complete disenfranchisement, or when the willful and illegal conduct of election officials results in fraudulently obtained or fundamentally unfair voting results.") (cleaned up); *Yoshina*, 140 F.3d at 1226 ("We have drawn a distinction between 'garden variety' election irregularities and a pervasive error that undermines the integrity of the vote. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation omitted); *Bennett v. Mollis*, 590 F. Supp. 2d 273, 278 (D.R.I. 2008) ("Before an election error becomes a key that unlocks the restraints on the

federal court's authority to act, the Plaintiffs must demonstrate either an intentional election fraud or an unintentional error resulting in broad-gauge unfairness.").

Indeed, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense"—the "executive action must be so ill-conceived or malicious that it 'shocks the conscience.' " *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999) (cleaned up).

Based on the slight burden imposed here, and the Commonwealth's interests in their overall county specific voting regime, which includes a host of other fraud-prevention measures, the Court finds that the drop-box claim falls short of the standard of substantive due process.

### III. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' signature-comparison claims.

*52   Plaintiffs' next claim concerns whether the Secretary's recent guidance on signature comparison violates the federal Constitution. Plaintiffs frame their claims pertaining to signature comparison in two ways—one based on due process and the other based on equal protection.

Plaintiffs initially assert that the Election Code requires a signature comparison for mail-in and absentee applications and ballots. Thus, according to Plaintiffs, Secretary Boockvar's guidance, which says the opposite, is creating unconstitutional vote dilution, in violation of due-process principles—*i.e.*, certain unlawful, unverified ballots will now be counted, thereby diluting the lawful ones cast by other voters (such as in-person voters, whose signatures are verified). Plaintiffs also appear to argue more generally that absent signature comparison, there is a heightened risk of voter fraud, and therefore a heightened risk of vote dilution of lawful votes.

In addition to due process, Plaintiffs argue that the guidance violates equal-protection principles—first, by counties engaging in a patchwork of procedures (where some counties intend to do a signature comparison for mail-in ballots, while others do not); and second, by implementing different standards between mail-in ballots and in-person ones.

In contrast, Defendants and Intervenors take the position that state law does not require signature comparison, and for good reason. According to them, requiring such comparisons

Case 2:20-cv-01831-NR Document 55-1 Filed 12/30/20 Page 137 of 249
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

2020 WL 5997680

is fraught with trouble, as signatures change over time and elections officials are not signature-analysis experts. This leaves open the possibility for arbitrary and discriminatory application that could result in the disenfranchisement of valid voters.

For the reasons that follow, the Court will dismiss the signature-comparison claims and enter judgment in favor of Defendants. A plain reading of the Election Code demonstrates that it does not impose a signature-comparison requirement for mail-in ballots and applications, and thus Plaintiffs' vote-dilution claim sounding in due process fails at the outset. Further, the heightened risk of fraud resulting from a lack of signature comparison, alone, does not rise to the level of a federal constitutional violation. Finally, the equal-protection claims fail because there are sound reasons for the different treatment of in-person ballots versus mail-in ballots; and any potential burdens on the right to vote are outweighed by the state's interests in their various election security measures.

### A. The Election Code does not require signature comparison for mail-in and absentee ballots or ballot applications.

Plaintiffs' federal-constitutional claims in Count I of their Second Amended Complaint are partially based on the Secretary's guidance violating state law. That is, Plaintiffs' first theory is that by the Secretary violating state law, unlawful votes are counted and thus lawfully cast votes are diluted. According to Plaintiffs, this violates the 1st and 14th Amendments, as well as the Elections Clause (the latter of which requires the legislature, not an executive, to issue election laws). [12]

**\*53** Thus, a necessary predicate for these constitutional claims is whether the Election Code mandates signature comparison for mail-in and absentee ballots. If it doesn't, as the Secretary's guidance advises, then there can be no vote dilution as between lawful and unlawful votes, nor a usurpation of the legislature's authority in violation of the Elections Clause.

**[37]** After carefully considering the parties' arguments and the relevant law, the Court finds that the plain language of the Election Code imposes no requirement for signature comparison for mail-in and absentee ballots and applications. [13] In other words, the Secretary's guidance is

consistent with the Election Code, and creates no vote-dilution problems. [14]

Plaintiffs, in advancing their claim, rely on section 3146.8(g)(3)-(7) of the Election Code to assert that the Code requires counties to "verify" the signatures on mail-in and absentee ballots (i.e., examine the signatures to determine whether they are authentic). Plaintiffs specifically point to section 3146.8(g)(3) as requiring this signature verification. [ECF 509, pp. 17-18].

Section 3146.8(g)(3) states:

> When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots ... the board shall examine the declaration on the envelope of each ballot ... and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

**\*54** 25 P.S. § 3146.8(g)(3).

According to Plaintiffs, Section 3146.8(g)(3)'s requirement to verify the proof of identification, and compare the information on the declaration, is tantamount to signature comparison. The Court disagrees, for at least three reasons.

First, nowhere does the plain language of the statute require signature comparison as part of the verification analysis of the ballots.

When interpreting a statute enacted by the Pennsylvania General Assembly, courts apply Pennsylvania's Statutory Construction Act, 1 Pa. C.S. §§ 1501-1991. And as the Act instructs, the "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa C.S. § 1921(a). If the words of

the statute are clear and unambiguous, the letter of the law applies. *Id.* at § 1921(b). Otherwise, courts may consider a variety of factors to determine the legislature's intent, including "other statutes upon the same or similar subjects" and "[t]he consequences of a particular interpretation." *Id.* at § 1921(c)(5)-(6).

Section 3146.8(g)(3) does not expressly require any signature verification or signature comparison. 25 P.S. § 3146.8(g)(3). It instead requires election officials to (1) "examine the declaration on the envelope of each ballot," (2) "compare the information thereon with that contained in the ... 'Voters' file' [or] the absentee voters' list," and (3) if "the county board has [a] verified the proof of identification as required under this act and [b] is satisfied that the declaration is sufficient and the information contained in the [Voter's file] ... verifies his right to vote," the election official shall include the ballot to be counted. *Id.*

Under the express terms of the statute, then, the information to be "verified" is the "proof of identification." *Id.* The Election Code defines "proof of identification" as the mail-in/absentee voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv). [15] The only other "verification" the election official must conduct is to determine whether "the information contained in the [Voter's file] ... verifies his right to vote."

**\*55** Nowhere does this provision require the election official to compare and verify the authenticity of the elector's signature. In fact, the word "signature" is absent from the provision. It is true that the elector must fill out and sign the declaration included on the ballot. 25 P.S. §§ 3146.6(a), 3150.16(a). However, while section 3146.8(g)(3) instructs the election official to "examine the declaration ... and compare the information thereon with that contained in the [Voter's file]," the provision clarifies that this is so the election official can be "satisfied that the declaration is sufficient." 25 P.S. § 3146.8(g)(3). In other words, the election official must be "satisfied" that the declaration is "fill[ed] out, date[d] and sign[ed]," as required by sections 3150.16(a) and 3146.6(a) of the Election Code. Notably absent is any instruction to verify the signature and set aside the ballot if the election official believes the signature to be non-genuine. There is an obvious difference

between checking to see if a signature was provided at all, and checking to see if the provided signature is sufficiently authentic. Only the former is referred to in section 3146.8(g)(3).

Second, beyond the plain language of the statute, other canons of construction compel the Court's interpretation. When interpreting statutes passed by the General Assembly, Pennsylvania law instructs courts to look at other aspects of the statute for context. *See* 1 Pa. C.S. § 1921(c)(5) ("When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering ... other statutes upon the same or similar subjects."); *O'Rourke v. Commonwealth*, 566 Pa. 161, 778 A.2d 1194, 1201 (2001) ("The cardinal rule of all statutory construction is to ascertain and effectuate the intent of the Legislature. To accomplish that goal, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." (citation omitted)).

Context here is important because the General Assembly mandated signature comparison for in-person voting elsewhere in the Election Code—thus evidencing its intention not to require such comparison for mail-in ballots. *See Fonner v. Shandon, Inc.*, 555 Pa. 370, 724 A.2d 903, 907 (1999) ("[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent.") (citation omitted).

In addressing in-person voting, the General Assembly explicitly instructs that the election official shall, after receiving the in-person elector's voter certificate, immediately "**compare the elector's signature** on his voter's certificate with his signature in the district register. If, upon such comparison, the signature upon the voter's certificate appears to be genuine, the elector who has signed the certificate shall, if otherwise qualified, be permitted to vote: Provided, That **if the signature on the voter's certificate, as compared with the signature as recorded in the district register, shall not be deemed authentic** by any of the election officers, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity and required to [cure the deficiency]." 25 P.S. § 3050(a.3)(2) (emphasis added).

Elsewhere, the General Assembly also explicitly accounts for signature comparison of in-person voters: "[I]f it is

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

determined that the individual was registered and entitled to vote at the election district where the ballot was cast, *the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form and, if the signatures are determined to be genuine, shall count the ballot* if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election. ... [But a] provisional ballot shall not be counted if ... the signature[s] required ... are either not genuine or are not executed by the same individual ..." 25 P.S. § 3050(a.4)(5)(i)-(ii) (emphasis added); *see also* 25 P.S. § 2936 ("[When reviewing nomination papers], the Secretary of the Commonwealth or the county board of elections, although not hereby required so to do, *may question the genuineness of any signature or signatures appearing thereon*, and if he or it shall thereupon find that any such signature or signatures are not genuine, such signature or signatures shall be disregarded[.]" (emphasis added)).

**\*56** Clearly then, the General Assembly, in enacting the Election Code, knew that it could impose a signature-comparison requirement that requires an analysis to determine whether a signature is "genuine." And when that was its intent, the General Assembly explicitly and unequivocally imposed that requirement. It is thus telling, from a statutory construction standpoint, that no such explicit requirement is imposed for returned mail-in or absentee ballots. Indeed, the General Assembly is aware—and in fact, requires—that a voter must sign their application for an absentee or mail-in ballot, and must sign the declaration on their returned ballot. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application), 3146.6(a) (absentee-voter declaration), 3150.16(a) (mail-in voter declaration). Despite this, the General Assembly did not mention a signature-comparison requirement for returned absentee and mail-in ballots.

The Court concludes from this context that this is because the General Assembly did not intend for such a requirement. *See, e.g.,* Mishoe v. Erie Ins. Co., 573 Pa. 267, 824 A.2d 1153, 1155 (2003) ("In arriving at our conclusion that the foregoing language does not provide for the right to a jury trial, we relied on three criteria. First, we put *substantial emphasis* on the fact that the PHRA was silent regarding the right to a jury trial. As we explained, 'the General Assembly is well aware of its ability to grant a jury trial in its legislative pronouncements,' and therefore, 'we can presume that the General Assembly's

express granting of trial by jury in some enactments means that it did not intend to permit for a jury trial under the PHRA.'

" (cleaned up) (emphasis added)); Holland v. Marcy, 584 Pa. 195, 883 A.2d 449, 456, n.15 (2005) ("We additionally note that the legislature, in fact, did specify clearly when it intended the choice of one individual to bind others. In every other category addressed by Section 1705(a) other than (a)(5) which addressed uninsured owners, the General Assembly specifically referenced the fact that the decision of the named insured ... binds other household members.... Similar reference to the ability of the uninsured owner's deemed choice to affect the rights of household members is conspicuously missing from Section 1705(a)(5).").

Accordingly, the Court finds that the General Assembly's decision not to expressly refer to signature comparisons for mail-in ballots, when it did so elsewhere, is significant.

Third, this Court is mindful that Pennsylvania's election statutes are to be construed in a manner that does not risk disenfranchising voters. *See, e.g.,* 1 Pa. C.S. § 1922(3) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: ... That the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth."); *id.* at § 1921(c)(6) (in interpreting a statute, the court may consider "[t]he consequences of a particular interpretation").

**[38]** As the Pennsylvania Supreme Court emphasized last month, "[I]t is well-settled that, although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote. Indeed, our goal must be to enfranchise and not to disenfranchise the electorate." Boockvar, --- A.3d at ----, 2020 WL 5554644, at \*9 (cleaned up); *see also* id. ("[A]lthough both Respondent and the Caucus offer a reasonable interpretation of Section 3150.16(a) as it operates within the Election Code, their interpretation restricts voters' rights, as opposed to the reasonable interpretation tendered by Petitioner and the Secretary. The law, therefore, militates in favor of this Court construing the Election Code in a manner consistent with the view of Petitioner and the Secretary, as this construction of the Code favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate.").

**\*57** Here, imposing a signature-comparison requirement as to mail-in and absentee ballots runs the risk of

restricting voters' rights. This is so because election officials, unstudied and untested in signature verification, would have to subjectively analyze and compare signatures, which as discussed in greater detail below, is potentially problematic.[16] [ECF 549-2, p. 19, ¶ 68]; [ECF 549-9, p. 20, ¶ 64]. And perhaps more importantly, even assuming an adequate, universal standard is implemented, mail-in and absentee voters whose signatures were "rejected" would, unlike in-person voters, be unable to cure the purported error. *See* 25 P.S. § 3146.8(a) (stating that in-person and absentee ballots "shall [be safely kept] in sealed or locked containers until they are to be canvassed by the county board of elections," which § 3146.8(g)(1.1)-(2) states is no earlier than election day); *Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at *20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature."). As discussed in more detail below, unlike in-person voters, whose signatures are verified in their presence, mail-in and absentee voters' signatures would be verified at a later date outside the presence of the voter. *See generally* 25 P.S. § 3146.8(a), (g) (requiring mail-in and absentee ballots to be kept secured in a sealed container until Election Day). Unbeknownst to the voter, then, and without an opportunity to remedy the purported error, these mail-in and absentee voters may not have their votes counted. Based on this risk of disenfranchisement, which the Court must consider in interpreting the statute, the Court cannot conclude that this was the General Assembly's intention.

The Court is not persuaded by Plaintiffs' arguments to the contrary.

Plaintiffs argue that section 3146.8(g)(5)-(7) provides a voter, whose ballot-signature was rejected, notice and an opportunity to cure the signature deficiency. [ECF 509, pp. 13, 18, 50]. That section, however, refers to when a person raises a specific challenge to a specific ballot or application on the grounds that the elector is not a "qualified elector." 25 P.S. § 3146.8(g)(4) (stating that mail-in and absentee ballots shall be counted unless they were challenged under

§§ 3146.2b or 3150.12b, which allow challenges on the grounds that the elector applying for a mail-in or absentee ballot wasn't qualified). Thus, the "challenges" referenced in § 3146.8(g)(5)-(7) refer to a voter's qualifications to vote, not a signature verification.

Plaintiffs similarly argue that section 3146.8(h) provides mail-in voters notice and opportunity to cure signature deficiencies. [ECF 552, p. 60]. But that section relates to "those absentee ballots or mail-in ballots for which proof of identification has not been received or could not be verified." 25 P.S. § 3146.8(h). As discussed above, "proof of identification" is a defined term, and includes the voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv). Not included is the voter's signature.[17]

**\*58** At bottom, Plaintiffs request this Court to impose a requirement—signature comparison—that the General Assembly chose not to impose. Section 3146.8(g)(3) does not mention or require signature comparison. The Court will not write it into the statute.

**[39]** For the same reasons that the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballots, the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballot ***applications***. While the General Assembly imposed a requirement that the application be signed, there is no mention of a requirement that the signature be verified, much less that the application be rejected based solely on such verification. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application). Again, finding no explicit instructions for signature comparison here (unlike elsewhere in the Code), the Court concludes that the General Assembly chose not to include a signature-comparison requirement for ballot applications.

The Court again finds Plaintiffs' arguments to the contrary unavailing. Plaintiffs argue that "there is no other proof of identification required to be submitted with the ballot applications," and thus, a signature comparison must be required. [ECF 509, p. 16].

But the Election Code expressly requires the applicant to include several pieces of identifying information, including their name, mailing address, and date of birth. 25 P.S. §§ 3146.2(b), 3150.12(b). And after receiving the applicant's application, the election official must "verify[ ] the proof of identification [a defined term as discussed above] and compar[e] the information provided on the application with the information contained on the applicant's permanent registration card." [18] *Id.* at §§ 3146.2b(c), 3150.12b(a). Thus, contrary to Plaintiffs' argument, the General Assembly provided for certain methods of identification as to ballot applications. Signature verification isn't one of them.

For these reasons, the Court concludes that the Election Code does not impose a signature-comparison requirement for absentee and mail-in ballots and applications. As such, the Secretary's September 11, 2020, and September 28, 2020, guidance is consistent with the Election Code. Plaintiffs' claims of vote dilution based on this guidance will therefore be dismissed.

### B. The lack of a signature comparison does not violate substantive due process.

[40] In addition to alleging that the Secretary's guidance violates the Election Code, Plaintiffs appear to also argue that their right to vote is unconstitutionally burdened and diluted due to a risk of fraud. That is, regardless of what the Election Code requires, Plaintiffs assert that absent signature comparison, mail-in and absentee ballots will be prone to fraud, thereby diluting other lawful ballots. [ECF 509, pp. 45-50; 504-19, pp. 10-15]. Plaintiffs argue that this significantly burdens their fundamental right to vote, resulting in a due-process violation, and thus strict scrutiny applies. The Court disagrees.

**\*59** As discussed above in the context of Plaintiffs' drop-box claim, Plaintiffs' claim here simply does not rise to the high level for a substantive due process claim. To violate substantive due process in the voting-rights context, the infringements are much more severe. Only in extraordinary circumstances will there be "patent and fundamental unfairness" that causes a constitutional harm.

*See* *Bonas v. Town of North Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001); *Shannon v. Jacobowitz*, 394 F.3d 90, 94 (2d Cir. 2005).

Here, Plaintiffs' signature-comparison claim does not meet this high standard. This isn't a situation of malapportionment, disenfranchisement, or intentional discrimination. And the risk of voter fraud generally without signature comparison —as a matter of fact and law—does not rise to "patent and fundamental unfairness."

Indeed, as discussed above, Plaintiffs' evidence of potential voter fraud here is insufficient to establish "patent and fundamental unfairness." In their summary-judgment brief, Plaintiffs argue that "the Secretary's September 2020 guidance memos promote voter fraud." [ECF 509, p. 48]. Plaintiffs then offer a hypothetical where a parent signs a ballot application on their child's behalf because the child is out-of-state. [ECF 509, p. 48]. Plaintiffs assert that without signature comparisons, such "fraud" could proceed unchecked. [*Id.*]. Plaintiffs continue, arguing that the "fraud" would "snowball," so that "spouses, neighbors, acquaintances, strangers, and others" were signing applications and ballots on others' behalf. [*Id.* at pp. 48-49]. To prevent such fraud, Plaintiffs' expert, Mr. Riddlemoser, asserts that signature comparison is needed. [ECF 504-19, p. 10 ("Not only does enforcing the Election Code's requirement of a completed and signed declaration ensure uniformity, which increases voter confidence, it also functions to reduce fraud possibilities by allowing signature verification.") ].

Mr. Riddlemoser first highlights that in Philadelphia in the primary, ballots were counted "that lacked a completed declaration." [*Id.* at p. 11]. Mr. Riddlemoser further opines that the September 11, 2020, guidance and September 28, 2020, guidance, in instructing that signature comparison is not required for mail-in and absentee ballots and applications, "encourage[s], rather than prevent[s], voter fraud." [*Id.* at pp. 12-13]. Mr. Riddlemoser also notes that signature comparison is "the most common method" to verify ballots and that the Secretary's guidance "leave the absentee/mail-in ballots subject to the potential for unfettered fraud." [*Id.* at p. 14]. He concludes that the guidance "invites the dilution of legitimately cast votes." [*Id.*].

Based on this evidentiary record, construed in Plaintiffs' favor, the Court cannot conclude that there exists "patent and fundamental unfairness." Rather, Plaintiffs present only the possibility and potential for voter fraud. In their briefing, Plaintiffs relied on hypotheticals, rather than actual events. [ECF 509, p. 48]. Mr. Riddlemoser admits that failing to verify signatures only creates "the potential" for fraud and "invites" vote dilution. [ECF 504-19, pp. 14, 15]. Even

assuming an absence of signature comparison does indeed invite the potential for fraud, the nondiscriminatory, uniform practice and guidance does not give rise to "patent and fundamental unfairness" simply because of a "potential" for fraud. Plaintiffs have not presented evidence to establish a sufficient burden on their constitutional right to vote.

**\*60** Indeed, even if the Court assumed some "forged" applications or ballots were approved or counted, this is insufficient to establish substantial, widespread fraud that undermines the electoral process. Rather, limited instances of "forged" ballots—which according to Plaintiffs' definition, includes an individual signing for their spouse or child—amount to what the law refers to as "garden variety" disputes of limited harm. As has long been understood, federal courts should not intervene in such "garden variety" disputes. *Hutchinson,* 797 F.2d at 1283 ("[C]ourts have uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities.") (cleaned up); *Yoshina,* 140 F.3d at 1226 ("In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." (collecting cases)); *Curry v. Baker,* 802 F.2d 1302, 1314-15 (11th Cir. 1986) ("[I]f the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots." (cleaned up)).

To be clear, the Court does not take Plaintiffs' allegations and evidence lightly. Election fraud is serious and disruptive. And Plaintiffs could be right that the safer course would be to mandate signature comparison for all ballots. But what Plaintiffs essentially complain of here is whether the procedures employed by the Commonwealth are sufficient to prevent that fraud. That is a decision left to the General Assembly, not to the meddling of a federal judge. *Crawford,* 553 U.S. at 208, 128 S.Ct. 1610 (Scalia, J. concurring) ("It is for state legislatures to weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to vote, or is intended to disadvantage a particular class."). *Griffin,* 385 F.3d at 1131-32 ("[S]triking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we

judges should not interfere unless strongly convinced that the legislative judgment is grossly awry.").

### C. Plaintiffs' federal equal-protection claims based on signature comparison fail.

Plaintiffs present two federal equal-protection claims. The Court will address each in turn.

### 1. County differences over signature comparison do not violate federal equal-protection rights.

**[41]** Plaintiffs' first federal equal-protection claim is based on some county boards of elections intending to verify the signatures on mail-in and absentee ballots and applications, while others do not intend to do so. To that end, Plaintiffs have presented evidence that some, but not all, counties do intend to verify signatures. *E.g.,* [ECF 504-1]. [19] According to Plaintiffs, this arbitrary and differential treatment of mail-in and absentee ballots among counties—purportedly caused by the Secretary's September 11, 2020, and September 28, 2020, guidance—violates the Equal-Protection Clause because voters will be treated differently simply because of the county in which they reside. The Court, however, finds no equal-protection violation in this context.

The Secretary's guidance about which Plaintiffs complain is uniform and nondiscriminatory. It was issued to all counties and applies equally to all counties, and by extension, voters. Because the uniform, nondiscriminatory guidance is rational, it is sound under the Equal-Protection Clause. *See Gamza,* 619 F.2d at 453 (5th Cir. 1980) ("We must, therefore, recognize a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause.") (citation omitted). Indeed, the guidance merely instructs counties to abide by the Election Code—an instruction to follow the law is certainly rational and related to an obviously rational government interest.

**\*61** In fact, if there is any unequal application now, it is caused by those counties that are ***not*** following the guidance and are going above and beyond the Election Code to impose a signature-comparison requirement. That claim, though, is

not before the Court, as Plaintiffs here do not assert that imposing a signature-comparison requirement violates the Constitution (they allege the opposite).

In any event, to the extent there was uncertainty before, this decision informs the counties of the current state of the law as it relates to signature comparison. If any county still imposes a signature-comparison requirement in order to disallow ballots, it does so without support from the Secretary's guidance or the Election Code. Further, counties that impose this signature-comparison requirement to reject ballots may be creating a different potential constitutional claim for voters whose ballots are rejected. 🔖 *Boockvar, —— A.3d at ——, 2020 WL 5554644, at \*34, n.16* (Wecht, J. concurring) (noting that courts around the country have found due process issues with signature-comparison requirements; and collecting cases).

For these reasons, Plaintiffs' equal-protection claim falls short.

### 2. Different treatment between in-person ballots and mail-in ballots also does not violate federal equal-protection rights.

 **[42]**  Plaintiffs also assert a second federal equal-protection claim on the grounds that the Election Code, by not requiring signature comparison for mail-in and absentee ballots, treats such ballots differently than in-person ballots (which require signature comparisons). Plaintiffs argue that this is an unconstitutionally arbitrary and unequal treatment. The Court disagrees.

 **[43]**  It is well-settled that states may employ in-person voting, absentee voting, and mail-in voting and each method need not be implemented in exactly the same way. *See Hendon, 710 F.2d at 181* ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state.")

"Absentee voting is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures." 🔖 *ACLU of New Mexico v. Santillanes, 546 F.3d 1313, 1320 (10th Cir. 2008)* (citations omitted). It is an "obvious fact that absentee voting is an inherently different procedure from in-person voting." 🔖 *Indiana Democratic Party v. Rokita, 458 F. Supp. 2d*

*775, 830-31 (S.D. Ind. 2006).* Because in-person voting is "inherently different" from mail-in and absentee voting, the procedures for each need not be the same. *See, e.g.,* 🔖 *Santillanes, 546 F.3d at 1320-21* ("[B]ecause there are clear differences between the two types of voting procedures, the law's distinction is proper."); 🔖 *Rokita, 458 F. Supp. 2d at 831* ("[I]t is axiomatic that a state which allows for both in-person and absentee voting must therefore apply different requirements to these two groups of voters."); 🔖⚠ *Billups, 439 F. Supp. 2d at 1356-57* ("[A]bsentee voting and in-person voting are inherently different processes, and both processes use different standards, practices, and procedures.").

Plaintiffs argue that while absentee and mail-in voting "is a fundamentally different process from in-person voting," Defendants have "no justification in this instance to create such an arbitrary and disparate rule between absentee/mail-in voters and in-person voters." [ECF 509, p. 51]. Not so.

 **\*62**  Because of the "inherent" differences between in-person voting and mail-in and absentee voting, Pennsylvania's requirement for signature comparison for in-person ballots, but not mail-in and absentee ballots, is not arbitrary. By way of example, Secretary Boockvar articulated several valid reasons why Pennsylvania implements different verification procedures for mail-in and absentee voters versus in-person voters. [ECF 504-12; ECF 549-2].

In her deposition, Secretary Boockvar explained that for in-person voters, the only possible verification is signature comparison and verification. [ECF 504-12, 55:19-56:19]. This is because, unlike mail-in and absentee voters who must apply for a ballot, in-person voters may simply show up at the polls on Election Day and vote. In contrast, for mail-in and absentee voters, there are several verification steps implemented before the voter's mail-in/absentee ballot is counted, such as checking their application and their drivers' license number or social security number. [*Id.* at 56:8-19]. Thus, counties don't need to resort to a signature comparison to identify and verify the mail-in or absentee voter.

This is important, as Defendants and Intervenors present valid concerns about the uniformity and equality of signature comparisons, in part, due to the technical nature of signature analysis, the subjective underpinnings of signature analysis, and the variety of reasons that signatures can naturally change over time. [ECF 549-2, pp. 19-20, ¶ 68; ECF 549-9, p. 20, ¶¶ 63-64]. Such factors can reasonably justify not requiring

a signature comparison when the elector is not physically present.

For example, Secretary Boockvar notes the concern with non-handwriting-expert election officials comparing signatures, without uniform standards. [ECF 549-2, pp. 19-20, ¶ 68]. She also notes that people's signatures can change over time, due to natural and unavoidable occurrences, like injuries, arthritis, or the simple passage of time. [*Id.*]. Such reasons are valid and reasonable. *See Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *34 (Wecht, J. concurring) ("Signature comparison is a process fraught with the risk of error and inconsistent application, especially when conducted by lay people.").

Secretary Boockvar further asserts that signature comparison is justified for in-person voting, but not mail-in or absentee voting, because the in-person voter is notified of his or her signature deficiency, and afforded an opportunity to cure. [ECF 549-2, pp. 19-20, ¶¶ 66-68 (explaining that in-person voters can be immediately notified of the signature deficiency, but mail-in/absentee voters cannot) ]. Secretary Boockvar's justifications are consistent with the Election Code's framework.

When a voter votes in person, he or she signs the voter's certificate, and the election official immediately, in the voter's presence, verifies the signature. 25 P.S. § 3050(a.3)(1)-(2). If the election official finds the signature to be problematic, the in-person voter is told as such. *Id.* at § 3050(a.3)(2). Notably, however, the in-person voter may still cast a ballot. *Id.* ("[I]f the signature on the voter's certificate ... shall not be deemed authentic by any of the election officers, such elector shall not be denied the right to vote for that reason[.]"). The in-person voter whose signature is questioned must, after casting the ballot, "produce at least one qualified elector of the election district as a witness, who shall make affidavit of his identity or continued residence in the election district." *Id.* at § 3050(d). Thus, the in-person voter whose signature is not verified is immediately notified, is still allowed to cast a ballot, and is given the opportunity to remedy the signature-deficiency.

**\*63** In contrast, a voter who casts a mail-in or absentee ballot cannot be afforded this opportunity. Absentee and mail-in ballots are kept in "sealed or locked containers" until they are "canvassed by the county board of elections." 25

P.S. § 3146.8(a). The pre-canvassing and canvassing cannot begin until Election Day. *Id.* at § 3146.8(g)(1.1)-(2). As such, the absentee and mail-in ballots cannot be verified until Election Day, regardless of when the voter mails the ballot. Further, even if there were sufficient time, a voter cannot cure these types of deficiencies on their mail-in or absentee ballot. *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner.").

Therefore, if mail-in and absentee ballots were subject to signature comparison, an election official—who is unstudied in the technical aspects of signature comparison—could deem a voter's signature problematic and not count the ballot, which would effectively disenfranchise that voter. Unlike the in-person voter, the mail-in or absentee voter may not know that his or her signature was deemed inauthentic, and thus may be unable to promptly cure the deficiency even if he or she were aware.

Accordingly, the Court concludes that the inherent differences and opportunities afforded to in-person voters compared to mail-in and absentee voters provides sufficient reason to treat such voters differently regarding signature comparison. The Court concludes that the lack of signature comparison for mail-in and absentee ballots is neither arbitrary, nor burdens Plaintiffs' equal-protection rights.

For these reasons, the Court will dismiss Plaintiffs' federal equal-protection claims related to signature comparison.

### 3. The Election Code provisions related to signature comparison satisfy *Anderson*-*Burdick*.

Finally, even assuming the Election Code's absence of a signature-comparison requirement imposes some burden on Plaintiffs' constitutional rights, Plaintiffs' constitutional claims still fail.

As discussed above with respect to Defendants' drop-box implementation, *Anderson*-*Burdick* does not apply neatly to this claim either. This is because Plaintiffs aren't challenging a specific regulation affecting their right to vote, but are instead challenging the **lack** of a restriction on

someone else's right to vote. This makes both the burden difficult to assess and also the state's interests in *not* doing something more abstract. As such, the Court finds that the proper application of the *Anderson*-*Burdick* framework here includes weighing the burden involving Plaintiffs' risk of vote dilution against the state's interests and overall plan in preventing against voter fraud, including with respect to forged mail-in ballots.

 **[44]**  Weighing these considerations compels a conclusion that there is no constitutional violation here. With respect to any burden on Plaintiffs' right to vote, that burden is slight, at best. A failure to engage in a signature comparison may, crediting Plaintiffs' evidence, increase the risk of voter fraud. But even then, this remains a largely speculative concern. This burden too is lessened by the numerous other regulations imposed by the Election Code, including the detailed verification procedure as to the information on mail-in ballots (discussed above), and the deterrence furthered by criminal sanctions for those engaging in such voter fraud.

Against these burdens, the Commonwealth has precise and weighty interests in verifying ballot applications and ballots in an appropriate manner to ensure that they are accurate. As discussed above, the Commonwealth determined that the risk of disenfranchising mail-in and absentee voters, did not justify signature comparison for those voters. [ECF 549-2, pp. 19-20, ¶¶ 66-69]. Unlike for in-person voters, there are other means of identifying and verifying mail-in and absentee voters, such as having to specifically apply for a mail-in or absentee ballot and provide various categories of identifying information. [ECF 504-12, 55:19-56:19]; 25 P.S. §§ 3146.2(b), 3150.12(b). And ultimately, due to the slight burden imposed on Plaintiffs, Pennsylvania's regulatory interests in a uniform election pursuant to established procedures is sufficient to withstand scrutiny. *Timmons, 520 U.S. at 358, 117 S.Ct. 1364.*

 ***64** The General Assembly opted not to require signature comparisons for mail-in and absentee ballots and applications. And as previously discussed, absent extraordinary reasons to, the Court is not to second-guess the legislature.

**IV. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' as-applied, federal constitutional challenge to the county-residency requirement for poll watchers.**

Plaintiffs next take exception with the provision of the Election Code that restricts a registered voter from serving as a poll watcher outside the county of his or her residence. [ECF 461, ¶ 217].

Plaintiffs argue that "[a]s applied to the 2020 General Election, during the midst of the COVID-19 pandemic, Pennsylvania's residency requirement for watchers violates equal protection." [ECF 509, p. 58]. That's because, according to Plaintiffs, the "current pandemic severely challenges the ability of parties to staff watchers[.]" [*Id.* at p. 60]. And not having enough poll watchers in place "puts into danger the constitutionally-guaranteed right to a transparent and undiluted vote," [*id.* at p. 68], by "fostering an environment that encourages ballot fraud or tampering," [ECF 461, ¶ 256]. As such, Plaintiffs believe that the county residency requirement "is not rationally connected or reasonably related to any interest presented by the Commonwealth." [ECF 509, p. 63].

Defendants and Intervenors have a markedly different view.

As an initial matter, the Democratic Intervenors argue that Plaintiffs "are precluded from relitigating their claim that the Commonwealth lacks a constitutionally recognized basis for imposing a county-residence restriction for poll watchers" based on the doctrine articulated in *England v. Louisiana State Bd. of Med. Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).* [ECF 529, p. 16]. That doctrine requires that after a federal court has abstained under *Pullman*, the plaintiff must expressly reserve the right to litigate any federal claims in federal court while litigating state-law issues in state court. *England, 375 U.S. at 419, 421-22, 84 S.Ct. 461.* Defendants and Intervenors contend that Plaintiffs (specifically, the Trump Campaign, the RNC, and the Republican Party) failed to do so in the proceedings before the Pennsylvania Supreme Court.

And if the *England* doctrine doesn't bar this claim, Defendants and Intervenors argue that "Plaintiffs' as-applied challenge simply fails to state a constitutional claim." *See, e.g.*, [ECF 547, p. 65]. They believe that the county-residency requirement does not infringe on a fundamental right or regulate a suspect classification (such as race, sex, or national origin). [*Id.*]. As a result, the Commonwealth need only provide a rational basis for the requirement, which

Defendants and Intervenors believe the Commonwealth has done. [*Id.*].

After carefully reviewing the record and considering the parties' arguments and evidence, the Court finds that the *England* doctrine does not bar Plaintiffs' ability to bring this claim. Even so, after fully crediting Plaintiffs' evidence, the Court agrees with Defendants and Intervenors that Plaintiffs' as-applied challenge fails on the merits.

### A. The *England* doctrine does not bar Plaintiffs' federal challenge to the county-residency requirement.

**\*65** **[45]** **[46]** In *England*, the Supreme Court established that after a federal court abstains under *Pullman*, "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then ... he has elected to forgo his right to return to the District Court." *375 U.S. at 419, 84 S.Ct. 461*. To reserve those rights, a plaintiff forced into state court by way of abstention must inform the state court that he is exposing the federal claims there only to provide the proper context for considering the state-law questions. *Id.* at 421, 84 S.Ct. 461. And that "he intends, should the state court[ ] hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." *Id.* Essentially, in *England*, the Supreme Court created a special doctrine of *res judicata* for *Pullman* abstention cases.

**[47]** The Democratic Intervenors argue that because none of the three Plaintiffs who participated in the Pennsylvania Supreme Court case as either intervenors or *amici* "reserved the right to relitigate [Plaintiffs' poll-watcher claim] in federal court," they are now "precluded" from doing so. [ECF 529, p. 17]. The Court is not convinced that this doctrine bars Plaintiffs' claim for at least two reasons.

First, in its original abstention decision, the Court noted that "[n]one of Plaintiffs' poll-watching claims directly ask the Court to construe an ambiguous state statute." [ECF 409, p. 24]. Instead, these claims resided in a *Pullman* gray area, because they were only indirectly affected by other unsettled state-law issues. In light of that, the Court finds that the *England* doctrine was not "triggered," such that Plaintiffs

needed to reserve their right to return to federal court to litigate the specific as-applied claim at issue here.

Second, even if it were triggered, not all of the Plaintiffs here were parties in the Pennsylvania Supreme Court case, and only one (the Republican Party) was even given intervenor status. But even the Republican Party, acting as an intervenor, did not have an opportunity to develop the record or present evidence relevant to its as-applied challenge. Thus, this claim wasn't "fully litigated" by any of the Plaintiffs, which is a necessary condition for the claim to be barred under the *England* doctrine. *Cf. Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1073 (3d Cir. 1990) (explaining that a litigant "may not relitigate an issue s/he fully and unreservedly litigated in state court").

Thus, Plaintiffs are not precluded by the *England* doctrine from bringing their remaining as applied poll-watcher claim. The Court will now address the claim on the merits.

### B. The county-residency requirement, as applied to the facts presented and the upcoming general election, does not violate the U.S. Constitution.

Originally, Plaintiffs raised a facial challenge to the county-residency requirement under *25 P.S. § 2687*. That is, Plaintiffs first took the position that there was no conceivable constitutional application of the requirement that an elector be a resident of the county in which he or she seeks to serve. But, as Plaintiffs' concede, their facial challenge is no longer viable in light of the Pennsylvania Supreme Court's recent decision. [ECF 448, p. 10]. As a result, Plaintiffs now focus solely on raising an as-applied challenge to the county-residency requirement.

"[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

At a fundamental level, a "facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." *United States v. Marcavage,* 609 F.3d 264, 273 (3d Cir. 2010). By contrast, an "as-applied attack" on a statute "does not contend

that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Id.* The distinction between facial and an as-applied attack, then, "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United*, 558 U.S. at 331, 130 S.Ct. 876; *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 362 (3d Cir. 2016) ("The distinction between facial and as-applied constitutional challenges, then, is of critical importance in determining the remedy to be provided).

*66 Because the distinction is focused on the available remedies, not the substantive pleading requirements, "[t]he substantive rule of law is the same for both challenges." *Edwards v. D.C.*, 755 F.3d 996, 1001 (D.C. Cir. 2014); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 509, n.5 (D.C. Cir. 2016) ("Indeed, the substantive rule of law is the same for both as-applied and facial First Amendment challenges.") (cleaned up); *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) ("The underlying constitutional standard, however, is no different [in an as-applied challenge] th[a]n in a facial challenge.").

"In other words, *how* one must demonstrate the statute's invalidity remains the same for both type of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by Bond v. United States*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011).

[48] In determining whether a state election law violates the U.S. Constitution, the Court must "first examine whether the challenged law burdens rights protected by the First and Fourteenth Amendments." *Patriot Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 95 F.3d 253, 258 (3d Cir. 1996). "Where the right to vote is not burdened by a state's regulation on the election process, ... the state need only provide a rational basis for the statute." *Cortés*, 218 F. Supp. 3d at 408. The same is true under an equal protection analysis. "If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review

should be used." *Obama*, 697 F.3d at 428 (6th Cir. 2012); *see also Biener*, 361 F.3d at 214-15 (applying rational basis where there was no showing of an "infringement on the fundamental right to vote."); *Donatelli*, 2 F.3d at 515 ("A legislative classification that does not affect a suspect category or infringe on a fundamental constitutional right must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (cleaned up)).

But where the law imposes at least some burden on protected rights, the court "must gauge the character and magnitude of the burden on the plaintiff and weigh it against the importance of the interests that the state proffers to justify the burden." *Patriot Party*, 95 F.3d at 258 (citations omitted).

[49] Consistent with the Pennsylvania Supreme Court's recent decision, but now based on a complete record, this Court finds that the county-residency requirement for poll watching does not, as applied to the particular circumstances of this election, burden any of Plaintiffs' fundamental constitutional rights, and so a deferential standard of review should apply. *See Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *30. Under a rational-basis review and considering all the relevant evidence before the Court, the county-residency requirement is rational, and thus constitutional. But even if the requirement burdened the right to vote, that burden is slight—and under the *Anderson*-*Burdick* test, the Commonwealth's interests in a county-specific voting system, viewed in the context of its overall polling-place security measures, outweigh any slight burden imposed by the county-residency restriction.

### 1. The county-residency requirement neither burdens a fundamental right, including the right to vote, nor discriminates based on a suspect classification.

*67 [50] At the outset, "there is no individual constitutional right to serve as a poll watcher[.]" *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *30 (citing *Cortés*, 218 F. Supp. 3d at 408); *see also Dailey v. Hands*, No. 14-423, 2015 WL 1293188, at *5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right protected by the First Amendment."); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) ("Plaintiffs have cited no authority ...,

nor have we found any, that supports the proposition that [the plaintiff] had a first amendment right to act as a poll watcher.").

"State law, not the Federal Constitution, grants individuals the ability to serve as poll watchers and parties and candidates the authority to select those individuals." *Cortés*, 218 F. Supp. 3d at 414; *see also Boockvar*, ––– A.3d at –––, 2020 WL 5554644, at *30 (the right to serve as a poll watcher "is conferred by statute"); *Tiryak v. Jordan*, 472 F. Supp. 822, 824 (E.D. Pa. 1979) ("The number of poll-watchers allowed, the manner of their appointment, their location within the polling place, the activities permitted and the amount of compensation allowed are all dictated by [ 25 P.S. § 2687].]"). Given the nature of the right, "[i]t is at least arguable that the [Commonwealth of Pennsylvania] could eliminate the position of poll watcher" without offending the constitution. *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007). In fact, one neighboring state—West Virginia—has eliminated poll watchers. W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41.

Nor does the county-residency requirement hinder the "exercise of the franchise." *Cortés*, 218 F. Supp. 3d at 408. It doesn't in any way limit voters' "range of choices in the voting booth"—voters can still "cast ballots for whomever they wish[.]" *Id.* And, as Plaintiffs admit, the county-residency requirement doesn't make the actual act of casting a vote any harder. *See* [ECF 524-24, 67:1-6]. Indeed, at least one of the plaintiffs here, Representative Joyce, testified that he was unaware of anyone unable to cast his ballot because of the county-residency requirement for poll watchers [ *Id.*].

Finally, Plaintiffs' claim that Pennsylvania's "poll watching system" denies them "equal access" to the ability to observe polling places in the upcoming election does not, on its own, require the Court to apply anything other than rational-basis scrutiny. [ECF 551, p. 75]. To the extent Plaintiffs are denied equal access (which discussed below, as a matter of evidence, is very much in doubt), it isn't based on their membership in any suspect classification.

 [51]  For a state law to be subject to strict scrutiny, it must not only make a distinction among groups, but the distinction must be based on inherently suspect classes such as race,

gender, alienage, or national origin. *See* *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Political parties are not such a suspect class. *Greenville Republican Party*, 824 F. Supp. 2d at 669 ("[T]his court is unfamiliar with, and Plaintiffs have not cited, any authority categorizing political parties as an inherently suspect class.") Likewise, "[c]ounty of residence is not a suspect classification warranting heightened scrutiny[.]" *Short*, 893 F.3d at 679.

Plaintiffs don't dispute this. [ECF 509, p. 65 ("To be clear, the right at issue here is the right of **candidates** and **political parties** to participate in an election where the process is transparent and open to observation and the right of the **voters** to participate in such election." (emphasis in original)) ]. Rather, Plaintiffs' theory as to how the county-residency requirement burdens the right to vote is based on the same threat of vote dilution by fraud that they have advanced with their other claims. In other words, Plaintiffs' claim that the county-residency requirement for poll watchers limits the ability to find poll watchers, which, in turn, limits the ability for poll watchers to detect fraud and ballot tampering. [ECF 461, ¶¶ 256-57]. The resulting fraudulent or destroyed ballots cause the dilution of lawfully cast ballots. [ECF 509, pp. 64-68].

 **\*68**  Thus, based on this theory, to establish the burden flowing from the county-residency restriction, Plaintiffs must show (1) the county-residency requirement prevents them from recruiting enough registered Republican poll watchers in every county, (2) the absence of these Republican poll watchers creates a material risk of increased fraud and ballot tampering, and (3) this risk of fraud and ballot tampering will dilute the value of honestly cast votes.

There are both factual and legal problems fatal to Plaintiffs' vote-dilution theory in this context. Factually, Plaintiffs' evidence, accepted as true, fails to establish that they cannot find enough poll watchers because of the county-residency requirement. But even if they made that factual showing, the inability to find poll watchers still does not burden any recognized constitutional right in a way that would necessitate anything more than deferential review.

### 2. Plaintiffs' evidence does not establish any factual predicate for their theory.

 **[52]**  Even accepting as true Plaintiffs' version of events, Plaintiffs have not established that the county-residency requirement is responsible for an inability to find enough poll watchers for at least two reasons.

First, Plaintiffs' evidence stops short of demonstrating any actual shortfall of desired poll watchers.

For example, in his declaration, James J. Fitzpatrick, the Pennsylvania Director for Election Day Operations for the Trump Campaign, stated only that the "Trump Campaign is *concerned* that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25 (emphasis added) ]. Notably, however, Mr. Fitzpatrick, even when specifically asked during his deposition, never identified a single county where the Trump Campaign has *actually* tried and failed to recruit a poll watcher because of the county-residency requirement. *See, e.g.*, [ECF 528-14, 261:21-25] ("Q: Which counties does the Trump campaign or the RNC contend that they will not be able to obtain what you refer to as full coverage of poll watchers for the November 2020 election? A: I'm not sure. I couldn't tell you a list.").

Nor do any of Plaintiffs' other witness declarations establish an actual, inability to recruit poll watchers in any specific county. Representative Reschenthaler stated only that he was "concerned" that he "will not be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12].

Representative Kelly stated that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. "Likely difficulty" isn't the same as an "actual inability." That aside, the declaration doesn't provide any basis for Representative Kelly's assessment of this "likely difficulty." Nowhere does he detail the efforts he took (*e.g.*, the outreach he tried, prospective candidates he unsuccessfully recruited, and the like), nor did he explain why those efforts aren't likely to succeed in the future.

The same goes for Representative Thompson's declaration. Representative Thompson stated that during some unspecified prior elections, unidentified parties and campaigns did not "always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20]. But this undetailed statement doesn't help Plaintiffs' cause, because it doesn't identify the elections during which this was a problem,

the parties and campaigns affected by a lack of poll watchers, or the precincts for which no poll watcher could be found.

 **\*69**  Representative Joyce's declaration doesn't even express a "concern" about "likely difficulty" in recruiting poll watchers. He simply stated his belief that "[p]oll watchers play a very important role in terms of protecting the integrity of the election process[.]" [ECF 504-7, ¶ 11]. While he may be right, it has no bearing on whether Plaintiffs can find enough people to play that "very important role."

Indeed, Plaintiffs' prediction that they will "likely" have difficulty finding poll watchers is belied by the uncontested Pennsylvania voter registration statistics for 2019 that they included as an exhibit to their summary-judgment brief. [ECF 504-34]. Those statistics suggest that there is no shortage of registered Republican voters who are qualified to serve as poll watchers. [*Id.*]. Even in the three specific counties in which Plaintiffs warn that "Democratic registered voters out-number ... their Republican counterparts" (*i.e.*, Philadelphia, Delaware, and Centre), there are still significant numbers of registered Republicans. *See* [ECF 504-34 (Philadelphia – 118,003; Delaware – 156,867; and Centre – 42,903) ]. And only a very small percentage of the registered Republicans would be needed to fill all the necessary poll watcher positions in those allegedly problematic counties. *See, e.g.*, *Cortés*, 218 F. Supp. 3d at 410 (noting that, in 2016, the Republican Party "could staff the entirety of the poll watcher allotment in Philadelphia county with just 4.1% of the registered Republicans in the county."). While Plaintiffs argue that these statistics don't show the number of registered Republicans *willing* to serve as a poll watcher, the Court is hard pressed to see, nor do Plaintiffs show, how among the tens—or hundreds—of thousands of registered Republicans in these counties, Plaintiffs are unable to find enough poll workers.[20]

Plaintiffs have not presented any evidence that would explain how, despite these numbers, they will have a hard time finding enough poll watchers. In fact, Plaintiffs' own expert, Professor Lockerbie, admits that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified poll watchers who meet the residency requirements[.]" [ECF 504-20, ¶ 16].

 **[53]**     **[54]**  Professor Lockerbie's report makes clear, and Plaintiffs appear to agree, that the county-residency requirement only potentially burdens other, "minor" political parties' ability to recruit enough poll watchers. [ECF 509, p.

61 (citing ECF 504-20, ¶¶ 16-17) ]. Regardless, any burden on these third parties is not properly before the Court. They are not parties to this litigation, and so the Court doesn't know their precise identities, whether they have, in fact, experienced any difficulty in recruiting poll watchers, or, more fundamentally, whether they even want to recruit poll watchers at all. [21]

**\*70**   Additionally, Plaintiffs failed to present evidence that connects the county-residency requirement to their inability to find enough poll watchers. To succeed on their theory Plaintiffs cannot just point to difficulty recruiting poll watchers, they need to also show that " Section 2687(b) is responsible for their purported staffing woes." *Cortés*, 218 F. Supp. 3d at 410. Plaintiffs fail to show this, too.

Plaintiffs argue that the ongoing COVID-19 pandemic greatly reduces the number of people who would be willing to serve as a poll watcher, which further exacerbates the alleged problem caused by the county-residency requirement. [ECF 509, p. 60]. The primary problem with this argument, though, is that Plaintiffs have not presented any evidence to support it. Plaintiffs have not put forward a statement from a single registered voter who says they are unwilling to serve as a poll watcher due to concerns about contracting COVID-19.

Despite this shortcoming, the Court also acknowledges that COVID-19 generally has made it more difficult to do anything in person, and it is entirely plausible that the current pandemic will limit Plaintiffs from recruiting poll watchers to man polling places on election day. But that is likely true for just about every type of election rule and regulation. For example, the effects of the ongoing pandemic coupled with the requirement that the poll watcher be a registered voter (a requirement that unquestionably narrows the pool of potential candidates) would also make it harder to recruit poll watchers. There is no basis to find that the current public-health conditions, standing alone, render the county-residency requirement irrational or unconstitutional.

To bolster their concerns over COVID-19, Plaintiffs point to *Democratic Nat'l Committee v. Bostelmann*, No. 20-249, ---- F.Supp.3d ----, 2020 WL 5627186 (W.D. Wis. Sept. 21, 2020), where the court here enjoined Wisconsin's statute that requires that each election official (*i.e.*, poll worker) be an elector of the county in which the municipality is located. That case is distinguishable in at least two important ways.

First, *Bostelmann* concerned poll **workers**, not poll **watchers**. *Id.* at ----, 2020 WL 5627186, at \*7. The difference between the two is significant. Poll workers are a more fundamental and essential aspect of the voting process. Without poll workers, counties cannot even open polling sites, which creates the possibility that voters will be completely disenfranchised. In fact, in *Bostelmann*, the plaintiffs presented evidence that Milwaukee was only able to open 5 of its normal 180 polling places. *Id.* A failure to provide voters a place to vote is a much more direct and established constitutional harm than the one Plaintiffs allege here.

Second, the plaintiffs in *Bostelmann* actually presented evidence that they were unable to find the poll workers they needed due to the confluence of the COVID-19 pandemic and the challenged restriction. *Id.* As discussed above, Plaintiffs here have presented no such evidence.

To succeed on summary judgment, Plaintiffs need to move beyond the speculative concerns they offer and into the realm of proven facts. But they haven't done so on two critical fronts —they haven't shown an actual inability to find the necessary poll watchers, or that such an inability is caused by the county-residency requirement. Because Plaintiffs have not pointed to any specific "polling place that Section 2687(b) prevents [them] from staffing with poll watchers," Plaintiffs' theory of burden is doomed at launch. *Cortés*, 218 F. Supp. 3d at 409.

### 3. Even if Plaintiffs could establish a factual predicate for their theory, it would fail as a matter of law.

**\*71**   As the Pennsylvania Supreme Court concluded last month, Plaintiffs' "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, *even if true*, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Boockvar*, ---- A.3d at ----, 2020 WL 5554644, at \*30 (emphasis added). [22] The fundamental constitutional principles undergirding this finding are sound.

Plaintiffs' only alleged burden on the right to vote is that Defendants' lawful imposition of a county-residency

requirement on poll watching will result in an increased risk of voter irregularities (*i.e.*, ballot fraud or tampering) that will, in turn, potentially cause voter dilution. While vote dilution is a recognized burden on the right to vote in certain contexts, such as when laws are crafted that structurally devalue one community's or group of people's votes over another's, there is no authority to support a finding of burden based solely on a speculative, future possibility that election irregularities might occur. *See, e.g., Minnesota Voters,* 720 F.3d at 1033 (affirming dismissal of claims "premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of EDRs' voting eligibility and the absence of post-election ballot rescission procedures"); *Common Cause Rhode Island v. Gorbea,* 970 F.3d 11, 15 (1st Cir. 2020) (rejecting the claim that a ballot witness signature requirement should not be enjoined during a pandemic because it would allegedly increase the risk of voter fraud and put Republican candidates at risk); *Cook Cnty. Rep. Party v. Pritzker,* No. 20-4676, 2020 WL 5573059, at *4 (N.D. Ill. Sept. 17, 2020) (denying a motion to enjoin a law expanding the deadline to cure votes because plaintiffs did not show how voter fraud would dilute the plaintiffs' votes).

Without a recognized burden on the right to vote, Plaintiffs' "argument that the defendants did not present an adequate justification is immaterial." *Green Party of Tennessee v. Hargett,* No. 16-6299, 2017 WL 4011854, at *4 (6th Cir. May 11, 2017). That's because the Court need not apply the *Anderson*-*Burdick* framework, and its intermediate standards, in this situation. *See Donatelli,* 2 F.3d at 514 & n.10. Instead, just as the Pennsylvania Supreme Court held, the Commonwealth here need only show "that a rational basis exists [for the county-residency requirement] to be upheld. *Boockvar,* ––– A.3d at ––––, 2020 WL 5554644, at *30 (citing *Cortes,* 218 F. Supp. 3d at 408); *see also Voting for Am., Inc. v. Andrade,* 488 F. App'x 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to the *Anderson*-*Burdick* balancing test because state election law did not implicate or burden specific constitutional rights); *McLaughlin v. North Carolina Bd. of Elections,* 65 F.3d 1215, 1227 (4th Cir. 1995) (concluding that a ballot access law "fails the *Anderson* balancing test only if it also does in fact burden protected rights").

**\*72** "Under rational-basis review, the challenged classification must be upheld 'if there is any reasonably

conceivable state of facts that could provide a rational basis for the classification.' " *Donatelli,* 2 F.3d at 513 (quoting *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). "This standard of review is a paradigm of judicial restraint." *FCC,* 508 U.S. at 314, 113 S.Ct. 2096. It "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313, 113 S.Ct. 2096. Nor is it the Court's "place to determine whether the [General Assembly's decisions] were the best decisions or even whether they were good ones." *Donatelli,* 2 F.3d at 518.

Applying this deferential standard of review, the Pennsylvania Supreme Court found that given Pennsylvania's "county-based scheme for conducting elections, it is reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Boockvar,* ––– A.3d at ––––, 2020 WL 5554644, at *30 (citing *Cortés,* 218 F. Supp. 3d at 409). The Court agrees.

There are multiple reasons for this. As Secretary Boockvar advises, "[b]y restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [ECF 549-2, p. 22, ¶ 78]. In a similar vein, Intervenors', expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know and they recognize from their area." [ECF 524-1, ¶40 ("Research in political science suggests that voters are much more comfortable and trusting of the process when they know or are familiar with poll workers who are from their community.") ]. When poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

Whether requiring poll watchers to be residents of the county in which they will serve is the best or wisest rule is not the issue before the Court. The issue is whether that rule is

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   66

2020 WL 5997680

*reasonable* and rationally advances Pennsylvania's legitimate interests. This Court, like multiple courts before it, finds that it does.

### 4. Plaintiffs' poll-watcher claim fails under the *Anderson*-*Burdick* framework.

Even if rational-basis review did not apply and Plaintiffs had established a burden on their right to vote, their claim nonetheless fails under the *Anderson*-*Burdick* framework.

Viewing Plaintiffs' evidence in the best possible light, at most, the county-residency requirement for poll watching places only an indirect, ancillary burden on the right to vote through an elevated risk of vote dilution.

Against this slight burden, the Commonwealth has sound interests in imposing a county-residency requirement, including, as noted above, local familiarity with rules, regulations, procedures, and the voters. Beyond this, in assessing the Commonwealth's interest in imposing the county-based restriction, that interest must be viewed in the overall context of the Commonwealth's security measures involving polling places that are designed to prevent against fraud and vote dilution.

As the court in *Cortés* recognized, "while poll watchers may help guard the integrity of the vote, they are not the Election Code's only, or even best, means of doing so." 218 F. Supp. 3d at 404.

**\*73** Each county has the authority to investigate fraud and report irregularities to the district attorney. 25 P.S. § 2642(i). Elections in each district are conducted by a multimember election board, which is comprised of an election judge, a majority inspector, and a minor inspector. 25 P.S. § 2671. Each voting district may also use two overseers of election, who are appointed from different political parties by the Pennsylvania Courts of Common Pleas, and "carry greater authority than poll watchers." *Cortés*, 218 F. Supp. 3d at 403 (citing 25 P.S. § 2685). "Election overseers have the right to be present with the officers of an election 'within the enclosed space during the entire time the ... election is held." *Id.* "Poll watchers have no such right," they

must "remain 'outside the enclosed space' where ballots are counted or voting machines canvassed." *Id.* (citing 25 P.S. § 2687(b)). Election overseers can also challenge any person entitled to vote, while poll watchers have no such authority. 25 P.S. § 2687. For these reasons, concerns "over potential voter fraud—whether perpetrated by putative electors or poll workers themselves—appear more effectively addressed by election overseers than poll watchers[.]" *Id.* at 406.

Plaintiffs complain that poll watchers may not be present during the pre-canvass and canvass meetings for absentee and mail-in ballots. But the Election Code provides that "authorized representatives" of each party of each candidate can attend such canvassing. 25 P.S. § 3146.8(g)(1.1), (2). That means if, for example, 15 Republican candidates appear on ballots within a particular county (between both the state and federal elections), there could be up to 16 "authorized representatives" related to the Republican Party (one for each candidate and one for the party as a whole) present during canvassing. Adding poll watchers to that mix would just be forcing unnecessary cooks into an already crowded kitchen.[23] *See* [ECF 549-2, p. 23, ¶ 83 ("If every certified poll watcher within a county was permitted to attend the pre-canvass meeting, the elections staff could be overwhelmed by the vast numbers of poll watchers, and the pre-canvassing process could become chaotic and compromised.") ].

**\*74** Further, Secretary Boockvar testified that Pennsylvania has adopted new voting systems that will provide an additional layer of security. [ECF 524-27, 237:21-238:11]. That is, there will now be a paper trail in the form of verifiable paper ballots that will allow voters to confirm their choice, and the state recently piloted a new program that will help ensure that votes can be properly verified. [*Id.*].

On balance, then, it is clear that to the extent any burden on the right to vote exists, it is minimal. On the other hand, the Commonwealth's interest in a county-specific voting system, including with county-resident poll watchers, is rational and weighty, particularly when viewed in the context of the measures that the Commonwealth has implemented to prevent against election fraud at the polls. As such, under the flexible *Anderson*-*Burdick* standard, Plaintiffs have failed to establish that the county-residency requirement is unconstitutional.

**5. The Court will continue to abstain from deciding where the Election Code permits poll watching to occur.**

Plaintiffs also appear to challenge any attempts to limit poll watching to "monitoring only in-person voting at the polling place on Election Day." [ECF 461, ¶ 254]. That is, in their proposed order accompanying their Motion for Summary Judgement, Plaintiffs seek a declaration that they are "permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections." [ECF 503-1, ¶ 3].

Plaintiffs also argue that Secretary Boockvar's October 6, 2020, guidance expressly, and unlawfully, prohibits poll watchers from being present at county election offices, satellite offices, and designated ballot-return sites. [ECF 571].

This challenge, however, is directly related to the unsettled state-law question of whether drop boxes and other satellite locations are "polling places" as envisioned under the Election Code. If they are, then Plaintiffs may be right in that poll watchers must be allowed to be present. However, the Court previously abstained under *Pullman* in addressing this "location" claim due to the unsettled nature of the state-law issues; and it will continue to do so. [ECF 459, p. 5 ("The Court will continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the 'polling place' requirements under the Election Code apply to drop-box locations. As discussed in the Court's prior opinion, this claim involves unsettled issues of state law.") ].

Moreover, Plaintiffs have filed a lawsuit in the Court of Common Pleas of Philadelphia to secure access to drop box locations for poll watchers. The state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, at p. 12]. The Trump Campaign immediately filed a notice of appeal of that decision. Regardless of what happens on appeal, Plaintiffs appear to be on track to obtain resolution of that claim in state court. [ECF 549-22]. Although this isn't dispositive, it does give the Court comfort that Plaintiffs will be able to seek timely resolution of these issues, which appear

to be largely matters of state law. *See Barr v. Galvin*, 626 F.3d 99, 108 n.3 (1st Cir. 2010) ("Though the existence of a pending state court action is sometimes considered as a factor in favor of abstention, the lack of such pending proceedings does not necessarily prevent abstention by a federal court.").

**V. The Court will decline to exercise supplemental jurisdiction over Plaintiffs' state-constitutional claims.**

**\*75** In addition to the federal-constitutional claims addressed above, Plaintiffs assert violations of the Pennsylvania Constitution in Counts III, V, VII, and IX of the Second Amended Complaint. Because the Court will be dismissing all federal-constitutional claims in this case, it will decline to exercise supplemental jurisdiction over these state-law claims.

**[55]** Under 28 U.S.C. § 1367(c)(3), a court "may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction[.]" *Stone v. Martin*, 720 F. App'x 132, 136 (3d Cir. 2017) (cleaned up). "It 'must decline' to exercise supplemental jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for [exercising supplemental jurisdiction].' " *Id.* (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original)).

Courts have specifically applied this principle in cases raising federal and state constitutional challenges to provisions of the state's election code. *See, e.g., Silberberg v. Bd. of Elections of New York*, 272 F. Supp. 3d 454, 480–81 (S.D.N.Y. 2017) ("Having dismissed plaintiffs' First and Fourteenth Amendment claims, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims."); *Bishop v. Bartlett*, No. 06-462, 2007 WL 9718438, at \*10 (E.D.N.C. Aug. 18, 2007) (declining "to exercise supplemental jurisdiction over the state constitutional claim" following dismissal of all federal claims and recognizing "the limited role of the federal judiciary in matters of state elections" and that North Carolina's administrative, judicial, and political processes provide a better forum for plaintiffs to seek vindication of their state constitutional claim), *aff'd*, 575 F.3d 419 (4th Cir. 2009).

Beyond these usual reasons to decline to exercise supplemental jurisdiction over the state-constitutional claims, there are two additional reasons to do so here.

First, the parties do not meaningfully address the state-constitutional claims in their cross-motions for summary judgment, effectively treating them as coextensive with the federal-constitutional claims here. The Pennsylvania Supreme Court, however, has held that Pennsylvania's "Free and Equal Elections" Clause is not necessarily coextensive with the 14th Amendment. *See* *League of Women Voters v. Commonwealth*, 645 Pa. 1, 178 A.3d 737, 812-813 (2018) (referring to the Pennsylvania Free and Equal Elections Clause as employing a "separate and distinct standard" than that under the 14th Amendment to the U.S. Constitution). Given the lack of briefing on this issue and out of deference to the state courts to interpret their own state constitution, the Court declines to exercise supplemental jurisdiction.

Second, several Defendants have asserted a defense of sovereign immunity in this case. That defense does not apply to Plaintiffs' federal-constitutional claims under the *Ex parte Young* doctrine. *See* *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 627 (E.D. Pa. 2018) ("Here, the doctrine of *Ex parte Young* applies to Plaintiffs' constitutional claims for prospective injunctive and declaratory relief, and therefore the First and Fourteenth Amendment claims are not barred

by the Eleventh Amendment. Secretary Cortés, as an officer of the Pennsylvania Department of State, may be sued in his individual and official capacities 'for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law.' "). But sovereign immunity may apply to the state-law claims, at least those against Secretary Boockvar. The possibility of sovereign immunity potentially applying here counsels in favor of declining supplemental jurisdiction to decide the state-law claims.

**\*76** As such, all state-constitutional claims will be dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Defendants and against Plaintiffs on all federal-constitutional claims, decline to exercise supplemental jurisdiction over the remaining state-law claims, and dismiss all claims in this case. Because there is no just reason for delay, the Court will also direct entry of final judgment under Federal Rule of Civil Procedure 54(b). An appropriate order follows.

**All Citations**

--- F.Supp.3d ----, 2020 WL 5997680

### Footnotes

1    "Drop boxes" are receptacles similar to U.S. Postal Service mailboxes. They are made of metal, and have a locking mechanism, storage compartment, and an insert or slot into which a voter can insert a ballot. *See generally* [ECF 549-9].

2    Intervenors include the Pennsylvania State Democratic Party, the League of Women Voters, the NAACP Pennsylvania State Conference, Common Cause Pennsylvania, Citizens for Pennsylvania's Future, the Sierra Club, the Pennsylvania Alliance for Retired Americans, and several affiliated individuals of these organizations.

3    As noted above, Plaintiffs and Mr. Riddlemoser use the term "voter fraud" to mean "illegal voting"—*i.e.*, voter fraud is any practice that violates the Election Code. For purposes of the Court's decision and analysis of Plaintiffs' vote-dilution claims, the Court accepts this definition.

4    The procedure for absentee ballots and applications largely resembles the procedure for mail-in ballots and applications.

5    If the application is approved, the approval is "final and binding," subject only to challenges "on the grounds that the applicant was not a qualified elector." 25 P.S. § 3150.12b(a)(2). An unqualified elector would be, for example, an individual who has not "been a citizen of the United States at least one month." Pa. Const.

Art. 7, § 1; *see also* 25 P.S. § 2602(t) (defining "qualified elector" as "any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election").

6    In her summary-judgment brief, Secretary Boockvar argues that Plaintiffs' as-applied challenge to Pennsylvania's county-residency requirement is unripe. [ECF 547, pp. 60-63]. The Secretary reasons that Plaintiffs have not shown sufficient evidence that they are harmed by the county-residency requirement. This argument is directed more towards a lack of standing and a lack of evidence to support the claim on the merits. As the sufficiency of the evidence of harm is a separate issue from ripeness (which is more concerned with timing), the Court does not find Plaintiffs' as-applied challenge to the county-residency requirement unripe. *See Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 734 (11th Cir. 2020) ("The question of ripeness frequently boils down to the same question as questions of Article III standing, but the distinction between the two is that standing focuses [on] whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff has personally suffered that harm, whereas ripeness centers on whether that injury has occurred yet." (cleaned up) (citations omitted)).

7    In their briefing, the parties focused on the "capable of repetition yet evading review" exception to the mootness doctrine. The Court, however, does not find that it needs to rely on this exception. Nearing the eve of the election, it is clear that Defendants intend to engage in the conduct that Plaintiffs assert is illegal and unconstitutional. Thus, the claims are presently live, and are not "evading review" in this circumstance.

8    While Rule 65(d)(2)(C) states that an injunction binds "[non-parties] who are in active concert or participation" with the parties or the parties' agents, the Court does not find that Rule 65(d) helps the county boards. As discussed, the county boards manage the elections and implement the electoral procedures. While the Court could enjoin Secretary Boockvar, for example, from using unmanned drop boxes, each individual county election board could still use unmanned drop boxes on their own. Doing so would not result in the counties being in "active concert or participation" with Secretary Boockvar, as each county is independently managing the electoral process within their county lines. *See Marshak v. Treadwell*, 595 F.3d 478, 486 (3d Cir. 2009) ("[N]on-parties guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction may be held in contempt." (cleaned up) (citations omitted)). In other words, each county elections board would not be "aiding or abetting" Secretary Boockvar in violating the injunction (which would implicate Rule 65(d)(2)(C)); rather, the counties would be utilizing their independent statutory authority to manage elections within their county lines.

9    As evidence of the county boards' indispensability, one court recently found that the failure to join local election officials in an election case can make the harm alleged not "redressable." It would be a catch-22 to say that county boards cannot be joined to this case as necessary parties, but then dismiss the case for lack of standing due to the boards' absence. *Cf. Jacobson v. Florida Secretary of States*, 974 F.3d 1236, ———– ———, 2020 WL 5289377, at *11-12 (11th Cir. Sept. 3, 2020) ("The problem for the [plaintiffs] is that Florida law tasks the [county] Supervisors, independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute. ... The Secretary is responsible only for certifying to the supervisor of elections of each county the names of persons nominated ... Because the Secretary didn't do (or fail to do) anything that contributed to [plaintiffs'] harm, the voters and organizations cannot meet Article III's traceability requirement." (cleaned up)).

10   The organizational Plaintiffs also raise certain associational and organizational standing arguments, asserting that they represent their members' interests. The associational standing arguments are derivative of their members' interests. That is, because the Court has found no concrete injury suffered by the individual voters, which would include the members of the organizational Plaintiffs, there are no separate grounds to establish standing for these organizations. *See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1997) (an organization only has standing to sue on

behalf of its members when "its members would otherwise have standing to sue in their own right") (citation omitted).

11    *See, also, e.g.,* 🔖 *Dudum v. Arntz*, 640 F.3d 1098, 1117 (9th Cir. 2011) ("If the aspects of the City's restricted IRV scheme Dudum challenges impose any burdens on voters' constitutional rights to vote, they are minimal at best."); 🔖 *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354–55 (11th Cir. 2009) ("The district court determined that the burden imposed on Georgia voters who lack photo identification was not undue or significant, and we agree.... The NAACP and voters are unable to direct this Court to any admissible and reliable evidence that quantifies the extent and scope of the burden imposed by the Georgia statute.");

🔖 🅐 *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1183 (9th Cir. 1988) ("Appellants claim that Hawaii's absentee voting law fails to prohibit 'the solicitation, examination and delivery of absentee ballots by persons other than the voters' and that such activities occurred during the special election ... We agree with the district court that the Hawaii absentee ballot statute and the regulations adopted under it adequately protect the secrecy and integrity of the ballot. Although Hawaii has not adopted a regulation to prevent the delivery of ballots by persons other than the voter, the Hawaii regulations go into great detail in their elaboration of procedures to prevent tampering with the ballots."); 🔖 *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) ("[A]lthough ballot format has an effect on the fundamental right to vote, the effect is somewhat attenuated."); *Nemes v. Bensinger*, —— F. Supp. 3d ——, ——, 2020 WL 3402345, at *13 (W.D. Ky. June 18, 2020) ("The burden imposed by the contraction to one polling place is modest, and the identified groups are afforded various other means under the voting plans to easily and effectively avoid disenfranchisement. As already discussed, Defendants have offered evidence of the substantial government interest in implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19."); 🅐 *Paralyzed Veterans of Am. v. McPherson*, No. 06-4670, 2008 WL 4183981, at *22 (N.D. Cal. Sept. 9, 2008) ("Plaintiff Bohlke's listed burdens rely on speculative risk or the ancillary effects of third party assistance, but not on evidence of any concrete harm. Such speculations or effects are insufficient under Supreme Court and Ninth Circuit precedent to demonstrate a severe burden on the fundamental right to vote.").

12    The parties do not specifically brief the elements of an Elections-Clause claim. This is typically a claim brought by a state legislature, and the Court has doubts that this is a viable theory for Plaintiffs to assert. *See* 🔖 *Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007). Regardless, if state law does not require signature comparison, then there is no difference between the Secretary's guidance and the Election Code, and the Elections-Clause claim necessarily fails.

13    Several Defendants and Intervenors have asked this Court to abstain from deciding this issue on the basis of 🔖 *Pullman*. As this Court previously discussed, a court can abstain under 🔖 *Pullman* if three factors are met: "(1) [the dispute] requires interpretation of "unsettled questions of state law,"; (2) permitting resolution of the unsettled state-law questions by state courts would "obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims"; and (3) an "erroneous construction of state law would be disruptive of important state policies[.]" " [ECF 409, p. 3 (quoting 🔖 *Chez Sez*, 945 F.2d at 631) ]. But if, on the other hand, the answer to the state law dispute is "clear and unmistakable," abstention is not warranted. [*Id.* at p. 15 (citing 🔖 *Chez Sez*, 945 F.2d at 632) ]. Here, the Court concludes (as discussed below) that the Election Code is clear that signature comparison is not required and further, that Plaintiffs' competing interpretation is not plausible. As such, the Court cannot abstain under 🔖 *Pullman*.

The 🔖 *Pullman* analysis does not change simply because Secretary Boockvar has filed a "King's Bench" petition with the Pennsylvania Supreme Court, requesting that court to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557].

The fact that such a petition was filed does not change this Court's conclusion that the Election Code is clear.

The 🔖 *Pullman* factors remain the same. And they are not met here.

14  The Secretary's September 11, 2020, guidance, stated that the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [ECF 504-24, p. 3, § 3]. Similarly, the Secretary's September 28, 2020, guidance stated that "Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [ECF 504-25, p. 9, § 5.2].

15  The Election Code's definition of "proof of identification" in full provides:

The words "proof of identification" shall mean ... For a qualified absentee elector ... or a qualified mail-in elector ...:

i. in the case of an elector who has been issued a current and valid driver's license, the elector's driver's license number;

ii. in the case of an elector who has not been issued a current and valid driver's license, the last four digits of the elector's Social Security number;

iii. in the case of an elector who has a religious objection to being photographed, a copy of a document that satisfies paragraph (1) [*i.e.*, "a valid-without-photo driver's license or a valid-without-photo identification card issued by the Department of Transportation"]; or

iv. in the case of an elector who has not been issued a current and valid driver's license or Social Security number, a copy of a document that satisfies paragraph (2) [*i.e.*, "a document that shows the name of the individual to whom the document was issued and the name substantially conforms to the name of the individual as it appears in the district register; shows a photograph of the individual to whom the document was issued; includes an expiration date and is not expired, except (A) ... or (B) ...; and was issued by" the federal, state, or municipal government, or an "accredited Pennsylvania public or private institution of higher learning [or] "a Pennsylvania are facility."].

🔖 25 P.S. § 2602(z.5)(3).

16  While election officials must engage in signature comparison for in-person voters, that requirement is explicitly required by the Election Code, unlike for mail-in ballots. 🔖 25 P.S. § 3050(a.3)(2). And as discussed below, in-person voters, unlike mail-in voters, are immediately notified if their signatures are deficient.

17  Plaintiffs also argue that signature comparison for mail-in and absentee ballots is supported by historical case law. [ECF 552, pp. 58-59]. Plaintiffs cite to two cases from the 1960s that the Court of Common Pleas decided. [*Id.*]. The first, 🔖 *Appeal of Fogleman*, concluded that under the then-applicable election law, an absentee voter had to sign a declaration to show that he was a proper resident who had not already voted in that election. 🔖 36 Pa. D. & C.2d 426, 427 (Pa. Ct. Comm. Pl. 1964). Regarding the voter's signature, the court simply stated, "[i]f the elector fails or refuses to attach his or her signature, then such elector has not completed the declaration as required by law of all voters." 🔖 *Id.* Thus, no signature comparison or verification was implicated there; rather, the court simply stated that the declaration must be signed (*i.e.*, completed). The second case Plaintiffs cite, 🔖 *In re Canvass of Absentee Ballots of Gen. Election* [ECF 552, pp. 58-59], arose from individual, post-election challenges to 46 individual absentee ballots. 🔖 39 Pa. D. & C.2d 429, 430 (Pa. Ct. Comm. Pl. 1965). Thus, a universal and mandatory signature-comparison requirement was not at issue there, unlike what Plaintiffs contest here. This Court finds neither case persuasive.

18  This identifying information on a ballot application includes much of the same information expressly listed for what a voter must provide in initially registering to vote. 🔖 25 Pa. C.S.A. § 1327(a) (stating that the "official voter registration application" shall request the applicant's: full name, address of residence (and mailing address if different), and date of birth).

19    The counties that intend to compare and verify signatures in the upcoming election include at least the
      following counties: Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming. [ECF
      504-1].

20    Plus, these figures do not even tell the whole story because they do not take into account the hundreds of
      thousands of voters who are registered to other parties who could also conceivably serve as poll watchers
      for the Trump Campaign and the candidate Plaintiffs. [504-34]. While that may not be the ideal scenario for
      Plaintiffs, they concede there's nothing in the Election Code that limits them to recruiting only registered voters
      from the Republican Party. [ECF 528-14, 267:23-268:1 (Q: And you don't have to be a registered Republican
      to serve as a poll watcher for the Trump campaign, do you? A: No.) ]. To that point, the Trump Campaign
      utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

21    To the extent that Plaintiffs are attempting to bring their claim on behalf of these third parties (which is unclear),
      they would lack standing to do so. Ordinarily, "a litigant must assert his or her own legal rights and interests

      and cannot rest a claim of relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S.
      400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The only time a litigant can bring an action on behalf of a

      third party is when "three important criteria are satisfied." *Id.* "The litigant must have suffered an 'injury in
      fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant
      must have a close relation to the third party; and there must exist some hindrance to the third party's ability

      to protect his or her own interest." *Id.* at 410-11, 111 S.Ct. 1364 (cleaned up). Plaintiffs cannot satisfy the
      second or third criteria.

      Plaintiffs claim that they "have a close relationship with these minor parties such that it will act as an effective
      advocate for the minor parties." [ECF 551, p. 30]. It is hard to see how Plaintiffs can be said to have a close
      relationship with rival political parties who are their direct adversaries in the upcoming election.

      Plaintiffs also argue that these "minor parties are hindered from protecting their own interests, particularly in
      this action when there are no minor party intervenors." [*Id.*]. But that doesn't hold water either. Just because
      these other parties have not asked to intervene, it does not mean they were incapable of intervening or
      seeking relief elsewhere. Indeed, these parties and their candidates have demonstrated time and again that
      they can raise their own challenges to election laws when they so desire, including by filing suit in federal
      district court. *See, e.g., Stein v. Cortés*, 223 F. Supp. 3d 423 (E.D. Pa. 2016) (Green Party Presidential

      candidate Jill Stein seeking recount); *Libertarian Party of Conn. v. Merrill*, No. 20-467, 2020 WL 3526922
      (D. Conn. June 27, 2020) (seeking to enjoin Connecticut's ballot access rules that required minor party

      candidates to petition their way onto the ballot); *Green Party of Ark. v. Martin*, 649 F.3d 675 (8th Cir. 2011)
      (challenging Arkansas' ballot access laws).

22    The Sierra Club Intervenors argue this should end the analysis. [ECF 542, p. 14 ("Even 'as applied,' Plaintiffs'
      claim has already been rejected") ]. While the Court finds the Pennsylvania Supreme Court's apparent
      ruling on Plaintiffs' as-applied challenge instructive, it is not outcome determinative. That is because the
      Pennsylvania Supreme Court did not have the benefit of the full evidentiary record that the Court has here.

23    After the briefing on the cross-motions for summary judgment had closed, on October 6, 2020, Secretary
      Boockvar issued additional guidance, which Plaintiffs then raised with the Court the following day. [ECF
      571]. This new guidance confirms that poll watchers cannot be present during the pre-canvassing and
      canvassing of mail-in ballots. It also makes clear that while the authorized representative can be present, the
      representative cannot make any challenges to the ballots. The Court finds that this new guidance has
      minimal relevance to the current disputes at issue here. The scope of duties of a representative is not before
      the Court. Of sole relevance here is whether this new guidance changes how this Court weighs the burdens
      and benefits of the county-residency restriction for poll watchers. The Court finds that the representative's
      inability to challenge mail-in ballots does appear to provide less protection to Plaintiffs; but in the grand
      election scheme, particularly in light of the role of the election overseers, the Court does not find the new
      guidance to materially upset the Commonwealth's interests in its overall election-monitoring plan.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    73

**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Unreported Opinion 6

*Strader v. U.S. Bank*, Case No. 2-19-cv-118-NR, 2020 WL 3447776 (W.D. Pa. Jun. 24, 2020) (Ranjan, J. op.)

KeyCite Blue Flag – Appeal Notification

Appeal Filed by VANCE STRADER v. US BANK, ET AL., 3rd Cir., July 28, 2020

2020 WL 3447776
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Vance STRADER, Plaintiff,
v.
U.S. BANK, et al., Defendants.

No. 2:19-cv-118-NR
|
Filed 06/24/2020

**Attorneys and Law Firms**

Vance Strader, Pittsburgh, PA, pro se.

William Sandelands, Sandelands Law LLC, Chester, NJ, for Defendants Nationstar Mortgage, Mr. Cooper, Fay Janati, CEO of Nationstar Mortgage, CFO of Nationstar Mortgage.

Bethann R. Lloyd, Weinheimer Haber & Coco, P.C., Pittsburgh, PA, for Defendants Sandelands and Eyet LLP, Matthew Eyet, Alina H. Eyet, William C. Sandelands.

Caroline Liebenguth, Administrative Office of Pennsylvania Courts, Pittsburgh, PA, for Defendant Joseph James.

Lee M. Dellecker, Allegheny County Law Department, Pittsburgh, PA, for Defendant Allegheny County.

Lisa G. Michel, Allegheny County Sheriff's Office, Pittsburgh, PA, for Defendant William Mullen.

Kristen D. Little, Shapiro & DeNardo, LLC, King of Prussia, PA, for Defendants David Kreisman, Gerald Shapiro, Kathleen Wolf, Shapiro & DeNardo.

## MEMORANDUM OPINION & ORDER

J. Nicholas Ranjan, United States District Judge

**\*1** On May 10, 2019, *pro se* Plaintiff Vance Strader filed this lawsuit against over a dozen Defendants. [ECF 9]. He amended his complaint on November 12, 2019, filing a 77-page complaint against the previous Defendants, as well as several others. [ECF 18]. Since then, all Defendants who have been served or waived service have filed motions to dismiss the claims against them. With the motions now fully briefed, and after careful consideration of the parties' arguments and the allegations in the operative complaint, the Court finds that Mr. Strader has failed to state a cause of action against any of the Defendants. For the reasons below, the Court will grant all Defendants' motions to dismiss and dismiss this case with prejudice.

## BACKGROUND

This is Mr. Strader's second federal lawsuit relating to the same mortgage-foreclosure proceeding. In 2017, Mr. Strader sued many of the same Defendants at Case No. 17-cv-684, alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), constitutional violations, and state-law causes of action. All of his claims relate to events surrounding the foreclosure on a house located in Penn Hills owned by Mr. Strader's deceased mother. The foreclosure action was initiated by the trustee for the trust that owned a mortgage issued to Mr. Strader's mother (U.S. Bank) and the mortgage loan servicer (Nationstar). Some of Mr. Strader's claims in the 2017 case have survived motions to dismiss and proceeded through discovery. That case is at the summary-judgment briefing stage.

Here, as in the 2017 case, Mr. Strader challenges events in the underlying mortgage-foreclosure proceeding. While the 2017 case centers on events from 2016, this case concerns events that occurred in the Fall of 2018, when certain Defendants obtained summary judgment in state court on the same underlying mortgage-foreclosure action. [ECF 18, ¶32].

The thrust of Mr. Strader's amended complaint is that actions taken by the various Defendants in furtherance of the mortgage-foreclosure action—including U.S. Bank, Nationstar, the law firm Defendants (as advocates for U.S. Bank and Nationstar), Judge Joseph James (as the judicial decision-maker), Allegheny County (as Judge James's "employer"), and the Allegheny County Sheriff, William Mullen, and his office (as courtroom security)—violated the FDCPA and other laws. [ECF 18, ¶¶ 32-53]. Generally, Mr. Strader alleges that Defendants were collectively out to steal his deceased mother's house: "This is a scam that is fleecing people/voters out of their houses, by debt collectors and corrupt public officials for profit." [ECF 18, ¶ 71].

Specifically, Mr. Strader complains about events that took place in the context of U.S. Bank and Nationstar's summary-judgment motion, filed in the Fall of 2018. [ECF 18, ¶ 32, ¶ 153]. On December 11, 2018, Judge James held oral argument on the motion and invited an attorney at Defendant Sandelands Eyet, LLP, to argue on behalf of U.S. Bank/Nationstar. [ECF 18, ¶¶ 37-40]. Judge James allowed evidence to be introduced, including asking Mr. Strader questions about financial matters. [ECF 18, ¶¶ 40-42]. Mr. Strader alleges that Judge James overstepped his role and essentially tried the case for U.S. Bank/Nationstar. [ECF 18, ¶ 46].

 **\*2** Mr. Strader further accuses Judge James of not allowing him to make his record at the argument and of cutting him off. [ECF 18, ¶¶ 61-67]. He also complains about various evidentiary rulings and argues that Judge James should have recused himself. [ECF 18, ¶ 66, ¶¶ 94-95]. According to Mr. Strader, the result of this conduct was a denial of due process, culminating in the grant of summary judgment to U.S. Bank/Nationstar. [ECF 18, ¶¶ 43-45].

Further, Mr. Strader alleges that, during the argument, he felt intimidated by the presence of a deputy sheriff in the courtroom, as he had a gun. Mr. Strader claims that the deputy sheriff stood ready to shoot him for making arguments to the court. [ECF 18, ¶ 38, ¶¶ 50-51].

Notwithstanding the state court granting summary judgment against him, Mr. Strader continues to dispute the debt, stating that the underlying promissory note is "bogus" and that he will not pay the debt. [ECF 18, ¶ 53, ¶ 128]. Following summary judgment, the house was posted for sale. [ECF 18, ¶ 122, ¶ 149]. In March 2019, Mr. Strader's attempts to seek reconsideration and appeal in the state courts failed. [ECF 41-4].

In this lawsuit, Mr. Strader pleads the following specific causes of action against all Defendants: (1) violation of the FDCPA; (2) violation of 42 U.S.C. § 1983 and § 1985; and (3) violation of the Racketeer Influenced Corruption Organizations Act ("RICO"). He seeks, in part, $5 million in punitive and actual damages, $5 million in statutory damages, and injunctive relief in the form of stopping the sale of the house and returning it to him. [ECF 18, "Wherefore" clause].

Defendants here can be grouped into three main categories: (1) the mortgage-related Defendants (Nationstar Mortgage LLC d/b/a Mr. Cooper, Fay Janati, and U.S. Bank); (2)

the law-firm Defendants (Shapiro & DeNardo, LLC, Gerald Shapiro, David Kreisman, Katherine Wolf, Sandelands Eyet, LLP, Matthew Eyet, Alina Eyet, and William Sandelands); and (3) the state-actor Defendants (Judge Joseph James, Allegheny County, and Sheriff William Mullen and his office). Each of these groups of Defendants have filed motions to dismiss [ECF 25; ECF 29; ECF 36; ECF 40; ECF 58; ECF 63], which are now fully briefed and ready for disposition.

For the reasons that follow, none of Mr. Strader's causes of action state a proper claim against the various Defendants, and granting him leave to amend his complaint would be both inequitable and futile. Therefore, the amended complaint will be dismissed with prejudice.

## DISCUSSION & ANALYSIS

The Court applies the familiar standard of Rule 12(b)(6), and accepts all of the allegations in the amended complaint as true. After careful consideration of each and every allegation in the amended complaint, and construing all factual averments and reasonable inferences in Mr. Strader's favor, the Court finds that the amended complaint fails to state a claim, for at least the following *seven* reasons:

*First,* the amended complaint is barred, at least in part, by the *Rooker-Feldman* doctrine. That doctrine provides that federal courts lack jurisdiction to review state-court judgments where the relief sought is in the nature of appellate review. *See District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923). The *Rooker-Feldman* doctrine deprives federal courts of subject-matter jurisdiction when: "(1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court's judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP,* 615 F.3d 159, 166 (3d Cir. 2010) (cleaned up).

 **\*3** Here, those elements are met because: (1) Mr. Strader lost the mortgage-foreclosure proceedings in state court; (2) he is complaining of injuries caused by the summary-judgment order; (3) that order, and the denial of his appeal, were rendered by March 2019, before this federal suit was filed;

and (4) Mr. Strader is asking this Court, at least as one aspect of the relief he seeks, to reverse that summary-judgment order. Specifically, Mr. Strader is seeking injunctive relief in the form of overturning Judge James's ruling and giving Mr. Strader his mother's house back. This request falls outside of the Court's authority. *See* 📄 *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996) ("If the relief requested in the federal action ... would void the state court's ruling, then the issues are inextricably intertwined and the district court has no subject matter jurisdiction to hear the suit.") (citation and quotation omitted); 📄 *Marran v. Marran*, 376 F.3d 143, 149-50 (3d Cir. 2004). Accordingly, the amended complaint, to the extent that it seeks injunctive relief, should be dismissed pursuant to the *Rooker-Feldman* doctrine.

**Second,** Mr. Strader's case impermissibly splits causes of action. The claim-splitting doctrine prohibits plaintiffs from "maintain[ing] two separate actions involving the same subject matter at the same time in the same court and against the same defendant." 📄 *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977) (citations omitted). "The longstanding rule against improper claim splitting prohibits a plaintiff from prosecuting his case piecemeal and requires that all claims arising out of a single alleged wrong be presented in one action." *Prewitt v. Walgreens Co.*, No. 12-6967, 2013 WL 6284166, at *5 (E.D. Pa. Dec. 2, 2013) (citations omitted). The claim-splitting doctrine in this Circuit "applies when two cases: (1) take place in the same court; (2) with the same defendants; (3) involving the same subject matter." 📄 *McKenna v. City of Phila.*, 304 F. App'x 89, 92 (3d Cir. 2008).

Mr. Strader's 2017 and 2019 cases are both before this Court and involve many of the same Defendants. At issue is only whether the subject matter is "the same." The Court finds that it is. The cases need not be identical to involve the same subject matter. 📄 *McKenna*, 304 F. App'x at 92. When the difference between the two cases is "purely semantic" and both cases rely on "the same operative facts and legal principles," the cases involve the same subject matter. *Id.* Mr. Strader's second lawsuit alleges the same type of FDCPA violation as before and is based upon the very same mortgage-foreclosure proceedings. Mr. Strader is impermissibly taking a second bite at the apple with his claims in this case. While the claim-splitting doctrine precludes all of the claims in this case, the most significant overlap between the 2017 and 2019 cases concerns the FDCPA claims. The FDCPA claims here are clearly duplicative of the ones in the 2017 case; Mr. Strader cannot effectively amend his 2017 case (which is at the summary-judgment stage) by bringing his FDCPA claims in this case. Thus, at a minimum, the FDCPA claims must be dismissed in this case on the basis of improper claim splitting.

**Third,** the claims against Judge James are barred by the doctrine of absolute judicial immunity, which provides that a judge is immune from liability for all acts taken in his or her judicial capacity. 📄 *Stump v. Sparkman*, 435 U.S. 349, 356 (1978); *see also Azubuko v. Royal*, 443 F.3d 302, 303 (3d Cir. 2006) ("A judicial officer in the performance of his duties has absolute immunity from suit and will not be liable for his judicial acts."). A judge "will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority[.]" 📄 *Stump*, 435 U.S. at 356. Immunity is not affected by a judge's motives in performing judicial acts, and will exist even if a judge's actions are unfair or controversial. *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 769 (3d Cir. 2000).

**\*4** Mr. Strader alleges that Judge James granted summary judgment against him, despite various protestations that it was improper. He alleges that Judge James cut him off at the oral argument and did not recuse himself when he should have. However, as a judge for the Court of Common Pleas of Allegheny County, Judge James was well within his jurisdiction to rule upon a motion for summary judgment in a mortgage-foreclosure matter and to conduct the oral argument proceedings in a manner that he deemed appropriate. *See* 42 Pa. C. S. § 931(a) ("the courts of common pleas shall have unlimited original jurisdiction of all actions and proceedings, including all actions and proceedings heretofore cognizable by law or usage in the courts of common pleas."). Judge James was acting in his judicial capacity when he heard and ruled upon the summary-judgment motion (which is the totality of the conduct alleged against him), and so all claims against him are barred.

**Fourth,** Mr. Strader fails to plead a claim under 📄 42 U.S.C. § 1983 against any of the Defendants. To state a viable 📄 Section 1983 claim, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." 📄 *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

In this case, Mr. Strader can't maintain a Section 1983 claim against any of the non-state actor Defendants, such as Sandelands & Eyet, LLC, Matthew Eyet, Alina Eyet, William Sandelands, Shapiro & DeNardo, LLC, Gerald Shapiro, David Kreisman, Katherine Wolf, U.S. Bank, Nationstar, and Fay Janati. This is because a civil-rights claim under Section 1983 requires a state action. Such a claim is not viable against a private individual or entity, even if the private party invoked state procedures. *See Brobst v. Brobst*, No. 16-4051, 2019 WL 1382513, at *3-4 (E.D. Pa. Mar. 27, 2019).

Further, with respect to the remaining state actors (Allegheny County and Sheriff Mullen and his office), the Section 1983 claim fails because Mr. Strader fails to allege sufficient facts to state a plausible claim.

To maintain a Section 1983 claim against a municipal entity, such as Allegheny County or the Sheriff's Office, a plaintiff "must demonstrate that the violation of his rights was caused by either a policy or a custom of the municipality." *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (citation omitted). While Mr. Strader identifies a number of concerns he has regarding the handling of his mortgage-foreclosure proceedings, and argues that these amount to a deprivation of his constitutional right to due process, he does not adequately identify a cognizable policy or custom of Allegheny County or the Sheriff's Office that may have led to this alleged violation of his constitutional rights. *See Pondexter v. Allegheny Cty.*, No. 11-857, 2012 WL 628494, at *6 (W.D. Pa. Feb. 27, 2012) (Fischer, J.) ("In the case at bar, Plaintiff has not identified any policy or custom attributable to Allegheny County.... Plaintiff has also not set forth any evidence of incidents that have occurred in the past to prove some pattern of conduct that could establish a discriminatory custom or policy of Allegheny County directed at him. Thus, Plaintiff has failed to allege facts that could prove an essential element of his case under 42 U.S.C. § 1983. As his allegations are insufficient to state a claim upon which relief may be granted against Allegheny County, Plaintiff's Complaint against Allegheny County must be dismissed, with prejudice.") (cleaned up).

Further, any claim against Sheriff Mullen himself fails because supervisory "liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v.*

*Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998); *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (same). Instead, there must be some affirmative conduct by the supervisor that contributed to the alleged constitutional violation. *Id.* Here, the only allegations regarding Sheriff Mullen are that he employed deputy sheriffs who posted service of a handbill on the property and appeared as courtroom security at the summary-judgment argument. The complaint fails to identify any affirmative conduct by Sheriff Mullen himself. As such, there is no basis to hold him liable here.[1]

**\*5**  Accordingly, Mr. Strader has failed to plead a plausible Section 1983 claim against any Defendant in this action.

*Fifth*, Mr. Strader fails to plead a claim of conspiracy under 42 U.S.C. § 1985. Section 1985 makes it unlawful for "two or more persons in any State or Territory [to] conspire" to (1) prevent officers from performing duties; (2) obstruct justice or intimidate a party, witness, or juror; or (3) deprive a person of the equal protection of the laws. 42 U.S.C. § 1985(1)-(3). While Mr. Strader does not identify the specific provision of Section 1985 under which he is suing, Section 1985(1) is inapplicable because it relates only to conspiracies to interfere with duties of federal officers, and Section 1985(2) is inapplicable because it relates to the intimidation of witnesses in a federal court action. *See Baron v. Carson*, 410 F. Supp. 299, 300-01 (N.D. Ill. 1976); *Rode*, 845 F.2d at 1206-07.

That leaves only 42 U.S.C. § 1985(3). To succeed under Section 1985(3), a "plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Rashid v. Pub. Sav. Ass'n, Inc.*, 97 B.R. 187, 190 n.6 (E.D. Pa. 1989) (citation and quotation omitted). Additionally, a well-established requirement of a Section 1985(3) claim is that there must be "some racial, or perhaps otherwise class-based, invidiously discriminatory

animus behind the conspirators' action." *Id.* (citation and quotation omitted).

The complaint fails to establish any of these elements. There are no plausible factual allegations evincing a conspiracy of any kind, let alone one designed to deny Mr. Strader equal protection of law, or any privileges and immunities under the law. Beyond that, there are no facts pled to indicate that the foreclosure proceedings were instituted for any reason other than the fact that the mortgage payments were not being met. With respect to the events at oral argument in the state proceeding, Mr. Strader has not alleged facts to suggest that anyone involved in those proceedings discriminated against him based on race or, for that matter, any other protected classification. Thus, the Section 1985 conspiracy claim fails.

***Sixth,*** Mr. Strader's RICO claim fails for failure to plead any of its essential elements. The RICO statute authorizes civil suits by any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962, which renders unlawful various transactions and other dealings resulting from racketeering activity. *See* 18 U.S.C. § 1964(c). "Racketeering Activity" is defined to include numerous criminal acts such as murder, kidnapping, arson, bribery, mail fraud, interference with commerce, and extortion. *See* 18 U.S.C. § 1961(1).

Here, none of the alleged actions that were taken by any of the Defendants come close to this definition of "racketeering activity." The only alleged conduct that could arguably form the basis for a RICO claim are Mr. Strader's conclusory allegations of mail, wire, and other forms of fraud. *See* 18 U.S.C. § 1961(1). These bare allegations, pled without any factual precision, are insufficient to plead the requisite "racketeering activity" since it is well-settled that where a plaintiff's RICO claim is predicated upon a crime of fraud, the fraud must be pled with particularity. *See* Fed. R. Civ. P. 9(b); *see also Brookhart v. Rohr*, 385 F. App'x. 67, 70 (3d Cir. 2010) ("Conclusory allegations of a pattern of racketeering activity, in this case, a fraudulent scheme, are insufficient to survive a Rule 12(b)(6) motion.") (citation omitted). Because Mr. Strader has not alleged any facts that plausibly and particularly describe mail, wire, or other fraud, let alone tie that fraud to a plausibly pled racketeering scheme, this claim fails at the threshold.

**\*6** ***Seventh,*** Mr. Strader cannot state FDCPA claims against Judge James, Sheriff Mullen and his office, or Allegheny County, as none of them are "debt collectors." The FDCPA, 15 U.S.C. § 1692 *et seq.*, was enacted to curb abuses by debt collectors. *See Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1167 (3d Cir. 1987). The term "debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The statute also excludes from this definition any person "serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt[.]" 15 U.S.C. § 1692a(6)(D).

Here, the amended complaint does not allege that Judge James, Sheriff Mullen and his office, or Allegheny County's "principal purpose" in being involved in the foreclosure action was to collect a debt. Rather, Mr. Strader alleges that Judge James was at all times acting in his judicial capacity and that Sheriff Mullen and his office were acting as courtroom security and effecting service of process. Indeed, to the extent the Sheriff's Office was serving legal process, it is specifically excluded from the FDCPA's definition of a "debt collector." *See id.* Finally, there are no specific allegations against Allegheny County. Accordingly, all FDCPA claims against these Defendants fail as a matter of law. [2]

## **CONCLUSION**

Thus, for at least the seven reasons described above, Mr. Strader's amended complaint must be dismissed in its entirety. Further, this dismissal must be with prejudice—the Third Circuit has stated that "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable ***or*** futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) (citation omitted) (emphasis added). Here, any further amendment would be both inequitable and futile. Mr. Strader has already had a chance to amend, and he has already raised similar claims against similar defendants in both his pending 2017 federal case and in state court.

Additionally, Mr. Strader has filed numerous documents with this Court, which have set forth, in exhaustive detail, the

purported legal basis for his claims, both in this case and the 2017 case. *See, e.g.,* [ECF 20; ECF 68; ECF 71]; Case No. 17-cv-684, [ECF 70; ECF 72; ECF 86; ECF 87]. From a review of those filings, the Court concludes that further amendment of the complaint would not cure the deficiencies above. *See Adelman v. Jacobs,* No. 18-607, 2019 WL 1651612, at *6 (W.D. Pa. Apr. 17, 2019) (Fischer, J.) ("[T]he Court finds that any further amendment of these claims would be futile given the Court's analysis of the claims set forth above."); *Goldsmith v. Goldsmith,* No. 16-01362, 2017 WL 11471785, at *6 (W.D. Pa. Nov. 22, 2017) (Hornak, J.) ("[T]he Court concludes that in light of the many 'do overs' that Plaintiff has been given, any amendment would be futile."). Accordingly, Mr. Strader's amended complaint will be dismissed with prejudice.

In sum, all of the claims in this case will be dismissed with prejudice. The only potentially viable claims are the FDCPA claims against Defendants Nationstar, Matthew Eyet, Alina Eyet, William Sandelands, and Sandelands Eyet, LLP. But those claims have been improperly split from the pending 2017 case, and so will be dismissed from this case.

## ORDER

**\*7** AND NOW, this 24th day of June, 2020, the Court hereby **ORDERS** that Defendants' motions to dismiss [ECF 25; ECF 29; ECF 36; ECF 40; ECF 58; ECF 63] are **GRANTED**. Mr. Strader's amended complaint is **DISMISSED WITH PREJUDICE**. The Clerk of Court shall mark this case as **CLOSED**.

**All Citations**

Slip Copy, 2020 WL 3447776

## Footnotes

1   Even if Sheriff Mullen engaged in affirmative conduct, the claim against him would still fail because there is no underlying constitutional violation. That is, the amended complaint does not allege any specific constitutional violations by Sheriff Mullen's subordinates. The allegations concern deputy sheriffs, who, as noted above, posted service of the handbill and served as courtroom security. As alleged, this conduct does not violate any aspect of the Constitution.

2   The FDCPA claims against all other Defendants are barred due to improper claim-splitting, as discussed above. Those claims will be addressed in the 2017 case.

# Unreported Opinion 7

*Campeau v. Soc. Sec. Admin.*, 575 F. App'x 35 (3d Cir. Aug. 8, 2014)

575 Fed.Appx. 35
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

David Frank CAMPEAU, Jr., Appellant

v.

SOCIAL SECURITY ADMINISTRATION.

No. 14−1488.
|
Submitted Pursuant to Third Circuit
LAR 34.1(a) Aug. 1, 2014.
|
Opinion Filed Aug. 8, 2014.

**Synopsis**

**Background:** Complainant filed suit against Social Security Administration (SSA), alleging that it failed to properly treat his request to amend his social security records and failed to provide him with access to those record in violation of Privacy Act. SSA moved to dismiss complaint for failure to state a claim. The United States District Court for the Eastern District of Pennsylvania granted motion. Complainant appealed.

**Holdings:** The Court of Appeals held that:

[1] claim that SSA failed to acknowledge receipt of complainant's request within ten days was barred by Privacy Act's two-year statute of limitations;

[2] complainant failed to allege adverse effect needed for standing to seek monetary damages;

[3] complainant was not entitled to injunction requiring SSA to amend his records by adding "indenture" to his file; and

[4] complainant was not entitled to damages based on SSA's alleged denial of access to his records.

Affirmed.

**Procedural Posture(s):** Motion to Dismiss.

West Headnotes (4)

**[1]    Records ⚷ Defects, amendment and correction**

Individual's claim that Social Security Administration (SSA) failed to acknowledge receipt of his request to amend his social security record within ten days as required by Privacy Act was time-barred, as he was well aware of that alleged injury more than two years before filing suit. 5 U.S.C.A. § 552a(d)(2)(A), (g)(5).

**[2]    Records ⚷ Defects, amendment and correction**

Privacy Act claims against Social Security Administration (SSA) for monetary damages stemming from its failure to make determination of whether to amend complainant's records and to permit him to seek review of any denial of his request to amend failed because he did not allege an adverse effect; though he allegedly incurred $300 in expenses in driving to SSA's headquarters in Baltimore to review his records and ascertain whether SSA had granted his request to amend them, his purely voluntary decision to travel there did not give him standing to seek damages because that self-inflicted injury was not fairly traceable to Government's purported activities. 5 U.S.C.A. § 552a(d)(2)(A), (g)(1)(D), (4).

**[3]    Records ⚷ Defects, amendment and correction**

Complainant under Privacy Act was not entitled to injunction requiring Social Security Administration (SSA) to amend his records by adding "indenture" to his file; complainant was required to allege at least some facts plausibly suggesting that his records were inaccurate or

incomplete without "indenture" he sought to add.
5 U.S.C.A. § 552a(g)(2)(A).

**[4]    Records**  ⬤  **Judicial enforcement in general**

Complainant under Privacy Act was not entitled to damages based on alleged refusal of Social Security Administration (SSA) to allow him to inspect his records in person at its headquarters and at field office in Baltimore, he had not alleged requisite adverse effect, and moreover Privacy Act did not authorize damages for denial-of-access claims in the first place and provided instead only for injunctive relief.  5 U.S.C.A. § 552a(d)(1),  (g)(1)(D); 20 C.F.R. § 401.40.

1 Cases that cite this headnote

**\*36**  On Appeal from the United States District Court for the Eastern District of Pennsylvania, (D.C. Civil Action No. 2–13–cv–05396), District Judge: Honorable Stewart Dalzell.

**Attorneys and Law Firms**

David Frank Campeau, Jr., Fernadale, PA, pro se.

Gerald B. Sullivan, Esq., Office of United States Attorney, Philadelphia, PA, for Social Security Administration.

Before: JORDAN, COWEN and BARRY, Circuit Judges.

**\*37  OPINION**

PER CURIAM.

David Frank Campeau, Jr., appeals from the District Court's dismissal of his complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. We will affirm.

I.

Campeau filed suit against the Social Security Administration ("SSA") alleging that it failed to properly treat his request to amend his social security records and failed to provide

him with access to those records in violation of the Privacy Act of 1974,  5 U.S.C. § 552a. His claims arise from his attempt to amend his records to include what he refers to as a "Simple Social Security Trust" and an "indenture." Campeau did not attach a copy of this document to his complaint or allege its contents, but he filed suit in his purported capacity as "Steward for the Kingdom of Israel." Other courts have addressed claims by similarly self-professed "Stewards of Israel" based on purported "Social Security Trusts" and "indentures," which other individuals have sought to place in their records in furtherance of an income tax liability avoidance theory that those other courts have rejected as "frivolous." *E.g.,* Crummey v. Soc. Sec. Admin., 794 F.Supp.2d 46, 56 (D.D.C.2011) (addressing similar Privacy Act claim and collecting cases), *aff'd,* No. 11–5231, 2012 WL 556317 (D.C.Cir. Feb. 6, 2012).

Campeau alleges that he mailed to the SSA a written request to include this "indenture" in his file but that the SSA never responded. He further alleges that, some seven months later, he drove to the SSA's headquarters in Baltimore, Maryland, and requested to review his records in person to ascertain whether the SSA had received and granted his request. According to Campeau, a Security Director at the SSA's headquarters directed him to an SSA field office located on Reistertown Road in Baltimore, but an agent at that office told him that he did not know where the records were located and advised Campeau to make a written or online request under the Freedom of Information Act ("FOIA"). Campeau does not allege that he followed that advice, and he instead filed this action almost two years later asserting the Privacy Act claims (but no claims under FOIA) discussed below. On the SSA's motion, the District Court dismissed Campeau's complaint under Rule 12(b)(6). Campeau appeals. [1]

II.

We agree that the District Court properly dismissed Campeau's complaint but, because our analysis differs somewhat, we will independently address Campeau's claims in some detail. Three of Campeau's four claims relate to his attempt to amend his records as described above. In particular, **\*38** he claims that the SSA: (1) failed to acknowledge receipt of his request within ten days as required by  5 U.S.C. § 552a(d)(2)(A); (2) failed to make a determination of whether to amend his records as required by  5 U.S.C. §

552a(d)(2)(B); and (3) failed to permit him to seek review of any denial of his request as required by 5 U.S.C. § 552a(d)(3).

[1] The District Court concluded that the first of these claims is barred by the Privacy Act's two-year statute of limitation, 5 U.S.C. § 552a(g)(5), and that ruling is clearly correct. Section 552a(d)(2)(A) required the SSA to acknowledge Campeau's request in writing "not later than 10 days (excluding [weekends and holidays] ) after the date of receipt." Campeau alleges that the SSA received his request on February 10, 2011, so (according to his allegations) the SSA was required to acknowledge it by February 24, 2011. Campeau was thus well aware of this alleged injury well more than two years before filing suit on September 13, 2013, and his arguments to the contrary are baseless.[2]

[2] Campeau's remaining amendment-related claims sought both monetary damages and injunctive relief. Monetary damages are potentially available under 5 U.S.C. § 552a(g)(1)(D), which permits a person to seek damages under 5 U.S.C. § 552a(g)(4) if a violation of the Privacy Act or regulations promulgated thereunder had an "adverse effect" on that person. The District Court concluded that all of Campeau's claims for damages fail because he failed to allege an "adverse effect," and we again agree.

"[T]he reference in § 552a(g)(1)(D) to 'adverse effect' acts as a term of art identifying a potential plaintiff who satisfies the injury-in-fact and causation requirements of Article III standing[.]" Doe v. Chao, 540 U.S. 614, 624, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004). Campeau argues that the SSA's alleged failure to determine his request or provide him with review had an adverse effect on him because he incurred $300 in expenses in driving to the SSA's headquarters in Baltimore to review his records and ascertain whether the SSA had granted his request to amend them. Campeau's purely voluntary decision to travel to Baltimore does not give him standing to seek damages under this statute because this "self-inflicted injur[y] [is] not fairly traceable to the Government's purported activities." Clapper v. Amnesty Int'l USA, —— U.S. ——, 133 S.Ct. 1138, 1152, 185 L.Ed.2d 264 (2013).

[3] Campeau also requested an injunction requiring the SSA to amend his records under 5 U.S.C. § 552a(g)(2)(A), by adding the "indenture" to his file. Campeau alleged in his complaint that he did not know whether the SSA did so, and he sought this remedy in the alternative in case it did not. After the SSA represented in its motion to dismiss that it had no record of having received Campeau's request, Campeau argued that the SSA must not have amended his records and that he should be allowed to amend his complaint to assert an affirmative claim for an injunction requiring it to do so. The District Court concluded that Campeau failed to exhaust his administrative remedies before seeking such an injunction because, inter alia, he failed to allege that his records are materially inaccurate or incomplete in any way. That conclusion is correct and, exhaustion aside, it means that Campeau has failed to state a claim for statutory relief.[3]

*39 The Privacy Act permits individuals to request amendment of their records and then seek judicial review of an agency's refusal to amend "any portion thereof which the individual believes is not accurate, relevant, timely, or complete." 5 U.S.C. § 552a(d)(2)(B). Campeau has never alleged why he believes it is necessary to add his so called "indenture" to his social security records in order to make them accurate or complete. To the contrary, as explained above, he has not provided a copy of the "indenture" or otherwise alleged its contents. As also explained above, the little information that Campeau has provided suggests (though we do not decide on this limited record) that his requested amendment may be in furtherance of a tax liability avoidance theory that other courts have rejected as "frivolous." E.g., Crummey, 794 F.Supp.2d at 56 (granting summary judgment on similar Privacy Act claim where plaintiff "failed to present even a scintilla of competent evidence suggesting that the SSA's records are, in actuality, materially inaccurate or incomplete").

Although this case is at the pleading stage, Campeau still was required to allege at least some facts plausibly suggesting that his records are inaccurate or incomplete without the "indenture" he seeks to add. Campeau has not alleged any such facts and—even though the SSA raised this point in its motion to dismiss, and even though Campeau sought to amend his complaint as noted above—he still has raised nothing suggesting that he could do so in the future. Thus, we are satisfied both that Campeau has failed to state a claim in this regard and that any amendment would be futile.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

[4]    Campeau's final claim is that the SSA violated 5 U.S.C. § 552a(d)(1) and 20 C. F.R. § 401.40 when it allegedly refused to allow him to inspect his records in person at its headquarters and a field office in Baltimore. Campeau seeks damages for this alleged refusal but, once again, he has not alleged the requisite "adverse effect." 5 U.S.C. § 552a(g)(1)(D). Campeau argues that lack of access to his records itself constitutes an adverse effect, but that reasoning reads the independent "adverse effect" requirement out of the statute. Moreover, the Privacy Act does not authorize damages for denial-of-access claims in the first place and provides instead only for injunctive relief. *See, e.g.,* Rouse v. U.S. Dep't of State, 567 F.3d 408, 414 n. 4 (9th Cir.2009).

Campeau has not requested an injunction requiring the SSA to permit him to inspect his records at its offices as he allegedly attempted to do. (ECF No. 1 at 6–7.) He did request an injunction requiring the SSA to produce his records "in open court" in order to "make it known" whether they include his "indenture" and to provide him with certified copies. (*Id.* at 6 ¶¶ VI.3–4.) The District Court concluded that Campeau failed to exhaust this claim as well. Once again, however, we conclude instead that Campeau failed to allege

any entitlement to statutory relief,  **\*40**  and we thus need not resolve the exhaustion-related issues noted in the margin.[4]

The Privacy Act permits injunctive relief when an agency "*refuses to comply* with an *individual request* [to review the record and obtain copies] under subsection (d)(1) of this section." 5 U.S.C. § 552a(g)(1)(B) (emphasis added). Campeau has not alleged that the SSA "refused to comply" with any "individual request" other than that it allow him to inspect his records at the SSA's offices. His brief on appeal too argues only that the Privacy Act permits "direct access to the records at their source." (Appellant's Br. at 5.) But Campeau did not request an injunction requiring the SSA to provide him with such access, and he has not stated any statutory basis for an injunction requiring the SSA to produce his records to him in any other way.

For these reasons, we will affirm the judgment of the District Court.

**All Citations**

575 Fed.Appx. 35

---

### Footnotes

1    We have jurisdiction under 28 U.S.C. § 1291. We review the dismissal of a complaint under Rule 12(b)(6) de novo, and we consider whether, accepting the factual allegations in the complaint as true, the complaint states a plausible entitlement to relief. *See* Mayer v. Belichick, 605 F.3d 223, 229–30 (3d Cir.2010). In this case, the SSA attached evidentiary material to its motion to dismiss, and the District Court expressly relied on that material without converting the SSA's motion into one for summary judgment as required by Rule 12(d). The District Court's failure to do so is subject to harmless error analysis, however, *see* SBRMCOA, LLC v. Bayside Resort, Inc., 707 F.3d 267, 272–73 (3d Cir.2013), and its error was harmless because Campeau's complaint is subject to dismissal on its face. We further note that, although Campeau argued below that the District Court was required to convert the SSA's motion into one for summary judgment before considering its evidence, he has not raised that issue on appeal.

2    We need not address whether the Privacy Act's statute of limitations is jurisdictional because, even if it is not, Campeau has not stated a basis to equitably toll this claim.

3    As the District Court noted, district courts in this circuit have reached different conclusions about whether the Privacy Act exhaustion requirement we identified in Quinn v. Stone, 978 F.2d 126, 137–38 (3d Cir.1992), is jurisdictional. Even if the exhaustion requirement is jurisdictional, we can reach the sufficiency of Campeau's complaint without impermissibly exercising "hypothetical jurisdiction" because the exhaustion requirement's jurisdictional character would derive from a statute and not from Article III. *See* Jordon v. Att'y Gen.,

424 F.3d 320, 325 n. 8 (3d Cir.2005). Thus, we need not address the parties' exhaustion-related disputes, including their factual dispute over whether the SSA ever received Campeau's request for amendment.

4    The SSA submitted a declaration by Stephen Patrick, which in turn attached (1) a September 16, 2011 e-mail from Campeau to an SSA office requesting assistance in obtaining in-person access to his file, and (2) a September 30, 2011 e-mail from the SSA to Campeau in response notifying him of the proper procedures for obtaining copies of his records, including payment of the applicable fees. (ECF No. 5–2.) Patrick's declaration also states that the SSA has no record of any further communications from Campeau. In his briefs below, Campeau asserted that he might not have received the SSA's e-mail but that, even if he did, the e-mail does not address his request for an in person inspection. He did not claim to have followed the procedures outlined in that email or to have paid the applicable fees. We need not address this issue, however, or the parties' other exhaustion-related disputes regarding whether Campeau visited the Reistertown Road field office or whether his alleged request to review his records there complied with 🔖 5 U.S.C. § 552a(d)(1) and 20 C.F.R. § 401.40.

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Unreported Opinion 8

*Feehan v. Wisconsin Elections Comm'n*, Case No. 20-cv-1771, --- F. Supp. 3d ----, 2020 WL 7250219 (E.D. Wisc. Dec. 9, 2020)

2020 WL 7250219

KeyCite Blue Flag – Appeal Notification
Appeal Filed by WILLIAM FEEHAN v. WISCONSIN ELECTIONS
COMMISSION, ET AL., 7th Cir., December 16, 2020

2020 WL 7250219
Only the Westlaw citation is currently available.
United States District Court, E.D. Wisconsin.

William FEEHAN, Plaintiff,
v.
WISCONSIN ELECTIONS COMMISSION,
Commissioner Ann S. Jacobs, Mark L. Thomsen,
Julie M. Glancey, Commissioner Marge Bostelmann,
Commissioner Dean Knudson, Robert F.
Spindell, Jr. and Tony Evers, Defendants.

Case No. 20-cv-1771-pp
|
Signed 12/09/2020

**Synopsis**
**Background:** Political party's nominee to be Presidential
elector brought action against Wisconsin Elections
Commission, governor, and state elections officials alleging
that Presidential election was subject of wide-spread ballot
fraud, and violated Elections and Electors Clauses, Equal
Protection Clause, and Due Process Clause. Defendants
moved to dismiss.

**Holdings:** The District Court, Pamela Pepper, Chief Judge,
held that:

[1] plaintiff lacked standing as voter to bring action;

[2] plaintiff standing as elector nominee to bring action;

[3] governor's certification of election's results rendered
action moot;

[4] Commission was not suable "person" under § 1983; and

[5] Eleventh Amendment barred action against governor and
officials in their official capacities.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim; Motion to Dismiss for Lack of Subject Matter
Jurisdiction.

West Headnotes (30)

[1] **Federal Courts** 🔑 Pleadings and motions
**Federal Courts** 🔑 Evidence; Affidavits

Court reviewing factual challenge to subject
matter jurisdiction may look beyond pleadings
and view any evidence submitted to determine
if subject matter exists, while court reviewing
facial challenge must accept all well-pleaded
factual allegations as true and draw all
reasonable inferences in plaintiff's favor. Fed. R.
Civ. P. 12(b)(1).

[2] **Federal Courts** 🔑 Limited jurisdiction;
jurisdiction as dependent on constitution or
statutes

Federal courts are courts of limited jurisdiction.

[3] **Federal Civil Procedure** 🔑 In general;
injury or interest
**Federal Courts** 🔑 Case or Controversy
Requirement

Article III standing is essential component of
Article III's case-or-controversy requirement,
and therefore threshold jurisdictional question.
U.S. Const. art. 3, § 2, cl. 1.

[4] **Federal Civil Procedure** 🔑 In general;
injury or interest
**Federal Civil Procedure** 🔑 Causation;
redressability

Irreducible constitutional minimum of standing
contains three requirements: (1) there must
be and ultimately proved injury in fact—
harm suffered by plaintiff that is concrete
and actual or imminent, not conjectural or
hypothetical; (2) there must be causation—fairly
traceable connection between plaintiff's injury
and defendant's complained-of conduct; and (3)

there must be redressability—likelihood that requested relief will redress alleged injury. U.S. Const. art. 3, § 2, cl. 1.

**[5]  Federal Civil Procedure**  In general; injury or interest

Injury-in-fact required to establish standing must be particularized, such that it affects plaintiff in personal and individual way.

**[6]  Federal Civil Procedure**  Rights of third parties or public

Plaintiff cannot show particularized and concrete injury required for standing by showing that he has merely general interest common to all members of public.

**[7]  Federal Civil Procedure**  Causation; redressability

Relief that does not remedy injury suffered cannot bootstrap plaintiff into federal court; that is very essence of redressability requirement for standing.

**[8]  Federal Civil Procedure**  Real Parties in Interest

Complaint must be brought in name of party to whom that claim belongs or party that, according to governing substantive law, is entitled to enforce right. Fed. R. Civ. P. 17(a).

**[9]  Constitutional Law**  Elections

Voter lacked standing to bring action alleging that his vote was diluted by possibility of unlawful or invalid ballots being counted, in violation of Equal Protection Clause, absent allegation that he suffered particularized, concrete injury. U.S. Const. Amend. 14.

**[10]  Constitutional Law**  Elections

Political party's certified nominee to be presidential elector lacked Article III standing to bring action alleging that wide-spread ballot fraud during Presidential election resulted in vote dilution, in violation of Equal Protection Clause. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; Wis. Stat. Ann. § 5.10.

**[11]  United States**  Presidential electors

Elector Clause confers on state right to appoint electors and confers on legislature right to decide way those electors will be appointed; it confers no right on electors themselves. U.S. Const. art. 2, § 1, cl. 2.

**[12]  Federal Courts**  Available and effective relief

**Federal Courts**  Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

Case becomes moot when issues presented are no longer live or parties lack legally cognizable interest in outcome.

**[13]  Federal Courts**  Mootness

Mootness strips federal court of subject matter jurisdiction.

**[14]  Federal Courts**  Elections, voting, and political rights

Wisconsin governor's certification of results of Presidential election rendered moot action seeking order prohibiting governor from certifying state's election results, even though College of Electors had not yet met.

**[15]  Federal Courts**  Suits Against States; Eleventh Amendment and Sovereign Immunity

**Federal Courts**  Abrogation by Congress

**Federal Courts**  Waiver by State; Consent

States are immune from suit in federal court unless they consent to suit or Congress has abrogated their immunity. U.S. Const. Amend. 11.

**[16]     Federal Courts** 🔑 Suits Against States; Eleventh Amendment and Sovereign Immunity

**Federal Courts** 🔑 Waiver by State; Consent

Eleventh Amendment's bar against suits against states in federal courts includes suits brought in federal court against nonconsenting states by their own citizens. U.S. Const. Amend. 11.

1 Cases that cite this headnote

**[17]     Civil Rights** 🔑 States and territories and their agencies and instrumentalities, in general

States are not suable "persons" under § 1983. 🔖 42 U.S.C.A. § 1983.

**[18]     Civil Rights** 🔑 States and territories and their agencies and instrumentalities, in general

Section 1983 provides federal forum to remedy many deprivations of civil liberties, but it does not provide federal forum for litigants who seek remedy against state for alleged deprivations of civil liberties. 🔖 42 U.S.C.A. § 1983.

**[19]     Civil Rights** 🔑 States and territories and their agencies and instrumentalities, in general

Wisconsin Elections Commission was arm of state, and thus was not suable "person" under § 1983. 🔖 42 U.S.C.A. § 1983; 🚩 Wis. Stat. Ann. § 5.05.

**[20]     Federal Courts** 🔑 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts** 🔑 Agencies, officers, and public employees

Eleventh Amendment extends to state agencies and departments and, subject to 🔖 *Ex parte Young* doctrine, to state employees acting in their official capacities. U.S. Const. Amend. 11.

1 Cases that cite this headnote

**[21]     Federal Courts** 🔑 Exceptions to Immunity

There are three exceptions to Eleventh Amendment immunity: (1) congressional abrogation; (2) state's waiver of immunity and consent to suit; and (3) suit against state officials seeking only prospective equitable relief. U.S. Const. Amend. 11.

1 Cases that cite this headnote

**[22]     Federal Courts** 🔑 Civil rights and discrimination in general

Congress did not abrogate states' sovereign immunity when it enacted § 1983. U.S. Const. Amend. 11; 🔖 42 U.S.C.A. § 1983.

**[23]     Federal Courts** 🔑 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts** 🔑 Agencies, officers, and public employees

🔖 *Ex parte Young* exception to Eleventh Amendment immunity does not apply when plaintiff asserts claim—regardless of relief requested—against state official based on state law. U.S. Const. Amend. 11.

**[24]     Federal Courts** 🔑 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

In determining whether 🔖 *Ex parte Young* doctrine avoids Eleventh Amendment bar to suit, court need only conduct straightforward inquiry into whether complaint alleges ongoing violation of federal law and seeks relief properly characterized as prospective. U.S. Const. Amend. 11.

**[25]** Federal Courts ⬌ Other particular entities and individuals

Eleventh Amendment barred action against Wisconsin governor and elections officials in their official capacities alleging widespread ballot fraud during Presidential election; alleged fraud was state law claim, and complaint sought retroactive relief in form of decertification of election results and prohibition against tabulation of unlawful votes. U.S. Const. Amend. 11.

**[26]** Federal Courts ⬌ Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

🔖 *Ex parte Young* exception to Eleventh Amendment immunity does not extend to claims for retroactive relief. U.S. Const. Amend. 11.

**[27]** Federal Courts ⬌ Elections, Voting, and Political Rights

Action seeking federal court order requiring state governor to decertify election results for entire state and directing governor to certify different outcome would constitute extraordinary intrusion on state sovereignty from which federal court should abstain.

**[28]** Equity ⬌ Lapse of Time

Doctrine of laches addresses delay in pursuit of right when party must assert that right in order to benefit from it.

**[29]** Equity ⬌ Grounds and Essentials of Bar
Equity ⬌ Prejudice from Delay in General

For laches to apply in particular case, party asserting defense must demonstrate: (1) unreasonable lack of diligence by party against whom defense is asserted and (2) prejudice arising therefrom.

**[30]** Equity ⬌ Knowledge of facts
Equity ⬌ Lapse of Time

In evaluating laches defense, timeliness must be judged by plaintiffs' knowledge as well as nature of right involved.

**Attorneys and Law Firms**

Daniel J. Eastman, Eastman Law, Mequon, WI, Michael D. Dean, Michael D. Dean LLC, Brookfield, WI, Brandon Johnson, Emily P. Newman, Julia Z. Haller, Sidney Powell, Sidney Powell PC, Dallas, TX, Howard Kleinhendler, New York, NY, L. Lin Wood, L. Lin Wood PC, Atlanta, GA, for Plaintiff.

Colin T. Roth, Jody J. Schmelzer, Sean Michael Murphy, Wisconsin Department of Justice Office of the Attorney General, Madison, WI, for Defendants Wisconsin Elections Commission, Commissioner Ann S. Jacobs, Mark L. Thomsen, Commissioner Marge Bostelmann, Julie M. Glancey, Commissioner Dean Knudson, Robert F. Spindell, Jr.

Davida Brook, Susman Godfrey LLP, Los Angeles, CA, Jeffrey A. Mandell, Rachel E. Snyder, Richard Manthe, Stafford Rosenbaum LLP, Madison, WI, Justin A. Nelson, Susman Godfrey LLP, Houston, TX, Paul M. Smith, Campaign Legal Center, Washington, DC, Stephen Morrissey, Susman Godfrey LLP, Seattle, WA, Stephen Shackelford, Jr., Susman Godfrey LLP, New York, NY, for Defendant Tony Evers.

**ORDER GRANTING DEFENDANTS'
MOTIONS TO DISMISS (DKT. NOS. 51,
53), DENYING AS MOOT PLAINTIFF'S
AMENDED MOTION FOR INJUNCTIVE
RELIEF (DKT. NO. 6) AND DISMISSING CASE**

PAMELA PEPPER, Chief United States District Judge

**\*1** At 8:24 a.m. on Tuesday, December 1, 2020—twenty-eight days after the November 3, 2020 general Presidential election, thirteen days after President Donald J. Trump petitioned for a recount in Milwaukee and Dane Counties

and one day after the Wisconsin Elections Commission and the Governor certified that Joseph R. Biden and Kamala D. Harris had received the highest number of votes following that recount—two plaintiffs filed this lawsuit in federal court for the Eastern District of Wisconsin. Although state law governs the election process, the plaintiffs brought the suit in a federal court, asking that federal court to order state officials to decertify the election results that state officials had certified the day before, order the Governor not to transmit to the Electoral College the certified results he'd transmitted the day before and order the Governor to instead transmit election results that declared Donald Trump to be "the winner of this election."

The election that preceded this lawsuit was emotional and often divisive. The pleadings that have been filed over the past week are passionate and urgent. People have strong, deep feelings about the right to vote, the freedom and opportunity to vote and the value of their vote. They should. But the legal question at the heart of this case is simple. Federal courts have limited jurisdiction. Does a federal court have the jurisdiction and authority to grant the relief this lawsuit seeks? The answer is no.

Federal judges do not appoint the president in this country. One wonders why the plaintiffs came to federal court and asked a federal judge to do so. After a week of sometimes odd and often harried litigation, the court is no closer to answering the "why." But this federal court has no authority or jurisdiction to grant the relief the remaining plaintiff seeks. The court will dismiss the case.

## I. Background

According to defendant the Wisconsin Elections Commission's November 18, 2020 canvass results, 3,297,352 Wisconsin residents voted in the November 3, 2020 general election for President. https://elections.wi.gov/sites/elections.wi.gov/files/Statewide% 20Results% 20All% 20Offices% 20% 28pre-Presidential% 20recount% 29.pdf. Of those, 49.45%—1,630,673—voted for Biden for President and Harris for Vice-President. Id. Biden and Harris received approximately 20,600 more votes than Donald J. Trump for President and Michael R. Pence for Vice-President. Id.

Under ⚑ Wis. Stat. § 9.01(1)(a)(1), any candidate in an election where more than 4,000 votes were cast for the office the candidate seeks and who trails the leading candidate by no more than 1 percent of the total votes cast for that office

may petition for a recount. On November 18, 2020, Donald J. Trump filed a recount petition seeking a recount of "all ballots in all wards in every City, Village, Town and other voting unit in Dane and Milwaukee Counties." https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/WEC% 20-% 20Final% 20Recount% 20Order_0.pdf. The Wisconsin Elections Commission granted that petition and ordered a recount "using the ballot count method selected per Wis. Stat. § 5.90(1) unless otherwise ordered by a court per Wis. Stat. § 5.90(2)." Id. The WEC ordered the recount to be completed by 12:00 p.m. on December 1, 2020. Id.

**\*2** The partial recount was completed on November 29, 2020. https://elections.wi.gov/elections-voting/recount. On November 30, 2020, the chair of the Wisconsin Elections Commission signed the statement of canvass certifying that Joseph R. Biden and Kamala D. Harris received the greatest number of votes and certified their electors. https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/Jacobs% 20-% 20Signed% 20Canvass% 20for% 20President% 20-% 20Vice% 20President.pdf. The same day—November 30, 2020—Wisconsin Governor Tony Evers announced that he had signed the Certificate of Ascertainment for the electors for Biden and Harris. https://content.govdelivery.com/accounts/WIGOV/bulletins/2aef6ff. The web site for the National Archives contains the Certificate of Ascertainment signed by Evers on November 30, 2020, certifying that out of 3,298,041 votes cast, Biden and Harris and their electors received 1,630,866 votes, while Trump and Pence and their electors received 1,610,184 votes. https://www.archives.gov/files/electoral-college/2020/ascertainment-wisconsin.pdf.

On December 1, 2020, Donald J. Trump filed a petition for an original action in the Wisconsin Supreme Court. Trump v. Evers, Case No. 2020AP001971-OA (available at https://wscca.wicourts.gov). On December 3, 2020, the court denied leave to commence an original petition because

under ⚑ Wis. Stat. § 9.01(6), appeals from the board of canvassers or the Wisconsin Elections Commission must be filed in circuit court. Dkt. No. 59-7. The same day —December 3, 2020—Donald J. Trump filed lawsuits in Milwaukee and Dane Counties. Trump v. Biden, Case No. 2020CV007092 (Milwaukee County Circuit Court); Trump v. Biden, Case No. 2020CV002514 (Dane County Circuit Court) (both available at https://wcca.wicourts.gov). Those cases have been consolidated and are scheduled for hearing on December 10, 2020 at 1:30 (or for December 11, 2020 at 9:00 a.m. if the parties are litigating in another court).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Meanwhile, on December 2, 2020, Donald J. Trump filed suit in federal court for the Eastern District of Wisconsin, suing the defendants in this case and others. Trump v. Wisconsin Elections Commission, et al., Case No. 20-cv-1785-BHL (E.D. Wis.). There is an evidentiary hearing scheduled for December 10, 2020 at 9:00 a.m. by videoconference. Id. at Dkt. No. 45.

## II. Procedural History of the Case

On December 1, 2020—the day after Governor Evers signed the Certificate of Ascertainment—William Feehan and Derrick Van Orden filed a complaint in the federal court for the Eastern District of Wisconsin. Dkt. No. 1. Feehan identified himself as a resident of La Crosse, Wisconsin, a registered voter and "a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Wisconsin." Id. at ¶23. Van Orden was identified as a resident of Hager City, Wisconsin and the 2020 Republican nominee for Wisconsin's Third Congressional District Seat for the U.S. House of Representatives. Id. at ¶26. The complaint alleged that "Mr. Van Orden 'lost' by approximately 10,000 votes to the Democrat incumbent," and stated that "[b]ecause of the illegal voting irregularities as will be shown below, Mr. Van Orden seeks to have a new election ordered by this court in the Third District, with that election being conducted under strict adherence with the Wisconsin Election Code." Id. at ¶27.

The complaint alleged "massive election fraud, multiple violations of the Wisconsin Election Code, see e.g., Wis. Stat. §§ 5.03, et seq., in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution" based on "dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses." Dkt. No. 1 at ¶1. The plaintiffs alleged four causes of action: (1) violation of the Elections and Electors Clauses and 42 U.S.C. § 1983; (2) violation of the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983 and the "invalid enactment of regulations & disparate treatment of absentee vs. mail-in ballots"; (3) denial of the Fourteenth Amendment due process right to vote and 42 U.S.C. § 1983; and (4) "wide-spread ballot fraud." Id. at ¶¶106-138. The plaintiffs asked for the following emergency relief:

**\*3** 1. An order directing Governor Evers and the Wisconsin Elections Commission to de-certify the election results:

2. An order enjoining Governor Evers from transmitting the currently certified election results [sic] the Electoral College;

3. An order requiring Governor Evers to transmit certified election results that state that President Donald Trump is the winner of the election;

4. An immediate emergency order to seize and impound all servers, software, voting machines, tabulators, printers, portable media, logs, ballot applications, ballot return envelopes, ballot images, paper ballots, and all "election materials" referenced in Wisconsin Statutes § 9.01(1)(b) 11 related to the November 3, 2020 Wisconsin election for forensic audit and inspection by the Plaintiffs;

5. An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted;

6. A declaratory judgment declaring that Wisconsin's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

7. A declaratory judgment declaring that currently certified election results violate the Due Process Clause, U.S. Const. Amend. XIV;

8. A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9. A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

10. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

11. Immediate production of 48 hours of security camera recording of all rooms used in the voting process at the TCF Center [1] for November 3, 2020 and November 4, 2020;

12. Plaintiffs further request the Court grant such relief as is just and proper including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. § 1988.

Id. at 50.

With the complaint, the plaintiffs filed a motion for declaratory, emergency, and permanent injunctive relief, dkt. no. 2, and memorandum in support of that motion, dkt. no. 3. The motion stated that the specific relief the plaintiff requested was set out in an attached order, dkt. no. 2 at 1, but there was no order attached. The memorandum asked the court to grant the motion and enter the proposed order, dkt. no. 3 at 10; again, no proposed order was provided.

Later that day, the plaintiffs filed a corrected motion for declaratory, emergency, and permanent injunctive relief. Dkt. No. 6. The plaintiff did not file a memorandum in support of this motion but did file a proposed order. Dkt. No. 1. The relief described in the proposed order was almost identical to the relief requested in the complaint, with a notable exception. Instead of the request for an order requiring production of forty-eight hours of security camera footage from the TCF Center, the plaintiffs asked for an order prohibiting "any wiping or alteration of data or other records or materials" from voting machines, tabulations machines, servers, software and printers, and any alteration or destruction of ballot applications, ballot return envelopes, ballot images, paper ballots, registration lists, poll lists or other election materials, "across the state of Wisconsin." Dkt. No. 6-1 at 7-8.

**\*4** Two days later, plaintiff Freehan filed an amended complaint removing Derrick Van Orden as a plaintiff. Dkt. No. 9. It differed from the original complaint only in the removal of Van Orden as a plaintiff.

Along with the amended complaint, the plaintiff filed a motion for temporary restraining order and preliminary injunction "to be considered in an expedited manner." Dkt. No. 10. The plaintiff did not file a memorandum in support of the motion; his main purpose in filing the amended motion appears to have been to ask the court to rule on the motion quickly. The plaintiff attached a proposed briefing schedule, suggesting that the court should require the defendants to respond by 8:00 p.m. on Friday, December 4, 2020 and require him to file his reply by 8:00 p.m. on Saturday, December 5, 2020; he proposed to submit the matter on briefs

without argument. Dkt. No. 10-1. The defendants objected to this severely truncated schedule. Dkt. Nos. 25 (defendant Evers), 26 (defendants Wisconsin Election Commission and its members).

Construing the amended motion as a Civil L.R. 7(h) expedited, non-dispositive motion for an expedited briefing schedule, the court granted the request on December 4, 2020, setting a schedule that, while not as expedited as the plaintiff requested, gave the parties a short leash. Dkt. No. 29.

Wisconsin voter James Gesbeck filed a motion to intervene, dkt. no. 14, and later an expedited motion to intervene, dkt. no. 33. The Democratic National Committee (DNC) also sought to intervene. Dkt. No. 22. The court denied both requests, dkt. nos. 41 (DNC), 74 (Gesbeck), but allowed both to file *amicus curiae* briefs by the December 7, 2020 deadline it had set for the defendants to oppose the plaintiff's motion for injunctive relief, dkt. nos. 37 (Gesbeck), 41 (DNC).

Recall that the plaintiff had not filed a memorandum in support of the December 1, 2020 corrected motion for injunctive relief or in support of the December 3, 2020 amended motion. On Sunday, December 6, 2020, the plaintiff filed an amended memorandum in support of the motion. Dkt. No. 42. In the first paragraph, the plaintiff indicated that he filed the amended memorandum to "avoid possible confusion from removal of Mr. Van Orden is [sic] plaintiff." Id. at 1. He said that the memorandum was identical to the original memorandum "except for amending references to plaintiffs to refer to Mr. Meehan [sic] only and correcting several inadvertent references to the State of Georgia. Id.

On Sunday, December 6, the plaintiff also filed a motion asking the court to schedule an evidentiary hearing "on the merits" for Wednesday, December 9, 2020 at 9:00 a.m. Dkt. No. 44. Although the plaintiff had not asked for a hearing in any prior motion, and had represented in the amended motion that he was submitting the matter on the briefs without argument, the plaintiff explained that he had changed his position based on the court's December 4, 2020 order. Id. at ¶4. The court denied the motion in a telephonic hearing on December 8, 2020, explaining that before it could reach the merits of the motion for injunctive relief, it must resolve issues regarding justiciability. Dkt. Nos. 70, 71.

In opposing the plaintiff's amended motion for injunctive relief, defendants Wisconsin Election Commission and its members argued that the case has jurisdictional and

procedural defects that require dismissal. Dkt. No. 52 at 5. They asserted that the plaintiff lacks Article III standing, id. at 6, that the doctrine of laches bars consideration of his claims, id. at 8 and that the Eleventh Amendment shields them from the relief he seeks, id. at 10. They asserted that the complaint fails to state a claim for relief under the Election or Electors Clauses, id. at 11, or under the Equal Protection or Due Process Clauses, id. at 13, and they contended that the plaintiff's purported evidence fails to meet basic evidentiary standards, id. at 20.

**\*5** In his brief opposing injunctive relief, defendant Governor Evers argued that there is no evidence of fraud in Wisconsin's election results, dkt. no. 55 at 10, that the plaintiff's witnesses and experts lack qualifications and are unreliable, id. at 12, and that the plaintiff has failed to state valid claims, id. at 22. Evers also argued that an adequate remedy at law exists because the recount procedures under Wis. Stat. § 9.01 unambiguously constitute the "exclusive remedy" for challenging election results. Id. at 55. With respect to the balancing of harms, Evers argued that the requested relief would prejudice the defendants and "retroactively deprive millions of Wisconsin voters of their constitutional right to vote in the 2020 presidential election." Id. at 32.

James Gesbeck, filing as friend of the court, opposed the motion for injunctive relief on the grounds that the plaintiff has not established subject matter jurisdiction and that the court should defer to the Wisconsin courts and Wisconsin's procedural mechanism for resolving disputed elections. Dkt. No. 47 at 11, 12. Gesbeck applied the balancing analysis for injunctive relief, asserting that relief in this court would moot the Wis. Stat. § 9.01 challenge pending in the Wisconsin courts. Id. at 17. He argued that this, in turn, would put the "insurmountable weight of the Federal Government on the election result in Wisconsin and would be unbalancing the scale created by the system of checks and balances that have been maintained since the Constitution was adopted." Id. at 17.

*Amicus* DNC opposed the motion on many of the same grounds as the other defendants. Dkt. No. 57. The DNC argued that the plaintiff lacks standing, that the doctrine of laches bars the plaintiff's claims, that the defendants are immune from suit under the Eleventh Amendment, that principles of federalism and comity require abstention, and that the plaintiff fails to state a claim upon which relief can

be granted. Dkt. No. 57. It asserted that the plaintiff cannot establish irreparable harm and has an adequate remedy of law. Id. at 36.

The defendants have filed motions to dismiss the case. The WEC and its members seek dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 53. Defendant Evers seeks dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), failure to plead fraud with particularity under Fed. R. Civ. P. 9(b) and failure to state a claim under Fed. R. Civ. P. 12(b)(6).

The Wisconsin State Conference of the NAACP and three of its members (Dorothy Harrell, Wendell J. Harris, Jr. and Earnestine Moss) sought leave to file an *amicus* brief on the question of whether the court should dismiss the case. Dkt. No. 56. The court granted that motion. Dkt. No. 69.

### III. Procedural Posture

From the outset, the plaintiff has sought to have the claims in the complaint resolved through a motion for injunctive relief under Fed. R. Civ. P. 65. The relief he requests in the second iteration of his motion for injunctive relief is the same relief he requests in the lawsuit itself. As defendant Evers points out in his motion to dismiss, the plaintiff's December 6, 2020 motion for an evidentiary hearing (which the court has denied) "makes clear that what [the plaintiff] seeks—without any discovery or basic adversarial development of evidence —is a trial and final adjudication on the merits." Dkt. No. 51 at 2.

Evers points to Fed. R. Civ. P. 12(i), which states that "[i]f a party so moves, any defense listed in Rule 12(b)(1)-(7)— whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial." Because Evers has raised defenses under Rule 12(b)(1) and (b)(6), and because in asking for a hearing the plaintiff sought what would have been a trial on the merits of the causes of action raised in the complaint, the court must resolve the defenses before moving to the merits.

**\*6** As the court stated in the hearing on December 8, that requirement is more than a procedural nicety. The defendants and the *amici* have raised questions about this federal court's authority to decide the claims alleged in the amended complaint. If this court does not have jurisdiction to hear and decide those claims, any decision it might make regarding the merits of the claims would be invalid. For that

reason, the court considers the motions to dismiss before considering the plaintiff's request for injunctive relief.

## IV. The Motions to Dismiss

### A. Legal Standards

#### 1. *Rule 12(b)(1)—Lack of Subject Matter Jurisdiction*

**[1]** In evaluating a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), "the court must first determine whether a factual or facial challenge has been raised." Silha v. ACT, Inc., 807 F.3d 169, 173 (7th Cir. 2015) (citing Apex Dig., Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 443 (7th Cir. 2009)). A *factual* challenge alleges that even if the pleadings are sufficient, no subject matter jurisdiction exists. A *facial* challenge alleges that the complaint is deficient—that the plaintiff has not sufficiently alleged subject matter jurisdiction. Id. The difference matters—a court reviewing a factual challenge "may look beyond the pleadings and view any evidence submitted to determine if subject matter exists," while a court reviewing a facial challenge "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." Id.

#### 2. *Rule 12(b)(6)—Failure to State a Claim*

A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the legal sufficiency of the complaint. A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). "[T]he plausibility determination is a context-specific task that requires the reviewing court to draw

on its judicial experience and common sense." W. Bend Mut. Ins. Co. v. Schumacher, 844 F.3d 670, 676 (7th Cir. 2016).

#### 3. *42 U.S.C. § 1983*

To state a claim for a civil rights violation under 42 U.S.C. § 1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States and that whoever deprived him of that right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)).

### B. Subject Matter Jurisdiction

**[2]** "Federal courts are courts of limited jurisdiction." Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Subject matter jurisdiction has to do with "the courts' statutory or constitutional *power* to adjudicate the case." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (emphasis in the original). "Article III, § 2, of the Constitution extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.' " Id. at 102, 118 S.Ct. 1003. The defendants raise a factual challenge to the court's subject matter jurisdiction, arguing that regardless of the pleadings, subject matter jurisdiction does not exist. The court may look outside the four corners of the complaint in considering that challenge.

#### 1. *Standing*

**\*7** **[3]** **[4]** Article III standing is an "essential component of Article III's case-or-controversy requirement," and therefore a "threshold jurisdictional question." Apex Dig., Inc., 572 F.3d at 443 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). "Standing to sue is part

of the common understanding of what it takes to make a justiciable case." *Id.* "Standing is an element of subject-matter jurisdiction in a federal civil action ...." Moore v. Wells Fargo Bank, N.A., 908 F.3d 1050, 1057 (7th Cir. 2018).

The "irreducible constitutional minimum of standing contains three requirements." *Lujan v. Defenders of Wildlife,* [504 U.S. 555], at 560[, 112 S.Ct. 2130] [ (1992) ]. First and foremost, there must be (and ultimately proved) an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.' " *Whitmore v. Arkansas,* [495 U.S. 149], at 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 [1990] (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 101-102, 103 S.Ct. 1660, 75 L.Ed.2d 675 ... (1983)). Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 ... (1976). And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. *Id.,* at 45-46, 96 S.Ct. 1917 ...; see also *Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 45 L.Ed.2d 343 ... (1975). This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence. See *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 ... (1990).

Steel Co., 523 U.S. at 102-104, 118 S.Ct. 1003.

[5]  [6] Regarding the "injury in fact" leg of the triad, the injury must be "particularized," such that it "affect[s] the plaintiff in a personal and individual way." Spokane, Inc. v. Robins, —— U.S. ——, 136 S. Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (citations omitted). The injury also must be "concrete"—it must be "real," not "abstract." *Id.* A plaintiff cannot show a particularized and concrete injury by showing "that he has merely a general interest common to all members of the public." Ex parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937). A plaintiff may not use a "federal court as a forum in which to air his generalized

grievances about the conduct of government ...." United States v. Richardson, 418 U.S. 166, 174, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (quoting Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)).

[7] As for the redressability leg of the triad, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." Steel Co., 523 U.S. at 107, 118 S.Ct. 1003. The plaintiff must show that it is "likely," not merely "speculative," that the injury the plaintiff alleges will be "redressed by a favorable decision." Lujan, 504 U.S. at 561, 112 S.Ct. 2130 (quoting Simon, 426 U.S. at 38, 96 S.Ct. 1917).

[8] In addition to the Article III case-or-controversy requirement, there is a prudential limitation in Fed. R. Civ. P. 17(a), requiring that "[e]very action must be prosecuted in the name of the real party in interest," Fed. R. Civ. P. 17(a), and "requir[ing] that the complaint be brought in the name of the party to whom that claim 'belongs' or the party who 'according to the governing substantive law, is entitled to enforce the right.' " Rawoof v. Texor Petroleum Co., Inc., 521 F.3d 750, 756 (7th Cir. 2008) (quoting Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 193 (2d Cir. 2003)); see also RK Co. v. See, 622 F.3d 846, 850 (7th Cir. 2010) ("the real party in interest rule is only concerned with whether an action can be maintained in the plaintiff's name," and is "similar to, but distinct from, constitutional ... standing"). The real party in interest is "the one who by the substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." Act II Jewelry, LLC v. Wooten, 301 F. Supp. 3d 905, 910-911 (N.D. Ill. 2018) (quoting Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338, 1343 (7th Cir. 1988) (internal citations omitted)). The purpose of the rule is to "protect the defendant against a subsequent action by the party actually entitled to recover." RK Co., 622 F.3d at 850 (citing Fed. R. Civ. P. 17(a) advisory committee note (2009)).

*8 The amended complaint alleges that the plaintiff has standing "as a voter and as a candidate for the office of Elector under Wis. Stat. §§ 5.10, *et seq* (election procedures for Wisconsin electors)." Dkt. No. 9 at 8. The defendants argue

that the plaintiff lacks standing in either capacity. Dkt. No. 43 at 4-5; Dkt. No. 59 at 8-9.

#### a. Standing as a voter

The amended complaint does not assert that the plaintiff voted in the 2020 general Presidential election in Wisconsin. It says that he is a registered voter, but it does not affirmatively state that he voted in the election the results of which he asks the court to decertify. His counsel asserts in the brief in opposition to the defendants' motion to dismiss—filed eight days after the original complaint and five days after the amended complaint—that the plaintiff "voted for President Trump in the 2020 General Election." Dkt. No. 72 at 17. For the first time at the motion to dismiss stage, the plaintiff provided his own declaration, in which he attests that he voted for President Donald J. Trump in the November 3, 2020 election. Dkt. No. 72-1.

The plaintiff claims that the defendants failed to comply "with the requirements of the Wisconsin Election Code and thereby diluted the lawful ballots of the Plaintiff and of other Wisconsin voters and electors in violation of the United States Constitution guarantee of Equal Protection." Dkt. No. 9 at ¶116. He alleges that the defendants enacted regulations or issued guidance that, in intent and effect, favored Democratic absentee voters over Republican voters, and that these regulations and this guidance enable and facilitated voter fraud. Id. The plaintiff also asserts that he has a right to have his vote count and claims that a voter is injured if "the important of his vote is nullified." Id. at ¶127.

Several lower courts have addressed the plaintiff's theory that a single voter has standing to sue as a result of his vote being diluted by the possibility of unlawful or invalid ballots being counted. The district court for the Middle District of North Carolina catalogued a few of those decisions, all finding that the harm was too speculative and generalized —not sufficiently "concrete"—to bestow standing. These courts concluded that the vote dilution argument fell into the "generalized grievance" category. In Moore v. Circosta, the court wrote:

> Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are

affected, rather than a small group of voters. See, e.g., Donald Trump for President, Inc. v. Cegavske, Case No. 2:20-CV-1445 JCM (VCF), — F. Supp. 3d ——, ——, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); Martel v. Condos, Case No. 5:20-cv-131, — F. Supp. 3d ——, ——, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); Paher v. Cegavske, 457 F. Supp. 3d 919, 926-27 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); Am. Civil Rights Union v. Martinez-Rivera, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.")

**\*9** Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because affects all voters," Martel, — F. Supp. 3d at ——, 2020 WL 5755289, at *4, the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district in which they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual Plaintiffs allege. This court finds this injury to generalized to give rise to a claim of vote dilution ....

Moore v. Circosta, Nos. 1:20CV911, 1:20CV912, —— F.Supp.3d ——, ——, 2020 WL 6063332, at *14 (M.D.N.C. Oct. 14, 2020),

**[9]** The court agrees. The plaintiff's alleged injuries are injuries that any Wisconsin voter suffers if the Wisconsin election process were, as the plaintiff alleges, "so riddled with fraud, illegality, and statistical impossibility that this Court, and Wisconsin's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election." Dkt. No. 9 at ¶5. The plaintiff has not alleged that, as a voter, he has

suffered a particularized, concrete injury sufficient to confer standing.

The plaintiff argues that it is incorrect to say that his standing is based on a theory of vote dilution. Dkt. No. 72 at 19. He then proceeds to opine that he has shown in great detail how his vote and the votes of others who voted for Republican candidates was diluted. Id. at 19-20. He says the vote dilution did not affect all Wisconsin voters equally, asserting that it had a negative impact on those who voted for Republican candidates and a positive impact on those who voted for Democratic candidates. Id. at 20. He asserts that he also has shown that the defendants sought to actively disenfranchise voters for Republican candidates. Id. These are the same arguments he made in the amended complaint and they still show no more than a generalized grievance common to any voter. Donald J. Trump carried some Wisconsin counties; the voters who voted for Joseph R. Biden in those counties could make the same complaints the plaintiff makes here.

The plaintiff says that his interests and injury are "identical to that of President Trump," and cites to 📄 Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), which he characterizes as holding that "then-candidate George W. Bush of Texas had standing to raise the equal protection rights of Florida voters that a majority of the Supreme Court deemed decisive." Id. at 21 (quoting 📄 Hawkins v. Wayne Twp. Bd. of Marion Cty., Ind, 183 F. Supp. 2d 1099, 1103 (S.D. Ind. 2002)). The court is stymied by the plaintiff's assertion that his interests and injury are identical to that of President Trump. As the court will explain in the next section, contrary to his assertions, the plaintiff is not a "candidate" in the way that President Trump was a candidate for office. President Trump's interest is in being re-elected, while the plaintiff has said that his interest is in having his vote count and not be diluted. If his interest is solely in getting President Trump re-elected, as opposed to having his vote be counted as part of a valid election process, the court is aware of no constitutional provision that gives him the right to have his candidate of choice declared the victor.

Nor does the decision in 📄 Bush v. Gore say what the plaintiff claims it says. As far as the court can tell, the word "standing" does not appear in the majority opinion. In the Indiana decision the plaintiff cites, then-district court judge David Hamilton wrote: "If candidate Hawkins did not have standing to raise equal protection rights of voters, it would be difficult to see how then-candidate George W. Bush of

Texas had standing to raise equal protection rights of Florida voters ... in 📄 Bush v. Gore." 📄 Hawkins, 183 F. Supp.2d at 1103. But the Supreme Court in 📄 Bush v. Gore never explained how candidate Bush had standing, and even if it had, the plaintiff is not a candidate.

**\*10** Nor has the plaintiff demonstrated redressability. He complains that his vote was diluted and that he wants his vote to count. But he asks the court to order the results of the election de-certified and then to order defendant Evers to certify the election for Donald J. Trump. Even if this *federal* court had the authority to order the governor of the *state* of Wisconsin to certify the results of a national presidential election for any candidate—and the plaintiff has presented *no* case, statute or constitutional provision providing the court with that authority—doing so would further invalidate and nullify the plaintiff's vote. The plaintiff wants Donald J. Trump to be certified as the winner of the Wisconsin election *as a result of the plaintiff's vote.* But what he asks is for Donald J. Trump to be certified the winner *as a result of judicial fiat.* That remedy does not redress the plaintiff's alleged injury. Even the plaintiff concedes in his brief in opposition to dismissal that "[d]efendant Evers can ... provide partial redress in terms of the requested injunctive relief, namely, by refusing to certify or transmit the election results, and providing access to voting machines, records and other 'election materials.' " Dkt. No. 72 at 21. The plaintiff is wrong in that regard, as the court will explain when it discusses the related doctrine of mootness; the point is that even from the plaintiff's perspective, the remedy he seeks will not fully redress the injury he claims.

Circling back to Article III's "case or controversy" requirement, the Supreme Court has held that "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." 📄 DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 353, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (quoting 📄 Lewis v. Casey, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). In other words, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." 📄 Gill v. Whitford, --- U.S. ----, 138 S. Ct. 1916, 1934, 201 L.Ed.2d 313 (2018) (citing 📄 Cuno, 547 U.S. at 353, 126 S.Ct. 1854). Even if the plaintiff had alleged a particularized, concrete injury and even if the relief he seeks would redress that injury, that relief is not tailored to the alleged injury. As the Michigan

court explained in King v. Whitmer, Case No. 20-13134, ––– F.Supp.3d ––––, 2020 WL 7134198, at Dkt. No. 62, page 25 (E.D. Mich. Dec. 7, 2020), "Plaintiffs' alleged injury does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote."

The plaintiff's status as a registered voter does not give him standing to sue.

### b. Standing as a nominee for elector

The amended complaint alleges that the plaintiff has standing to bring the suit "as a candidate for the office of Elector under Wis. Stat. §§ 5.10, et seq." Dkt. No. 9 at ¶26. The amended complaint cites to "Wis. Stat. §§ 5.10, et seq," but the court is not sure what the "*et seq.*"—"and what follows"—contributes to the plaintiff's belief that he has standing. Wis. Stat. § 5.10 is followed by Wis. Stat. § 5.15, which concerns the "Division of municipalities into wards," as well as other sections concerning polling places and voting machines. The court assumes the plaintiff meant to reference only Wis. Stat. § 5.10.

Wis. Stat. § 5.10 states:

> Although the names of the electors do not appear on the ballot and no reference is made to them, a vote for the president and vice president named on the ballot is a vote for the electors of the candidates for whom an elector's vote is cast. Under chs. 5 to 12, all references to the presidential election, the casting of votes and the canvassing of votes for president, or for president and vice president, mean votes for them through their pledged presidential electors.

Relying on this section, the amended complaint directs the court's attention to Carson v. Simon, 978 F.3d 1051, 1057 (8th Cir. 2020).[2] In Carson, two certified nominees of the Republican Party to be presidential electors sued the Minnesota secretary of state, challenging a consent decree that "essentially ma[de] the statutorily-mandated absentee ballot receipt deadline inoperative." Id. at 1054. As a result of the decree, the secretary of state had directed election officials "to count absentee ballots received up to a week after election day, notwithstanding Minnesota law." Id. The potential electors sought an injunction in federal court, but the district court found they lacked standing. Id.

**\*11** The Eighth Circuit reversed, finding that the potential electors had standing as candidates "because the plain text of Minnesota law treats prospective presidential electors as candidates." Id. at 1057. The court found that candidates suffered particularized and concrete injury from an inaccurate vote tally. Id. at 1058.

The plaintiff urges this court to reach the same conclusion. An Eighth Circuit decision is not binding on this court, but the question is whether the reasoning in that decision is persuasive. A member of the panel in Carson dissented from the majority opinion and expressed doubt about the potential electors' standing. Circuit Judge Jane Kelley wrote:

> ... I am not convinced the Electors have Article III standing to assert claims under the Electors Clause. Although Minnesota law at times refers to them as "candidates," see, e.g., Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. Id. § 208.04 subdiv. 1 ("[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors.") They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals. But even if we nonetheless assume the Electors should be treated like traditional political candidates for standing purposes, I question whether these particular candidates have demonstrated the "concrete and particularized" injury necessary for Article III standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 ... (1992). To the contrary, their claimed injury—a potentially "inaccurate vote tally" ...

—appears to be "precisely the kind of undifferentiated, generalized grievance about the conduct of government: that the Supreme Court has long considered inadequate for standing." Lance v. Coffman, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 ... (2007) (examining standing in the context of a claim under the Elections Clause). Because the Electors, should they in fact assume that office, must swear an oath to mark their Electoral College ballots for the presidential candidate who won the popular vote, Minn. Stat. § 208.43 (2015), it is difficult to discern how they have more of a "particularized stake," Lance, 549 U.S. at 442, 127 S.Ct. 1194 ..., in Minnesota conducting fair and transparent elections than do the rest of the state's voters.

Id. at 1063.

[10] Judge Kelly's reasoning is the more persuasive. Under Wisconsin law, a vote for the candidates of president and vice president is a vote for the electors of those candidates. Wis. Stat. § 5.65(3)(a). When the electors meet, they must vote for the candidates of the party that nominated the electors. Wis. Stat. § 7.75(2). Like Minnesota electors, Wisconsin electors may be referred to as "candidates" by statute but they are not traditional political candidates presented to and chosen by the voting public. Their interest in seeing that every valid vote is correctly counted and that no vote is diluted is no different than that of an ordinary voter. And the court has concluded, as did Judge Kelly, that the plaintiff's status as a voter does not give him standing.

*12 The amended complaint does not mention the Elections Clause or the Electors Clause of the Constitution in relation to standing. In his brief in opposition to the motions to dismiss, the plaintiff alleges that he has standing under "Electors and Elections Clause." Dkt. No. 72 at 17. He asserts that the Eighth Circuit found in Carson that electors had "both Article III and Prudential standing under the Electors and Elections Clauses." Id. The plaintiff reads Carson differently than does this court. The Carson majority did not mention the Electors or Elections Clause in its discussion of Article III standing. The entire discussion of Article III standing was based on Minnesota law. See Carson, 978 F.3d at 1057-1058. In its discussion of prudential standing, the Carson majority stated that "[a]lthough the Minnesota Legislature may have been harmed by the

Secretary's usurpation of its constitutional right under the Elector Clause, the Electors have been as well." Id. at 1058-59.

[11] This court has found that the plaintiff does not have Article III standing, but even if had not, it disagrees that the Elector Clause [3] provides prudential standing to electors. Article II, Section 1, Clause 2 of the Constitution—known as the "Elector Clause"—states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector." The clause confers on the *state* the right to appoint electors and confers on the *legislature* the right to decide the way those electors will be appointed. It confers no right on the *electors* themselves. Just a few months ago, the Supreme Court stated as much in Chiafalo v. Washington, ––– U.S. ––––, 140 S. Ct. 2316, 2328, 207 L.Ed.2d 761 (2020), in the context of considering whether a state could penalize an elector for breaking his pledge and voting for someone other than the candidate who won his state's popular vote: [4] "Article II and the Twelfth Amendment give States broad powers over electors, and give electors themselves no rights." The Court went on to say,

> Early in our history, States decided to tie electors to the presidential choices of others, whether legislatures or citizens. Except that legislatures no longer play a role, that practice has continued for more than 200 years. Among the devices States have long used are pledge laws, designed to impress on electors their role as agents of others. A State follows in the same tradition if, like [the state of] Washington, it chooses to sanction an elector for breaching his promise. Then, too, the State instructs its electors that they have no ground for reversing the vote of millions of its citizens. That direction accords with the Constitution—as well as with the

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 14

trust of a Nation that here, We the People rule.

Id.

The plaintiff's status as a nominee to be a Republican elector does not give him Article III or prudential standing.

2. *Mootness*

**[12]** **[13]** Mootness "has sometimes been called 'the doctrine of standing set in a time frame.' " Chi. Joe's Tea Room, LLC v. Vill. of Broadview, 894 F.3d 807, 812-13 (7th Cir. 2018) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). A case becomes moot " 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " Already, LLC v. Nike, Inc., 568 U.S. 85, 91, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013) (quoting Murphy v. Hunt, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam)). "Mootness strips a federal court of subject-matter jurisdiction." Id. at 815 (citing DJL Farm LLC v. EPA, 813 F.3d 1048, 1050 (7th Cir. 2016)). This is because "[a] case that becomes moot at any point during the proceedings is 'no longer a "Case" or "Controversy" for purposes of Article III.' " United States v. Sanchez-Gomez, ––– U.S. ––––, 138 S. Ct. 1532, 1537, 200 L.Ed.2d 792 (2018) (quoting Already, LLC, 568 U.S. at 91, 133 S.Ct. 721).

**\*13** **[14]** The amended complaint states that the plaintiff brought this suit "to prohibit certification of the election results for the Office of President of the United States in the State of Wisconsin ...." Dkt. No. 9 at ¶27. The plaintiff asks the court to prohibit from occurring an event that already has occurred—an event that occurred the day before he filed this lawsuit and nine days before the court issues this order. He asks the court to enjoin defendant Evers from transmitting the certified election results, id. at ¶142—an event that already has occurred. He asks the court to order that certain votes not be counted, id., when the vote counting has been over since November 29.

The plaintiff himself demonstrates the mootness problem in his brief in opposition to dismissal. He states that defendant

Evers can provide partial redress for his alleged injuries "by refusing to certify or transmit the election results." Dkt. No. 72 at 21. But Evers already has certified and transmitted the elections results—he cannot refuse to do that which he already has done.

At the December 8 hearing, the plaintiff argued that there remains a live controversy because the electors have not yet voted and will not do so until Monday, December 14, 2020. Dkt. No. 70. This argument ignores the fact that several of the events that dictate which slate of nominees are certified to vote already have taken place and had taken place at the time the plaintiff filed his complaint. The votes have been counted. In two counties, they've been counted twice. The WEC chair has signed the canvass and certified electors for Biden/Harris. The governor has signed the Certificate of Ascertainment and the National Archive has that certificate.

In his brief in opposition to dismissal, the plaintiff points to this court's own order earlier in this case, determining that the plaintiff had not demonstrated why the December 8, 2020 "safe harbor" deadline under 3 U.S.C. § 5 was the date by which the plaintiff needed the court to issue a decision to preserve his rights. Dkt. No. 72 at 25 (citing Dkt. No. 29 at 7). The court noted in that order that the plaintiff's brief in opposition to a motion to reassign another case erroneously referred to December 8 as the date that the College of Electors was scheduled to meet. Dkt. No. 29 at 7. The court pointed out that that was incorrect, and that December 8 was the deadline by which the state would have to make its final determination of any election dispute in order to avoid congressional challenge. Id. The court then said, "Because the electors do not meet and vote until December 14, 2020, the court will impose a less truncated briefing schedule than the one the plaintiff proposes ...." Dkt. No. 29.

The plaintiff says that "[i]mplicit in this Court's determination" is the assumption that "this Court can still grant some or perhaps all of the relief requested and this Plaintiff's claims are not moot." Dkt. No. 72 at 25. The plaintiff reads more into the court's language than the court intended. In the plaintiff's earliest pleadings—the first motion for injunctive relief, the "corrected" motion for injunctive relief, the "amended" motion for injunctive relief—the plaintiff failed to identify a date by which he needed the court to act. The first time he identified such a date was in his brief in opposition to a motion to reassign another case— and then, the reference was oblique. In his opposition brief, the plaintiff stated, "With the College of Electors scheduled

to meet December 8, there could never be a clearer case of 'justice delayed is justice denied.' " Dkt. No. 18 at 1. From that, the court deduced that the plaintiff needed the court to act by the date the College of Electors was scheduled to meet. But the College of Electors was not scheduled to meet December 8—it was (and is) scheduled to meet December 14. So the court set a briefing schedule that would give the defendants a chance to respond, but would complete briefing ahead of the event the plaintiff deemed important—the electoral meeting and vote. That was not a decision by this court—implicit or explicit—on the mootness of the plaintiff's claims.

**\*14**  The plaintiff also asserts that the "cutoff for election-related challenges, at least in the Seventh Circuit, appears to be the date that the electors meet, rather than the date of certification." Dkt. No. 72 at 24. He cites Swaffer v. Deininger, No. 08-CV-208, 2008 WL 5246167 (E.D. Wis. Dec. 17, 2008). Swaffer is not a Seventh Circuit case, and the court is not aware of a Seventh Circuit case that establishes a "cutoff for election-related challenges." And the plaintiff seems to have made up the "quote" in his brief that purports to be from Swaffer. The plaintiff asserts that these words appear on page 4 of the **election** Swaffer decision: "even though the **election** has passed, the meeting of electors obviously has not, so plaintiff's claim here is hardly moot." Dkt. No. 72 at 24-25. The court has read page 4 of Swaffer—a decision by this court's colleague, Judge J.P. Stadtmueller—three times and cannot find these words. In fact, Swaffer did not involve a challenge to a presidential election and it did not involve electors. Mr. Swaffer sought to challenge a Wisconsin statute requiring individuals or groups promoting or opposing a referendum to file a registration statement and take other actions. Swaffer, 2008 WL 5246167, at \*1. The defendants argued that the election (in which the plaintiff had taken steps to oppose a referendum on whether to allow liquor sales in the Town of Whitewater) was over and that Swaffer's claims thus were moot. Id. at \*2. Judge Stadtmueller disagreed, finding that because Swaffer alleged that he intended to violate the statutes at issue in the future, a credible threat of prosecution remained. Id. at \*3.

Some of the relief the plaintiff requests may not be moot. For example, he asks for an immediate order seizing voting machines, ballots and other materials relating to the physical mechanisms of voting. And there remain five days until the electors vote—as the events of this year have shown, anything can happen. But most of the relief the plaintiff seeks is beyond this court's ability to redress absent the mythical time machine.

### 3. *Conclusion*

The plaintiff does not have Article III standing to sue in federal court for the relief he seeks.

### C. Other Arguments

Standing is the *sine qua non* of subject matter jurisdiction. Absent standing, the court does not have jurisdiction to consider the plaintiff's claims on the merits. Arguably, it has no jurisdiction to consider the other bases the defendants and *amici* assert for why the court should dismiss the case. At the risk of producing dicta (and spilling even more ink on a topic that has received an ocean's worth by now), the court will briefly address some of the other bases for the sake of completeness.

### 1. *Eleventh Amendment Immunity*

**[15]    [16]**  The defendants argue that the plaintiff's claims are barred by the Eleventh Amendment. Dkt. No. 59 at 15; Dkt. No. 54 at 10. The Eleventh Amendment "bars most claims in federal court against a state that does not consent to suit." Carmody v. Bd. of Trs. of Univ. of Ill., 893 F.3d 397, 403 (7th Cir. 2018) (citations omitted). States are immune from suit in federal court "unless the State consents to the suit or Congress has abrogated their immunity." Tucker v. Williams, 682 F.3d 654, 658 (7th Cir. 2012) (citing Seminole Tribe v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). This includes suits brought in federal court against nonconsenting states by their own citizens. See, *e.g.*, Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Hans v. Louisiana, 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890) ("Can we suppose that, when the eleventh amendment was adopted, it was understood to be left open for citizens of a state to sue their own state in the federal courts, while the idea of suits by citizens of other states, or of foreign states, was indignantly repelled?").

**[17]** **[18]** **[19]** The plaintiff has sued the Governor of Wisconsin, Tony Evers, in his official capacity; the Wisconsin Elections Commission and each member of the WEC in his or her official capacity. Before going too much further down the Eleventh Amendment road, the court notes that the vehicle for the plaintiff to bring his constitutional claims—his claims under the Elector Clause, the Elections Clause, the Equal Protection Clause and the Due Process Clause—is 42 U.S.C. § 1983. Section 1983 prohibits a "person" acting under color of state law from violating another's civil rights. The Wisconsin Elections Commission is not a "person." It is an arm of the state of Wisconsin, Wis. Stat. § 5.05, and "states are not suable 'persons' under 42 U.S.C. § 1983." Phillips v. Baxter, 768 F. App'x 555, 559-560 (7th Cir. 2019) (citing Sebesta v. Davis, 878 F.3d 226, 231 (7th Cir. 2017)). See also, Will v. Mich. Dept. of State Police, 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("a State is not a person within the meaning of § 1983"). "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." Will, 491 U.S. at 66, 109 S.Ct. 2304. The WEC is not the proper defendant for the plaintiff's constitutional claims.

***15** The plaintiff faces the same problem with his claims against the individual defendants, all of whom are state officials whom he sues in their official capacities. [5]

Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. *Brandon v. Holt*, 469 U.S. 464, 471, 105 S.Ct. 873, 83 L.Ed.2d 878 ... (1985). As such, it is no different from a suit against the State itself. See, *e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 ... (1985); *Monell* [*v. New York City Dept. of Social Services*, 436 U.S.

658], at 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 [ ( 1978) ].

Id. at 71. Arguably, *none* of the defendants are subject to suit under 42 U.S.C. § 1983, which means that even if the plaintiff had standing, the court would have to dismiss Counts I, II and III of the amended complaint.

**[20]** Circling back to the defendants' Eleventh Amendment argument, "The Eleventh Amendment extends to state agencies and departments and, subject to the Ex Parte Young doctrine, to state employees acting in their official capacities." Nelson v. La Crosse Cty. Dist. Atty. (State of Wis.), 301 F.3d 820, 827 n.7 (7th Cir. 2002) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 123-24, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)).

**[21]** There are three exceptions to Eleventh Amendment immunity: (1) congressional abrogation, Nuñez v. Ind. Dep't of Child Servs., 817 F.3d 1042, 1044 (7th Cir. 2016) (citing Alden v. Maine, 527 U.S. 706, 754-55, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)); (2) "a state's waiver of immunity and consent to suit," id. (citing College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999)); and (3) a suit "against state officials seeking only prospective equitable relief," id. (citing Ex parte Young, 209 U.S. 123, 159-60, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). None of the exceptions apply here.

**[22]** **[23]** **[24]** Congress did not abrogate the sovereign immunity of the states when it enacted 42 U.S.C. § 1983. Will, 491 U.S. at 66, 109 S.Ct. 2304. Wisconsin has not waived its immunity from civil actions under § 1983. See Shelton v. Wis. Dep't of Corr., 376 Wis. 2d 525, 2017 WL 2349109, *2 (Table) (Ct. App. 2017) (citing Boldt v. State, 101 Wis. 2d 566, 584-85, 305 N.W.2d 133 (1981)). And the Ex parte Young doctrine does not apply when a plaintiff asserts a claim—regardless of the relief requested —against a state official based on *state* law. Pennhurst, 465 U.S. at 106, 104 S.Ct. 900 ("A federal court's grant of relief against state officials on the basis of state law, whether

prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). "In determining whether the Ex parte Young doctrine avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."

Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 636, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); McDonough Assocs., Inc. v. Grunloh, 722 F.3d 1043, 1051 (7th Cir. 2013)).

**\*16** **[25]** **[26]** Count IV of the amended complaint alleges "[w]ide-spread ballot fraud," a *state*-law claim. The Eleventh Amendment bars that claim against the defendants in their official capacities. The Eleventh Amendment also bars the plaintiff's federal claims to the extent that the plaintiff seeks retrospective relief. The Supreme Court has refused to extend the Ex Parte Young doctrine to claims for retrospective relief. Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (citing Pennhurst, 465 U.S. at 102-103, 104 S.Ct. 900). The amended complaint seeks (1) a "temporary restraining order instructing Defendants to de-certify the results of the General Election for the Office of President," dkt. no. 9 at 47; (2) "an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump," id.; (3) "a temporary restraining order" prohibiting the tabulation of unlawful votes," id.; (4) an order preserving voting equipment and data, id.; (5) "the elimination of the mail ballots from counting in the 2020 election," id. at 48; (6) the disqualification of Wisconsin's electors from participating in the 2020 election, id.; and (7) an order directing Wisconsin's electors to vote for President Donald Trump, id. As the court already has noted, with the possible exception of the request for an order preserving voting equipment and data, the relief the plaintiff requests is retrospective.

The plaintiff disagrees—he characterizes the certification of the election results as "ongoing violations of federal law ... ongoing violations of the Electors and Elections Clauses, the Equal Protection and Due Process Clauses, as well as likely

violations of federal law including the Voting Rights Act and the Help America Vote Act." Dkt. No. 72 at 25-26. The plaintiff has not brought claims under the latter two statutes and saying that a completed event is an ongoing violation doesn't make it so.

### 2. *Exclusive Remedy/Exhaustion/Abstention*

Defendant Evers moves to dismiss because Wisconsin provides a remedy to address irregularities or defects during the voting or canvassing process: Wis. Stat. § 9.01(11). Four days ago, the Wisconsin Supreme Court held that § 9.01(6) requires that a party aggrieved after a recount must appeal by filing suit in circuit court. Trump v. Evers, No. 2020AP1971-OA, Order at \*2 (Wis. Dec. 3, 2020). In a concurring opinion, Justice Hagedorn noted that Wis. Stat. § 9.01(11) provides that § 9.01 is the exclusive judicial remedy for an aggrieved candidate. Defendant Evers points out that President Trump has lawsuits pending in state circuit courts and argues that those cases raise many of the claims the plaintiff raises here. Dkt. No. 59 at 11. He argues that the process detailed in Wis. Stat. § 9.01 is designed to allow an aggrieved candidate to resolve election challenges promptly, and that for this court to permit the plaintiff to circumvent that process "would eviscerate Wisconsin's careful process for properly and quickly deciding election challenges." Id. at 11-12.

Of course, the plaintiff has no redress under Wis. Stat. § 9.01, because he is not a "candidate" in the sense of that statute. But Evers argues that there was a form of state-law relief available to the plaintiff. He asserts that the plaintiff should have filed a complaint with the Wisconsin Elections Commission under Wis. Stat. § 5.06. Dkt. No. 59 at 13. That statute allows a voter dissatisfied with the Wisconsin election process to file a written, sworn complaint with the elections board. Wis. Stat. § 5.06(1). The statute states that no voter may "commence an action or proceeding to test the validity of any decision, action or failure to act on the part of any election official" without first filing a complaint under § 5.06(1). Wis. Stat. § 5.06(2). Evers points out that the plaintiff has not demonstrated that he followed this procedure and thus that the plaintiff did not exhaust his remedies before coming to federal court. Dkt. No. 59 at 14.

The plaintiff does not directly respond to the exhaustion argument. He simply maintains that he has a right to bring his constitutional claims in federal court, argues that there is no evidence that the statute Evers cites is an exhaustion requirement and asserts that the court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over any state-law claims under 28 U.S.C. § 1367. [6] Dkt. No. 72 at 27-28. He neatly sidesteps the question of why he did not follow a procedure that would have allowed him to direct his concerns to the entity in charge of enforcing the state's election laws and in a way that likely would have brought those concerns to that entity's attention long before the election results were certified.

**\*17** **[27]** Because the court has concluded that the plaintiff does not have standing, and because the plaintiff has sued defendants who either are not suable under § 1983 or are protected by Eleventh Amendment immunity, the court will not accept the invitations of the defendants and *amici* to wade into the waters of the various types of abstention. If this court does not have subject matter jurisdiction, there is no case or controversy from which it should abstain. The court agrees with the parties, however, that the relief the plaintiff requests —asking a federal judge to order a state governor to decertify the election results for an entire state and direct that governor to certify a different outcome—constitutes "an extraordinary intrusion on state sovereignty from which a federal court should abstain under longstanding precedent." Dkt. No. 57 at 28.

### 3. *Laches*

The defendants argue that the equitable defense of laches requires dismissal, because the plaintiff "inexplicably waited until after the election, after the canvassing, after the recount, after the audit, after results were certified, and indeed until the eve of the electoral college vote, to bring his claim of state law violations and widespread fraud ...." Dkt. No. 52 at 11. See also, Dkt. No 59 at 17 ("the doctrine of laches bars [the plaintiff's] claims because he has unreasonably delayed bringing his claims to the detriment not only of Defendants, but also of the nearly 3.3 million voters in Wisconsin who voted in this last election under the good-faith belief that they were following the correct procedures to have their votes counted.").

**[28]** **[29]** **[30]** The doctrine of laches "addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it." Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 820 (7th Cir. 1999). "For laches to apply in a particular case, the party asserting the defense must demonstrate: (1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." Id. (citing Cannon v. Univ. of Health Scis./The Chicago Med. Sch., 710 F.2d 351, 359 (7th Cir. 1983)). "Timeliness must be judged by the knowledge of the plaintiffs as well as the nature of the right involved." Jones v. Markiewicz-Qualkinbush, 842 F.3d 1053, 1061 (7th Cir. 2016).

"The obligation to seek injunctive relief in a timely manner in the election context is hardly a new concept." Id. at 1060-61. In fact, the Seventh Circuit has held that such "claims must be brought expeditiously ... to afford the district court sufficient time in advance of an election to rule without disruption of the electoral cycle." Id. at 1061 (internal quotation marks and citations omitted).

The amended complaint asserts that the alleged problems with the Dominion voting machine software "have been widely reported in the press and have been subject to investigation." Dkt. No. 9 at ¶12. It cites to exhibits from January and August of 2020. Dkt. No. 9 at 5 n.1. It cites to the WEC's May 13, 2020 directive to clerks that they should not reject the ballots of "indefinitely confined" absentee voters. Id. at ¶40. It cites an October 18, 2016 memorandum issued by the WEC instructing clerks on how to handle absentee envelope certifications that did not bear the address of the witness. Id. at ¶44. It cites October 19, 2020 instructions by the WEC to clerks about filling in missing ballot information. Id. at ¶45.

Defendant Evers points out that the plaintiff's own allegations demonstrate that he has known about the Dominion voting machine issues since long before the election. Dkt. No. 59 at 17-18. He argues that the WEC guidance about which the plaintiff complains came in directives issued in October 2016, May 2020 and October 2020. Id. He asserts that the plaintiff has made no effort "to offer a justifiable explanation for why he waited until weeks after the election to challenge" these issues. Id. at 18. The WEC defendants advise the court that the issue regarding "indefinitely confined" voters was litigated in state court almost eight months ago. Dkt. No. 54 at 9 (citing Pet. For Original Action dated March 27, 2020, Supreme Court of Wisconsin, No. 2020AP000557-OA). They

assert that the plaintiff "waited to challenge widely-known procedures until after millions of voters cast their ballots in reliance on those procedures." Id. at 6. They state that "[i]f the doctrine of laches means anything, it is that Plaintiff here cannot overturn the results of a completed and certified election through preliminary relief in this late-filed case." Id.

 **\*18** The plaintiff first responds that laches is a defense and shouldn't be raised on a motion to dismiss. Dkt. No. 72 at 22. He then claims that he could not have known the bases of any of these claims until after the election. Id. at 22-23. He says that because Wisconsin election officials did not "announce or publicize their misconduct," and because, he alleges, they "prevented Republican poll watchers from observing the ballot counting and handling," it took him time to gather the evidence and testimony he attached to the amended complaint. Id. at 23. Finally, he alleges that the delay post-November 3, 2020 is attributable to the defendants' failure to timely complete the election count. Id. He insists that he filed this suit at the earliest possible moment—the day after the certification. Id.

The court has determined that the plaintiff does not have standing. That means that the court does not have jurisdiction to assess the plaintiff's credibility, and it will refrain from doing so.

 4. *Failure to state a claim upon which relief can be granted*

Both defendants asked the court to dismiss the case for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Because the court does not have subject matter jurisdiction, it will not address the sufficiency of the substantive claims in the amended complaint.

 5. *Requests for injunctive relief*

For the same reason, the court cannot address the merits of the plaintiff's request for preliminary injunctive relief.

**V. Conclusion**

This court's authority to grant relief is confined by the limits of the Constitution. Granting the relief the plaintiff requests would take the court far outside those limits, and outside the limits of its oath to uphold and defendant the Constitution. The court will grant the defendants' motion to dismiss.

The court **GRANTS** Defendant Governor Tony Evers's Motion to Dismiss Plaintiff's Amended Complaint. Dkt. No. 51.

The court **GRANTS** Defendant Wisconsin Elections Commission and Its Members' Motion to Dismiss. Dkt. No. 53.

The court **DENIES AS MOOT** Plaintiff's Corrected Motion for Declaratory, Emergency, and Permanent Injunctive Relief. Dkt. No. 6.

The court **DENIES AS MOOT** Plaintiff's Amended Motion for Temporary Restraining Order and Preliminary Injunction to be Considered in an Expedited Manner Dkt. No. 10.

The court **DISMISSES** the Amended Complaint for Declaratory, Emergency, and Permanent Injunctive Relief. Dkt. No. 9.

The court **ORDERS** that this case is **DISMISSED.**

**All Citations**

--- F.Supp.3d ----, 2020 WL 7250219

---

**Footnotes**

1    The plaintiff may be referring to the TCF convention center in Detroit, Michigan; the court is unaware of a "TCF Center" in Wisconsin.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                                                   20

2020 WL 7250219

2    The complaint also cites two Supreme Court cases: McPherson v. Blacker, 146 U.S. 1, 27, 13 S.Ct. 3, 36 L.Ed. 869 (1892) and Bush v. Palm Beach Cty. Canvassing Bd., 531 U.S. 70, 76, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000) (*per curiam*). Neither address the Article III standing of an elector. In McPherson, the Court reviewed the Michigan supreme court's decision on the constitutionality of the Michigan statute governing selection of electors. While the parties who brought the suit in state court were nominees for presidential electors, the Court did not address their standing (or lack of it). The petitioner in Bush was the then-Republican candidate, George W. Bush, who was challenging the Florida supreme court's interpretation of its election statutes; again, the Court did not address (and had no need to address) the standing of an elector to sue.

3    The plaintiff cites the "Elector and Elections Clause" or "Clauses" in the same breath but does not discuss the text of either. It is not clear how the plaintiff sees the Elections Clause—Article II, Sec. 1, cl. 3—as providing him with standing and the plaintiff has not developed that argument. The court notes only that in Lance v. Coffman, the Supreme Court found that plaintiffs whose only alleged injury was that the Elections Clause had not been followed did not have standing because they alleged "precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past." Lance, 549 U.S. at 442, 127 S.Ct. 1194.

4    Wisconsin's "pledge law"—Wis. Stat. § 7.75(1)—does not impose a penalty on a "faithless elector."

5    Had the plaintiff sued the individual defendants in their *personal* capacities, he could have sought relief against them under 42 U.S.C. § 1983, assuming he had standing.

6    The court could exercise supplemental jurisdiction over state-law claims only if there remained federal claims to which those state-law claims related. As the court has noted, it likely would have been required to dismiss the federal claims because the plaintiff asserted them through § 1983 against state officials in their official capacities, which in turn would have required dismissal of any state claims for lack of subject matter jurisdiction.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Unreported Opinion 9

*Bowyer v. Ducey*, Case No. cv-20-02321-PHX, --- F. Supp.3d ----, 2020 WL
7238261 (D. Ariz. Dec. 9, 2020)

2020 WL 7238261
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Tyler BOWYER, et al., Plaintiffs,

v.

Doug DUCEY, et al., Defendants.

No. CV-20-02321-PHX-DJH

|

Signed 12/09/2020

**Synopsis**

**Background:** Voters, Republican nominees for Arizona's presidential electors, and Republican county chairs brought action against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct. Plaintiffs moved for temporary restraining order (TRO) and, after county board of supervisors and county recorder intervened as defendants, defendants filed motions to dismiss.

**Holdings:** The District Court, Diane J. Humetewa, J., held that:

[1] county chairs failed to establish their standing to bring action for violation of the Elections Clause;

[2] electors lacked standing to bring action for violations of the Electors and Elections Clauses;

[3] plaintiffs lacked standing to bring vote dilution claim under the Equal Protection Clause;

[4] *Colorado River* abstention was warranted in light of parallel litigation in state court;

[5] Eleventh Amendment barred plaintiffs' claims under § 1983;

[6] *Ex parte Young* doctrine did not apply so as to provide exception to Eleventh Amendment immunity as bar to plaintiffs' claims for prospective injunctive relief; and

[7] plaintiffs' claim for injunctive relief was moot.

Motions to dismiss granted, remaining pending motions denied as moot, and preliminary injunction vacated.

**Procedural Posture(s):** Motion for Permanent Injunction; Motion for Temporary Restraining Order (TRO); Motion for Preliminary Injunction; Motion to Dismiss for Lack of Subject Matter Jurisdiction; Motion to Dismiss for Failure to State a Claim.

West Headnotes (57)

**[1]** **Federal Courts** ⚖️ Rights and interests at stake; adverseness

To ensure that the Federal Judiciary respects the proper and properly limited role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy. U.S. Const. art. 3, § 2, cl. 1.

**[2]** **Federal Civil Procedure** ⚖️ In general; injury or interest

**Federal Courts** ⚖️ Case or Controversy Requirement

For there to be a case or controversy over which federal courts may exercise judicial power, the plaintiff must have standing to sue. U.S. Const. art. 3, § 2, cl. 1.

**[3]** **Federal Civil Procedure** ⚖️ In general; injury or interest

Whether a plaintiff has standing presents a threshold question in every federal case, because it determines the power of the court to entertain the suit. U.S. Const. art. 3, § 2, cl. 1.

**[4]** **Federal Courts** ⚖️ Case or Controversy Requirement

No principle is more fundamental to the judiciary's proper role in the country's system of government than the constitutional limitation

of federal court jurisdiction to actual cases or controversies. U.S. Const. art. 3, § 2, cl. 1.

**[5]**    **Federal Civil Procedure** 🔑 In general; injury or interest

**Federal Courts** 🔑 Case or Controversy Requirement

A suit brought by a plaintiff without Article III standing is not a case or controversy, and an Article III federal court therefore lacks subject matter jurisdiction. U.S. Const. art. 3, § 2, cl. 1.

**[6]**    **Federal Civil Procedure** 🔑 In general; injury or interest

**Federal Civil Procedure** 🔑 Rights of third parties or public

To have Article III standing, a plaintiff seeking relief in federal court must first demonstrate a personal stake in the outcome, distinct from a generally available grievance about government. U.S. Const. art. 3, § 2, cl. 1.

**[7]**    **Constitutional Law** 🔑 Nature and scope in general

**Federal Civil Procedure** 🔑 In general; injury or interest

The threshold requirement for standing that the plaintiff must demonstrate a personal stake in the outcome, distinct from a generally available grievance about government, ensures that the federal courts act as judges, and do not engage in policymaking properly left to elected representatives. U.S. Const. art. 3, § 2, cl. 1.

**[8]**    **Federal Civil Procedure** 🔑 In general; injury or interest

**Federal Civil Procedure** 🔑 Causation; redressability

To establish Article III standing, a plaintiff has the burden of clearly demonstrating that she has: (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed

by a favorable judicial decision. U.S. Const. art. 3, § 2, cl. 1.

**[9]**    **Federal Civil Procedure** 🔑 In general; injury or interest

To establish an injury in fact, as required to have Article III standing, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. U.S. Const. art. 3, § 2, cl. 1.

**[10]**    **Federal Civil Procedure** 🔑 In general; injury or interest

To establish an injury in fact, as required to have Article III standing, the plaintiff must establish a "particularized injury," which means that the injury must affect the plaintiff in a personal and individual way. U.S. Const. art. 3, § 2, cl. 1.

**[11]**    **Federal Civil Procedure** 🔑 In general; injury or interest

Although imminence is concededly a somewhat elastic concept in the context of establishing Article III standing, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes, that the injury is certainly impending. U.S. Const. art. 3, § 2, cl. 1.

**[12]**    **Federal Courts** 🔑 Dismissal or other disposition

When a plaintiff has not established the elements of standing, the case must be dismissed for lack of subject matter jurisdiction. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

**[13]**    **Federal Courts** 🔑 Pleadings and motions

**Federal Courts** 🔑 Evidence; Affidavits

A challenge on a motion to dismiss for lack of subject matter jurisdiction may be either facial or factual. Fed. R. Civ. P. 12(b)(1).

**[14]  Federal Courts** 🔑 Dismissal or other disposition

In a facial attack on a motion to dismiss for lack of subject matter jurisdiction, the court may dismiss a complaint when the allegations of and documents attached to the complaint are insufficient to confer subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

**[15]  Federal Courts** 🔑 Pleadings and motions

In a facial attack on a motion to dismiss for lack of subject matter jurisdiction, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 12(b)(1).

**[16]  Federal Courts** 🔑 Weight and sufficiency

When a court evaluates a factual challenge to jurisdiction, on a motion to dismiss for lack of subject matter jurisdiction, the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. Fed. R. Civ. P. 12(b)(1).

**[17]  United States** 🔑 Relation to state law; preemption

The Elections Clause of the United States Constitution authorizes the state governments to regulate federal elections held in the state, while Congress retains exclusive control to alter a state's regulations. U.S. Const. art. 1, § 4, cl. 1.

**[18]  United States** 🔑 Regulation of Election of Members

**United States** 🔑 Presidential electors

While the Electors Clause and Elections Clause are separate Constitutional provisions, they share considerable similarity and are therefore often

considered together. U.S. Const. art. 1, § 4, cl. 1; U.S. Const. art. 2, § 1, cl. 2.

**[19]  Injunction** 🔑 Persons entitled to apply; standing

**United States** 🔑 In general; election contests

Republican county chairs failed to establish their standing to bring action against Arizona's governor and secretary of state, alleging violation of the Elections Clause of the Constitution and seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where chairs did not allege any grounds for their standing in their complaint, and their briefings did not contain any arguments that they had standing to assert claim under the Elections Clause. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. art. 1, § 4, cl. 1.

**[20]  Injunction** 🔑 Persons entitled to apply; standing

**United States** 🔑 In general; election contests

**United States** 🔑 Presidential electors

Republican nominees for Arizona's presidential electors were not considered candidates for office under Arizona law, and, thus, they lacked standing to bring action against Arizona's governor and secretary of state, alleging violations of the Electors and Elections Clauses of the Constitution and seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where electors were limited to merely fulfilling ministerial function, and voters in Arizona did not vote for any single electors listed next to presidential candidates' names. U.S. Const. art. 1, § 4, cl. 1; U.S. Const. art. 2, § 1, cl. 2; U.S. Const. art. 3, § 2, cl. 1; Ariz. Rev. Stat. Ann. §§ 16-212(C), 16-344, 16-507(B).

**[21]  Constitutional Law** 🔑 Elections

Voters, Republican nominees for Arizona's presidential electors, and Republican county

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

chairs failed to allege they suffered any concrete harm, as required to establish injury in fact required to have Article III standing to bring vote dilution claim under Equal Protection Clause against Arizona's governor and secretary of state, in action seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where state actors' alleged counting of ballots in violation of state election law did not involve any votes being weighed differently in violation of the Equal Protection Clause, and plaintiffs raised only generally available grievance about government. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14.

**[22]    Constitutional Law**  Equality of Voting Power (One Person, One Vote)

Vote dilution under the Equal Protection Clause is concerned with votes being weighed differently. U.S. Const. Amend. 14.

**[23]    Constitutional Law**  Ballots in general

State actors counting ballots in violation of state election law is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. Amend. 14.

**[24]    Constitutional Law**  Elections

Voters, Republican nominees for Arizona's presidential electors, and Republican county chairs did not request relief that was redressable in tailored way, as required to establish Article III standing to bring vote dilution claim under Equal Protection Clause against Arizona's governor and secretary of state, in action seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where providing relief requested would disenfranchise nearly 3.4 million Arizonans that voted in general election, transforming all allegedly diluted votes from being diluted to being destroyed. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14.

**[25]    Federal Courts**  Right to Decline Jurisdiction; Abstention

Generally, a federal court has a duty to exercise the jurisdiction conferred by Congress.

**[26]    Federal Courts**  Right to Decline Jurisdiction; Abstention

Under certain circumstances, it is prudent for a federal court to abstain from hearing a matter.

**[27]    Federal Courts**  Right to Decline Jurisdiction; Abstention

Abstention by a federal court may be warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration.

**[28]    Federal Courts**  Colorado River abstention

*Colorado River* abstention permits a federal court to abstain from exercising jurisdiction over a matter in deference to a state court suit regarding similar claims and allegations.

**[29]    Federal Courts**  Colorado River abstention

The factors for determining whether *Colorado River* abstention is warranted are: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    4

**[30]**   **Federal Courts** 👉 Elections, Voting, and Political Rights

⭐ *Colorado River* abstention was warranted in action brought by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, although plaintiffs' allegations of widespread fraud in relation to vote tabulation systems and software were not before state courts, where plaintiffs' claims were similar to those raised in ongoing state court cases, federal forum was less convenient than state forum considering state election law violations alleged, state actors involved, and interplay of state election law, many of same parties and attorneys were litigating related matters in both forums, federal action was last filed case, crux of plaintiffs' arguments and statutes upon which they relied involved Arizona election law, and state courts were adequately equipped to protect rights of named plaintiffs.

**[31]**   **Federal Courts** 👉 Right to Decline Jurisdiction; Abstention

When considering abstention, proper constitutional adjudication, regard for federal-state relations, and wise judicial administration inform the court.

**[32]**   **Federal Courts** 👉 Suits Against States; Eleventh Amendment and Sovereign Immunity

Eleventh Amendment immunity applies when a citizen brings a claim against their own state. U.S. Const. Amend. 11.

**[33]**   **Federal Courts** 👉 Agencies, officers, and public employees

Eleventh Amendment immunity extends to suits against state officials when the state is the real, substantial party in interest. U.S. Const. Amend. 11.

**[34]**   **Federal Courts** 👉 Suits Against States; Eleventh Amendment and Sovereign Immunity

**Federal Courts** 👉 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

The jurisdictional bar of a suit against a state, under the Eleventh Amendment, applies regardless of the nature of the relief sought. U.S. Const. Amend. 11.

**[35]**   **Federal Courts** 👉 Agencies, officers, and public employees

When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself, as would be barred under the Eleventh Amendment. U.S. Const. Amend. 11.

**[36]**   **Federal Courts** 👉 What Are Suits Against States; Entities and Individuals Entitled to Immunity

The general rule is that a suit is against the sovereign, for purposes of Eleventh Amendment immunity, if the effect of the judgment would be to restrain the government from acting, or to compel it to act. U.S. Const. Amend. 11.

**[37]**   **Federal Courts** 👉 Exceptions to Immunity

**Federal Courts** 👉 Agencies, officers, and public employees

There are three recognized exceptions to a state's Eleventh Amendment immunity: (1) Congress has abrogated the immunity within a federal statute; (2) the state has waived immunity and allowed individuals to sue it pursuant to specific state statutes; and (3) in claims seeking prospective injunctive relief against state officials to remedy a state's ongoing violation of federal law. U.S. Const. Amend. 11.

**[38]**   **Federal Courts** 🔗 Civil rights and discrimination in general

**Federal Courts** 🔗 Other particular entities and individuals

Congress did not abrogate states' immunity from suit in enacting language of § 1983, as would provide exception to Eleventh Amendment immunity as bar to claims brought in § 1983 action by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct. U.S. Const. Amend. 11; 🔖 42 U.S.C.A. § 1983.

**[39]**   **Federal Courts** 🔗 Waiver by State; Consent

State of Arizona did not explicitly waive its immunity for elections challenges, as would provide exception to Eleventh Amendment immunity as bar to claims brought in § 1983 action by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct. U.S. Const. Amend. 11; 🔖 42 U.S.C.A. § 1983.

**[40]**   **Federal Courts** 🔗 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

In determining whether the doctrine of 🔖 Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. U.S. Const. Amend. 11.

**[41]**   **Federal Courts** 🔗 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

When claims are state law claims, masked as federal law claims, 🔖 Ex parte Young is inapplicable and the Eleventh Amendment clearly bars the suit, whether the relief requested is prospective or retroactive in nature. U.S. Const. Amend. 11.

**[42]**   **Federal Courts** 🔗 Other particular entities and individuals

🔖 Ex parte Young doctrine did not apply so as to provide exception to Eleventh Amendment immunity as bar to claim for prospective injunctive relief brought by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where plaintiffs' fraud claims were entirely based on state election law, and even if plaintiffs had asserted independent federal claims, those claims concerned past conduct related to alleged issues with signature verification, ballot duplication, and poll observation, and did not assert any ongoing violation of federal law. U.S. Const. Amends. 11, 14.

**[43]**   **Equity** 🔗 Prejudice from Delay in General

Laches will bar a claim when the party asserting it shows the plaintiff unreasonably delayed in filing the action and the delay caused prejudice to the defendant or the administration of justice.

**[44]**   **Constitutional Law** 🔗 Delay in assertion of rights; laches

**Election Law** 🔗 Limitations and laches

Laches can bar untimely claims for relief in election cases, even when the claims are framed as constitutional challenges.

**[45]**   **Injunction** 🔗 Laches

Doctrine of laches barred claims asserted by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct, where plaintiffs delayed nearly a month after general election in seeking to decertify election results, even though basis for their claims was either known well before election day or soon thereafter, and Arizona state election challenge law, which required electors to file challenge to election in state court within five days of certification of election, did not excuse plaintiffs' delay because they opted to file their federal constitutional challenges in federal court. Ariz. Rev. Stat. Ann. § 16-673.

[46]    **Federal Courts** 🔑 Mootness

**Federal Courts** 🔑 Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

Mootness is a jurisdictional issue, and federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists.

[47]    **Federal Courts** 🔑 Available and effective relief

A case is moot when a party cannot obtain relief for its claim.

[48]    **Injunction** 🔑 Mootness and ripeness; ineffectual remedy

**Injunction** 🔑 Conduct of elections

Claim for permanent injunction enjoining governor from transmitting certified results of general election, and decertifying election results, was moot, in action asserted by voters, Republican nominees for Arizona's presidential electors, and Republican county chairs against Arizona's governor and secretary of state, seeking injunctive relief setting aside results of general election on basis of alleged fraud and

election misconduct, where governor had already transmitted results, District Court lacked power to decertify results, and even if the Court could decertify election, such relief would necessarily run afoul of the Electoral Count Act by ignoring Arizona law that required election contest claims to be brought in state court. 🔖 3 U.S.C.A. § 6; Ariz. Rev. Stat. Ann. § 16-672.

[49]    **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

A motion to dismiss a complaint or claim grounded in fraud for failure to plead fraud with requisite particularity is the functional equivalent of a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 9(b), 12(b)(6).

[50]    **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

The particularity requirement of the rule requiring that, in all averments of fraud or mistake, the circumstances constituting fraud or mistake be stated with particularity demands a higher degree of notice than that required for other claims; the claim must identify who, what, where, when, and how. Fed. R. Civ. P. 9(b).

[51]    **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

The rule requiring that, in all averments of fraud or mistake, the circumstances constituting fraud or mistake be stated with particularity serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect defendants from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties, and society enormous social and economic costs absent some factual basis. Fed. R. Civ. P. 9(b).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

[52]   **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Voters, Republican nominees for Arizona's presidential electors, and Republican county chairs failed to plead fraud with requisite particularity, and failed to plead facts that could plausibly give rise to inference that Arizona's secretary of state and governor conspired with various domestic and international actors to manipulate Arizona's general election results allowing Democratic candidate to defeat Republican candidate in presidential race, as required to state claim against Arizona's governor and secretary of state for injunctive relief setting aside results of general election on basis of alleged fraud and election misconduct. Fed. R. Civ. P. 9(b).

[53]   **Injunction** 🔑 Relation or conversion to preliminary injunction

The standard for issuing a temporary restraining order is identical to that for issuing a preliminary injunction.

[54]   **Injunction** 🔑 Extraordinary or unusual nature of remedy

**Injunction** 🔑 Extraordinary or unusual nature of remedy

**Injunction** 🔑 Clear showing or proof

Under normal circumstances, both a temporary restraining order and a preliminary injunction are extraordinary and drastic remedies, and should not be granted unless the movant, by a clear showing, carries the burden of persuasion.

[55]   **Injunction** 🔑 Grounds in general; multiple factors

**Injunction** 🔑 Grounds in general; multiple factors

A plaintiff seeking a temporary restraining order or preliminary injunction must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm without

an injunction; (3) the balance of equities tips in his or her favor; and (4) an injunction is in the public interest.

[56]   **Injunction** 🔑 Other particular cases

**Injunction** 🔑 Sufficiency, particular cases

Voters, Republican nominees for Arizona's presidential electors, and Republican county chairs seeking temporary restraining order (TRO) and preliminary injunction setting aside results of general election failed to show substantial likelihood of success on merits of their claims of fraud and election misconduct, where they faced serious jurisdictional impediments in bringing their claims to federal court at eleventh hour, and those insurmountable legal hurdles were exacerbated by insufficiently pled allegations of fraud, rendered implausible by multiple inadmissible affidavits, declarations, and expert reports upon which their complaint relied.

[57]   **Injunction** 🔑 Conduct of elections

Public interest did not support grant of temporary restraining order (TRO) and preliminary injunction setting aside results of general election in Arizona on basis of alleged fraud and election misconduct, where relief requested would cause enormous harm to Arizonans, supplanting will of nearly 3.4 million voters reflected in certified election results and potentially imperiling Arizona's participation in Electoral College.

**Attorneys and Law Firms**

Alexander Michael Kolodin, Christopher Alfredo Viskovic, Kolodin Law Group PLLC, Phoenix, AZ, Brandon Johnson, Emily P. Newman, Sidney Katherine Powell, Pro Hac Vice, Sidney Powell PC, Dallas, TX, Howard Kleinhendler, Pro Hac Vice, New York, NY, Julia Zuszua Haller, Defending the Republic, Washington, DC, L. Lin Wood, Wood Hernacki & Evans LLC, Atlanta, GA, for Plaintiffs.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   8

Anni Lori Foster, Office of the Governor, Brett William Johnson, Colin Patrick Ahler, Derek Conor Flint, Ian R. Joyce, Snell & Wilmer LLP, Phoenix, AZ, for Defendant Doug Ducey.

David Andrew Gaona, Kristen Michelle Yost, Roopali H. Desai, Coppersmith Brockelman PLC, Phoenix, AZ, Davida Brook, Pro Hac Vice, Susman Godfrey LLP, Los Angeles, CA, Elizabeth B. Hadaway, Pro Hac Vice, Justin A. Nelson, Pro Hac Vice, Susman Godfrey LLP, Houston, TX, Stephen Edward Morrissey, Pro Hac Vice, Susman Godfrey LLP, Seattle, WA, Stephen Lee Shackelford, Jr., Pro Hac Vice, Susman Godfrey LLP, New York, NY, for Defendant Katie Hobbs.

### ORDER

Diane J. Humetewa, United States District Judge

*1 Plaintiffs bring their Complaint seeking injunctive relief from this Court, specifically, to "set aside the results of the 2020 General Election," because they claim the election process and results were "so riddled with fraud, illegality and statistical impossibility ... that Arizona voters, courts and legislators cannot rely on or certify" its results. (Doc. 1 at 2.) By any measure, the relief Plaintiffs seek is extraordinary. If granted, millions of Arizonans who exercised their individual right to vote in the 2020 General Election would be utterly disenfranchised. Such a request should then be accompanied by clear and conclusive facts to support the alleged "egregious range of conduct in Maricopa County and other Arizona counties ... at the direction of Arizona state election officials." (*Id.*) Yet the Complaint's allegations are sorely wanting of relevant or reliable evidence, and Plaintiffs' invocation of this Court's limited jurisdiction is severely strained. Therefore, for the reasons stated herein, the Complaint shall be dismissed.

### I. Background

In Arizona, more than 3.4 million voters participated in the November 3, 2020, General Election. Thereafter, pursuant to A.R.S. § 16-602, several counties performed a hand count of sample ballots to test the tabulation equipment, and either no discrepancies were found or, if there were, they were "within the acceptable margin."[1] Arizona law also requires the secretary of state, in the governor's presence, to certify the statewide canvas on the fourth Monday after a general election. A.R.S. § 16-648. On November 30, 2020, Secretary of State Katie Hobbs, in the presence of Governor Doug Ducey, certified the statewide canvas. (Doc. 40 at 4.) The Canvas shows that former Vice President Joseph Biden prevailed over President Donald Trump by more than ten thousand votes.[2] On that same day, Governor Ducey signed the Certificate of Ascertainment for Vice President Biden's presidential electors. (Doc. 40 at 4.) The Certificate was then transmitted to the United States Archivist pursuant to the Electoral Count Act. (*Id.*); *see also* 3 U.S.C. § 6.

In their Complaint and the accompanying Motion for Temporary Restraining Order ("TRO") filed on December 2, Plaintiffs "contest" the election and ask this Court to compel the Governor to "de-certify" these results. (Docs. 1 ¶ 145; 2 at 10). The Complaint also requests that this Court grant a permanent injunction "enjoining Secretary Hobbs and Governor Ducey from transmitting the currently certified election results to the Electoral College," declare the election results unconstitutional, and seize all voting machines, equipment, software, and other election-related records and materials, including all ballots cast.[3] (Doc. 1 at 51–52). The Complaint claims to show "multifaceted schemes and artifices implemented by Defendants and their collaborators" to defraud the election. (*Id.* at ¶ 3). And these schemes allegedly resulted in "the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots." (*Id.*)

*2 Of the fourteen named Plaintiffs, three are registered voters and GOP Chairs for various Arizona counties. (*Id.* at ¶¶ 29–31). The remaining eleven are Republican nominees for Arizona's presidential electors. (*Id.* at ¶ 28). One of the eleven, Dr. Kelli Ward, filed suit in state-court over allegations of fraud in this election. *See Ward v. Jackson*, Case No. CV2020-015285, slip. op. (Ariz. Super. Ct. Dec. 4, 2020) (finding no evidence of alleged fraud and dismissing claims of election misconduct); (Doc. 55-1). In that case, on December 8, 2020, the Arizona Supreme Court affirmed the Maricopa County Superior Court's findings that there was no evidence of fraud or misconduct in Arizona's election. (*Ward v. Jackson*, CV2020-015285 (Ariz. 2020); (Doc. 81-1).

Plaintiffs' Complaint contains four counts, three of which assert 42 U.S.C. § 1983 claims for violations of the Constitution's Elections and Electors Clauses, as well as the Fourteenth Amendment's Due Process and Equal Protection guarantees. (Doc. 1 ¶¶ 103–34). The final count, which does

not specify a cause of action, is for "Wide-Spread Ballot Fraud." (*Id.* at ¶¶ 135–41).

On December 3, the day after Plaintiffs filed their Complaint, the Court received a Motion to Intervene from the Arizona Democratic Party, which was subsequently denied. [4] (Docs. 26 and 69). The Court also received a Motion to Intervene from the Maricopa County Board of Supervisors and Maricopa County Recorder Adrian Fontes, which was granted. (Docs. 27 and 32). The Court held a status conference on the same day, in which it scheduled a December 8 hearing on the TRO. (Doc. 28). By subsequent Order (Doc. 43), the Court converted that hearing to oral argument on the Motions to Dismiss filed on December 4. (Docs. 36, 38, and 40). Plaintiffs have filed their Response to the Motions (Doc. 44), and Defendants have filed their Replies. (Docs. 53, 54, and 55). On December 8, 2020, the Court held oral argument on the Motions to Dismiss and took this matter under advisement. Being fully briefed on the matter, the Court now issues its ruling.

**II. Analysis**

Given the import of the overarching subject—a United States Presidential Election—to the citizens of Arizona, and to the named Plaintiffs, the Court is compelled to make clear why it finds it inappropriate to reach the merits of Plaintiffs' Complaint and why it must grant the Motions to Dismiss this matter in its entirety. The Court will endeavor to lay bare the independent reasons for its conclusions, including those related to Article III standing, abstention, laches, mootness, and the federal pleading standards, which govern its review.

**A. Article III Standing**

[1] [2] [3] [4] [5] "To ensure that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society, a plaintiff cannot invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy." *Gill v. Whitford*, ––– U.S. ––––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (internal citations omitted). Article III provides that federal courts may only exercise judicial power in the context of "cases" and "controversies." U.S. Const. Art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). For there to be a case or controversy, the plaintiff must have standing to sue. *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d

635 (2016) ("*Spokeo II*"). Whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). A suit brought by a plaintiff without Article III standing is not a "case or controversy," and an Article III federal court therefore lacks subject matter jurisdiction. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

**\*3** [6] [7] [8] "[A] plaintiff seeking relief in federal court must first demonstrate ... a personal stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), distinct from a "generally available grievance about government," *Lance v. Coffman*, 549 U.S. 437, 439, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam). "That threshold requirement ensures that we act as judges, and do not engage in policymaking properly left to elected representatives." *Gill*, 138 S. Ct. at 1923. To establish standing, a plaintiff has the burden of clearly demonstrating that she has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo II*, 136 S. Ct. at 1547 (quoting *Warth*, 422 U.S. at 518, 95 S.Ct. 2197); *accord Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (noting the party asserting jurisdiction bears the burden of establishing subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss).

[9] [10] [11] [12] To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Spokeo II*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). "When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.' " *Id.* The plaintiff must establish a "particularized" injury, which means that "the injury must affect the plaintiff in a personal and individual

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 10

way." *Raines v. Byrd*, 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Moreover, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). Where a plaintiff has not established the elements of standing, the case must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

[13] [14] [15] [16] Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks subject-matter jurisdiction. A Rule 12(b)(1) challenge may be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the court may dismiss a complaint when the allegations of and documents attached to the complaint are insufficient to confer subject-matter jurisdiction. *See* *Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). In this context, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996). In contrast, when a court evaluates a factual challenge to jurisdiction, a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Safe Air for Everyone*, 373 F.3d at 1039 ("In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.").

### 1. Elections and Electors Clause – Count One

Plaintiffs allege in Count One that Defendants violated the Elections and Electors Clauses and 42 U.S.C. § 1983 by, among other things, losing or destroying absentee ballots, and/or replacing those ballots with "blank ballots filled out by election workers, Dominion or other third parties" sending thousands of absentee ballots to someone besides the registered voter that "could have been filled out by anyone." (Doc. 1 at 41). Defendants argue that Plaintiffs do not have standing to assert such a claim. (Doc. 40 at 8–9).

[17] [18] The Elections Clause of the United States Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]" U.S. Const. Art. I, § 4, cl. 1. The Elections Clause authorizes the state governments to regulate federal elections held in the state, while Congress retains "exclusive control" to alter a state's regulations. *Colegrove v. Green*, 328 U.S. 549, 554, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). A separate provision, the "Electors Clause" of the Constitution, states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors ...." U.S. Const. Art. II, § 1, cl. 2. [5]

**\*4** [19] Plaintiffs' Complaint alleges that Defendants violated the Elections Clause. However, the Complaint does not allege grounds for standing to assert this claim, nor does it distinguish between the status of the groups of Plaintiffs. At oral argument, Plaintiffs' counsel stated that eleven of the Plaintiffs were Republican Party nominees to be electors, and the other three were county GOP Chairs. As an initial matter, Plaintiffs' briefing does not contain any arguments that the GOP Chairs have standing to assert this claim and the Court will dismiss the claim as to the GOP Chairs outright.

[20] Plaintiffs argue that the Plaintiff Electors should be considered "candidates," and thus that they have standing under the Electors and Elections Clause pursuant to an Eighth Circuit case, *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020). (Doc. 44 at 5.) That case, which is based on the operation of Minnesota state election law, allowed electors to bring claims under the Elections Clause because electors were treated as candidates for office under Minnesota law and thus would be injured by the governor's failure to seat them if chosen as the state's electors. *See* *Carson*, 978 F.3d at 1057.

Plaintiff Electors likewise assert that under Arizona law they should also be considered "candidates." (Doc. 44 at 5–6) (citing A.R.S. § 16-344). However, the Electors are not candidates for office as the term is generally understood. Arizona law makes clear that the duty of an Elector is to fulfill a ministerial function, which is extremely limited in scope and duration, and that they have no discretion to deviate at all from the duties imposed by the statute. *See* A.R.S. § 16-212(C) ("After the secretary of state issues the statewide canvass containing the results of a presidential election, the presidential electors of this state ***shall cast their electoral***

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    11

*college votes for the candidate for president and the candidate for vice president who jointly received the highest number of votes* in this state as prescribed in the canvass.") (emphasis added). Arizona voters do not show up to vote for any single Electors listed next to the presidential candidates' names; they vote for their preferred presidential candidate. By specifying that the electors "shall be enclosed in a bracketed list" next to "the surname of the presidential candidate and vice-presidential candidate," A.R.S. § 16-507(B) clarifies and distinguishes the Electors' ministerial status from that of the presidential candidate running for office, the latter who unquestionably suffers the discrete injury required for standing. [6] Notably, the Republican candidate whose name was on the ballot is not a plaintiff in this case.

Other circuit courts to reach the issue have cited the Carson decision with disapproval, noting that there was no precedent for expanding standing in the way that it did. [7] See Bognet v. Sec'y of Commonwealth of Pa., 980 F.3d 336, 351 n.6 (3d Cir. 2020) ("Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under Bond [v. United States, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011)] to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots.... The Carson court appears to have cited language from Bond without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding Bond beyond this context, and the Carson court cited none."). Indeed, as numerous other courts have held, where, as here, the injury alleged by plaintiffs is that defendants failed to follow the Elections Clause, the Supreme Court has stated that the "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance." Lance, 549 U.S. at 442, 127 S.Ct. 1194.

*5 Elector Plaintiffs have not established they can personally bring suit, and therefore, they do not have standing to bring Count One. [8] Therefore, the Court will dismiss Count One.

### 2. Vote Dilution – Count Two

[21] In Count Two, Plaintiffs allege Equal Protection violations based on Defendants' failure to comply with Arizona law by permitting "illegal votes," allowing "voting fraud and manipulation," and in preventing "actual observation and access to the elector process," which allegedly resulted in "the dilution of lawful votes ... and the counting of unlawful votes." (Doc. 1 at 45). Plaintiffs ask the Court to order that "no ballot processed by a counting board in Arizona can be included in the final vote tally unless a challenger [i]s allowed to meaningfully observe the process." (Doc 1 ¶ 120). Absent from the Complaint is an allegation that Plaintiffs (or any registered Arizona voter for that matter) were deprived of their right to vote. Instead, they bring baseless claims of "disparate treatment of Arizona voters, in subjecting one class of voters to greater burdens or scrutiny than another." (Doc. 1 ¶ 115). They do not allege what "class" of voters were treated disparately. Nor do the Elector Plaintiffs cite to any authority that they, as "elector delegates," are a class of protected voters. Defendants contend that Plaintiffs do not have standing to assert these claims and point out that these allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed. The Court agrees.

[22] [23] Here, Plaintiffs have not alleged a concrete harm that would allow the Court to find Article III Standing for their vote dilution claim. As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud. "Contrary to the Voter Plaintiffs' conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently." Bognet, 980 F.3d at 355; see also Rucho v. Common Cause, —— U.S. ——, 139 S. Ct. 2484, 2501, 204 L.Ed.2d 931 (2019) ("[V]ote dilution in the one-person, one-vote cases refers to the idea that each vote must carry equal weight."). "This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment. Violation of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim." Bognet, 980 F.3d at 355; see also Shipley v. Chicago Bd. of Election Comm'rs, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate

violation of state election laws by state election officials does not transgress against the Constitution."); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection claim where allegations of state's erroneous counting of votes cast by voters unqualified to participate).

**\*6** Additionally, Plaintiffs cannot sustain their Equal Protection Clause claim on a vote dilution theory. *See Bognet*, 980 F.3d at 355 (rejecting Equal Protection theory and explaining "[t]his conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment"); *see also Shipley*, 947 F.3d at 1062 ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution") (internal citations omitted); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) (holding that allegations of "vote dilution" as a result of alleged voting process irregulates "[are] speculative and, as such, are more akin to a generalized grievance about the government than an injury in fact."); *Powell*, 436 F.2d at 88 (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary); *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944) ("It was not intended by the Fourteenth Amendment ... that all matters formerly within the exclusive cognizance of the states should become matters of national concern.").

**[24]** Setting aside that Plaintiffs' claims regarding the election are not viable vote dilution claims, Plaintiffs also have not requested relief that is redressable in a tailored way as is required. *See Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *see also Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Therefore, even if Plaintiffs could somehow establish that their vote dilution claim was more than a generalized grievance to the point of asserting an injury, Plaintiffs have not established that the Court can redress this grievance. To give Plaintiffs the relief they desire would disenfranchise the nearly 3.4 million Arizonans that voted in the 2020 General Election. Under Plaintiffs' theory of dilution, this would transform all of the alleged diluted votes from being "diluted" to being destroyed. As Plaintiffs raise "only a generally available grievance about

government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large," the Court finds that Plaintiffs' Count Two "does not state an Article III case or controversy." *See Lance*, 549 U.S. 437 at 439, 127 S.Ct. 1194. Therefore, Plaintiffs do not have standing to bring suit in this forum. [9]

### B. Abstention

Defendants also argue the Court should abstain from reaching Plaintiffs' claims based on their similarities with ongoing state court cases. Yesterday, the Arizona Supreme Court ruled on one such case—filed by Dr. Kelli Ward—seeking to "set aside the 2020 General Election results." *See Ward*, CV 2020-015285 (Ariz. 2020); (Doc. 81-1). That case was filed pursuant to A.R.S. § 16-672 and was also filed after Governor Ducey certified the election results on November 30, 2020. (Doc. 58-1 at 17). The *Ward* plaintiffs alleged an insufficient opportunity to observe election officials, an overcounting of mail-in ballots by not adequately comparing signatures on the ballot envelopes, and errors in the ballot duplication process. (*Id.* at 17–21). After an evidentiary hearing, the Maricopa County Superior Court issued a ruling on December 4, 2020, finding that there was no misconduct, fraud, or effect on the outcome of the election. [10] (*Id.*) This ruling was unanimously affirmed by an *en banc* panel of the Arizona Supreme Court on expedited review. [11]

**\*7** Here, Plaintiffs' Complaint similarly relies upon A.R.S. § 16-672 and its provisions related to bringing suit for alleged election misconduct, including illegal votes and erroneous counting. (Doc. 1 at ¶ 15). A.R.S. § 16-672 also provides that an elections contest brought under this statute should be filed in the superior court of the county in which the person contesting resides or in the superior court of Maricopa county. A.R.S. § 16-672(B). Plaintiffs aver that their claims seek federal action under federal statutes, and therefore, their claims are distinguishable from the claims being litigated in the state court. The Court disagrees.

**[25]  [26]  [27]  [28]** Generally, a federal court has a duty to exercise the jurisdiction conferred by Congress. However, under certain circumstances, it is prudent for a federal court to abstain from hearing a matter. "Indeed, we have held that federal courts may decline to exercise its jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important

countervailing interest." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 716, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (citing *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959)). Abstention may be "warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration." *Id. Colorado River* abstention permits a federal court to abstain from exercising jurisdiction over a matter in deference to a state court suit regarding similar claims and allegations. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

[29]   The Ninth Circuit has enumerated an eight-part test for whether *Colorado River* abstention is warranted, stressing that the factors are "not a mechanical checklist," with some factors that "may not have any applicability to a case." *Seneca Ins. Co., Inc. v. Strange Land, Inc.,* 862 F.3d 835, 841–42 (9th Cir. 2017). The factors are: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court. *Id.*

[30]   Factors two through seven all support abstaining from this case. [12] To begin, this federal forum is less convenient than the state forum, considering the state election law violations alleged, the claims are brought against state actors, and the interplay of state election law. Moreover, the present suit reflects the very essence of "piecemeal litigation," with many of the same parties and attorneys litigating related matters in both forums. As to the primacy of cases, this case was the last filed case. All of the state court litigation filed related to the election preceded this action. As to the nature of the claims, while Plaintiffs bring their claims under federal laws, the crux of their arguments, and the statutes upon which they rely, involve Arizona election law and the election procedures carried out at the county and state level by state officials. The state courts are adequately equipped to protect the rights of the named Plaintiffs, especially considering that Plaintiff Ward already pursued her grievances there. Moreover, as Congress has conferred concurrent jurisdiction

on state courts to adjudicate Section 1983 claims, there is no concern that the state is unable to adjudicate Plaintiffs' Section 1983 claims. *Felder v. Casey,* 487 U.S. 131, 139, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988). Lastly, abstention would alleviate the necessity to consider whether this matter was filed in this Court as a form of forum shopping, especially considering that a number of other related state court lawsuits have already been disposed of. The eighth factor is the only factor that weighs against abstention, as it does not appear that Plaintiffs' allegations of widespread fraud in relation to the tabulation systems and software were before the state court. However, as discussed *infra,* the Court finds that claim lacks Rule 9(b) particularity and plausibility.

*8   [31]   Moreover, when considering abstention, "proper constitutional adjudication, regard for federal-state relations, or wise judicial administration," also inform this Court. *Quackenbush,* 517 U.S. at 716, 116 S.Ct. 1712. If the Court were to reach the merits of Plaintiffs' claims, it would be entirely possible today for it to reach a different legal determination, or the same conclusion but with a different analysis, than the Arizona Supreme Court reached in *Ward v. Jackson.* The Court cannot think of a more troubling affront to "federal-state relations" than this. *See Quackenbush,* 517 U.S. at 716, 116 S.Ct. 1712. Therefore, the Court finds that abstention of these parallel issues is appropriate and indeed necessary.

**C. Eleventh Amendment**

Defendants also argue that the Eleventh Amendment bars Plaintiffs' demands for relief because they, as state officials who have not consented to being sued, are immune from suit. Further, they argue that no exception applies, that the relief Plaintiffs seek is not prospective, and that the claims are barred.

[32]   [33]   [34]   [35]   [36]   The Eleventh Amendment to the Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens

of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI. Such immunity applies when a citizen brings a claim against their own state. *See Hans v. Louisiana*, 134 U.S. 1, 19, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The immunity extends to "suit[s] against state officials when the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). "This jurisdictional bar applies regardless of the nature of the relief sought." *Id.* "When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Id. at 101, 104 S.Ct. 900.* "The general rule is that a suit is against the sovereign ... if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

[37] There are three recognized exceptions to the above: (1) Congress has abrogated the immunity within a federal statute; (2) the State has waived immunity and allowed individuals to sue it pursuant to specific state statutes; and (3) in "claims seeking *prospective* injunctive relief against state officials to remedy a state's *ongoing* violation of *federal* law." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 865 (9th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)) (emphasis added).

[38]   [39] None of these exceptions are present here. As for Plaintiffs' 42 U.S.C. § 1983 claims, Congress did not abrogate the states' immunity from suit in the enacting language of Section 1983, and therefore, the Eleventh Amendment bars those claims. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties"). Plaintiffs provided no argument or authority that the state has explicitly waived its immunity for elections challenges. Therefore, the second exception does not apply. As for the remaining claims, the Court must determine whether Plaintiffs are seeking prospective relief to cure an ongoing violation of federal law.

[40]   [41] "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (internal citations omitted). However, where the claims are state law claims, masked as federal law claims, *Ex parte Young* is inapplicable and the Eleventh Amendment clearly bars the suit. *See Massey v. Coon*, 865 F.2d 264 (9th Cir. 1989) (affirming dismissal where "on its face the complaint states a claim under the due process and equal protection clauses of the Constitution, [but] these constitutional claims are entirely based on the failure of defendants to conform to state law"); *see also Pennhurst*, 465 U.S. at 90, 104 S.Ct. 900 ("[W]hen a plaintiff alleges that a state official has violated state law" and "when a federal court instructs state officials on how to conform their conduct to state law, this conflicts directly with the principles of federalism that underlie the Eleventh Amendment."). This is true whether the relief requested is "prospective or retroactive" in nature. *Pennhurst*, 465 U.S. at 106, 104 S.Ct. 900.

*9 [42] Here, Plaintiffs face a number of difficulties in their attempt to pierce Defendants' sovereign immunity. Defendants argue that all of Plaintiffs' allegations are actually state law allegations masked under federal law. Defendants point to numerous instances in Plaintiffs' Complaint where Arizona state election law is relied on, including their catch-all fraud claims, which are entirely based on state law. The Eleventh Amendment clearly bars such claims. *See Pennhurst*, 465 U.S. at 106, 104 S.Ct. 900 ("On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

However, even assuming that Plaintiffs established that their claims are indeed independent federal claims, it is unclear what *ongoing* violation of federal law is being asserted. Plaintiffs allege Due Process and Equal Protection claims, along with a catch-all fraud claim, that arise from Defendants' alleged failure to follow Arizona state election laws. (Doc. 1 at ¶¶ 106–120). These numerous alleged violations—related to alleged issues with signature verification, ballot

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

duplication, and poll observation—concern past conduct. [13] The relief requested—compelling the Governor to decertify the election—similarly seeks to alter past conduct. Plaintiffs have not identified an ongoing violation to enjoin. In short, "Plaintiffs are seeking to undo what has already occurred, as their requested relief reflects." *See* *King v. Whitmer*, ––– F.Supp.3d ––––, ––––, 2020 WL 7134198, at *5 (E.D. Mich. Dec. 7, 2020).

The Eleventh Amendment bars the injunctive relief sought.

### D. Laches

**[43]** **[44]** Defendants also argue that the doctrine of laches bars Plaintiffs' claims. Laches will bar a claim when the party asserting it shows the plaintiff unreasonably delayed in filing the action and the delay caused prejudice to the defendant or the administration of justice. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951–52 (9th Cir. 2001) (noting that laches requires a "defendant [ ] prove both an unreasonable delay by the plaintiff and prejudice to itself"). Laches can bar untimely claims for relief in election cases, even when the claims are framed as constitutional challenges. *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1181 (9th Cir. 1988); *U.S. v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9, 128 S.Ct. 1511, 170 L.Ed.2d 392 (2008) ("[A] 'constitutional claim can become time-barred just as any other claim can.' ") (quoting *Block v. North Dakota ex rel. Board of Univ. and School Lands*, 461 U.S. 273, 292, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983)).

**[45]** Plaintiffs filed their Complaint and request for TRO seeking to "de-certify" the election results on December 2, 2020, nearly a month after the General Election on November 3, 2020. Plaintiffs conclusively argue that they waited this long because they "could not have known the basis of their claim, or presented evidence substantiating their claim, until after the election." (Doc. 44 at 9). They further state that, because "Arizona election officials and other third parties did not announce or publicize their misconduct, and in fact prevented Republican poll watchers from observing the ballot counting and handling, it took Plaintiffs additional time post-election to gather the fact and expert witness testimony presented in the Complaint." (*Id.*) During oral argument, Plaintiffs' counsel repeatedly stated that the alleged fraud related to the Dominion voting machines was not known until election night, when their experts noted a "blip" in their

reporting data that showed an increase in votes for Joe Biden around 8:00 p.m. Plaintiffs also argue that A.R.S. § 16-673 supports the timeliness of their Complaint because it requires an elector to file a challenge to the election in state court within five days of certification of the election.

**\*10** Plaintiffs' Complaint includes a hodge-podge of alleged misconduct by Arizona elections officials, occurring on various dates over the past weeks, months, and even years. In addition to the objections regarding poll watchers' inability to observe ballot counting and handling, Plaintiffs also object to the manner and process by which Arizona election officials matched signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52); and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

The affidavits or declarations upon which Plaintiffs rely clearly shows that the basis for each of these claims was either known well before Election Day or soon thereafter, and thus cannot be excused by a lack of knowledge nor an inability to substantiate their claims through December 2. For example, Plaintiffs' Complaint cites to documents showing that Plaintiffs were in possession of information about suspected irregularities with the Dominion voting machines as early as 2018. (*Id.* at ¶¶ 21, 69, 71–73) (referencing "publicly available evidence (including judicial and administrative proceedings)" that discuss concerns with security flaws in Dominion voting machines dating back to 2018); (Doc. 1-10 at 19, Ex. 20, Declaration of Mark Paul Law dated November 24, 2020 (describing his concerns over Maricopa County Dominion voting machine security and observations while poll watching on October 25, 2020 and November 1, 2020); *id.* at 30, Ex. 22, Declaration of Gregory Wodynski dated November 23, 2020 (describing his concerns over Maricopa County Dominion voting machine security and his perception that "Bruce," a Dominion employee, could manually manipulate voter data files while poll watching on October 24, 2020 and November 1, 2020).

Plaintiffs also include documents showing that the facts underlying their allegations of ballot counting and verification misconduct occurred weeks before Election Day. Canvassing in Arizona began in October, and the poll watcher declarations and affidavits attached to the Complaint object to the signature verification and ballot process during this time. (*See* Doc. 1-3 at 7, Ex. 5) (containing unsigned Declaration

dated October 25, 2020 from poll watcher objecting to "NO EFFECTIVE oversight" in signature verification rooms); *id.* at 9, Ex. 5A (document listing poll watcher objections made on 10/7/20, 10/23/20, 10/24/20, 10/29/20); (Doc. 1-10 at 25, Ex. 21) (containing a Declaration of poll watcher Judith Burns dated November 16, 2020 and noting her objections in observing the signature verification and ballot processing on October 17, 2020 and October 21, 2020). In a statement from Ms. Linda Brickman, the First Vice-Chair of the Maricopa County Republican Committee, she represents that she had ongoing concerns regarding the signature verification for early and mail-in ballots during her time as an elections worker "from 10/19/20 to 11/11/20" (Doc. 1-10 at 38, Ex. 23) and had objections to the Logic and Accuracy Certification of the Dominion voting systems that occurred on November 18, 2020. (*Id.* at 35). Indeed, at least one Plaintiff has already raised some of these complaints in state court. [14] *Ward*, CV2020-015285 (Super. Ct. of Ariz. Dec. 4, 2020) (dismissing the Petition with prejudice); (Doc. 58-1 at 14, Ex. B). Dr. Ward clearly knew the basis of her claim before December 2, 2020 but offers no reasonable explanation for the delay in bringing this suit in federal court. When contesting an election, any delay is prejudicial, but waiting until a month after Election Day and two days after certification of the election is inexcusable. *See* Kelly v. Penn., 2020 WL 7018314, at *1 (Pa. Nov. 28, 2020) ("Petitioners failed to act with due diligence in presenting the instant claim" when they waited until November 21 to sue to invalidate Pennsylvania's election); *Kistner v. Simon*, No. A20-1486, slip op. at 3–4 (Minn. Dec. 4, 2020); *see also, e.g.,* Ariz. Libertarian Party v. Reagan, 189 F. Supp. 3d 920, 922–23 (D. Ariz. 2016).

**\*11** The Court does not find that the Arizona state election challenge deadline excuses delay on Plaintiffs' part in these circumstances. *See* A.R.S. § 16-673. As noted above, the facts underlying the suspected irregularities complained of were either known to Plaintiffs prior to Election Day or soon thereafter. Although Arizona electors may have a deadline by which to file election contests in Arizona state court, Plaintiffs here opted to file their federal constitutional challenges in federal court. The exhibits to the Complaint confirm that the events complained of occurred on or before Election Day. Accordingly, the Court rejects Plaintiffs' self-serving statement that they did not know the basis for their claims before December 2, 2020. The documents they submit with their Complaint plainly shows the contrary is true, and the delay—which has resulted in a rush by this Court and Defendants to resolve these issues before the

Electoral College meeting deadline of December 14, 2020—is unreasonable.

The second part of the laches test—prejudice—is also unquestionably met. First, the prejudice to the Defendants and the nearly 3.4 million Arizonans who voted in the 2020 General Election would be extreme, and entirely unprecedented, if Plaintiff were allowed to have their claims heard at this late date. SW Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented."). As an Eastern District of Michigan Court stated in a nearly identical case, "[the prejudice] is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified. The rationale for interposing the doctrine of laches is now at its peak." King, —— F.Supp.3d at ——, 2020 WL 7134198, at *7.

Second, the challenges that Plaintiffs assert quite simply could have been made weeks ago, when the Court would have had more time to reflect and resolve the issues. "Unreasonable delay can prejudice the administration of justice by compelling the court to steamroll through ... delicate legal issues in order to meet election deadlines." *Arizona Libertarian Party*, 189 F. Supp. 3d at 923 (quotation marks and citations omitted). Plaintiffs offer no reasonable explanation why their claims were brought in federal court at this late date. Their delay and the resulting prejudice bars their claims by laches.

### E. Mootness

**[46]** **[47]** Defendants also argue that this case is moot. (Docs. 38 at 5; 40 at 22). The Court agrees. "Mootness is a jurisdictional issue, and 'federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists.' " Foster v. Carson, 347 F.3d 742, 745 (9th Cir. 2003) (quoting Cook Inlet Treaty Tribes v. Shalala, 166 F.3d 986, 989 (9th Cir. 1999)). In addition, a case is moot when a party cannot obtain relief for its claim. *Id.*; *see also* Ruvalcaba v. City of L.A., 167 F.3d 514, 521 (9th Cir. 1999).

**[48]** Plaintiffs request an injunction that (a) enjoins Governor Ducey from transmitting the certified results, (b) orders

Defendants to "de-certify" the election results, (c) nullifies votes tabulated by uncertified machines, (d) declares that illegal ballot fraud occurred in violation of the Electors and Elections Clauses and the Fourteenth Amendment's Due Process and Equal Protections Clauses, (e) mandates a manual recount or statistical sampling of all mail-in and absentee ballots, and (f) allows Plaintiffs to seize and inspect voting hardware and software as well as security camera recordings "of all rooms used in Maricopa County" from November 3 to 4. (Doc. 1 at ¶ 145).

Obviously, the Court cannot enjoin the transmission of the certified results because they have already been transmitted. (Doc. 40 at 4). Plaintiffs' counsel orally argued that Defendants had the power to de-certify the election under 3 U.S.C. § 6. Nothing in that statute authorizes this Court to de-certify the results. The manner provided to contest elections under Arizona law requires election contest claims to be brought, "in the superior court of the county in which the person contesting resides or in the superior court of Maricopa County." A.R.S. § 16-672. Therefore, if de-certification were possible, it would only be possible through an action brought in Arizona superior court. In other words, this Court has no power to de-certify the results. But even assuming the Court were able to grant the extraordinary relief requested, ordering Governor Ducey to de-certify the election, such relief would necessarily run afoul of 3 U.S.C. § 6 by ignoring Arizona law. In this instance, the Court cannot allow Plaintiffs to circumvent both federal and Arizona law.

**\*12** Because this Court cannot de-certify the results, it would be meaningless to grant Plaintiffs any of the remaining relief they seek. *See Wood v. Raffensperger*, — F.3d —, —, 2020 WL 7094866, at \*6 (11th Cir. Dec. 5, 2020) ("[I]t is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified."); *King*, — F.Supp.3d at —, 2020 WL 7134198, at \*5 n.3 ("[T]he evidence Plaintiffs seek to gather by inspecting voting machines and software and security camera footage only would be useful if an avenue remained open for them to challenge the election results."). Plaintiffs' claims are moot.

### F. Failure to State a Claim

**[49]** "A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b)[15] for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). In a Rule 12(b)(6) context, courts must consider all well-pleaded factual allegations as true and interpret them in the light most favorable to the plaintiff. *Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204, 1207 (9th Cir. 2013). Dismissal is proper when there is either (1) a lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011), *cert. denied, Blasquez v. Salazar*, 565 U.S. 1261, 132 S.Ct. 1762, 182 L.Ed.2d 532 (2012).

**[50]** When pleading allegations concerning fraudulent conduct, Rule 9(b) requires something more than Rule 8: particularity. *Ashcroft v. Iqbal*, 556 U.S. 662, 686, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "This particularity requirement demands a higher degree of notice than that required for other claims. The claim must identify who, what, where, when, and how." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

**[51]** Moreover, "claims of fraud or mistake ... must, in addition to pleading with particularity, also plead plausible allegations. That is, the pleading must state enough facts to raise a reasonable expectation that discovery will reveal evidence of the misconduct alleged." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal citations omitted). Indeed, "Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also 'to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.' " *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (citing *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996)).

**\*13** Establishing the plausibility of a complaint's allegations is a two-step process that is "context-specific" and "requires the reviewing court to draw on its judicial experience and

common sense." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937. First, a court must "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Then, assuming the truth only of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id.*; see also *Eclectic Props. E., LLC v. Marcus & Millichap Co.,* 751 F.3d 990, 996 (9th Cir. 2014) (identifying the two-step process for evaluating pleadings). Although a plaintiff's specific factual allegations may be consistent with a plaintiff's claim, a district court must assess whether there are other "more likely explanations" for a defendant's conduct such that a plaintiff's claims cannot cross the line " 'from conceivable to plausible.' " *Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard represents a balance between Rule 8's roots in relatively liberal notice pleading and the need to prevent "a plaintiff with a largely groundless claim" from " 'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of settlement value.' " *Twombly,* 550 U.S. at 557–58, 127 S.Ct. 1955 (quoting *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).

[52]  Advancing several different theories, Plaintiffs allege that Arizona's Secretary of State and Governor conspired with various domestic and international actors to manipulate Arizona's 2020 General Election results allowing Joseph Biden to defeat Donald Trump in the presidential race. The allegations they put forth to support their claims of fraud fail in their particularity and plausibility. Plaintiffs append over three hundred pages of attachments, which are only impressive for their volume. The various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections. Because the Complaint is grounded in these fraud allegations, the Complaint shall be dismissed. *Vess,* 317 F.3d at 1107 ("When an entire complaint, or an entire claim within a complaint, is grounded in fraud and its allegations fail to satisfy the heightened pleadings requirements of Rule 9(b), a district court may dismiss the complaint or claim.").

Plaintiffs first "describe specific violations of Arizona law" to support their fraud claims.[16]  In doing so, they attach

declarations from poll watchers that observed election officials during the November General Election. (Doc. 1 ¶¶ 46–53). As Intervenor-Defendant Maricopa County points out, these are the only declarants offered by Plaintiffs with first-hand observation of the election administration. (Doc. 36 at 4). But these four declarants do not allege fraud at all. (*See* Doc. 1-10 at 18–24). Instead, they raise objections to the manner and process by which Arizona election officials matched signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52); and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53). These objections to the manner in which Arizona officials administered the election cannot serve to overturn the results of the 2020 presidential election in Arizona because they fail to present evidence that supports the underlying fraud claim. At most, these are the type of "garden variety election irregularities" federal courts are "not equipped nor empowered to supervise ...." *Griffin v. Burns,* 570 F.2d 1065, 1076, 1077 (1st Cir. 1978) ("If every election irregularity or contested vote involved a federal violation, the court would be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitioners, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law.").

**\*14**  Plaintiffs next argue that they have expert witnesses who can attest to widespread voter fraud in Arizona. As an initial matter, none of Plaintiffs' witnesses identify Defendants as committing the alleged fraud, or state what their participation in the alleged fraudulent scheme was. Instead, they allege that, absentee ballots "*could have* been filled out by anyone and then submitted in the name of another voter," "*could be* filled in by third parties to shift the election to Joe Biden," or that ballots were destroyed or replaced "with blank ballots filled out by election workers, Dominion or other third parties." (Doc. 1 ¶¶ 54–58) (emphasis added). These innuendoes fail to meet Rule 9(b) standards. But perhaps more concerning to the Court is that the "expert reports" reach implausible conclusions, often because they are derived from wholly unreliable sources.

Plaintiffs' expert Mr. William Briggs ("Briggs"), for example, concludes that "troublesome" errors by Arizona election officials "involving unreturned mail-in ballots [ ] are indicative of voter fraud" and that the election should

consequently be overturned. (Doc. 1 at ¶ 54). Briggs relies on data provided by an unknown person named "Matt Braynard," a person who may or may not have tweeted a "Residency Analysis of ABS/EV Voters" on his Twitter account on November 20, 2020 (Doc. 1-2 at 14, Ex. 2); (*Id.* at 52, Ex. 3). Apart from a screenshot of Mr. Braynard's tweets that day, Plaintiffs offer nothing further about Mr. Braynard's identity, qualifications, or methodologies used in conducting his telephone "survey." But according to the Briggs' report, Mr. Braynard conducted his survey of unknown size and to unknown persons in Georgia, Michigan, Wisconsin, Arizona, and Pennsylvania regarding absentee ballots, and his "findings" were conveyed to Mr. Briggs. (*Id.*) In concluding that there were "clearly a large number of troublesome ballots in each state," Mr. Briggs assumed Mr. Braynard's "survery [sic] respondents [were] representative and the data [was] accurate." (*Id.*) This cavalier approach to establishing that hundreds of thousands of Arizona votes were somehow cast in error is itself troublesome. The sheer unreliability of the information underlying Mr. Briggs' "analysis" of Mr. Braynard's "data" cannot plausibly serve as a basis to overturn a presidential election, much less support plausible fraud claims against these Defendants.

The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election. Plaintiffs are clearly concerned about the vulnerabilities of voting machines used in some counties across Arizona and in other states. They cite sources that attest to knowledge of "well-known" vulnerabilities, have included letters from concerned citizens, Arizona elected officials, and United States senators. Plaintiffs even attach an affidavit of an anonymous witness with connections to the late Venezuelan dictator Hugo Chavez claiming to be privy as to how officials in Venezuela rigged their elections with the help of a voting systems company whose software "DNA" is now used in voting machines in the United States. (Doc. 1-1, Ex. 1). These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election. Rather, what is present is a lengthy collection of phrases beginning with the words "could have, possibly, might," and "may have." (Doc. 1 ¶¶ 8, 53, 55, 57, 60, 66, 77, 88, 91, 108, 109, 122). To lend support to this theory, Plaintiffs offer expert Russell Ramsland, Jr., who asserts there was "an improbable, and *possibly impossible* spike in processed votes" in Maricopa and Pima Counties at 8:46 p.m. on November 3, 2020. (Doc. 1 ¶ 60); (Doc. 1-9, Ex. 17)

(emphasis added). He suggests that this spike "could easily be explained" by presuming that Dominion "pre-load[ed] batches of blank ballots in files such as Write-Ins or other adjudication-type files then casting them almost all for Biden using the Override Procedure ...." (Doc. 1-9 at 9, Ex. 17). This scenario is conceivable. However, Defendant Hobbs points to a much more likely plausible explanation: because Arizona begins processing early ballots before the election, the spike represented a normal accounting of the early ballot totals from Maricopa and Pima Counties, which were reported shortly after in-person voting closed. (Doc. 40 at 17–18). Thus, the Court finds that while this "spike" *could* be explained by an illicit hacking of voting machinery in Arizona, the spike is "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed" reporting of early ballot tabulation in those counties. *See* 🔖*Iqbal*, 556 U.S. at 680, 129 S.Ct. 1937. Plaintiffs have not moved the needle for their fraud theory from conceivable to plausible, which they must do to state a claim under Federal pleading standards. 🔖*Id.*

**\*15** Because Plaintiffs have failed to plead their fraud claims with particularity and because the Complaint is grounded in these claims, it must be dismissed.[17]

### G. Motion for TRO and Preliminary Injunction

There are multiple independent grounds upon which to dismiss Plaintiffs' Complaint. Accordingly, it is not necessary to reach the merits of Plaintiffs' requests for a temporary restraining order and preliminary injunction and the Court will therefore only briefly addresses those Motions here.

[53]  [54]  [55] "The standard for issuing a temporary restraining order is identical to that for issuing a preliminary injunction." *Taylor-Failor v. Cty of Hawaii*, 90 F. Supp. 3d 1095, 1098 (D. Haw. 2015). Under normal circumstances, both are extraordinary and drastic remedies, and " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " 🔖*Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting 🔖*Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam)); *see also* 🔖*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted). A plaintiff seeking a temporary restraining order or preliminary injunction must

show that (1) he or she is likely to succeed on the merits, (2) is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his or her favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20, 129 S.Ct. 365.

[56] Plaintiffs simply cannot establish they have a likelihood of success on their claims. Plaintiffs face serious jurisdictional impediments in bringing their claims to federal court at the eleventh hour. These insurmountable legal hurdles are exacerbated by insufficiently plead allegations of fraud, rendered implausible by the multiple inadmissible affidavits, declarations, and expert reports upon which their Complaint relies.

[57] Furthermore, granting Plaintiffs the injunctive relief they seek would greatly harm the public interest. As stated by Defendant Hobbs, "the requested relief would cause enormous harm to Arizonans, supplanting the will of nearly 3.4 million voters reflected in the certified election results and potentially imperiling Arizona's participation in the Electoral College. It would be more difficult to envision a case in which the balance of hardships would tip more strongly against a plaintiff." (Doc. 40 at 24). The Court agrees. The significant weight of these two *Winters* factors requires that the Court deny Plaintiffs' requests for injunctive relief. [18]

**III. Conclusion**

*16 Not only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them. Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court. They most certainly cannot be the basis for upending Arizona's 2020 General Election. The Court is left with no alternative but to dismiss this matter in its entirety.

Accordingly,

IT IS HEREBY ORDERED that Defendants' Governor Doug Ducey, Secretary of State Katie Hobbs, and Intervenor Defendants Maricopa County Board of Supervisors and Adrian Fontes' Motions to Dismiss the Complaint (Docs. 36, 38, and 40) are **GRANTED** for the reasons stated herein.

IT IS FURTHER ORDERED that all remaining pending motions (Docs. 14, 62, 65 and 66) are **denied as moot,** and the hearing on Plaintiffs' TRO and Preliminary Injunction set for December 10, 2020 is **vacated**.

IT IS FINALLY ORDERED that this matter is dismissed, and the Clerk of Court is kindly directed to terminate this action.

**All Citations**

--- F.Supp.3d ----, 2020 WL 7238261

---

### Footnotes

1    Ariz. Sec'y of State, *Summary of Hand Count Audits–2020 General Election* (Nov. 17, 2020), https://azsos.gov/election/2020-general-election-hand-count-results.

2    Ariz. Sec'y of State, State of Arizona Official Canvass, https://azsos.gov/sites/default/files/2020_General_State_Canvass.pdf.

3    Under 3 U.S.C. § 5, if a state enacts and applies procedures to decide election controversies before election day, and a decision regarding a contested election is made at least six days before the electors' meetings, then the decision is conclusive and will apply in counting the electoral votes. That deadline, referred to as the "safe harbor" deadline, was December 8, 2020, as the Electoral College will meet on December 14, 2020. *See* 3 U.S.C. § 7.

4    The Arizona Democratic Party sought intervention under theories of permissive joinder. While the Court did not believe the Motion was inappropriate, the Court did not find their presence necessary to this lawsuit and therefore denied the Motion to Intervene.

5    While the Electors Clause and Elections Clause are separate Constitutional provisions, they share "considerable similarity." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015) (Roberts, C.J., dissenting). These provisions are therefore often considered together. *See Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 348–52 (3d Cir. 2020) (analyzing standing for Elections Clause and Electors Clause under the same test); *Wood v. Raffensperger*, 2020 WL 6817513, at *1 (N.D. Ga. Nov. 20, 2020) (same); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (holding that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause). Plaintiffs do not meaningfully distinguish between the two clauses in their Complaint or briefing.

6    A.R.S. § 16-507(B) in its entirety reads: "Presidential electors, which, shall be enclosed in a bracketed list and next to the bracketed list shall be printed in bold type the surname of the presidential candidate and vice-presidential candidate who is seeking election jointly with the presidential candidate shall be listed directly below the name of the presidential candidate. The indicator for the selection of the presidential and vice-presidential candidates shall be directly next to the surname of the presidential candidate, and one mark directly next to a presidential candidate's surname shall be counted as a vote for each elector in the bracketed list next to the presidential and vice-presidential candidates."

7    *See also Carson*, 978 F.3d at 1063 (Kelly, J., dissenting) ("I am not convinced the Electors have Article III standing to assert claims under the Electors Clause. Although Minnesota law at times refers to them as 'candidates,' *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. *Id.* § 208.04 subdiv. 1 ('[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors.'). They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.").

8    The Court notes that Count One of the Complaint makes passing references to the "VRA and HAVA," (the Voting Rights Act and the Help America Vote Act of 2002) but does not bring any claims under these statutes. (Doc. 1 ¶ 106).

9    Having established that the Court does not have jurisdiction over Plaintiffs' Counts One through Three, the Court will decline to exercise supplemental jurisdiction over Count Four, which pleads no federal cause of action and is entirely based on alleged fraud under Arizona law.

10   Judge Randall H. Warner of the Maricopa County Superior Court addressed Ward's allegations of election misconduct. First, Ward argued that there was an insufficient opportunity to observe the actions of election officials. The State Court dismissed that claim as untimely, holding that "[t]he observation procedures for the November general election were materially the same as for the August primary election, and any objection to them should have been brought at a time when any legal deficiencies could have been cured," and citing *Lubin v. Thomas*, 213 Ariz. 496, 144 P.3d 510, 511 (2006) ("In the context of election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice."). Second, Ward alleged that "election officials overcounted mail-in ballots by not being sufficiently skeptical in their comparison of signatures on the mail-in envelope/affidavits with signatures on file." The state court allowed Ward to examine a sampling of mail-in ballots, and the court held that "[t]he evidence does not show that these affidavits are fraudulent, or that someone other than the voter signed them. There is no evidence that the manner in which signatures were reviewed was designed to benefit one candidate or another, or that there was any misconduct, impropriety, or violation of Arizona law with respect to the review of mail-in ballots." Lastly, Ward alleged errors with duplication of ballots. The state court also allowed Ward to examine a sampling of duplicate ballots and held that "[t]he duplication process prescribed by the Legislature necessarily requires manual action and human judgment, which entail a risk of human error. Despite that, the duplication process for the presidential election was

99.45% accurate. And there is no evidence that the inaccuracies were intentional or part of a fraudulent scheme. They were mistakes. And given both the small number of duplicate ballots and the low error rate, the evidence does not show any impact on the outcome." The state court concluded by holding that "[t]he Court finds no misconduct, no fraud, and no effect on the outcome of the election." *Ward*, CV 2020-015285 (Ariz. Super. Ct. Dec. 4, 2020); (Doc. 58-1).

11   "The Court concludes, unanimously, that the trial judge did not abuse his discretion in denying the request to continue the hearing and permit additional inspection of the ballots." *Ward*, CV 2020-015285, at *7 (Ariz. 2020); (Doc. 81-1).

12   The Court finds that the first factor is not relevant to the facts alleged herein.

13   These include objections regarding poll watchers' ability to observe ballot counting, issues related to the manner and process by which Arizona election officials matched signatures on absentee ballots (Doc. 1 at ¶¶ 46–48); issues related to the process and role assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); "irregularities" with the voting machines (*Id.* at ¶¶ 50–52); and certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

14   As she does here, Ms. Ward's state court action claimed that poll watchers were given insufficient opportunity to observe the actions of election officials. Notably, the state court judge found this claim barred by the doctrine of laches, as Ms. Ward had failed to assert it during a time when it could have been corrected. (Doc. 1-10 at 19 ("The observation procedures for the November general election were materially the same as for the August primary election, and any objection to them should have been brought at a time when any legal deficiencies could have been cured.").

15   Although Plaintiffs strenuously argue that they can bring their Arizona election law-based claims in federal court because of the presence of federal allegations, they also boldly assert in their Reply that they need not follow the heightened pleading standard of Federal Rule of Civil Procedure 9(b) in pleading their fraud claims with particularity, because the federal rules are somehow abrogated by "controlling Arizona Supreme Court precedent.[15]" (Doc. 44 at 23). Plaintiffs cannot have it both ways. Plaintiffs have not provided any authority that a state court decision can alter the pleading requirements in federal court established by United States Supreme Court precedent and the Federal Rules of Civil Procedure.

16   Plaintiffs' often scattershot pleadings allege that "Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the ***Georgia legislature***." (Doc 2 at 6) (emphasis added). Plaintiffs also nonsensically include references to Wisconsin state statutes. (Doc. 1 at 33).

17   Throughout their pleadings, Plaintiffs allege that there were "spikes" of votes for Joe Biden that occurred in Arizona, which also occurred in other states that certified the election for Joe Biden, including Georgia, Wisconsin, Michigan, and Pennsylvania. Regardless of whether these "spikes" shifting the vote majorities from President Trump to Vice President Biden occurred in other states, Plaintiffs have presented nothing to support the claim that these same "spikes" occurred in Arizona, where Biden never trailed Trump in the vote tally.

18   The Court will vacate the hearing on Plaintiffs' TRO and Request for Preliminary Injunction scheduled for December 10, 2020.

---

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   

# Unreported Opinion 10

*Wood v. Raffensperger*, Case No. 20-14418 ---F.3d ----, 2020 WL 7094866 (11th Cir. Dec. 5, 2020)

🏳 KeyCite Blue Flag – Appeal Notification

Petition for Certiorari Docketed by  L. LIN WOOD, JR. v. BRAD RAFFENSPERGER, GEORGIA SECRETARY OF STATE, ET AL.,  U.S., December 11, 2020

981 F.3d 1307
United States Court of Appeals, Eleventh Circuit.

L. Lin WOOD, Jr., Plaintiff-Appellant,

v.

Brad RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia, Rebecca N. Sullivan, in her official capacity as Vice Chair of the Georgia State Election Board, et al., Defendants-Appellees.

No. 20-14418
|
(December 5, 2020)

**Synopsis**

**Background:** Voter brought post-election action against Georgia election officials alleging violations of equal protection, due process, and election and electors clauses and seeking to enjoin certification of general election results, to secure a new recount under different rules, and to establish new rules for upcoming runoff election. The United States District Court for the Northern District of Georgia, No. 1:20-cv-04651-SDG, Steven D. Grimberg, J., 2020 WL 6817513, denied voter's motion for temporary restraining order (TRO). Voter appealed.

**Holdings:** The Court of Appeals, William H. Pryor, Chief Judge, held that:

[1] voter did not satisfy the injury-in-fact requirement for Article III standing;

[2] voter's requests to delay certification of election results and commence a new recount were moot; and

[3] exception to mootness doctrine for issues that are capable of repetition yet evading review did not apply.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Temporary Restraining Order (TRO).

**West Headnotes (29)**

**[1]** **Federal Courts** ⬤ Determination of question of jurisdiction

Court of Appeals is required to examine its jurisdiction sua sponte.

**[2]** **Federal Courts** ⬤ Jurisdiction

Court of Appeals reviews jurisdictional issues de novo.

**[3]** **Federal Courts** ⬤ Limited jurisdiction; jurisdiction as dependent on constitution or statutes

Federal courts are not constituted as free-wheeling enforcers of the Constitution and laws, but rather are courts of limited jurisdiction.

**[4]** **Federal Courts** ⬤ Justiciability in general

Absent a justiciable case or controversy between interested parties, a federal court lacks the power to declare the law. U.S. Const. art. 3, § 2, cl. 1.

**[5]** **Federal Courts** ⬤ Presumptions and burden of proof

When someone sues in federal court, he bears the burden of proving that his suit falls within the federal court's jurisdiction.

**[6]** **Federal Civil Procedure** ⬤ In general; injury or interest

Standing is a threshold jurisdictional inquiry; the elements of standing are an indispensable part of the plaintiff's case.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   1

**[7]**     **Federal Civil Procedure**      In general;
injury or interest

**Federal Civil Procedure**      Causation;
redressability

To prove Article III standing, a litigant must
prove: (1) an injury in fact that (2) is fairly
traceable to the challenged action of the
defendant and (3) is likely to be redressed by a
favorable decision. U.S. Const. art. 3, § 2, cl. 1.

**[8]**     **Constitutional Law**      Elections

**Constitutional Law**      Elections

**Injunction**      Persons entitled to apply;
standing

**United States**      Regulation of Election of
Members

**United States**      Presidential electors

Voter lacked particularized injury needed to
satisfy injury-in-fact requirement for Article III
standing for action against Georgia election
officials alleging violations of equal protection,
due process, and election and electors clauses
and seeking to enjoin certification of general
election results, to secure a new recount under
different rules, and to establish new rules for
upcoming runoff election, where voter based his
standing on his interest in ensuring that only
lawful ballots were counted, and voter could not
explain how his interest in compliance with state
election laws was different from that of any other
person. U.S. Const. art. 1, § 4, cl. 1; U.S. Const.
art. 2, § 1, cls. 2, 3; U.S. Const. art. 3, § 2, cl. 1;
U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[9]**     **Federal Civil Procedure**      In general;
injury or interest

An "injury in fact" that is needed for Article
III standing is an invasion of a legally protected
interest that is both concrete and particularized
and actual or imminent, not conjectural or
hypothetical. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[10]**     **Federal Civil Procedure**      In general;
injury or interest

A "particularized injury" that is needed to satisfy
the injury-in-fact requirement for Article III
standing is one that affects the plaintiff in a
personal and individual way. U.S. Const. art. 3,
§ 2, cl. 1.

1 Cases that cite this headnote

**[11]**     **Federal Civil Procedure**      Rights of third
parties or public

A generalized grievance, no matter how sincere,
is not a particularized injury needed to satisfy
the injury-in-fact requirement for Article III
standing. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[12]**     **Election Law**      Persons entitled to bring
contest

Vote dilution can be a basis to satisfy the injury-
in-fact element for Article III standing for action
challenging conduct of an election. U.S. Const.
art. 3, § 2, cl. 1.

**[13]**     **Election Law**      Vote Dilution

In the racial gerrymandering and
malapportionment contexts, vote dilution occurs
when voters are harmed compared to irrationally
favored voters from other districts.

**[14]**     **Election Law**      Persons entitled to bring
contest

Vote dilution in the context of alleged improper
counting of vote is a paradigmatic generalized
grievance that does not satisfy the injury-in-
fact element for Article III standing for action
challenging conduct of an election. U.S. Const.
art. 3, § 2, cl. 1.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    2

**[15]**    **Federal Courts**    Failure to mention or inadequacy of treatment of error in appellate briefs

Voter forfeited argument about his having Article III standing by virtue of his status as political party donor with interests aligned to those of Georgia Republican Party by failing to raise argument in his opening appellate brief, on appeal of denial of motion for temporary restraining order (TRO) in action against Georgia election officials seeking to enjoin certification of general election results and a new recount based on alleged election irregularities. U.S. Const. art. 3, § 2, cl. 1.

**[16]**    **Constitutional Law**    Elections

**Constitutional Law**    Elections

**Injunction**    Persons entitled to apply; standing

**United States**    Regulation of Election of Members

**United States**    Presidential electors

Voter's status as a political party donor with interests aligned to those of Georgia Republican Party did not give him a particularized injury that was needed to satisfy injury-in-fact requirement for Article III standing for action against Georgia election officials alleging violations of equal protection, due process, and election and electors clauses and seeking to enjoin certification of general election results, to secure a new recount under different rules, and to establish new rules for upcoming runoff election, where voter based his standing on his interest in ensuring that only lawful ballots were counted, and voter could not explain how his interest in compliance with state election laws was different from that of any other person. U.S. Const. art. 1, § 4, cl. 1; U.S. Const. art. 2, § 1, cls. 2, 3; U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14.

**[17]**    **Election Law**    Persons entitled to bring contest

A political party donor can establish injury-in-fact requirement for Article III standing based

on injuries that flow from status as a donor, but donors, like voters, have no judicially enforceable interest in the outcome of an election. U.S. Const. art. 3, § 2, cl. 1.

**[18]**    **Federal Civil Procedure**    In general; injury or interest

The injury-in-fact test for Article III standing requires that the party seeking review be himself among the injured. U.S. Const. art. 3, § 2, cl. 1.

**[19]**    **Constitutional Law**    Elections

**Constitutional Law**    Elections

**Injunction**    Persons entitled to apply; standing

**United States**    Regulation of Election of Members

**United States**    Presidential electors

Voter could not satisfy injury-in-fact requirement for Article III standing based on any standing that a candidate, political party, or election monitors possessed, in voter's action against Georgia election officials alleging violations of equal protection, due process, and election and electors clauses and seeking to enjoin certification of general election results, to secure a new recount under different rules, and to establish new rules for upcoming runoff election; voter was at most a concerned bystander. U.S. Const. art. 1, § 4, cl. 1; U.S. Const. art. 2, § 1, cls. 2, 3; U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14.

**[20]**    **Federal Courts**    Mootness

A federal court is not empowered to decide moot questions.

**[21]**    **Federal Courts**    Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

An issue is "moot" when it no longer presents a live controversy with respect to which the court can give meaningful relief.

**[22]**   **Federal Courts**   Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

An issue can become moot at any stage of litigation, even if there was a live case or controversy when the lawsuit began. U.S. Const. art. 3, § 2, cl. 1.

**[23]**   **Federal Courts**   Elections, voting, and political rights

Voter's requests to delay certification of general election results by Georgia election officials and commence a new recount, on the basis of alleged election irregularities and constitutional violations, were moot, where Georgia already had certified its results.

1 Cases that cite this headnote

**[24]**   **Federal Courts**   In general; necessity

A district court must first have the opportunity to pass upon every issue, so Court of Appeals may not consider requests for relief made for the first time on appeal.

**[25]**   **Federal Courts**   Available and effective relief

Mootness concerns the availability of relief, not the existence of a lawsuit or an injury.

**[26]**   **Federal Courts**   Available and effective relief

Pendency of other claims for relief cannot rescue the otherwise moot claims.

**[27]**   **Federal Courts**   Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

A court may apply exception to mootness doctrine for issues that are capable of repetition yet evading review when (1) the challenged

action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.

**[28]**   **Federal Courts**   Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

A court will not apply exception to mootness doctrine for issues that are capable of repetition yet evading review if there is some alternative vehicle through which a particular policy may effectively be subject to complete review.

**[29]**   **Federal Courts**   Elections, voting, and political rights

Exception to mootness doctrine for issues that are capable of repetition yet evading review did not apply to allow Court of Appeals to review voter's moot requests to delay certification of general election results by Georgia election officials and commence a new recount on the basis of alleged election irregularities and constitutional violations, where the challenged action on appeal was the denial of an emergency injunction against the certification of election results, and there was no reasonable expectation that voter would again seek to delay certification, which already had occurred.

**Attorneys and Law Firms**

Ray S. Smith, III, Smith & Liss LLC, Atlanta, GA, for Plaintiff-Appellant.

Charlene S. McGowan, Christopher Michael Carr, Russell D. Willard, Attorney General's Office, Atlanta, GA, for Defendants-Appellees.

Marc Erik Elias, Amanda Rebecca Callais, Perkins Coie, LLP, Washington, DC, Kevin J. Hamilton, Perkins Coie, LLP, Seattle, WA, Susan Coppedge, U.S. Attorney's Office, Halsey

G. Knapp, Jr., Joyce Gist Lewis, Adam M. Sparks, Krevolin & Horst, LLC, Atlanta, GA, for Intervenors-Appellees.

Jon M. Greenbaum, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Bryan L. Sells, Law Office of Bryan L. Sells, LLC, Atlanta, GA, for Amici Curiae Helen Butler, Georgia State Conference of the NAACP, Georgia Coalition for the Peoples' Agenda, James Woodall, and Melvin Ivey.

Amanda J. Beane, Perkins Coie, LLP, Seattle, WA, Emily Rachel Brailey, Alexi M. Velez, Perkins Coie, LLP, Washington, DC, Gillian Kuhlmann, Perkins Coie, LLP, Los Angeles, CA, Matthew Joseph Mertens, Perkins Coie, LLP, Portland, OR, for Service.

Appeal from the United States District Court for the Northern District of Georgia, D.C. Docket No. 1:20-cv-04651-SDG

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR and LAGOA, Circuit Judges.

**Opinion**

WILLIAM PRYOR, Chief Judge:

**\*1** This appeal requires us to decide whether we have jurisdiction over an appeal from the denial of a request for emergency relief in a post-election lawsuit. Ten days after the presidential election, L. Lin Wood Jr., a Georgia voter, sued state election officials to enjoin certification of the general election results, to secure a new recount under different rules, and to establish new rules for an upcoming runoff election. Wood alleged that the extant absentee-ballot and recount procedures violated Georgia law and, as a result, his federal constitutional rights. After Wood moved for emergency relief, the district court denied his motion. We agree with the district court that Wood lacks standing to sue because he fails to allege a particularized injury. And because Georgia has already certified its election results and its slate of presidential electors, Wood's requests for emergency relief are moot to the extent they concern the 2020 election. The Constitution makes clear that federal courts are courts of limited jurisdiction, U.S. Const. art. III; we may not entertain post-election contests about garden-variety issues of vote counting and misconduct that may properly be filed in state courts. We affirm.

**I. BACKGROUND**

Secretary of State Brad Raffensperger is the "chief election official" of Georgia. Ga. Code Ann. § 21-2-50(b). He manages the state system of elections and chairs the State Election Board. Id. § 21-2-30(a), (d). The Board has the authority to promulgate rules and regulations to ensure uniformity in the practices of county election officials and, "consistent with law," to aid "the fair, legal, and orderly conduct of primaries and elections." Id. § 21-2-31(1)–(2). The Board may also publish and distribute to county election officials a compilation of Georgia's election laws and regulations. Id. § 21-2-31(3). Many of these laws and regulations govern absentee voting.

Any voter in Georgia may vote by absentee ballot. Id. § 21-2-380(b). State law prescribes the procedures by which a voter may request and submit an absentee ballot. Id. §§ 21-2-381; 21-2-384; 21-2-385. The ballot comes with an oath, which the voter must sign and return with his ballot. Id. § 21-2-385(a). State law also prescribes the procedures for how county election officials must certify and count absentee ballots. Id. § 21-2-386(a). It directs the official to "compare the identifying information on the oath with the information on file" and "compare the signature or mark on the oath with the signature or mark" on file. Id. § 21-2-386(a)(1)(B). If everything appears correct, the official certifies the ballot. Id. But if there is a problem, such as a signature that does not match, the official is to "write across the face of the envelope 'Rejected.' " Id. § 21-2-386(a)(1)(C). The government must then notify the voter of this rejection, and the voter may cure the problem. Id.

In November 2019, the Democratic Party of Georgia, the Democratic Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee challenged Georgia's absentee ballot procedures as unconstitutional under the First and Fourteenth Amendments. They sued Secretary Raffensperger and members of the Board for declaratory and injunctive relief. Secretary Raffensperger and the Board maintained that the procedures were constitutional, but they agreed to promulgate regulations to ensure uniform practices across counties. In March 2020, the parties entered into a settlement agreement and dismissed the suit.

**\*2** In the settlement agreement, Secretary Raffensperger and the Board agreed to issue an Official Election Bulletin regarding the review of signatures on absentee ballots. The Bulletin instructed officials to review the voter's signature with the following process:

If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file ..., the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail-in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file ....

Secretary Raffensperger and the Board also agreed to train county election officials to follow this process.

This procedure has been in place for at least three elections since March, including the general election on November 3, 2020. Over one million Georgians voted by absentee ballot in the general election. No one challenged the settlement agreement until the filing of this action. By then, the general election returns had been tallied and a statewide hand recount of the presidential election results was underway.

On November 13, L. Lin Wood Jr. sued Secretary Raffensperger and the members of the Board in the district court. Wood alleged that he sued "in his capacity as a private citizen." He is a registered voter in Fulton County, Georgia, and a donor to various 2020 Republican candidates. His amended complaint alleged that the settlement agreement violates state law. As a result, he contends, it violates the Election Clause of Article I; the Electors Clause of Article II; and the Equal Protection Clause of the Fourteenth Amendment. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2; *id.* amend. XIV, § 1. Wood also alleged that irregularities in the hand recount violated his rights under the Due Process Clause of the Fourteenth Amendment. *Id.* amend. XIV, § 1.

State law requires that such recounts be done in public view, and it permits the Board to promulgate policies that facilitate recounting. Ga. Code Ann. § 21-2-498(c)(4), (d). Secretary Raffensperger directed county election officials

to designate viewing areas for members of the public and the news media to observe the recount. He also permitted the Democratic and Republican Parties to designate special recount monitors.

Wood alleged that officials ignored their own rules and denied Wood and President Donald Trump's campaign "meaningful access to observe and monitor the electoral process." Although Wood did not personally attempt to observe or monitor the recount, he alleged that Secretary Raffensperger and the Board violated his "vested interest in being present and having meaningful access to observe and monitor the electoral process to ensure that it is properly administered ... and ... otherwise free, fair, and transparent."

Wood submitted two affidavits from volunteer monitors. One monitor stated that she was not allowed to enter the counting area because there were too many monitors already present, and she could not be sure from a distance whether the recount was accurate. The other explained that the counting was hard for her to follow and described what she thought were possible tabulation errors.

**\*3** Wood moved for extraordinary relief. He asked that the district court take one of three steps: prohibit Georgia from certifying the results of the November election; prevent it from certifying results that include "defective absentee ballots, regardless of whether said ballots were cured"; or declare the entire election defective and order the state to fix the problems caused by the settlement agreement. He also sought greater access for Republican election monitors, both at a new hand recount of the November election and in a runoff election scheduled for January 5, 2021.

Wood's lawsuit faced a quickly approaching obstacle: Georgia law requires the Secretary of State to certify its general election results by 5:00 p.m. on the seventeenth day after Election Day. Ga. Code Ann. § 21-2-499(b). And it requires the Governor to certify Georgia's slate of presidential electors by 5:00 p.m. on the eighteenth day after Election Day. *Id.* Secretary Raffensperger's deadline was November 20, and Governor Brian Kemp had a deadline of November 21.

To avoid these deadlines, Wood moved to bar officials from certifying the election results until a court could consider his lawsuit. His emergency motion reiterated many of the requests from his amended complaint, including requests for changes to the procedures for the January runoff. He also

submitted additional affidavits and declarations in support of his motion.

The district court held a hearing on November 19 to consider whether it should issue a temporary restraining order. It heard from Wood, state officials, and two groups of intervenors. Wood also introduced testimony from Susan Voyles, a poll manager who participated in the hand recount. Voyles described her experience during the recount. She recalled that one batch of absentee ballots felt different from the rest, and that that batch favored Joe Biden to an unusual extent. At the end of the hearing, the district court orally denied Wood's motion.

On November 20, the district court issued a written opinion and order that explained its denial. It first ruled that Wood lacked standing because he had alleged only generalized grievances, instead of injuries that affected him in a personal and individual way. It next explained that, even if Wood had standing, the doctrine of laches prevented him from challenging the settlement agreement now: he could have sued eight months earlier, yet he waited until two weeks after the election. Finally, it explained why Wood would not be entitled to a temporary restraining order even if the district court could reach the merits of his claims. On the same day, Secretary Raffensperger certified the results of the general election and Governor Kemp certified a slate of presidential electors.

## II. STANDARD OF REVIEW

**[1]** **[2]** "We are required to examine our jurisdiction *sua sponte*, and we review jurisdictional issues *de novo*." *United States v. Lopez*, 562 F.3d 1309, 1311 (11th Cir. 2009) (citation omitted).

## III. DISCUSSION

**[3]** **[4]** This appeal turns on one of the most fundamental principles of the federal courts: our limited jurisdiction. Federal courts are not "constituted as free-wheeling enforcers of the Constitution and laws." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc). As the Supreme Court has[s] often explained," we are instead "courts of limited jurisdiction." *Home Depot U.S.A., Inc. v. Jackson*, —— U.S. ——, 139 S. Ct. 1743, 1746,

204 L.Ed.2d 34 (2019) (internal quotation marks omitted). Article III of the Constitution establishes that our jurisdiction —that is, our judicial power—reaches only "Cases" and "Controversies." U.S. Const. art. III, § 2. Absent a justiciable case or controversy between interested parties, we lack the "power to declare the law." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

**\*4** **[5]** When someone sues in federal court, he bears the burden of proving that his suit falls within our jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Wood had the choice to sue in state or federal court. Georgia law makes clear that post-election litigation may proceed in a state court. Ga. Code Ann. §§ 21-2-499(b), 21-2-524(a). But Wood chose to sue in federal court. In doing so, he had to prove that his suit presents a justiciable controversy under Article III of the Constitution. See *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (listing examples of problems that preclude our jurisdiction). He failed to satisfy this burden.

We divide our discussion in two parts. We first explain why Wood lacks standing to sue. We then explain that, even if he had standing, his requests to recount and delay certification of the November election results are moot. Because this case is not justiciable, we lack jurisdiction. *Id.* And because we lack the power to entertain this appeal, we will not address the other issues the parties raise.

### A. Wood Lacks Standing Because He Has Not Been Injured in a Particularized Way.

**[6]** **[7]** Standing is a threshold jurisdictional inquiry: the elements of standing are "an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To prove standing, Wood "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). If he cannot satisfy these requirements, then we may not decide the merits of his appeal. *Steel Co.*, 523 U.S. at 94, 118 S.Ct. 1003.

**[8]** **[9]** Wood lacks standing because he fails to allege the "first and foremost of standing's three elements": an injury in fact. *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (alteration adopted) (internal quotation marks omitted). An injury in fact is "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (internal quotation marks omitted). Wood's injury is not particularized.

**[10]** **[11]** Wood asserts only a generalized grievance. A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted). For example, if Wood were a political candidate harmed by the recount, he would satisfy this requirement because he could assert a personal, distinct injury. *Cf. Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 579 (11th Cir. 1995). But Wood bases his standing on his interest in "ensur[ing that] ... only lawful ballots are counted." An injury to the right "to require that the government be administered according to the law" is a generalized grievance. *Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (alteration adopted) (internal quotation marks omitted). And the Supreme Court has made clear that a generalized grievance, "no matter how sincere," cannot support standing. *Hollingsworth v. Perry*, 570 U.S. 693, 706, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013).

A generalized grievance is "undifferentiated and common to all members of the public." *Lujan*, 504 U.S. at 575, 112 S.Ct. 2130 (internal quotation marks omitted). Wood cannot explain how his interest in compliance with state election laws is different from that of any other person. Indeed, he admits that any Georgia voter could bring an identical suit. But the logic of his argument sweeps past even that boundary. All Americans, whether they voted in this election or whether they reside in Georgia, could be said to share Wood's interest in "ensur[ing] that [a presidential election] is properly administered."

**\*5** **[12]** **[13]** **[14]** Wood argues that he has two bases for standing, but neither satisfies the requirement of a distinct, personal injury. He first asserts that the inclusion of unlawfully processed absentee ballots diluted the weight of his vote. To be sure, vote dilution can be a basis for standing. *Cf. Jacobson*, 974 F.3d at 1247–48. But it requires a point of comparison. For example, in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to "irrationally favored" voters from other districts. *See Baker v. Carr*, 369 U.S. 186, 207–08, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). By contrast, "no single voter is specifically disadvantaged" if a vote is counted improperly, even if the error might have a "mathematical impact on the final tally and thus on the proportional effect of every vote." *Bognet v. Sec'y Commonwealth of Pa.*, —— F.3d ——, ——, 2020 WL 6686120, at *12 (3d Cir. Nov. 13, 2020) (internal quotation marks omitted). Vote dilution in this context is a "paradigmatic generalized grievance that cannot support standing." *Id.* (internal quotation marks omitted).

Wood's second theory—that Georgia "value[d] one person's vote over that of another" through "arbitrary and disparate treatment"—fares no better. He argues that Georgia treats absentee voters as a "preferred class" compared to those who vote in person, both by the terms of the settlement agreement and in practice. In his view, all voters were bound by law before the settlement agreement, but the rules for absentee voting now run afoul of the law, while in-person voters remain bound by the law. And he asserts that in practice Georgia has favored absentee voters because there were "numerous irregularities" in the processing and recounting of absentee ballots. Setting aside the fact that "[i]t is an individual voter's *choice* whether to vote by mail or in person," *Bognet*, —— F.3d at ——, 2020 WL 6686120, at *15, these complaints are generalized grievances. Even if we assume that absentee voters are favored over in-person voters, that harm does not affect Wood as an individual—it is instead shared identically by the four million or so Georgians who voted in person this November. "[W]hen the asserted harm is ... shared in substantially equal measure by ... a large class of citizens," it is not a particularized injury. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). And irregularities in the tabulation of election results do not affect Wood differently from any other person. His allegation, at bottom, remains "that the law ... has not been followed." *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1332 (11th Cir. 2007) (quoting *Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007)).

Wood's attempts to liken his injury to those we have found sufficient in other appeals fall short. In *Common Cause/ Georgia v. Billups*, we ruled that "[r]equiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing." 554 F.3d 1340, 1351–52 (11th Cir. 2009). But the injury there was the burden of producing photo identification, not the existence of separate rules for in-person and absentee voters. *Id.* And the burden to produce photo identification affected each voter in a personal way. For example, some plaintiffs in *Common Cause* alleged that they "would be required to make a special trip" to obtain valid identification "that is not required of voters who have driver's licenses or passports." *Id.* at 1351 (internal quotation marks omitted). By contrast, even Wood agrees that he is affected by Georgia's alleged violations of the law in the same way as every other Georgia voter. "This injury is precisely the kind of undifferentiated, generalized grievance that the Supreme Court has warned must not be countenanced." *Dillard*, 495 F.3d at 1335 (internal quotation marks omitted).

*Roe v. Alabama ex rel. Evans*, 43 F.3d 574, also does not support Wood's argument for standing. In *Roe*, we ruled that the post-election inclusion of previously excluded absentee ballots would violate the substantive-due-process rights of Alabama voters and two political candidates. *Id.* at 579–81. But no party raised and we did not address standing in *Roe*, so that precedent provides no basis for Wood to establish standing. *Cf.* *Lewis v. Casey*, 518 U.S. 343, 352 n.2, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (noting that in cases where "standing was neither challenged nor discussed ... the existence of unaddressed jurisdictional defects has no precedential effect"). And Wood's purported injury is far more general than the voters' injury in *Roe*. The voters in *Roe* bore individual burdens—to obtain notarization or witness signatures if they wanted to vote absentee—that state courts post-election retroactively permitted other voters to ignore. *Roe*, 43 F.3d at 580–81. In contrast, Georgia applied uniform rules, established before the election, to all voters, who could choose between voting in person or by absentee ballot, and Wood asserts that the effect of those rules

harmed the electorate collectively. That alleged harm is not a particularized injury.

**\*6** **[15]** **[16]** **[17]** Wood suggested in his amended complaint that his status as a donor contributed to standing and aligned his interests with those of the Georgia Republican Party. But he forfeited this argument when he failed to raise it in his opening brief. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1335 (11th Cir. 2004); *see also* *Nat'l All. for the Mentally Ill v. Bd. of Cnty. Comm'rs*, 376 F.3d 1292, 1296 (11th Cir. 2004) (ruling standing claims forfeited for failure to comply with the Federal Rules of Appellate Procedure). And the donor argument fails on its own terms. True, a donor can establish standing based on injuries that flow from his status as a donor. *See, e.g.,* *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019). But donors, like voters, "have no judicially enforceable interest in the *outcome* of an election." *Jacobson*, 974 F.3d at 1246. Nor does a donation give the donor a legally cognizable interest in the proper administration of elections. Any injury to Wood based on election irregularities must flow from his status as a voter, unrelated to his donations. And that fact returns him to the stumbling block of particularization.

**[18]** **[19]** "[T]he 'injury in fact' test requires ... that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563, 112 S.Ct. 2130 (internal quotation marks omitted). Wood's allegations suggest that various nonparties might have a particularized injury. For example, perhaps a candidate or political party would have standing to challenge the settlement agreement or other alleged irregularities. Or perhaps election monitors would have standing to sue if they were denied access to the recount. But Wood cannot place himself in the stead of these groups, even if he supports them. *Cf.* *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006) (explaining that "associational standing ... does not operate in reverse," so a member cannot represent an association). He is at most a "concerned bystander." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004) (internal quotation marks omitted). So he is not "entitled to have the court[s] decide the merits of [his] dispute." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197.

### B. Wood's Requested Relief Concerning the 2020 General Election Is Moot.

**[20]** **[21]** **[22]** Even if Wood had standing, several of his requests for relief are barred by another jurisdictional defect: mootness. We are "not empowered to decide moot questions."

*North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (internal quotation marks omitted). "An issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief."

*Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011) (alteration rejected) (internal quotation marks omitted). And an issue can become moot at any stage of litigation, even if there was a live case or controversy when the lawsuit began. *Id.* at 1189–90.

**[23]** Wood asked for several kinds of relief in his emergency motion, but most of his requests pertained to the 2020 election results. He moved the district court to prohibit either the certification of the election results or certification that included the disputed absentee ballots. He also asked the district court to order a new hand recount and to grant Republican election monitors greater access during both the recount and the January runoff election. But after the district court denied Wood's motion, Secretary Raffensperger certified the election results on November 20. And Governor Kemp certified the slate of presidential electors later that day.

**[24]** Because Georgia has already certified its results, Wood's requests to delay certification and commence a new recount are moot. "We cannot turn back the clock and create a world in which" the 2020 election results are not certified. *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015). And it is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified. *Cf. Tropicana Prods. Sales, Inc. v. Phillips Brokerage Co.*, 874 F.2d 1581, 1582 (11th Cir. 1989) ("[A]n appeal from the denial of a motion for preliminary injunction is mooted when the requested effective end-date for the preliminary injunction has passed."). Nor can we reconstrue Wood's previous request that we temporarily prohibit certification into a new request that we undo the certification. A district court "must first have the opportunity to pass upon [every] issue," so we may not consider requests for relief made for the first time on appeal. *S.F. Residence Club, Inc. v. 7027 Old Madison Pike, LLC*, 583 F.3d 750, 755 (11th Cir. 2009).

*\*7* **[25]** **[26]** Wood's arguments reflect a basic misunderstanding of what mootness is. He argues that the certification does not moot anything "because this litigation is ongoing" and he remains injured. But mootness concerns the availability of relief, not the existence of a lawsuit or an injury. *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1304 (11th Cir. 2011). So even if post-election litigation is not always mooted by certification,

*see, e.g.,* *Siegel v. LePore*, 234 F.3d 1163, 1172–73 (11th Cir. 2000) (en banc), Wood's particular requests are moot. Wood is right that certification does not moot his requests for relief concerning the 2021 runoff—although Wood's lack of standing still forecloses our consideration of those requests —but the pendency of other claims for relief cannot rescue the otherwise moot claims. *See, e.g.,* *Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1478–79, 1481 (11th Cir. 1997) (instructing the district court to dismiss moot claims but resolving other claims on the merits). Wood finally tells us that President Trump has also requested a recount, but that fact is irrelevant to whether Wood's requests remain live.

**[27]** **[28]** Nor does any exception to mootness apply. True, we often review otherwise-moot election appeals because they are "capable of repetition yet evading review." *ACLU v. The Fla. Bar*, 999 F.2d 1486, 1496 (11th Cir. 1993) (internal quotation marks omitted). We may apply this exception when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1023 (11th Cir. 1988) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)). But we will not apply this exception if there is "some alternative vehicle through which a particular policy may effectively be subject to" complete review. *Bourgeois v. Peters*, 387 F.3d 1303, 1308 (11th Cir. 2004).

**[29]** The "capable of repetition yet evading review" exception does not save Wood's appeal because there is no "reasonable expectation" that Wood will again face the issues in this appeal. Based on the posture of this appeal, the challenged action is the denial of an emergency injunction against the certification of election results. *See* *Fleming*, 785 F.3d at 446 (explaining that whether the issues in an

interlocutory appeal are "capable of repetition, yet evading review" is a separate question from whether the issues in the overall lawsuit are capable of doing so). That denial is the decision we would review but for the jurisdictional problems. But Wood cannot satisfy the requirement that there be a "reasonable expectation" that he will again seek to delay certification. Wood does not suggest that this situation might recur. *Cf.* *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 463–64, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007). And we have no reason to think it would: he is a private citizen, so the possibility of a recurrence is purely theoretical. *Cf.* *Hall v. Sec'y, Ala.*, 902 F.3d 1294, 1305 (11th Cir. 2018).

## IV. CONCLUSION

We **AFFIRM** the denial of Wood's motion for emergency relief.

## All Citations

981 F.3d 1307, 2020 WL 7094866

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Unreported Opinion 11

*King v. Whitmer*, Case No. cv-20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020)

KeyCite Blue Flag – Appeal Notification

Appeal Filed by TIMOTHY KING, ET AL v. GRETCHEN WHITMER, ET AL, 6th Cir., December 10, 2020

2020 WL 7134198
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Timothy KING, Marian Ellen Sheridan, John Earl Haggard, Charles James Ritchard, James David Hooper, and Daren Wade Rubingh, Plaintiffs,

v.

Gretchen WHITMER, in her official capacity as Governor of the State of Michigan, Jocelyn Benson, in her official capacity as Michigan Secretary of State, and Michigan Board of State Canvassers, Defendants,

and

City of Detroit, Democratic National Committee and Michigan Democratic Party, and Robert Davis, Intervenor-Defendants.

Civil Case No. 20-13134
|
Signed 12/07/2020

**Synopsis**

**Background:** Registered voters brought § 1983 action against Michigan's Governor and other state officials, alleging that there were voter irregularities and fraud in processing tabulation of votes and absentee ballots for the general election, in violation of the Elections and Electors Clauses of the Constitution and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Voters moved for preliminary injunction requiring officials to decertify the election results.

**Holdings:** The District Court, Linda V. Parker, J., held that:

[1] Ex parte Young exception to Eleventh Amendment immunity did not apply;

[2] claims were moot;

[3] delay in filing action resulted in claims being barred by laches;

[4] abstention under Colorado River was appropriate;

[5] plaintiffs lacked Article III standing to pursue claims;

[6] plaintiffs were not likely to succeed on claim under the Elections and Electors Clauses; and

[7] plaintiffs were not likely to succeed on equal protection claim.

Motion denied.

**Procedural Posture(s):** Motion for Preliminary Injunction.

West Headnotes (41)

**[1]    Injunction** 🔑

A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

**[2]    Injunction** 🔑

Preliminary injunctive relief will only be granted where the movant carries his or her burden of proving that the circumstances clearly demand it.

**[3]    Injunction** 🔑

Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction.

**[4]    Injunction** 🔑

Four factors are relevant in deciding whether to grant preliminary injunctive relief: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

interest would be served by the issuance of an injunction.

**[5]** **Injunction** 🔑

At the preliminary injunction stage, a plaintiff must show more than a mere possibility of success, but need not prove his case in full.

**[6]** **Injunction** 🔑

Proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion.

**[7]** **Federal Courts** 🔑

Eleventh Amendment immunity extends to suits brought by citizens against their own states. U.S. Const. Amend. 11.

**[8]** **Federal Courts** 🔑

Eleventh Amendment extends to suits against agencies or departments, and suits against state officials when the state is the real, substantial party in interest. U.S. Const. Amend. 11.

**[9]** **Federal Courts** 🔑

A suit against a state, a state agency or its department, or a state official is in fact a suit against the state and is barred by the Eleventh Amendment regardless of the nature of the relief sought. U.S. Const. Amend. 11.

**[10]** **Federal Courts** 🔑

General rule is that a suit is against the sovereign for Eleventh Amendment immunity purposes if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the government from acting, or to compel it to act. U.S. Const. Amend. 11.

**[11]** **Federal Courts** 🔑

Eleventh Amendment immunity is subject to three exceptions: (1) congressional abrogation; (2) waiver by the State; and (3) a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law. U.S. Const. Amend. 11.

**[12]** **Federal Courts** 🔑

Congress did not abrogate the states' sovereign immunity when it enacted § 1983. U.S. Const. Amend. 11; 42 U.S.C.A. § 1983.

**[13]** **Federal Courts** 🔑

State of Michigan has not consented to being sued in civil rights actions in the federal courts.

**[14]** **Federal Courts** 🔑

In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. U.S. Const. Amend. 11.

**[15]** **Federal Courts** 🔑

*Ex parte Young* exception to Eleventh Amendment immunity does not apply to state law claims against state officials, regardless of the relief sought. U.S. Const. Amend. 11.

**[16]** **Federal Courts** 🔑

There was no continuing violation of federal law, as required for *Ex parte Young* exception to Eleventh Amendment immunity to apply to registered voters' § 1983 post-election suit against state officials seeking to decertify general

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

election results based on alleged widespread voter irregularities and fraud in processing tabulation of votes and absentee ballots for the general election, in violation of Elections and Electors Clauses of the Constitution and Fourteenth Amendment due process and equal protection, where Board had already certified the election results and Governor had transmitted the state's late of electors to the United States Archivist. U.S. Const. art. 2, § 1, cl. 2; U.S. Const. Amends. 11, 14; 42 U.S.C.A. § 1983.

**[17]    Federal Courts**

Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. U.S. Const. art. 3, § 2, cl. 1.

**[18]    Federal Courts**

A case may become "moot" when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome; in other words, a case is "moot" where the court lacks ability to give meaningful relief. U.S. Const. art. 3, § 2, cl. 1.

**[19]    Federal Courts**

Conclusion of election and passage of time rendered moot registered voters' § 1983 post-election suit against state officials seeking to decertify general election results based on alleged widespread voter irregularities and fraud in processing tabulation of votes and absentee ballots for the general election, in violation of Elections and Electors Clauses of the Constitution and Fourteenth Amendment due process and equal protection; by time suit was filed, all counties in the state had finished canvassing their results for all elections and reported results to state office races in accordance with Michigan law, and state code had set forth detailed procedures for challenging an election, but voters did not avail themselves of those remedies before deadline for doing so had passed. U.S. Const. art. 2, § 1, cl. 2; U.S.

Const. Amend. 14; 42 U.S.C.A. § 1983; Mich. Comp. Laws Ann. §§ 168.831, 168.843.

**[20]    Equity**

The doctrine of laches is rooted in the principle that equity aids the vigilant, not those who slumber on their rights.

**[21]    Equity**

An action may be barred by the doctrine of laches if: (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant is prejudiced by this delay.

**[22]    Election Law**

Courts apply laches in election cases.

**[23]    Election Law**

Registered voters' delay in filing § 1983 post-election suit against state officials seeking to decertify general election results based on alleged widespread voter irregularities and fraud in processing tabulation of votes and absentee ballots for the general election, in violation of Elections and Electors Clauses of the Constitution and Fourteenth Amendment due process and equal protection resulted in their claims being barred by laches; plaintiffs showed no diligence in filing suit three weeks after election day and one week after certification of results and offered no persuasive explanation for waiting so long to file suit, and such delay prejudiced the defendants. U.S. Const. art. 2, § 1, cl. 2; U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[24]    Federal Courts**

*Colorado River* abstention doctrine permits a federal court to abstain from exercising jurisdiction over a matter in deference to parallel state-court proceedings.

**[25]    Federal Courts** 🔑

Abstention under the *Colorado River* doctrine is warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration.

**[26]    Federal Courts** 🔑

There are two prerequisites for abstention under the *Colorado River* doctrine; first, the court must determine that the concurrent state and federal actions are parallel, and second, the court must consider the factors that include (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

**[27]    Federal Courts** 🔑

Factors considered in analysis of *Colorado River* abstention do not comprise a mechanical checklist; rather, they require a careful balancing of the important factors as they apply in a given case depending on the particular facts at hand.

**[28]    Federal Courts** 🔑

Abstention under *Colorado River* doctrine was appropriate for registered voters' § 1983 post-election suit against state officials seeking to decertify general election results based on alleged widespread voter irregularities and fraud in processing tabulation of votes and absentee ballots for the general election, in violation of Elections and Electors Clauses of the Constitution and Fourteenth Amendment due process and equal protection; federal and state

courts had concurrent jurisdiction to enforce statutory rights in question, state's election code dominated even the federal claims, and there were parallel proceedings in state court that could render conflicting results. U.S. Const. art. 2, § 1, cl. 2; U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[29]    Federal Courts** 🔑

"Piecemeal litigation" occurs, for purposes of *Colorado River* abstention analysis, when different courts adjudicate the identical issue, thereby duplicating judicial effort and potentially rendering conflicting results.

**[30]    Federal Courts** 🔑

The case-or-controversy requirement for Article III standing is satisfied only where a plaintiff has standing to bring suit. U.S. Const. art. 3, § 2, cl. 1.

**[31]    Federal Civil Procedure** 🔑

Where there are multiple plaintiffs, each plaintiff must demonstrate standing for each claim he seeks to press.

**[32]    Federal Civil Procedure** 🔑

To establish Article III standing, a plaintiff must show that: (1) he has suffered an injury in fact that is concrete and particularized and actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1.

**[33]    Election Law** 🔑

Registered voters' alleged injury of voter-dilution underlying their equal protection claim against state officials arising out of alleged voter irregularities and fraud in vote tabulation for the general election could not be redressed by a

favorable decision from the court, and thus, they lacked Article III standing to pursue the claim; plaintiffs asked court to decertify the results of the election, but harm of having plaintiffs' votes invalidated or diluted would not be remedied by denying millions of others their right to vote. U.S. Const. art. 2, § 1, cl. 2; U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[34]     Federal Civil Procedure**

Standing is not dispensed in gross: a plaintiff's remedy must be tailored to redress the plaintiff's particular injury. U.S. Const. art. 3, § 2, cl. 1.

**[35]     Election Law**

The Elections Clause of the Constitution effectively gives state governments the default authority to regulate the mechanics of federal elections, with Congress retaining exclusive control to make or alter any state's regulations. U.S. Const. art. 2, § 1, cl. 2.

**[36]     Election Law**

Registered voters who alleged that there were voter irregularities and fraud in processing tabulation of votes and absentee ballots in the general election did not have standing to pursue claim against state officials for violation of the Elections and Electors Clauses of the Constitution; claims belonged, if anyone, to Michigan's state legislature, and none of the defendants were part of Michigan's lawmaking bodies, nor did they have a relationship to them. U.S. Const. art. 2, § 1, cl. 2; U.S. Const. art. 3, § 2, cl. 1.

**[37]     Election Law**

Registered voters were not likely to succeed on claim under the Elections and Electors Clauses of the Constitution, and thus could not obtain preliminary injunction requiring state officials to decertify the results of the general election due to alleged voter irregularities and fraud

in processing tabulation of votes and absentee ballots; plaintiffs alleged that officials violated the Elections and Electors Clauses by deviating from the requirements of the Michigan Election Code, but asking the federal court to find any alleged deviation from state election law amounted to a modification of state election law, an approach not supported by any caselaw. U.S. Const. art. 2, § 1, cl 2; 42 U.S.C.A. § 1983.

**[38]     Constitutional Law**

The Constitution leaves no room for classification of people in a way that unnecessarily abridges the right to vote. U.S. Const. Amend. 14.

**[39]     Election Law**

Voting rights can be impermissibly burdened by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

**[40]     Election Law**

Registered voters were not likely to succeed on claim under the Equal Protection Clause that state officials engaged in schemes to destroy, discard, and switch votes and thereby devalued votes for the Republican candidate in the general election and diluted the influence of their individual votes, and thus, they could not obtain preliminary injunction requiring officials to decertify the election results on such basis, where voters' claims were based on nothing but speculation and conjecture that votes for the Republican candidate were changed or destroyed. U.S. Const. Amend. 14.

**[41]     Injunction**

A belief is not evidence and falls far short of what is required to obtain any relief, much less the extraordinary relief of a preliminary injunction.

**Attorneys and Law Firms**

Gregory J. Rohl, The Law Offices of Gregory J. Rohl, P.C., Novi, MI, for Plaintiffs.

Erik A. Grill, Heather S. Meingast, Michigan Department of Attorney General, Lansing, MI, for Defendants.

Darryl Bressack, Fink Bressack, David H. Fink, Nathan J. Fink, Fink + Associates Law, Bloomfield Hills, MI, for Intervenor-Defendant City of Detroit.

Andrew A. Paterson, Jr., Novi, MI, for Intervenor-Defendant Robert Davis.

Mary Ellen Gurewitz, Cummings & Cummings Law PLLC, Royal Oak, MI, and Scott R. Eldridge, Miller, Canfield, Lansing, MI, for Intervenor-Defendants Democratic National Committee, Michigan Democratic Party.

**OPINION AND ORDER DENYING PLAINTIFFS' "EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF" (ECF NO. 7)**

LINDA V. PARKER, U.S. DISTRICT JUDGE

**\*1** The right to vote is among the most sacred rights of our democracy and, in turn, uniquely defines us as Americans. The struggle to achieve the right to vote is one that has been both hard fought and cherished throughout our country's history. Local, state, and federal elections give voice to this right through the ballot. And elections that count each vote celebrate and secure this cherished right.

These principles are the bedrock of American democracy and are widely revered as being woven into the fabric of this country. In Michigan, more than 5.5 million citizens exercised the franchise either in person or by absentee ballot during the 2020 General Election. Those votes were counted and, as of November 23, 2020, certified by the Michigan Board of State Canvassers (also "State Board"). The Governor has sent the slate of Presidential Electors to the Archivist of the United States to confirm the votes for the successful candidate.

Against this backdrop, Plaintiffs filed this lawsuit, bringing forth claims of widespread voter irregularities and fraud in the processing and tabulation of votes and absentee ballots. They seek relief that is stunning in its scope and breathtaking in its reach. If granted, the relief would disenfranchise the votes of the more than 5.5 million Michigan citizens who, with dignity, hope, and a promise of a voice, participated in the 2020 General Election. The Court declines to grant Plaintiffs this relief.

**I. Background**

In the weeks leading up to, and on, November 3, 2020, a record 5.5 million Michiganders voted in the presidential election ("2020 General Election"). (ECF No. 36-4 at Pg ID 2622.) Many of those votes were cast by absentee ballot. This was due in part to the coronavirus pandemic and a ballot measure the Michigan voters passed in 2018 allowing for no-reason absentee voting. When the polls closed and the votes were counted, Former Vice President Joseph R. Biden, Jr. had secured over 150,000 more votes than President Donald J. Trump in Michigan. (Id.)

Michigan law required the Michigan State Board of Canvassers to canvass results of the 2020 General Election by November 23, 2020. Mich. Comp. Laws § 168.842. The State Board did so by a 3-0 vote, certifying the results "for the Electors of President and Vice President," among other offices. (ECF No. 36-5 at Pg ID 2624.) That same day, Governor Gretchen Whitmer signed the Certificates of Ascertainment for the slate of electors for Vice President Biden and Senator Kamala D. Harris. (ECF No. 36-6 at Pg ID 2627-29.) Those certificates were transmitted to and received by the Archivist of the United States. (Id.)

Federal law provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to decide controversies or contests over electors and electoral votes, and if these procedures have been applied, and the decisions are made at least six days before the electors' meetings, then the decisions are considered conclusive and will apply in counting the electoral votes. 3 U.S.C. § 5. This date (the "Safe Harbor" deadline) falls on December 8, 2020. Under the federal statutory timetable for presidential elections, the Electoral College must meet on "the first Monday after the second Wednesday in December," 3 U.S.C. § 7, which is December 14 this year.

**\*2** Alleging widespread fraud in the distribution, collection, and counting of ballots in Michigan, as well as violations of state law as to certain election challengers and the manipulation of ballots through corrupt election machines

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

and software, Plaintiffs filed the current lawsuit against Defendants at 11:48 p.m. on November 25, 2020—the eve of the Thanksgiving holiday. (ECF No. 1.) Plaintiffs are registered Michigan voters and nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan. (ECF No. 6 at Pg ID 882.) They are suing Governor Whitmer and Secretary of State Jocelyn Benson in their official capacities, as well as the Michigan Board of State Canvassers.

On November 29, a Sunday, Plaintiffs filed a First Amended Complaint (ECF No. 6), "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof" (ECF No. 7), and Emergency Motion to Seal (ECF No. 8). In their First Amended Complaint, Plaintiffs allege three claims pursuant to 42 U.S.C. § 1983: (Count I) violation of the Elections and Electors Clauses; (Count II) violation of the Fourteenth Amendment Equal Protection Clause; and, (Count III) denial of the Fourteenth Amendment Due Process Clause. (ECF No. 6.) Plaintiffs also assert one count alleging violations of the Michigan Election Code. (*Id.*)

By December 1, motions to intervene had been filed by the City of Detroit (ECF No. 15), Robert Davis (ECF No. 12), and the Democratic National Committee and Michigan Democratic Party ("DNC/MDP") (ECF No. 14). On that date, the Court entered a briefing schedule with respect to the motions. Plaintiffs had not yet served Defendants with their pleading or emergency motions as of December 1. Thus, on December 1, the Court also entered a text-only order to hasten Plaintiffs' actions to bring Defendants into the case and enable the Court to address Plaintiffs' pending motions. Later the same day, after Plaintiffs filed certificates of service reflecting service of the summons and Amended Complaint on Defendants (ECF Nos. 21), the Court entered a briefing schedule with respect to Plaintiffs' emergency motions, requiring response briefs by 8:00 p.m. on December 2, and reply briefs by 8:00 p.m. on December 3 (ECF No. 24).

On December 2, the Court granted the motions to intervene. (ECF No. 28.) Response and reply briefs with respect to Plaintiffs' emergency motions were thereafter filed. (ECF Nos. 29, 31, 32, 34, 35, 36, 37, 39, 49, 50.) Amicus curiae Michigan State Conference NAACP subsequently moved and was granted leave to file a brief in support of Defendants' position. (ECF Nos. 48, 55.) Supplemental briefs also were filed by the parties. (ECF Nos. 57, 58.)

In light of the limited time allotted for the Court to resolve Plaintiffs' emergency motion for injunctive relief—which Plaintiffs assert "must be granted in advance of December 8, 2020" (ECF No. 7 at Pg ID 1846)—the Court has disposed of oral argument with respect to their motion pursuant to Eastern District of Michigan Local Rule 7.1(f). [1]

## II. Standard of Review

**[1]** **[2]** **[3]** A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (citation omitted). The plaintiff bears the burden of demonstrating entitlement to preliminary injunctive relief. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Such relief will only be granted where "the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction." 11A Mary Kay Kane, Fed. Prac. & Proc. § 2949 (3d ed.).

**\*3** **[4]** **[5]** **[6]** Four factors are relevant in deciding whether to grant preliminary injunctive relief: " '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.' " *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)). "At the preliminary injunction stage, 'a plaintiff must show more than a mere possibility of success,' but need not 'prove his case in full.' " *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007)). Yet, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion ...." *Leary*, 228 F.3d at 739.

## III. Discussion

The Court begins by discussing those questions that go to matters of subject matter jurisdiction or which counsel against reaching the merits of Plaintiffs' claims. While the Court finds that any of these issues, alone, indicate that Plaintiffs' motion should be denied, it addresses each to be thorough.

### A. Eleventh Amendment Immunity

**[7]** **[8]** The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. This immunity extends to suits brought by citizens against their own states. *See, e.g., Ladd v. Marchbanks*, 971 F.3d 574, 578 (6th Cir. 2020) (citing *Hans v. Louisiana*, 134 U.S. 1, 18-19, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). It also extends to suits against state agencies or departments, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citations omitted), and "suit[s] against state officials when 'the state is the real, substantial party in interest[,]' " *id.* at 101, 104 S.Ct. 900 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)).

**[9]** **[10]** A suit against a State, a state agency or its department, or a state official is in fact a suit against the State and is barred "regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100-02, 104 S.Ct. 900 (citations omitted). " 'The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.' " *Id.* at 101 n.11, 104 S.Ct. 900 (quoting *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)) (internal quotation marks omitted).

**[11]** **[12]** **[13]** Eleventh Amendment immunity is subject to three exceptions: (1) congressional abrogation; (2) waiver by the State; and (3) "a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law." *See Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (citations omitted). Congress did not abrogate the States' sovereign immunity when it enacted 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). "The State of Michigan has not consented to being sued in civil rights actions in the federal courts." *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citing *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986)). The Eleventh Amendment therefore bars Plaintiffs' claims against the Michigan Board of State Canvassers. *See McLeod v. Kelly*, 304 Mich. 120, 7 N.W.2d 240, 242 (1942) ("The board of State canvassers is a State agency ..."); *see also Deleeuw v. State Bd. of Canvassers*, 263 Mich.App. 497, 688 N.W.2d 847, 850 (2004). Plaintiffs' claims are barred against Governor Whitmer and Secretary Benson unless the third exception applies.

**\*4** **[14]** The third exception arises from the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). But as the Supreme Court has advised:

> To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle ... that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction. The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading. Application of the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

courts instead of a reflexive reliance on an obvious fiction.

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). Further, "the theory of *Young* has not been provided an expansive interpretation." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 102, 104 S.Ct. 900. " 'In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (quoting *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 296, 117 S.Ct. 2028 (O'Connor, J., concurring)).

[15] *Ex parte Young* does not apply, however, to *state law* claims against state officials, regardless of the relief sought. *Pennhurst State Sch. & Hosp.*, 465 U.S. at 106, 104 S.Ct. 900 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."); *see also* *In re Ohio Execution Protocol Litig.*, 709 F. App'x 779, 787 (6th Cir. 2017) ("If the plaintiff sues a state official under state law in federal court for actions taken within the scope of his authority, sovereign immunity bars the lawsuit regardless of whether the action seeks monetary or injunctive relief."). Unquestionably, Plaintiffs' state law claims against Defendants are barred by Eleventh Amendment immunity.

The Court then turns its attention to Plaintiffs' *§ 1983* claims against Defendants. Defendants and Intervenor DNC/MDP contend that these claims are not in fact federal claims as they are premised entirely on alleged violations of *state* law. (ECF No. 31 at Pg ID 2185 ("Here, each count of Plaintiffs' complaint—even Counts I, II, and III, which claim to raise violations of federal law—is predicated on the election being conducted contrary to Michigan law."); ECF No. 36 at Pg ID 2494 ("While some of [Plaintiffs'] allegations concern fantastical conspiracy theories that belong more appropriately in the fact-free outer reaches of the Internet[,] ... what Plaintiffs assert at bottom are violations of the Michigan Election Code.") Defendants also argue that even if properly stated as federal causes of action, "it is far from clear whether Plaintiffs' requested injunction is actually prospective in nature, as opposed to retroactive." (ECF No. 31 at Pg ID 2186.)

**\*5** [16] The latter argument convinces this Court that *Ex parte Young* does not apply. As set forth earlier, " '[i]n order to fall with the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law.' " *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (quoting *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013)). Unlike *Russell*, which Plaintiffs cite in their reply brief, this is not a case where a plaintiff is seeking to enjoin the continuing enforcement of a statute that is allegedly unconstitutional. *See id.* at 1044, 1047 (plaintiff claimed that Kentucky law creating a 300-foot no-political-speech buffer zone around polling location violated his free-speech rights). Instead, Plaintiffs are seeking to undo what has already occurred, as their requested relief reflects. [2] (*See* ECF No. 7 at Pg ID 1847; *see also* ECF No. 6 at Pg 955-56.)

Before this lawsuit was filed, the Michigan Board of State Canvassers had already certified the election results and Governor Whitmer had transmitted the State's slate of electors to the United States Archivist. (ECF Nos. 31-4, 31-5.) There is no continuing violation to enjoin. *See Rios v. Blackwell*, 433 F. Supp. 2d 848 (N.D. Ohio, 2006); *see also* *King Lincoln Bronzeville Neighborhood Ass'n v. Husted*, No. 2:06-cv-00745, 2012 WL 395030, at *4-5 (S.D. Ohio Feb. 7, 2012); *cf.* *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (finding that the plaintiff's claims fell within the *Ex parte Young* doctrine where it alleged that the problems that plagued the election "are chronic and will continue absent injunctive relief").

For these reasons, the Court concludes that the Eleventh Amendment bars Plaintiffs' claims against Defendants.

**B. Mootness**

This case represents well the phrase: "this ship has sailed." The time has passed to provide most of the relief Plaintiffs request in their Amended Complaint; the remaining relief is beyond the power of any court. For those reasons, this matter is moot.

[17] [18] " 'Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies.' " *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 595 (6th Cir. 2014) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)). A case may become moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396, 410, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (internal quotation marks and citation omitted). Stated differently, a case is moot where the court lacks "the ability to give meaningful relief[.]" *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019). This lawsuit was moot well before it was filed on November 25.

In their prayer for relief, Plaintiffs ask the Court to: (a) order Defendants to decertify the results of the election; (b) enjoin Secretary Benson and Governor Whitmer from transmitting the certified election results to the Electoral College; (c) order Defendants "to transmit certified election results that state that President Donald Trump is the winner of the election"; (d) impound all voting machines and software in Michigan for expert inspection; (e) order that no votes received or tabulated by machines not certified as required by federal and state law be counted; and, (f) enter a declaratory judgment that mail-in and absentee ballot fraud must be remedied with a manual recount or statistically valid sampling.[3] (ECF No. 6 at Pg ID 955-56, ¶ 233.) What relief the Court could grant Plaintiffs is no longer available.

*6 Before this lawsuit was filed, all 83 counties in Michigan had finished canvassing their results for all elections and reported their results for state office races to the Secretary of State and the Michigan Board of State Canvassers in accordance with Michigan law. *See* Mich. Comp. Laws § 168.843. The State Board had certified the results of the 2020 General Election and Governor Whitmer had submitted the slate of Presidential Electors to the Archivists. (ECF No. 31-4 at Pg ID 2257-58; ECF No. 31-5 at Pg ID 2260-63.) The time for requesting a special election based on mechanical errors or malfunctions in voting machines had expired. *See* Mich. Comp. Laws §§ 168.831, 168.832 (petitions for special

election based on a defect or mechanical malfunction must be filed "no later than 10 days after the date of the election"). And so had the time for requesting a recount for the office of President. *See* Mich. Comp. Laws § 168.879.

[19] The Michigan Election Code sets forth detailed procedures for challenging an election, including deadlines for doing so. Plaintiffs did not avail themselves of the remedies established by the Michigan legislature. The deadline for them to do so has passed. Any avenue for this Court to provide meaningful relief has been foreclosed. As the Eleventh Circuit Court of Appeals recently observed in one of the many other post-election lawsuits brought to specifically overturn the results of the 2020 presidential election:

> "We cannot turn back the clock and create a world in which" the 2020 election results are not certified. *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015). And it is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified.

*Wood v. Raffensperger*, ––– F.3d ––––, 2020 WL 7094866 (11th Cir. Dec. 5, 2020). And as one Justice of the Supreme Court of Pennsylvania advised in another 2020 post-election lawsuit: "there is no basis in law by which the courts may grant Petitioners' request to ignore the results of an election and recommit the choice to the General Assembly to substitute its preferred slate of electors for the one chosen by a majority of Pennsylvania's voters." *Kelly v. Commonwealth*, No. 68 MAP 2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020) (Wecht, J., concurring); *see also Wood v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513, at *13 (N.D. Ga. Nov. 20, 2020) (concluding that "interfer[ing] with the result of an election that has already concluded would be unprecedented and harm the public in countless ways").

In short, Plaintiffs' requested relief concerning the 2020 General Election is moot.

**C. Laches**

Defendants argue that Plaintiffs are unlikely to succeed on the merits because they waited too long to knock on the Court's door. (ECF No. 31 at Pg ID 2175-79; ECF No. 39 at Pg ID 2844.) The Court agrees.

**[20]** **[21]** **[22]** The doctrine of laches is rooted in principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941); *see also* United States v. Clintwood Elkhorn Min. Co., 553 U.S. 1, 9, 128 S.Ct. 1511, 170 L.Ed.2d 392 (2008) ("A constitutional claim can become time-barred just as any other claim can."). An action may be barred by the doctrine of laches if: (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant is prejudiced by this delay. *Brown-Graves Co. v. Central States, Se. and Sw. Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000); *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d 634, 639 n.6 (6th Cir. 2009) ("Laches arises from an extended failure to exercise a right to the detriment of another party."). Courts apply laches in election cases. *Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding that the district court did not err in finding plaintiff's claims regarding deadline for local ballot initiatives "barred by laches, considering the unreasonable delay on the part of [p]laintiffs and the consequent prejudice to [d]efendants"). *Cf.* Benisek v. Lamone, ––– U.S. ––––, 138 S. Ct. 1942, 1944, 201 L.Ed.2d 398 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence. That is as true in election law cases as elsewhere.").

**\*7** First, Plaintiffs showed no diligence in asserting the claims at bar. They filed the instant action on November 25 —more than 21 days after the 2020 General Election—and served it on Defendants some five days later on December 1. (ECF Nos. 1, 21.) If Plaintiffs had legitimate claims regarding whether the treatment of election challengers complied with state law, they could have brought their claims well in advance of or on Election Day—but they did not. Michigan's 83 Boards of County Canvassers finished canvassing by no later than November 17 and, on November 23, both the Michigan Board of State Canvassers and Governor Whitmer certified the election results. Mich. Comp. Laws §§ 168.822, 168.842.0. If Plaintiffs had legitimate claims regarding the manner by which ballots were processed and tabulated on or after Election Day, they could have brought the instant action on Election Day or during the weeks of canvassing that followed—yet they did not. Plaintiffs base their claims related to election machines and software on "expert and fact witness" reports discussing "glitches" and other alleged vulnerabilities that occurred as far back as 2010. (*See e.g.*, ECF No. 6 at Pg ID 927-933, ¶¶ 157(C)-(E), (G), 158, 160, 167.) If Plaintiffs had legitimate concerns about the election machines and software, they could have filed this lawsuit well before the 2020 General Election—yet they sat back and did nothing.

Plaintiffs proffer no persuasive explanation as to why they waited so long to file this suit. Plaintiffs concede that they "would have preferred to file sooner, but [ ] needed some time to gather statements from dozens of fact witnesses, retain and engage expert witnesses, and gather other data supporting their Complaint." (ECF No. 49 at Pg ID 3081.) But according to Plaintiffs themselves, "[m]anipulation of votes was apparent *shortly after the polls closed on November 3, 2020.*" (ECF No. 7 at Pg ID 1837 (emphasis added).) Indeed, where there is no reasonable explanation, there can be no true justification. *See* Crookston v. Johnson, 841 F.3d 396, 398 (6th Cir. 2016) (identifying the "first and most essential" reason to issue a stay of an election-related injunction is plaintiff offering "no reasonable explanation for waiting so long to file this action"). Defendants satisfy the first element of their laches defense.

Second, Plaintiffs' delay prejudices Defendants. *See* Kay v. Austin, 621 F.2d 809, 813 (6th Cir. 1980) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights.") This is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified. The rationale for interposing the doctrine of laches is now at its peak. *See* McDonald v. Cnty. of San Diego, 124 F. App'x 588 (9th Cir. 2005) (citing Soules v. Kauaians for Nukolii Campaign Comm., 849 F.2d 1176, 1180 (9th Cir. 1988)); Soules, 849 F.2d at 1180 (quoting Hendon v. N.C. State Bd. of Elections, 710 F.2d 177, 182 (4th Cir. 1983)) (applying doctrine of laches in post-election lawsuit because doing otherwise would, "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action").

**[23]** Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes. The Court concludes that Plaintiffs' delay results in their claims being barred by laches.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## D. Abstention

As outlined in several filings, when the present lawsuit was filed on November 25, 2020, there already were multiple lawsuits pending in Michigan state courts raising the same or similar claims alleged in Plaintiffs' Amended Complaint. (*See, e.g.*, ECF No. 31 at Pg ID 2193-98 (summarizing five state court lawsuits challenging President Trump's defeat in Michigan's November 3, 2020 General Election).) Defendants and the City of Detroit urge the Court to abstain from deciding Plaintiffs' claims in deference to those proceedings under various abstention doctrines. (*Id.* at Pg ID 2191-2203; ECF No. 39 at Pg ID 2840-44.) Defendants rely on the abstention doctrine outlined by the Supreme Court in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The City of Detroit relies on the abstention doctrines outlined in *Colorado River*, as well as those set forth in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500-01, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The City of Detroit maintains that abstention is particularly appropriate when resolving election disputes in light of the autonomy provided to state courts to initially settle such disputes.

**\*8** **[24]** **[25]** The abstention doctrine identified in *Colorado River* permits a federal court to abstain from exercising jurisdiction over a matter in deference to parallel state-court proceedings. *Colorado River*, 424 U.S. at 813, 817, 96 S.Ct. 1236. The exception is found warranted "by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration.' " *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (quoting *Colorado River*, 424 U.S. at 817, 96 S.Ct. 1236). The Sixth Circuit has identified two prerequisites for abstention under this doctrine. *Romine v. Compuserve Corp.*, 160 F.3d 337, 339-40 (6th Cir. 1998).

**[26]** **[27]** First, the court must determine that the concurrent state and federal actions are parallel. *Id.* at 339. Second, the court must consider the factors outlined by the Supreme Court in *Colorado River* and subsequent cases:

(1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; ... (4) the order in which jurisdiction was obtained; ... (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Romine*, 160 F.3d at 340-41 (internal citations omitted). "These factors, however, do not comprise a mechanical checklist. Rather, they require 'a careful balancing of the important factors as they apply in a give[n] case' depending on the particular facts at hand." *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

**[28]** As summarized in Defendants' response brief and reflected in their exhibits (*see* ECF No. 31 at Pg ID 2193-97; *see also* ECF Nos. 31-7, 31-9, 31-11, 31-12, 31-14), the allegations and claims in the state court proceedings and the pending matter are, at the very least, substantially similar, *Romine*, 160 F.3d at 340 ("Exact parallelism is not required; it is enough if the two proceedings are substantially similar." (internal quotation marks and citation omitted)). A careful balancing of the factors set forth by the Supreme Court counsel in favor of deferring to the concurrent jurisdiction of the state courts.

The first and second factor weigh against abstention. *Id.* (indicating that the weight is against abstention where no property is at issue and neither forum is more or less convenient). While the Supreme Court has stated that " 'the presence of federal law issues must always be a major consideration weighing against surrender of federal jurisdiction in deference to state proceedings[,]' " *id.* at 342 (quoting *Moses H. Cone*, 460 U.S. at 26, 103

S.Ct. 927), this " 'factor has less significance where the federal courts' jurisdiction to enforce the statutory rights in question is concurrent with that of the state courts.' " [4] *Id.* (quoting *Moses H. Cone,* 460 U.S. at 25, 103 S.Ct. 927). Moreover, the Michigan Election Code seems to dominate even Plaintiffs' federal claims. Further, the remaining factors favor abstention.

[29] "Piecemeal litigation occurs when different courts adjudicate the identical issue, thereby duplicating judicial effort and potentially rendering conflicting results." *Id.* at 341. The parallel proceedings are premised on similar factual allegations and many of the same federal and state claims. The state court proceedings were filed well before the present matter and at least three of those matters are far more advanced than this case. Lastly, as Congress conferred concurrent jurisdiction on state courts to adjudicate § 1983 claims, *Felder v. Casey,* 487 U.S. 131, 139, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), "[t]here can be no legitimate contention that the [Michigan] state courts are incapable of safeguarding [the rights protected under this statute]," *Romine,* 160 F.3d at 342.

***9** For these reasons, abstention is appropriate under the *Colorado River* doctrine. The Court finds it unnecessary to decide whether abstention is appropriate under other doctrines.

**E. Standing**

[30] [31] [32] Under Article III of the United States Constitution, federal courts can resolve only "cases" and "controversies." U.S. Const. art. III § 2. The case-or-controversy requirement is satisfied only where a plaintiff has standing to bring suit. *See Spokeo, Inc. v. Robins,* ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016), *as revised* (May 24, 2016). Each plaintiff must demonstrate standing for each claim he seeks to press. [5] *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (citation omitted) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). To establish standing, a plaintiff must show that: (1) he has suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly ... trace[able] to the challenged action of

the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-62, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted).

**1. Equal Protection Claim**

Plaintiffs allege that Defendants engaged in "several schemes" to, among other things, "destroy," "discard," and "switch" votes for President Trump, thereby "devalu[ing] Republican votes" and "diluting" the influence of their individual votes. (ECF No. 49 at Pg ID 3079.) Plaintiffs contend that "the vote dilution resulting from this systemic and illegal conduct did not affect all Michigan voters equally; it had the intent and effect of inflating the number of votes for Democratic candidates and reducing the number of votes for President Trump and Republican candidates." (ECF No. 49 at Pg ID 3079.) Even assuming that Plaintiffs establish injury-in-fact and causation under this theory, [6] their constitutional claim cannot stand because Plaintiffs fall flat when attempting to clear the hurdle of redressability.

[33] [34] Plaintiffs fail to establish that the alleged injury of vote-dilution can be redressed by a favorable decision from this Court. Plaintiffs ask this Court to de-certify the results of the 2020 General Election in Michigan. But an order de-certifying the votes of approximately 2.8 million people would not reverse the dilution of Plaintiffs' vote. To be sure, standing is not "dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford,* ––– U.S. ––––, 138 S. Ct. 1916, 1934, 201 L.Ed.2d 313 (2018) (citing *Cuno,* 547 U.S. at 353, 126 S.Ct. 1854); *Cuno,* 547 U.S. at 353, 126 S.Ct. 1854 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). (quoting *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). Plaintiffs' alleged injury does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote. Accordingly, Plaintiffs have failed to show that their injury can be redressed by the relief they seek and thus possess no standing to pursue their equal protection claim.

### 2. Elections Clause & Electors Clause Claims

**\*10** **[35]** The provision of the United States Constitution known as the Elections Clause states in part: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]" U.S. Const. art. I, § 4, cl. 1. "The Elections Clause effectively gives state governments the 'default' authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S. Ct. 464, 139 L.Ed.2d 369 (1997), with Congress retaining 'exclusive control' to 'make or alter' any state's regulations, *Colegrove v. Green*, 328 U.S. 549, 554, 66 S. Ct. 1198, 90 L.Ed. 1432 (1946)." *Bognet*, 980 F.3d at ——, 2020 WL 6686120, \*1. The "Electors Clause" of the Constitution states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors ...." U.S. Const. art. II, § 1, cl. 2.

Plaintiffs argue that, as "nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan, they have standing to allege violations of the Elections Clause and Electors Clause because "a vote for President Trump and Vice-President Pence in Michigan ... is a vote for each Republican elector[ ], and ... illegal conduct aimed at harming candidates for President similarly injures Presidential Electors." (ECF No. 7 at Pg ID 1837-38; ECF No. 49 at Pg ID 3076-78.)

**[36]** But where, as here, the only injury Plaintiffs have alleged is that the Elections Clause has not been followed, the United States Supreme Court has made clear that "[the] injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance."[7] *Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007). Because Plaintiffs "assert no particularized stake in the litigation," Plaintiffs fail to establish injury-in-fact and thus standing to bring their Elections Clause and Electors Clause claims. *Id.*; *see also Johnson v. Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009) (citing *Lance*, 549 U.S. at 441-42, 127 S.Ct. 1194) (affirming district court's conclusion that citizens did not allege injury-in-fact to support standing for claim that the state of Tennessee violated constitutional law).

This is so because the Elections Clause grants rights to "the Legislature" of "each State." U.S. Const. art. I, § 4, cl. 1. The Supreme Court interprets the words "the Legislature," as used in that clause, to mean the lawmaking bodies of a state. *Ariz. State Legislature*, 135 S.Ct. at 2673. The Elections Clause, therefore, grants rights to state legislatures and to other entities to which a State may delegate lawmaking authority. *See id.* at 2668. Plaintiffs' Elections Clause claims thus belong, if to anyone, Michigan's state legislature. *Bognet v. Secy. Commonwealth of Pa.*, 980 F.3d 336, ——, 2020 WL 6686120, \*7 (3d Cir. 2020). Plaintiffs here are six presidential elector nominees; they are not a part of Michigan's lawmaking bodies nor do they have a relationship to them.

**\*11** To support their contention that they have standing, Plaintiffs point to *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), a decision finding that electors had standing to bring challenges under the Electors Clause. (ECF No. 7 at Pg ID 1839 (citing *Carson*, 978 F.3d at 1057).) In that case, which was based on the specific content and contours of Minnesota state law, the Eighth Circuit Court of Appeals concluded that because "the plain text of Minnesota law treats prospective electors as candidates," it too would treat presidential elector nominees as candidates. *Carson*, 978 F.3d at 1057. This Court, however, is as unconvinced about the majority's holding in *Carson* as the dissent:

> I am not convinced the Electors have Article III standing to assert claims under the Electors Clause. Although Minnesota law at times refers to them as "candidates," *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. *Id.* § 208.04 subdiv. 1 ("[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors."). They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.

978 F.3d at 1063 (Kelly, J., dissenting).[8]

Plaintiffs contend that the Michigan Election Code and relevant Minnesota law are similar. (See ECF No. 49 at Pg

ID 3076-78.) Even if the Court were to agree, it finds that Plaintiffs lack standing to sue under the Elections and Electors Clauses.

### F. The Merits of the Request for Injunctive Relief

#### 1. Likelihood of Success on the Merits

The Court may deny Plaintiffs' motion for injunctive relief for the reasons discussed above. Nevertheless, the Court will proceed to analyze the merits of their claims.

#### a. Violation of the Elections & Electors Clauses

Plaintiffs allege that Defendants violated the Elections Clause and Electors Clause by deviating from the requirements of the Michigan Election Code. (*See, e.g.*, ECF No. 6 at Pg ID 884-85, ¶¶ 36-40, 177-81, 937-38.) Even assuming Defendants did not follow the Michigan Election Code, Plaintiffs do not explain how or why such violations of state election procedures automatically amount to violations of the clauses. In other words, it appears that Plaintiffs' claims are in fact state law claims disguised as federal claims.

A review of Supreme Court cases interpreting these clauses supports this conclusion. In *Cook v. Gralike*, the Supreme Court struck down a Missouri law that required election officials to print warnings on the ballot next to the name of any congressional candidate who refused to support term limits after concluding that such a statute constituted a " 'regulation' of congressional elections," as used in the Elections Clause. 531 U.S. 510, 525-26, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001) (quoting U.S. Const. art. I, § 4, cl. 1). In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the Supreme Court upheld an Arizona law that transferred redistricting power from the state legislature to an independent commission after concluding that "the Legislature," as used in the Elections Clause, includes any official body with authority to make laws for the state. 576 U.S. 787, 824, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015). In each of these cases, federal courts measured enacted state election laws against the federal mandates established in the clauses—they did not measure *violations* of enacted state elections law against those federal mandates.

*\*12* [37] By asking the Court to find that they have made out claims under the clauses due to alleged violations of the Michigan Election Code, Plaintiffs ask the Court to find that any alleged deviation from state election law amounts to a modification of state election law and opens the door to federal review. Plaintiffs cite to no case—and this Court found none—supporting such an expansive approach.

#### b. Violation of the Equal Protection Clause

[38] [39] Most election laws will "impose some burden upon individual voters." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). But "[o]ur Constitution leaves no room for classification of people in a way that unnecessarily abridges this right [to vote]." *Reynolds v. Sims*, 377 U.S. 533, 559, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17-18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)). Voting rights can be impermissibly burdened "by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* (quoting *Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362).

Plaintiffs attempt to establish an Equal Protection claim based on the theory that Defendants engaged in "several schemes" to, among other things, "destroy," "discard," and "switch" votes for President Trump, thereby "devalu[ing] Republican votes" and "diluting" the influence of their individual votes. (ECF No. 49 at Pg ID 3079.)

[40] [41] But, to be perfectly clear, Plaintiffs' equal protection claim is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden. For example, the closest Plaintiffs get to alleging that physical ballots were altered in such a way is the following statement in an election challenger's sworn affidavit: "I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." [9] (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-1010).) But of course, "[a] belief is not evidence" and falls far short of what is required to obtain any relief, much less the extraordinary relief Plaintiffs request. *United States v. O'Connor*, 1997 WL 413594, at *1 (7th Cir. 1997); *see Brown v. City of Franklin*, 430 F. App'x 382, 387 (6th Cir. 2011) ("Brown just submits his belief that Fox's 'protection'

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  15

statement actually meant "protection from retaliation.... An unsubstantiated belief is not evidence of pretext."); *Booker v. City of St. Louis*, 309 F.3d 464, 467 (8th Cir. 2002) ("Booker's "belief" that he was singled out for testing is not evidence that he was."). [10] The closest Plaintiffs get to alleging that election machines and software changed votes for President Trump to Vice President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible*. (*See e.g.*, ECF No. 6 at ¶¶ 7-11, 17, 125, 129, 138-43, 147-48, 155-58, 160-63, 167, 171.) And Plaintiffs do not at all explain how the question of whether the treatment of election challengers complied with state law bears on the validity of votes, or otherwise establishes an equal protection claim.

**\*13** With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails. [11] *See Wood*, --- F.3d ----, 2020 WL 7094866 (quoting *Bognet*, 980 F.3d at ----, 2020 WL 6686120, at *12) (" '[N]o single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.' ").

### 2. Irreparable Harm & Harm to Others

Because "a finding that there is simply no likelihood of success on the merits is usually fatal[,]" *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)), the Court will not discuss the remaining preliminary injunction factors extensively.

As discussed, Plaintiffs fail to show that a favorable decision from the Court would redress their alleged injury. Moreover, granting Plaintiffs' injunctive relief would greatly harm the public interest. As Defendants aptly describe, Plaintiffs' requested injunction would "upend the statutory process for election certification and the selection of Presidential Electors. Moreover, it w[ould] disenfranchise millions of Michigan voters in favor [of] the preferences of a handful of people who [are] disappointed with the official results." (ECF No. 31 at Pg ID 2227.)

In short, none of the remaining factors weigh in favor of granting Plaintiffs' request for an injunction.

### IV. Conclusion

For these reasons, the Court finds that Plaintiffs are far from likely to succeed in this matter. In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government. Plaintiffs ask this Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters. This, the Court cannot, and will not, do.

The People have spoken.

The Court, therefore, **DENIES** Plaintiffs' "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief" (ECF No. 7.)

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2020 WL 7134198

## Footnotes

1    " '[W]here material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.' " *Nexus Gas Transmission, LLC v. City of Green, Ohio*, 757 Fed. Appx. 489, 496-97 (6th Cir. 2018) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007)) (citation omitted).

2    To the extent Plaintiffs ask the Court to certify the results in favor of President Donald J. Trump, such relief is beyond its powers.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

3   Plaintiffs also seek an order requiring the impoundment of all voting machines and software in Michigan for expert inspection and the production of security camera footage from the TCF Center for November 3 and 4. (ECF No. 6 at Pg ID 956, ¶ 233.) This requested relief is not meaningful, however, where the remaining requests are no longer available. In other words, the evidence Plaintiffs seek to gather by inspecting voting machines and software and security camera footage only would be useful if an avenue remained open for them to challenge the election results.

4   State courts have concurrent jurisdiction over § 1983 actions. *Felder v. Casey*, 487 U.S. 131, 139, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988).

5   Plaintiffs assert a due process claim in their Amended Complaint and twice state in their motion for injunctive relief that Defendants violated their due process rights. (*See* ECF No. 7 at Pg ID 1840, 1844.) Plaintiffs do not pair either statement with anything the Court could construe as a developed argument. (*Id.*) The Court finds it unnecessary, therefore, to further discuss the due process claim. *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

6   To be clear, the Court does not find that Plaintiffs satisfy the first two elements of the standing inquiry.

7   Although separate constitutional provisions, the Electors Clause and Elections Clause share "considerable similarity," *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, 135 S.Ct. 2652, 192 L.Ed.2d 704, (2015) (Roberts, C.J., dissenting), and Plaintiffs do not at all distinguish the two clauses in their motion for injunctive relief or reply brief (ECF No. 7; ECF No. 49 at Pg ID 3076-78). *See also Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d at ——, 2020 WL 6686120, at *7 (3d Cir. 2020) (applying same test for standing under both Elections Clause and Electors Clause); *Wood*, 2020 WL 6817513, at *1 (same); *Foster*, 522 U.S. at 69, 118 S.Ct. 464 (characterizing Electors Clause as Elections Clauses' "counterpart for the Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (noting that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause).

8   In addition, at least one Circuit Court, the Third Circuit Court of Appeals, has distinguished *Carson*'s holding, noting:

> Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* [*v. U.S.*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011) ] to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots.... The *Carson* court appears to have cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.

> *Bognet*, 980 F.3d at —— n.6, 2020 WL 6686120, at *8 n.6.

9   Plaintiffs allege in several portions of the Amended Complaint that election officials improperly tallied, counted, or marked ballots. But some of these allegations equivocate with words such as "believe" and "may" and none of these allegations identify which presidential candidate the ballots were allegedly altered to favor. (*See, e.g.*, ECF No. 6 at Pg ID 902, ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-10 ("I *believe* some of these ballots *may* not have been properly counted.") (emphasis added))); Pg ID 902-03, ¶ 92 (citing Tyson Aff. ¶ 17) ("At least one challenger observed poll workers adding marks to a ballot where there was no mark for any candidate.").

10  As stated by the Circuit Court for the District of Columbia Circuit:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The statement is that the complainant believes and expects to prove some things. Now his belief and expectation may be in good faith; but it has been repeatedly held that suspicion is not proof; and it is equally true that belief and expectation to prove cannot be accepted as a substitute for fact. The complainant carefully refrains from stating that he has any information upon which to found his belief or to justify his expectation; and evidently he has no such information. But belief, without an allegation of fact either upon personal knowledge or upon information reasonably sufficient upon which to base the belief, cannot justify the extraordinary remedy of injunction.

*Magruder v. Schley*, 18 App. D.C. 288, 292, 1901 WL 19131, at *2 (D.C. Cir. 1901).

11    "[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop

the illegal activity. That is not how the Equal Protection Clause works." *Bognet*, 980 F.3d at ——, 2020 WL 6686120, at *11.

---

End of Document                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.