# APPENDIX A

Unreported Opinions

# Unreported Opinion 1

*Strader v. U.S. Bank*, Case No. 2-19-cv-118-NR, 2020 WL 3447776 (W.D. Pa. Jun. 24, 2020) (Ranjan, J. op.)

KeyCite Blue Flag – Appeal Notification

Appeal Filed by    VANCE STRADER v. US BANK, ET AL.,    3rd Cir.,    July 28, 2020

2020 WL 3447776
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Vance STRADER, Plaintiff,
v.
U.S. BANK, et al., Defendants.

No. 2:19-cv-118-NR
|
Filed 06/24/2020

**Attorneys and Law Firms**

Vance Strader, Pittsburgh, PA, pro se.

William Sandelands, Sandelands Law LLC, Chester, NJ, for Defendants Nationstar Mortgage, Mr. Cooper, Fay Janati, CEO of Nationstar Mortgage, CFO of Nationstar Mortgage.

Bethann R. Lloyd, Weinheimer Haber & Coco, P.C., Pittsburgh, PA, for Defendants Sandelands and Eyet LLP, Matthew Eyet, Alina H. Eyet, William C. Sandelands.

Caroline Liebenguth, Administrative Office of Pennsylvania Courts, Pittsburgh, PA, for Defendant Joseph James.

Lee M. Dellecker, Allegheny County Law Department, Pittsburgh, PA, for Defendant Allegheny County.

Lisa G. Michel, Allegheny County Sheriff's Office, Pittsburgh, PA, for Defendant William Mullen.

Kristen D. Little, Shapiro & DeNardo, LLC, King of Prussia, PA, for Defendants David Kreisman, Gerald Shapiro, Kathleen Wolf, Shapiro & DeNardo.

## MEMORANDUM OPINION & ORDER

J. Nicholas Ranjan, United States District Judge

**\*1** On May 10, 2019, *pro se* Plaintiff Vance Strader filed this lawsuit against over a dozen Defendants. [ECF 9]. He amended his complaint on November 12, 2019, filing a 77-page complaint against the previous Defendants, as well as several others. [ECF 18]. Since then, all Defendants who have been served or waived service have filed motions to dismiss the claims against them. With the motions now fully briefed, and after careful consideration of the parties' arguments and the allegations in the operative complaint, the Court finds that Mr. Strader has failed to state a cause of action against any of the Defendants. For the reasons below, the Court will grant all Defendants' motions to dismiss and dismiss this case with prejudice.

## BACKGROUND

This is Mr. Strader's second federal lawsuit relating to the same mortgage-foreclosure proceeding. In 2017, Mr. Strader sued many of the same Defendants at Case No. 17-cv-684, alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), constitutional violations, and state-law causes of action. All of his claims relate to events surrounding the foreclosure on a house located in Penn Hills owned by Mr. Strader's deceased mother. The foreclosure action was initiated by the trustee for the trust that owned a mortgage issued to Mr. Strader's mother (U.S. Bank) and the mortgage loan servicer (Nationstar). Some of Mr. Strader's claims in the 2017 case have survived motions to dismiss and proceeded through discovery. That case is at the summary-judgment briefing stage.

Here, as in the 2017 case, Mr. Strader challenges events in the underlying mortgage-foreclosure proceeding. While the 2017 case centers on events from 2016, this case concerns events that occurred in the Fall of 2018, when certain Defendants obtained summary judgment in state court on the same underlying mortgage-foreclosure action. [ECF 18, ¶32].

The thrust of Mr. Strader's amended complaint is that actions taken by the various Defendants in furtherance of the mortgage-foreclosure action—including U.S. Bank, Nationstar, the law firm Defendants (as advocates for U.S. Bank and Nationstar), Judge Joseph James (as the judicial decision-maker), Allegheny County (as Judge James's "employer"), and the Allegheny County Sheriff, William Mullen, and his office (as courtroom security)—violated the FDCPA and other laws. [ECF 18, ¶¶ 32-53]. Generally, Mr. Strader alleges that Defendants were collectively out to steal his deceased mother's house: "This is a scam that is fleecing people/voters out of their houses, by debt collectors and corrupt public officials for profit." [ECF 18, ¶ 71].

Specifically, Mr. Strader complains about events that took place in the context of U.S. Bank and Nationstar's summary-judgment motion, filed in the Fall of 2018. [ECF 18, ¶ 32, ¶ 153]. On December 11, 2018, Judge James held oral argument on the motion and invited an attorney at Defendant Sandelands Eyet, LLP, to argue on behalf of U.S. Bank/Nationstar. [ECF 18, ¶¶ 37-40]. Judge James allowed evidence to be introduced, including asking Mr. Strader questions about financial matters. [ECF 18, ¶¶ 40-42]. Mr. Strader alleges that Judge James overstepped his role and essentially tried the case for U.S. Bank/Nationstar. [ECF 18, ¶ 46].

 **\*2** Mr. Strader further accuses Judge James of not allowing him to make his record at the argument and of cutting him off. [ECF 18, ¶¶ 61-67]. He also complains about various evidentiary rulings and argues that Judge James should have recused himself. [ECF 18, ¶ 66, ¶¶ 94-95]. According to Mr. Strader, the result of this conduct was a denial of due process, culminating in the grant of summary judgment to U.S. Bank/Nationstar. [ECF 18, ¶¶ 43-45].

Further, Mr. Strader alleges that, during the argument, he felt intimidated by the presence of a deputy sheriff in the courtroom, as he had a gun. Mr. Strader claims that the deputy sheriff stood ready to shoot him for making arguments to the court. [ECF 18, ¶ 38, ¶¶ 50-51].

Notwithstanding the state court granting summary judgment against him, Mr. Strader continues to dispute the debt, stating that the underlying promissory note is "bogus" and that he will not pay the debt. [ECF 18, ¶ 53, ¶ 128]. Following summary judgment, the house was posted for sale. [ECF 18, ¶ 122, ¶ 149]. In March 2019, Mr. Strader's attempts to seek reconsideration and appeal in the state courts failed. [ECF 41-4].

In this lawsuit, Mr. Strader pleads the following specific causes of action against all Defendants: (1) violation of the FDCPA; (2) violation of 🔖 42 U.S.C. § 1983 and 🔖 § 1985; and (3) violation of the Racketeer Influenced Corruption Organizations Act ("RICO"). He seeks, in part, $5 million in punitive and actual damages, $5 million in statutory damages, and injunctive relief in the form of stopping the sale of the house and returning it to him. [ECF 18, "Wherefore" clause].

Defendants here can be grouped into three main categories: (1) the mortgage-related Defendants (Nationstar Mortgage LLC d/b/a Mr. Cooper, Fay Janati, and U.S. Bank); (2) the law-firm Defendants (Shapiro & DeNardo, LLC, Gerald Shapiro, David Kreisman, Katherine Wolf, Sandelands Eyet, LLP, Matthew Eyet, Alina Eyet, and William Sandelands); and (3) the state-actor Defendants (Judge Joseph James, Allegheny County, and Sheriff William Mullen and his office). Each of these groups of Defendants have filed motions to dismiss [ECF 25; ECF 29; ECF 36; ECF 40; ECF 58; ECF 63], which are now fully briefed and ready for disposition.

For the reasons that follow, none of Mr. Strader's causes of action state a proper claim against the various Defendants, and granting him leave to amend his complaint would be both inequitable and futile. Therefore, the amended complaint will be dismissed with prejudice.

## DISCUSSION & ANALYSIS

The Court applies the familiar standard of Rule 12(b)(6), and accepts all of the allegations in the amended complaint as true. After careful consideration of each and every allegation in the amended complaint, and construing all factual averments and reasonable inferences in Mr. Strader's favor, the Court finds that the amended complaint fails to state a claim, for at least the following ***seven*** reasons:

***First,*** the amended complaint is barred, at least in part, by the *Rooker-Feldman* doctrine. That doctrine provides that federal courts lack jurisdiction to review state-court judgments where the relief sought is in the nature of appellate review. *See* 🔖 *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983);* 🔖 *Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923).* The *Rooker-Feldman* doctrine deprives federal courts of subject-matter jurisdiction when: "(1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court's judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." 🔖 *Great W. Mining & Mineral Co. v. Fox Rothschild LLP,* 615 F.3d 159, 166 (3d Cir. 2010) (cleaned up).

 **\*3** Here, those elements are met because: (1) Mr. Strader lost the mortgage-foreclosure proceedings in state court; (2) he is complaining of injuries caused by the summary-judgment order; (3) that order, and the denial of his appeal, were rendered by March 2019, before this federal suit was filed;

and (4) Mr. Strader is asking this Court, at least as one aspect of the relief he seeks, to reverse that summary-judgment order. Specifically, Mr. Strader is seeking injunctive relief in the form of overturning Judge James's ruling and giving Mr. Strader his mother's house back. This request falls outside of the Court's authority. *See FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996) ("If the relief requested in the federal action ... would void the state court's ruling, then the issues are inextricably intertwined and the district court has no subject matter jurisdiction to hear the suit.") (citation and quotation omitted); *Marran v. Marran*, 376 F.3d 143, 149-50 (3d Cir. 2004). Accordingly, the amended complaint, to the extent that it seeks injunctive relief, should be dismissed pursuant to the *Rooker-Feldman* doctrine.

**Second,** Mr. Strader's case impermissibly splits causes of action. The claim-splitting doctrine prohibits plaintiffs from "maintain[ing] two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977) (citations omitted). "The longstanding rule against improper claim splitting prohibits a plaintiff from prosecuting his case piecemeal and requires that all claims arising out of a single alleged wrong be presented in one action." *Prewitt v. Walgreens Co.*, No. 12-6967, 2013 WL 6284166, at *5 (E.D. Pa. Dec. 2, 2013) (citations omitted). The claim-splitting doctrine in this Circuit "applies when two cases: (1) take place in the same court; (2) with the same defendants; (3) involving the same subject matter." *McKenna v. City of Phila.*, 304 F. App'x 89, 92 (3d Cir. 2008).

Mr. Strader's 2017 and 2019 cases are both before this Court and involve many of the same Defendants. At issue is only whether the subject matter is "the same." The Court finds that it is. The cases need not be identical to involve the same subject matter. *McKenna*, 304 F. App'x at 92. When the difference between the two cases is "purely semantic" and both cases rely on "the same operative facts and legal principles," the cases involve the same subject matter. *Id.* Mr. Strader's second lawsuit alleges the same type of FDCPA violation as before and is based upon the very same mortgage-foreclosure proceedings. Mr. Strader is impermissibly taking a second bite at the apple with his claims in this case. While the claim-splitting doctrine precludes all of the claims in this case, the most significant overlap between the 2017 and 2019

cases concerns the FDCPA claims. The FDCPA claims here are clearly duplicative of the ones in the 2017 case; Mr. Strader cannot effectively amend his 2017 case (which is at the summary-judgment stage) by bringing his FDCPA claims in this case. Thus, at a minimum, the FDCPA claims must be dismissed in this case on the basis of improper claim splitting.

**Third,** the claims against Judge James are barred by the doctrine of absolute judicial immunity, which provides that a judge is immune from liability for all acts taken in his or her judicial capacity. *Stump v. Sparkman*, 435 U.S. 349, 356 (1978); *see also Azubuko v. Royal*, 443 F.3d 302, 303 (3d Cir. 2006) ("A judicial officer in the performance of his duties has absolute immunity from suit and will not be liable for his judicial acts."). A judge "will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority[.]" *Stump*, 435 U.S. at 356. Immunity is not affected by a judge's motives in performing judicial acts, and will exist even if a judge's actions are unfair or controversial. *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 769 (3d Cir. 2000).

**\*4** Mr. Strader alleges that Judge James granted summary judgment against him, despite various protestations that it was improper. He alleges that Judge James cut him off at the oral argument and did not recuse himself when he should have. However, as a judge for the Court of Common Pleas of Allegheny County, Judge James was well within his jurisdiction to rule upon a motion for summary judgment in a mortgage-foreclosure matter and to conduct the oral argument proceedings in a manner that he deemed appropriate. *See 42 Pa. C. S. § 931(a)* ("the courts of common pleas shall have unlimited original jurisdiction of all actions and proceedings, including all actions and proceedings heretofore cognizable by law or usage in the courts of common pleas."). Judge James was acting in his judicial capacity when he heard and ruled upon the summary-judgment motion (which is the totality of the conduct alleged against him), and so all claims against him are barred.

**Fourth,** Mr. Strader fails to plead a claim under 42 U.S.C. § 1983 against any of the Defendants. To state a viable Section 1983 claim, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

In this case, Mr. Strader can't maintain a Section 1983 claim against any of the non-state actor Defendants, such as Sandelands & Eyet, LLC, Matthew Eyet, Alina Eyet, William Sandelands, Shapiro & DeNardo, LLC, Gerald Shapiro, David Kreisman, Katherine Wolf, U.S. Bank, Nationstar, and Fay Janati. This is because a civil-rights claim under Section 1983 requires a state action. Such a claim is not viable against a private individual or entity, even if the private party invoked state procedures. *See Brobst v. Brobst*, No. 16-4051, 2019 WL 1382513, at \*3-4 (E.D. Pa. Mar. 27, 2019).

Further, with respect to the remaining state actors (Allegheny County and Sheriff Mullen and his office), the Section 1983 claim fails because Mr. Strader fails to allege sufficient facts to state a plausible claim.

To maintain a Section 1983 claim against a municipal entity, such as Allegheny County or the Sheriff's Office, a plaintiff "must demonstrate that the violation of his rights was caused by either a policy or a custom of the municipality." *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (citation omitted). While Mr. Strader identifies a number of concerns he has regarding the handling of his mortgage-foreclosure proceedings, and argues that these amount to a deprivation of his constitutional right to due process, he does not adequately identify a cognizable policy or custom of Allegheny County or the Sheriff's Office that may have led to this alleged violation of his constitutional rights. *See Pondexter v. Allegheny Cty.*, No. 11-857, 2012 WL 628494, at \*6 (W.D. Pa. Feb. 27, 2012) (Fischer, J.) ("In the case at bar, Plaintiff has not identified any policy or custom attributable to Allegheny County.... Plaintiff has also not set forth any evidence of incidents that have occurred in the past to prove some pattern of conduct that could establish a discriminatory custom or policy of Allegheny County directed at him. Thus, Plaintiff has failed to allege facts that could prove an essential element of his case under 42 U.S.C. § 1983. As his allegations are insufficient to state a claim upon which relief may be granted against Allegheny County, Plaintiff's Complaint against Allegheny County must be dismissed, with prejudice.") (cleaned up).

Further, any claim against Sheriff Mullen himself fails because supervisory "liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v.*

*Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998); *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (same). Instead, there must be some affirmative conduct by the supervisor that contributed to the alleged constitutional violation. *Id.* Here, the only allegations regarding Sheriff Mullen are that he employed deputy sheriffs who posted service of a handbill on the property and appeared as courtroom security at the summary-judgment argument. The complaint fails to identify any affirmative conduct by Sheriff Mullen himself. As such, there is no basis to hold him liable here. [1]

**\*5** Accordingly, Mr. Strader has failed to plead a plausible Section 1983 claim against any Defendant in this action.

*Fifth*, Mr. Strader fails to plead a claim of conspiracy under 42 U.S.C. § 1985. Section 1985 makes it unlawful for "two or more persons in any State or Territory [to] conspire" to (1) prevent officers from performing duties; (2) obstruct justice or intimidate a party, witness, or juror; or (3) deprive a person of the equal protection of the laws. 42 U.S.C. § 1985(1)-(3). While Mr. Strader does not identify the specific provision of Section 1985 under which he is suing, Section 1985(1) is inapplicable because it relates only to conspiracies to interfere with duties of federal officers, and Section 1985(2) is inapplicable because it relates to the intimidation of witnesses in a federal court action. *See Baron v. Carson*, 410 F. Supp. 299, 300-01 (N.D. Ill. 1976); *Rode*, 845 F.2d at 1206-07.

That leaves only 42 U.S.C. § 1985(3). To succeed under Section 1985(3), a "plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Rashid v. Pub. Sav. Ass'n, Inc.*, 97 B.R. 187, 190 n.6 (E.D. Pa. 1989) (citation and quotation omitted). Additionally, a well-established requirement of a Section 1985(3) claim is that there must be "some racial, or perhaps otherwise class-based, invidiously discriminatory

animus behind the conspirators' action." *Id.* (citation and quotation omitted).

The complaint fails to establish any of these elements. There are no plausible factual allegations evincing a conspiracy of any kind, let alone one designed to deny Mr. Strader equal protection of law, or any privileges and immunities under the law. Beyond that, there are no facts pled to indicate that the foreclosure proceedings were instituted for any reason other than the fact that the mortgage payments were not being met. With respect to the events at oral argument in the state proceeding, Mr. Strader has not alleged facts to suggest that anyone involved in those proceedings discriminated against him based on race or, for that matter, any other protected classification. Thus, the Section 1985 conspiracy claim fails.

**Sixth,** Mr. Strader's RICO claim fails for failure to plead any of its essential elements. The RICO statute authorizes civil suits by any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962, which renders unlawful various transactions and other dealings resulting from racketeering activity. *See* 18 U.S.C. § 1964(c). "Racketeering Activity" is defined to include numerous criminal acts such as murder, kidnapping, arson, bribery, mail fraud, interference with commerce, and extortion. *See* 18 U.S.C. § 1961(1).

Here, none of the alleged actions that were taken by any of the Defendants come close to this definition of "racketeering activity." The only alleged conduct that could arguably form the basis for a RICO claim are Mr. Strader's conclusory allegations of mail, wire, and other forms of fraud. *See* 18 U.S.C. § 1961(1). These bare allegations, pled without any factual precision, are insufficient to plead the requisite "racketeering activity" since it is well-settled that where a plaintiff's RICO claim is predicated upon a crime of fraud, the fraud must be pled with particularity. *See* Fed. R. Civ. P. 9(b); *see also Brookhart v. Rohr,* 385 F. App'x. 67, 70 (3d Cir. 2010) ("Conclusory allegations of a pattern of racketeering activity, in this case, a fraudulent scheme, are insufficient to survive a Rule 12(b)(6) motion.") (citation omitted). Because Mr. Strader has not alleged any facts that plausibly and particularly describe mail, wire, or other fraud, let alone tie that fraud to a plausibly pled racketeering scheme, this claim fails at the threshold.

**\*6  Seventh,** Mr. Strader cannot state FDCPA claims against Judge James, Sheriff Mullen and his office, or Allegheny County, as none of them are "debt collectors." The FDCPA, 15 U.S.C. § 1692 *et seq.,* was enacted to curb abuses by debt collectors. *See Zimmerman v. HBO Affiliate Grp.,* 834 F.2d 1163, 1167 (3d Cir. 1987). The term "debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The statute also excludes from this definition any person "serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt[.]" 15 U.S.C. § 1692a(6)(D).

Here, the amended complaint does not allege that Judge James, Sheriff Mullen and his office, or Allegheny County's "principal purpose" in being involved in the foreclosure action was to collect a debt. Rather, Mr. Strader alleges that Judge James was at all times acting in his judicial capacity and that Sheriff Mullen and his office were acting as courtroom security and effecting service of process. Indeed, to the extent the Sheriff's Office was serving legal process, it is specifically excluded from the FDCPA's definition of a "debt collector." *See id.* Finally, there are no specific allegations against Allegheny County. Accordingly, all FDCPA claims against these Defendants fail as a matter of law. [2]

## CONCLUSION

Thus, for at least the seven reasons described above, Mr. Strader's amended complaint must be dismissed in its entirety. Further, this dismissal must be with prejudice—the Third Circuit has stated that "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable *or* futile." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 245 (3d Cir. 2008) (citation omitted) (emphasis added). Here, any further amendment would be both inequitable and futile. Mr. Strader has already had a chance to amend, and he has already raised similar claims against similar defendants in both his pending 2017 federal case and in state court.

Additionally, Mr. Strader has filed numerous documents with this Court, which have set forth, in exhaustive detail, the

purported legal basis for his claims, both in this case and the 2017 case. *See, e.g.,* [ECF 20; ECF 68; ECF 71]; Case No. 17-cv-684, [ECF 70; ECF 72; ECF 86; ECF 87]. From a review of those filings, the Court concludes that further amendment of the complaint would not cure the deficiencies above. *See Adelman v. Jacobs*, No. 18-607, 2019 WL 1651612, at *6 (W.D. Pa. Apr. 17, 2019) (Fischer, J.) ("[T]he Court finds that any further amendment of these claims would be futile given the Court's analysis of the claims set forth above."); *Goldsmith v. Goldsmith*, No. 16-01362, 2017 WL 11471785, at *6 (W.D. Pa. Nov. 22, 2017) (Hornak, J.) ("[T]he Court concludes that in light of the many 'do overs' that Plaintiff has been given, any amendment would be futile."). Accordingly, Mr. Strader's amended complaint will be dismissed with prejudice.

In sum, all of the claims in this case will be dismissed with prejudice. The only potentially viable claims are the FDCPA claims against Defendants Nationstar, Matthew Eyet, Alina Eyet, William Sandelands, and Sandelands Eyet, LLP. But those claims have been improperly split from the pending 2017 case, and so will be dismissed from this case.

## **ORDER**

**\*7** AND NOW, this 24th day of June, 2020, the Court hereby **ORDERS** that Defendants' motions to dismiss [ECF 25; ECF 29; ECF 36; ECF 40; ECF 58; ECF 63] are **GRANTED**. Mr. Strader's amended complaint is **DISMISSED WITH PREJUDICE**. The Clerk of Court shall mark this case as **CLOSED**.

**All Citations**

Slip Copy, 2020 WL 3447776

## Footnotes

1    Even if Sheriff Mullen engaged in affirmative conduct, the claim against him would still fail because there is no underlying constitutional violation. That is, the amended complaint does not allege any specific constitutional violations by Sheriff Mullen's subordinates. The allegations concern deputy sheriffs, who, as noted above, posted service of the handbill and served as courtroom security. As alleged, this conduct does not violate any aspect of the Constitution.

2    The FDCPA claims against all other Defendants are barred due to improper claim-splitting, as discussed above. Those claims will be addressed in the 2017 case.

**WESTLAW**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Unreported Opinion 2

*In Re: Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*, Case No. 29 WAP 2020, --- A.3d ----, 2020 WL 6866415 (Pa. Nov. 23, 2020)



KeyCite Blue Flag – Appeal Notification

Petition for Certiorari Docketed by DONALD J. TRUMP FOR PRESIDENT, INC. v. KATHY BOOCKVAR, SECRETARY OF PENNSYLVANIA, ET AL., U.S., December 23, 2020

2020 WL 6866415
Only the Westlaw citation is currently available.
Supreme Court of Pennsylvania.

IN RE: CANVASS OF ABSENTEE AND
MAIL-IN BALLOTS OF NOVEMBER
3, 2020 GENERAL ELECTION

Appeal of: Donald J. Trump for President, Inc.
In re: Canvass of Absentee and Mail-in
Ballots of November 3, 2020 General Election
Appeal of: Donald J. Trump for President, Inc.
In re: Canvass of Absentee and Mail-in
Ballots of November 3, 2020 General Election
Appeal of: Donald J. Trump for President, Inc.
In re: Canvass of Absentee and Mail-in
Ballots of November 3, 2020 General Election
Appeal of: Donald J. Trump for President, Inc.
In re: Canvass of Absentee and Mail-in
Ballots of November 3, 2020 General Election
Appeal of: Donald J. Trump for President, Inc.
In re: 2,349 Ballots in the 2020 General Election
Appeal of: Allegheny County Board of Elections

No. 31 EAP 2020
|
No. 32 EAP 2020
|
No. 33 EAP 2020
|
No. 34 EAP 2020
|
No. 35 EAP 2020
|
No. 29 WAP 2020
|
Submitted: November 18, 2020
|
Submitted: November 20, 2020
|
Decided: November 23, 2020

**Synopsis**

**Background:** Presidential campaign challenged decision of the county board of elections to count 8,329 absentee and mail-in ballots on grounds that the voters who submitted them failed to handwrite their name, street address or the date (or some combination of the three) on the ballot-return outer envelope. The Court of Common Pleas, Philadelphia County, J-118A-E-2020, James Crumlish, J., upheld the board's decision. Campaign appealed, and the Supreme Court granted the board's application to exercise extraordinary jurisdiction. In separate proceeding, candidate for state senator initiated a statutory appeal from a decision by the county board of elections to canvass and count 2,349 absentee or mail-in ballots for the general election, notwithstanding the lack of a date of signature by the elector on the statutorily required elector declaration on the outside envelope of the ballots. The Court of Common Pleas, Allegheny County, No. GD 20-011654, Joseph M. James, Senior Judge, affirmed.

Candidate appealed, and the Commonwealth Court, No. 1162 CD 2020, 2020 WL 6820816, reversed. Board filed emergency petition for appeal, which was granted, and appeals were consolidated.

**Holdings:** The Supreme Court, Nos. 31-35 EAP 2020 and 29 WAP 2020, Donohue, J., held that:

[1] absentee or mail-in voter's failure to handwrite name and/or address under the full paragraph of the declaration on the back of the outer envelope was not a material violation of statutory directive to "fill out" the declaration, and

[2] Per concurring opinion of Wecht, J., statutory requirement that absentee or mail-in ballot voter date and sign the voter declaration was not a minor irregularity which could be overlooked and thus, in future elections, the omission of either item would be sufficient, without more, to invalidate the ballot in question.

Affirmed; Commonwealth Court reversed.

Wecht, J., concurred in the result and filed concurring and dissenting opinion.

Dougherty, J., concurred in part and dissented in part with opinion in which Saylor, Chief Justice, and Mundy, J., joined.

**Procedural Posture(s):** On Appeal; Petition for Discretionary Review; Judgment.

West Headnotes (20)

**[1]    Statutes    Absence of Ambiguity; Application of Clear or Unambiguous Statute or Language**

Where the language of a statute is unambiguous, the language shall be controlling. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)    1 Pa. Cons. Stat. Ann. § 1921(b).

**[2]    Statutes    Purpose and intent; determination thereof**

In the case of ambiguity in a statute, court looks to ascertain the legislative intent. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[3]    Election Law    Liberal or strict construction**

In election cases, court adheres to the overarching principle that the Election Code should be liberally construed so as to not deprive, inter alia, electors of their right to elect a candidate of their choice. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[4]    Election Law    Liberal or strict construction**

Election laws will be strictly enforced to prevent fraud, but ordinarily will be construed liberally in favor of the right to vote. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[5]    Election Law    Liberal or strict construction**

All statutes tending to limit the citizen in his exercise of the right of suffrage should be liberally construed in his favor. (Per Donohue,

**[6]    Election Law    Construction and Operation**

Where the elective franchise is regulated by statute, the regulation should, when and where possible, be so construed as to insure rather than defeat the exercise of the right of suffrage. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[7]    Election Law    Liberal or strict construction**

Technicalities should not be used to make the right of the voter insecure. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[8]    Election Law    Construction and Operation**

No construction of a statute should be indulged that would disfranchise any voter if the law is reasonably susceptible of any other meaning. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[9]    Appeal and Error    Elections, voting, and political rights**

Supreme Court would review Court of Common Pleas' decision regarding absentee and mail-in ballots to determine whether the findings are supported by competent evidence and to correct any conclusions of law erroneously made. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)    25 Pa. Stat. Ann. §§ 3146.6(a), 3150.16(a).

**[10]    Appeal and Error    Elections, voting, and political rights**

Proper interpretation of the Election Code presents a question of law, and thus the Supreme Court's standard of review is de novo and its scope of review is plenary. (Per Donohue, J.,

with two Justices concurring and four Justices concurring in part.)

**[11]      Election Law ⚷  In General; Right of Suffrage**

It is the longstanding and overriding policy in the Commonwealth to protect the elective franchise. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[12]      Election Law ⚷  Liberal or strict construction**

The Election Code must be liberally construed so as not to deprive the voters of their right to elect a candidate of their choice. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[13]      Election Law ⚷  Ballots**

Under Pennsylvania election law, every rationalization within the realm of common sense should aim at saving the ballot rather than voiding it. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[14]      Election Law ⚷  Construction and Operation**

Imbedded in the Election Code is the General Assembly's intent to protect voter privacy in her candidate choice and to prevent fraud and to otherwise ensure the integrity of the voting process. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)
Pa. Const. art. 7, § 4.

**[15]      Statutes ⚷  Mandatory or directory statutes**

The use of "shall" in a statute is not always indicative of a mandatory directive; in some instances, it is to be interpreted as merely directory. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[16]      Election Law ⚷  Absentee or mail-in ballots**

Absentee or mail-in voter's failure to handwrite name and/or address under the full paragraph of the declaration on the back of the outer envelope was not a material violation of statutory directive to "fill out" the declaration, and therefore county board of elections was not required to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name or address, where no fraud or irregularity was alleged. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.) ▯ 25 Pa. Stat. Ann. §§ 3146.4, ▯ 3150.14(b).

**[17]      Election Law ⚷  Liberal or strict construction**

Where an election statute is ambiguous, courts apply the interpretative principle that election laws ordinarily will be construed liberally in favor of the right to vote. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[18]      Statutes ⚷  Mandatory or directory statutes**

While both mandatory and directory provisions of the Legislature are meant to be followed, the difference between a mandatory and directory provision is the consequence for non-compliance: a failure to strictly adhere to the requirements of a directory statute will not nullify the validity of the action involved. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[19]      Election Law ⚷  Ballots**

Ballots containing mere minor irregularities should only be stricken for compelling reasons. (Per Donohue, J., with two Justices concurring and four Justices concurring in part.)

**[20]      Election Law ⚷  Absentee or mail-in ballots**

Statutory requirement that absentee or mail-in ballot voter date and sign the voter declaration

was not a minor irregularity which could be overlooked and thus, in future elections, the omission of either item would be sufficient, without more, to invalidate the ballot in question

(Per concurring opinion of Wecht, J.). 25 Pa. Stat. Ann. §§ 3146.6(a), 3150.16(a).

Appeal from the Order of the Commonwealth Court entered November 19, 2020 at No. 1162 CD 2020, reversing the Order of the Court of Common Pleas of Allegheny County entered November 18, 2020 at No. GD 20-011654 and remanding.

**Attorneys and Law Firms**

Ronald Lee Hicks Jr., Esq., Porter Wright Morris & Arthur, LLP, Linda Ann Kerns, Esq., Law Offices of Linda A. Kerns, LLC, for Appellant Donald J. Trump for President, Inc. and for Appellee Elken, Elizabeth J.

Adam Craig Bonin, Esq., The Law Office of Adam C. Bonin, for Appellee DNC Services Corp. / Democratic National Committee.

Mark Alan Aronchick, Esq., John Gracie Mackay Coit, Esq., Michele D. Hangley, Esq., Robert Andrew Wiygul, Esq., Hangley Aronchick Segal Pudlin & Schiller, Marcel S. Pratt, Esq., Philadelphia Law Department, for Appellee Philadelphia County Board of Elections.

Benjamin Hirsch Field, Esq., Lydia Maureen Furst, Esq., Craig R. Gottlieb, Esq., Marcel S. Pratt, Esq., Philadelphia Law Department, for Appellees Philadelphia County Board of Elections, Sabir, Omar, Schmidt, Al, Deely, Lisa.

Kathleen Marie Kotula, Esq., Pennsylvania Department of State, for Appellee Bureau of Commissions, Elections and Legislation.

Michael R. McDonald, Esq., Matthew Ian Vahey, Esq., Kahlil Charles Williams, Esq., Ballard Spahr LLP, for Appellee DNC Services Corp. / Democratic National Committee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

**OPINION ANNOUNCING THE JUDGMENT OF THE COURT**

JUSTICE DONOHUE

**\*1** These appeals present the question of whether the Election Code requires a county board of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, their address, and/or a date, where no fraud or irregularity has been alleged. Pursuant to our longstanding jurisprudence, central to the disposition of these appeals is whether the information is made mandatory by the Election Code or whether the inclusion of the information is directory, i.e., a directive from the Legislature that should be followed but the failure to provide the information does not result in invalidation of the ballot.

[1] [2] [3] [4] [5] [6] [7] [8] We are guided by well-established interpretive principles including that where the language of a statute is unambiguous, the language shall be controlling. 1 Pa.C.S. § 1921(b). In the case of ambiguity, we look to ascertain the legislative intent, and in election cases, we adhere to the overarching principle that the Election Code should be liberally construed so as to not deprive, inter alia, electors of their right to elect a candidate of their choice. Pa. Democratic Party v. Boockvar, ––– Pa. ––––, 238 A.3d 345, 356 (2020). Stated more fully:

> Election laws will be strictly enforced to prevent fraud, but ordinarily will be construed liberally in favor of the right to vote. All statutes tending to limit the citizen in his exercise of the right of suffrage should be liberally construed in his favor. Where the elective franchise is regulated by statute, the regulation should, when and where possible, be so construed as to insure rather than defeat the exercise of the right of suffrage. Technicalities should not be used to make the right of the voter insecure. No construction of a statute should be indulged that would disfranchise any voter if the law

is reasonably susceptible of any other meaning.

📑 *Appeal of James*, 377 Pa. 405, 105 A.2d 64, 65-66 (1954).

Guided by these principles and for the reasons discussed at length in this opinion, we conclude that the Election Code does not require boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, their address, and/or date, where no fraud or irregularity has been alleged.

* * *

In connection with five of these consolidated appeals, Petitioner Donald J. Trump for President, Inc. (the "Campaign") challenges the decision of the Philadelphia County Board of Elections (the "Philadelphia Board") to count 8,329 absentee and mail-in ballots. The Campaign does not contest that these ballots were all timely received by the Philadelphia Board prior to 8:00 p.m. on November 3, 2020 (election day); that they were cast and signed by qualified electors; and that there is no evidence of fraud associated with their casting. The Campaign instead contends that these votes should not be counted because the voters who submitted them failed to handwrite their name, street address or the date (or some combination of the three) on the ballot-return outer envelope. The Philadelphia County Court of Common Pleas, per the Honorable James Crumlish, upheld the Philadelphia Board's decision to count the ballots, ruling that the Election Code does not mandate the disqualification of ballots for a failure to include the challenged information, stressing that the inclusion or exclusion of this information does not prevent or promote fraud. The Campaign pursued an appeal to the Commonwealth Court. This Court granted the Philadelphia Board's application to exercise our extraordinary jurisdiction, 42 Pa. C.S. § 726, over these cases then pending in the Commonwealth Court.

**\*2**  At or around the same time that the matters were being litigated in Philadelphia, across the state in Allegheny County, Nicole Ziccarelli, a candidate for the Pennsylvania Senate in the 45th Senatorial District (Allegheny-Westmoreland counties) challenged the November 10, 2020 decision of the Allegheny County Board of Elections (the "Allegheny County Board") to canvass 2,349 mail-in ballots that contained a signed – but undated – declaration. Again, all

of the outer envelopes were signed, they are conceded to be timely and there are no allegations of fraud or illegality. On November 18, 2020, the Court of Common Pleas of Allegheny County, per the Honorable Joseph James, upheld the decision of the Allegheny County Board to count the ballots. *Ziccarelli v. Allegheny County Board of Elections*, No. GD-20-011654 (Allegheny Cty. Ct. Com. Pl.). Ziccarelli filed an appeal to the Commonwealth Court and an application in this Court requesting that we exercise extraordinary jurisdiction over her appeal. During the pendency of the request to this Court, on November 19, 2020, a three-judge panel of the Commonwealth Court, with one judge dissenting, reversed the common pleas court decision.

On November 20, 2020, the Allegheny County Board filed an emergency petition for allowance of appeal, which we granted, limited to whether the ballots contained in undated outer envelopes should be invalidated. We stayed the order of the Commonwealth Court pending the outcome of this appeal and consolidated it with the Philadelphia Board cases.

In these appeals, we are called upon to interpret several provisions of the Election Code. We set them forth at the outset since they guide the resolution of these appeals.

Section 3146.6(a) provides as follows with respect to absentee ballots:

> (a) Except as provided in paragraphs (2) and (3), at any time after receiving an official absentee ballot, but on or before eight o'clock P.M. the day of the primary or election, the elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. **The elector shall then fill out, date and**

sign the declaration printed on such envelope. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

25 P.S. § 3146.6(a) (emphasis added).

Section 3150.16(a) sets forth the procedure for the submission of a mail-in ballot:

(a) General rule.--At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. **The elector shall then fill out, date and sign the declaration printed on such envelope.** Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

25 P.S. § 3150.16(a) (emphasis added).

Sections 3146.4 and 3150.14(b) delegate to the Secretary of the Commonwealth the responsibility to prescribe the form of the elector's declaration on the outer envelope used to mail the absentee and mail-in ballots:

**\*3 § 3146.4. Envelopes for official absentee ballots**

The county boards of election shall provide two additional envelopes for each official absentee ballot of such size and shape as shall be prescribed by the Secretary of the Commonwealth, in order to permit the placing of one within the other and both within the mailing envelope. On the smaller of the two envelopes to be enclosed in the mailing envelope shall be printed, stamped or endorsed the words "Official Election Ballot," and nothing else. **On the larger of the two envelopes, to be enclosed within the mailing envelope, shall be printed the form of the declaration of the elector, and the name and address of the county board of election of the proper county.** The larger envelope shall also contain information indicating the local election district of the absentee voter. **Said form of declaration and envelope shall be as prescribed by the Secretary of the Commonwealth and shall contain among other things a statement of the electors qualifications, together with a statement that such elector has not already voted in such primary or election.** The mailing envelope addressed to the elector shall contain the two envelopes, the official absentee ballot, lists of candidates, when authorized by section 1303 subsection (b) of this act, the uniform instructions in form and substance as prescribed by the Secretary of the Commonwealth and nothing else.

25 P.S. § 3146.4 (emphasis added).

**§ 3150.14. Envelopes for official mail-in ballots**

* * *

(b) Form of declaration and envelope.--**The form of declaration and envelope shall be as prescribed by the Secretary of the Commonwealth and shall contain, among other things, a statement of the elector's qualifications, together with a statement that the elector has not already voted in the primary or election.**

25 P.S. § 3150.14(b) (emphasis added).

The pre-canvassing or canvassing of absentee and mail-in ballots proceed in accordance with the dictates of 25 P.S. § 3146.8(g)(3), as follows:

**§ 3146.8. Canvassing of official absentee ballots and mail-in ballots**

When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots under paragraphs (1), (1.1) and (2), **the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) [a voter who dies before the election] and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote**, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

**\*4** 25 P.S. § 3146.8(g)(3) (emphasis added).

Pursuant to the authority granted in § 3150.14(b), the Secretary of the Commonwealth developed the following declaration used in connection with the 2020 General Election:

I hereby declare that I am qualified to vote from the below stated address at this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

[BAR CODE]

Voter, sign or mark here/Votante firme o marque aqui

X _____

_____
Date of signing (MM/DD/YYYY)/Fechale firme (MM/DD/YYYY)

_____
Voter, print name/Votante, nombre en letra de impreta

_____
Voter, address (street)/Votante, dirreccion (calle)

[LABEL – Voters' name and address]

In addition, the Secretary issued guidance to the county boards of elections with respect to the examination of ballot return envelopes. First, on September 11, 2020, she issued the following guidance:

3. EXAMINATION OF DECLARATION ON BALLOT RETURN ENVELOPES:

The county board of elections is responsible for approving ballots to be counted during pre-canvassing.

To promote consistency across the 67 counties, the county boards of elections should follow the following steps when processing returned absentee and mail-in ballots.

After setting aside ballots of elector's who died prior to the opening of the polls, the county board of elections shall examine the Voter's Declaration on the outer envelope of each returned ballot and compare the information on the outer envelope, i.e., the voter's name and address, with the information contained in the "Registered Absentee and Mail-in Voters File, the absentee voter's list and/or the Military Veterans' and Emergency Civilians Absentee Voters File."

If the Voter's Declaration on the return envelope is blank, that ballot return envelope must be set aside and not counted. If the board determines that a ballot should not be counted, the final ballot disposition should be noted in SURE. The ballot return status (Resp Type) should be noted using the appropriate drop-down selection.

If the Voter's Declaration on the return envelope is signed and the county board is satisfied that the declaration is sufficient, the mail-in or absentee ballot should be approved for canvassing unless challenged in accordance with the Pennsylvania Election Code.

Guidance Concerning Examination of Absentee and Mail-in Ballot Return Envelopes, 9/11/2020, at 3. On September 28, 2020, the Secretary offered additional guidance on the treatment of ballot return envelopes:

With regard to the outer ballot-return envelope:

A ballot-return envelope with a declaration that is filled out, dated, and signed by an elector who was approved to receive an absentee or mail-in ballot is sufficient and counties should continue to pre-canvass and canvass these ballots.

**\*5** A ballot-return envelope with a declaration that is not filled out, dated, and signed is not sufficient and must be set aside, declared void and may not be counted. Ballot-return envelopes must be opened in such a manner as not to destroy the declarations executed thereon.

All ballot-return envelopes containing executed declarations must be retained for a period of two years in accordance with the Election Code.

\* \* \*

**Pre-canvass and Canvass Procedures**

At the pre-canvass or canvass, as the case may be, the county board of elections should:

- Segregate the unopened ballots of voters whose applications were challenged by the challenge deadline (5:00 PM on the Friday before the election).

  o These ballots must be placed in a secure, sealed container until the board of elections holds a formal hearing on the challenged ballots.

  o Ballot applications can only be challenged on the basis that the applicant is not qualified to vote.

- Set aside the ballot of any voter who was deceased before election day.

- Set aside any ballots without a filled out, dated and signed declaration envelope.

- Set aside any ballots without the secrecy envelope and any ballots in a secrecy envelope that include text, mark, or symbol which reveals the identity of the voter, the voter's political affiliation (party), or the voter's candidate preference.

The Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis.

No challenges may be made to mail-in or absentee ballot applications after 5:00 pm on the Friday before the election.

No challenges may be made to mail-in and absentee ballots at any time based on signature analysis.

NOTE: For more information about the examination of return envelopes, please refer to the Department's September 11, 2020 *Guidance Concerning Examination of Absentee and Mail-in Ballot Return Envelopes*.

Guidance Concerning Civilian Absentee and Mail-in Ballot Procedures, 9/28/2020, at 5, 8-9.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to the General Assembly's passage of Act 77 of 2019, voters in Pennsylvania may cast their ballots in elections by absentee or no-excuse mail-in ballots. To do so, they must submit applications to county boards of elections, and in connection therewith must provide the address at which they are registered to vote. They must also sign a declaration affirming, among other things, that they are "eligible to vote by mail-in [or absentee] ballot at the forthcoming primary or election," and that "all of the information" supplied in the mail-in or absentee ballot application is "true and correct." 25 P.S. §§ 3150.12, 3146.2. Upon receipt of the application, the county board of elections must confirm the elector's qualifications and verify that the elector's address on the application matches the elector's registration. Upon the county board of elections' approval of the application, the elector is provided with a ballot, an inner "secrecy envelope" into which the ballot is to be placed, and an outer envelope into which the secrecy envelope is to be placed and returned to the board. The outer envelope has pre-printed on it (1) a voter's declaration, (2) a label containing the voter's name and address, and (3) a unique nine-digit bar code that links the outer envelope to the voter's registration file contained in the Statewide Uniform Registry of Electors ("SURE") system. After receiving the outer envelope, the board of elections stamps the date of receipt on it and then scans the unique nine-digit bar code, which links the voter's ballot to his or her registration file.

**\*6** The pre-canvassing or canvassing of absentee and mail-in ballots then proceeds in accordance with the dictates of 25 P.S. § 3146.8(g)(3):

When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots under paragraphs (1), (1.1) and (2), the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d)

[a voter who dies before the election] and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

25 P.S. § 3146.8(g)(3).

Pursuant to this section, on November 9, 2020, the Philadelphia Board met to determine whether ballots separated into nine categories were "sufficient" to be pre-canvassed or canvassed. It concluded that four categories were not sufficient to be pre-canvassed or canvassed: (1) 472 ballots where the outer envelope lacked a signature and any other handwritten information; (2) 225 ballots where the outer envelope was not signed by the voter; (3) 112 ballots where the individual who completed the declaration appeared to be different from the individual who had been assigned the ballot; and (4) 4,027 ballots that were not submitted in a secrecy envelope.

In contrast, the Philadelphia Board approved as sufficient to be pre-canvassed or canvassed the ballots in five categories: (1) 1,211 ballots that lacked a handwritten date, address, and printed name on the back of the outer envelope (but were signed); (2) 1,259 ballots that lacked only a handwritten date on the back of the outer envelope (but were signed and contained a handwritten name and address); (3) 533 ballots that lack only a handwritten name on the back of the outer envelope (but were signed and dated and contained a handwritten address); (4) 860 ballots that lack only a handwritten address on the back of the outer envelope (but were signed and dated and contained a handwritten name); (5) 4,466 ballots that lack only a handwritten name and address on the back of the outer envelope (but were signed and dated).

On November 10, 2020, the Campaign filed five pleadings entitled "Notice of Appeal via Petition for Review of Decision by the Philadelphia County Board of Elections," one for each of the five categories referenced above that

the Philadelphia Board approved as sufficient to be pre-canvassed or canvassed. In each petition for review, the Campaign alleged that this Court, in *Pa. Democratic Party v. Boockvar*, ── Pa. ──238 A.3d 345 (2020), declared that absentee and mail-in ballots cast in violation of the Election Code's mandatory requirements are void and cannot be counted. Petition for Review, 11/10/2020, ¶ 14. The Campaign further alleged that failures to include hand-written names, addresses and dates constituted violations of mandatory obligations under Sections 3146.6(a) and/or 3150.16(a) of the Election Code. *Id.* at 15-16. Accordingly, the Campaign alleged that the Board's decisions with respect to the absentee and mail-in ballots in the above-referenced five categories were based on a clear error of law and must be reversed. *Id.* at 32.

**\*7** On November 13, 2020, Judge Crumlish held oral argument on the issues raised in the Petition for Review. In response to questions from Judge Crumlish, counsel for the Campaign agreed that the Petition for Review was "not proceeding based on allegations of fraud or misconduct." Transcript, 11/13/2020, at 13-14. She further agreed that the Campaign was not challenging the eligibility of the 8,329 voters in question and did not contest either that all of the ballots at issue were signed by the voters or that they had been timely received by the Board. *Id.* at 30-31, 37. Instead, she indicated that the Campaign was "alleging that the ballots were not filled out correctly." *Id.* at 14. Counsel for the DNC [1] argued that the failures to handwrite names, addresses and dates "are, at most, minor technical irregularities that the Supreme Court of Pennsylvania has repeatedly said do not warrant disenfranchisement." *Id.* at 14. Counsel for the Philadelphia Board added that the Election Code includes no provision requiring "absolute technical perfection" when filling out the declaration on the outer envelope containing an absentee or mail-in ballot. *Id.* at 38.

Later that same day, Judge Crumlish entered five orders affirming the Philadelphia Board's decision to count the contested ballots. In his orders, Judge Crumlish noted that while the declaration contained a specific directive to the voter to sign the declaration, it made no mention of filling out the date or other information. Trial Court Orders, 11/13/2020, ¶ 2. He further found that while the Election Code provides that while the voter shall "fill out" and date the declaration, the term " 'fill out' is not a defined term and is ambiguous." *Id.* at ¶ 4. He indicated that the outer envelope already contains a pre-printed statement of the voter's name and address, and that "[n]either a date nor the elector's filling out of the printed

name of the address are requirements necessary to prevent fraud." *Id.* at ¶ 5-6. Concluding that "[t]he Election Code directs the Court of Common Pleas in considering appeals from the County Board of Elections to make such decree as right and justice may require[,]" *id.* at ¶ 8 (quoting 25 P.S. § 3157), Judge Crumlish upheld the decision of the Philadelphia Board.

The Campaign filed appeals from Judge Crumlish's orders in the Commonwealth Court on November 14, 2020, and the next day the Commonwealth Court issued an order consolidating the five appeals and setting an expedited briefing schedule. On November 17, 2020, the Philadelphia Board filed an application with this Court to exercise its extraordinary jurisdiction, 42 Pa.C.S. § 726, over the consolidated appeals, which we granted by order dated November 18, 2020.

In our order granting the Philadelphia Board's application for the exercise of extraordinary jurisdiction, we stated the issue to be decided as follows:

> Does the Election Code require county boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed their ballot's outer envelopes but did not handwrite their name, their address, and/or a date, where no fraud or irregularity has been alleged?

On November 10, 2020, the Allegheny County Board decided to canvass 2,349 mail-in ballots that contained a signed but undated declaration. Ziccarelli challenged the decision in an appeal to the court of common pleas ultimately heard and decided by the Honorable Joseph James. It was not disputed that all 2,349 voters signed and printed their name and address on the outer envelopes and returned the ballots to the Allegheny County Board on time. Each of the ballots was processed in the Statewide Uniform Registry of Electors ("SURE") system and was time-stamped when it was delivered to the Allegheny County Board on or before November 3, 2020. At a hearing, via Microsoft Teams, on November 17, 2020, the Democratic Party and James Brewster (Ziccarelli's opponent in the 45th Senatorial District race) moved to intervene, which motion was granted. At the

hearing, Ziccarelli stated that she was not claiming voter fraud regarding the challenged ballots.

**\*8** In an opinion and order dated November 18, 2020, Judge James affirmed the Allegheny County Board's decision to count the ballots. He concluded that the date provision in 🔖 Section 3150.16(a) is directory, not mandatory, and that "ballots containing mere minor irregularities should only be stricken for compelling reasons," citing 🔖 *Shambach v. Bickhart*, 577 Pa. 384, 845 A.2d 793, 798 (2004). Noting that the ballots were processed in the SURE system and time-stamped when delivered to the Allegheny County Board, he found that the technical omission of the handwritten date on a ballot was a minor technical defect and did not render the ballot deficient.

Ziccarelli immediately appealed Judge James' decision to the Commonwealth Court and contemporaneously filed an application to this Court requesting our exercise of extraordinary jurisdiction, noting that the issue presented was accepted by this Court as part of the Philadelphia Board appeals. While the application was pending, the Commonwealth Court ordered expedited briefing and on November 19, 2020, issued an opinion and order reversing the Court of Common Pleas of Allegheny County and remanded.

🚩 *In Re: 2,349 Ballots in the 2020 General Election; Appeal of: Nicole Ziccarelli*, ––– A.3d ––––, 1162 C.D. 2020, 2020 WL 6820816 (Commw. Ct. 2020). Ziccarelli then withdrew her application for extraordinary jurisdiction.

On November 20, 2020, this Court granted the Allegheny County Board's Petition for Allowance of Appeal limited to the question of whether the ballots contained in undated but signed outer envelopes should be invalidated. The opinion of the Commonwealth Court will be discussed, as necessary, in the analysis that follows. The order was stayed pending our disposition of these consolidated cases.

**[9]**   **[10]**   The pertinent scope and standard of review follow: the Court of Common Pleas' decision is reviewed on appeal "to determine whether the findings are supported by competent evidence and to correct any conclusions of law erroneously made." *In re Reading Sch. Bd. of Election*, 535 Pa. 32, 634 A.2d 170, 171–72 (1993). The Court of Common Pleas, in turn, could reverse the Philadelphia Board's decision only for an abuse of discretion or error of law. *See* 🔖 *Appeal of McCracken*, 370 Pa. 562, 88 A.2d 787, 788 (1952). As the issue involves the proper interpretation of the Election Code,

it presents a question of law and our standard of review is de novo and our scope of review is plenary. *See, e.g., Banfield v. Cortés*, 631 Pa. 229, 110 A.3d 155, 166 (2015).

## II. ARGUMENTS OF THE PARTIES

Although more fully developed in our analysis set forth later in this opinion, we here briefly summarize the arguments of the parties and intervenors.

The Campaign argues that the General Assembly set forth in the Election Code the requirements for how a qualified elector can cast a valid absentee or mail-in ballot. Campaign's Brief at 22. One of those requirements is for each elector to "fill out, date, and sign" the declaration on the Outside Envelope. *Id.* (citing 25 P.S. §§ 3146.6(a) and 3150.16(a)). According to the Campaign, this Court has repeatedly ruled that the requirements of the sections of Election Code relevant here impose mandatory obligations, and that ballots cast in contravention of the these requirements are void and cannot be counted. *Id.* at 23. As a result, the Campaign insists that the trial court erred in affirming the Board's decision to count the 8,329 non-conforming absentee and mail-in ballots. *Id.*

The Philadelphia Board, conversely, contends that the Election Code does not require the Philadelphia Board to set aside timely-filed ballots by qualified electors that are merely missing handwritten names, street addresses, and/or dates on the signed voter declaration. Philadelphia Board's Brief at 12. Contrary to the Campaign's contention that the provisions of the Election Code at issue here impose exclusively mandatory requirements, the Philadelphia Board argues that Pennsylvania courts have long held that minor errors or omissions should not result in disenfranchisement, particularly in cases where the errors or omissions do not implicate the board's ability to ascertain the voter's right to vote or the secrecy or sanctity of the ballot. *Id.* Here, the Philadelphia Board notes that the Campaign does not allege that the voters at issue here were not qualified to vote and have not asserted that any fraud or other impropriety has occurred. *Id.* As such, it concludes that it acted properly and within its discretion in determining that these omissions were not a basis for setting aside those ballots. *Id.*

**\*9** The DNC largely concurs with the Philadelphia Board's arguments, indicating that there is no statutory requirement that voters print their full name or address on the outer envelopes and that adding a date to the envelope serves no compelling purpose. DNC's Brief at 9-10.

Ziccarelli argues further that, in regard to outer envelopes not containing a voter-supplied date, this Court's opinion in *In Re: Nov. 3, 2020 General Election*, —— Pa. ——, 240 A.3d 591 (2020) definitively speaks to the mandatory nature of the date requirement and, without much extrapolation, requires that such ballots not be counted. The Allegheny County Board agrees with its Philadelphia counterpart. It counters Ziccarelli's reliance on *In Re Nov. 3, 2020 General Election* by noting that Ziccarelli's challenge to the ballots for lack of a date is based on the premise that the date is essential to the validity of the signature. Allegheny County Board points out this is the precise type of challenge that was disavowed in the case upon which Ziccarelli relies.

## III. ANALYSIS

**[11]** **[12]** **[13]** **[14]** We begin by recognizing from the outset that it is the "longstanding and overriding policy in this Commonwealth to protect the elective franchise." *Shambach v. Bickhart*, 577 Pa. 384, 845 A.2d 793, 798 (2004). "The Election Code must be liberally construed so as not to deprive ... the voters of their right to elect a candidate of their choice." *Ross Nomination Petition*, 411 Pa. 45, 190 A.2d 719, 719 (1963). It is therefore a well-settled principle of Pennsylvania election law that "[e]very rationalization within the realm of common sense should aim at saving the ballot rather than voiding it." *Appeal of Norwood*, 382 Pa. 547, 116 A.2d 552, 554–55 (1955). It is likewise settled that imbedded in the Election Code is the General Assembly's intent to protect voter privacy in her candidate choice based on Article VII, Section 4 of the Pennsylvania Constitution and to prevent fraud and to otherwise ensure the integrity of the voting process.

**[15]** We agree with the Campaign's observation that in Sections 3146.6(a) and 3150.16(a), the General Assembly set forth the requirements for how a qualified elector may cast a valid absentee or mail-in ballot. Campaign's Brief at 22. We further agree that these sections of the Election Code specifically provide that each voter "shall fill out, date, and sign" the declaration on the outside envelope. *Id.* We do not agree with the Campaign's contention, however, that because the General Assembly used the word "shall" in this context, it is of necessity that the directive is a mandatory one, such that a failure to comply with any part of it requires a board of elections to declare the ballot void and that it

cannot be counted. It has long been part of the jurisprudence of this Commonwealth that the use of "shall" in a statute is not always indicative of a mandatory directive; in some instances, it is to be interpreted as merely directory. *See, e.g., Commonwealth v. Baker*, 547 Pa. 214, 690 A.2d 164, 167 (1997) (citing *Fishkin v. Hi–Acres, Inc.*, 462 Pa. 309, 341 A.2d 95 (1975)); *see also Commonwealth ex rel. Bell v. Powell*, 249 Pa. 144, 94 A. 746, 748 (1915) (quoting *Bladen v. Philadelphia*, 60 Pa. 464, 466 (1869) ("It would not perhaps be easy to lay down any general rule as to when the provisions of a statute are merely directory, and when mandatory and imperative.")). The Campaign's reliance on this Court's recent decision in *Pa. Democratic Party v. Boockvar*, —— Pa. ——, 238 A.3d 345 (2020) for the proposition it asserts is misplaced.

**\*10** In *Pa. Democratic Party*, we held that the requirement in Section 3150.16(a) that a mail-in voter place his or her ballot in the inner secrecy envelope was a mandatory requirement and thus a voter's failure to comply rendered the ballot void. *Pa. Democratic Party*, 238 A.3d at 380. In concluding that the use of the secrecy envelope was a mandatory, rather than a discretionary directive, we reviewed our prior decisions on the distinction between mandatory and discretionary provisions in the Election Code, including *Shambach v. Bickhart*, 577 Pa. 384, 845 A.2d 793 (2004), *In re Luzerne County Return Board, Appeal of Elmer B. Weiskerger*, 447 Pa. 418, 290 A.2d 108 (1972), and *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election, Appeal of John Pierce*, 577 Pa. 231, 843 A.2d 1223 (2004).

In *Shambach*, the Court declined to invalidate a write-in vote cast for a candidate who was named on the ballot, in direct violation of the Election Code's instruction that a voter could only write in a person's name if the name of said individual was "not already printed on the ballot for that office." *Shambach*, 845 A.2d at 795. In reaching that conclusion, the Court observed that "[m]arking a ballot is an imprecise process, the focus of which is upon the unmistakable registration of the voter's will in substantial conformity to the statutory requirements." *Id.* at 799 (quoting *Appeal of Gallagher*, 351 Pa. 451, 41 A.2d 630, 632 (1945)).

In *Weiskerger*, this Court refused to invalidate a ballot based upon the "minor irregularity" that it was completed in the wrong color of ink. The provision of the Election Code in question provided that " '[a]ny ballot that is marked in blue, black or blue-black ink ... shall be valid and counted.' " *Weiskerger*, 290 A.2d at 109 (citing 25 P.S. § 3063). In providing that ballots completed in the right color must be counted, we noted that the General Assembly "neither stated nor implied that ballots completed in a different color must not be counted." *Id.* We thus treated the instruction to use blue, black or blue-black ink as merely directory.

In *Pa. Democratic Party*, we compared these cases to our decision in *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election, Appeal of John Pierce*, 577 Pa. 231, 843 A.2d 1223 (2004), where we held that the Election Code's "in-person" ballot delivery requirement, *see* 25 P.S. § 3146.6, was mandatory, and that votes delivered by third persons must not be counted. *Appeal of Pierce*, 843 A.2d at 1231. There, we recognized that the in-person requirement served important purposes in the Election Code, including "limit[ing] the number of third persons who unnecessarily come in contact with the ballot[,] ... provid[ing] some safeguard that the ballot was filled out by the actual voter, ... and that once the ballot has been marked by the actual voter in secret, no other person has the opportunity to tamper with it." *Id.* at 1232. We thus explained in *Pa. Democratic Party* that "the clear thrust of *Appeal of Pierce*, ... is that, even absent an express sanction, where legislative intent is clear and supported by a weighty interest like fraud prevention, it would be unreasonable to render such a concrete provision ineffective for want of deterrent or enforcement mechanism." *Pa. Democratic Party*, 238 A.3d at 380 (citing *Appeal of Pierce*, 843 A.2d at 1232).

Based upon this comparison between *Shambach*, *Weiskerger* and *Appeal of Pierce*, in *Pa. Democratic Party* we determined that the decision in *Appeal of Pierce* provided the appropriate guidance for the analysis of the secrecy envelope requirement. We held that "[i]t is clear that the Legislature believed that an orderly canvass of mail-in ballots required the completion of two discrete steps before critical identifying information on the ballot could be

revealed. The omission of a secrecy envelope defeats this intention." *Pa. Democratic Party*, 238 A.3d at 380. Unlike in *Shambach* and *Weiskerger* which involved "minor irregularities," the use of a secrecy envelope implicated a "weighty interest," namely secrecy in voting protected expressly by Article VII, Section 4 of our state charter. *Id.* As such, we recognized the use of a secrecy envelope as a mandatory requirement and that failures to comply with the requirement required that the ballot must be disqualified." *Id.*; *see also id.* at 378 (quoting *JPay, Inc. v. Dep't of Corr. & Governor's Office of Admin.*, 89 A.3d 756, 763 (Pa. Commw. 2014) ("While both mandatory and directory provisions of the Legislature are meant to be followed, the difference between a mandatory and directory provision is the consequence for non-compliance: a failure to strictly adhere to the requirements of a directory statute will not nullify the validity of the action involved.")).

**\*11** To determine whether the Election Code's directive that the voter handwrite their names, address and the date of signing the voter declaration on the back of the outer envelope is a mandatory or directory instruction requires us to determine whether the intent of the General Assembly was clear and whether the failure to handwrite the information constitutes "minor irregularities" or instead represent "weighty interests," like fraud prevention or ballot secrecy that the General Assembly considered to be critical to the integrity of the election.

**(1) Failures to include handwritten names and addresses**

**[16]** Beginning with the Campaign's contention that ballots may not be counted if a voter fails to handwrite their name and/or address under the full paragraph of the declaration on the back of the outer envelope, we conclude that given the factual record in this case and the mechanics of the pre-canvassing and canvassing procedures including the incorporation of reliance on the SURE system, this "requirement" is, at best, a "minor irregularity" and, at worst, entirely immaterial. More to the point, the direction to the voter to provide a handwritten name and/or address is not only not mandatory, it is not a directive expressed in the Election Code. Thus, these directions do not meet the first prong of the test used in *Pa. Democratic Party*: the clear intent of the General Assembly.

The Election Code does not require that the outer envelope declaration include a handwritten name or address at all. Instead, Sections 3146.4 (absentee) and 3150.14(b) (mail-in) provide only that the declaration must include "a statement of the elector's qualifications, together with a statement that the elector has not already voted in the primary or election." 25 P.S. §§ 3146.4, 3150.14(b). Aside from this information (none of which is relevant to the present issue), the General Assembly delegated to the Secretary of the Commonwealth the obligation to prescribe the form of declaration and envelope for absentee and mail-in ballots, presumably to allow the inclusion of information that would be helpful for administrative or processing purposes. *Id.*[2] As such, the decision to include spaces in the declaration for handwritten names and addresses was made solely by the Secretary of the Commonwealth, not the General Assembly. It would be a stretch to divine that the General Assembly was advancing any weighty interest for the inclusion of handwritten names and addresses in the declaration such that a voter's failure to include them should result in the ballot not being counted. Moreover, the Campaign does not argue that the Secretary's request for handwritten names and addresses implicated any "weighty interests" that would compel a finding that the request to provide them constituted a mandatory requirement.[3]

**\*12** The Campaign argues that we should read the "handprinted name and address" requirement into the directives in Section 3146.6(a) and 3150.16(a) that the voter "fill out" the declaration. Campaign's Brief at 30. Citing to dictionary definitions, the Campaign contends that "fill out" means "to write or type information in spaces that are provided for it." *Id.* at 32. Because 8,349 voters did not "fill out" one or more spaces provided on the outer envelope provided in the declaration (including the voter's name and/or address), the Campaign argues that those ballots were non-conforming and could not be counted. *Id.* at 29. The directive to "fill out" does not give any legislative definition to the specific information to be placed in the blank spaces. It is the weight of the information that must be tested in the analysis. As stated, since the General Assembly did not choose the information to be provided, its omission is merely a technical defect and does not invalidate the ballot.

**[17]** Further, as Judge Crumlish observed, the term "fill out" is ambiguous.[4] Trial Court Opinion, 11/13/2020, ¶ 4. As Judge Crumlish recognized, the term "fill out" is not a

defined term under the Election Code. *Id.* Moreover, and contrary to the Campaign's contention that no alternative understanding of the term "fill out" has been proffered, the Campaign has failed to recognize, **the voter's name and address are already on the back of the outer envelope on a pre-printed label affixed no more than one inch from the declaration itself.** A voter could reasonably have concluded that the blanks requesting his or her name and address needed to be "filled out" only if the name and/or address on the label was incorrect or incomplete, as it was unnecessary to provide information that was already on the back of the outer envelope. [5] To add further confusion, the declaration itself can be read to refer to the label: "I hereby declare that I am qualified to vote from the below stated address" can be read to mean the address as already stated on the label.

**\*13** The text of the Election Code provides additional evidence of the directory nature of the provisions at issue. With regard to individuals who are not able to sign their name due to illness or physical disability, the General Assembly imposed a requirement that the declarant provide his or her "complete address." 25 P.S. § 3146.6(a)(3); 25 P.S. § 3150.16(a.1). These provisions demonstrate that the General Assembly clearly knew how to impose such a requirement when it wishes to do so. *In re Nov. 3, 2020 Gen. Election*, ––– Pa. –––, 240 A.3d 591, –––, 2020 WL 6252803, at \*14 (2020) (stating that the General Assembly's prior inclusion of a signature comparison requirement demonstrated that "it understands how to craft language requiring signature comparisons at canvassing when it chooses to do so"). Moreover, Sections 3146.6(a)(3) and 3150.16(a.1) contain a precise form of declaration, crafted by the General Assembly, pertaining to voters with disabilities evidencing the General Assembly's understanding of how to mandate a precise declaration without resort to delegating non-essential information to the Secretary.

Finally, the text of the Election Code further demonstrates the lack of any need for handwritten names and addresses. Section 3146.8(g)(3), which relates to the canvassing of official absentee ballots and mail-in ballots, provides, in relevant part:

> When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots under paragraphs (1), (1.1) and (2), the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d)

[a voter who dies before the election] and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable.

25 P.S. § 3146.8(g)(3). The county board of elections' duty to keep a "Military Veterans and Emergency Civilians Absentee Voters File," which is not relevant to the current dispute, is governed by 25 P.S. § 3146.2c(b). Section 3146.2c(a) previously housed the board's duty to keep a "Registered Absentee and Mail-in Voters File." However, the General Assembly recently eliminated this directive. *See* 2020, March 27, P.L. 41, No. 12, § 8, imd. effective (deleting subsection (a), which required county board of elections to maintain at its office "a file containing the duplicate absentee voter's temporary registration cards of every registered elector to whom an absentee ballot has been sent"). By virtue of this amendment, the General Assembly eliminated one of the reference points that still appear in Section 3146.8(g)(3). The current Section 3146.2c(c) directs the county board to maintain the "the absentee voters' list" referenced in Section 3146.8(g)(3). The General Assembly also amended Section 3146.2c(c), which previously only directed the chief clerk to "prepare a list for each election district showing the names and post office addresses of all voting residents thereof to whom official absentee ballots shall have been issued," to include such voting residents who were issued mail-in ballots. *See* 2019, Oct. 31, P.L. 552, No. 77, § 5.1, imd. effective (inserting "or mail-in" twice in subsection (c)).

As such, as relevant for our purposes, Section 3146.8(g) (3) directs that "the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) [a voter who dies before the election] and shall compare the information thereon with that contained in the ... the absentee voters' list," which, pursuant to Section 3146.2c(c), now also contains voters who received mail-in ballots. A close reading of the language chosen by the General Assembly here is telling. Section 3146.8(g)(3) directs the board to "examine the declaration **on the envelope**" and "compare the information **thereon**" to the absentee (and mail-in) voters' list. 25 P.S. § 3146.8(g)(3) (emphasis added). Reading these phrases together, it is clear that the General Assembly intended that the information to be compared to the absentee

(and mail-in) voters' list is the information on the outer envelope which includes the pre-printed name and address. If the General Assembly intended for the information written by the voter to be compared to the absentee voters' list, it would have used the term "therein," thus directing the board to compare the information contained "within" the declaration (the handwritten name and address).

**\*14** The following sentence in this section further suggests that the General Assembly intended such bifurcation. 📑 Section 3146.8(g)(3) next states:

> If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the ... the absentee voters' list ... verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

📑 25 P.S. § 3146.8(g)(3). Here, the board is directed to consider whether the declaration is sufficient (i.e., the examination contained in the previous sentence) and also ensure that the absentee voters' list confirms the voter's right to vote (i.e., the comparison of the printed information to the relevant list from the prior sentence).

### (2) Failures to include dates

Both the Campaign and Ziccarelli argue that the requirement to state the date on which declaration was signed is a mandatory obligation requiring disenfranchisement for lack of compliance. We disagree, as we conclude that dating the declaration is a directory, rather than a mandatory, instruction, and thus the inadvertent failure to comply does not require that ballots lacking a date be excluded from counting. As reviewed hereinabove, in our recent decision in 📑 *Pa. Democratic Party*, we reiterated that the distinction between directory and mandatory instructions applies with respect to a voter's obligations under the Election Code, and that only failures to comply with mandatory obligations, which implicate both legislative intent and "weighty interests" in the election process, like ballot confidentiality or fraud

prevention, will require disqualification. 📑 *Pa. Democratic Party*, 238 A.3d at 379-80.

The Commonwealth Court and Ziccarelli relied upon the Election Code's use of the of "**shall** ... date" language in construing the date obligation as mandatory. 🚩 *In Re: 2,349 Ballots in the 2020 General Election, Appeal of: Nicole Ziccarelli*, —— A.3d ——, 1162 C.D. 2020, 10, 2020 WL 6820816 (Pa. Comm. 2020). Although unlike the handwritten name and address, which are not mentioned in the statute, the inclusion of the word "date" in the statute does not change the analysis because the word "shall" is not determinative as to whether the obligation is mandatory or directive in nature. That distinction turns on whether the obligation carries "weighty interests." The date that the declaration is signed is irrelevant to a board of elections' comparison of the voter declaration to the applicable voter list, and a board can reasonably determine that a voter's declaration is sufficient even without the date of signature. Every one of the 8,329 ballots challenged in Philadelphia County, as well as all of the 2,349 ballots at issue in Allegheny County, were received by the boards of elections by 8:00 p.m. on Election Day, so there is no danger that any of these ballots was untimely or fraudulently back-dated. Moreover, in all cases, the receipt date of the ballots is verifiable, as upon receipt of the ballot, the county board stamps the date of receipt on the ballot-return and records the date the ballot is received in the SURE system. The date stamp and the SURE system provide a clear and objective indicator of timeliness, making any handwritten date unnecessary and, indeed, superfluous.

**\*15** Ziccarelli offers two alternative "weighty interests" for our consideration. She first contends that the date on which the declaration was signed may reflect whether the person is a "qualified elector" entitled to vote in a particular election. Pursuant to Section 3150.12b (entitled "Approval of application for mail-in ballot"), a board of elections may have determined that the person was a qualified elector and thus entitled to receive a mail-in ballot. Pursuant to Section 2811, however, to be a qualified elector, "[h]e or she shall have resided in the election district where he or she shall offer to vote at least thirty days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, he or she may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within thirty days preceding the election." 25 P.S. § 2811. As a result, Ziccarelli contends that the person may have been qualified to vote in a particular

voting district at the time of applying for a mail-in ballot, but no longer a qualified elector in that voting district on Election Day. Ziccarelli's Brief at 16.

This unlikely hypothetical scenario is not evidence of a "weighty interest" in the date on the document for assuring the integrity of Pennsylvania's system for administering mail-in voting. Among other things, the canvassing statute, 25 P.S. § 3146.8(g)(3), directs the board to examine the declaration on the envelope of each ballot and compare the information thereon with that contained in the now defunct "Registered Absentee and Mail-in Voters File." *See* discussion supra pp. —— – ——. The date of signing the declaration will not be of any benefit in performing this task, as the name of the voter at issue will be on this list (as a result of his or her approval to receive a mail-in ballot), and the date of signing will provide no information with respect to whether or not he or she has left the voting district in the interim. Most critically, our current statutory framework includes no requirement that a county board of elections investigate whether an individual who had been confirmed as a qualified elector at the time of approval to receive a mail-in ballot remains as a qualified elector on Election Day. If the General Assembly had so intended, it would certainly have expressly stated it, as opposed to nebulously tucking such an unprecedented requirement into the instructions to the Secretary for designing the declaration.

Second, Ziccarelli argues that the date of signature of the declaration will serve to prevent double voting, as "whether an elector has already voted in the election for which the ballot is issued, by its very nature, depends on the date on which the declaration was signed." Ziccarelli's Brief at 16. Boards of elections do not use signatures or any handwritten information to prevent double voting. Duplicate voting is detected by the use of bar codes through the SURE system, and the board identifies the earlier cast vote by referencing the date it received the ballot, not the date on which the declaration was signed.

Ziccarelli and the Commonwealth Court insist that this Court "has already held that mail-in ballots with undated declarations are not 'sufficient' and, thus, must be set aside." Ziccarelli's Brief at 9; *In Re: 2,349 Ballots in the 2020 General Election,* 1162 C.D. 2020, at 10. In support of this contention, they reference an observation in our recent decision in *In re November 3, 2020 General Election,* —— Pa. ——, 240 A.3d 591 (2020), that when assessing the sufficiency of a voter's declaration, "the county board is

required to ascertain whether the return envelope has been filled out, dated, and signed – and if it fails to do so then the ballot cannot be designated as "sufficient" and must be set aside.[6] *Id.* at —— – ——, 2020 WL 6252803 at *12-13. This statement is being taken out of context. Our statement in 2020 *General Election* was in reference to the limitations on what an election board is directed by the statute to do when assessing the sufficiency of a voter's declaration for the express purpose of indicating what they were not to do, i.e., signature comparisons. The question in *In Re: Nov. 3, 2020 General Election* was a narrow one. We did not address (as it was not at issue) whether a county board of elections could find a declaration as sufficient even though it was undated. That question requires an entirely different analysis that depends in significant part on whether dating was a mandatory, as opposed to a directive, requirement. We have conducted that analysis here and we hold that a signed but undated declaration is sufficient and does not implicate any weighty interest. Hence, the lack of a handwritten date cannot result in vote disqualification.

## IV. CONCLUSION

**\*16** **[18]** **[19]** As we recognized in *Pa. Democratic Party,* "while both mandatory and directory provisions of the Legislature are meant to be followed, the difference between a mandatory and directory provision is the consequence for non-compliance: a failure to strictly adhere to the requirements of a directory statute will not nullify the validity of the action involved." *Pa. Democratic Party,* 238 A.3d at 378. Here we conclude that while failures to include a handwritten name, address or date in the voter declaration on the back of the outer envelope, while constituting technical violations of the Election Code, do not warrant the wholesale disenfranchisement of thousands of Pennsylvania voters. As we acknowledged in *Shambach,* "ballots containing mere minor irregularities should only be stricken for compelling reasons." *Shambach,* 845 A.2d at 799; *see also Appeal of Gallagher,* 351 Pa. 451, 41 A.2d 630, 632 (1945) ("[T]he power to throw out a ballot for minor irregularities ... must be exercised very sparingly and with the idea in mind that either an individual voter or a group of voters are not to be disfranchised at an election except for compelling reasons."). Having found no compelling reasons to do so, we decline to intercede in the counting of the votes at issue in these appeals.

The decision of the Philadelphia Court of Common Pleas is hereby affirmed. The decision of the Commonwealth Court is hereby reversed and the decision of the Allegheny County Court of Common Pleas is reinstated.

Justice Donohue announces the judgment of the Court, joined by Justices Baer, Todd and Wecht, and files an opinion joined by Justices Baer and Todd

Justices Baer and Todd join the opinion.

Justice Wecht concurs in the result and files a concurring and dissenting opinion.

Justice Dougherty files a concurring and dissenting opinion in which Chief Justice Saylor and Justice Mundy join.

## CONCURRING AND DISSENTING OPINION

JUSTICE WECHT

 [20]  I agree with the conclusion that no mail-in or absentee ballot should be set aside solely because the voter failed to hand print his or her name and/or address on the declaration form on the ballot mailing envelope. These items are prescribed not by statute but by the Secretary of the Commonwealth under legislatively delegated authority. Absent evidence of legislative intent that what in context amounts to redundant information must be furnished to validate a mail ballot, their omission alone should not deny an elector his or her vote. But I part ways with the conclusion reflected in the Opinion Announcing the Judgment of the Court ("OAJC") that a voter's failure to comply with the statutory requirement that voters date the voter declaration should be overlooked as a "minor irregularity." This requirement is stated in unambiguously mandatory terms, and nothing in the Election Code [1] suggests that the legislature intended that courts should construe its mandatory language as directory. Thus, in future elections, I would treat the date and sign requirement as mandatory in both particulars, with the omission of either item sufficient without more to invalidate the ballot in question. [2] However, under the circumstances in which the issue has arisen, I would apply my interpretation only prospectively. So despite my reservations about the OAJC's analysis, I concur in its disposition of these consolidated cases.

Concurring in this Court's recent decision in Pennsylvania Democratic Party v. Boockvar, I expressed my increasing discomfort with this Court's willingness to peer behind the curtain of mandatory statutory language in search of some unspoken directory intent.

[If this Court is] to maintain a principled approach to statutory interpretation that comports with the mandate of our Statutory Construction Act, [3] if we are to maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect, we must read mandatory language as it appears, and we must recognize that a mandate without consequence is no mandate at all. [4]

 *17  There, I wrote separately in support of this Court's ruling requiring the invalidation of mail-in ballots that were returned to boards of elections not sealed in their secrecy envelopes as required by statutory language. The secrecy envelope requirement at issue in that case was no less ambiguous than the "fill out, date and sign" mandate at issue in this case. [5] Nonetheless, departing from that holding for reasons that do not bear close scrutiny, the OAJC concludes that invalidation should *not* follow for failure to comply with the Election Code provisions requiring that "the elector shall ... fill out, date and sign the declaration printed on" the ballot mailing envelope, even though this requirement appears in precisely the same statutory provisions as were at issue in PDP.

Section 3150.16 of the Election Code, governing "[v]oting by mail-in electors"—and its counterpart for absentee ballots, which employs the same operative language [6]—provides:

> At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed

the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. *The elector **shall** then fill out, date and sign the declaration printed on such envelope.* Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election. [7]

While this Court has not reviewed every constituent step this provision prescribes, we have addressed several of the requirements, taking it upon ourselves to weigh in each instance whether to interpret the mandatory statutory language as being mandatory in fact. The law those cases now comprise is so muddled as to defy consistent application, an inevitable consequence of well-meaning judicial efforts to embody a given view of what is faithful to the spirit of the law, with the unfortunate consequence that it is no longer clear what "shall" even means.

Nearly fifty years ago, this Court considered whether a ballot completed in red or green ink should be counted given that the statute provided by its terms only for the canvassing of ballots completed in blue/black ink. [8] Then-applicable Section 3063 of the Election Code provided that "[a]ny ballot that is marked in blue, black or blue-black ink, in fountain pen or ball point pen, or black lead pencil or indelible pencil, shall be valid and counted." [9] The Court determined that the Code did not require the invalidation of ballots completed in other colors, holding that the mandatory language was merely directory in effect:

> **\*18** [T]he power to throw out a ballot for minor irregularities should be sparingly used. It should be done only for very compelling reasons. Marking a ballot in voting is a matter not of precision engineering but of an unmistakable registration of the voter's will in substantial conformity to statutory requirements. In construing election laws[,] while we must strictly

enforce all provisions to prevent fraud over overriding concern at all times must be to be flexible in order to favor the right to vote. Our goal must be to enfranchise and not to disenfranchise. This section of the code merely assures the validity of ballots marked in blue, black or blue-black ink. It does not ... specify that any other type of marking will necessarily be void. We have noted in other cases that the dominant theme of this section is to prevent ballots from being identifiable. A ballot should not be invalidated under [ 25 P.S. § 3063] unless the voter purposely makes a mark thereon or commits some other act in connection with this ballot to distinguish and identify it. The proper interpretation of this portion of the statute considering the occasion for its enactment, the mischief to be remedied, and the policy to liberally construe voting laws in the absence of fraud, is that the ballot is valid unless there is a clear showing that the ink used was for the purpose of making the ballot identifiable. [10]

As this Court later stressed in *Appeal of Pierce*, *Weiskerger* "was decided before the enactment of the Statutory Construction Act [ ("SCA") ], which dictates that legislative intent is to be considered only when a statute is ambiguous." [11] Thus, while *Pierce* focused on distinguishing *Weiskerger*, it nonetheless implicitly called into question the *Weiskerger* Court's casual dismissal of the language of the statute there at issue because the various factors the *Weiskerger* Court cited as relevant to its decision not to give "shall" mandatory effect are relevant under the SCA only when the statute is susceptible of two or more reasonable interpretations. [12]

In insisting that a court's goal should be to "enfranchise and not to disenfranchise" and to be "flexible" in furtherance of that goal, the *Weiskerger* Court found itself awash

in language so slippery as to defy consistent application. The Court posited the existence of "minor irregularities," a term we repeat often but have yet to define with suitable rigor,[13] and posited that ballots should be invalidated only for "very compelling reasons."[14] It also blessed "substantial conformity," and directed courts to "be flexible in order to favor the right to vote"—evidently even when doing so runs counter to statutory directives stated in mandatory terms.[15]

*19 Perhaps most troublingly, the Court posited that its "*goal* must be to enfranchise and not to disenfranchise."[16] A court's only "goal" should be to remain faithful to the terms of the statute that the General Assembly enacted, employing only one juridical presumption when faced with unambiguous language: that the legislature *meant what it said*. And even where the legislature's goal, however objectionable, is to impose a requirement that appears to have a disenfranchising effect, it may do so to any extent that steers clear of constitutional protections. In any event, even if the 📖 *Weiskerger* Court faithfully applied the common-law principles it cited, it did so inconsistently with the SCA's contrary guidance, which issued later the same year and binds us today.[17]

But the advent of the SCA did not prevent this Court from repeating the same mistake even decades later. In 📖 *Shambach v. Bickhart*,[18] a voter wrote in a candidate for office despite the fact that the candidate appeared on the official ballot for that office. This facially violated the Election Code, which provided that the voter shall, in the designated area, "write the identification of the office in question and the name of *any person not already printed on the ballot for that office*, and such mark and written insertion shall count as a vote for that person for such office."[19] Echoing 📖 *Weiskerger*, the 📖 *Shambach* Court observed that, "although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote."[20] Thus, the Court "[has] held that ballots containing mere irregularities should only be stricken for compelling reasons."[21] In support of this particular proposition, though, the Court cited only decisions that predated the SCA.[22] Much as in 📖 *Weiskerger*, the Court held that the absence of statutory language requiring the invalidation of a ballot completed in violation of the mandatory language of Section 3031.12(b)(3), combined with the amorphous principles it drew from the Court's prior

cases, precluded the invalidation of a nonconforming ballot, effectively writing unambiguous language out of the Election Code entirely.

*20 We restored a greater degree of rigor in 📖 *Pierce*. In that case, we considered whether absentee ballots delivered by third persons on behalf of non-disabled voters were invalid under the Election Code, which provided that "*the elector shall* send [the absentee ballot] by mail, postage prepaid, except where franked, *or deliver it in person* to said county board of election."[23] There, in a step the 📖 *Shambach* Court tacitly bypassed, the Court underscored the SCA's direction that a court's sole objective in construing a statute is to "ascertain and effectuate the intention of the General Assembly," and that, "[g]enerally speaking, the best indication of legislative intent is the plain language of a statute."[24] "[I]t is only when the words of a statute 'are not explicit' that a court may resort to other considerations, such as the statute's perceived 'purpose,' in order to ascertain legislative intent."[25] In this light, the Court turned to the legislature's use of the word "shall." "Although some contexts may leave the precise meaning of the word 'shall' in doubt," the Court opined, "this Court has repeatedly recognized the unambiguous meaning of the word in most contexts."[26] As noted *supra*, this Court in 📖 *Pierce* declined to treat 📖 *Weiskerger* as controlling in part because it was decided before the enactment of the SCA. While we did not assert 📖 *Weiskerger*'s abrogation, we certainly cast doubt upon its probity as well, by extension, as all similarly permissive Election Code case law relying upon the presumption to count votes that violated the Code's unambiguous directives.

In 📖 *In re Scroggin*,[27] too, we applied the relevant statutory language strictly in conformity with its terms, despite colorable arguments that doing so would deny ballot access to a candidate who had "substantially complied" with the statutory requirements. And at issue in that case was not merely the votes of a small percentage of otherwise qualified voters, but whether a political body's Presidential candidate would appear on the ballot at all in the wake of a placeholder nominee's failure to satisfy the Code's mandatory affidavit requirement. "[T]he provisions of the election laws relating to the form of nominating petitions and the accompanying affidavits are not mere technicalities," we explained, "but are necessary measures to prevent fraud and to preserve the integrity of the election process. ... Thus, the policy of the

028

liberal reading of the Election Code cannot be distorted to emasculate those requirements necessary to assure the probity of the process." [28]

Finally, in *PDP*, we held that the failure strictly to comply with the Election Code's mandatory requirement that mail-in ballots be sealed in the provided "Official Election Ballot" envelope required invalidation. Again, we specifically rejected the appellants' reliance upon *Weiskerger* and *Shambach*, relying instead upon *Pierce*. As in *Pierce*, we found that to interpret "shall" as directory rather than mandatory would render the Code's requirements "meaningless and, ultimately, absurd," notwithstanding the absence of an express, statutorily-prescribed sanction for non-compliance. [29] While we did not go out of our way to express as jaundiced a view of our cases holding that "minor irregularities" might be overlooked, the gravamen of our decision in that case, as in *Pierce*, was clear: shall means *shall*. [30]

Although I joined the Majority in that case, I wrote separately to underscore the difficulties endemic to judicial efforts to discern ulterior meanings ostensibly obscured by the legislature's use of mandatory language. I observed that relying upon such unbounded investigations invited courts "to bend unclear texts toward whatever ends that they believe to be consonant with legislative intent, but with little or no contemporaneous insight into whether they have done so successfully." [31] Acknowledging that legislation is sometimes less than a model of clarity, and that this Court consequently will continue to face invitations to treat mandatory language as something less, I wrote: "[I]f we are to maintain a principled approach to statutory interpretation that comports with the mandate of [the SCA], if we are to maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect, we must read mandatory language as it appears, and we must recognize that a mandate without consequence is no mandate at all." [32]

**\*21** It is against this case law, and particularly the views I expressed in *PDP*, that I review the question now before us, briefly addressing the Secretary-imposed name and address requirement first, before proceeding to consider the statutory requirement that the voter date and sign the voter declaration.

As to the former question, I agree with the OAJC's conclusion, although I subscribe to the narrower approach briefly set forth by Justice Dougherty in his Concurring and Dissenting Opinion and developed variously in the OAJC's analysis. But while the OAJC acknowledges the reasons that Justice Dougherty cites as militating against invalidation, it supplements them with the minor-irregularity analysis familiar from *Weiskerger* and *Shambach*, which is neither necessary nor advisable. Justice Dougherty's approach requires no reliance upon cases that *Pierce* and *PDP* rightly have called into question. Rather, the fact that the name and address requirement does not stem from mandatory statutory language, [33] as well as questions about the Secretary's authority to compel county boards of elections to conform with whatever guidance the Secretary offers, [34] combined with our presumption in favor of treating qualified voters' ballots as valid absent clear legal mandates to the contrary where statutory language is less than clear, [35] collectively recommend against invalidating ballots for this omission alone. [36] That is enough for me.

The same cannot be said about the date and sign requirement, which derives from an unmistakable statutory directive. Drawing upon our less rigorous case law, and relying heavily upon the interpretive latitude this Court has arrogated to itself sporadically for generations, the OAJC assumes that our mission is to determine whether the apparent mandate is in fact directory, hanging the entire inquiry upon the question of mandatory versus directory effect. That reading, in turn, must rely upon the "minor irregularity" / "weighty interest" dichotomy underlying the cases that *Pierce* and *PDP* have called into question.

> To determine whether the Election Code's directive that the voter handwrite their names, address, and the date of signing the voter declaration on the back of the outer envelope is a mandatory or directory instruction requires us to determine whether the intent of the General Assembly was clear and whether the failure to handwrite the information constitutes "minor irregularities" or instead represent[s]

"weighty interests" ... that the General
Assembly considered to be critical to
the integrity of the election. [37]

**\*22**  To be clear, the OAJC offers a commendably thorough
analysis, but its length and involution is necessary only
*because* of the open-ended inquiry it embarks upon. And it is
no surprise that, like the cases upon which it relies, the OAJC
involves protean characterizations of voting requirements
as "technicalities," [38] "minor irregularities," [39] and even
"superfluous." [40] As illustrated in my review of earlier case
law, the OAJC does not conjure this terminology from the
ether—all but the last of these terms have been central to
this Court's decisional law going back decades. But properly
understood, all of these terms signal (and implicitly bless) the
substitution of judicial appraisals for legislative judgments.

The OAJC's approach ultimately requires that in *any* case
requiring interpretation of the Election Code to determine
the validity of votes nonconforming with facially mandatory
requirements, the Court must assess the effect of that language
*de novo* before deciding whether the legislature intended for
it to be interpreted as mandatory or merely directory. [41] Thus,
while a court embracing that test might take it as obvious,
*e.g.*, that the signature requirement should be construed as
mandatory, it could not merely have taken its mandatory
effect as a given by virtue of the statutory language alone. If
the mandatory/directory inquiry is ever appropriately applied
to mandatory language, then the Court can only conclude that
mandatory language must be applied as such after applying its
balancing test, with cases that *seem* obvious merely reflecting
that the Court deemed the "interest" to be protected so
"weighty" that its omission clearly cannot be viewed as a
"minor irregularity."

**\*23**  The only practical and principled alternative is to read
"shall" as mandatory. Only by doing so may we restore to
the legislature the onus for making policy judgments about
what requirements are necessary to ensure the security of
our elections against fraud and avoid inconsistent application
of the law, especially given the certainty of disparate views
of what constitute "minor irregularities" and countervailing
"weighty interests."

I do not dispute that colorable arguments may be mounted to
challenge the necessity of the date requirement, and the OAJC
recites just such arguments. [42] But colorable arguments also

suggest its importance, as detailed in Judge Brobson's opinion
as well as Justice Dougherty's Concurring and Dissenting
Opinion. [43] And even to *indulge* these arguments requires the
court to referee a tug of war in which unambiguous statutory
language serves as the rope. That reasonable arguments
may be mounted for and against a mandatory reading only
illustrates precisely why we have no business doing so.

Ultimately, I agree with Judge Brobson's description of the
greatest risk that arises from questioning the intended effect
of mandatory language on a case-by-case basis:

> While we realize that our decision
> in this case means that some votes
> will not be counted, the decision is
> grounded in law. It ensures that the
> votes will not be counted because
> the votes are invalid as a matter
> of law. Such adherence to the law
> ensures equal elections throughout the
> Commonwealth, on terms set by the
> General Assembly. The danger to our
> democracy is not that electors who
> failed to follow the law in casting their
> ballots will have their ballots set aside
> due to their own error; rather, the real
> danger is leaving it to each county
> board of election to decide what laws
> must be followed (mandatory) and
> what laws are optional (directory),
> providing a patchwork of unwritten
> and arbitrary rules that will have some
> defective ballots counted and others
> discarded, depending on the county
> in which a voter resides. Such a
> patchwork system does not guarantee
> voters an "equal" election, particularly
> where the election involves inter-
> county and statewide offices. We do
> not enfranchise voters by absolving
> them of their responsibility to execute
> their ballots in accordance with law. [44]

We must prefer the sometimes-unsatisfying clarity of
interpreting mandatory language as such over the burden of
seeking The Good in its subtext. Substantive perfection is

the ever-elusive concern of the legislature. Ours must be consistency of interpretive method without fear or favor, a goal that recedes each time a court takes liberties with statutory language in furtherance of salutary abstractions. Because the OAJC favors a more intrusive and ambitious inquiry, I respectfully dissent.

But just because I disagree with the OAJC's interpretation of the date and sign requirement does not inexorably lead me to the conclusion that the votes at issue in this case must be disqualified. While it is axiomatic that *ignorantia legis neminem excusat* (ignorance of the law excuses no one), this Court may elect to apply only prospectively a ruling that overturns pre-existing law or issues a ruling of first impression not foreshadowed by existing law. Indeed, we have done so in at least one case under the Election Code. In 🔖 *Appeal of Zentner*,[45] we confronted a statute governing candidates' obligation to submit statements of financial interests by a time certain that had been revised specifically to correct our previously fluid interpretations of the predecessor statute. We were forced to consider whether our newly strict construal of the revised statute should result in the invalidation of entire ballots already cast because they included one or more candidates who had failed to satisfy the statutory disclosures. We held, as the legislature clearly intended, that a candidate's "failure to file the requisite financial interests statement within the prescribed time shall be fatal to a candidacy."[46] But we also concluded that to "void the results of an election where all candidates were submitted to the voters, with late but nonetheless filed financial statements which left adequate time for study by the electorate, would be an unnecessary disenfranchisement."[47] Thus we determined that our holding should apply prospectively but not to the election at issue.[48]

**\*24** It goes without saying that 2020 has been an historically tumultuous year. In October of 2019, the legislature enacted Act 77,[49] introducing no-excuse mail-in voting with no inkling that a looming pandemic would motivate millions of people to avail themselves of the opportunity to cast their ballots from home in the very first year that the law applied. Soon thereafter, Act 12,[50] introduced and enacted with unprecedented alacrity in response to the pandemic, further amended the Election Code to address emergent concerns prompted by the looming public health crisis. While aspects of the new provisions that are relevant to this case were not wholly novel to the Code, as such—for example, the provisions that authorized no-excuse mail-in voting by

and large just expanded the pool of voters to whom the rules that long had governed absentee balloting applied —the massive expansion of mail-in voting nonetheless presented tremendous challenges to everyone involved in the administration of elections, from local poll workers to the Secretary of the Commonwealth. Importantly, it transformed the incentives of probing the mail-in balloting provisions for vulnerabilities in furtherance of invalidating votes. For the first time, a successful challenge arising from a given technical violation of statutory requirements might result in the invalidation of many thousands of no-excuse mail-in ballots rather than scores or hundreds of absentee ballots.

In advance of the 2020 election, neither this Court nor the Commonwealth Court had occasion to issue a precedential ruling directly implicating the fill out, date and sign requirement. Moreover, as the OAJC highlights in multiple connections, the Secretary issued confusing, even contradictory guidance on the subject.[51] Thus, local election officials and voters alike lacked clear information regarding the consequence of, *e.g.*, failing to handwrite one's address on an envelope that already contained preprinted text with that exact address or record the date beside the voter's declaration signature.

I have returned throughout this opinion to our decision in 🔖 *PDP*, and I do so once more. I maintained in that case that the Election Code should be interpreted with unstinting fidelity to its terms, and that election officials should disqualify ballots that do not comply with unambiguous statutory requirements, when determining noncompliance requires no exercise of subjective judgment by election officials.[52] The date requirement here presents such a case. But I *also* emphasized that disqualification is appropriate "[s]o long as the Secretary and county boards of elections *provide electors with adequate instructions for completing the declaration of the elector—including conspicuous warnings regarding the consequences for failing strictly to adhere*" to those requirements.[53] I cannot say with any confidence that even diligent electors were adequately informed as to what was required to avoid the consequence of disqualification in this case. As in 🔖 *Zentner*, it would be unfair to punish voters for the incidents of systemic growing pains.

In case after case involving the Election Code, especially this year, we have been reminded how important it is that the General Assembly provide unambiguous guidance for the administration of the election process. But it is imperative that

we recognize when the legislature has done precisely that, and resolve not to question the legislature's chosen language when it has done so. And perhaps it is a silver lining that many of the problems that we have encountered this year, in which a substantially overhauled electoral system has been forced to make its maiden run in stormy seas, are now clear enough that the legislature and Department of State have notice of what statutory refinements are most needful. It is my sincere hope that the General Assembly sees fit to refine and clarify the Election Code scrupulously in the light of lived experience. In particular, because this is the second time this Court has been called upon to address the declaration requirement, it seems clear that the General Assembly might clarify and streamline the form and function of the declaration, perhaps prescribing its form to advance clarity and uniformity across the Commonwealth. [54]

## CONCURRING AND DISSENTING OPINION

JUSTICE DOUGHERTY

**\*25** I concur in the decision to affirm the lower courts' orders pertaining to ballots where the qualified electors failed to print their name and/or address on the outer envelope containing their absentee or mail-in ballots. However, I cannot agree that the obligation of electors to set forth the date they signed the declaration on that envelope does not carry "weighty interests." Opinion Announcing the Judgment of the Court (OAJC) at ——. I therefore respectfully dissent from the holding at Section III(2) of the OAJC which provides that the undated ballots may be counted.

The applicable statutes require that electors "shall [ ] fill out, date and sign" the declaration printed on the ballot envelope. 25 P.S. §§ 3146.6(a), 3150.16(a). In my view, the term "fill out" is subject to interpretation. Maybe it means printing one's name and address on the envelope, and maybe it does not. Given that our goal in interpreting the Election Code is to construe ambiguous provisions liberally, in order to avoid disenfranchisement where possible, I do not consider the failure of qualified electors to "fill out" their name and address, particularly where the name and address already appear on the other side of the envelope, to require disqualification of the ballot. I am further persuaded of this position by the fact that the blank spaces on the envelope indicating where the name and address should be "filled out" were designated by the Secretary, not the General Assembly. 25 P.S. § 3146.4 ("Said form of declaration and envelope shall be as prescribed by the Secretary of the Commonwealth[.]"); *see also* Concurring and Dissenting Opinion at —— – —— (Wecht, J.). But, the meaning of the terms "date" and "sign" — which **were** included by the legislature — are self-evident, they are not subject to interpretation, and the statutory language expressly requires that the elector provide them. *See In re Canvass of Absentee Ballots of Nov. 4, 2003 General Election*, 577 Pa. 231, 843 A.2d 1223, 1231 (2004) ("[A]ll things being equal, the law will be construed liberally in favor of the right to vote but, at the same time, we cannot ignore the clear mandates of the Election Code.") (citation omitted). Accordingly, I do not view the absence of a date as a mere technical insufficiency we may overlook.

In my opinion, there is an unquestionable purpose behind requiring electors to date and sign the declaration. As Judge Brobson observed below, the date on the ballot envelope provides proof of when the "elector actually executed the ballot in full, ensuring their desire to cast it in lieu of appearing in person at a polling place. The presence of the date also establishes a point in time against which to measure the elector's eligibility to cast the ballot[.]" *In Re: 2,349 Ballots in the 2020 General Election*, 1162 C.D. 2020, slip op. at 12, 2020 WL 6820816 (Pa. Cmwlth. Nov. 19, 2020) (memorandum). The date also ensures the elector completed the ballot within the proper time frame and prevents the tabulation of potentially fraudulent back-dated votes. *Cf. In re Canvass of Absentee Ballots of November 4, 2003 General Election*, 843 A.2d at 1232-33 (statutory requirement that ballot be submitted by elector and not third-party is mandatory safeguard against fraud). I recognize there is presently no dispute that all undated ballots at issue here arrived in a timely manner. But I am also cognizant that our interpretation of this relatively new statute will act as precedential guidance for future cases.

Chief Justice Saylor and Justice Mundy join this concurring and dissenting opinion.

## All Citations

--- A.3d ----, 2020 WL 6866415

## Footnotes

1    DNA Services Corp./Democratic National Committee (hereinafter "DNC") intervened in the proceedings before the trial court.

2    None of the parties have challenged whether these provisions constituted improper delegations of legislative authority. *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 639 Pa. 645, 161 A.3d 827 (2017).

3    Conversely, the Philadelphia Board and the DNC have both selectively relied upon guidance provided by the Secretary to the county boards of election that indicated that a voter's failure to handwrite his/her name and address was not a ground to set the ballot aside. Philadelphia Board's Brief at 19; DNC's Brief at 15. They have directed the Court to the Guidance published on September 11, 2020, in which the Secretary advised that "[i]f the Voter's Declaration on the return envelope is signed and the county board is satisfied that the declaration is sufficient, the mail-in or absentee ballot should be approved for canvassing." Guidance, 9/11/2020, at 3. As discussed infra at n.6, however, on September 28, 2020 the Secretary issued arguably contrary guidance stating that "[a] ballot-return envelope with a declaration that is not filled out, dated, and signed is not sufficient and must be set aside, declared void and may not be counted." Guidance, 9/28/20, at 9. Confusingly, she also incorporated by reference the September 11, 2020 Guidance. Both sets of Guidance are set forth on pages —— – —— supra.

4    Where an election statute is ambiguous, courts apply the interpretative principle that that "election laws ... ordinarily will be construed liberally in favor of the right to vote." *Pa. Democratic Party*, 238 A.3d at 360–61.

5    The DNC argues, with some persuasive force, that the Campaign's requested interpretation of Pennsylvania's Election Code could lead to a violation of federal law by asking the state to deny the right to vote for immaterial reasons. Nobody acting under color of state law may deny anyone the right to vote "in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

Under this section, the so-called "materiality provision" of the Voting Rights Act, federal courts have barred the enforcement of similar administrative requirements to disqualify electors. *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) (disclosure of voter's social security number is not "material" in determining whether a person is qualified to vote under Georgia law for purposes of the Voting Rights Act); *Washington Ass'n of Churches v. Reed*, 492 F.Supp.2d 1264 (W.D. Wash. 2006) (enjoining enforcement of "matching" statute, requiring state to match potential voter's name to Social Security Administration or Department of Licensing database, because failure to match applicant's information was not material to determining qualification to vote); *Martin v. Crittenden*, 347 F.Supp.3d 1302 (N.D. Ga. 2018), *reconsideration denied*, 1:18-CV-4776-LMM, 2018 WL 9943564 (N.D. Ga. Nov. 15, 2018) (voter's ability to correctly recite his or her year of birth on absentee ballot envelope was not material to determining said voter's qualifications).

6    In her brief, Ziccarelli cites to the Guidance distributed by the Secretary of the Commonwealth on September 28, 2020 to the county boards of elections, advising that "[a] ballot-return envelope with a declaration that is not filled out, dated, and signed is not sufficient and must be set aside, declared void and may not be counted." As noted in footnote 3 supra, however, the Secretary also issued Guidance on September 11, 2020, which was cited with approval by the Philadelphia Board and the DNC. No party referenced both sets of Guidance, however, even though the September 28 Guidance incorporated the September 11 Guidance. *See* Guidance, 9/28/2020, at 9 ("For more information about the examination of return envelopes, please refer to the Department's September 11, 2020 Guidance Concerning Examination of Absentee and Mail-in Ballot Return Envelopes.").

In any event, we will not consider this Guidance in making our decision. Neither of the parties explain how the potentially contradictory directives are to be understood. More importantly, the Secretary has no

authority to definitively interpret the provisions of the Election Code, as that is the function, ultimately, of this Court. The Secretary also clearly has no authority to declare ballots null and void. "[I]t is the Election Code's express terms that control, not the written guidance provided by the Department and as this Court repeatedly has cautioned, even erroneous guidance from the Department or county boards of elections cannot nullify the express provisions of the Election Code." *In re Scroggin*, ––– Pa. ––––, 237 A.3d 1006, 1021 (2020). Moreover, the Secretary has no authority to order the sixty-seven county boards of election to take any particular actions with respect to the receipt of ballots. 25 P.S. § 2621(f.2).

Finally, with respect to the September 28 Guidance indicating that undated ballots must be set aside, we note that in addition to the Philadelphia and Allegheny County Boards, at least two other boards of elections also did not follow it. *Donald J. Trump for President Inc. v. Bucks Cnty. Bd. of Elections,* No. 2020-05786 (Bucks Cty. Ct. Com. Pl.); *Donald J. Trump for President, Inc., et al. v. Montgomery Cnty. Bd. of Elections*, No. 2020-18680 (Nov. 13, 2020). Both the Bucks County and Montgomery County Courts of Common Pleas affirmed the counting of the ballots even though the declarations had not been filled out in full. Each of the courts of common pleas appropriately applied this Court's precedent in doing so.

1       Act of June 3, 1937, P.L. 1333, art. I, § 101, *codified as amended at* 25 P.S. §§ 2601, *et seq.*

2       None of the parties or courts involved in these consolidated cases dispute that a voter's failure to sign a mail-in or absentee ballot's declaration requires invalidation.

3       Act of Dec. 6, 1972, No. 290, § 3, *codified as amended at* 1 Pa.C.S. §§ 1501, *et seq.*

4       ––– Pa. ––––, 238 A.3d 345, 391 (2020) (Wecht, J., concurring) (hereinafter " *PDP*").

5       Specifically, 25 P.S. § 3150.16(a) provides that the mail-in ballot elector "shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, *enclose and securely seal the same in the envelope on which is printed, stamped or endorsed 'Official Election Ballot.'* "

6       *Compare* 25 P.S. § 3150.16(a) ("Voting by mail-in electors") *with* 25 P.S. § 3146.6(a) ("Voting by absentee electors"). Each provision governing the form of mail-in ballots and the voter's obligations in preparing and transmitting them has its verbatim equivalent for absentee ballots, and the issue presented applies equally to both. Hereinafter, for simplicity's sake, I refer exclusively to mail-in ballots and cite and quote only the provisions that apply to mail-in ballots, but my analysis applies identically to both. The OAJC reproduces the relevant sections at length. *See* OAJC at ––––– – –––––.

7       25 P.S. § 3150.16(a) (emphasis added).

8       *Appeal of Weiskerger*, 447 Pa. 418, 290 A.2d 108 (1972).

9       25 P.S. § 3063 (applicable through October 30, 2019).

10      *Weiskerger*, 290 A.2d at 109 (cleaned up).

11      *Appeal of Pierce*, 577 Pa. 231, 843 A.2d 1223, 1231 (2004); *see* 1 Pa.C.S. 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."); *see also* *Oberneder v. Link Computer Corp.*, 548 Pa. 201, 696 A.2d 148, 150 n.2 (1997) (rejecting a party's reliance upon a 1965 case because it was at odds with the ambiguity-first, reliance-upon-rules-of-construction-later approach to statutory construction required by the SCA).

12      Without suggesting that the ink color language at issue in that case was ambiguous on its face, the *Weiskerger* Court suggested that interpreting the language required it to consider, *inter alia*, "the occasion for its enactment" and "the mischief to be remedied." *Weiskerger*, 290 A.2d at 109. Section 1921 of the SCA similarly provides that courts may consider "[t]he occasion and necessity for the statute" and "[t]he mischief to be remedied"—but *only* "[w]hen the words of the statute are not explicit." 1 Pa.C.S. § 1921(c).

*In re Canvass of Absentee and Mail-in Ballots of November 3,..., --- A.3d ---- (2020)*

2020 WL 6866415

13   *See, e.g., Appeal of Norwood*, 382 Pa. 547, 116 A.2d 552, 555 (1955); *Appeal of Gallagher*, 351 Pa. 451, 41 A.2d 630, 632 (1945).

14   *Weiskerger*, 290 A.2d at 109 (quoting *In re Petitions to Open Ballot Boxes*, 410 Pa. 62, 188 A.2d 254, 256 (1963)).

15   In contrast to *Weiskerger*'s capacious understanding of this principle, the Court adopted a more measured tone in *Appeal of Urbano*, 411 Pa. 45, 190 A.2d 719 (1963). There, citing the presumption in favor of counting votes, it allowed for relief from the apparent consequences of failing to satisfy mandatory statutory language, but did so specifically because the common-law presumption was in keeping with additional statutory language expressly granting the court discretion to permit amendments to cure even "material errors or defects." *Id.*

16   *Weiskerger*, 290 A.2d at 109 (emphasis added).

17   To be clear, *Weiskerger* was by no means our original sin in this area. In one earlier example cited by the OAJC, this Court discerned reason to disregard the mandatory connotation of "shall" in *Appeal of James*, 377 Pa. 405, 105 A.2d 64 (1954). Indeed, one can detect aspects of the same open-ended analysis in, *e.g.*, our 1922 decision in *In re Fish's Election*, 273 Pa. 410, 117 A. 85, 87 (1922) (quoting *Knight v. Borough of Coudersport*, 246 Pa. 284, 92 A. 299, 300 (1914)) ("If the law declares a specified irregularity to be fatal, the court will follow that command, irrespective of their views of the importance of the requirement. In the absence of such declaration the judiciary endeavor, as best they may, to discern whether the deviation from the prescribed forms of law had or had not so vital an influence on the proceedings as probably prevented a full and free expression of the popular will. ... [If not], it is considered immaterial."). Our willingness to substitute our judgment for that of the legislature perhaps reached its nadir in *Norwood*, where we held that "[e]very rationalization within the realm of common sense should aim at saving [a] ballot rather than void it," 116 A.2d at 554-55, an expression that the OAJC embraces as a "well-settled principle of Pennsylvania election law." OAJC at ——. Perhaps no passage better illustrates the liberties this Court has taken when probing for reasons to treat mandatory language as anything but mandatory.

18   577 Pa. 384, 845 A.2d 793 (2004).

19   25 P.S. § 3031.12(b)(3) (emphasis added). The language in question has been amended in the intervening years.

20   *Shambaugh*, 845 A.2d at 798 (quoting *James*, 105 A.2d at 65).

21   *Id.* at 798.

22   *See Appeal of Mellody*, 449 Pa. 386, 296 A.2d 782, 784 (1972); *Reading Defense Committee*, 188 A.2d at 256; *Gallagher*, 41 A.2d at 632. The OAJC similarly relies substantially for these principles on pre-SCA case law. *See, e.g.*, OAJC at —— (quoting *James*, 105 A.2d at 65-66 (Pa. 1954)); *id.* at —— (quoting *Urbano*, 190 A.2d at 719, and *Norwood*, 116 A.2d at 554).

23   25 P.S. § 3146.6(a) (emphasis added); *see Pierce*, 843 A.2d at 1231.

24   *Pierce*, 843 A.2d at 1230 (citations omitted).

25   *Id.*

26   *Id.* at 1231-32 (citing, *inter alia*, BRYAN GARNER, DICTIONARY OF MODERN LEGAL USAGE 939 (2d ed. 1995)).

27   —— Pa. ——, 237 A.3d 1006 (2020).

28   *Id.* at 1019 (quoting *Appeal of Cubbage*, 467 Pa. 491, 359 A.2d 383, 384 (1976)).

29   *PDP*, 238 A.3d at 379 (quoting *Pierce*, 843 A.2d at 1232).

30   *Id.* at 380 ("[*Pierce*] leads to the inescapable conclusion that a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified. ... Accordingly, we hold that the secrecy [envelope] language in Section 3150.16(a) is mandatory and the mail-in elector's failure to comply ... renders the ballot invalid.").

31   *Id.* at 391 (Wecht, J., concurring).

32   *Id.*

33   *See* Conc. & Diss. Op. at ——Conc. & Diss. Op. at —— (Dougherty, J.).

34   *See* OAJC at —— – —— n.6.

35   *See* PDP, 238 A.3d at 356 ("[T]he Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice."). Notably, the OAJC cites PDP for the same proposition, correctly qualifying the principle by noting that liberal construction comes into play only "[w]here *an election statute is ambiguous*." OAJC at —— n.4 (emphasis added).

36   I also find cause for concern in the absence of clear instruction on the ballot materials indicating that a ballot lacking a name or address will be disqualified, a concern that informs my preference for prospective application of the statutory date requirement. *Cf. Reading*, 188 A.2d at 256 (declining to invalidate ballots upon which voters did not signal their intended votes strictly with the X or check mark mandated by statute for various reasons—including a "minor irregularity" approach I reject—especially where the printed instruction on the ballot did not specify that only those two methods of signaling one's vote would be recognized).

37   OAJC at ——.

38   *See id.* at —— (quoting James, 105 A.2d at 66 ("Technicalities should not be used to make the right of the voter insecure.")). *James*'s tendentious resort to the word "technicalities," which seldom is used constructively when invoked in connection with the law, is contradicted at least in tenor by subsequent pronouncements. *See* Pierce, 843 A.2d at 1234 ("[S]o-called technicalities of the Election Code are necessary for the preservation of secrecy and the sanctity of the ballot and must therefore be observed ...."); *Appeal of Weber*, 399 Pa. 37, 159 A.2d 901, 905 (1960) ("The technicalities of the Election Law (and they are many) are necessary for the preservation of the secrecy and purity of the ballot and must, therefore, be meticulously observed.").

39   *See* OAJC at —— – —— (counterposing "minor irregularities" and "weighty interests" as the framework for decision). Notably, the question as to which we granted review quite confused the meaning of "irregularity." We proposed to answer the question whether "the Election Code require[s] county boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed their ballot's outer envelopes but did not handwrite their name, their address, and/or a date, *where no fraud or irregularity has been alleged*?" *Id.* at ——. But this formulation is irreconcilable with the question whether failing to date a ballot declaration is, itself, a "minor irregularity" and, as such, not subject to the sanction of ballot invalidation—the very crux of the case, as the OAJC defines it. I raise this discrepancy because it illustrates how these constructs lend themselves to confusion, complicating what should be simple questions by engrafting unenumerated considerations upon plainly worded statutes.

40   *See id.* at —— ("The date stamp and the SURE system provide a clear and objective indicator of timeliness, making any handwritten date unnecessary and, indeed, superfluous."); *cf. id.* at —— (characterizing the handwritten name and address requirement as, "at best, a 'minor irregularity' and, at worst, entirely immaterial").

41   *See id.* at —— ("Although unlike the handwritten name and address, which are not mentioned in the statute, the inclusion of the word 'date' in the statute does not change the analysis *because the word 'shall' is not determinative as to whether the obligation is mandatory or direct[ory] in nature*." (emphasis added)).

42   *See id.* at —— – ——.

43    See 🚩 *In re 2,349 Ballots in the 2020 General Election*, 1162 C.D. 2020, slip op. at 12, 2020 WL 6820816 (Pa. Cmwlth. Nov. 19, 2020) (memorandum); Conc. & Diss. Op. at ——— (Dougherty, J.).

44    🚩 *In re 2,349 Ballots*, slip op. at 12-13.

45    🏳 533 Pa. 564, 626 A.2d 146 (1993)

46    🏳 *Id.* at 149.

47    🏳 *Id.*

48    *Cf. Andino v. Middleton*, No. 20A55, ——— U.S. ———, ———, ——— S.Ct. ———, ——— L.Ed.2d ———, 2020 WL 5887393, *1 (Oct. 5, 2020) (staying the district court's injunction of an absentee ballot witness requirement, "except to the extent that any ballots cast before this stay issues and received within two days of this order may not be rejected for failing to comply with the witness requirement" in light of the fact that voters cast nonconforming absentee ballots in reliance upon the guidance of state elections officials during the pendency of the injunction); *In re Beyer*, 631 Pa. 612, 115 A.3d 835, 843-44 (2015) (Baer, J., dissenting) (finding it "reasonable for this Court to rule prospectively that a candidate may only designate his occupation or profession as 'lawyer' on nomination papers after he or she has graduated from law school, passed the bar exam, and is in good standing as an active member of the Pennsylvania Bar," but dissenting because, "at the time Candidate Beyer filed his nomination papers, neither a majority of this Court nor the Commonwealth Court had ever made such an express declaration").

49    See Act of Oct. 31, 2019, P.L. 552, No. 77.

50    See Act of March 27, 2020, P.L. 41, No. 12.

51    *See* OAJC at ——— n.3, ——— – ——— n.6; *see also id.* at ——— – ——— (reproducing all relevant aspects of the guidance documents pertaining to the issues presented).

52    *See* 🏳 *PDP*, 238 A.3d at 389 (Wecht, J., concurring).

53    *See* 🏳 *id.* (emphasis added).

54    In this regard, the OAJC observes that the Democratic National Committee "argues, with some persuasive force, that the Campaign's requested interpretation of Pennsylvania's Election Code could lead to a violation of [the federal Voting Rights Act] by asking the state to deny the right to vote for immaterial reasons." OAJC at ——— n.5; *see* 🏳 52 U.S.C. § 10101(a)(2) ("No person acting under color of law shall ... (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election ...."). The OAJC does not pursue this argument, except to acknowledge a handful of cases that might be read to suggest that the name and address, and perhaps even the date requirement could qualify as "not material in determining whether such individual is qualified under State law to vote." Given the complexity of the question, I would not reach it without the benefit of thorough advocacy. But I certainly would expect the General Assembly to bear that binding provision in mind when it reviews our Election Code. It is inconsistent with protecting the right to vote to insert more impediments to its exercise than considerations of fraud, election security, and voter qualifications require.

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Unreported Opinion 3

*Donald J. Trump for President, Inc. v. Boockvar*, Case No. 4:20-cv-2078, --- F.Supp.3d ----, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020) (Brann, J. op.)

KeyCite Blue Flag – Appeal Notification

Appeal Filed by  DONALD J. TRUMP FOR PRESIDENT, ET AL. v. SECRETARY COMMONWEALTH OF PA, ET AL.,  3rd Cir.,  November 23, 2020

2020 WL 6821992
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiffs,
v.
Kathy BOOCKVAR, et al., Defendants.

No. 4:20-CV-02078
|
Filed November 21, 2020

**Synopsis**
**Background:** Voters and President's reelection campaign brought action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, seeking to invalidate millions of votes cast by Pennsylvanians in presidential election during COVID-19 pandemic based on allegations that Secretary's authorization of notice-and-cure procedure for procedurally defective mail-in ballots violated the Equal Protection Clause and that poll watchers were impermissibly excluded from canvass. Secretary and county boards of elections moved to dismiss.

**Holdings:** The District Court, Matthew W. Brann, J., held that:

[1] voters lacked standing to pursue action;

[2] campaign lacked associational standing to pursue action;

[3] campaign lacked competitive standing to pursue action;

[4] rational basis existed for Secretary's decision to provide counties with discretion to use notice-and-cure procedure for procedurally defective mail-in ballots, and thus, Secretary's decision did not violate voters' rights under the Equal Protection Clause; and

[5] campaign failed to allege that its poll watchers were treated differently than opposing party presidential

candidate's poll watchers, as required to state equal protection claim for allegedly excluding watchers from canvass.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Standing.

West Headnotes (45)

[1] **Election Law**  Power to Confer and Regulate

The power to regulate and administer federal elections arises from the Constitution. U.S. Const. art. 1, § 4, cl. 1.

[2] **United States**  Relation to state law; preemption

States' power to regulate the incidents of federal elections, including balloting, is limited to the exclusive delegation of power under the Elections Clause. U.S. Const. art. 1, § 4, cl. 1.

[3] **Federal Courts**  Case or Controversy Requirement

Article III limits the power of the federal judiciary to "cases" and "controversies." U.S. Const. art. 3, § 2, cl. 1.

[4] **Federal Civil Procedure**  In general; injury or interest
**Federal Courts**  Case or Controversy Requirement

To satisfy the case-or-controversy requirement of Article III, a plaintiff must establish that they have standing. U.S. Const. art. 3, § 2, cl. 1.

[5] **Federal Civil Procedure**  In general; injury or interest

Standing is a "threshold" issue; it is an irreducible constitutional minimum, without

which a federal court lacks jurisdiction to rule on the merits of an action. U.S. Const. art. 3, § 2, cl. 1.

**[6]    Federal Civil Procedure** 🔑 In general; injury or interest

Federal courts are obligated to raise the issue of standing sua sponte. U.S. Const. art. 3, § 2, cl. 1.

**[7]    Federal Civil Procedure** 🔑 In general; injury or interest

The plaintiff bears the burden of establishing standing. U.S. Const. art. 3, § 2, cl. 1.

**[8]    Federal Civil Procedure** 🔑 In general; injury or interest

**Federal Civil Procedure** 🔑 Causation; redressability

To demonstrate standing, a plaintiff must show: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. U.S. Const. art. 3, § 2, cl. 1.

**[9]    Federal Civil Procedure** 🔑 In general; injury or interest

In assessing whether a plaintiff has carried the burden of demonstrating standing, courts must separate the standing inquiry from any assessment of the merits of the plaintiff's claim. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[10]    Federal Civil Procedure** 🔑 In general; injury or interest

To maintain the fundamental separation between standing and merits at the dismissal stage, courts assume for the purposes of the standing inquiry that a plaintiff has stated valid legal claims. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[11]    Federal Civil Procedure** 🔑 In general; injury or interest

While a court's standing inquiry may necessarily reference the nature and source of the claims asserted, the court's focus remains on whether the plaintiff is the proper party to bring those claims. U.S. Const. art. 3, § 2, cl. 1.

**[12]    Election Law** 🔑 Nature and source of right

**Election Law** 🔑 Persons entitled to bring contest

A person's right to vote is individual and personal in nature; accordingly, the denial of a person's right to vote is typically always sufficiently concrete and particularized to establish a cognizable injury for standing purposes, and this is true regardless of whether such a harm is widely shared. U.S. Const. art. 3, § 2, cl. 1.

**[13]    Federal Civil Procedure** 🔑 In general; injury or interest

So long as an injury is concrete, courts will find that an injury in fact exists, as required for standing, despite the fact that such harm is felt by many. U.S. Const. art. 3, § 2, cl. 1.

**[14]    Constitutional Law** 🔑 Elections

Pennsylvania voters, who were not given opportunity to cure their mail-in ballots for presidential election after ballots were invalidated, suffered an injury-in-fact, as required to have standing to pursue action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, challenging on equal protection grounds millions of votes cast by Pennsylvanians in presidential election during COVID-19 pandemic, although many other voters across the state might also have had their votes invalidated due to their county's failure to implement notice-and-cure procedure for procedurally defective mail-in ballots. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 📄 25 Pa. Stat. Ann. § 3150.16.

**[15] Civil Rights** 🔑 Injury and Causation

County boards of elections did not cause injury to Pennsylvania voters, who were not given opportunity to cure their mail-in ballots after ballots were invalidated, and thus, voters lacked standing to pursue action against the boards, challenging on equal protection grounds the boards' use of notice-and-cure procedure for procedurally defective mail-in ballots cast by Pennsylvanians in presidential election during COVID-19 pandemic; voters' ballots were rejected by counties that were not party to the action, and boards of elections did not receive, review, or discard voters' ballots. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 25 Pa. Stat. Ann. § 3150.16.

**[16] Civil Rights** 🔑 Injury and Causation

Secretary of the Commonwealth of Pennsylvania did not cause injury to Pennsylvania voters, who were not given opportunity to cure their mail-in ballots after ballots were invalidated, and thus, voters lacked standing to pursue action against Secretary, challenging on equal protection grounds Secretary's decision to provide counties with direction to use notice-and-cure procedure for procedurally defective mail-in ballots cast by Pennsylvanians in presidential election during COVID-19 pandemic; by sending e-mail to counties encouraging them to adopt notice-and-cure policy, Secretary did not intend for voters' ballots to be cancelled but encouraged counties to allow voters' types of votes to be counted. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 25 Pa. Stat. Ann. § 3150.16.

**[17] Civil Rights** 🔑 Injury and Causation

Pennsylvania voters' injury of not being given opportunity to cure their mail-in ballots after ballots were invalidated could not be redressed by favorable decision, and thus, voters lacked standing to pursue action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, challenging on equal protection grounds Secretary's authorization of and boards' use of notice-and-cure procedure for procedurally defective mail-in ballots cast by Pennsylvanians in presidential election during COVID-19 pandemic; voters sought injunction prohibiting boards of elections from certifying election results, but prohibiting certification of the election results would not reinstate voters' right to vote. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 25 Pa. Stat. Ann. § 3150.16.

**[18] Federal Civil Procedure** 🔑 In general; injury or interest

**Federal Civil Procedure** 🔑 Causation; redressability

Standing is measured based on the theory of harm and the specific relief requested, and it is not dispensed in gross, as a plaintiff's remedy must be tailored to redress the plaintiff's particular injury. U.S. Const. art. 3, § 2, cl. 1.

**[19] Associations** 🔑 Suits on Behalf of Members; Associational or Representational Standing

Associational standing allows an entity to bring suit on behalf of members upon a showing that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. U.S. Const. art. 3, § 2, cl. 1.

**[20] Constitutional Law** 🔑 Elections

President's reelection campaign lacked associational standing to pursue action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, challenging on equal protection grounds Secretary's authorization of and boards' use of notice-and-cure procedures for procedurally defective mail-in ballots cast by Pennsylvanians in presidential

election during COVID-19 pandemic; even if member voters attempted to vote for President but had their ballots invalidated, voters' constitutional interests were different from interests of campaign. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 🔑 25 Pa. Stat. Ann. § 3150.16.

[21] **Constitutional Law** 🔑 Elections

President's reelection campaign lacked competitive standing to pursue action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, challenging on equal protection grounds Secretary's authorization of and boards' use of notice-and-cure procedures for procedurally defective mail-in ballots cast by Pennsylvanians in presidential election during COVID-19 pandemic, absent allegation that presidential candidate was ineligible to appear on ballot. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 14; 🔑 25 Pa. Stat. Ann. § 3150.16.

[22] **Election Law** 🔑 Persons entitled to bring contest

Competitive standing applies to challenges regarding the eligibility of a candidate. U.S. Const. art. 3, § 2, cl. 1.

[23] **Federal Civil Procedure** 🔑 Pleading, Defects In, in General

A motion to dismiss for failure to state a claim tests the legal sufficiency of a claim and streamlines litigation by dispensing with needless discovery and factfinding. Fed. R. Civ. P. 12(b)(6).

[24] **Federal Civil Procedure** 🔑 Insufficiency in general

Rule governing motions to dismiss for failure to state a claim authorizes a court to dismiss a claim on the basis of a dispositive issue of law; this is true of any claim, without regard to whether

it is based on an outlandish legal theory or on a close but ultimately unavailing one. Fed. R. Civ. P. 12(b)(6).

[25] **Federal Civil Procedure** 🔑 Insufficiency in general

Although the plausibility standard used for motions to dismiss for failure to state a claim does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully. Fed. R. Civ. P. 12(b)(6).

[26] **Federal Civil Procedure** 🔑 Insufficiency in general

On a motion to dismiss for failure to state a claim, asking for plausible grounds calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of wrongdoing. Fed. R. Civ. P. 12(b)(6).

[27] **Federal Civil Procedure** 🔑 Insufficiency in general

The plausibility determination on a motion to dismiss for failure to state a claim is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense; no matter the context, however, where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Fed. R. Civ. P. 12(b)(6).

[28] **Federal Civil Procedure** 🔑 Matters deemed admitted; acceptance as true of allegations in complaint

The tenet that a court must accept as true all of the allegations contained in the complaint on a motion to dismiss for failure to state a claim is inapplicable to legal conclusions. Fed. R. Civ. P. 12(b)(6).

**[29]    Constitutional Law** 🔖 Discrimination and Classification

**Constitutional Law** 🔖 Similarly situated persons; like circumstances

The Equal Protection Clause does not forbid classifications; it simply keeps governmental decisionmakers from treating similarly situated persons differently. U.S. Const. Amend. 14.

**[30]    Constitutional Law** 🔖 Perfect, exact, or complete equality or uniformity

A classification resulting in some inequality will be upheld under the Equal Protection Clause unless it is based on an inherently suspect characteristic or jeopardizes the exercise of a fundamental right. U.S. Const. Amend. 14.

**[31]    Constitutional Law** 🔖 Voting rights and suffrage in general

All citizens of the United States have a constitutionally protected right to vote; and all citizens have a constitutionally protected right to have their votes counted.

**[32]    Election Law** 🔖 State legislatures

States have broad authority to regulate the conduct of elections, including federal ones; this authority includes broad powers to determine the conditions under which the right of suffrage may be exercised. U.S. Const. art. 1, § 4, cl. 1.

**[33]    Election Law** 🔖 Constitutionality and validity

Because states must have freedom to regulate elections if some sort of order, rather than chaos, is to accompany the democratic processes, such regulation is generally insulated from the stringent requirements of strict scrutiny. U.S. Const. art. 1, § 4, cl. 1.

**[34]    Election Law** 🔖 Constitutionality and validity

State regulation that burdens voting rights is normally subject to the 🔖 *Anderson*-🔖 *Burdick* balancing test, which requires that a court weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule; under this test, any law respecting the right to vote, whether it governs voter qualifications, candidate selection, or the voting process, is subjected to a deferential important regulatory interests standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote.

**[35]    Election Law** 🔖 Constitutionality and validity

The 🔖 *Anderson*-🔖 *Burdick* balancing test, which requires a court to weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule, operates on a sliding scale; thus, more restrictive laws are subject to greater scrutiny, and conversely, minimally burdensome and nondiscriminatory regulations are subject to a level of scrutiny closer to rational basis.

**[36]    Constitutional Law** 🔖 Voting and political rights

Where a state imposes no burden on the right to vote at all, true rational basis review applies on an equal protection challenge to a voting law. U.S. Const. Amend. 14.

**[37]    Constitutional Law** 🔖 Absentee ballots

Notice-and-cure procedure for procedurally defective mail-in ballots used by county boards of elections and authorized by the Secretary of the Commonwealth of Pennsylvania imposed no burden on voters' right to vote, such that voters'

equal protection challenge to millions of votes cast by Pennsylvanians in presidential election during COVID-19 pandemic was subject to rational basis review; counties by implementing procedure had lifted burden on the right to vote, and expanding the right to vote for some residents did not burden the rights of others.

U.S. Const. Amend. 14; 🔖 25 Pa. Stat. Ann. § 3150.16.

**[38]    Constitutional Law** 🔑 Absentee ballots

**Election Law** 🔑 Rejection of vote by election officers

Rational basis existed for decision of the Secretary of the Commonwealth of Pennsylvania to provide counties with discretion to use notice-and-cure procedure for procedurally defective mail-in ballots for presidential election during COVID-19 pandemic, and thus, Secretary's decision did not violate rights of voters, who were not given opportunity to cure their mail-in ballots after ballots were invalidated, under Equal Protection Clause; although states may not discriminatorily sanction procedures likely to burden some persons' right to vote more than others, they need not expand the right to vote in perfect uniformity, and no county was forced to adopt notice-and-cure procedure but made choice to do so, or not. U.S. Const. Amend. 14; 🔖 25 Pa. Stat. Ann. § 3150.16.

**[39]    Federal Civil Procedure** 🔑 Causation; redressability

Though every injury must have its proper redress, a court may not prescribe a remedy unhinged from the underlying right being asserted.

**[40]    Injunction** 🔑 Conduct of elections

Even if decision of the Secretary of the Commonwealth of Pennsylvania to provide counties with discretion to use notice-and-cure procedure for procedurally defective mail-in ballots for presidential election during

COVID-19 pandemic violated rights of voters, who were not given opportunity to cure their mail-in ballots after ballots were invalidated, under Equal Protection Clause, District Court could not grant voters' requested injunctive relief preventing certification of Pennsylvania election results; granting voters' requested injunctive relief would necessarily require invalidating the ballots of every person who voted in Pennsylvania, and court lacked the authority to take away the constitutionally-protected right to vote of even one person. U.S. Const. Amend. 14; 🔖 25 Pa. Stat. Ann. § 3150.16.

**[41]    Civil Rights** 🔑 Judgment and relief in general

When remedying an equal-protection violation, a court may either level up or level down; this means that a court may either extend a benefit to one that has been wrongfully denied it, thus leveling up and bringing that person on par with others who already enjoy the right, or a court may level down by withdrawing the benefit from those who currently possess it. U.S. Const. Amend. 14.

**[42]    Civil Rights** 🔑 Judgment and relief in general

Generally, the preferred rule when remedying an equal-protection violation in a typical case is to extend favorable treatment and to level up; in fact, leveling down is impermissible where the withdrawal of a benefit would necessarily violate the Constitution, and such would be the case if a court were to remedy discrimination by striking down a benefit that is constitutionally guaranteed. U.S. Const. Amend. 14.

**[43]    Constitutional Law** 🔑 Conduct of Elections

**Election Law** 🔑 Presence of representatives of candidates or parties

President's reelection campaign failed to allege that its poll watchers were treated differently from opposing party presidential candidate's poll watchers, as required to state equal protection claim against Secretary of the Commonwealth

2020 WL 6821992

of Pennsylvania and county boards of elections for allegedly excluding watchers from canvass; campaign simply alleged that poll watchers did not have access or were denied access to some areas. U.S. Const. Amend. 14.

**[44]    Federal Civil Procedure  ⬦  Complaint**

Among the grounds that could justify a denial of leave to amend a complaint are undue delay, bad faith, dilatory motive, prejudice, and futility.

**[45]    Federal Civil Procedure  ⬦  Time for amendment**

Allowing voters and President's reelection campaign to amend their complaint would unduly delay resolution of the issues, and thus, District Court would deny leave to amend in action against Secretary of the Commonwealth of Pennsylvania and county boards of elections, challenging on equal protection grounds Secretary's authorization of and boards' use of notice-and-cure procedure for procedurally defective mail-in ballots cast by Pennsylvanians in presidential election during COVID-19 pandemic; voters and campaign had already amended once as of right, voters and campaign sought to amend simply in order to effectively reinstate their initial complaint and claims, and deadline for counties in Pennsylvania to certify their election results was two days away. U.S. Const. Amend. 14; 25 Pa. Stat. Ann. § 3150.16.

**Attorneys and Law Firms**

Brian C. Caffrey, Marc A. Scaringi, Rudolph William Giuliani, Scaringi & Scaringi PC, Rudolph Giuliani, PLLC, Harrisburg, PA, New York, NY, for Plaintiff.

Thomas W. King, III, Dillon McCandless King Coulter & Graham LLP, Buter, PA, for Intervenor Plaintiff.

Daniel T. Brier, Donna A. Walsh, John B. Dempsey, Karen Mascio Romano, Keli M. Neary, Nicole J. Boland, Stephen

Moniak, John Coit, John B. Hill, Andrew F. Szefi, Christina C. Matthias, Mark A. Aronchick, Michele D. Hangley, Robert A. Wiygul, Virginia Scott, Elizabeth A. Dupuis, Molly E. Meacham, Edward D. Rogers, Elizabeth Wingfield, Terence M. Grugan, Timothy D. Katsiff, Brian J. Taylor, Timothy P. Brennan, Myers Brier & Kelly, LLP, Pennsylvania Office of Attorney General, Office of Attorney General, Office of Attorney General Civil Litigation Section, Hangley Aronchick Segal Pudlin & Schiller, Scott Law Office, Babst, Calland, Clements and Zomnir, P.C., Ballard Spahr LLP, King Spry Herman Freund & Faul LLC, Scranton, PA, Harrisburg, PA, Philadelphia, PA, Pittsburgh, PA, State College, PA, Bethlehem, PA, Easton, PA, for Defendant.

Jon Greenbaum, Witold J. Walczak, Adriel I. Cepeda Derieux, Benjamin D. Geffen, Claudia De Palma, Dale E. Ho, David Meir Zionts, Ezra D. Rosenberg, Ihaab Syed, Marian K. Schneider, Mary M. McKenzie, Rani Gupta, Sarah E. Brannon, Shankar Duraiswamy, Sophia Lin Lakin, Lawyers' Committee for Civil Rights Under Law District Of Columbia, American Civil Liberties Union of PA, American Civil Liberties Union Foundation, Inc., Covington & Burling LLP, Washington, DC, Pittsburgh, PA, New York, NY, Philadelphia, PA, Palo Alto, CA, for Intervenor/Interpleader Defendant.

Remy Green, Jonathan Wallace, Sean M. Shultz, Zachary Michael Wallen, Nancy A. Temple, Richard Bernstein, James P. DeAngelo, Joshua John Voss, Shohin Vance, Matthew H. Haverstick, Cohen & Green P.L.L.C., Hanft & Knight, P.C., Chalmers & Adams LLC, Katten & Temple LLP, McNees Wallace & Nurick, Kleinbard LLC, Ridgewood, NY, Amagansett, NY, Carlisle, PA, Pittsburgh, PA, Chicago, IL, Harrisburg, PA, Philadelphia, PA, for Amicus.

Alex M. Lacey, Ari Holtzblatt, John Michael Geise, Kyle J. Semroc, Lalitha D. Madduri, Marc E. Elias, Seth Waxman, Uzoma Nkwonta, Witold J. Walczak, Clifford B. Levine, Robert M. Linn, Dentons Cohen & Grigsby P.C., Wilmer Cutler Pickering Hale & Dorr LLP, Perkins Coie LLP, American Civil Liberties Union of PA, Cohen & Grigsby, PC, Pittsburgh, PA, Washington, DC, for Intervenor.

Jeffrey Cutler, York, PA, pro se.

## MEMORANDUM OPINION

Matthew W. Brann, United States District Judge

**\*1** Pending before this Court are various motions to dismiss Plaintiffs' First Amended Complaint. Plaintiffs in this matter are Donald J. Trump for President, Inc. (the "Trump Campaign"), and two voters, John Henry and Lawrence Roberts (the "Individual Plaintiffs"). [1] Defendants, who filed these motions to dismiss, include seven Pennsylvania counties (the "Defendant Counties"), as well as Secretary of the Commonwealth Kathy Boockvar. [2]

## I. INTRODUCTION

In this action, the Trump Campaign and the Individual Plaintiffs (collectively, the "Plaintiffs") seek to discard millions of votes legally cast by Pennsylvanians from all corners – from Greene County to Pike County, and everywhere in between. In other words, Plaintiffs ask this Court to disenfranchise almost seven million voters. This Court has been unable to find any case in which a plaintiff has sought such a drastic remedy in the contest of an election, in terms of the sheer volume of votes asked to be invalidated. One might expect that when seeking such a startling outcome, a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption, such that this Court would have no option but to regrettably grant the proposed injunctive relief despite the impact it would have on such a large group of citizens.

That has not happened. Instead, this Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence. In the United States of America, this cannot justify the disenfranchisement of a single voter, let alone all the voters of its sixth most populated state. Our people, laws, and institutions demand more. At bottom, Plaintiffs have failed to meet their burden to state a claim upon which relief may be granted. Therefore, I grant Defendants' motions and dismiss Plaintiffs' action with prejudice.

## II. BACKGROUND

### A. Legal and Factual Background

[1] [2] The power to regulate and administer federal elections arises from the Constitution. [3] "Because any state authority to regulate election to those offices could not precede their very creation by the Constitution, such power 'had to be delegated to, rather than reserved to by, the States.' " [4] Consequently, the Elections Clause "delegated to the States the power to regulate the 'Times, Places, and Manner of holding Elections for Senators and Representatives,' subject to a grant of authority to Congress to 'make or alter such Regulations.' " [5] Accordingly, States' power to "regulate the incidents of such elections, including balloting" is limited to "the exclusive delegation of power under the Elections Clause." [6]

Pennsylvania regulates the "times, places, and manner" of its elections through the Pennsylvania Election Code. [7] The Commonwealth's Constitution mandates that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." [8] Recognizing this as a foundational principle, the Pennsylvania Supreme Court has declared that the purpose of the Election Code is to promote "freedom of choice, a fair election and an honest election return." [9]

**\*2** In October 2019, the General Assembly of Pennsylvania enacted Act 77, which, "for the first time in Pennsylvania," extended the opportunity for all registered voters to vote by mail. [10] Following the beginning of the COVID-19 outbreak in March 2020, the General Assembly enacted laws regulating the mail-in voting system. [11] Section 3150.16 of the Election Code sets forth procedural requirements that voters must follow in order for their ballot to be counted. [12] These procedures require, for example, that voters mark their ballots in pen or pencil, place them in secrecy envelopes, and that ballots be received by the county elections board on or before 8:00 P.M. on Election Day. [13]

Nowhere in the Election Code is any reference to "curing" ballots, or the related practice of "notice-and-cure." This practice involves notifying mail-in voters who submitted procedurally defective mail-in ballots of these deficiencies and allowing those voters to cure their ballots. [14] Notified voters can cure their ballots and have their vote counted by requesting and submitting a provisional ballot. [15]

Recently, the Supreme Court of Pennsylvania in *Democratic Party of Pennsylvania v. Boockvar* addressed whether counties are *required* to adopt a notice-and-cure policy under the Election Code. [16] Holding that they are not, the court declined to explicitly answer whether such a policy is necessarily *forbidden*. [17]

Following this decision, Secretary Boockvar sent an email on November 2, 2020 encouraging counties to "provide information to party and candidate representatives during the pre-canvass that identifies the voters whose ballots have been rejected" so those ballots could be cured.[18] From the face of the complaint, it is unclear which counties were sent this email, which counties received this email, or which counties ultimately followed Secretary Boockvar's guidance.

Some counties chose to implement a notice-and-cure procedure while others did not.[19] Importantly, however, Plaintiffs allege only that Philadelphia County implemented such a policy.[20] In contrast, Plaintiffs also claim that Lancaster and York Counties (as well as others) did not adopt any cure procedures and thus rejected all ballots cast with procedural deficiencies instead of issuing these voters provisional ballots.[21]

Both Individual Plaintiffs had their ballots cancelled in the 2020 Presidential Election.[22] John Henry submitted his mail-in ballot to Lancaster County; however, it was cancelled on November 6, 2020 because he failed to place his ballot in the required secrecy envelope.[23] Similarly, after submitting his ballot to Fayette County, Lawrence Roberts discovered on November 9, 2020 that his ballot had been cancelled for an unknown reason.[24] Neither was given an opportunity to cure his ballot.[25]

### B. The 2020 Election Results

In large part due to the coronavirus pandemic still plaguing our nation, the rate of mail-in voting in 2020 was expected to increase dramatically. As anticipated, millions more voted by mail this year than in past elections. For weeks before Election Day, ballots were cast and collected. Then, on November 3, 2020, millions more across Pennsylvania and the country descended upon their local voting precincts and cast ballots for their preferred candidates. When the votes were counted, the Democratic Party's candidate for President, Joseph R. Biden Jr., and his running-mate, Kamala D. Harris, were determined to have received more votes than the incumbent ticket, President Donald J. Trump and Vice President Michael R. Pence. As of the day of this Memorandum Opinion, the Biden/Harris ticket had received 3,454,444 votes, and the Trump/Pence ticket had received 3,373,488 votes, giving the Biden ticket a lead of more than 80,000 votes, per the Pennsylvania state elections return website.[26] These results

will become official when counties certify their results to Secretary Boockvar on November 23, 2020 – the result Plaintiffs seek to enjoin with this lawsuit.

### C. Procedural History

**\*3** Although this case was initiated less than two weeks ago, it has already developed its own tortured procedural history. Plaintiffs have made multiple attempts at amending the pleadings, and have had attorneys both appear and withdraw in a matter of seventy-two hours. There have been at least two perceived discovery disputes, one oral argument, and a rude and ill-conceived voicemail which distracted the Court's attention from the significant issues at hand.[27] The Court finds it helpful to place events in context before proceeding further.

In the evening of November 9, 2020, Plaintiffs filed suit in this Court against Secretary Boockvar, as well as the County Boards of Elections for the following counties: Allegheny, Centre, Chester, Delaware, Montgomery, Northampton, and Philadelphia.[28] The original complaint raised seven counts; two equal-protection claims, two due-process claims, and three claims under the Electors and Elections Clauses.[29]

The following day, I convened a telephonic status conference with the parties to schedule future proceedings. During that conference, I learned that several organizations, including the Democratic National Committee, sought to file intervention motions with the Court. Later that day, I set a briefing schedule.[30] Additionally, November 17, 2020 was set aside for oral argument on any motions to dismiss, and the Court further told the parties to reserve November 19, 2020 in their calendars in the event that the Court determined that an evidentiary hearing was necessary. Subsequent to the Court's scheduling order, the proposed-intervenors filed their motions, and the parties filed their briefings. Plaintiffs then filed a motion for a preliminary injunction on November 12, 2020.[31]

On November 12, 2020, Plaintiffs also underwent their first change in counsel. Attorneys Ronald L. Hicks, Jr., and Carolyn B. McGee with Porter Wright Morris & Arthur LLP filed a motion seeking to withdraw from the case. The Court granted this motion, and Plaintiffs retained two attorneys from Texas, John Scott and Douglas Brian Hughes, to serve as co-counsel to their original attorney, Linda A. Kerns.

The next day, November 13, 2020, was a relatively quiet day on the docket for this case, but an important one for the parties. That day, the United States Court of Appeals for the Third Circuit issued a decision in 🏳 *Bognet v. Secretary Commonwealth of Pennsylvania*. [32] This decision, though not factually connected to this matter, addressed issues of standing and equal protection relevant to the Plaintiffs' claims. [33]

Thereafter, on Sunday, November 15, 2020 – the day Plaintiffs' response to Defendants' motions to dismiss was due – Plaintiffs filed a First Amended Complaint (the "FAC") with the Court. This new complaint excised five of the seven counts from the original complaint, leaving just two claims: one equal-protection claim, and one Electors and Elections Clauses claim. [34] In addition, a review of the redline attached to the FAC shows that Plaintiffs deleted numerous allegations that were pled in the original complaint.

Plaintiffs acknowledge that under the Third Circuit's decision in 🏳 *Bognet*, this Court cannot find that Plaintiffs have standing for their Elections and Electors Clauses claim in the FAC. Plaintiffs represent that they have included this claim in the FAC to preserve the argument for appellate review. Because Plaintiffs have made this concession, and because the Third Circuit's decision in 🏳 *Bognet* is clear, this Court dismisses Count II for lack of standing without further discussion.

**\*4**  Defendants filed new motions to dismiss and briefs in support thereof on November 16, 2020. That evening, less than 24 hours before oral argument was to begin, Plaintiffs instituted a second series of substitutions in counsel. Ms. Kerns, along with Mr. Scott and Mr. Hughes, requested this Court's permission to withdraw from the litigation. I granted the motions of the Texan attorneys because they had been involved with the case for approximately seventy-two hours. Because oral argument was scheduled for the following day, however, and because Ms. Kerns had been one of the original attorneys in this litigation, I denied her request. I believed it best to have some semblance of consistency in counsel ahead of the oral argument. That evening, attorney Marc A. Scaringi entered an appearance on behalf of Plaintiffs. Furthermore, Mr. Scaringi asked the Court to postpone the previously-scheduled oral argument and evidentiary hearing. The Court denied Mr. Scaringi's motion for a continuance; given the emergency nature of

this proceeding, and the looming deadline for Pennsylvania counties to certify their election results, postponing those proceedings seemed imprudent.

On November 17, 2020, the Court prepared to address the parties in oral argument. That morning, attorney Rudolph W. Giuliani entered his appearance on behalf of Plaintiffs. With this last-minute appearance, Plaintiffs had made their final addition to their representation. [35] At the conclusion of the argument, I determined that an evidentiary hearing (previously scheduled to take place on November 19, 2020) was no longer needed and cancelled that proceeding. Instead, I imposed a new briefing schedule in light of the FAC's filing, which arguably mooted the initial motions to dismiss. The parties submitted briefing on the issues. [36]

### D. Plaintiffs' Claims

Plaintiffs' only remaining claim alleges a violation of equal protection. This claim, like Frankenstein's Monster, has been haphazardly stitched together from two distinct theories in an attempt to avoid controlling precedent. The general thrust of this claim is that it is unconstitutional for Pennsylvania to give counties discretion to adopt a notice-and-cure policy. Invoking 📁 *Bush v. Gore*, Plaintiffs assert that such local control is unconstitutional because it creates an arbitrary system where some persons are allowed to cure procedurally defective mail-in ballots while others are not.

Apparently recognizing that such a broad claim is foreclosed under the Third Circuit's decision in 🏳 *Bognet*, Plaintiffs try to merge it with a much simpler theory of harm based on the cancellation of Individual Plaintiffs' ballots in order to satisfy standing. [37] Because Individual Plaintiffs' votes were invalidated as procedurally defective, Individual Plaintiffs argue, for purposes of standing, that their claim is based on the denial of their votes. But on the merits, Plaintiffs appear to have abandoned this theory of harm and instead raise their broader argument that the lack of a uniform prohibition against notice-and-cure is unconstitutional. [38] They assert this theory on behalf of both Individual Plaintiffs and the Trump Campaign.

**\*5**  That Plaintiffs are trying to mix-and-match claims to bypass contrary precedent is not lost on the Court. The Court will thus analyze Plaintiffs' claims as if they had been raised properly and asserted as one whole for purposes of standing *and* the merits. Accordingly, the Court considers Plaintiffs

2020 WL 6821992

as alleging two equal-protection claims. The first being on behalf of Individual Plaintiffs whose ballots were cancelled. And the second being on behalf of the Trump Campaign and raising the broad 📄 *Bush v. Gore* arguments that Plaintiffs allege is the main focus of this lawsuit. [39] The Court analyzes both claims separately for purposes of standing and the merits analysis.

## III. STANDING

[3]  [4]  [5]  [6]  Plaintiffs lack standing to raise either of their claims. "Article III of the United States Constitution limits the power of the federal judiciary to 'cases' and 'controversies.' " [40]  To satisfy the case-or-controversy requirement, a plaintiff must establish that they have standing. [41]  Standing is a "threshold" issue. [42]  It is an "irreducible constitutional minimum," without which a federal court lacks jurisdiction to rule on the merits of an action. [43]  Consequently, federal courts are obligated to raise the issue of standing sua sponte. [44]

[7]  [8]  [9]  [10]  [11]  The plaintiff bears the burden of establishing standing. [45]  To demonstrate standing, he must show: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. [46]  "In assessing whether a plaintiff has carried this burden, [courts must] separate [the] standing inquiry from any assessment of the merits of the plaintiff's claim." [47]  "To maintain this fundamental separation between standing and merits at the dismissal stage, [courts] assume for the purposes of [the] standing inquiry that a plaintiff has stated valid legal claims." [48]  "While [the Court's] standing inquiry may necessarily reference the 'nature and source of the claims asserted,' [the Court's] focus remains on whether the plaintiff is the proper party to bring those claims." [49]

As discussed above, Plaintiffs allege two possible theories of standing. First, Individual Plaintiffs argue that their votes have been unconstitutionally denied. Under this theory, Individual Plaintiffs must show that Defendant Counties' use of the notice-and-cure procedure, as well as Secretary Boockvar's authorization of this procedure, denied Individual Plaintiffs the right to vote. [50]  Second, the Trump Campaign maintains that it has competitive standing. [51]

*6  Both theories are unavailing. Assuming, as this Court must, that Plaintiffs state a valid equal-protection claim, the Court finds that Individual Plaintiffs have adequately established an injury-in-fact. However, they fail to establish that it was Defendants who caused these injuries and that their purported injury of vote-denial is adequately redressed by invalidating the votes of others. The Trump Campaign's theory also fails because neither competitive nor associational standing applies, and it does not assert another cognizable theory of standing.

### A. Voters

#### 1. Injury in Fact

[12]  [13]  Individual Plaintiffs have adequately demonstrated that they suffered an injury-in-fact. "[A] person's right to vote is 'individual and personal in nature.' " [52]  Accordingly, the denial of a person's right to vote is typically always sufficiently concrete and particularized to establish a cognizable injury. [53]  This is true regardless of whether such a harm is widely shared. [54]  So long as an injury is concrete, courts will find that an injury in fact exists despite the fact that such harm is felt by many. [55]

[14]  This is precisely the situation presented here. Individual Plaintiffs have adequately pled that their votes were denied. As discussed above, the denial of a vote is a highly personal and concrete injury. That Individual Plaintiffs had their ballots cancelled and thus invalidated is sufficiently personal to establish an injury in fact. It is of no matter that many persons across the state might also have had their votes invalidated due to their county's failure to implement a curing procedure. Accordingly, the Court finds that Individual Plaintiffs have established injury in fact.

#### 2. Causation

[15]  However, Individual Plaintiffs fail to establish that Defendant Counties or Secretary Boockvar actually caused their injuries. First, Defendant Counties, by Plaintiffs' own pleadings, had nothing to do with the denial of Individual Plaintiffs' ability to vote. Individual Plaintiffs' ballots were rejected by Lancaster and Fayette Counties, neither of which is a party to this case. None of Defendant Counties received, reviewed, or discarded Individual Plaintiffs' ballots. Even

assuming that Defendant Counties unconstitutionally allowed *other* voters to cure their ballots, that alone cannot confer standing on Plaintiffs who seek to challenge the denial of *their* votes.

[16] Second, Individual Plaintiffs have not shown that their purported injuries are fairly traceable to Secretary Boockvar. Individual Plaintiffs have entirely failed to establish any causal relationship between Secretary Boockvar and the cancellation of their votes. The only connection the Individual Plaintiffs even attempt to draw is that Secretary Boockvar sent an email on November 2, 2020 to some number of counties, encouraging them to adopt a notice-and-cure policy. However, they fail to allege which counties received this email or what information was specifically included therein. Further, that this email encouraged counties to adopt a notice-and-cure policy does not suggest in any way that Secretary Boockvar intended or desired Individual Plaintiffs' votes to be cancelled. To the contrary, this email suggests that Secretary Boockvar encouraged counties to allow exactly these types of votes to be counted. Without more, this Court cannot conclude that Individual Plaintiffs have sufficiently established that their injuries are fairly traceable to Secretary Boockvar. [56]

### 3. Redressability

*7 [17] In large part because the Individual Plaintiffs cannot establish that their injury is "fairly traceable" to the Defendants' conduct, they also cannot show that their injury could be redressed by a favorable decision from this Court. [57] Beyond that substantial hurdle, however, a review of the injury alleged and the relief sought plainly shows that the Individual Plaintiffs' injury would not be redressable. The Individual Plaintiffs base their equal-protection claim on the theory that their right to vote was denied. Their prayer for relief seeks, in pertinent part: (1) an order, declaration, or injunction from this Court prohibiting the Defendants from certifying the results of the 2020 General Election in Pennsylvania on a Commonwealth-wide basis; and (2) another order prohibiting Defendants from certifying the results which include ballots the Defendants permitted to be cured.

[18] Neither of these orders would redress the injury the Individual Plaintiffs allege they have suffered. Prohibiting certification of the election results would not reinstate the Individual Plaintiffs' right to vote. It would simply deny more than 6.8 million people *their* right to vote. "Standing

is measured based on the theory of harm and the specific relief requested." [58] It is not "dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." [59] Here, the answer to invalidated ballots is not to invalidate millions more. Accordingly, Plaintiffs have not shown that their injury would be redressed by the relief sought.

### B. Trump Campaign

The standing inquiry as to the Trump Campaign is particularly nebulous because neither in the FAC nor in its briefing does the Trump Campaign clearly assert what its alleged injury is. Instead, the Court was required to embark on an extensive project of examining almost every case cited to by Plaintiffs to piece together the theory of standing as to this Plaintiff – the Trump Campaign.

The Trump Campaign first posits that "as a political committee for a federal candidate," it has "Article III standing to bring this action." [60] On its face, this claim is incorrect. Simply being a political committee does not obviate the need for an injury-in-fact, nor does it automatically satisfy the other two elements of standing.

For this proposition, the Trump Campaign relies on two federal cases where courts found associational standing by a political party's state committee. Therefore, the Court considers whether the Trump Campaign can raise associational standing, but finds that those cases are inapposite. [61] First, a candidate's political committee and a political party's state committee are not the same thing. Second, while the doctrine of associational standing is well established, the Trump Campaign overlooks a particularly relevant, very recent decision from another federal court – one where the Trump Campaign itself argued that it had associational standing. In *Donald J. Trump for President, Inc. v. Cegavske*, [62] the Trump Campaign asserted associational standing, and that court rejected this theory.

[19] Associational standing allows an entity to bring suit on behalf of members upon a showing that: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." [63]

**\*8**  **[20]**  In *Cegavske* (another case in which the Trump Campaign alleged violations of equal protection), the court found that the Trump Campaign failed to satisfy the second prong of associational standing because it "represents only Donald J. Trump and his 'electoral and political goals' of reelection." [64]  That court noted that while the Trump Campaign might achieve its purposes through its member voters, the "constitutional interests of those voters are wholly distinct" from that of the Trump Campaign. [65]  No different here. Even if the Individual Plaintiffs attempted to vote for President Trump, their constitutional interests are different, precluding a finding of associational standing. In any event, because the Individual Plaintiffs lack standing in this case, the Trump Campaign cannot satisfy the first prong of associational standing either.

**[21]**  The Trump Campaign's second theory is that it has " 'competitive standing' based upon disparate state action leading to the 'potential loss of an election.' " [66]  Pointing to a case from the United States Court of Appeals for the Ninth Circuit, *Drake v. Obama*, [67]  the Trump Campaign claims this theory proves injury-in-fact. First, the Court finds it important to emphasize that the term "competitive standing" has specific meaning in this context. Second, the Trump Campaign's reliance on the theory of competitive standing under *Drake v. Obama* is, at best, misguided. Subsequent case law from the Ninth Circuit has explained that competitive standing "is the notion that 'a candidate or his political party has standing to challenge the *inclusion of an allegedly ineligible rival on the ballot*, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election.' " [68]  In the present matter, there is no allegation that the Democratic Party's candidate for President, or any other candidate, was ineligible to appear on the ballot.

**[22]**  Examination of the other case law cited to by Plaintiffs contradicts their theory that competitive standing is applicable here for the same reason. For example, in *Texas Democratic Party v. Benkiser*, the United States Court of Appeals for the Fifth Circuit found competitive standing in a case in which the Democratic Party petitioned against the decision to deem a candidate ineligible and replace him with another. [69]  Likewise, in *Schulz v. Williams*, the United States Court of Appeals for the Second Circuit found competitive standing where the Conservative party alleged an injury in fact by arguing that a candidate from the Libertarian Party of New York was improperly placed on the ballot for the

Governor's race in 1994. [70]  By way of yet another example, Plaintiffs' citation to *Fulani v. Hogsett* makes the same point; competitive standing applies to challenges regarding the eligibility of a candidate. There, the Indiana Secretary of State was required to certify the names of candidates for President by a certain date. [71]  When the Secretary failed to certify the Democratic and Republican candidates by that date, the New Alliance party challenged the inclusion of those candidates on the ballot, arguing that allowing these ineligible candidates constituted an injury-in-fact. [72]  Three other cases relied on by Plaintiffs illustrate separate grounds for stating an injury in fact, all still relating to ballot provisions. [73]

**\*9**  It is telling that the only case from the Third Circuit cited to by Plaintiffs, *Marks v. Stinson*, does not contain a discussion of competitive standing or any other theory of standing applicable in federal court. [74]  Simply pointing to another case where a competitor in an election was found to have standing does not establish *competitive standing* in this matter. Without more, this Court declines to take such an expansive view of the theory of competitive standing, particularly given the abundance of guidance from other Circuits, based on Plaintiffs' own citations, limiting the use of this doctrine.

The Trump Campaign has not offered another theory of standing, and therefore, cannot meet its burden of establishing Article III jurisdiction. To be clear, this Court is not holding that a political campaign can never establish standing to challenge the outcome of an election; rather, it merely finds that in this case, the Trump Campaign has not pled a cognizable theory. [75]

## IV. MOTION TO DISMISS 12(b)(6)

### A. Legal Standard

**[23]**  **[24]**  Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted." A motion to dismiss "tests the legal sufficiency of a claim" [76]  and "streamlines litigation by dispensing with needless discovery and factfinding." [77]  "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." [78]  This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." [79]

Following the Roberts Court's "civil procedure revival,"[80] the landmark decisions of 📁 *Bell Atlantic Corporation v. Twombly*[81] and 📁 *Ashcroft v. Iqbal*[82] tightened the standard that district courts must apply to 12(b)(6) motions.[83] These cases "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[84]

[25] [26] Accordingly, after 📁 *Twombly* and 📁 *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[85] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[86] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[87] Moreover, "[a]sking for plausible grounds ... calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[88]

*10 [27] The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[89] No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' "[90]

[28] When disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the light most favorable to [the plaintiff]."[91] However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[92] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[93]

As a matter of procedure, the Third Circuit has instructed that:

Under the pleading regime established by 📁 *Twombly* and 📁 *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[94]

**B. Equal Protection**

Even if Plaintiffs had standing, they fail to state an equal-protection claim. The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[95] The principle of equal protection is fundamental to our legal system because, at its core, it protects the People from arbitrary discrimination at the hands of the State.

[29] [30] But, contrary to Plaintiffs' assertions, not all "unequal treatment" requires Court intervention.[96] The Equal Protection Clause "does not forbid classifications."[97] It simply keeps governmental decisionmakers from treating similarly situated persons differently.[98] The government could not function if complete equality were required in all situations. Consequently, a classification resulting in "some inequality" will be upheld unless it is based on an inherently suspect characteristic or "jeopardizes the exercise of a fundamental right."[99]

[31] One such fundamental right, at issue in this case, is the right to vote. Voting is one of the foundational building blocks of our democratic society, and that the Constitution firmly protects this right is "indelibly clear."[100] All citizens of the United States have a constitutionally protected right

to vote. [101] And all citizens have a constitutionally protected right to have their votes counted. [102]

 **\*11** With these background principles firmly rooted, the Court turns to the merits of Plaintiffs' equal-protection claims. The general gist of their claims is that Secretary Boockvar, by failing to prohibit counties from implementing a notice-and-cure policy, and Defendant Counties, by adopting such a policy, have created a "standardless" system and thus unconstitutionally discriminated against Individual Plaintiffs. Though Plaintiffs do not articulate why, they also assert that this has unconstitutionally discriminated against the Trump Campaign.

As discussed above, the Court will address Individual Plaintiffs' and the Trump Campaign's claims separately. Because Individual Plaintiffs premised standing on the purported wrongful cancellation of their votes, the Court will only analyze whether Defendants have impermissibly burdened Individual Plaintiffs' ability to vote. Further, the Court will consider two issues raised by the Trump Campaign; the first being whether it has stated a valid claim alleging discrimination relating to its use of poll-watchers, and the second being whether the General Assembly's failure to uniformly prohibit (or permit) the notice-and-cure procedure is unconstitutional.

### 1. Individual Plaintiffs

 **[32]**     **[33]** States have "broad authority to regulate the conduct of elections, including federal ones." [103] "This authority includes 'broad powers to determine the conditions under which the right of suffrage may be exercised.' " [104] Because states must have freedom to regulate elections if "some sort of order, rather than chaos, is to accompany the democratic processes," [105] such regulation is generally insulated from the stringent requirements of strict scrutiny. [106]

 **[34]** Instead, state regulation that burdens voting rights is normally subject to the *Anderson*-🖱 *Burdick* balancing test, which requires that a court "weigh the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.' " [107] Under this test, "any 'law respecting the right to vote – whether it governs voter qualifications,

candidate selection, or the voting process,' is subjected to 'a deferential "important regulatory interests" standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote.' " [108]

 **[35]**     **[36]** The *Anderson*-🖱 *Burdick* balancing test operates on a sliding scale. [109] Thus, more restrictive laws are subject to greater scrutiny. Conversely, "minimally burdensome and nondiscriminatory" regulations are subject to "a level of scrutiny 'closer to rational basis.' " [110] "And where the state imposes no burden on the 'right to vote' at all, true rational basis review applies." [111]

 **\*12** **[37]** Here, because Defendants' conduct "imposes no burden" on Individual Plaintiffs' right to vote, their equal-protection claim is subject to rational basis review. [112] Defendant Counties, by implementing a notice-and-cure procedure, have in fact *lifted* a burden on the right to vote, even if only for those who live in those counties. Expanding the right to vote for some residents of a state does not burden the rights of others. [113] And Plaintiffs' claim cannot stand to the extent that it complains that "the state is *not* imposing a restriction on *someone else's* right to vote." [114] Accordingly, Defendant Counties' use of the notice-and-cure procedure (as well as Secretary Boockvar's authorization of this procedure) will be upheld unless it has no rational basis. [115]

 **[38]** Individual Plaintiffs' claims fail because it is perfectly rational for a state to provide counties discretion to notify voters that they may cure procedurally defective mail-in ballots. Though states may not discriminatorily sanction procedures that are likely to burden some persons' right to vote more than others, they need not expand the right to vote in perfect uniformity. All Plaintiffs have alleged is that Secretary Boockvar allowed counties to choose whether or not they wished to use the notice-and-cure procedure. No county was forced to adopt notice-and-cure; each county made a choice to do so, or not. Because it is not irrational or arbitrary for a state to allow counties to expand the right to vote if they so choose, Individual Plaintiffs fail to state an equal-protection claim.

 **[39]**     **[40]** Moreover, even if they could state a valid claim, the Court could not grant Plaintiffs the relief they seek. Crucially, Plaintiffs fail to understand the relationship between right and remedy. Though every injury must have its proper redress, [116] a court may not prescribe a remedy

unhinged from the underlying right being asserted. [117] By seeking injunctive relief preventing certification of the Pennsylvania election results, Plaintiffs ask this Court to do exactly that. Even assuming that they can establish that their right to vote has been denied, which they cannot, Plaintiffs seek to remedy the denial of their votes by invalidating the votes of millions of others. Rather than requesting that their votes be counted, they seek to discredit scores of other votes, but only for one race. [118] This is simply not how the Constitution works.

 **[41]**   **[42]**   When remedying an equal-protection violation, a court may either "level up" or "level down." [119] This means that a court may either extend a benefit to one that has been wrongfully denied it, thus leveling up and bringing that person on par with others who already enjoy the right, [120] or a court may level down by withdrawing the benefit from those who currently possess it. [121] Generally, "the preferred rule in a typical case is to extend favorable treatment" and to level up. [122] In fact, leveling down is impermissible where the withdrawal of a benefit would necessarily violate the Constitution. [123] Such would be the case if a court were to remedy discrimination by striking down a benefit that is constitutionally guaranteed.

 **\*13** Here, leveling up to address the alleged cancellation of Plaintiffs' votes would be easy; the simple answer is that their votes would be counted. But Plaintiffs do not ask to level up. Rather, they seek to level down, and in doing so, they ask the Court to violate the rights of over 6.8 million Americans. It is not in the power of this Court to violate the Constitution. [124] "The disenfranchisement of even one person validly exercising his right to vote is an extremely serious matter." [125] "To the extent that a citizen's right to vote is debased, he is that much less a citizen." [126]

Granting Plaintiffs' requested relief would necessarily require invalidating the ballots of every person who voted in Pennsylvania. Because this Court has no authority to take away the right to vote of even a single person, let alone millions of citizens, it cannot grant Plaintiffs' requested relief.

### 2. Trump Campaign

Plaintiffs' brief in opposition to the motions to dismiss spends only *one* paragraph discussing the merits of its equal-protection claim. Plaintiffs raise two arguments as to how equal protection was violated. The first is that "Defendants excluded Republican/Trump observers from the canvass so that they would not observe election law violations." [127] The second claims that the "use of notice/cure procedures violated equal protection because it was deliberately done in counties where defendants knew that mail ballots would favor Biden/ Democrats." [128] The former finds no support in the operative pleading, and neither states an equal-protection violation.

 **[43]**   Count I of the FAC makes no mention of disparity in treatment of observers based on which campaign they represented. Instead, Count I discusses the use of "standardless" procedures. These are two separate theories of an equal protection violation. That deficiency aside, to the extent this new theory is even pled, Plaintiffs fail to plausibly plead that there was "uneven treatment" of Trump and Biden watchers and representatives. Paragraphs 132-143 of the FAC are devoted to this alleged disparity. None of these paragraphs support Plaintiffs' argument. A selection below:

- "Defendants have not allowed *watchers and representatives* to be present ..." [129]

- "In Centre County, the central pre-canvassing location was a large ballroom. The set-up was such that the *poll watchers did not have meaningful access* to observe the canvassing and tabulation process of mail-in and absentee ballots, and in fact, the *poll watchers and observers* who were present could not actually observe the ballots such that they could confirm or object to the validity of the ballots." [130]

- "In Philadelphia County, *poll watchers and canvass representatives* were denied access altogether in some instances." [131]

- "In Delaware County, *observers* were denied access to a back room counting area ..." [132]

None of these allegations (or the others in this section) claim that the Trump Campaign's watchers were treated *differently* than the Biden campaign's watchers. Simply alleging that poll watchers did not have access or were denied access to some areas does not plausibly plead unequal treatment. Without actually alleging that one group was treated differently than another, Plaintiffs' first argument falls flat.

**\*14**  Likewise, Plaintiffs cannot salvage their notice-and-cure theory by invoking 🔖 *Bush v. Gore.* [133] Plaintiffs claim that the Equal Protection clause "imposes a 'minimum requirement for nonarbitrary treatment of voters' and forbids voting systems and practices that distribute resources in 'standardless' fashion, without 'specific rules designed to ensure uniform treatment.' " [134] Plaintiffs attempt to craft a legal theory from 🔖 *Bush*, but they fail because: (1) they misapprehend the issues at play in that case; and (2) the facts of this case are distinguishable.

Plaintiffs' interpretation of 🔖 *Bush v. Gore* would broaden the application of that case far beyond what the Supreme Court of the United States endorsed. In 🔖 *Bush*, the Supreme Court stopped a recount of votes in Florida in the aftermath of the 2000 Presidential Election. Despite Plaintiffs' assertions, 🔖 *Bush* does not stand for the proposition that every rule or system must ensure uniform treatment. In fact, the Supreme Court explicitly said so, explaining: "[t]he question before the Court is *not* whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." [135] Instead, the Court explained that its holding concerned a "situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards." [136] Where a state court has ordered such a remedy, the Supreme Court held that "there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." [137] In other words, the lack of guidance from a court constituted an equal-protection violation.

In the instant matter, Plaintiffs are not challenging any court action as a violation of equal protection, and they do not allege that Secretary Boockvar's guidance differed from county to county, or that Secretary Boockvar told some counties to cure ballots and others not to. That some counties may have chosen to implement the guidance (or not), or to implement it differently, does not constitute an equal-protection violation. "[M]any courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state." [138] "Arguable differences in how elections boards apply uniform statewide standards to the innumerable permutations of ballot irregularities, although perhaps unfortunate, are to be expected, just as judges in sentencing-guidelines cases apply uniform standards with arguably different results." [139] Requiring that every single county administer elections in exactly the same way would impose untenable burdens on counties, whether because of population, resources, or a myriad of other reasonable considerations.

## V. CONCLUSION

**[44]**     **[45]** Defendants' motions to dismiss the First Amended Complaint are granted with prejudice. Leave to amend is denied. "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." [140] Given that: (1) Plaintiffs have already amended once as of right; (2) Plaintiffs seek to amend simply in order to effectively reinstate their initial complaint and claims; and (3) the deadline for counties in Pennsylvania to certify their election results to Secretary Boockvar is November 23, 2020, amendment would unduly delay resolution of the issues. This is especially true because the Court would need to implement a new briefing schedule, conduct a second oral argument, and then decide the issues.

**\*15**  An appropriate Order follows.

## ORDER

**AND NOW**, this 21st day of November 2020, in accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1. Defendants' motions to dismiss the First Amended Complaint (Docs. 127, 135, 140, 145, 161, and 165) are **GRANTED WITH PREJUDICE. NO LEAVE TO AMEND IS GRANTED**.

2. Defendants' motions to dismiss the original complaint (Docs. 81, 85, 90, 92, 96, and 98) are **DENIED AS MOOT**.

3. Plaintiffs' motion for leave to file a second amended complaint (Doc. 172) is **DENIED AS MOOT**.

4. Plaintiffs' motions for preliminary injunction (Docs. 89 and 182) are **DENIED AS MOOT.**

5. Plaintiffs' motions regarding discovery (Docs. 118 and 171) are **DENIED AS MOOT.**

6. Further motions regarding amicus briefing and intervention (Docs. 166, 180, and 200) are **DENIED AS MOOT**.

7. The case is dismissed and the Clerk of Court is directed to close the case file.

**All Citations**

--- F.Supp.3d ----, 2020 WL 6821992

## Footnotes

1   Doc. 125.
2   *Id.* Since the filing of the initial complaint, there have also been several intervenors and amicus petitioners.
3   *Cook v. Gralike*, 531 U.S. 510, 522, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001).
4   *Id.* (quoting *U.S. Term Limits v. Thornton*, 514 U.S. 779, 804, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995)).
5   *Id.* (quoting U.S. Const. Art. I, § 4, cl. 1).
6   *Id.* at 523, 121 S.Ct. 1029.
7   25 P.S. §§ 2601, *et seq.*
8   *Pa. Democratic Party v. Boockvar*, ––– Pa. –––––, 238 A.3d 345, 356 (2020) (quoting Pa. Const., Art. I, § 5).
9   *Id.* (quoting *Perles v. Hoffman*, 419 Pa. 400, 213 A.2d 781, 783 (1965)).
10  *Id.* at 352 (citing 25 P.S. §§ 3150.11-3150.17). Prior to the enactment of Act 77, voters were only permitted to vote by mail if they could "demonstrate their absence from the voting district on Election Day." *Id.* (internal citations omitted).
11  *E.g.*, 25 P.S. § 3150.16.
12  *Id.*
13  *Id.*
14  *Pa. Democratic Party*, 238 A.3d at 372.
15  Doc. 93 at 9.
16  *Pa. Democratic Party*, 238 A.3d at 374.
17  *Id.* (holding only that the Election Code "does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner").
18  Doc. 125 at ¶ 129.
19  *Id.* at ¶¶ 124-27.
20  *Id.* at ¶ 127.
21  *Id.* at ¶ 130.
22  *Id.* at ¶¶ 15-16.
23  *Id.* at ¶ 15.
24  *Id.* at ¶ 16.
25  *Id.* at ¶¶ 15-16.
26  Pa. Dep't of State, *Unofficial Returns, Statewide*, https://www.electionreturns.pa.gov/ (last visited on November 21, 2020).
27  Doc. 131 (denied).
28  *See* Doc. 1.
29  *Id.*

2020 WL 6821992

30    *See* Doc. 35.

31    Doc. 89.

32    No. 20-3214, ––– F.3d –––, 2020 WL 6686120 (3d Cir. Nov. 13, 2020) (pending publication).

33    For example, *Bognet* held that only the General Assembly had standing to raise claims under the Elections and Electors Clauses. *Id.* at ––––, 2020 WL 6686120, at *7. This ruling effectively shut the door on Plaintiffs' allegations under those clauses of the Constitution.

34    Doc. 125.

35    Ms. Kerns has since withdrawn from the case.

36    Separately, Plaintiffs filed a motion seeking leave to file a second amended complaint. Doc. 172. Having filed the FAC as of right, Plaintiffs may file a second amended complaint only with the opposing party's written consent or the court's leave. During the oral argument on November 17, 2020, Defendants indicated that they would not consent to the filing of a third pleading and did not concur in the motion for leave to file this second amended complaint.

37    Plaintiffs initially appeared to base their standing under the Equal Protection Clause on the theory that the notice-and-cure policy unlawfully allowed certain ballots to be counted, and that this inclusion of illegal ballots diluted Plaintiffs' legal votes. Doc. 1. After *Bognet* expressly rejected this theory of standing, however, Plaintiffs have since reversed course and now argue that their standing is based on the cancellation of Individual Plaintiffs' votes and the Trump Campaign's "competitive standing." ––– F.3d at –––– – ––––, 2020 WL 6686120, at *9-10; Doc. 124 at 2. To the extent that Plaintiffs may still argue that votes have been unconstitutionally diluted (*see*, FAC ¶ 97), those claims are barred by the Third Circuit's decision in *Bognet.*

38    Plaintiffs essentially conceded that they were only setting forth the vote-denial theory for purposes of standing when they stated on the record at oral argument that they believed Individual Plaintiffs' votes were *lawfully* cancelled. Hr'g. Tr. 110:22-111:02.

39    In briefing, Plaintiffs attempt to revive their previously-dismissed poll-watcher claims. Count I does not seek relief for those allegations, but the Court considers them, *infra*.

40    *Pa. Voters All. v. Centre Cnty.*, No. 4:20-CV-01761, ––– F.Supp.3d ––––, ––––, 2020 WL 6158309, at *3 (M.D. Pa. Oct. 21, 2020) (*quoting* *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 161-62 (3d Cir. 2017)).

41    *Cottrell*, 874 F.3d at 161-62.

42    *Wayne Land & Mineral Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 573-74 (3d Cir. 2020) (internal citations omitted).

43    *Id.* at 574 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

44    *Id.* (quoting *Seneca Reservation Corp. v. Twp. of Highland*, 863 F.3d 245, 252 (3d Cir. 2017).

45    *Cottrell*, 874 F.3d at 162 (quoting *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016)).

46    *Id.* (quoting *Spokeo*, 136 S. Ct. at 1547).

47    *Id.*

48    *Id.* (citing *Info. Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003)).

49    *Id.* (brackets and internal citations omitted).

50    As discussed above, to the extent that Plaintiffs would have premised standing on the theory that Pennsylvania's purportedly unconstitutional failure to uniformly prohibit the notice-and-cure procedure constitutes vote-dilution, such an assertion would be foreclosed under *Bognet,* ––– F.3d at –––– – ––––,

2020 WL 6686120, at \*9-10. Accordingly, the Court will only consider whether Individual Plaintiffs have standing under their vote-denial theory.

51    In the interest of comprehensiveness, the Court also addresses whether the Trump Campaign has associational standing.

52    *Gill v. Whitford*, ––– U.S. ––––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)).

53    *See* *Gomillion v. Lightfoot*, 364 U.S. 339, 349, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (Whittaker, J.) (noting the distinction between injuries caused by outright denial of the right to vote versus those caused by reducing the weight or power of an individual's vote). The Court notes that much of standing doctrine as it relates to voting rights arises from gerrymandering or vote-dilution cases, which often involve relatively abstract harms.

      *See, e.g.,* *Gill*, 138 S. Ct. at 1929; *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)).

54    *See* *Federal Election Comm'n v. Akins*, 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (citing *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449-50, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989)).

55    *See* *id.* ("[W]here a harm is concrete, though widely shared, the [United States Supreme] Court has found 'injury in fact.' ") (quoting *Public Citizen*, 491 U.S. at 449-50, 109 S.Ct. 2558).

56    The Third Circuit has held that a party may have standing "to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action."

      *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014) (quoting *Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 116 (D.D.C. 2013)). But in that case, standing was permitted to avoid a catch-22 situation where, absent standing against a third-party government actor, a plaintiff would not be able to bring suit against any responsible party. *Id. at 367*. Here, Plaintiffs allege that Secretary Boockvar is responsible for authorizing the unconstitutional actions of Defendant Counties. However, unlike the plaintiffs in *Aichele*, Plaintiffs are able to sue Defendant Counties for their allegedly unconstitutional actions. Moreover, because this Court has already concluded that Plaintiffs lack standing to sue Defendant Counties for their use of the notice-and-cure policy, it would be counterintuitive for Plaintiffs to have standing to challenge Secretary Boockvar's authorization of this policy, which is even further removed from any purported harm that Individual Plaintiffs have suffered.

57    *See, e.g.,* *Newdow v. Roberts*, 603 F.3d 1002, 1011 (D.C. Cir. 2010) (noting that when an injury is caused by a third party not before the Court, courts cannot "redress injury ... that results from [such] independent action.") (ellipses and alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

58    *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, ––– F.Supp.3d ––––, ––––, 2020 WL 5997680, at \*37 (W.D. Pa. Oct. 10, 2020) (citing *Gill*, 138 S. Ct. at 1934).

59    *Gill*, 138 S. Ct. at 1934 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)).

60    Doc. 170 at 11.

61    *Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006); *Orloski v. Davis*, 564 F. Supp. 526 (M.D. Pa. 1983).

62    No. 2:20-CV-1445, ––– F.Supp.3d ––––, 2020 WL 5626974 (D. Nev. Sept. 18, 2020).

63    *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

64    *Cegavske*, ––– F.Supp.3d at ––––, 2020 WL 5626974 at \*4 (internal citations omitted).

65  *Id.*

66  Doc. 170 at 11 (citing *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)).

67  664 F.3d at 783.

68  *Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013) (emphasis added) (quoting *Drake*, 664 F.3d at 782); *see also Mecinas v. Hobbs*, No. CV-19-05547, ––– F.Supp.3d –––, ––– – –––, 2020 WL 3472552, at *11-12 (D. Ariz. June 25, 2020) (explaining the current state of the doctrine of competitive standing and collecting cases).

69  459 F.3d at 586.

70  44 F.3d 48, 53 (2d Cir. 1994).

71  917 F.2d 1028, 1029-30 (7th Cir. 1990).

72  *Id.*

73  *See Green Party of Tennessee v. Hargett*, 767 F.3d 533, 542-43 (6th Cir. 2014) (finding that Plaintiffs had standing to challenge Tennessee's *ballot-access* laws); *see also Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020) (finding that Plaintiffs had standing to challenge the *ballot-ordering* provision in Minnesota); *Nelson v. Warner*, No. 3:19-0898, ––– F.Supp.3d –––, –––, 2020 WL 4582414, at *3 (S.D. W. Va. Aug. 10, 2020) (same).

74  19 F.3d 873 (3d Cir. 1994).

75  Even assuming, however, that the Trump Campaign could establish that element of standing, it would still fail to satisfy the causation and redressability requirements for the same reasons that the Voter Plaintiffs do. To the extent the Trump Campaign alleges any injury at all, its injury is attenuated from the actions challenged.

76  *Richardson v. Bledsoe*, 829 F.3d 273, 289 n. 13 (3d Cir. 2016) (Smith, C.J.) (citing *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (Easterbrook, J.)).

77  *Neitzke v. Williams*, 490 U.S. 319, 326-27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

78  *Id.* at 326, 109 S.Ct. 1827 (internal citations omitted).

79  *Id.* at 327, 109 S.Ct. 1827.

80  Howard M. Wasserman, The Roberts Court and the Civil Procedure Revival, 31 Rev. Litig. 313, 316, 319-20 (2012).

81  550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

82  556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

83  *Id.* at 670, 129 S.Ct. 1937.

84  *Id.*

85  *Id.* at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

86  *Id.*

87  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (Jordan, J.) (internal quotations and citations omitted).

88  *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955.

89  *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

90  *Id.* at 678, 129 S.Ct. 1937 (*quoting Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

91  *Phillips v. County. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

92  *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937;

93  *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

94  *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).

95  U.S. Const. Amend. XIV, cl. 1.

96  Doc. 170 at 29.

97  *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)).

98  *Id.* (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)).

99  *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

100  *Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

101  *Id.* (citing *Ex parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884)).

102  *Id.* (citing *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915)).

103  *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citing U.S. Const. Art. I, § 4, cl. 1).

104  *Donald J. Trump for President, Inc.*, —— F.Supp.3d at ——, 2020 WL 5997680, at *38 (quoting *Shelby County, Ala. v. Holder*, 570 U.S. 529, 543, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013)).

105  *Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)).

106  *Burdick*, 504 U.S. at 432-33, 112 S.Ct. 2059.

107  *Crawford v. Marion County Election Board*, 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (quoting *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059).

108  *Donald J. Trump for President*, —— F.Supp.3d at ——, 2020 WL 5997680, at *39 (quoting *Crawford*, 553 U.S. at 204, 128 S.Ct. 1610 (Scalia, J. concurring)).

109  *See id.* at ——, 2020 WL 5997680, at *40; *see also Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019); *Fish v. Schwab*, 957 F.3d 1105, 1124 (10th Cir. 2020).

110  *Donald J. Trump for President*, —— F.Supp.3d at ——, 2020 WL 5997680, at *39 (quoting *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016)).

111  *Id. (citing Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004)).

112  Even after questioning from this Court during oral argument regarding the appropriate standard of review for their equal-protection claim, Plaintiffs failed to discuss this key aspect of the claim in briefing. *See* Doc. 170.

113  *See, e.g., Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).

114  *Donald J. Trump for President*, —— F.Supp.3d at ——, 2020 WL 5997680, at *44 (emphasis in original).

115  *Biener*, 361 F.3d at 215.

116  *Marbury v. Madison*, 5 U.S. 137, 147, 1 Cranch 137, 2 L.Ed. 60 (1803).

117  *Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.") (citing *Cuno*, 547 U.S. at 353, 126 S.Ct. 1854).

118  Curiously, Plaintiffs now claim that they seek only to enjoin certification of the presidential election results. Doc. 183 at 1. They suggest that their requested relief would thus not interfere with other election results in the state. But even if it were logically possible to hold Pennsylvania's electoral system both constitutional and unconstitutional at the same time, the Court would not do so.

119  *Heckler v. Mathews*, 465 U.S. 728, 740, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) (internal citations omitted).

Case 2:20-cv-01831-NR    Document 68-1    Filed 01/08/21    Page 61 of 97
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d --- (2020)
2020 WL 6821992

120    *Id.* at 741, 104 S.Ct. 1387; *Califano v. Westcott*, 443 U.S. 76, 90-91, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979).

121    *E.g.,* *Sessions v. Morales-Santana*, —— U.S. ——, 137 S. Ct. 1678, 1701, 198 L.Ed.2d 150 (2017).

122    *Id.* (internal citations omitted).

123    *See* *Palmer v. Thompson*, 403 U.S. 217, 226-27, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) (addressing whether a city's decision to close pools to remedy racial discrimination violated the Thirteenth Amendment);

     *see also* *Reynolds*, 377 U.S. at 554, 84 S.Ct. 1362 (citing *Mosley*, 238 U.S. at 383, 35 S.Ct. 904).

124    *Marbury*, 5 U.S. at 147.

125    *Perles v. County Return Bd. of Northumberland County*, 415 Pa. 154, 202 A.2d 538, 540 (1964) (cleaned up).

126    *Id.* at 567.

127    Doc. 170 at 29. Count I makes no mention of the poll-watching allegations, nor does it seek relief for any violation of law on the basis of those allegations. Out of an abundance of caution, however, the Court considers whether these allegations state a claim.

128    *Id.*

129    Doc. 125 at ¶ 134 (emphasis added).

130    *Id.* at ¶ 135 (emphasis added).

131    *Id.* at ¶ 136 (emphasis added).

132    *Id.* at ¶ 137 (emphasis added).

133    531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

134    Doc. 170 at 13.

135    *Bush*, 531 U.S. at 109, 121 S.Ct. 525 (emphasis added).

136    *Id.*

137    *Id.*

138    *Donald J. Trump for President*, —— F.Supp.3d at ——, 2020 WL 5997680, at *44.

139    *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 636 (6th Cir. 2016).

140    *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413–14 (3d Cir.1993).

# Unreported Opinion 4

*Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, 830 F. App'x 377 (3d Cir. 2020)

830 Fed.Appx. 377
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

DONALD J. TRUMP FOR PRESIDENT, INC.;
Lawrence Roberts; David John Henry, Appellants

v.

SECRETARY Commonwealth OF PENNSYLVANIA;
Allegheny County Board of Elections; Centre
County Board of Elections; Chester County
Board of Elections; Delaware County Board
of Elections; Montgomery County Board of
Elections; Northampton County Board of
Elections; Philadelphia County Board of Elections

No. 20-3371
|
Submitted Under Third Circuit
L.A.R. 34.1(a) on November 25, 2020
|
(Filed: November 27, 2020)

**Synopsis**
**Background:** Voters and President's reelection campaign
brought action against Secretary of the Commonwealth
of Pennsylvania and county boards of elections, seeking
to invalidate millions of votes cast by Pennsylvanians in
presidential election during COVID-19 pandemic based on
allegations that Secretary's authorization of notice-and-cure
procedure for procedurally defective mail-in ballots violated
the Equal Protection Clause and that poll watchers were
impermissibly excluded from canvass. The United States
District Court for the Middle District of Pennsylvania,
Matthew W. Brann, J., 2020 WL 6821992, granted motion
by Secretary and county boards of elections to dismiss. Voters
and campaign appealed.

**Holdings:** The Court of Appeals, Bibas, Circuit Judge, held
that:

[1] delay by President's reelection campaign in moving to
amend complaint second time was undue;

[2] second amendment of complaint would have been futile;

[3] county-to-county variations in processing votes from
election did not show discrimination;

[4] failure of President's reelection campaign to request
injunction pending appeal from district court or show that
it could not have made that request barred campaign from
pursuing that motion on appeal;

[5] campaign likely could not succeed on merits;

[6] campaign likely would not suffer irreparable harm; and

[7] granting relief would not have been equitable.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim.

West Headnotes (21)

**[1]** **Federal Courts** 🔑 **Pleading**
The denial of a motion to amend a complaint is
reviewed for abuse of discretion.

**[2]** **Federal Civil Procedure** 🔑 **Injustice or**
**prejudice**
**Federal Civil Procedure** 🔑 **Form and**
**sufficiency of amendment; futility**
In a civil-rights case, a court should grant leave
to amend a complaint unless amendment would
be futile or inequitable. Fed. R. Civ. P. 15(a)(2).

**[3]** **Election Law** 🔑 **Amendment**
**Federal Civil Procedure** 🔑 **Time for**
**amendment**
Delay by President's reelection campaign in
moving to amend complaint second time was
undue, barring amendment in action against

Case 2:20-cv-01831-NR    Document 68-1    Filed 01/08/21    Page 64 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

Secretary of Commonwealth of Pennsylvania and county boards of elections to invalidate millions of votes cast in presidential election over election procedures, since motion would have mooted existing motions to dismiss and required new briefing, possibly new oral argument, and reasoned judicial opinion within 72 hours over weekend, and it largely repleaded many claims abandoned by first amendment. Fed. R. Civ. P. 15(a)(2).

**[4]**    **Federal Civil Procedure** 🔑 Time for amendment

Delay alone is not enough to bar amendment of a complaint. Fed. R. Civ. P. 15(a)(2).

**[5]**    **Federal Civil Procedure** 🔑 Time for amendment

Delay may become "undue," allowing for amendment of a complaint to be barred, when it places an unwarranted burden on the court. Fed. R. Civ. P. 15(a)(2).

**[6]**    **Election Law** 🔑 Amendment

**Federal Civil Procedure** 🔑 Form and sufficiency of amendment; futility

Second amendment of complaint would have been futile, and therefore amendment could be barred in action brought by President's reelection campaign against Secretary of Commonwealth of Pennsylvania and county boards of elections to invalidate millions of votes cast in presidential election over election procedures, since campaign already litigated and lost most issues raised and remaining allegations were conclusory and campaign did not offer any specific facts to back up its claims. Fed. R. Civ. P. 15(a)(2).

1 Cases that cite this headnote

**[7]**    **Federal Civil Procedure** 🔑 Claim for relief in general

While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. Fed. R. Civ. P. 8.

**[8]**    **Constitutional Law** 🔑 Conduct of Elections

**Election Law** 🔑 Conduct of Election

County-to-county variations in election procedures did not show discrimination under equal protection clause, in action brought by President's reelection campaign against Secretary of Commonwealth of Pennsylvania and county boards of elections to invalidate millions of votes cast in presidential election over election procedures, since Pennsylvania's Election Code gave counties specific election procedure guidelines and reasonable county variation in implementing that guidance was normal. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[9]**    **Constitutional Law** 🔑 Conduct of Elections

A violation of the Equal Protection Clause requires more than variation in election procedures from county to county; it requires unequal treatment of similarly situated parties. U.S. Const. Amend. 14.

**[10]**    **Constitutional Law** 🔑 Conduct of Elections

Counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state. U.S. Const. Amend. 14.

**[11]**    **Constitutional Law** 🔑 Ballots in general

Even when boards of elections vary considerably in how they decide to reject ballots, those local differences in implementing statewide standards do not violate equal protection. U.S. Const. Amend. 14.

**[12]** **Federal Courts** ✏ Injunction and temporary restraining order cases

Failure of President's reelection campaign to request injunction pending appeal from district court or show that it could not have made that request barred campaign from pursuing that motion on appeal, in action against Secretary of Commonwealth of Pennsylvania and county boards of elections to invalidate millions of votes cast in presidential election. Fed. R. App. P. 8(a)(2)(A).

**[13]** **Federal Courts** ✏ Injunction and temporary restraining order cases

**Injunction** ✏ Extraordinary or unusual nature of remedy

Injunctions pending appeal, like preliminary injunctions, are extraordinary remedies never awarded as of right. Fed. R. App. P. 8(a)(2)(A).

**[14]** **Federal Courts** ✏ Supersedeas or Stay of Proceedings

**Federal Courts** ✏ Injunction and temporary restraining order cases

For a stay or injunction pending appeal, the movant must show both (1) a strong likelihood of success on the merits and (2) irreparable injury absent a stay or injunction; after that, the court also balances (3) whether a stay or injunction will injure other interested parties, also called the balance of equities, and (4) the public interest. Fed. R. App. P. 8(a)(2)(A).

**[15]** **Federal Courts** ✏ Supersedeas or Stay of Proceedings

President's re-election campaign likely could not succeed on merits, and therefore it was not entitled to stay pending appeal in action against Secretary of Commonwealth of Pennsylvania and county boards of elections to invalidate millions of votes cast in presidential election over election procedures, since campaign already raised and lost most of state-law issues and claims of discrimination under equal protection clause did not turn state-law claims into federal ones. U.S. Const. Amend. 14; Fed. R. App. P. 8(a)(2)(A).

**[16]** **Federal Courts** ✏ Supersedeas or Stay of Proceedings

President's re-election campaign likely would not suffer irreparable harm without stay pending appeal in action against Secretary of Commonwealth of Pennsylvania and county boards of elections to invalidate millions of votes cast in presidential election over election procedures, since campaign alleged only modest number of votes were affected, court would not use extrapolation to postulate that number of affected ballots came close to certified margin of victory, and issues raise could be remedied through state courts and then United States Supreme Court. U.S. Const. art. 1, § 4, cl. 1; 🔖 3 U.S.C.A. § 5.

**[17]** **Election Law** ✏ State legislatures

States are primarily responsible for running federal elections. U.S. Const. art. 1, § 4, cl. 1; 🔖 3 U.S.C.A. § 5.

**[18]** **Federal Courts** ✏ Supersedeas or Stay of Proceedings

Granting relief would not have been equitable, and therefore President's re-election campaign was not entitled to stay pending appeal in action against Secretary of Commonwealth of Pennsylvania and county boards of elections to invalidate millions of votes cast in presidential election over election procedures, since campaign already had litigated and lost most issues raised as garden-variety state-law claims, it delayed in bringing suit, fraud was not alleged, granting relief would have disenfranchised voters or sidestepped expressed will of people, and tossing out those ballots could have disrupted every down-ballot race as well. Fed. R. App. P. 8(a)(2)(A).

Case 2:20-cv-01831-NR   Document 68-1   Filed 01/08/21   Page 66 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

[19]   **Federal Courts**   Supersedeas or Stay of
Proceedings

Granting relief would not have served public
interest, and therefore President's re-election
campaign was not entitled to stay pending appeal
in action against Secretary of Commonwealth
of Pennsylvania and county boards of elections
to invalidate millions of votes cast in
presidential election over election procedures,
since democracy depended on counting all
lawful votes promptly and finally, not setting
them aside without weighty proof, public had to
have confidence that government honored and
respected their votes, and throwing out those
votes would have conflicted with Pennsylvania
election law. Fed. R. App. P. 8(a)(2)(A).

1 Cases that cite this headnote

[20]   **Election Law**   Liberal or strict construction

Under Pennsylvania law, technicalities should
not be used to make the right of the voter
insecure.

[21]   **Election Law**   Ballots
**Election Law**   Voting by ballot

Unless there is evidence of fraud, Pennsylvania
law overlooks small ballot glitches and respects
the expressed intent of every lawful voter.

**\*380**  On Appeal from the United States District Court for the
Middle District of Pennsylvania (D.C. No. 4:20-cv-02078),
District Judge: Honorable Matthew W. Brann.

**Attorneys and Law Firms**

Brian C. Caffrey, Esq., Keith E. Kendall, Esq., Marc A.
Scaringi, Esq., Scaringi & Scaringi, Harrisburg, PA, Rudolph
W. Giuliani, Esq., New York, NY, for Plaintiffs-Appellants

Barry H. Berke, Esq., Dani R. James, Esq., Kramer Levin
Naftalis & Frankel, New York, NY, Nicole J. Boland, Esq.,
Stephen Moniak, Esq., Keli M. Neary, Esq., Karen M.
Romano, Esq., Office of Attorney General of Pennsylvania,

Harrisburg, PA, Daniel T. Brier, Esq., John B. Dempsey,
Esq., Donna A. Walsh, Esq., Myers Brier & Kelly, Scranton,
PA, Dani R. James, Esq., Kramer Levin Naftalis &
Frankel, New York, NY, for Defendant - Appellee Secretary
Commonwealth of Pennsylvania

Mark A. Aronchick, Esq., John Coit, Esq., Michele D.
Hangley, Esq., John B. Hill, Esq., Christina Matthias, Esq.,
Robert A. Wiygul, Esq., Hangley Aronchick Segal Pudlin &
Schiller, Philadelphia, PA, Stephen H. Barrett, Esq., Brian H.
Benjet, Esq., Ilana H. Eisenstein, Esq., Ben C. Fabens-Lassen,
Esq., Rachel A.H. Horton, Esq., Danielle T. Morrison, Esq.,
Jayne A. Risk, Esq., DLA Piper, Philadelphia, PA, Virginia
S. Scott, Esq., Andrew F. Szefi, Esq., Office of Allegheny
County, Law Department, Pittsburgh, PA, for Defendant -
Appellee Allegheny County Board of Elections

Mark A. Aronchick, Esq., John Coit, Esq., Michele D.
Hangley, Esq., John B. Hill, Esq., Christina Matthias,
Esq., Robert A. Wiygul, Esq., Hangley Aronchick Segal
Pudlin & Schiller, Philadelphia, PA, Stephen H. Barrett,
Esq., Brian H. Benjet, Esq., Ilana H. Eisenstein, Esq.,
Ben C. Fabens-Lassen, Esq., Rachel A.H. Horton, Esq.,
Danielle T. Morrison, Esq., Jayne A. Risk, Esq., DLA Piper,
Philadelphia, PA, for Defendants-Appellees Chester County
Board of Elections, Montgomery County Board of Elections,
Philadelphia County Board of Elections

Elizabeth A. Dupuis, Esq., Molly E. Meacham, Esq., Babst
Calland, State College, PA, for Defendant-Appellee Centre
County Board of Elections

Timothy P. Brennan, Esq., Brian Jeffrey Taylor, Northampton
County Office of the Solicitor, Easton, PA, Molly
E. Meacham, Esq., Babst Calland, Pittsburgh, PA, for
Defendant-Appellee Northampton County Board of Elections

Terence M. Grugan, Esq., Timothy D. Katsiff, Esq., Edward
D. Rogers, Esq., Elizabeth V. Wingfield, Esq., Ballard Spahr,
Philadelphia, PA, Molly E. Meacham, Esq., Babst Calland,
Pittsburgh, PA, for Defendant-Appellee Delaware County
Board of Elections

Adriel I. Cepeda Derieux, Esq., Sophia Lin Lakin, Esq.,
American Civil Liberties Union, New York, NY, Witold J.
Walczak, Esq., American Civil Liberties Union, Pittsburgh,
PA, Claudia De Palma, Esq., Benjamin D. Geffen, Esq.,
Mary M. McKenzie, Esq., Public Interest Law Center
of Philadelphia, Philadelphia, PA, Jon M. Greenbaum,
Esq., Lawyers' Committee for Civil Rights Under Law,
Washington, DC, David M. Zionts, Esq., Covington

Case 2:20-cv-01831-NR    Document 68-1    Filed 01/08/21    Page 67 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

& Burling, Washington, DC, for Intervenor-Defendants-Appellees Joseph Ayeni, Black Political Empowerment Project, Common Cause of Pennsylvania, Stephanie Higgins, Meril Lara, League of Women Voters of Pennsylvania, Ricardo Morales, Pennsylvania State Conference of NAACP Branches, Natalie Price, Tim Stevens, Taylor Stover, Lucia Gajda

Marc E. Elias, Esq., Ariel B. Glickman, Esq., Laura Hill, Esq., Lalitha S. Madduri, Esq., Uzoma N. Nkwonta, Esq., Perkins Coie, Washington, DC, Seth P. Waxman, Esq., Wilmer Cutler Pickering Hale & Dorr, Washington, DC, for Intervenor-Defendant - Appellee Democratic National Committee

Remy Green, Esq., Cohen Green, Ridgewood, NY, for Amicus Appellee Democrats Abroad

James P. DeAngelo, Esq., McNees Wallace & Nurick, Harrisburg, PA, for Amicus Curiae Christine T. Whitman

Matthew Stiegler, Esq., Law Office of Matthew Stiegler, Philadelphia, PA, for Amicus Appellee Erwin Chemerinsky

Before: SMITH, Chief Judge, and CHAGARES and BIBAS, Circuit Judges

OPINION [*]

BIBAS, Circuit Judge.

**\*381** Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here.

The Trump Presidential Campaign asserts that Pennsylvania's 2020 election was unfair. But as lawyer Rudolph Giuliani **\*382** stressed, the Campaign "doesn't plead fraud. ... [T]his is not a fraud case." Mot. to Dismiss Hr'g Tr. 118:19–20, 137:18. Instead, it objects that Pennsylvania's Secretary of State and some counties restricted poll watchers and let voters fix technical defects in their mail-in ballots. It offers nothing more.

This case is not about whether those claims are true. Rather, the Campaign appeals on a very narrow ground: whether the District Court abused its discretion in not letting the Campaign amend its complaint a second time. It did not.

Most of the claims in the Second Amended Complaint boil down to issues of state law. But Pennsylvania law is willing to overlook many technical defects. It favors counting votes as long as there is no fraud. Indeed, the Campaign has already litigated and lost many of these issues in state courts.

The Campaign tries to repackage these state-law claims as unconstitutional discrimination. Yet its allegations are vague and conclusory. It never alleges that anyone treated the Trump campaign or Trump votes worse than it treated the Biden campaign or Biden votes. And federal law does not require poll watchers or specify how they may observe. It also says nothing about curing technical state-law errors in ballots. Each of these defects is fatal, and the proposed Second Amended Complaint does not fix them. So the District Court properly denied leave to amend again.

Nor does the Campaign deserve an injunction to undo Pennsylvania's certification of its votes. The Campaign's claims have no merit. The number of ballots it specifically challenges is far smaller than the roughly 81,000-vote margin of victory. And it never claims fraud or that any votes were cast by illegal voters. Plus, tossing out millions of mail-in ballots would be drastic and unprecedented, disenfranchising a huge swath of the electorate and upsetting all down-ballot races too. That remedy would be grossly disproportionate to the procedural challenges raised. So we deny the motion for an injunction pending appeal.

## I. BACKGROUND

### A. Pennsylvania election law

In Pennsylvania, each county runs its own elections. 25 Pa. Stat. § 2641(a). Counties choose and staff polling places. § 2642(b), (d). They buy their own ballot boxes and voting booths and machines. § 2642(c). They even count the votes and post the results. § 2642(k), (l). In all this, counties must follow Pennsylvania's Election Code and regulations. But counties can, and do, adopt rules and guidance for election officers and electors. § 2642(f). And they are charged with ensuring that elections are "honestly, efficiently, and uniformly conducted." § 2642(g).

1. *Poll watchers and representatives.* Counties must admit qualified poll "watchers" to observe votes being tallied. 25 Pa. Stat. § 2650(a). Poll watchers must be registered to vote in the county where they will serve. § 2687(b). Each candidate can pick two poll watchers per election district; each political

Case 2:20-cv-01831-NR    Document 68-1    Filed 01/08/21    Page 68 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

party, three. § 2687(a). The poll watchers remain at the polling place while election officials count in-person ballots. § 2687(b). They can ask to check voting lists. *Id.* And they get to be present when officials open and count all the mail-in ballots. § 3146.8(b). Likewise, candidates' and political parties' "representatives" may be present when absentee and mail-in ballots are inspected, opened, or counted, or when provisional ballots are examined. §§ 2602(a.1), (q.1), 3050(a.4)(4), 3146.8(g)(1.1) & (2); *see also* § 3050(a.4)(12) (defining provisional ballots **\*383** as those cast by voters whose voter registration cannot be verified right away).

Still, counties have some control over these poll watchers and representatives. The Election Code does not tell counties how they must accommodate them. Counties need only allow them "in the polling place" or "in the room" where ballots are being inspected, opened, or counted. §§ 2687(b), 3050(a.4) (4), 3146.8(g)(1.1) & (2). Counties are expected to set up "an enclosed space" for vote counters at the polling place, and poll watchers "shall remain outside the enclosed space." § 2687(b). So the counties decide where the watchers stand and how close they get to the vote counters.

2. *Mail-in ballots.* For decades, Pennsylvania let only certain people, like members of the military and their families, vote by mail. *See, e.g.*, 25 Pa. Stat. § 3146.1. But last year, as part of a bipartisan election reform, Pennsylvania expanded mail-in voting. Act of Oct. 31, 2019, Pub. L. No. 552, sec. 8, § 1310-D, 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421). Now, any Pennsylvania voter can vote by mail for any reason. *See* 25 Pa. Stat. §§ 2602(t), 3150.11(a).

To vote by mail, a Pennsylvania voter must take several steps. First, he (or she) must ask the State (Commonwealth) or his county for a mail-in ballot. 25 Pa. Stat. § 3150.12(a). To do that, he must submit a signed application with his name, date of birth, address, and other information. § 3150.12(b)–(c). He must also provide a driver's license number, the last four digits of his Social Security number, or the like. §§ 2602(z.5), 3150.12b(a), (c). Once the application is correct and complete, the county will approve it. *See* §§ 3150.12a(a), 3150.12b.

Close to the election, the county will mail the voter a mail-in ballot package. § 3150.15. The package has a ballot and two envelopes. The smaller envelope (also called the secrecy envelope) is stamped "Official Election Ballot." § 3150.14(a). The larger envelope is stamped with the county

board of election's name and address and bears a printed voter declaration. *Id.*

Next, the voter fills out the ballot. § 3150.16(a). He then folds the ballot; puts it into the first, smaller secrecy envelope; and seals it. *Id.* After that, he puts the secrecy envelope inside the larger envelope and seals that too. *Id.* He must also "fill out, date and sign the declaration printed" on the outside of the larger envelope. §§ 3150.16(a), 3150.14(b). The declaration for the November 2020 election read thus:

> I hereby declare that I am qualified to vote from the below stated address at this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.
>
> [BAR CODE]
>
> Voter, sign or mark here/Votante firme o mar[q]ue aqui
>
> **X_____**
>
> **_____**
>
> Date of signing (MM/DD/YYYY)/Fechade firme (MM/ DD/YYYY)
>
> **_____**
>
> Voter, print name/Votante, nombre en letra de impreta

**\*384** *In re: Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*, Nos. 31–35 EAP & 29 WAP 2020,—— A.3d ——, ——, 2020 WL 6875017, at \*4 (Pa. Nov. 23, 2020). Once the voter assembles the ballot packet, he can mail it back or deliver it in person. 25 Pa. Stat. § 3150.16(a).

Not every voter can be expected to follow this process perfectly. Some forget one of the envelopes. Others forget to sign on the dotted line. Some major errors will invalidate a ballot. For instance, counties may not count mail-in ballots that lack secrecy envelopes. *Pa. Dem. Party v. Boockvar, 238 A.3d 345, 378–80 (Pa. 2020).* But the Election Code says nothing about what should happen if a county notices these

Case 2:20-cv-01831-NR   Document 68-1   Filed 01/08/21   Page 69 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

errors before election day. Some counties stay silent and do not count the ballots; others contact the voters and give them a chance to correct their errors.

### B. Facts and procedural history

On appeal from the dismissal of a complaint, we take the factual allegations as true:

1. *Mail-in voting*. For months, Pennsylvanians went to the polls, so to speak. The first batch of mail-in ballots went out to voters in late September. As they trickled back in, election officials noticed that some voters had not followed the rules. Some ballots were not in secrecy envelopes, so those packages were lighter and thinner than complete ballot packages. Others had declarations that voters had not completed. Some counties did not notify voters about these defective ballots. Others, including the counties named in this suit, decided to reach out to these voters to let them cure their mistakes by voting provisionally on Election Day or asking for a replacement ballot.

2. *Election Day*. Though more than two million Pennsylvanians voted by mail, even more voted in person. On Election Day, November 3, the Campaign set up poll watchers at polling places around the Commonwealth. Appellees' election officials kept poll watchers and representatives away from where ballots were opened, counted, and tallied. In Philadelphia, for instance, poll watchers were kept six to twenty-five feet back from officials. In comparison, other, "Republican[-]controlled" counties did give the Campaign's poll watchers and representatives full access. Second Am. Compl. ¶¶ 151, 154.

In all, nearly seven million Pennsylvanians voted, more than a third of them by mail. *Unofficial Returns for the 2020 Presidential Election*, Pa. Dep't of State, https://www.electionreturns.pa.gov/ (last visited Nov. 27, 2020). As of today, former Vice President Biden leads President Trump in Pennsylvania by 81,660 votes. *Id.*

Pennsylvania's counties certified their election results by the November 23 certification deadline. 25 Pa. Stat. § 2642(k). The next morning, the Secretary of State (technically, Secretary of the Commonwealth) certified the vote totals, and the Governor signed the Certificate of Ascertainment and sent it to the U.S. Archivist. *Department of State Certifies Presidential Election Results*, PA Media, https://www.media.pa.gov/Pages/State-details.aspx?

newsid=435 (last visited Nov. 27, 2020). The certified margin of victory was 80,555 votes. *Id.*

3. *This lawsuit*. Almost a week after the election, the Campaign (as well as two voters) sued seven Pennsylvania counties and Secretary of State Kathy Boockvar. It alleged that they had violated the Due Process, Equal Protection, and Electors and Elections Clauses of the U.S. Constitution by taking two basic actions: First, the counties (encouraged by Secretary Boockvar) identified defective mail-in ballots early and told voters how to fix them. Second, they kept poll watchers and representatives **\*385** from watching officials count all ballots.

So far, the Campaign has filed or tried to file three complaints. The original Complaint, filed November 9, set out six counts (plus a duplicate). After Boockvar and the counties moved to dismiss, on November 15 the Campaign filed a First Amended Complaint as of right, dropping four of the six counts (plus the duplicate), including all the counts relating to poll watchers and representatives. The Campaign sought a preliminary injunction to block certifying the election results. Boockvar and the counties again moved to dismiss. On November 18, the Campaign sought to file a Second Amended Complaint, resurrecting four dropped claims from the original Complaint and adding three more about how Philadelphia had blocked poll watching.

The District Court ended these volleys, denying leave to file the Second Amended Complaint. Instead, it dismissed the First Amended Complaint with prejudice and denied the Campaign's motion for a preliminary injunction as moot. *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-cv-02078, —— F. Supp. 3d ——, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020). In doing so, it held that the individual voters lacked standing. *Id.* at ——, at \*5–6. We commend the District Court for its fast, fair, patient handling of this demanding litigation.

4. *This appeal*. The Campaign filed this appeal on Sunday, November 22, and we granted its motion to expedite. The Campaign filed its brief and another motion November 23; opposing briefs and filings arrived the next day. We are issuing this opinion nonprecedentially so we can rule by November 27.

The Campaign does not challenge the District Court's finding that the voters lacked standing, so we do not consider their

Case 2:20-cv-01831-NR    Document 68-1    Filed 01/08/21    Page 70 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

claims. On appeal, it seeks only narrow relief: to overturn the District Court's decision not to let it amend its complaint again. We address that claim in Part II. Separately, the Campaign asks us for an injunction to prevent the certified vote totals from taking effect. We address that claim in Part III.

## II. THE DISTRICT COURT PROPERLY DENIED LEAVE TO AMEND THE COMPLAINT AGAIN

 **[1]**   After one amendment, the District Court denied the Campaign's motion to amend the complaint a second time. We review that denial for abuse of discretion. *Premier Comp. Sol., LLC v. UPMC*, 970 F.3d 316, 318–19 (3d Cir. 2020). But on any standard of review, the court got it right.

 **[2]**   Courts should grant leave to amend "freely ... when justice so requires." Fed. R. Civ. P. 15(a)(2). In civil-rights cases, that means granting leave unless "amendment would be futile or inequitable." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018); *Cureton v. NCAA*, 252 F.3d 267, 272–73 (3d Cir. 2001) (giving undue delay as an example of inequity). Here, the Campaign's request fails as both inequitable and futile.

### A. The Campaign's delay was undue, given its stress on needing to resolve the case by November 23

 **[3]**   When the Campaign was before the District Court, it focused its arguments on the need to resolve the case by Pennsylvania's deadline for counties to certify their votes: Monday, November 23. Indeed, all three iterations of the complaint focused their prayers for relief on blocking the certification of the vote tally. The Campaign said it could get no "meaningful remedy" after that date. Br. in Supp. of Mot. for TRO & PI, Dkt. 89-1, at 4.

 ***386***   The Campaign filed its First Amended Complaint on November 15, eight days before the certification deadline. In response to several pending motions to dismiss, it dropped many of the challenged counts from the original Complaint. It did not then move to file a Second Amended Complaint until November 18, when its opposition to the new motions to dismiss was due. And it did not file a brief in support of that motion until Friday, November 20. Certification was three days away.

 **[4]**   **[5]**   As the District Court rightly noted, amending that close to the deadline would have delayed resolving the issues. True, delay alone is not enough to bar amendment. *Cureton*, 252 F.3d at 273. But "at some point, the delay will become 'undue,' placing an unwarranted burden on the court." *Id.* (quoting *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984)). The Campaign's motion would have done just that. It would have mooted the existing motions to dismiss and required new briefing, possibly new oral argument, and a reasoned judicial opinion within seventy-two hours over a weekend. That is too much to ask—especially since the proposed Second Amended Complaint largely repleaded many claims abandoned by the first one. *Cf.* *Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 654–55 (3d Cir. 1998) (affirming denial of leave to amend because the movant sought largely to "replead facts and arguments that could have been pled much earlier").

Having repeatedly stressed the certification deadline, the Campaign cannot now pivot and object that the District Court abused its discretion by holding the Campaign to that very deadline. It did not.

### B. Amending the Complaint again would have been futile

 **[6]**   The Campaign focuses on critiquing the District Court's discussion of undue delay. Though the court properly rested on that ground, we can affirm on any ground supported by the record. Another ground also supports its denial of leave to amend: it would have been futile.

1. *The Campaign had to plead plausible facts, not just conclusory allegations*. Plaintiffs must do more than allege conclusions. Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The Second Amended Complaint does not meet *Twombly* and *Iqbal*'s baseline standard of specifics.

To start, note what it does not allege: fraud. Indeed, in oral argument before the District Court, Campaign lawyer

Case 2:20-cv-01831-NR   Document 68-1   Filed 01/08/21   Page 71 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

Rudolph Giuliani conceded that the Campaign "doesn't plead fraud." Mot. to Dismiss Hr'g Tr. 118:19–20 (Nov. 17, 2020). He reiterated: "If we had alleged fraud, yes, but this is not a fraud case." *Id.* at 137:18.

 [7] Though it alleges many conclusions, the Second Amended Complaint is light on facts. Take the nearly identical paragraphs introducing Counts One, Two, Four, and Six: "Democrats who controlled the Defendant County Election Boards engaged in a deliberate scheme of intentional and purposeful discrimination ... by excluding Republican and Trump Campaign observers from the canvassing of the mail ballots in order to conceal their decision not to enforce [certain ballot] requirements." Second Am. Compl. ¶¶167, 193, 222, 252. That is conclusory. So is the claim that, "[u]pon information and belief, **\*387** a substantial portion of the approximately 1.5 million absentee and mail votes in Defendant Counties should not have been counted." *Id.* ¶¶168, 194, 223, 253. "Upon information and belief" is a lawyerly way of saying that the Campaign does not know that something is a fact but just suspects it or has heard it. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. Yet the Campaign offers no specific facts to back up these claims.

2. *The Campaign has already litigated and lost most of these issues*. Many of the Second Amended Complaint's claims have already had their day in court. The Campaign cannot use this lawsuit to collaterally attack those prior rulings. On Counts One, Two, Four, and Six, the Campaign has already litigated whether ballots that lack a handwritten name, address, or date on the outer envelope must be disqualified. *See In re: Canvass of Absentee and Mail-In Ballots*, — A.3d at ——, 2020 WL 6875017, at \*1. The Pennsylvania Supreme Court ruled against the Campaign, holding: "[T]he Election Code does not require boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, their address, and/or date, where no fraud or irregularity has been alleged." *Id.* at ——, at \*1. That holding undermines the Campaign's suggestions that defective ballots should not have been counted.

Counts One and Two also challenge the requirement that poll watchers be registered electors of the county they wish to observe and that observers be Pennsylvania lawyers. But a federal district court has already held "that the county-residency requirement for poll watching does not, as applied

to the particular circumstances of this election, burden any of [the Campaign's] fundamental constitutional rights." *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, — F. Supp. 3d ——, ——, 2020 WL 5997680, at \*66 (W.D. Pa. Oct. 10, 2020). The Campaign never appealed that decision, so it is bound by it.

Count Seven alleges that Philadelphia's Board of Elections violated due process by obstructing poll watchers and representatives. But nothing in the Due Process Clause requires having poll watchers or representatives, let alone watchers from outside a county or less than eighteen feet away from the nearest table. The Campaign cites no authority for those propositions, and we know of none. (Ditto for notice-and-cure procedures.) And the Campaign litigated and lost that claim under state law too. The Pennsylvania Supreme Court held that the Election Code requires only that poll watchers be in the room, not that they be within any specific distance of the ballots. *In re Canvassing Observation Appeal of: City of Phila. Bd. of Electors*, No. 30 EAP 2020, — A.3d ——, ——, 2020 WL 6737895, at \*8–9 (Pa. Nov. 17, 2020).

The Campaign does not even challenge the dismissal of Counts Three, Five, and Nine, the Electors and Elections Clause counts. It concedes that under our recent decision, it lacks standing to pursue alleged violations of those clauses. *Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, 980 F.3d 336, 348–53 (3d Cir. Nov. 13, 2020). Given its concession, we need not consider the issue any more.

The Second Amended Complaint thus boils down to the equal-protection claims in Counts Two, Four, Six, and Eight. They require not violations of state law, but discrimination in applying it. Those claims fail too.

 **\*388** [8] [9] 3. *The Campaign never pleads that any defendant treated the Trump and Biden campaigns or votes differently*. A violation of the Equal Protection Clause requires more than variation from county to county. It requires unequal treatment of similarly situated parties. But the Campaign never pleads or alleges that anyone treated it differently from the Biden campaign. Count One alleges that the counties refused to credential the Campaign's poll watchers or kept them behind metal barricades, away from the ballots. It never alleges that other campaigns' poll watchers or representatives were treated differently. Count Two alleges that an unnamed lawyer was able to watch all aspects of voting in York County,

Case 2:20-cv-01831-NR  Document 68-1  Filed 01/08/21  Page 72 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

while poll watchers in Philadelphia were not. It also makes a claim about one Jared M. Mellott, who was able to poll watch in York County. Counts Four and Six allege that poll watcher George Gallentin had no issues in Bucks County but was barred from watching in Philadelphia. And Count Eight alleges that Philadelphia officials kept Jeremy Mercer too far away to verify that ballots were properly filled out. None of these counts alleges facts showing improper vote counting. And none alleges facts showing that the Trump campaign was singled out for adverse treatment. The Campaign cites no authority suggesting that an actor discriminates by treating people equally while harboring a partisan motive, and we know of none.

**[10]** **[11]** These county-to-county variations do not show discrimination. "[C]ounties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state." *Donald J. Trump for President, Inc.*, —— F. Supp. 3d at ——, 2020 WL 5997680, at *44 (collecting cases). Even when boards of elections "vary ... considerably" in how they decide to reject ballots, those local differences in implementing statewide standards do not violate equal protection. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635–36 (6th Cir. 2016); *see also* *Wexler v. Anderson*, 452 F.3d 1226, 1231–33 (11th Cir. 2006) (recognizing that equal protection lets different counties use different voting systems).

Nor does *Bush v. Gore* help the Campaign. *531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000)* (per curiam). There, the Florida Supreme Court had ratified treating ballots unequally. *Id. at 107, 121 S.Ct. 525*. That was because the principle it set forth, the "intent of the voter," lacked *any* "specific standards to ensure its equal application." *Id. at 105–06, 121 S.Ct. 525*. The lack of any standards at all empowered officials to treat ballots arbitrarily, violating equal protection. *Id.* Here, by contrast, Pennsylvania's Election Code gives counties specific guidelines. To be sure, counties vary in implementing that guidance, but that is normal. Reasonable county-to-county variation is not discrimination. *Bush v. Gore* does not federalize every jot and tittle of state election law.

4. *The relief sought—throwing out millions of votes—is unprecedented*. Finally, the Second Amended Complaint seeks breathtaking relief: barring the Commonwealth from certifying its results or else declaring the election results defective and ordering the Pennsylvania General Assembly, not the voters, to choose Pennsylvania's presidential electors. It cites no authority for this drastic remedy.

The closest the Campaign comes to justifying the relief it seeks is citing *Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994). But those facts were a far cry from the ones here. In *Marks*, the district court found that the Stinson campaign had orchestrated "massive absentee ballot fraud, deception, intimidation, harassment and forgery." ***389** *Id. at 887* (quoting district court's tentative findings). It had lied to voters, deceived election officials, and forged ballots. *Id. at 877*. We remanded that case, instructing that "the district court should not direct the certification of a candidate unless it finds, on the basis of record evidence, that the designated candidate would have won the election but for wrongdoing." *Id. at 889*. And that seemed likely: the Stinson campaign had gotten about 600 net absentee-ballot applications (roughly 1000 minus 400 that were later rejected), more than the 461-vote margin of victory. *Id. at 876–77*.

Here, however, there is no clear evidence of massive absentee-ballot fraud or forgery. On the contrary, at oral argument in the District Court, the Campaign specifically disavowed any claim of fraud. And the margin of victory here is not nearly as close: not 461 votes, but roughly 81,000.

Though district courts should freely give leave to amend, they need not do so when amendment would be futile. Because the Second Amended Complaint would not survive a motion to dismiss, the District Court properly denied leave to file it.

### III. NO STAY OR INJUNCTION IS WARRANTED

We could stop here. Once we affirm the denial of leave to amend, this case is over. Still, for completeness, we address the Campaign's emergency motion to stay the effect of certification. No stay or injunction is called for.

**[12]** Though the Campaign styles its motion as seeking a stay or preliminary injunction, what it really wants is an injunction pending appeal. But it neither requested that from the District Court during the appeal nor showed that it could not make that

Case 2:20-cv-01831-NR   Document 68-1   Filed 01/08/21   Page 73 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

request, as required by Federal Rule of Appellate Procedure 8(a)(2)(A). That failure bars the motion.

**[13]** **[14]** Even if we could grant relief, we would not. Injunctions pending appeal, like preliminary injunctions, are "extraordinary remed[ies] never awarded as of right."

*Winter v. NRDC,* 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). For a stay or injunction pending appeal, the movant must show both (1) a "strong" likelihood of success on the merits and (2) irreparable injury absent a stay or injunction. *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). The first two factors are "the most critical." *Nken v. Holder,* 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). After that, we also balance (3) whether a stay or injunction will injure other interested parties (also called the balance of equities) and (4) the public interest. *Hilton,* 481 U.S. at 776, 107 S.Ct. 2113; *In re Revel AC, Inc.,* 802 F.3d 558, 568–71 (3d Cir. 2015). None of the four factors favors taking this extraordinary step.

### A. The Campaign has no strong likelihood of success on the merits

**[15]** As discussed, the Campaign cannot win this lawsuit. It conceded that it is not alleging election fraud. It has already raised and lost most of these state-law issues, and it cannot relitigate them here. It cites no federal authority regulating poll watchers or notice and cure. It alleges no specific discrimination. And it does not contest that it lacks standing under the Elections and Electors Clauses. These claims cannot succeed.

### B. The Campaign faces no irreparable harm

**[16]** The Campaign has not shown that denying relief will injure it. "Upon information and belief," it suspects that many of the 1.5 million mail-in ballots in the challenged counties were improperly counted. Second Am. Compl. ¶¶168, 194, **\*390** 223, 253. But it challenges no specific ballots. The Campaign alleges only that at most three specific voters cast ballots that were not counted. *Id.* ¶237 (one voter); First Am. Compl. ¶¶15–16, 112 (three). And it never alleges that anyone except a lawful voter cast a vote. Of the seven counties whose notice-and-cure procedures are challenged, four (including the three most populous) represented that they gave notice to only about 6,500 voters who sent in defective ballot packages. Allegheny Cty. Opp. Mot. TRO & PI 7–8, D. Ct. Dkt. No. 193 (Nov. 20, 2020). The Campaign never disputed these numbers

or alleged its own. Even if 10,000 voters got notice and cured their defective ballots, and every single one then voted for Biden, that is less than an eighth of the margin of victory.

Without more facts, we will not extrapolate from these modest numbers to postulate that the number of affected ballots comes close to the certified margin of victory of 80,555 votes. Denying relief will not move the needle.

**[17]** Plus, states are primarily responsible for running federal elections. U.S. Const. art. I, § 4, cl. 1; 3 U.S.C. § 5. Pennsylvania law has detailed mechanisms for disputing election results. 25 Pa. Stat. §§ 3261–3474. Because the Campaign can raise these issues and seek relief through state courts and then the U.S. Supreme Court, any harm may not be irreparable. *Touchston v. McDermott,* 234 F.3d 1130, 1132–33 (11th Cir. 2000) (per curiam) (en banc).

### C. The balance of equities opposes disenfranchising voters

**[18]** Nor would granting relief be equitable. The Campaign has already litigated and lost most of these issues as garden-variety state-law claims. It now tries to turn them into federal constitutional claims but cannot. *See Bognet,* 980 F.3d at 354–56.

Even if it could, it has delayed bringing this suit. For instance, in proposed Count Four, it challenges giving voters notice and letting them cure ballot defects as violating equal protection. The Campaign could have disputed these practices while they were happening or during the canvassing period. Instead, it waited almost a week after Election Day to file its original complaint, almost another week to amend it, and then another three days to amend it again. Its delay is inequitable, and further delay would wreak further inequity.

And the Campaign's charges are selective. Though Pennsylvanians cast 2.6 million mail-in ballots, the Campaign challenges 1.5 million of them. It cherry-picks votes cast in "Democratic-heavy counties" but not "those in Republican-heavy counties." Second Am. Compl. ¶8. Without compelling evidence of massive fraud, not even alleged here, we can hardly grant such lopsided relief.

Granting relief would harm millions of Pennsylvania voters too. The Campaign would have us set aside 1.5 million ballots without even alleging fraud. As the deadline to certify votes has already passed, granting relief would disenfranchise those

Case 2:20-cv-01831-NR    Document 68-1    Filed 01/08/21    Page 74 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

voters or sidestep the expressed will of the people. Tossing out those ballots could disrupt every down-ballot race as well. There is no allegation of fraud (let alone proof) to justify harming those millions of voters as well as other candidates.

### D. The public interest favors counting all lawful voters' votes

[19] Lastly, relief would not serve the public interest. Democracy depends on counting all lawful votes promptly and finally, not setting them aside without weighty proof. The public must have confidence **\*391** that our Government honors and respects their votes.

[20] [21] What is more, throwing out those votes would conflict with Pennsylvania election law. The Pennsylvania Supreme Court has long "liberally construed" its Election Code "to protect voters' right to vote," even when a ballot violates a technical requirement. *Shambach v. Bickhart*, 577 Pa. 384, 845 A.2d 793, 802 (2004). "Technicalities should not be used to make the right of the voter insecure." *Appeal of James*, 377 Pa. 405, 105 A.2d 64, 66 (1954) (internal quotation marks omitted). That court recently reiterated: "[T]he Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice." *Pa. Dem. Party*, 238 A.3d at 356. Thus, unless there is evidence of fraud, Pennsylvania law overlooks small ballot glitches and respects the expressed intent of every lawful voter. *In re: Canvass of Absentee and Mail-in Ballots*, 2020 WL 6875017, at \*1 (plurality opinion). In our federalist system, we must respect Pennsylvania's approach to running elections. We will not make more of ballot technicalities than Pennsylvania itself does.

\* \* \* \* \*

Voters, not lawyers, choose the President. Ballots, not briefs, decide elections. The ballots here are governed by Pennsylvania election law. No federal law requires poll watchers or specifies where they must live or how close they

may stand when votes are counted. Nor does federal law govern whether to count ballots with minor state-law defects or let voters cure those defects. Those are all issues of state law, not ones that we can hear. And earlier lawsuits have rejected those claims.

Seeking to turn those state-law claims into federal ones, the Campaign claims discrimination. But its alchemy cannot transmute lead into gold. The Campaign never alleges that any ballot was fraudulent or cast by an illegal voter. It never alleges that any defendant treated the Trump campaign or its votes worse than it treated the Biden campaign or its votes. Calling something discrimination does not make it so. The Second Amended Complaint still suffers from these core defects, so granting leave to amend would have been futile.

And there is no basis to grant the unprecedented injunction sought here. First, for the reasons already given, the Campaign is unlikely to succeed on the merits. Second, it shows no irreparable harm, offering specific challenges to many fewer ballots than the roughly 81,000-vote margin of victory. Third, the Campaign is responsible for its delay and repetitive litigation. Finally, the public interest strongly favors finality, counting every lawful voter's vote, and not disenfranchising millions of Pennsylvania voters who voted by mail. Plus, discarding those votes could disrupt every other election on the ballot.

We will thus affirm the District Court's denial of leave to amend, and we deny an injunction pending appeal. The Campaign asked for a very fast briefing schedule, and we have granted its request. Because the Campaign wants us to move as fast as possible, we also deny oral argument. We grant all motions to file overlength responses, to file amicus briefs, and to supplement appendices. We deny all other outstanding motions as moot. This Court's mandate shall issue at once.

### All Citations

830 Fed.Appx. 377

## Footnotes

\*        This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

Case 2:20-cv-01831-NR    Document 68-1    Filed 01/08/21    Page 75 of 97

Donald J. Trump for President, Inc. v. Secretary of Pennsylvania, 830 Fed.Appx. 377...

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Unreported Opinion 5

*In Re: Canvass of Absentee and/or Mail-in Ballots of November 3, 2020 General Election*, 1191 C.D. 2020, (Pa. Commw. Ct. Nov. 25, 2020) (Slip. Op.)

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In Re: Canvass of Absentee | : | |
| and/or Mail-in Ballots of | : | |
| November 3, 2020 General Election | : | |
| | : | |
| v. | : | No. 1191 C.D. 2020 |
| | : | Submitted: November 23, 2020 |
| Appeal of: Donald J. Trump for | : | |
| President, Inc. | : | |

**BEFORE:** **HONORABLE RENÉE COHN JUBELIRER,** Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**         **FILED: November 25, 2020**

Donald J. Trump for President, Inc. (Appellant) appeals from the Order of the Court of Common Pleas of Bucks County (common pleas) that overruled the Appellant's objections to certain absentee and/or mail-in ballots, denied Appellant's requested relief, and dismissed Appellant's appeal from the Bucks County Board of Elections' (Board) determination that the challenged ballots were valid and could be counted in the General Election of November 3, 2020 (Election).[1] Appellant argues the Board violated the Election Code[2] (Code) when it did not reject and, over objection, accepted 2,177 ballots on the basis that they did not comply, in some way, with Sections 3146.6 or 3150.16 of the Code, 25 P.S. §§ 3146.6 (absentee electors),

---

[1] Others challenged the Board's decision to common pleas, but only Appellant has filed a notice of appeal from the common pleas' Order.

[2] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2601-3591.

3150.16 (mail-in electors). Appellant has since withdrawn some of the challenges, and of the remaining challenges, all but 69 ballots are resolved by a recent decision of the Supreme Court; common pleas' Order with regard to those ballots is, therefore, affirmed for that reason. The remaining 69 ballots were received with secrecy envelopes that were "unsealed." The statute unambiguously requires that secrecy envelopes shall be "securely seal[ed]," 25 P.S. §§ 3146.6(a), 3150.16(a), and that the board of elections shall "break the seals" on these envelopes before counting the ballots. Section 3146.8(g)(4)(iii) of the Code, 25 P.S. § 3146.8(g)(iii).[3] Therefore, in future elections, the sealing requirement should be treated as mandatory and if unsealed secrecy envelopes are received, this will invalidate the ballots contained therein. However, because of the facts and circumstances in this case, this interpretation will be applied prospectively. Common pleas' Order is, therefore, affirmed with regard to those 69 ballots.

The parties filed a joint stipulation of facts with common pleas setting forth the following facts relevant to the Court's resolution of this appeal. On November 3, 2020, the Board met to pre-canvass absentee and mail-in ballots as set forth in Section 3146.8(g) of the Code. (Stip. ¶ 17.) During the course of the Board's canvass meeting on November 7, 2020, and with Authorized Representatives present and given an opportunity to provide argument, the Board considered whether certain voter declarations on the outer envelope were "sufficient" to meet the requirements of Section 3146.8(g). (*Id.* ¶ 18.) The Board separated the ballots into 10 different categories, and accepted some of the categories for canvassing and rejected others. (*Id.* ¶ 19.) Of the categories accepted for canvassing, Appellant challenged six to common pleas. Those six categories were:

---

[3] This section was added by Section 11 of the Act of March 6, 1951, P.L. 3.

078

-   Category 1: 1,196 ballots whose outer envelopes did not contain a handwritten date or contained only a partial handwritten date.

-   Category 2: 644 ballots whose outer envelopes did not include a handwritten name or address.

-   Category 3: 86 ballots whose outer envelopes contained a partial written address.

-   Category 4: 246 ballots whose outer envelopes contained mismatched addresses.

-   Category 5: 69 ballots with "unsealed" secrecy envelopes.

-   Category 6: 7 ballots whose secrecy envelopes had markings that did not identify the elector's identity, political affiliation, or candidate preference.

(*Id.* ¶ 24.) During the hearing before common pleas, Appellant withdrew its challenges to Categories 4 and 6, (Hr'g Tr. at 114-15; common pleas' op. at 6; common pleas' November 23, 2020 Order Clarifying the Record.) Therefore, these challenges will not be discussed further.

The parties stipulated that "[w]hen received by [the Board,] each of the challenged ballots was inside a [secrecy] envelope, and the [secrecy] envelope was inside a sealed outer envelope with a voter's declaration that had been signed by the elector." (Stip. ¶ 45.) On the outer envelope "is a checklist for the voter, asking: "Did you . . . [p]ut your ballot inside the secrecy envelope and place it in here?" (*Id.* ¶ 10). With regard to Category 5 ballots, the parties stipulated that the Board "could not determine whether the [secrecy] envelopes were initially sealed by the elector but later became unsealed." (*Id.* ¶ 46.) The electors whose ballots are being challenged have not been notified. (*Id.* ¶ 47.) The stipulation clearly establishes that Appellant does not allege, and there is no evidence of, fraud, misconduct, impropriety, or undue influence. (*Id.* ¶¶ 27-30.) Further, Appellant does not allege,

3

and there is no evidence, that the Board counted ballots that did not contain signatures on the outer envelope or "'naked ballots,' (ballots that did not arrive in a secrecy envelope)." (*Id.* ¶¶ 31-32.) Last, Appellant does not allege, and there is no evidence, that the electors who cast these votes were ineligible to vote, that votes were cast by or on the behalf of a deceased elector, or that votes were cast by someone other than the elector. (*Id.* ¶¶ 33-35.)

In addition to these stipulated facts, common pleas held a hearing, at which Thomas Freitag, the Board's Director (Director), testified. (Hr'g Tr. at 63-64.) Director testified about the Board's process in reviewing the ballots in general, the challenged ballots, and the Board's determinations to accept or reject challenged ballots that were missing information on the outer envelopes. (*Id.* at 68-96.) Relevant specifically to Category 5 challenges, Director indicated that "the privacy of the ballots [were not] jeopardized in any manner[,]" there was no "view of the ballots" "to his knowledge," and that there was no "way to determine by the Board whether or not [the secrecy envelope] had been sealed at one point and became unsealed." (*Id.* at 97-98.) He testified that the Board provided the envelopes, including the secrecy envelopes, which were the type that had "to be either moistened by licking or water or glue," and agreed that people would have to rely on the type of envelopes provided by the Board as to the quality of the seal. (*Id.* at 98-99.) Director agreed that the Board discussed the possibility that voters may have concerns about licking the envelopes, given the pandemic, which appeared to be a factor in its decisions. (*Id.* at 99.) He further agreed that the "ballots that were enclosed within unsealed [secrecy] envelopes" were "enclosed within [the] outer envelope." (*Id.*) Director was subjected to limited cross-examination., but not on this issue. The parties then provided argument on the various challenges. Following

4

the hearing, common pleas issued an opinion and order rejecting the challenges and dismissing the appeal of the Board's decision. Appellant now appeals to this Court.[4]

As to Categories 1 through 3, which challenged the ballots on the basis of a deficiency on the outer envelopes, common pleas held that the information missing was not mandatory under the Election Code, but directory and, therefore, its absence would not invalidate those ballots. (Common pleas' op. at 14-19.) Appellant challenges these determinations before this Court. However, after the filing of the appeal, the Supreme Court of Pennsylvania rejected these same legal challenges in *In re: Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election* (Pa., Nos. 31-35 EAP 2020 and 29 WAP 2020, filed November 23, 2020) (*Philadelphia/Allegheny*), slip op. 19-32.[5] In doing so, the Supreme Court "conclude[d] that the . . . Code does not require boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, their address, and/or date, where no fraud or irregularity has been alleged." *Id.*, slip op. at 3. Appellant acknowledges this holding in its brief, but points out that, per a majority of the Supreme Court, dating the outer envelope is a mandatory requirement, but would be applied prospectively. (Appellant's Brief (Br.) at 27.)

---

[4] Common pleas' decision is reviewed on appeal "to determine whether the findings are supported by competent evidence and to correct any conclusions of law erroneously made." *In re Reading Sch. Bd. Election*, 634 A.2d 170, 171-72 (Pa. 1993). Issues involving the proper interpretation of the Code is a question of law, and the Court's standard of review is de novo and scope of review is plenary. *Banfield v. Cortes*, 110 A.3d 155, 166 (Pa. 2015.)

[5] DNC Services Corporation/Democratic National Committee, an appellee here, filed an application for extraordinary relief with the Supreme Court requesting the Supreme Court exercise its extraordinary jurisdiction powers over this appeal, but this application was denied by the Supreme Court by order dated November 24, 2020.

081

This Court is bound by the Supreme Court's decision,[6] and, applying that decision, there was no error in common pleas rejecting Appellant's challenges to Categories 1 through 3.[7]

The sole remaining issue before this Court is whether the ballots identified in Category 5, which are those ballots that were enclosed, but did not appear to be "sealed," in the secrecy envelope, must be invalidated under the Code. In rejecting Appellant's challenge to this category, common pleas explained that the ballots at issue were not "naked ballots," which would have been invalid pursuant to the Supreme Court's decision in *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 378-80 (Pa. 2020). Common pleas held that "[t]here is no factual evidence that supports a conclusion that the envelopes had not been sealed by the elector prior to" the time of canvassing. (Common pleas op. at 20.) Instead, common pleas pointed to the parties' stipulation that "[w]ith respect to Category 5 . . . [the Board] could not determine whether the [secrecy] envelopes were initially sealed by the elector but later became unsealed." (*Id.* (quoting Stip. ¶ 46).) Accordingly, common pleas found "there [was] no evidence that the electors failed to 'securely seal [the ballot] in the [secrecy] envelope,' as required by the . . . Code." (*Id.* (first and third alteration added).) It explained that "[t]he elector was provided the envelope by the government" and "[i]f the glue on the envelope failed[,] that would be the responsibility of the government." (*Id.*) Therefore, common pleas held "[t]here

---

[6] Notably, the Supreme Court referenced common pleas' decision in this matter and held that common pleas "appropriately applied th[e Supreme] Court's precedent" in affirming the counting of these ballots. *Philadelphia/Allegheny*, slip op. at 32-33 n.6.

[7] To the extent Appellant seeks to "incorporate" Equal Protection arguments into this case that were raised in other cases, Appellant did not raise such claims before common pleas and, therefore, the Court will not consider them. Pennsylvania Rule of Appellate Procedure 302(a), Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

082

[was] insufficient evidence to determine whether the specific language of the mandated law was violated" and "it would be an injustice to disenfranchise these voters when it cannot be shown that the ballots in question were not 'securely sealed' in the [secrecy] envelope prior to the canvassing of those ballots," particularly where "there ha[d] been no suggestion or evidence that the absence of a sealed inner envelope in anyway jeopardized the privacy of the ballot." (*Id.*)

Appellant, citing *Boockvar*, argues that the requirements of Sections 3146.6(a) and 3150.16(a) are mandatory, not directory. According to Appellant, the Supreme Court has recognized that these requirements of the Code "are necessary for the preservation of secrecy and the sanctity of the ballot and must therefore be observed -- particularly where . . . they are designed to reduce fraud." *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d 1223, 1234 (Pa. 2004) (*Appeal of Pierce*). Therefore, Appellant argues, "absentee or mail-in ballots cast in contravention of the requirements of [Section 3146.6(a) and 3150.16(a) of the Code] are 'void' and cannot be counted." (Appellant's Br. at 23 (quoting *Appeal of Pierce*, 843 A.2d at 1234).)

The Board, as an appellee, argues that the deficiencies set forth in Category 5 are minor technical deficiencies related to the sealing of the secrecy envelopes and should be treated like other minor mistakes that do not require that the ballots be stricken. The Board maintains that there is no evidence that these 69 electors did not comply with the statutory language or that the secrecy of the ballots was in any way compromised. *Boockvar*, the Board asserts, requires that the ballots must be **enclosed** in the secrecy envelopes or the ballots should be disqualified. 238 A.3d at 380. Here, there is no dispute that the ballots were fully enclosed in the secrecy envelopes, consistent with the holding in *Boockvar*, and, as a factual matter, there

083

could be no determination as to whether the secrecy envelopes were sealed by the electors and later became unsealed.  Given that the Court cannot tell whether the electors made errors in casting their ballots, and the lack of any allegation of fraud, the Board argues there is no compelling reason to disenfranchise these electors. *Appeal of James*, 105 A.2d 64, 66 (Pa. 1954).

Appellee DNC Services Corporation/Democratic National Committee (DNC) asserts there is no statutory requirement that the voter must seal the secrecy envelope in order for the ballot to be counted.  Further, it asserts that the word "seal" is not a term of art and is not defined by the Code, is ambiguous and, per a dictionary definition, commonly means "to close" or "to make secure," and there is no allegation that the secrecy envelopes were not closed or the ballots were not secure in the envelopes.  (DNC's Br. at 16-17.)  DNC argues that noncompliance with this requirement does not justify disenfranchisement because, unlike with "naked ballots," the identity of the electors was protected, which is consistent with the statutory purpose.[8]

Relevant here are Sections 3146.6(a), 3150.16(a), and 3146.8(g)(4)(ii) and (iii) of the Code.  Section 3146.6(a) states, in pertinent part:

> at any time after receiving an official absentee ballot, but on or before eight o'clock P.M. the day of the primary or election, **the elector shall**, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, **enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot**.  This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election

---

[8] DNC argues this Court does not have jurisdiction to consider this matter; however, our Supreme Court's order denying DNC's request for that Court to exercise its powers of extraordinary jurisdiction confirms this Court's jurisdiction.

084

district of the elector.  The elector shall then fill out, date and sign the
declaration printed on such envelope.  Such envelope shall then be
securely sealed and the elector shall send same by mail, postage
prepaid, except where franked, or deliver it in person to said county
board of election.

25 P.S. § 3146.6(a) (emphasis added).  Section 3150.16(a) contains the nearly
identical statement that "**the mail-in elector shall**, in secret, proceed to mark the
ballot . . . and then fold the ballot, **enclose and securely seal the same in the
envelope** on which is printed, stamped or endorsed 'Official Election Ballot'" and
"[t]his envelope shall then be placed in the second one, on which is printed the form
of declaration of the elector, and the address of the elector's county board of election
and the local election district of the elector " 25 P.S. § 3150.16(a) (emphasis added).

Section 3146.8(g)(4)(ii) and (iii), governing "Canvassing of official absentee
ballots and mail-in ballots," specifies that

(4) All absentee ballots which have not been challenged under section
1302.2(c) and all mail-in ballots which have not been challenged under
section 1302.2-D(a)(2) and that have been verified under paragraph (3) shall
be counted and included with the returns of the applicable election district as
follows:
. . . .
(ii) If any of the envelopes on which are printed, stamped or endorsed
the words "Official Election Ballot" contain any text, mark or symbol which
reveals the identity of the elector, the elector's political affiliation or the
elector's candidate preference, the envelopes and the ballots contained therein
shall be set aside and declared void.

(iii) **The county board shall then break the seals of such envelopes,
remove the ballots and count, compute and tally the votes**.

25 P.S. § 3146.8(g)(4)(ii), (iii) (emphasis added).

9

The parties present three legal interpretive approaches to whether these 69 ballots were properly accepted by the Board when they were enclosed, but not sealed, in the secrecy envelope at the time of canvassing. Appellant argues this requirement is mandatory and allows for **no** exception. The Board and DNC argue that this requirement is directory and noncompliance with that requirement is a minor defect that should be excused. The Board alternatively argues, in accordance with common pleas' reasoning, that as a factual matter, a violation of this requirement by the electors has not been established, and, in the absence of compelling reasons, such as allegations of fraud or infringement on the electors' secrecy, the electors should not be disenfranchised.

"[T]he polestar of statutory construction is to determine the intent of the General Assembly." *Appeal of Pierce*, 843 A.2d at 1230. Generally, "the best indication of the legislative intent is the plain language of a statute." *Id.* (citation omitted). In construing that language, "[w]ords and phrases shall be construed according to the rules of grammar and according to their common and approved usage . . . ." *Id.* (citation omitted). The Court is mindful that, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* (citation omitted). It is only when the words of the statute "are not explicit" that the Court may then "resort to other considerations, such as the statute's perceived 'purpose,' in order to ascertain legislative intent." *Id.* (citation omitted). The Court is likewise mindful that, as our Supreme Court has explained, "all things being equal, the [Code] will be construed liberally in favor of the right to vote but, at the same time, we cannot ignore the clear mandates of the . . . Code." *Id.* at 1231.

086

The operative provisions at issue here involve the statutory direction that "the elector shall . . . fold the ballot, **enclose and securely seal** the same in the envelope on which is printed, stamped or endorsed 'Official Election Ballot.'" 25 P.S. §§ 3146.6(a), 3150.16(a) (emphasis added). At canvassing, "[t]he county board shall then **break the seals** of such envelopes, remove the ballots and count . . . ." 25 P.S. § 3146.8(g)(4)(iii) (emphasis added).

The provisions that are at issue here are contained within sections that our Supreme Court has found to contain both mandatory and directory provisions. However, particularly applicable here, the Supreme Court in *Boockvar* held that "the secrecy provision language in Section 3150.16(a) is **mandatory** and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid." *Boockvar*, 238 A.3d at 380 (emphasis added). In *Boockvar*, our Supreme Court considered whether county boards of election should be required to "clothe and count naked ballots," that is, place ballots that were returned to the county board without the secrecy envelopes into an envelope and count them. 238 A.3d at 374. As here, the Supreme Court was presented with conflicting assertions that this requirement was directory or mandatory. After examining the statutory text, the Court concluded that the legislative intent was for the "**secrecy envelope provision**" to be mandatory, citing article VII, section 4 of the Pennsylvania Constitution, providing that "secrecy in voting shall be preserved," PA. CONST. art. VII, § 4, and Section 3146.8(g)(4)(ii). The Supreme Court explained that the two statutory provisions, dealing with the same subject, "must be read *in pari materia*." *Boockvar*, 238 A.3d at 378. Based on that statutory language, the Supreme Court held that it was clear that the legislature intended "that, during the collection and canvassing processes, when the outer envelope in which the ballot

11

arrived is unsealed and **the sealed ballot** removed, it should not be readily apparent who the elector is, with what party [the elector] affiliates, or for whom the elector has voted." *Id.* (emphasis added). Per the Court, "[t]he secrecy envelope properly unmarked **and sealed** ensures that result, unless it is marked with identifying information, in which case that goal is compromised" and that "[t]he omission of a secrecy envelope defeats this intention." *Id.* at 378, 380 (emphasis added). The Supreme Court in *Boockvar* found the matter analogous to the issue in *Appeal of Pierce*, where there was a challenge to absentee ballots that were delivered to the county board of election by third persons in violation of the Code's "in-person" delivery requirement. *Id.* at 379. In *Appeal of Pierce*, the Supreme Court held that the "so-called technicalities of the . . . Code," such as the requirement that an elector personally deliver the elector's absentee ballot, "are necessary for the preservation of secrecy and the sanctity of the ballot and must therefore be observed – particularly where, as here, they are designed to reduce fraud." 843 A.2d at 1234. Therefore, the Court in that case, found that the in-person delivery requirement was mandatory and the absentee ballots delivered in contravention of this mandatory provision were void. *Id.*

The Court recognizes that the unsealed envelopes here could be viewed as a less substantial noncompliance than an elector's failure to use the secrecy envelope, as the ballots here were actually enclosed in the secrecy envelope and then in the sealed outer envelope. However, the language relating to securely sealing the secrecy envelope is encompassed within the provision directing the use of the secrecy envelope, which the Supreme Court found mandatory in *Boockvar*. That the legislature intended the secrecy envelopes to remain sealed until the ballots are counted is further evidenced by the directive in Section 3146.8(g)(4)(iii) that "[t]he

088

county board **shall then break the seals of such envelopes**, remove the ballots and **count** . . . ." 25 P.S. § 3146.8(g)(4)(iii) (emphasis added). Such language, when read *in pari materia* with Sections 3146.6(a) and 3150.16(a), reflects that the legislature intended the secure sealing of the secrecy envelope to be mandatory. *Boockvar*, 238 A.3d at 378. Accordingly, Appellant's argument that this directive is mandatory such that an elector's noncompliance results in a ballot that is not valid is supported by the statutory language and *Boockvar*.

The parties stipulated that these challenged ballots were "unsealed" in the secrecy envelopes when canvassing of the ballots was to begin. The text of the Code unambiguously states that the elector "shall . . . enclose and securely seal the [ballot] in the envelope . . . ," 25 P.S. §§ 3146.6(a), 3150.16(a), and that, at canvassing, "[t]he county board shall then break the seals of such envelopes, remove the ballots and count," 25 P.S. § 3146.8(g)(4)(iii). The legislature did not merely require the envelope to be sealed, but specified that it be **"securely"** sealed. 25 P.S. §§ 3146.6(a), 3150.16(a) (emphasis added). The Code unambiguously requires the envelopes remain sealed until the county board of elections can "break the seals" of the secrecy envelopes. 25 P.S. § 3146.8(g)(4)(iii). When the text of the statute is clear and unambiguous, those words best reflect the legislative intent, and "the letter of [the unambiguous language] is not to be disregarded under the pretext of pursuing its spirit." *Appeal of Pierce*, 843 A.2d at 1230 (citation omitted).

Justice Wecht recently in *Philadelphia/Allegheny* highlighted that there are times a Court should give prospective application to a ruling under the Code. Slip op. at 17-18 (Wecht, J., concurring). Citing *In Appeal of Zentner*, 626 A.2d 146 (Pa.1993), as precedent, Justice Wecht concurred in the decision of the Court to count the ballots that were undated, and would prospectively apply a more strict

13

interpretation of the statute favored by three other justices. As did Justice Wecht, this Court recognizes the tremendous challenges presented by the massive expansion of mail-in voting, and the lack of precedential rulings on the requirement of a "securely sealed" secrecy envelope. Moreover, the parties stipulated in this case reveals that the instructions on the outer envelope for the elector stated only that the ballot should be placed in the secrecy envelope and did not specify that the envelope needed to be securely sealed or the consequences of failing to strictly adhere to that requirement. *See Philadelphia/Allegheny*, slip op. at 20 (Wecht, J., concurring). Moreover, in this case, it cannot be established that the electors did not seal the secrecy envelope. Importantly, the Court must point out that there are absolutely **no allegations** of any fraud, impropriety, misconduct, or undue influence, that anyone voted who was not eligible to vote, or that the secrecy of the ballots cast was jeopardized. For these reasons, the decision of the Court will be applied prospectively, and the 69 ballots will not be invalidated.

Accordingly, common pleas' Order is affirmed.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Canvass of Absentee  :
and/or Mail-in Ballots of   :
November 3, 2020 General Election :
           :
     v.     :  No. 1191 C.D. 2020
           :
Appeal of:  Donald J. Trump for :
President, Inc.       :

## O R D E R

  **NOW**, November 25, 2020, the Order of the Court of Common Pleas of Bucks

County, entered in the above-captioned matter, is **AFFIRMED** in accordance with

the foregoing opinion.

            _____

            **RENÉE COHN JUBELIRER,** Judge

# Unreported Opinion 6

*Ziccarelli v. Allegheny County Board of Elections*, No. GD 20-011654 (Ct. Com. Pl. Allegheny Cty. Nov. 18, 2020)

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CIVIL DIVISION

NICOLE ZICCARELLI,

      Petitioner,

v.

ALLEGHENY COUNTY BOARD OF
ELECTIONS,

      Respondent,

and

PENNSYLVANIA DEMOCRATIC PARTY
AND JAMES BREWSTER,

      Intervenors.

No.  GD 20-011654

MEMORANDUM AND ORDER OF COURT

Honorable Joseph M. James

Copies Sent To:

Matthew H. Haverstick, Esquire
Andrew F. Szefi, Esquire
Allan J. Opsitnick, Esquire
Michael J. Healey, Esquire

2020 NOV 18  PM 12: 25

DEPT. OF
CIVIL DIVISION
ALLEGHENY COUNTY PA

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CIVIL DIVISION

| | |
|---|---|
| NICOLE ZICCARELLI,<br><br>    Petitioner,<br><br>v.<br><br>ALLEGHENY COUNTY BOARD OF<br>ELECTIONS,<br><br>    Respondent,<br><br>and<br><br>PENNSYLVANIA DEMOCRATIC<br>PARTY AND JAMES BREWSTER,<br><br>    Intervenors. | No.   GD 20-011654 |

## MEMORANDUM AND ORDER OF COURT

James, J.                                                   November 18, 2020

Petitioner Nicole Ziccarelli, candidate for the Senate of Pennsylvania from the 45th

Senatorial District, filed a Petition for Review of Decision by the Respondent Allegheny

County Board of Elections ("the Board") on November 12, 2020, seeking to invalidate

2,349 mail-in ballots cast by voters in the November 3, 2020 General Election. Petitioner seeks review of the Board's decision to overrule Petitioner's objection to count these ballots. Petitioner alleges that these ballots were cast in violation of the Election Code because they do not contain a date penned by the elector on the outer envelope. The Court conducted a hearing on November 17, 2020 via Microsoft Teams. The Pennsylvania Democratic Party and James Brewster moved to intervene in the action. Petitioner and the Board did not object and the motion was granted by the Court. Petitioner stated that she was not claiming any voter fraud regarding the challenged ballots. The Board argues that the failure to place a date on the outer envelope does not invalidate a ballot.

Section 3150.16(a) of the Election Code states:

> (a) General rule--At any time after receiving an official mail-in ballot, but on or before eight o'clock p.m. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "official election ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

The Election Code Section 3146.8(g)(3) vests the Board with the duty of determining the sufficiency of the declaration of a mail-in ballot. If the Board determines that the declaration is sufficient, then the Board "shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed." Id. Any ballots cast by electors whose applications have been challenged are set aside

unopened, but all other ballots that have been verified under subsection (g)(3) shall be counted. 25 P.S. Section 3146.8(g)(4).

The Court agrees with the Board that the Section 3150.16(a) date provision is directory not mandatory. Specifically, the use of the word "shall" does not make a statutory phrase mandatory. It is well settled Pennsylvania law that election laws should be construed liberally in favor of voters, and that "[t]echnicalities should not be used to make the right of the voter insecure." Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345, 373 (Pa. 2020) citing Appeal of James, 105 A.2d 64, 65-66 (Pa. 1954). "Ballots containing mere minor irregularities should only be stricken for compelling reasons." Shambach v. Bickhart, 845 A.2d 793, 798 (Pa. 2004).

The ballots at issue here are sufficient even without a voter supplied date. They were processed in the Statewide Uniform Registry of Electors ("SURE") system and timestamped when they were timely delivered to the Board on or before November 3, 2020. They were signed and have been otherwise properly completed by a qualified elector. In light of the fact that there is no fraud, a technical omission on an envelope should not render a ballot invalid. The lack of a written date on an otherwise qualified ballot is a minor technical defect that does not render it deficient. The Court finds that the Board properly overruled Petitioner's objections to the 2,349 challenged mail-in ballots. These ballots must be counted. The Petition for Review is denied and the Board's decision is affirmed.

*Joseph M. James*

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CIVIL DIVISION

NICOLE ZICCARELLI,

    Petitioner,

v.

ALLEGHENY COUNTY BOARD OF
ELECTIONS,

    Respondent,

and

PENNSYLVANIA DEMOCRATIC
PARTY AND JAMES BREWSTER,

    Intervenors.

No.   GD 20-011654

## ORDER OF COURT

And NOW, this 18th day of November 2020, upon consideration of the Petition For
Review In the Nature Of A Statutory Appeal filed by Nicole Ziccarelli, and any responses
thereto, it is hereby ORDERED that the Petitioner's appeal is dismissed and the decision
of the Board of Elections is affirmed.

BY THE COURT:

*Joseph M. James*